2015-1402, -1435                NON-CONFIDENTIAL

In The
# United States Court of Appeals for the Federal Circuit

SINCE HARDWARE (GUANGZHOU) CO. LTD., FOSHAN SHUNDE
YONGJIAN HOUSEWARE AND HARDWARE CO., LTD,

Plaintiffs-Appellants,

v.

HOME PRODUCTS INTERNATIONAL, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
Nos. 1:11-cv-00108-LMG, 1:11-cv-00118-LMG, 1:11-cv-00106-LMG,
Judge Leo M. Gordon.

## NON-CONFIDENTIAL JOINT APPENDIX
## VOLUME I – PAGES JA0001-JA0946

William Perry                      Gregory S. Menegaz
Emily Lawson                       J. Kevin Horgan
**Dorsey & Whitney, LLP**          **DeKieffer & Horgan, PLLC**
701 Fifth Avenue                   1455 Pennsylvania Avenue, NW
Seattle, Washington 98104          Suite 900-B
(206) 903-8894                     Washington, DC 20005
                                   (202) 783-6900

*Counsel for Plaintiff-Appellant*   *Counsel for Plaintiff-Appellant*
*Since Hardware*                     *Foshan Shunde*

October 19, 2015

## NON-CONFIDENTIAL JOINT APPENDIX

## CAFC 15-1402-1435

| Date | Document | Appendix starting page | Designation |
|---|---|---|---|
| 2012-08-14 | CIT Order First Remand | JA0001 | PUBLIC |
| 2013-05-30 | Since Hardware II | JA0014 | PUBLIC |
| 2014-04-15 | Since Hardware III | JA0028 | PUBLIC |
| 2014-12-30 | Since Hardware IV | JA0039 | PUBLIC |
| 2014-12-30 | Since Hardware Final Judgment | JA0047 | PUBLIC |
| 2015-05-21 | CIT Docket Report | JA0049 | PUBLIC |
| 2009-10-29 | Section A Response of Since Hardware | JA0073 | CONFIDENTIAL INFORMATION DELETED |
| 2009-11-13 | Section A Response of Foshan Shunde | JA0282 | CONFIDENTIAL INFORMATION DELETED |
| 2009-11-20 | Sections C and D Response of Foshan Shunde | JA0399 | CONFIDENTIAL INFORMATION DELETED |
| 2010-07-13 | Surrogate Country List | JA0526 | PUBLIC |
| 2010-07-15 | Foshan Shunde Revised FOP Databases | JA0536 | CONFIDENTIAL INFORMATION DELETED |
| 2010-08-24 | Foshan Shunde Surrogate Values for the Preliminary Results | JA0575 | PUBLIC |
| 2010-08-24 | HPI Info Concerning Valuation Factors of Production | JA0760 | PUBLIC |
| 2010-08-24 | Since Hardware Submission of Surrogate Values | JA0803 | PUBLIC |
| 2010-09-07 | Preliminary Results of Administrative Review | JA0901 | PUBLIC |
| 2010-09-07 | Factors of Production Memo | JA0922 | PUBLIC |

1

| | | | |
|---|---|---|---|
| 2010-10-18 | Foshan Shunde Surrogate Values for Final Results | JA0956 | PUBLIC |
| 2010-10-18 | Foshan Shunde SV Researcher Statement | JA1431 | CONFIDENTIAL INFORMATION DELETED |
| 2010-10-21 | Since Hardware Surrogate Values | JA1438 | PUBLIC |
| 2010-10-22 | Industry-Specific Wage Rate Selection | JA1466 | PUBLIC |
| 2010-11-15 | Foshan Shunde Case Brief | JA1489 | PUBLIC |
| 2011-03-22 | Issues and Decisions Memo for Final Results | JA1718 | PUBLIC |
| 2011-04-20 | Foshan Shunde Analysis Memo for Amended Final Results | JA1747 | CONFIDENTIAL INFORMATION DELETED |
| 2011-07-12 | Scheduling Order | JA1905 | PUBLIC |
| 2011-09-08 | Foshan Shunde 56.2 Brief | JA1913 | PUBLIC |
| 2011-09-08 | Since Hardware 56.2 Brief | JA2054 | CONFIDENTIAL INFORMATION DELETED |
| 2011-09-08 | Foshan Shunde Reply Brief | JA2078 | PUBLIC |
| 2012-01-11 | Since Hardware Reply Brief | JA2098 | PUBLIC |
| 2012-01-30 | Since Hardware Motion | JA2117 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix | JA2120 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 9, Federal Register Notice of Preliminary Results of Administrative Review (09/14/2010) | JA2469 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 15, Industry-Specific Wage Rate Selection Memo (10/22/2010) | JA2771 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 17, Excerpts of HPI Surrogate Value Rebuttal (10/28/2010) | JA2469 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 21, HPI Rebuttal Brief (11/22/2010) | JA2958 | PUBLIC |

| 2012-02-01 | CIT Joint Appendix, Tab 26, Federal Register Notice of Final Results of Administrative Review (03/21/2011) | JA3098 | PUBLIC |
|---|---|---|---|
| 2012-02-01 | CIT Joint Appendix, Tab 27, Issues and Decision Memorandum (03/22/2011) | JA3102 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 30, Department Memo Re: Allegation of Ministerial Errors (02/20/2011) | JA3143 | PUBLIC |
| 2012-02-01 | CIT Joint Appendix, Tab 31, Federal Register Notice of Amended Final Results (04/27/2011) | JA3149 | PUBLIC |
| 2012-05-24 | Order Denying Motion for Oral Argument | JA3153 | PUBLIC |
| 2012-12-07 | Foshan Shunde Comments re. Remand Redetermination | JA3155 | PUBLIC |
| 2012-12-17 | Final Results of Redetermination | JA3176 | PUBLIC |
| 2013-01-25 | Foshan Shunde Comments on Remand Redetermination | JA3223 | PUBLIC |
| 2013-07-24 | Foshan Shunde Comment re. Remand Determination II | JA3309 | PUBLIC |
| 2013-08-14 | Final Results of Second Redetermination | JA3344 | PUBLIC |
| 2014-07-08 | Final Results of Third Redetermination | JA3381 | PUBLIC |
| 2014-07-24 | Since Objection to Third Remand Results | JA3416 | CONFIDENTIAL INFORMATION DELETED |
| 2011-04-28 | Since Hardware Complaint | JA3441 | PUBLIC |
| 2011-04-29 | Foshan Shunde Complaint | JA3446 | PUBLIC |
| 2011-05-11 | HPI Complaint | JA3456 | PUBLIC |
| 2012-11-29 | Commerce Foshan Shunde Analysis Memorandum | JA3461 | PUBLIC |
| 2012-11-29 | Commerce Labor Calculation for Since Hardware | JA3479 | PUBLIC |

| 2013-01-15 | HPI Motion to Sever and Dismiss | JA3504 | PUBLIC |
|---|---|---|---|
| 2013-02-19 | Since Hardware Response in Opposition to Motion of HPI | JA3528 | PUBLIC |
| 2013-03-05 | Court Order Denying HPI Motion to Dismiss | JA3557 | PUBLIC |
| 2014-03-19 | HPI Surreply | JA3558 | PUBLIC |
| 2014-03-28 | U.S. Surreply | JA3581 | PUBLIC |
| 2014-05-15 | HPI Motion for Rehearing | JA3606 | PUBLIC |
| 2014-07-14 | HPI Reply to Responses to its Motion for Rehearing | JA3678 | PUBLIC |
| 2013-01-18 | Steel Grating Remand Results | JA3694 | PUBLIC |
| 2013-02-22 | United States Response to Remand Comments | JA3731 | PUBLIC |
| 2010-11-22 | HPI Rebuttal Brief | JA3899 | PUBLIC |
| 2013-01-25 | Since Hardware Objection to Remand Redetermination | JA4046 | PUBLIC |
| 2013-09-30 | Since Hardware Objection to Remand Redetermination II | JA4151 | PUBLIC |
| 2010-08-17 | Foshan Shunde Verification Report and Exhibits | JA4189 | CONFIDENTIAL INFORMATION DELETED |
| 2013-09-30 | Foshan Shunde Comment re. Remand Determination II | JA5218 | PUBLIC |

## OMMISSION OF CONFIDENTIAL INFORMATION

The document information removed as indicated in the table of documents above contains business proprietary information released by the U.S. Department of Commerce to parties under administrative protective order ("APO"). The APO provides that such information cannot be shared with any party not approved under the APO.

10/16/2015   web.ita.doc.gov/ia/webapotrack.nsf/26f3835426434a4b852569df00718b6f/5685cb94cbd7b399852576390061b6f0?OpenDocument

Case: 15-1402     Document: 63-1     Page: 7     Filed: 10/19/2015

A-570-888
Administrative Review
8/1/08-7/31/09
Public Document
APO: Lohre Holter

In the Matter of the Administrative Review of the
Antidumping Duty Order on Floor-Standing,
Metal-Top Ironing Tables And Parts Thereof from
the People's Republic Of China (A-570-888)
(8/1/08-7/31/09)

## ADMINISTRATIVE PROTECTIVE ORDER

IT IS HEREBY ORDERED THAT:

All business proprietary information submitted in the above-referenced
segment of the proceeding, including new information submitted in a
remand during litigation on this segment of the proceeding, which the
submitting party agrees to release or the Department of Commerce ("the
Department") determines to release, will be released to the authorized
applicants on the administrative protective order ("APO") service list for
this segment of the proceeding, except the following:

• customer names in an investigation; and

• specific information of a type for which the Department determines there is
a clear and compelling need to withhold from disclosure.

## <u>USE OF BUSINESS PROPRIETARY INFORMATION UNDER THIS APO</u>

An authorized applicant may use business proprietary information submitted
in this segment of the proceeding in this segment. If business proprietary

10/16/2015    web.ita.doc.gov/ia/webapotrack.nsf/26f3835426434a4b852569df00718b6f/5685cb94cbd7b399852576390061b6f0?OpenDocument

Case 15-1402    Document: 63-1    Page: 8    Filed: 10/19/2015

information that is submitted in this segment of the proceeding is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews. If business proprietary information submitted in this segment of the proceeding is relevant to an issue in other segments of this proceeding (such as scope, anticircumvention, changed circumstances) that are initiated before publication of the final results in the second consecutive subsequent administrative review, an authorized applicant may place such information on the record of those
segments. At the conclusion of the second consecutive subsequent administrative review or at such earlier date as the Department may determine to be appropriate, the authorized applicant must certify to the destruction of business proprietary information within 30 days in accordance with item 6 of this APO. The existence of a judicial protective order in a subsequent administrative review does not extend the deadline for destruction of business proprietary information subject to this APO.

## REQUIREMENTS FOR AUTHORIZED APPLICANTS

All applicants authorized to have access to business proprietary information under this APO are subject to the following terms:

1. The authorized applicant must establish and follow procedures to ensure that no employee of the authorized applicant's firm releases business proprietary information to any person other than the submitting party, an authorized applicant, or the appropriate Department official identified in section 351.306(a) of the regulations. No person in the authorized applicant's firm may release business proprietary information received under this APO to any person other than those described in this paragraph.

2. The authorized applicant may allow APO access to one or more paralegals, law clerks, secretaries, or other support staff employed by or on behalf of the applicant's firm and operating within the confines of the firm. The authorized applicant also may use the services of subcontracted individuals to transport business proprietary information released by the Department and to deliver APO information to other parties. All support staff must sign and date an acknowledgment that they will abide by the terms and conditions of the APO at the time they are first permitted access to any information subject to APO.

3. The authorized applicant must ensure that business proprietary information in an electronic format will not be accessible to parties not authorized to receive business proprietary information.

Case: 15-1402    Document: 63-1    Page: 5    Filed: 10/19/2015

A-570-888

4. The authorized applicant must pay all reasonable costs incurred by the submitter of the electronic business proprietary information for the copying of its electronic information released to the authorized applicant, if payment is requested. Reasonable costs include the cost of the electronic medium and the cost of copying the complete proprietary version of the electronic information/medium submitted to the Department in APO releasable form, but not costs borne by the submitter of the electronic data in the creation of the electronic data/medium submitted to the Department.

## NOTIFICATION REQUIREMENTS

5. If changed circumstances affect the authorized applicant's representation of an interested party at any time authorized under this APO (i.e., reassignment, departure from firm), the authorized applicant must notify the Department in accordance with section 351.305(a)(2) of the regulations.

6. At the expiration of the time specified in this APO, the authorized applicant must destroy all business proprietary information and notify the Department of the destruction in accordance with section 351.305(a)(3) of the regulations, or provide to the Department official responsible for the administration of the APO in this segment of the proceeding a protective order issued by a court or in a binational panel proceeding.

## SANCTIONS FOR BREACH OF THIS APO

7. The authorized applicant will be subject to any or all of the sanctions described in 19 C.F.R. Part 354 if there is a violation of this APO by the authorized applicant or any of the persons identified in item 8 of this APO.

8. The authorized applicant will accept full responsibility, individually and on behalf of the authorized applicant's firm or corporate office, for violation of this APO by any employee of the firm or corporate office, support staff retained by the firm or corporate office, or any other consultant, expert, or other outside staff retained for the subject proceeding, who is permitted access to APO information.

9. The authorized applicant will promptly report and confirm in writing any possible violation of this APO to the Department.

A-570-888

# DEFINITIONS

For purposes of this APO , the following definitions apply:

**"Representative"** is an individual, enterprise, or entity acting on behalf of an interested party.

**"Applicant"** is an individual representative of an interested party who has applied for access to business proprietary information under this APO.

**"Authorized Applicant"** is an applicant that the Secretary has authorized to receive business proprietary information under this APO.

**"Lead firm"** is the firm that will be the primary contact with the Department and that will accept service of all documents for the party it represents where two firms independently have access under APO.

**"Support staff"** includes paralegals, law clerks, secretaries and other support staff that are employed by or on behalf of the applicant's firm, are operating within the premises of the firm, and work under the supervision of an authorized applicant, as well as subcontractors of the firm providing similar support staff functions.

**"Electronic data"** includes (1) data submitted by a party, generated by the Department, or entered by the recipient on computer tape, disk, diskette, or any other electronic computer medium; and (2) all electronic work products resulting from manipulation of this data, as transferred in any form onto any other electronic computer medium, such as tape, disk, diskette, Bernoulli cartridge, removable disk pack, etc.


*original on file*
_____

Ann M. Sebastian
Director, APO Unit
Import Administration


09/22/2009
_____

(date)


A-570-888

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------------X
                                        :
                                        :    ADMINISTRATIVE ORDER
In re ELECTRONIC FILING PROCEDURES      :
AND SUBMISSION OF CONFIDENTIAL          :    No. 02-01
INFORMATION                             :
                                        :
-------------------------------------------------------------X
```

WHEREAS, Rules 1, 5, 79 and 80 of the Rules of the U.S. Court of International Trade and 28 U.S.C. §§ 251, 258, 451, 452, 1651, 2632 and 2633 authorize the Court to enter all appropriate orders respecting practices and procedures for filing, signing, verifying and providing access to the public to Court documents; and

WHEREAS, this Administrative Order is intended to be applied and interpreted in connection with the Public Access to Court Electronic Records (PACER) System, the Court's Case Management/Electronic Case Files (CM/ECF) System and the Case Management/Electronic Case Files (CM/ECF) User's Manual for Electronically Filing Case Events (the "CM/ECF User's Manual") which, together with this Administrative Order, shall be termed the "Electronic Filing Procedures" or "EFPs"; and

WHEREAS, the Court has formulated the EFPs with the assistance of the Court's Advisory Committee, and has solicited and considered public comment on the proposed procedures; and

WHEREAS, consistent with the EFPs, the Court has established a World Wide Website at **www.cit.uscourts.gov** ("USCIT Website") with the technological capacity to provide access to all contents of that Website, including links to all electronically-filed

documents via the PACER System, and to permit direct electronic filing of documents on the Court's CM/ECF System; and

WHEREAS, the EFPs provide adequate procedures for the safeguarding of documents that contain Confidential Information (including Business Proprietary Information) and access to and use of such documents in conjunction with Rule 73.2(c); and

WHEREAS, the EFPs make adequate provision for filing, notice and service of documents and proceedings in actions before the Court, consistent with the requirements of the Rules of the Court; and

WHEREAS, the EFPs provide a means for counsel of record and unrepresented parties to sign documents electronically; and

WHEREAS, the EFPs require the Clerk's Office to provide adequate procedures for electronic filing of documents on behalf of persons who are not able to access the Court's CM/ECF System;

NOW, THEREFORE, IT IS ORDERED as follows:

1.    <u>Actions Subject to the EFPs</u>.

(a)    All actions commenced in accordance with Rule 3(a) of the Rules of the Court shall be subject to the EFPs of the Court, unless the Court has ordered that the action not be subject to the EFPs pursuant to section (b) of this paragraph.

(b)    Upon motion of any party for good cause shown, or upon its own initiative, the Court may terminate or modify application of the EFPs in any action.

(c)    A party who is not represented by an attorney and who is permitted by the Rules of the Court to appear without an attorney must file all documents in paper form,

unless such party is permitted to become a Registered CM/ECF Filer pursuant to paragraph 3(b).

2.    <u>Access to Confidential Information</u>.

Unless amended by a subsequent order of the Court, this Administrative Order governs access to all Confidential Information filed in any action, including access to Business Proprietary Information (as defined in 19 U.S.C. § 1677f(b)) pursuant to Rule 73.2(c) in an action commenced under 28 U.S.C. § 1581(c). For all actions filed under 28 U.S.C. § 1581(c), the terms of this Order covering access to Confidential Information will take effect with regard to a non-government attorney or consultant upon the filing of a Business Proprietary Certification, substantially in the form set forth in Form 17 of the Appendix of Forms; for government attorneys, the terms regarding access will take effect upon the filing of an entry of appearance.  In all other cases, access to Confidential Information will take effect upon the entry of a judicial protective order.

3.    <u>Registration, Assignment of Passwords, Notification Requirement of Changes in Information, Authorization for Filing Using User ID and Password of Registered CM/ECF User or Confidential Information Filer</u> .

(a)    (i) <u>Types of Registration</u>:  Anyone  may register to become a "Registered PACER User" on the PACER System.  A Registered PACER User will have access to all public documents maintained in the Court's CM/ECF System.  In addition to becoming a Registered PACER User with access to the public documents, any attorney admitted to practice before the Court may register to become a "Registered CM/ECF Filer" on the Court's CM/ECF System in order to file public documents on that System.  Alternatively, such attorney may register as a "Confidential Information Filer," which will allow the

attorney to file and access not only public information, but also Confidential Information using the CM/ECF System pursuant to the Court's Rules and this Order.

(ii) <u>Registration Process</u>: PACER registration will be accomplished through the PACER website, **www.pacer.gov**. Registered CM/ECF Filer and Confidential Information Filer registration will be accomplished with a non-electronic CM/ECF Registration Form prescribed by the Clerk. This form will require, as appropriate, identification of the registrant's name, employer (if applicable), address, telephone number, Internet e-mail address(es) (e-mail address(es) of record), an identification of the CM/ECF access level being requested, together with a declaration that the attorney, if applicable, is a member in good standing of the Bar of the Court. CM/ECF Registration Forms must be mailed or delivered to the Office of the Clerk of the Court, United States Court of International Trade, One Federal Plaza, New York, New York 10278-0001.

(b)    The Court may permit a party to a pending action who is not represented by an attorney and who is permitted by the Rules of the Court to appear without an attorney to become a Registered CM/ECF Filer solely for purposes of the action. Registration will be by non-electronic filing of the CM/ECF Registration Form prescribed by the Clerk. If the party wishes to file confidential information, he or she will do so in accordance with paragraph 7(f) of this order. If during the course of the action, the party retains an attorney who appears on the party's behalf, the appearing attorney must advise the Clerk to terminate the party's registration as a Registered CM/ECF Filer upon the attorney's appearance.

(c)    Each attorney of record to an action is obligated to become a Registered CM/ECF Filer or Confidential Information Filer, unless the Court has otherwise ordered in accordance with paragraph 1(b) of this Order. An attorney is required to become a

Confidential Information Filer only if that attorney intends to electronically file or access documents containing Confidential Information.

(d)    Everyone registered on the CM/ECF System must immediately notify the Clerk of any change in the information provided in the CM/ECF Registration Form by submitting a Request for Change in Information Form.

(e)    Each person registered on the CM/ECF System will, upon registration, be issued a User Identification Designation ("User ID") and a Password by the Clerk.  The Clerk will maintain a confidential record of issued User IDs.  Confidential Information Filers are required to change their Passwords at least once a year.  Failure of a Confidential Information Filer to change his or her Password at least once a year will result in termination of his or her ability to file documents and termination of access to confidential documents on the CM/ECF System until the Password is changed or a new CM/ECF status is requested.

(f)    Except as expressly provided in subparagraph (g), the User ID and Password must be maintained as confidential.  Upon learning of the compromise of the confidentiality of the CM/ECF Password, the Password holder must change his/her Password immediately and notify the Clerk without delay.

(g)    A Registered CM/ECF Filer or Confidential Information Filer may authorize another person to file a document using the User ID and Password of the Registered CM/ECF Filer or Confidential Information Filer.  Under these circumstances, the Registered CM/ECF Filer or Confidential Information Filer will retain full responsibility and will be treated as a signatory under the Rules of the Court for any document so filed.

(h)　　The Court's CM/ECF System will include for each action subject to the EFPs a current list of the e-mail addresses of record maintained by the Clerk. Each attorney of record must file with the Court a notice of any changes in his or her e-mail address, in the manner prescribed by Rule 75(e) of the Rules of the Court, in addition to submitting the Notice required under paragraph 3(d) of this Order.

4.　　<u>Electronic Filing of Documents</u>.

(a)　　Except as otherwise ordered by the Court, all pleadings and other documents required to be filed with the Clerk, including documents containing Confidential Information, must be filed electronically on the Court's CM/ECF System pursuant to the EFPs, except for certain documents described in subparagraph (e) below. Electronic filing may be made only by a Registered CM/ECF Filer or Confidential Information Filer, or by a person authorized by a Registered CM/ECF Filer or Confidential Information Filer pursuant to paragraph 3(g) of this Order. Any document filed with the Court that contains any Confidential Information must be conspicuously marked in accordance with Rule 81(h) and any Confidential Information must be appropriately marked by bracketing.

(b)　　With the exception of agency records filed in accordance with Rules 73.1, 73.2 and 73.3 and federal agency remand determinations, every document filed electronically must be signed for the purposes of Rule 11 of the Rules of the Court by one or more attorneys of record (each "Rule 11 Signatory") pursuant to paragraph 5(a) of this Order. For each Rule 11 Signatory, the document must identify the Signatory by name and provide such Signatory's law firm or agency, address, telephone number and e-mail address(es) of record.

(c)    Except as provided in subsection (e) of this paragraph, electronic transmission of a document to the Court's CM/ECF System consistent with the EFPs, together with the receipt by the person making the filing of a Notice of Electronic Filing from the Court as provided in Paragraph 6 of this Order, shall constitute filing of the document for all purposes under the Rules of the Court, and shall constitute entry of that document on the docket kept by the Clerk pursuant to Rules 58 and 79 of the Rules of the Court.  A document filed electronically shall be deemed filed at the date and time stated on the Notice of Electronic Filing from the Court.

(d)    (i) When a document has been filed electronically, the official document of record is the electronic recording of the document as stored by the Court, and the filing party shall be bound by the document as filed, unless amended by order of the Court.  A party wishing to correct a filing must file a motion for errata after seeking consent from all parties, in accordance with the provisions of Rule 7(b) of the Rules of the Court.  A motion for errata must list each correction, including the page number for each correction, and must provide a complete copy of the corrected document, or indicate that the corrections are minor.  The motion must also include a proposed order either permitting the substitution of the complete corrected copy or ordering the corrections deemed made without physical substitution because the corrections are minor.  The corrected filing will become the official document of record and the filing date will remain the date of the filing of the original electronic filing.  When a motion for errata is made upon consent of all parties in an unassigned case, the Clerk may dispose of the motion as if such motion were expressly listed in Rule 82(b) of the Rules of the Court.

(ii)  If a document containing Confidential Information is erroneously filed as a public document, is filed in the wrong case, or otherwise improperly releases Confidential Information, the filing party must immediately contact the Clerk.  Parties should use the emergency number posted on the USCIT Website to contact the Clerk after hours.  Parties must also follow the procedures set forth in paragraph 17 of this Order.

(e)      Documents, portions of documents or sets of documents that are not readily convertible to electronic form, or which are more appropriately filed as physical exhibits, may be filed in paper form and must be accompanied by a Notice of Manual Filing. Likewise, documents, portions of documents or sets of documents that are in electronic form but exceed certain technical parameters may be filed on electronic media or in paper form, and must be accompanied by a Notice of Manual Filing.

Summonses and original complaints referred to in Rule 3 of the Rules of the Court; original third party complaints; original complaints filed pursuant to 28 U.S.C. § 1581(b); Notices of Appeal filed in accordance with Rule 3 of the Rules of the United States Court of Appeals for the Federal Circuit; and a request for transfer to the Court from a binational panel or committee pursuant to 19 U.S.C. § 1516a(g)(12)(B) or (D) may be filed electronically or manually.  A Notice of Manual Filing must accompany manually-filed documents.  Notwithstanding any other provision of the EFPs, no document containing classified information may be filed electronically.  A party filing a document that contains classified information must file such document manually in accordance with the Rules of the Court.  Public versions of such document must be filed electronically in accordance with the requirements and limitations of this Order.

(f)    A document properly and timely submitted and filed in non-electronic form pursuant to Rule 5 of the Rules of the Court shall be deemed filed on the date set forth in Rule 5(d)(4).    Subsequent electronic submission of the same document shall not be deemed to change the date of original filing of that document.    Where a portion of a document is filed electronically and another portion is filed in paper form, or on electronic media, the latest filing date and time of the multiple portions will be used to determine compliance with applicable deadlines.

(g)    Unless otherwise ordered by the Court, an agency filing an administrative record pursuant to Rule 73.2 will follow the procedure in Rule 73.2(b).

5.    <u>Signatures</u>.

(a)    A document filed with the Court electronically shall be deemed to be signed by a person when the document identifies the person as a Signatory and the filing complies with subparagraph (b), (c) or (d).    When the document is filed with the Court in accordance with any of these methods, the filing shall bind the Signatory as if the document (or the document to which the filing refers, in the case of a Notice of Endorsement filed pursuant to subparagraph (d)) were physically signed and filed, and shall function as the Signatory's signature, whether for purposes of Rule 11 of the Rules of the Court, to attest to the truthfulness of an affidavit or declaration, or for any other purpose.

(b)    In the case of a Signatory who is a Registered CM/ECF Filer or Confidential Information Filer as described in paragraph  3, such document shall be deemed signed, regardless of the existence of a physical signature on the document, provided that such document is filed using the User ID and Password of the Signatory.    The page on which the physical signature would appear if filed in non-electronic form must be filed electronically,

but need not be filed in an optically scanned format displaying the signature of the Signatory.  In such cases, the electronically filed document shall indicate an "electronic signature", e.g., "s/Jane Doe".

(c)    In the case of a Signatory who is  a Registered CM/ECF Filer or Confidential Information Filer, but whose User ID and Password will not be utilized in the electronic filing of the document, such document will be deemed signed and filed when the document is physically signed by the Signatory, the document is filed electronically, and the signature page is filed in optically scanned form pursuant to and consistent with the EFPs.

(d)    In the case of a stipulation or other document to be signed by two or more persons, the following procedure shall be used:

(i)  The filing party shall initially confirm that the content of the document is acceptable to all persons required to sign the document and shall indicate in the document that such confirmations have been made. To the extent practicable, the filing party shall obtain the physical signatures of all parties on the document.

(ii)  The filing party shall then file the document electronically, indicating the original signatures that have been obtained, e.g., "s/Jane Doe," "s/John Doe," etc., and the signatures that will be provided through Notices of Endorsement.

(iii)  The filing party or attorney shall retain the hard copy of the document containing the original signatures until one year after the final disposition of the action in which it was filed.

(iv)  In the case of any person required to sign the document but for whom the filing party does not obtain a physical signature, such person shall file a Notice of

Endorsement of the document. The document shall be deemed fully executed upon the filing of any and all such Notices of Endorsement.

6.    Notice of Electronic Filing.

Upon electronic filing of a pleading or other document, a Notice of Electronic Filing will be sent by the Clerk to all e-mail address(es) of record in the action. Such Notice shall provide, at a minimum, the electronic docket number and the title of the document filed, and shall provide the date and time filed.

7.    Service.

(a)    A pro se party who becomes a Registered CM/ECF User or Filer, or an attorney who becomes a Registered CM/ECF Filer or Confidential Information Filer, is deemed to have consented in writing to electronic service of all documents that are filed electronically. Therefore, except as otherwise ordered by the Court, electronic filing of any document and the Court's transmission of a Notice of Electronic Filing of that document, as described in Paragraph 6 of this Order, will constitute service of such document on all counsel or pro se parties with CM/ECF accounts. Documents that are not filed electronically must be served in non-electronic form in accordance with Rule 5 of the Rules of the Court, and the Court's transmission of a Notice of Electronic Filing will not constitute service.

(b)    Counsel excused in any particular case under Paragraph 1(b) of this Order and pro se parties who do not have a CM/ECF account must serve and be served with all filed documents in non-electronic form as provided in Rule 5 of the Rules of the Court.

(c)    For any document which is served electronically pursuant to subparagraph (a) of this paragraph, the requirement for the filing of a certificate or other proof of service

set forth in Rule 5 of the Rules of the Court will be satisfied by the Court's transmission of the Notice of Electronic Filing described in Paragraph 6 of this Order.

(d)    Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice or other document upon that person, and such document is filed and served electronically pursuant to the EFPs, five days shall be added to the prescribed period.

(e)    Notwithstanding any provision of this Order, where the Rules of the Court require that any document be served but not filed, or that any document be served and filing of that document be delayed, service of that document shall be in non-electronic form. Any subsequent filing of such previously-served document shall be accomplished in the manner prescribed by this Order, and the document need not be re-served upon parties who were previously served.

(f)    Any document containing Confidential Information not required to be electronically filed as permitted in this Order must be served on all parties whose counsel are authorized to have access to such document. The document must be contained in a wrapper conspicuously marked on the front "Confidential – to be opened only by (authorized attorney for that party)." If served by mail, the confidential document must be placed within two envelopes, the inner one sealed and marked "Confidential Information – to be opened only by (name of authorized attorney)" or Business Propriety Information – to be opened only by (name of authorized attorney)," and the outer one sealed and not marked as containing Confidential/Business Proprietary Information. Parties not authorized to have access to any such document pursuant to this Order are to be served in

12

accordance with Rule 81(h) with a copy of the document from which all Confidential Information has been deleted.

8.     Docket.

The Court's CM/ECF System shall denote in a separate electronic document for each action subject to the EFPs the filing of any document by or on behalf of a party and the entry of any order or judgment by the Court, regardless of whether such document was filed electronically.  The record of those filings and entries for each case shall be consistent with Rule 79 of the Rules of the Court and shall constitute the docket for purposes of that Rule.

9.     Notice of Entry of Orders and Judgments.

The Clerk will file electronically all orders, decrees, judgments, and proceedings of the Court in accordance with the EFPs, which filing will constitute entry of the order, decree, judgment or proceeding on the docket kept by the Clerk pursuant to Rules 58 and 79 of the Rules of the Court.  Upon the entry of an order or judgment in an action subject to the EFPs, the Clerk will transmit by e-mail to all e-mail addresses(es) of record in the action a notice of the entry of the order or judgment and will make a note of the transmission in the docket.  Transmission of the notice of entry will constitute notice as required by Rule 79(c) of the Rules of the Court and will constitute service of such notice unless non-electronic service is required under paragraph 7(b) of this Order.

10.     Technical Failures.

(a)     The Clerk will deem the USCIT CM/ECF System to be subject to a technical failure on a given day if the CM/ECF System is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour after 12:00 noon

in New York, New York on that day. The Clerk will provide notice of all such technical failures on the CM/ECF Help Desk line, 866-450-1859, which persons may telephone in order to learn the current status of the CM/ECF System. The Clerk will maintain records of the nature and duration of all such technical failures. Filings due that day, which were not filed due solely to such technical failures, will become due the next business day. Such delayed filings will be rejected unless accompanied by a declaration or affidavit attesting to the filing person's failed attempts to file electronically at least two times after 12:00 noon in New York, New York, separated by at least one hour on that day due to such technical failure. A declaration or affidavit will not be required if, on the day a filing is due, a notice is posted on the Court's Website or on the Court's CM/ECF Help Desk line indicating that the CM/ECF System is not available on that day for a period of one hour or more after 12:00 noon in New York, New York.

(b)    If a Notice of Electronic Filing is not received from the Court following transmission of a document for filing, the document will not be deemed filed. The person filing must attempt to re-file the document electronically until such a Notice is received, consistent with the provisions of subparagraph (a) permitting delayed filings.

(c)    If, within one business day after filing a document electronically, the party filing the document discovers that the version of the document available for viewing on the Court's CM/ECF System does not conform to the document as transmitted upon filing, the filing party must contact the Clerk, who will either ensure that the document is properly posted as filed or direct the party to re-transmit the document, which will be marked "Re-transmitted". This provision (and the designation "Re-transmitted") will not be used for filing a motion for errata as set forth in paragraph 4(d)(i) of this Order.

11.    <u>Copyright and Other Proprietary Rights</u>.

(a)    The USCIT Website will bear a prominent notice as follows: "The contents of each filing in the electronic case files on the Court's CM/ECF System  may be subject to copyright and other proprietary rights (with the exception of the opinions, memoranda and orders of the Court).  It is the user's obligation to determine and satisfy copyright or other use restrictions when publishing or otherwise distributing material found in the electronic case files.  Transmission or reproduction of protected items beyond that allowed by fair use requires the written permission of the copyright owners.  Users must make their own assessments of rights in light of their intended use."

(b)    By consenting to the EFPs, each party or other person and their counsel are deemed to consent to all uses of the filed materials consistent with the notice set forth in subparagraph (a).

(c)    By producing discovery materials in an action subject to electronic filing, or by filing any material in the action electronically or otherwise, each party or subpoenaed non-party or other non-party so producing or filing, and all of the counsel to such persons, are deemed to consent to all uses of such materials by all parties to the action solely in connection with and for the purposes of the action, including the electronic filing in the action (by a party who did not originally file or produce such materials) of portions of such excerpts, quotations, or selected exhibits from such discovery materials or other filed materials as part of motion documents, pleadings or other filings with the Court which must refer to such excerpts, quotations, etc.

12.    <u>Protective Order</u>.

In connection with discovery or the filing of any material, other than those items specifically exempted from electronic filing in subparagraph 4(a) or (e) of this Order, any person may apply by motion for an order prohibiting the electronic filing in the action of certain specifically-identified materials on the grounds that such materials are subject to copyright, other proprietary rights, privacy interests, or other specifically-identified interests and that electronic filing in the action is likely to result in substantial prejudice to those rights or interests.  A motion for such an order must be filed not less than five days before the materials to which the motion pertains are due to be produced or filed with the Court.  Any material not filed electronically pursuant to such an order shall be filed with the Clerk and served as if the action were not subject to the EFPs.  Nothing in this paragraph may be construed to change the standard for the issuance of a protective order respecting confidentiality in an action subject to the EFPs.

13.    <u>Disclosure and Access to Confidential Information</u>.

(a)    (i) Individuals who have access to Confidential Information pursuant to Rule 73.2(c) and/or this Order will not disclose it to anyone (including, without limitation, any officer, shareholder, director, or employee of any of the parties in the action), other than the Court, authorized Court personnel, and other persons authorized under this Order.  An authorized attorney or authorized consultant may use Confidential Information only for issues relating to the federal administrative agency proceeding that is the subject of the action, in administrative proceedings resulting from an order of the Court remanding the matter to that agency, or in an appeal of a decision rendered by the Court in the action.  In the event of the consolidation of actions arising from determinations of the International

Trade Commission and the Department of Commerce, nothing in this Order will be read to require or allow the use of Confidential Information from the records of one agency in argumentation related to the decision of the other agency or the service upon one agency of documents containing Confidential Information from the record of the other.

With respect to Confidential Information that was originally submitted by a party to the action, nothing in Rule 73.2(c) or this Order prevents an attorney for that party from disclosing that information or using that information in any way, so long as such disclosure or use does not result in the disclosure of another entity's Confidential Information to anyone not authorized under Rule 73.2(c) and/or this Order to have access to the Confidential Information.

(ii) The Clerk of the Court will permit access to documents containing Confidential Information, including electronic access, only to the Court, authorized Court personnel, and individuals authorized by this Order to have access to such documents.

(b)    Authorized Consultants.  An authorized consultant may have access to Confidential Information in an action only under the direction and control of an authorized attorney, who will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by such authorized consultant, and subject to the terms of Rule 73.2(c) and/or this Order.  Consultants include non-attorneys such as economists, accountants and computer specialists.

As to any consultant who is subject to the agency's administrative protective order issued in the proceeding that gave rise to the action whom an authorized attorney considers necessary to preparation of the case in the action, the authorized attorney must file with the Court a Business Proprietary Information Certification which must be

substantially in the form set forth in Form 17 of the Appendix of Forms executed by the consultant.

As to any consultant not described in the preceding paragraph whom an authorized attorney considers necessary to preparation of the case, the authorized attorney must, prior to seeking consent for the filing of such a Certification, provide counsel for the parties with the curriculum vitae of the proposed consultant. If all counsel consent, the authorized attorney may then file such a Certification, executed by the proposed consultant, with the Court. If all counsel do not consent, access to Confidential Information for the consultant may be sought by motion.

(c)    An authorized attorney or authorized consultant may disclose Confidential Information to office personnel (such as paralegals, administrative assistants, etc.) who are actively assisting in the action and are employed by or supervised by him or her and under his or her direction and control. The authorized attorney charged with direction and control of the authorized consultant will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by all office personnel described in this paragraph. An authorized consultant will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by all of his or her own office personnel. All office personnel authorized to see the Confidential Information must comply with the terms of Rule 73.2(c) and/or this Order, and must, before having access to any confidential documents, sign a statement of recognition that he or she is bound by the terms of Rule 73.2(c) and/or this Order, that the information is confidential and that such information will not be disclosed to anyone other than authorized attorneys, authorized consultants or authorized office personnel. Such

statements of recognition must be retained by an authorized attorney, but need not be filed with the Court or served on the parties.

14.     Safeguarding Confidential Information.

The individuals covered by Rule 73.2(c) and/or this Order must review the procedures for the protection of Confidential Information listed in any federal agency administrative protective orders on the administrative record and comply with such procedures for the duration of the action.

15.     Termination of Access to Confidential Information.

Termination of access to Confidential Information in other than one filed under 28 U.S.C. § 1581(c) will occur under the terms of the protective order issued in the case.  For actions filed under 28 U.S.C. § 1581(c), the following procedures will apply.  An authorized attorney or authorized consultant will cease to have access to Confidential Information subject to this Order on the filing of a Notice of Termination pursuant to Rule 73.2(c).  For government attorneys, access to Confidential Information will cease upon the filing of a Form 18A.  A former authorized attorney or authorized consultant remains bound by his or her obligation to abide by the terms of Rule 73.2(c) and/or this Order and may not divulge Confidential Information that he or she learned during the action or in the underlying administrative proceeding to any person.  Within 28 days of final judgment, including all appeals, the parties will file a Joint Notice Regarding Termination of Access to Confidential Information, and the Clerk's Office will terminate electronic access to any confidential documents on receipt of that filing.

16.    <u>Use of Confidential Information During Proceedings in Open Court</u>.

Authorized attorneys will endeavor to avoid the unnecessary use of Confidential Information in any oral proceeding before the Court.  If an authorized attorney for any party in the action finds it necessary to refer to Confidential Information in any oral proceeding before the Court, such attorney must notify the Court and all other counsel of record as soon as the necessity becomes apparent and propose whatever mechanism may be available and appropriate to prevent disclosure of Confidential Information to persons other than those authorized by this Order.

17.    <u>Breach of Requirements Regarding Confidential Information</u>.

The individuals covered by Rule 73.2(c) and/or this Order must promptly report any breach of paragraphs 13-16 of this Order to the Court, to counsel for the federal administrative agency involved, and to counsel for the party whose Confidential Information is involved.  The individuals covered by Rule 73.2(c) and/or this Order must take all reasonable steps to remedy the breach and must cooperate fully in any investigation of the breach undertaken by the Court.

18.    <u>Miscellaneous Provisions</u>.

(a)    The Clerk will establish procedures to permit pleadings and other documents to be presented for electronic filing at the Court.  The Clerk will also provide for appropriate access to all electronic Court records.  Facilities and equipment made available at the Court to permit access to the PACER System may not be used for any other purpose.

(b)    Until such time as the United States Court of Appeals for the Federal Circuit provides notice to the Court that public access to the PACER System obviates or modifies

any need for transmittal of the record on appeal of any action subject to the EFPs as to which a notice of appeal to that Court of Appeals has been filed, when required, the Clerk will deliver to the Court of Appeals, at that Court's election, either a complete non-electronic copy of the record on appeal or an electronic reproduction of that record on appeal as such record is reflected in the PACER System.

(c)      This Administrative Order and the CM/ECF User's Manual will be posted on the USCIT Website in a location that may be reached from the home page of that Website via one or more highly visible and easily found hyperlinks and will be posted prominently in and otherwise made available in the Office of the Clerk.  Any amendments to the EFPs will be similarly posted and published.

(d)      The effective date of this  Administrative Order and the CM/ECF User's Manual is April 1, 2002 and may be amended by the Court from time to time on the Court's own initiative.  This Administrative Order shall apply to all proceedings in actions brought after its effective date and all further proceedings in actions then pending, except actions in which a complaint was filed prior to the effective date of this Order.

For the Court:

/S/

_____

By:    Tina Potuto Kimble
       Clerk of the Court

Dated:  April 1, 2002, amended Nov. 28, 2006, eff. Jan. 1, 2007; amended Aug. 2, 2010,
        eff. Sept. 1, 2010; amended Dec. 4, 2012, eff. Jan. 1, 2013; amended August 7,
        2013, eff. October 1, 2013.

New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SINCE HARDWARE (GUANGZHOU) CO., LTD., | |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Consol. Court No. 11-00106 |
| UNITED STATES, | |
| Defendant. | |

**ORDER**

This consolidated action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011) (final results admin. review), as amended by 76 Fed. Reg. 23,543 (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review) (collectively, "Final Results"); see also Issues and Decision Memorandum for Ironing Tables from China, A-570-888 (March, 2011), available at http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf (last visited Aug. 14, 2012) ("Decision Memorandum"). Before the court are motions for judgment on the agency record filed by Home Products International, Inc. ("HPI"), Foshan Shunde Yongjian Housewares & Hardwares Co. Ltd. ("Foshan Shunde"), and Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware").

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).　For the reasons set forth below, the <u>Final Results</u> are remanded to Commerce for further consideration.

## I. Cotton Fabric Surrogate Valuation

In response to a challenge raised by HPI in its motion, Commerce has requested a voluntary remand to reconsider Since Hardware's cotton fabric weight and recalculate the conversion factor based on the remand, which the court will grant.　<u>See</u> <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1029 (Fed. Cir. 2001).　In its reply brief Home Products has withdrawn further pursuit of its claim regarding Commerce's treatment of Foshan Shunde's cotton fabric.　<u>See</u> HPI Reply Br. at 2-3, Jan. 11, 2012, ECF. No. 61.

## II. Zeroing

During the administrative proceeding, Foshan Shunde challenged Commerce's zeroing practice in its case brief.　Subsequently, the Federal Circuit issued a decision upon which Foshan Shunde now relies.　The doctrine of exhaustion ordinarily precludes a party from raising new arguments and theories not presented to the agency, <u>see, e.g.</u>, <u>QVD Food Co. v. United States</u>, 34 CIT ___, 721 F. Supp. 2d 1311, 1318-1321 (2010), but an intervening judicial decision may permit a party to refine one's argument to take account of the new authority, <u>cf.</u> <u>JTEKT Corp. v. United States</u>, 35 CIT ___, ___, 768 F. Supp. 2d. 1333, 1363 (2011), which is what happened here.　Importantly, Foshan Shunde raised the issue of zeroing at the administrative level, and has refined its

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

argument before this court to account for the intervening judicial decision from the

Federal Circuit.  Application of the exhaustion doctrine is therefore not appropriate in

this instance.  With that said, the court will stay resolution of this issue pending a

decision from the Federal Circuit on the lawfulness of zeroing.  This will likely be

forthcoming in <u>Union Steel v. United States</u>, CAFC appeal No. 2012-1315, but may

occur in either <u>Dongbu Steel Co. v. United States</u>, 635 F.3d 1363 (Fed. Cir. 2011), or

<u>JTEKT Corp. v. United States</u>, 642 F.3d 1378 (Fed. Cir. 2011).  Once the Federal

Circuit issues its pronouncement, the court will schedule a conference call to discuss

appropriate procedures for the further disposition of this issue.  In the meantime, the

rest of this action will proceed.

### III. Financial Statement Selection

The issue of Commerce's selection of financial statements to calculate the

financial ratios for respondents' margins is an oft-litigated problem in non-market

economy antidumping cases.  Commerce's choice is guided by a general regulatory

preference for publicly available information. 19 C.F.R. § 351.408(c)(4) (2009).  Beyond

that Commerce generally considers the quality, specificity, and contemporaneity of the

available financial statements.  <u>See</u> <u>Fresh Garlic from the People's Republic of</u>

<u>China</u>, 67 Fed. Reg. 72,139 (Dep't of Commerce Dec. 4, 2002)(final results new shipper

review).

During the administrative review Commerce had a choice among several Indian

financial statements to calculate surrogate financial ratios.  Commerce ultimately settled

on the 2006-2007 financial statement of Infiniti Modules Pvt. Ltd. ("Infiniti Modules") as

the best available information to calculate surrogate financial ratios for the Chinese

respondent producers of ironing tables and parts.  Properly framed, the question for the

court is whether a reasonable mind could conclude that Commerce chose the best

available information after conducting a reasonable comparison of the financial

statements by measuring their relative quality, specificity, and contemporaneity against

a regulatory preference for publicly available information.

The court must remand this issue to Commerce for further consideration.  In the

Final Results, Commerce states:

> Moreover, as Petitioner has noted, the 2006-2007 financial statements of
> Infiniti Modules are publicly available, have been placed on the public
> record of multiple antidumping proceedings, and thus continue to qualify
> as publicly available information within the meaning of the statute.
> Moreover, we disagree with Foshan Shunde's assertion that financial
> statements must be available from directly from the company or a registar
> of companies in order to qualify as "publicly available." The 2006-2007
> financial statements of Infiniti Modules are "publicly available" because
> Petitioner obtained them from a public source (in this case the Indian
> MCA) which could be verified.

Decision Memorandum at 10.  Commerce's findings about the public availability of the

Infiniti Modules financial statement does not appear to be supported by the

administrative record.   There appears to be more than a fair amount of record

information demonstrating that the Infiniti Modules financial statements may not have

been publicly available. The administrative record demonstrates that both Since

Hardware and Foshan Shunde apparently each tried unsuccessfully to obtain the 2006-

2007 Infiniti Module financial statements from public sources.  Foshan Shunde reported

to Commerce that it "attempt[ed] to ascertain the financial statement of Infiniti Modules

Private Ltd. through traditional means recognized by standard Department practice but

was unable to." Foshan Shunde Surrogate Value ("SV") Submission at 1, PD 96[2] (Oct. 18, 2010).  Foshan Shunde also submitted documentation from the MCA website along with information directly from Infiniti Modules showing that the financial statement and the profit and loss statement is not publicly available. Id. at 1-2, Ex. 17 PD 96 and Foshan Shunde SV Submission, Ex. 1, PD 94/CD 35 (Oct. 18, 2010).  There is also the statement of Mr. Cal Scott of Polder, Inc. that neither he nor colleagues in India could obtain the Infiniti Modules financial information.  Since Hardware SV Submission, App. 1, p.3, PD 98 (Oct. 21, 2010).

Given this record information, how could one reasonably conclude that the Infiniti Modules 2006-2007 financial statement is publicly available?  It does not appear to be.  Commerce may need to review the purposes behind its regulatory preference for publicly available information.  One would assume that publicly available information is preferred because all parties, including Commerce, may readily access it for review, analysis, and if appropriate, use.  If two interested parties had such difficulty accessing the information, is it really publicly available?  Or does the fault lie with Foshan Shunde and Since Hardware?  Were their efforts incomplete or misplaced?  Or is the question of public availability a moot point because, although not publicly available, the entire financial statement was placed on the administrative record such that it was, at least for the interested parties, completely accessible and available for analysis and comment?

Commerce's apparently one-sided handling of the issue of the public availability of the Infiniti Modules financial statement reveals a potentially larger problem with

---

[2] "PD __" refers to a document contained in the public administrative record.  "CD__" refers to a document contained in the confidential administrative record.

Commerce's financial statement selection generally.  Given the available choices before Commerce (and the voluminous competing arguments made by the parties), Commerce's decision to use only one, less contemporaneous financial statement gives the impression (especially when considered with the brokerage and handling issue) of possibly being an unreasonable step in a hunt for the highest possible margin, rather than a reasonable effort to identify the best available information to calculate dumping margins as accurately as possible.

To rectify this impression on remand, and in addition to reconsidering the issue of the public availability of the Infiniti Modules financial statement, Commerce must review and reconsider whether the more contemporaneous statements of Omax or Maximaa might be useful additional data points, either in place of, or in addition to, Infinity Modules.  In particular Commerce needs to address, rather than ignore, the statements of Mr. Cal Scott, who appears to have direct knowledge of Omax as a manufacturer and supplier of ironing boards.  Likewise, Commerce needs to explain its choices in this administrative review against the choices it made in Folding Metal Tables and Chairs from the People's Republic of China, 74 Fed. Reg. 68,568 (Dep't of Commerce Dec. 28, 2009) (final results admin. review, and accompanying Issues & Decision Memo at cmt. 1, available at http://ia.ita.doc.gov/frn/summary/prc/E9-30695-1.pdf (last visited Aug. 14, 2012).  Essentially, Commerce needs to review and respond to the arguments made by Since Hardware and Foshan Shunde in their reply briefs: Since Hardware Reply Br. at 9-11, ECF No. 63; Foshan Shunde Reply Br. at 6-10, ECF No. 62, which the court finds persuasive in challenging the reasonableness of Commerce's financial statement

selection.  In addressing those arguments Commerce would also do well to consult and perhaps incorporate in its analysis the arguments made by HPI in its administrative case brief, see HPI Resp. Br., Appendix 2, ECF No. 52.  The important point is that on this administrative record the court cannot sustain Commerce's financial statement selection as reasonable.  More work needs to be done.

### IV. Brokerage and Handling

Both Since Hardware and Foshan Shunde challenge Commerce's surrogate valuation for brokerage and handling (B&H).  Although this is the same issue for both parties, Since Hardware and Foshan Shunde have chosen to argue the issue differently. Since Hardware, unfortunately, has submitted the exact same argumentation that the court found wanting in Home Products Int'l, Inc. v. United States, 36 CIT ___, 837 F. Supp. 2d 1294, 1296-97 (2012).  Because Since Hardware's one paragraph argument is exactly the same (verbatim except for one word), compare Since Hardware Mem. of Points and Authorities in Supp. of R. 56.2 Mot. at 11, ECF No. 42, with Since Hardware Mem. of Points and Authorities in Supp. of R. 56.2 Mot. at 11-12, Consol. Court No. 11–00104, Aug. 8, 2011, ECF No. 30, the result here is the same, and the court deems this issue waived for incompleteness, as it did in Home Products.  The court will therefore sustain Commerce's surrogate valuation for Since Hardware's B&H costs.

In marked contrast to Since Hardware's approach is the more well-developed argumentation of Foshan Shunde, see Foshan Shunde's R. 56.2 Mem. in Supp. of Mot. for J. upon Agency Rec. at 16-26, ECF No. 44.  Foshan Shunde has raised several legitimate issues causing Commerce to request a voluntary remand to reconsider or

explain its determination regarding Foshan Shunde's requested letter of credit deduction and to correct Foshan Shunde's container weight. The court will grant this request, but also require Commerce to further explain several aspects of its B&H surrogate valuation for Foshan Shunde.

B&H is typically a routine and well-known component of most international trade transactions. As such, one would expect that Commerce's methodology for handling this expense could be readily explained in a publicly available manner. Defendant, however, did not provide such an explanation in its public response brief. The court, for its part, attempted without success to prepare a public summary of Commerce's treatment of Foshan Shunde's B&H expenses. That exercise, in turn, proved inordinately difficult thereby raising suspicions about the reasonableness of Commerce's approach. A formerly straightforward adjustment has now become a seemingly impenetrable surrogate valuation. Something seems amiss.

The first order of business on remand is for Commerce to prepare a clear, complete public summary of its calculation of Foshan Shunde's B&H expense, one that the court can then incorporate into a written disposition of this action. Commerce should next address the arguments Foshan Shunde makes in its reply brief, Foshan Shunde Reply Br. at 11-15, ECF No. 62, which the court believes persuasively challenge the reasonableness of Commerce's B&H calculation. Commerce needs to explain in detail why its chosen surrogate data source and calculation of Foshan Shunde's B&H expenses is reasonably the best choice. For the court to be able to meaningfully review this agency action, Commerce needs to analyze, compare, and

explain the advantages and disadvantages of using Commerce's preferred data as opposed to the data that Foshan Shunde argues is more accurate and appropriate for calculating its B&H expenses.   The court is especially interested in Commerce's response to the arguments Foshan Shunde makes with respect to Commerce's adjustments to Foshan Shunde's actual shipped weight and actual shipping mode on page 14 of Foshan Shunde's Reply Brief.   As with Commerce's financial ratio calculation, more work needs to be done on Foshan Shunde's B&H surrogate valuation.

### V. Labor Wage Rate Surrogate Valuation

Preliminarily, the court notes that the issue of labor wage rate valuation must be remanded to Commerce to include Indian data under ISIC revision 2, as well as data from any other countries that may appropriate under that data set.  See Home Products I, Final Results of Redetermination ("Remand Results"), Mar. 14, 2012, ECF No. 83 (including labor data from India and Nicaragua).

Moving on, Foshan Shunde and Since Hardware both challenge Commerce's surrogate valuation for the labor wage rate.  They both argue that Commerce should have used Indian wage rate information alone.  It is an argument with which the court is familiar. See Home Products Int'l, Inc. v. United States, 36 CIT ___, 810 F. Supp. 2d 1373, 1377-78 (2012) ("Home Products I"); Home Products Int'l, Inc. v. United States, 36 CIT ___, 837 F. Supp. 2d 1294, 1296-97 ("Home Products II"); Shandong Rongxin Import & Export Co. v. United States, 35 CIT ___, 774 F. Supp. 2d 1307, 1314 (2011) ("The Court finds groundless [the] argument that Commerce was obligated to utilize data from a single country to value labor. This argument is untenable in the face of a

statute, agency regulation, and CAFC case law, which all explicitly permit the agency to

utilize data from multiple countries."). The statute does not mandate that Commerce

must as a matter of law use Indian data alone; to obtain their desired relief Foshan

Shunde and Since Hardware must demonstrate as a factual matter that "India, and India

alone is both economically comparable to China and a significant producer of

comparable merchandise." Home Products I, 36 CIT at ___, 810 F. Supp. 2d at 1378.

There is a straightforward, common sense way to accomplish this—or at least to

demonstrate that Commerce's selection of multiple countries is unreasonable because it

includes countries (other than India) that are not significant producers of comparable

merchandise.  Simply prepare a chart that details the relevant record data for each

country that Commerce included in its analysis:

| Countries included in labor valuation | Measure of Economic Comparability | Measure of Significant Production | | | |
| --- | --- | --- | --- | --- | --- |
| | | HTS 9403.20 (Exports) | HTS 9493.20 (Exports) | Proposed data alternative (Foshan Shunde) | Proposed data alternative (Since Hardware) |
| | | | | | |
| | | | | | |
| | | | | | |

Neither Foshan Shunde, nor Since Hardware chose this simple, straightforward

approach.  The court therefore suspects that both Foshan Shunde and Since Hardware

are being disingenuous in arguing that India and India alone satisfies the requirements

of economic comparability and significant production.  If pressed, the court suspects

that counsel for Foshan Shunde and Since Hardware (as officers of the court) would

have to acknowledge that one or more countries, other than India, satisfy the two

statutory requirements.  It may be that Commerce has unreasonably included some

countries within its analysis that do not satisfy the statutory requirements, but for

whatever reason Foshan Shunde and Since Hardware chose not to identify <u>any</u> by

name, only offering oblique references such as "countries included in the labor rate as

significant producers export less than 0.1% and some even less than 0.001% of the

total world exports for comparable merchandise," Foshan Shunde Br. at 37, ECF. No.

44; Since Hardware Reply Br. at 4, ECF No. 63.  This unfortunately assumes that the

court will do counsel's work and identify which specific countries, if any, failed to satisfy

the two statutory requirements (economic comparability and significant production).

This is not the court's responsibility. The burden is on litigants like Foshan Shunde and

Since Hardware to come forward and demonstrate that Commerce's decision is

"unsupported by substantial evidence or otherwise not in accordance with law."  As

explained above, there was an easy, straightforward way to do this—simply identify the

suspect countries and explain why they fail either of the two statutory requirements.  For

whatever reason Foshan Shunde and Since Hardware chose not to do this.  The court

will not require Defendant or HPI to expend any more energy on this issue other than for

Commerce on remand to conform its decision to its Remand Redetermination from the

prior administrative review, and include data from India (and any other appropriate

countries, such as Nicaragua), within its labor wage rate valuation.  <u>See</u> <u>Remand</u>

<u>Results</u> (including data from India and Nicaragua).

Finally, the court has previously reviewed the issue of Commerce's selection and

use of Classification 28 (metal fabricated products) as opposed to Classification 36

(manufacture of metal furniture) and sustained that choice as reasonable.  Home Products I, 36 CIT at ___, 810 F. Supp. 2d at 1378.  That determination is equally applicable here, and the court again sustains Commerce's use of Classification 28 as reasonable.

## VI. Conclusion

Accordingly, it is hereby

**ORDERED** that this matter is remanded for Commerce to reconsider Since Hardware's cotton fabric weight and recalculate the conversion factor based on the remand; it is further

**ORDERED** that this matter is remanded for Commerce to reconsider its selection of financial statements consistent with the direction outlined above; it is further

**ORDERED** that this matter is remanded for Commerce to reconsider or explain its determination regarding Foshan Shunde's requested letter of credit deduction and to correct Foshan Shunde's container weight as well as to reconsider its surrogate valuation of Foshan Shunde's brokerage and handling expenses consistent with the direction outlined above; it is further

**ORDERED** that this matter is remanded for Commerce to conform its decision to its Remand Redetermination from the prior administrative review, and include data from India (and any other appropriate countries, such as Nicaragua), within its labor wage rate valuation.  See Home Products I, Consol. Court. No. 11-00104, Final Results of Redetermination  ("Remand Results"), Mar. 14, 2012, ECF No. 83 (including data from India and Nicaragua); it is further

Consol. Court No. 11-00106                                                    Page 13

**ORDERED** that the issue of zeroing is stayed pending resolution of the issue by the Federal Circuit; it is further

**ORDERED** that Commerce shall file its remand results on or before October 16, 2012; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

<div align="right">

/s/ Leo M. Gordon
Judge Leo M. Gordon

</div>

Dated: August 14, 2012
    New York, New York



⚠ Caution

As of: May 20, 2015 12:59 PM EDT

## *Since Hardware (Guangzhou) Co., Ltd. v. United States*

United States Court of International Trade

May 30, 2013, Decided

Consol. Court No. 11-00106

**Reporter**

911 F. Supp. 2d 1362; 2013 Ct. Intl. Trade LEXIS 70; 35 Int'l Trade Rep. (BNA) 1525; SLIP OP. 2013-69; 2013 WL 2364200

SINCE HARDWARE (GUANGZHOU) CO., LTD., Plaintiff, v. UNITED STATES, Defendant.

**Prior History:** *Since Hardware (Guangzhou) Co. v. United States, 2012 Ct. Intl. Trade LEXIS 165 (Ct. Int'l Trade, Aug. 14, 2012)*

**Disposition:** [**1] Final results of administrative review sustained in part and remanded in part.

## Case Summary

### Overview

The government unreasonably selected a financial statement to calculate the financial ratios for antidumping margins on metal ironing boards exported from a non-market economy country, since the selected statement was less contemporaneous and did not appear to be publicly available, and another statement covered the period of review and was publicly available.

### Outcome

Determination remanded.

**Counsel:** William E. Perry and Emily Lawson, Dorsey & Whitney LLP of Seattle, Washington for Plaintiff Since Hardware (Guangzhou) Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, DeKieffer & Horgan of Washington, DC for Plaintiff-Intervenor Foshan Shunde.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With her on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General,

Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Thomas M. Beline, Office of the Chief Counsel for Import Administration of Washington, DC.

Frederick L. Ikenson, Peggy A. Clarke, and Larry Hampel, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

**Judges:** Before: Leo M. Gordon, Judge.

**Opinion by:** Leo M. Gordon

## Opinion

[*1364] OPINION and ORDER

Gordon, Judge: This consolidated action involves the U.S. Department of Commerce's ("Commerce") fifth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See *Floor-Standing,* [**2] *Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 76 Fed. Reg. 15,297* (Dep't of Commerce Mar. 21, 2011) (final results admin. review), *as amended by 76 Fed. Reg. 23,543* (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review) (collectively, "Final Results"); *see also* Issues and Decision [*1365] Memorandum for Ironing Tables from China, A-570-888 (March 22, 2011), available at *http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf* (last visited this date) ("Decision Memorandum"). Before the court are the Final Results of Redetermination, ECF No. 85 ("Remand Results") filed by Commerce pursuant to *Since Hardware (Guangzhou) Co. v. United States,* Consol. Court No. 11-106, ECF No. 81 (Aug. 14, 2012) ("Since Hardware") (order remanding to Commerce). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, *19 U.S.C. §*

911 F. Supp. 2d 1362, *1365; 2013 Ct. Intl. Trade LEXIS 70, **4

1516a(a)(2)(B)(iii) (2006), [1] and 28 U.S.C. § 1581(c) (2006).

Plaintiffs Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") and Foshan Shunde Yongjian [**3] Housewares & Hardwares Co., Ltd. ("Foshan Shunde") both challenge Commerce's financial statement selection; Foshan Shunde challenges Commerce's brokerage and handling surrogate valuation; and Since Hardware challenges Commerce's cotton fabric surrogate valuation and labor wage rate surrogate valuation. [2] See Since Hardware Comments to Remand Results, ECF No. 90 ("SH Remand Br."); Foshan Shunde Comments to Remand Results, ECF No. 89 ("FS Remand Br."). The court sustains Commerce's labor wage rate valuation and cotton fabric valuation, but remands the issues of financial statements, and brokerage and handling to Commerce for further consideration.

## I. [**4] Standard of Review

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966). Fundamentally, though, "substantial [**5] evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2013).

Therefore, when addressing a substantial evidence issue [*1366] raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2013).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316, 129 S. Ct. 878, 172 L. Ed. 2d 679 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Financial Statement Selection

Commerce's selection of financial statements to calculate the financial ratios for respondents' margins is an oft-litigated issue in non-market economy antidumping cases. Commerce is guided by a general regulatory preference for publicly available, [**6] non-proprietary information. 19 C.F.R. § 351.408(c)(1), (4) (2009). Beyond that, Commerce generally considers the quality, specificity, and contemporaneity of the available financial statements. See Fresh Garlic from the People's Republic of China, 67 Fed. Reg. 72,139 (Dep't of Commerce Dec. 4, 2002) (final results new shipper review).

During the administrative review, Commerce had a choice from among four Indian financial statements: '06-'07 Infiniti Modules Private Ltd. ("Infiniti Modules"); '08-'09 Omax Autos Ltd. ("Omax"); and '07-'08 and '08-'09 Maximaa Systems Ltd. ("Maximaa"). In the Final Results Commerce chose the '06-'07 Infiniti Modules' financial statements alone as the best available information from which to calculate the financial ratios. Foshan Shunde and Since Hardware challenged this decision, arguing that the statements were not publicly available and that Omax's and Maximaa's financial statements represented the best available information to calculate the financial ratios. Since Hardware Mot. for J. upon the Agency R., ECF No. 43 (SH

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

[2] Since Hardware also attempted to challenge Commerce's brokerage and handling ("B&H") valuation, but the court had to deem the issue waived for failure to adequately brief the argument. Since Hardware at 7; see also Home Prods. Int'l, Inc. v. United States, 810 F. Supp. 2d 1373 (2012), ECF No. 62 (order waiving challenge to B&H calculation), as amended, ECF No. 63; Home Prods Int'l, Inc. v. United States, 36 CIT ___, 837 F. Supp. 2d 1294, 1300-1302 (2012); opinion after remand, Home Prods. Int'l, Inc. v. United States, 36 CIT ___, 853 F. Supp. 2d 1257 (2012).

911 F. Supp. 2d 1362, *1366; 2013 Ct. Intl. Trade LEXIS 70, **6

56.2 Br."); Foshan Shunde Mot. for J. upon the Agency R., ECF No. 44 (FS 56.2 Br."). In its initial consideration of the issue, the [**7] court agreed that Commerce's choice may not have been reasonable and remanded for Commerce to "reconsider[] the issue of the public availability of the Infiniti Modules financial statement, . . . [and to] review and reconsider whether the more contemporaneous statements of Omax or Maximaa might be useful additional data points, either in place of, or in addition to, Infiniti Modules." Since Hardware at 6. On remand Commerce again solely selected the '06-'07 Infiniti Modules' financial statements and found them to be publicly available. See Remand Results at 7,15.

## 1. Public Availability

When first reviewing the issue of the public availability of the '06-'07 Infiniti Modules' financial statements, the court could not sustain Commerce's determination as reasonable. Since Hardware at 6. Although Commerce found that the statements were available through the Indian Ministry of Corporate Affairs' ("MCA") website, Decision Memorandum at 10, there was more than a "fair amount of record information demonstrating that the Infiniti Modules financial statements may not have been publicly available[,]" as evidenced by Since Hardware and Foshan Shunde's unsuccessful attempts to obtain the financial [**8] statements or other Infiniti Modules' financial information. Since Hardware at 4.

[*1367] On remand Commerce acknowledges that it erred in the Final Results when it concluded that the Infiniti Modules' financial statements were available through the MCA website; they are not. Remand Results at 7. Commerce nevertheless clarifies that it still believes that they are publicly available. Id. at 29. In the Remand Results Commerce reasons that the Infiniti Modules' financial statements are publicly available because they were used in a prior administrative review and available on the public administrative record of that review are publicly available. Id. at 29. Commerce explains that Commerce and all interested parties have significant experience with Infiniti Modules as a surrogate company. Id. at 5-6. In each of the four prior administrative reviews, Commerce calculated financial ratios using a single year of Infiniti Modules' financial statements. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the *People's Republic of China, 72 Fed. Reg. 13,239* (Dep't of Commerce Mar. 21, 2007) (final results 1st admin. review) (selected Infiniti Modules' '04-'05 statement); Floor-Standing, [**9] Metal-Top Ironing Tables and Certain Parts Thereof from the *People's Republic of China, 73 Fed. Reg. 14,437* (Dep't of Commerce Mar. 18, 2008) (final results 2nd

admin. review) (selected Infiniti Modules' '04-'05 statement); Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the *People's Republic of China, 74 Fed. Reg. 11,085* (Dep't of Commerce Mar. 16, 2009) (final results 3rd admin. review) (selected Infiniti Modules' '06-'07 statement); Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the *People's Republic of China, 75 Fed. Reg. 55,759 (Sept. 14, 2010)* (prelim. results 4th admin. review) (selected Infiniti Modules' '05-'06 statement). In prior administrative reviews both Since Hardware and Foshan Shunde accepted Infiniti Modules' financial statements as publicly available and argued about the specific substantive application of the financial statements:

Specifically, Infiniti Modules' 2006-2007 financial statements were obtained by Petitioner and placed on the record of the third administrative review along with the 2005-2006 financial statements of Infiniti Modules. [Commerce] used the 2006-2007 financial statements of Infiniti Modules [**10] in the calculations set forth in the final results of the third administrative review. More importantly, Since Hardware acknowledged the existence of and was given the opportunity to comment on both Infiniti Modules' 2005-2006 and Infiniti Modules' 2006-2007 financial statements in that review. Specifically, during that review, Since Hardware asserted that regardless of whether [Commerce] selected the 2005-2006 financial statements of Infiniti Modules or the 2006-2007 financial statements of Infiniti Modules, [Commerce] should make certain adjustments to the financial ratios derived from those financial statements. Similarly, Foshan Shunde engaged in argument over certain aspects of using Infiniti's financial statements in the fourth administrative review, though it did not dispute that the information was publicly available.

Remand Results at 5-6 (citations omitted). Noting that its regulatory preference for publicly available information addresses "the concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability," Commerce found that nothing had "transpired to undermine the integrity or reliability" of the [**11] '06-'07 Infiniti Modules' financial statements. Id. at 6.

This though is not really a determination of "public availability" made against measurable objective criteria. It is instead a determination that the Infiniti Modules' [*1368] data remains among the best available information because of its reliability (notwithstanding that it may not be publicly available). The court understands Commerce's desire to use

911 F. Supp. 2d 1362, *1368; 2013 Ct. Intl. Trade LEXIS 70, **11

information with which it is familiar from a surrogate company that it knows well. It makes good, practical, efficient sense. The '06-'07 Infiniti Modules' financial statements were apparently obtained directly from the company by petitioner, Home Products International, Inc. ("HPI"), in the third administrative review. The public availability of that document was not challenged. Financial statements from Infiniti Modules were also used in the fourth administrative review, and again the public availability of that data was not challenged. In both instances respondents accepted the data and made substantive arguments about its proper use. Commerce and the interested parties have invested significant time and energy over the course of the prior reviews vetting and refining the Infiniti [**12] Modules' financial statements for use in the financial ratio calculations. The court fully understands Commerce's reluctance to abandon otherwise reliable data on a technicality that it has become publicly unavailable (or perhaps never was when measured against objective criteria).

The court, though, cannot sustain Commerce's determination that these financial statements are publicly available. In the Remand Results Commerce cites to *Catfish Farmers of Am. v. United States, 33 CIT ___, ___, 641 F. Supp. 2d 1362, 1377 (2009)*, as an example of "the standard for public availability established in our practice." Remand Results at 29. One searches Catfish Farmers in vain for an explanation of the "standard for public availability established in [Commerce's] practice." Remand Results at 29. That explanation does not appear in Catfish Farmers because it did not involve Commerce's administrative practice for determining public availability. Instead, Catfish Farmers involved a challenge to Commerce's use of a proprietary auditors' report to supplement a publicly available financial statement. *Catfish Farmers, 33 CIT at ___, 641 F. Supp. 2d at 1377*. Unlike here, Commerce did not determine that [**13] the proprietary auditors' report was publicly available. Commerce, instead reasoned that because everyone had fair and open access to it during the proceeding, it was appropriate to supplement an otherwise publicly available financial statement as among the best available information. Id. The court, in turn, sustained as reasonable Commerce's use of the non-public, confidential, auditors' report to supplement a publicly available financial statement. Id.

Further, Catfish Farmers does not identify or explain Commerce's standards or criteria for public availability. Instead, it more modestly demonstrates that Commerce's regulatory preference for public availability is not absolute, offering an instance in which Commerce's use of proprietary surrogate information was reasonable. Catfish Farmers does not provide support for Commerce's conclusion that the

Infiniti Modules' financial statements are publicly available. *Catfish Farmers* would instead appear to lend support for the conclusion that although the '06-'07 financial statements are no longer publicly available, they may still merit consideration as among the best available information to calculate surrogate financial ratios because [**14] all parties had full and fair access to otherwise reliable data.

As for the missing public availability criteria necessary to evaluate Commerce's decision here, Foshan Shunde directs the court to another administrative proceeding, contemporaneous with the Remand Results, where Commerce applied what appears to be fairly rigorous standards for public availability. See Yantai Xinke Steel [*1369] Structure Co. v. United States, Court No. 10-00240, Final Results of Redetermination Pursuant to Court Remand, ECF No. 83 at 18-23 ("Steel Grating Remand Results"); see also Certain Steel Grating from the *People's Republic of China, 75 Fed. Reg. 32,366* (Dep't of Commerce June 8, 2010) (final LTFV determ.). In that proceeding Commerce

sought clarification by issuing a supplemental questionnaire. . . . In this supplemental questionnaire, the Department requested that Petitioners provide a detailed step-by-step explanation of how they obtained Greatweld's 2008-09 financial statements, and that the steps provided should be of sufficient detail so that any party would be able to replicate these steps to acquire Greatweld's 2008-09 financial statements. If such a step-by-step explanation could not be provided, [**15] the Department requested that Petitioners provide a detailed explanation of why they could not provide such information. In addition, the Department also asked Petitioners to provide a detailed explanation as to the reason they believed Greatweld's 2008-09 financial statements were properly described as publicly available and, in providing their response, to indicate if Greatweld was required under Indian law to publicly file its 2008-09 financial statements with any governmental authority.

Steel Grating Remand Results at 19-20. Petitioners there provided the step-by-step process of obtaining the "1) annual return; 2) balance sheet; 3) schedules; 4) auditor's report; 5) director's report; and 6) notice," but did not provide the step-by-step process of receiving the income statements. Commerce determined Greatweld's financial statements were not publicly available "[b]ecause the other interested parties to the proceeding, as well as the Department itself, do not know the steps necessary to acquire Greatweld's 2008-09 income statement, and, therefore, could not acquire that data themselves . . . ." Id.

**JA0017**

Case: 15-1402    Document: 63-1    Page: 49    Filed: 10/19/2015

Page 5 of 14

911 F. Supp. 2d 1362, *1369; 2013 Ct. Intl. Trade LEXIS 70, **15

at 22.

In contrast, Commerce here was satisfied that Infiniti Modules' statements were [**16] publicly available because "Petitioner was able to get them directly from the company simply by requesting them," Remand Results at 7, even though respondents were apparently unsuccessful with similar requests. Under the standards Commerce enunciated in the Steel Grating Remand Results, respondents' inability to obtain the data from the same source and in the same manner does seem to establish that Infiniti Modules' statements are now publicly unavailable. In the Remand Results Commerce casts a skeptical eye on respondents' efforts to obtain the data from Infiniti Modules, noting that respondents never specifically requested the '06-'07 data. Id. at 6-7. The court was somewhat surprised by this interpretation of the record. Although it may be technically correct, the court was under the impression that the record made clear that respondents had made a good faith effort to obtain general financial information from Infiniti Modules (including more contemporaneous financial statements), but were completely rebuffed, which then instigated their arguments about public availability.

The court will remand the issue of public availability for Commerce to reconcile its approach here with the [**17] Steel Grating Remand Results, as well as to reconsider its determination in light of the court's explanation of Catfish Farmers. Commerce's determination that Infiniti Modules financial statements are publicly available remains unreasonable (unsupported by substantial evidence), and therefore cannot be sustained.

**2. Other Financial Statements**

In Since Hardware the court also remanded for Commerce to "review and reconsider whether the more contemporaneous [*1370] statements of Omax or Maximaa might be useful additional points, either in place of, or in addition to, Infinit[i] Modules" and to "explain its choices in this administrative review against the choices made in Folding Metal Tables and Chairs . . . ." Since Hardware at 6. On remand Commerce again selected the '06-'07 Infiniti Modules' financial statements. Since Hardware and Foshan Shunde argue that Commerce's selection was unreasonable and that it should have selected Omax or Maximaa. As previously discussed, Infiniti Modules' data has certain advantages. It has been used in every review under the order, and Commerce and the parties know it well. The '06-'07 Infiniti Modules' financial statements, however, are less

contemporaneous than [**18] the other choices, and have this nagging problem with public availability. The court, for its part, remains unconvinced that Commerce's sole selection of the '06-'07 Infiniti Modules' financial statements alone is a reasonable choice on this administrative record.

**a. Maximaa**

Compared to the '06-'07 Infiniti Modules financial statements, the '07-'08 Maximaa financial statements are more contemporaneous, and the '08-'09 Maximaa financial statements cover the exact period of review. Unlike Infiniti Modules' financial statements, Maximaa's public availability is not in dispute. Commerce, nevertheless, continues to reject Maximaa's financial statements for the following reasons:

We . . . dispute Foshan Shunde's assertion that Maximaa's financial statements represent the best available information. Foshan Shunde argues that the Department's selection of Maximaa's financial statements in Folding Metal Tables and Chairs undercuts the rejection of Maximaa's 2007-2008 financial statements in the instant proceeding. However, in the proceeding at issue in this remand, **the Department declined to use the 2008 and 2009 financial statements of Maximaa based on record evidence that was submitted by interested [**19] parties on the record of this case, not the record of the case Foshan cites.** The record evidence in this proceeding is separate and distinct from the information that comprised the record in Folding Metal Tables and Chairs and relates to a different product. Necessarily, our comments about the nature of financial statements in that case were made in the context of comparing them to folding metal tables and chairs, not ironing tables. In Folding Metal Tables and Chairs, we based our selection of Maximaa on the fact that, **based on the evidence in that proceeding, "a greater proportion of Maximaa's production appears to consist of comparable merchandise (i.e., metal furniture)," and "because it has a similar production process to that of the respondent." The record in this case does not support the same conclusions. Rather, Maximaa's business activities and production processes do not resemble that of respondent in this case and with respect to this product.** . . .[T]he Department's review of the information submitted by Petitioner concerning Maximaa's financial statements indicated that **Maximaa had increasingly become an assembler rather than a manufacturer of the merchandise. Thus, notwithstanding [**20] the conclusion reached in Folding Tables and Chairs that Maximaa was an**

911 F. Supp. 2d 1362, *1370; 2013 Ct. Intl. Trade LEXIS 70, **20

**integrated producer of steel furniture**, we continue to maintain that facts on the record in this case demonstrate that the use of Maximaa's financial statements inappropriate in this proceeding.

Remand Results at 12-13 (citations omitted) (emphasis added).

[*1371] Commerce fails to reasonably distinguish its financial statement selection here from its financial statement selection in Folding Metal Tables and Chairs from the *People's Republic of China, 74 Fed. Reg. 68,568* (Dep't of Commerce Dec. 28, 2009) (final results admin. review) ("Folding Metal Tables and Chairs"); see also Issues and Decision Memorandum for Folding Metal Tables and Chairs from China, A-570-868 (Dec. 18, 2009), available at *http://ia.ita.doc.gov/frn/summary/prc/E9-30695-1.pdf* (last visited this date) ("FMTC Decision Memorandum"). Folding Metal Tables and Chairs involved merchandise similar to metal ironing boards and a choice among similar financial statements, Maximaa's '07-'08 and Infiniti Modules' '06-'07. In that review, Commerce selected the Maximaa financial statement because it found that Maximaa produced a greater proportion of comparable merchandise—metal [**21] furniture—than Infiniti Modules, and because Maximaa was an integrated producer while Infiniti was an assembler. FMTC Decision Memorandum at 4-5.

Commerce distinguished Folding Metal Tables and Chairs by explaining that, in this review, Maximaa had "increasingly become an assembler." Remand Results at 13. Commerce rejected Maximaa's financial statement because of this critical finding. Id. However, Infiniti Modules was "evermore a 100% assembler." FS Remand Br. at 10. Therefore, the court does not understand the basis for rejecting Maximaa's financial statements because it was becoming an assembler, while accepting the financial statements of Infiniti Modules, who was an assembler. The simple fact is that both were assemblers. Commerce's distinction appears to be one without a difference, and is accordingly unreasonable.

Turning to Commerce's remaining criteria for selecting the best available information, Maximaa remains more contemporaneous, has more comparable metal merchandise, and its public availability is not in dispute. On this administrative record, it is difficult to imagine a reasonable mind concluding that Maximaa's financial statement is not at least as useful, if not better, [**22] than the Infiniti Modules data. Further, Commerce has a "preference . . . to use more than one financial statement where more than one

representative financial statement is available." Remand Results at 14. The court, therefore, remands this issue to Commerce to reconsider its financial statement selection.

**b. Omax**

Since Hardware and Foshan Shunde argue that Commerce also unreasonably excluded the '08-'09 Omax financial statements. In selecting financial statements, Commerce is driven by a statutory preference for selecting financial statements from producers of comparable merchandise. *19 U.S.C. § 1677b(c)(4)(B)*; see also 19 C.F.R. § 351.408(c)(4) ("For manufacturing overhead, general expenses, and profit, the Secretary normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country."). In the final results Commerce declined to use Omax's financial statements because it determined that Omax was primarily an auto producer and therefore not an appropriate surrogate. Final Results; see Decision Memorandum at 10-11. Respondents challenged Commerce's findings and argued that they had supplied evidence of Omax's production [**23] of home furnishings. The court, therefore, directed Commerce to address the evidence of Omax as a manufacturer and supplier of ironing tables. Since Hardware at 6.

On remand, Commerce determined that Omax was not a producer of ironing tables:

[*1372] [T]here is no record evidence that suggests Omax sold ironing tables to either Ikea or Polder during either the POR or the period covered by Omax's 2008-2009 annual report. We thus conclude that while Omax may have been in a position to supply ironing tables to Polder subsequent to the end of the POR, there is insufficient evidence to conclude that Omax was a producer of ironing tables during the POR.

Remand Results at 12. This finding is unreasonable on an administrative record in which the Omax '08-'09 financial statements actually contain a picture of an ironing table. Id. at 31. Although Commerce tries to explain the picture away, id. at 31, the court is not persuaded that a company not producing ironing tables would include a picture of an ironing table in its financial statements as a representative product. Additionally, Polder, Inc., a company that imported ironing tables from Omax, stated in a letter that Omax "has supplied global behemoth [**24] Ikea with ironing tables and other steel housewares for the last two years." Since Hardware SV Submission, PD 98, App. 1 at 1-2 (emphasis added).[3] Because Polder's letter was dated, October 15,

_____

[3] "PD" refers to a document in the public administrative record.

911 F. Supp. 2d 1362, *1372; 2013 Ct. Intl. Trade LEXIS 70, **24

2010, the "last two years" references October 2008 through October 2010. Id. This period overlaps this 2008-2009 administrative review. Therefore, Commerce unreasonably concluded that "there is no record evidence that suggests Omax sold ironing tables to either Ikea or Polder during the POR or the period covered by Omax's 2008-2009 annual report." Remand Results at 12.

This error though is ultimately harmless because Commerce's overall decision to exclude the Omax financial statements remains reasonable. The administrative record supports Commerce's determination that Omax is not a suitable surrogate because it is primarily an auto producer:

. . . [T]he record in this case establishes that during the period of review (POR), Omax's principle business comprised automotive products. Ironing tables constituted, at most, a very small portion of Omax's business during Omax's 2008-2009 financial reporting period.

As a fundamental matter, **[**25]** Omax's 2008-2009 annual report establishes that during the 2008-2009 fiscal reporting period, Omax was principally a manufacturer of automobile parts. First, we note that Omax's official name is "**Omax Autos Limited.**" More importantly, we note that at page 13 of its financial statements, Omax lists 29 of its customers. **Of those 29 customers, only one customer** (Ikea) seems to be involved in the business that Omax describes as "home furnishings." The rest of the customers listed by Omax in that section of the report appear to be involved in the automotive business based upon a simple examination of the company names. The importance of the automotive business to Omax is further highlighted in the account from Jatender Mehta, the Managing Director of Omax, which can be found in Omax's 2008-2009 annual report . . . . In that account, Mr. Mehta discusses Omax's financial performance during the fiscal year. In discussing the challenges that Omax faced during the 2008-2009 fiscal reporting period, Mr. Mehta cites to a decline from "**World Giants like GM, Chrysler and Ford." Mr. Mahta**[sic] **also notes a downturn that was experienced by Toyota.** While Mr. Mehta indicates elsewhere in this account **[**26]** that Omax intends to expand the company's "product profile to Home Furnishings, Commercial Vehicles and the Indian Railway," **[*1373]** Mr. Mehta merely indicates that "[I]nvestments for creating manufacturing facilities have been earmarked." However, Omax's "foray" into the home furnishings business, is primarily described as a business segment from which Omax expects to derive

future, rather than current, business. Mr. Mehta discusses no specific sales volume for "home furnishings" during the POR. Additionally, Mr. Mehta indicates that;

. . . the company has made a foray into the Home Furnishings segment. The strategy has been to tie up with the biggest international brand—Ikea. This would include the desired level of quality, delivery and cost awareness within the Company. The company has started exports of various items under the division. We are putting up a new 10 Acre plant facility at Bawai Haryana. This plant will be operational in the 3rd quarter of FY 09-10.

From our review of the customers identified by Omax, in its 2008-2009 Annual Report, and the account of Omax's business that is set forth by Mr. Mehta, we continue to conclude that **Omax's primary business during the period captured [**27] by its 2008-2009 financial statements was the production of automotive products.**

***

Because automotive products are less similar to ironing tables than is furniture, we conclude that data from Infiniti Modules represents a higher quality of data within the meaning of *section 773(c)(1)* of the Act.

Id. at 10-12 (emphasis added). Commerce, therefore, determined Omax was primarily an auto producer based on its name, customers, and the statements of its Managing Director.

The name of the company, Omax Autos Limited, pretty much says it all. It communicates that the company is primarily involved in the automotive business. Similarly, all but one of Omax's 29 customers is in the automotive business. Admittedly, that one customer in the home furnishings business is the "global behemoth" Ikea. Since Hardware SV Submission, PD 98 at App. 1. And although that does count for something, a reasonable mind could conclude on this administrative record that Omax concentrates the bulk of its operations on the automotive sector and is therefore not a suitable surrogate for the general financial ratio calculations of a metal ironing board manufacturer. Accordingly, the court must sustain Commerce's decision **[**28]** to exclude the Omax financial statements.

**B. Brokerage and Handling**

In the final results Commerce determined the World Bank's Doing Business 2010: India is "the best available source for

911 F. Supp. 2d 1362, *1373; 2013 Ct. Intl. Trade LEXIS 70, **28

valuing Foshan Shunde's brokerage and handling expenses." Final Results; see Decision Memorandum at cmt. 3. Commerce used the World Bank data to calculate Foshan Shunde and Since Hardware's brokerage and handling ("B&H") expenses based on their respective container sizes. Id. Foshan Shunde challenged Commerce's reliance on the World Bank data and the specific B&H calculations. Commerce requested a voluntary remand to correct Foshan Shunde's container weight and to address Foshan Shunde's requested letter of credit deduction. The court granted Commerce's voluntary request for remand and further remanded the issue for Commerce to (1) prepare a clear and complete public summary of its calculations of Foshan Shunde's B&H expense; (2) explain why its chosen surrogate data source and calculation is reasonably the best choice by comparing the advantages and

| | |
|---|---|
| 1) Document Preparation: | $350 |
| 2) Customs Clearance and technical control | $120 |
| 3) Ports and Terminal Handling | $175 |
| Total charges | $645 |

Moreover, as noted in the Doing Business India—2010 study, the container size assumed in the study is for a 20 foot full container load. However, both Since Hardware and Foshan Shunde shipped in 40 foot containers. Therefore, using the formulae set forth, we estimated the shipment weight that would be incurred in a 20 foot container as follows: [This calculation is also explained at HPI November 15, 2010 Case Brief at 17-18.]

D= (A*B)/C

E= $645/D

A represents the cubic capacity of a 20 foot container which is 33 **[\*\*30]** cubic meters

B represents the weight of product shipped in 40 foot containers which is { } kg of product

C represents the cubic capacity of a 40 foot container (the size in which both respondents shipped merchandise) which is 67.3.

D represents the estimated weight of product shipped in 20 foot containers

E represents the calculated, per kilogram amount for brokerage and handling.

In this case D yields an estimated weight of { } kilograms for product shipped in a 20 foot container

D= 33*{ }/67.3= { }.

Therefore, to derive the { } per unit brokerage and handling amount utilized in the Final Results, we divided the total

disadvantages of each; and (3) respond to Foshan Shunde's arguments with respect to

Commerce adjusting Foshan Shunde's actual **[\*1374]** shipped weight and actual **[\*\*29]** shipping mode. Since Hardware at 8-9.

On remand Commerce affirmed its selection of the World Bank data and its B&H calculation. Remand Results at 15-22, Attach. 1. Commerce also detailed the mechanics of its calculation for public summary:

> This details [Commerce's] calculation of brokerage and handling expense. In Doing Business India, total brokerage and handling expenses are listed as follows: [See Doing Business in India - Doing Business - The World Bank Group (Doing Business India—2010) at 37 and 84; see also HPI November 15, 2010 Case Brief at 17-18.]

brokerage and handling amount of $645 by the { } estimated weight of product shipped in 20 foot containers.

E=$645/{ }={ }

Public Summary of Calculation

This calculation can also be illustrated publicly through the use of hypothetical numbers. In this hypothetical example, we continue to allocate the total pool of brokerage and handling expenses ($645) from the Doing Business India—2010 study. We assume that this respondent shipped in a 40 foot container. We, thus adjust the calculated shipment weight for this hypothetical respondent to adjust for shipments in a 20 foot container **[\*\*31]** instead of in a 40 foot container. We also continue to assume the same cubic capacity for both the 20 foot and 40 foot containers that we utilized in the Final Results of this review.

In our hypothetical example, we assume that the respondent shipped 5000 kg of product in a 40 foot container. In such an instance

A (the cubic capacity of a 20 foot container) would continue to equal 33 cubic meters.

**[\*1375]** B (the weight of product shipped in 40 foot container) would equal 5000 kilograms.

C (the cubic capacity of a 40 foot container) would continue to equal 67.3 cubic meters.

D represents the estimated weight of product shipped in 20 foot container which would be

D= 33*5000/67.3= 2,451.71

E represents the calculated, per kilogram amount for brokerage and handling which would equal $0.2631 or

E= $645/2451.71=.2631

<u>Remand Results</u> at Attach. 1. Commerce further explained:

[W]e have determined that brokerage and handling expenses were properly calculated in the <u>Final Results</u> for the following reasons. The Department's practice when selecting the best available information for valuing FOPs, in accordance with *section 773(c)(1)* of the Act, is to select surrogate values which are product-specific, representative **[\*\*32]** of a broad-market average, publicly available, contemporaneous with the POR, and free of taxes and duties. The <u>Doing Business 2010: India</u> data from the World Bank reflect the experience of a broad number of companies, are publicly available, specific to the costs in question, represent a broad market average, and are contemporaneous to the POR.

\*\*\*

[T]he Department has utilized such World Bank data in a number of cases including <u>Wooden Bedroom Furniture from the People's Republic of China, Stainless Steel Sinks from China,</u> and <u>Wooden Bedroom Furniture from the People's Republic of China</u>, consistently finding the World Bank data to be a reliable and accurate source of surrogate value information. World Bank data represent a reputable source of information for valuing brokerage and handling because those data are prepared by an independent organization and are based upon a survey derived from a broad number of producers. In contrast, the import data offered by Foshan Shunde were limited to two freight forwarders (Samsora[sic] and Hapang[sic] Lloyd). While Foshan Shunde has argued that the import data of Samsora and Hapang[sic] Lloyd also relate somehow to exports, **the facts on the record [\*\*33] of this proceeding do not substantiate the quantification of any such export experience.** As previously noted, the business of exporting is fundamentally different than the business of importing and the data from these activities cannot be considered interchangeable.

Further, the data provided by Foshan Shunde to link brokerage and handling expenses to Foshan Shunde's specific business situation fail to substantiate its claims with regard to the expenses associated with the preparation of letters of credit. As

Petitioner has demonstrated, the World Bank data upon which the Department relied constituted $350 and are comprised of eight items: 1) bill of lading, 2) certificate of origin, 3) commercial invoice, 4) custom's export declaration, 5) inspection report, 6) packing list, 7) technical standard/health certificate, and 8) terminal handling receipts. Nowhere in this schedule of eight items are letter of credit expenses mentioned. More to the point, . . . **Foshan Shunde has claimed a constructed letter of credit cost of $390 which exceeds the total amount of brokerage and handling expenses calculated by the World Bank. Applying the $390 letter of credit expense, to the $350 of charges [\*\*34] set forth in the Doing Business report would thus result in the nonsensical calculation of a negative expense amount for Foshan Shunde's [\*1376] brokerage and handling expenses.** . . . .

Foshan Shunde's fails to substantiate its assertions that as a "rational producer" it would never incur expenses as high as those enumerated in the <u>Doing Business</u> report or that distance from seaport is a determining factor in brokerage and handling expenses. As Petitioner has noted, **because "inland transportation and handling" are calculated elsewhere in NV calculations, distance from a seaport is an irrelevant factor for purposes of calculating brokerage and handling expenses. These expenses are by definition incurred at the port of export.**

\*\*\*

. . . **While Foshan Shunde asserts that exporters close to a seaport incur lower brokerage and handling costs than do inland manufacturers, there is no evidence on the record that permits the Department to quantify that suggested difference.** Similarly, there is no information on the record of this proceeding that would permit the Department to tailor any publicly-available surrogate value data to the specific business situation experienced by Foshan Shunde or to remove **[\*\*35]** elements of brokerage and handling expense which Foshan Shunde claims not to have incurred. . . . Foshan Shunde's claim that it does not incur letter of credit expenses invites an inquiry that is beyond the scope of the issue here. The relevant question is whether the World Bank data are a reliable source for general brokerage and handling expenses, not whether the World Bank report reflects Foshan Shunde's line-by-line experience. . . . **Without knowing the exact breakdown of the data included in the World Bank report, the Department can no more deduct a letter of credit expense than add extra expenses which Foshan Shunde incurred but are not**

911 F. Supp. 2d 1362, *1376; 2013 Ct. Intl. Trade LEXIS 70, **35

**reflected by the World Bank data.** In other words, the averaged data in the World Bank report is a reasonable surrogate value because a line-by-line analysis is simply not possible. . . . .

Foshan Shunde has also challenged the Department's adjustment from the 40 foot container size in which it shipped to the 20 foot container sizes that are reflected in the Doing Business 2010: India data. This issue was also reviewed by the Court in Dongguan Sunrise. . . . In sustaining the Department's conversion from a 40 foot to a 20 foot container size, the **[**36]** Court rejected Fairmont's argument indicating:

> This argument fails because Fairmont has not presented evidence that brokerage costs are based on value, not volume, and do not increase proportionately with the number of cubic feet.

The methodology employed in this review is consistent with that employed in Dongguan Sunrise. Foshan Shunde has failed to demonstrate which, if any, of the costs included within the Doing Business 2010: India data do not increase proportionately with volume. Accordingly, . . . we continue to maintain that our adjustment for container size is supported by record evidence in this proceeding.

Remand Results at 17-21, 38-40 (citations omitted) (emphasis added).

Foshan Shunde first argues that Commerce's B&H calculations are unreasonable because Commerce should not have relied on the World Bank data but should have instead used the data from Indian freight forwarders: Samsara and Hapag-Lloyd. FS Remand Br. at 11-20. Foshan Shunde challenges the World Bank data as not reflecting the experience of any Indian producers at all, but being **[*1377]** based on a survey completed by "[l]ocal freight forwarders, shipping lines, customs brokers, port officials, and banks." Id. at 13 (citing **[**37]** Foshan Shunde SV Submission for Final Results, PD 96 at Ex. 6). Foshan Shunde adds that Commerce is generally reluctant to use the results of a survey as source documentation when "none of the actual responses or data collected from these questionnaires were provided in the report" and that therefore, Commerce "had no way to evaluate whether the information collected in the questionnaire responses was complete or properly analyzed, much less whether the responses can be considered representative . . . ." Id. at 13 (quoting Fresh Garlic from *China*, 77 Fed. Reg. 34,346 (Dep't of Commerce June 11, 2012) (final results admin. review)). The court disagrees.

Commerce explained that its practice when selecting the best available information for valuing factors of production,

in accordance with *19 U.S.C. § 1677b(c)(1)*, is to "select surrogate values which are product-specific, representative of a broad-market average, publicly available, contemporaneous . . . and free of taxes and duties." Remand Results at 17-18 (citing Certain Polyester Staple Fiber from the *People's Republic of China, 75 Fed. Reg. 1336* (Dep't of Commerce Jan. 11, 2010) (final results admin. review). Accordingly, Commerce **[**38]** calculated Foshan Shunde's B&H costs using the World Bank's Doing Business 2010: India which "reflect[s] the experience of a broad number of companies, [is] publicly available, specific to the costs in question, represent a broad market average, and are contemporaneous." Remand Results at 17-18. In contrast, Foshan Shunde's data are limited to two sources, Samsara and Hapag-Lloyd. Commerce explained that while the World Bank data largely satisfy Commerce's surrogate value criteria, Foshan Shunde's two sources are deficient in several respects. See id. at 18-19. First, they fail to represent a broad market average because they are from only two companies. Id. at 18. Second, the experience of two freight forwarders is not specific to the expenses in question because the expenses reported in these data sources represent import expenses—not export expenses. Id. at 19 ("[T]here is no documentation on the record of this proceeding to suggest that the costs for importing merchandise parallel the costs that are related to exporting merchandise."). Commerce further explained that "the business of exporting is fundamentally different than the business of importing and the data from these activities **[**39]** cannot be considered interchangeable." Id. at 39. In response, Foshan Shunde contends that Commerce's finding "is simply incorrect" and that it submitted "prices for all port activities - for both importers and exporters." FS Remand Br. at 16. However, the Samsara and Hapag-Lloyd data that Foshan Shunde submitted are both labeled as import data. See Foshan Shunde SV Submission for Prelim. Results, PD 77 at Ex. 2. Further, when arguing that it submitted export data, Foshan Shunde cites to its submission of the Indian port schedules, Foshan Shunde SV Submission for Prelim. Results, PD 77 Ex. 1, and not the Samsara and Hapag-Lloyd data, Foshan Shunde SV Submission for Prelim. Results, PD 77 Ex. 2. Therefore, Commerce reasonably concluded that the Samsara and Hapag-Lloyd data reflect only import data. See Foshan Shunde SV Submission for Prelim. Results, PD 77 at Ex. 2.

Additionally, although Foshan Shunde claims that consistent with Commerce practice, Commerce "must reject the World Bank Doing Business Report as unrepresentative, unreliable, and unverifiable," FS Remand Br. at 13, Commerce reasonably found the World Bank data to be a "reliable and accurate source." Remand Results at 38. **[**40]** Commerce explained **[*1378]** that the "World Bank data represent a

911 F. Supp. 2d 1362, *1378; 2013 Ct. Intl. Trade LEXIS 70, **40

reputable source of information for valuing brokerage and handling because those data are prepared by an independent organization and are based upon a survey derived from a broad number of producers." Id. at 38-39. Commerce has also previously relied on the World Bank data to calculate surrogate B&H values. See e.g., Wooden Bedroom Furniture from the *People's Republic of China, 76 Fed. Reg. 9,747* (Dep't of Commerce Feb. 22, 2011) (new shipper review final results); Drawn Stainless Steel Sinks from the *People's Republic of China, 78 Fed. Reg. 13,019* (Dep't of Commerce Feb. 26, 2013) (final results admin. review); Wooden Bedroom Furniture from the *People's Republic of China, 75 Fed. Reg. 50,992* (Dep't of Commerce Aug. 18, 2010) (final results admin. review); see also *Dongguan Sunrise Furniture Co. v. United States, 36 CIT ___ , 865 F. Supp. 2d 1216, 1246 (2012)* (affirming Commerce's reliance on the World Bank data and noting that "Commerce has consistently found the World Bank to be a reliable source for data"). Therefore, Commerce reasonably relied on the World Bank data.

Foshan Shunde next argues that Commerce should have **[**41]** altered the World Bank data to reflect Foshan Shunde's actual expenses. FS Remand Br. at 12. First, Foshan Shunde argues that Commerce should remove a specific expense from the aggregate data, specifically, the expense for preparing a letter of credit. Id. at 17. Foshan Shunde contends that because it did not incur a letter of credit expense, Commerce should adjust the B&H by deducting amounts for letter of credit expenses. Id. at 17. Foshan Shunde explains that "the World Bank data includes costs for procuring an export letter of credit," id. at 17, and that "the L/C costs are embedded in the 'documents required to export and import' and greatly inflate the document preparation costs." FS 56.2 Br. at Ex. 1, 31. Foshan Shunde lists the price of an export letter of credit as $390. FS Remand Br. at 17 (citing FS' Br. 56.2 at 26). Commerce, however, responds that it will not adjust the B&H because the listed items composing the B&H do not include a letter of credit expense. Remand Results at 39 ("Nowhere in this schedule of eight items is letter of credit expenses mentioned."). Moreover, Defendant argues that Foshan Shunde's $390 letter of credit cost "exceeds [$350,] the total amount **[**42]** of [the document preparation costs of the] brokerage and handling expenses calculated by the World Bank. Applying the $390 letter of credit expense, to the $350 . . . charges . . . would result in the nonsensical calculation of a negative expense." Id. at 39 (citations omitted) (original emphasis).

The B&H costs from the Word Bank data are composed of three categories of expenses: (1) document preparation; (2)

customs clearance and technical control; and (3) ports and terminal handling. Id. at Attach. 1. The document preparation fee is composed of eight items: (1) bill of lading; (2) certificate of origin; (3) commercial invoice; (4) custom's export declaration; (5) inspection report; (6) packing list; (7) technical standard/health certificate; and (8) terminal handling receipts. Id. at 39. Letters of credit are not included in the eight listed expenses for document preparation. Even if the letter of credit expenses are embedded, as Foshan Shunde argues, the court agrees that, "without knowing the exact breakdown of the data included in the World Bank Report, [Commerce] can no more deduct a letter of credit expense than add extra expenses which Foshan Shunde incurred but are not reflected **[**43]** by the World Bank data." Id. at 19-20. Therefore, Commerce's refusal to adjust the B&H costs for possible letter of credit expenses was reasonable.

**[*1379]** Next, Foshan Shunde argues that Commerce should have adjusted its B&H calculations to reflect Foshan Shunde's proximity to China's seaports. Foshan Shunde argues that "proximity to a major seaport is a key factor in the World Bank's determination of the cost of trading across borders in India" and that companies near ports bear lower B&H expenses. FS 56.2 Br. at Ex. 1, 28; FS Remand Br. at 16. Commerce responds that "because 'inland transportation and handling' are calculated elsewhere in NV calculations, distance from a seaport is an irrelevant factor for purposes of calculating brokerage and handling expenses. These expenses are by definition incurred at the port of export." Remand Results at 40. Commerce further adds that "[w]hile Foshan Shunde asserts that exporters close to a seaport incur lower brokerage and handling costs than do inland manufacturers, there is no evidence on the record that permits [Commerce] to quantify that suggested difference." Id. at 19. The court does not believe this conclusion is reasonable on this administrative **[**44]** record.

Foshan Shunde placed on the administrative record the World Bank's Doing Business Subnational Report that includes the specific B&H costs for Indian seaports: Chennai, Kochi, Kolkata, and Mumbai. Foshan Shunde SV Submission for Final Results, PD 96 at Ex. 4. The data that Commerce relied on, the World Bank's Doing Business in India: 2010, is composed of the B&H costs of 17 Indian cities/regions including the four above mentioned port cities. Id. at Ex. 3-4. Four of the 17 cities are seaports, and the remaining 13 are inland. Id. at Ex. 4. The Doing Business Subnational Report contains the following categories of expenses for each seaport: (1) document preparation; (2) customs clearance and technical control; (3) ports and terminal handling; and (4) inland transportation

911 F. Supp. 2d 1362, *1379; 2013 Ct. Intl. Trade LEXIS 70, **44

and handling. Id. Commerce explained that it did not include inland transportation and handling in its B&H calculations. Remand Results at 40. Commerce instead calculated B&H from the other three categories of costs: (1) document preparation; (2) customs clearance and technical control; and (3) ports and terminal handling. Id. at Attach. 1. Therefore, in arguing the proper B&H calculation for each seaport, Foshan [**45] Shunde also omitted inland transportation and handling costs from the Business Subnational Report data. FS 56.2 Br. at 28. The Business Subnational Report, excluding inland transportation and handling fees, provides the following B&H costs for the four seaports: Chennai: $439; Kochi: $375; Kolkata: $462; and Mumbai $645. Foshan Shunde SV Submission for Final Results, PD 96 at Ex. 4.; see also id. The average B&H costs for the four seaports are $480. In contrast, based on the aggregate data of all 17 cities, Commerce calculated $645 in B&H costs. Remand Results at Attach. 1. Therefore, even excluding inland transportation costs, there is a $165 difference between the combined data for all 17 Indian cities and the data from the seaports. This evidence directly contradicts Commerce's conclusion that "distance from a seaport is an irrelevant factor" and that there is no evidence to "quantify that suggested difference." Id. at 19, 40. Further, the court agrees with Foshan Shunde that Commerce "offered no explanation why the World Bank report including export costs from 17 Indian cities, most of which lie far inland, was a more appropriate data set than the regional reports of four Indian [**46] cities geographically located near major ports, when Foshan Shunde itself is located near major Chinese ports." FS 56.2 Br. at 26. Commerce's determination appears unreasonable. The court must therefore remand this issue to Commerce to consider the World Bank data from the seaports or to [*1380] provide a reasonable explanation as to why that is not appropriate.

Finally, Foshan Shunde argues that Commerce's adjustment of the World Bank data from 20-foot to 40-foot containers is unreasonable because B&H costs do not increase proportionally from 20-foot to 40-foot containers. FS Remand Br. at 19-20. Foshan Shunde contends that the per-kilogram B&H costs of a 40-foot container is lower than that of a 20-foot container. Id. Commerce calculated the B&H costs by first determining the per-kilogram B&H costs of a 20-foot container, and then applied that value to the weight of a 40-foot container. This type of calculation assumes that B&H costs increase proportionally from 20-foot to 40-foot containers. From this calculation, Commerce determined B&H costs to be $645. Remand Results at Attach. 1. Defendant and HPI respond to Foshan Shunde's argument, explaining that Commerce "merely converted the data, [**47] such that the World Bank data would reflect the

ways in which Foshan Shunde actually ships its goods" and that, "Commerce made a straightforward mathematical adjustment from the 40-foot container size in which it shipped to the 20-foot container size that are reflected in the World Bank data." Defendant's Resp. to Plaintiffs' Comm. Concerning Remand Results, ECF No. 100 at 19-20 ("Def. Remand Br."); see also Reply of HPI to Comm. Concerning Remand Results, ECF No. 101 at 19 ("HPI Remand Br."). Defendant also argues that this same issue was addressed in *Dongguan Sunrise v. United States, 36 CIT __, __, 865 F. Supp. 2d 1216, 1247 (2012)*, in which the court held Commerce's conversion from a 20-foot to a 40-foot container reasonable. Def. Remand Br. at 20. HPI also relies on Utility Scale Wind Towers from the *People's Republic of China, 77 Fed. Reg. 75,992* (Dep't of Commerce Dec. 26, 2012) (final determ.), in arguing that total B&H costs increase proportionally with container capacity. HPI Remand Br. at 19. On remand, Commerce explained that "Foshan Shunde has failed to demonstrate which, if any, of the costs included within the Doing Business 2010: India data do not increase proportionately [**48] with [container size]." Remand Results at 21. Defendant and HPI, therefore, argue that Commerce's conversion of the data is reasonable (supported by substantial evidence).

In Dongguan Sunrise the court sustained Commerce's adjustment of the World Bank data from a 20-foot to a 40-foot container "because [Respondent] ha[d] not presented evidence that brokerage costs are based on value, not volume, and do not increase proportionally with the number of cubic feet." *Dongguan Sunrise, 36 CIT at __, 865 F. Supp. 2d at 1247*. Similarly, in Utility Scale Wind Towers from the People's Republic of China, Commerce stated, "absent record evidence to the contrary, total brokerage and handling costs increase proportionally with a container's capacity and, therefore, per-unit brokerage and handling rates do not change as a container's capacity increases." Utility Scale Wind Towers from the *People's Republic of China, 77 Fed. Reg. 75,992, 75,997* (Dep't of Commerce Dec. 26, 2012) (final determ.) (emphasis added). If B&H costs increased proportionally from 20-foot to 40-foot containers, as Commerce calculated, then there would be a 100% increase in B&H costs from a 20-foot to a 40-foot container. Foshan [**49] Shunde, however, points to evidence in the record that shows only a 30-50% increase in costs from 20-foot to 40-foot containers. Foshan Shunde SV Submission for Prelim., PD 77, Ex. 1 at 3-6, 14-16, 37, 64-65, Ex. 2; see also FS 56.2 Br. at 33. Therefore, Foshan Shunde has demonstrated that B&H costs do not increase proportionally from 20-foot to 40-foot containers. Accordingly, Commerce unreasonably concluded [*1381] that, "Foshan Shunde has failed to demonstrate, which if any, of the costs . . . do not

911 F. Supp. 2d 1362, *1381; 2013 Ct. Intl. Trade LEXIS 70, **49

increase proportionately with volume." Remand Results at 21. The court remands this issue to Commerce to consider Foshan Shunde's evidence regarding B&H costs in 20-foot versus 40-foot containers.

**C. Cotton Fabric Surrogate Valuation**

In Since Hardware the court granted Commerce's voluntary remand request to reconsider Since Hardware's cotton fabric weight and recalculate the conversion factor. Since Hardware at 2. On remand, Commerce changed the conversion factor from 5.0 to 7.5 and explained:

Since Hardware has demonstrated that the weight of its cotton fabric was between 100 grams and 200 grams per square meter. The precise conversion factor for Since Hardware's cotton inputs would therefore **[**50]** range between 5 and 10. Therefore, based upon the information on record, the Department has based its determination on a reasonable inference that the conversion factor is 7.5.

Remand Redetermination at 23. In challenging the cotton fabric conversion factor, Since Hardware presents a hollow argument. Since Hardware's entire argument consists of the following: "[t]his Court should find that Commerce should use the record information verified for Since Hardware and apply the 5.49 conversion factor instead of the 7.5 as it is more specific to Since Hardware Draft Remand Comments at 2-6[sic]." SH Br. at 20. Missing is any effort to develop an argument as to how the 5.49 conversion factor is "more specific to Since Hardware" and to identify standards against which the court can evaluate the reasonableness of Commerce's cotton fabric valuation. Id. Since Hardware's "argument" is all the more difficult to countenance because the Scheduling Order specifically cautioned against just such a submission:

Please be advised that the court will not permit the plaintiff to shift to the court and the other parties the burden of establishing the ossature of plaintiff's arguments against the standard of **[**51]** review the court applies to resolve them. Instead, the court will summarily sustain Commerce's action.

Scheduling Order at 5, ECF No. 36. Rule 56.2(c)(2) requires that briefs "must include the authorities relied on and the conclusions of law deemed warranted by the authorities." USCIT R. 56.2(c)(2). As Since Hardware has failed to satisfy this basic requirement, and abide by the express instructions of the Scheduling Order, the court deems this issue waived and sustains Commerce's cotton fabric

surrogate valuation. See *MTZ Polyfilms, Ltd. v. United States, 33 CIT    ,    , 659 F. Supp. 2d 1303, 1308-09 (2009); Fujian Lianfu Forestry Co. v. United States, 33 CIT    ,    , 638 F. Supp. 2d 1325, 1350 (2009); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)* ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citations omitted).

**D. Labor Wage Rate Surrogate Valuation**

In the final results Commerce calculated the surrogate labor **[**52]** wage rate using data from the International Standard Classification of all Economic Activities ("ISIC") Revision 3 rather than ISIC Revision 2. Final Results; see Decision Memorandum at 16. The court in Since Hardware remanded the issue to have Commerce conform its results with the prior review, *Home Prods., 36 CIT    ,    , 837 F. Supp. 2d 1294, 1296-97,* **[*1382]** and to include Indian data under ISIC Revision 2, as well as any other appropriate country in that data set. Since Hardware at 9-11. The court rejected Since Hardware and Foshan Shunde's argument that Commerce must use data from India because "the statute does not mandate Commerce must, as a matter of law, use Indian data alone." Since Hardware at 10. The court also deemed waived any argument by Since Hardware and Foshan Shunde that, as a factual matter, India alone was both economically comparable to China and a significant producer of comparable merchandise, because neither party identified even one country included in Commerce's analysis that failed either standard, leaving that work to the court or the other interested parties. Id. Consequently, the court did not "require Defendant or HPI to expend any more energy on this issue" **[**53]** other than for Commerce to conform its decision to its Remand Redetermination from the prior administrative review. Id. at 11.

On remand Commerce followed the court's instructions and recalculated the labor wage rate "rely[ing] on labor data reported by countries either under the International Standard Industrial Classification (ISIC) Revision 3, or, as discussed below, ISIC Revision 2," including "data from India and Nicaragua." Remand Results at 22-22. Since Hardware again argues that Commerce should use India alone to calculate the surrogate wage rate. SH Br. at 19-20. The court previously rejected this argument in Since Hardware, and Commerce's labor wage rate surrogate valuation is therefore sustained. See Since Hardware at 10-11; see also *Home Prods. Int'l, Inc. v. United States, 36*

911 F. Supp. 2d 1362, *1382; 2013 Ct. Intl. Trade LEXIS 70, **53

*CIT    ,    , 810 F. Supp. 2d 1373, 1380 (2012)*; opinion after remand, *Home Prods. Int'l, Inc. v. United States, 36 CIT    ,    , 837 F. Supp. 2d 1294, 1297 (2012)*; opinion after remand, *Home Prods. Int'l, Inc. v. United States, 36 CIT    , 853 F. Supp. 2d 1257 (2012)*, aff'd, *Home Prods. Int'l, Inc. v. United States, 501 Fed. Appx. 981 (Fed. Cir. Apr. 11, 2013)*.

### III. Conclusion

Accordingly,  **[**54]** it is hereby

**ORDERED** that Commerce's financial statement selection is remanded to reconsider the exclusion of the Maximaa financial statements; it is further

**ORDERED** that Commerce's brokerage and handling calculations are remanded for Commerce to reconsider its treatment of container sizes and proximity to seaports; it is further

**ORDERED** that Commerce's labor wage rate surrogate valuation is sustained; it is further

**ORDERED** that Commerce's cotton fabric surrogate valuation is sustained; it is further

**ORDERED** that Commerce shall file its remand results on or before July 30, 2013; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

/s/ Leo M. Gordon

Judge Leo M. Gordon

Dated: May 30, 2013

New York, New York



🔴 Warning
As of: May 20, 2015 1:14 PM EDT

# *Since Hardware* (Guangzhou) Co. v. United States

United States Court of International Trade

April 15, 2014, Dated

Consol. Court No. 11-00106

**Reporter**

977 F. Supp. 2d 1347; 2014 Ct. Intl. Trade LEXIS 43; 36 Int'l Trade Rep. (BNA) 197; SLIP OP. 2014-44

**Subsequent History:** Counsel Amended June 19, 2014.
Motion denied by *Since Hardware (Guangzhou) Co. v. United States, 991 F. Supp. 2d 1319, 2014 Ct. Intl. Trade LEXIS 65 (2014)*
Vacated by, in part, Reconsideration denied by *Since Hardware (Guangzhou) Co. v. United States, 37 F. Supp. 3d 1354, 2014 Ct. Intl. Trade LEXIS 154 (2014)*
Appeal after remand at, Remanded by *Since Hardware Guangzhou Co. v. United States, 2015 Ct. Intl. Trade LEXIS 20 (Ct. Int'l Trade, Feb. 18, 2015)*

**Prior History:** *Since Hardware (Guangzhou) Co. v. United States, 2013 Ct. Intl. Trade LEXIS 78 (May 31, 2013)*

**Disposition:** **[\*\*1]** Final results of administrative review sustained in part and remanded in part.

**Counsel:** William E. Perry and Emily Lawson, Dorsey & Whitney LLP of Seattle, Washington for Plaintiff Since Hardware (Guangzhou) Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, deKieffer & Horgan of Washington, DC for Plaintiff-Intervenor Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.

Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nathanial J. Halvorson and Aman Kakar, Office of the Chief Counsel for Import Administration, U. S. Department of Commerce of Washington, DC.

Frederick L. Ikenson, Peggy A. Clarke, and Larry Hampel, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

**Judges:** Before: Leo M. Gordon, Judge.

**Opinion by:** Leo M. Gordon

# Opinion

**[\*1349] OPINION and ORDER**

Gordon, Judge: This consolidated action involves the U.S. Department of Commerce's ("Commerce") fifth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing **[\*\*2]** Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the *People's Republic of China, 76 Fed. Reg. 15,297* (Dep't of Commerce Mar. 21, 2011) (final results admin. review), as amended by *76 Fed. Reg. 23,543* (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review) (collectively, "Final Results"); see also Issues and Decision Memorandum for Ironing Tables from China, A-570-888 (Mar.22, 2011), available at *http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf* **[\*1350]** (last visited this date) ("Decision Memorandum"). Before the court are the Final Results of Redetermination, ECF No. 113 ("Second Remand Results") filed by Commerce pursuant to *Since Hardware (Guangzhou) Co. v. United States, 37 CIT ___, 911 F. Supp. 2d 1362 (2013)* ("Since Hardware II"); see also Final Results of Redetermination, ECF No. 85 ("First Remand Results"); Since Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 81 ("Since Hardware I") (order remanding to Commerce). The court has jurisdiction pursuant to Section 516a(a)(2)(B)(iii) of the Tariff Act of 1930, as

977 F. Supp. 2d 1347, *1350; 2014 Ct. Intl. Trade LEXIS 43, **3

amended, *19 U.S.C. § 1516a(a)(2)(B)(iii) (2006)*,[1] and *28 U.S.C. § 1581(c) (2006)*. [**3] Familiarity with the prior judicial and administrative decisions in this action is presumed.

Plaintiffs Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") and Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd. ("Foshan Shunde") both challenge Commerce's financial statement selection; Foshan Shunde challenges Commerce's brokerage and handling surrogate valuation.[2] See Since Hardware Comments on Remand Results, ECF No. 119; Foshan Shunde Comments on Remand Results, ECF No. 118; Foshan Shunde Reply Comments on Remand Results, ECF No. 128. Defendant and Defendant-Intervenor, Home Products International, Inc. ("Home Products" or "HPI"), oppose these challenges and argue that the <u>Second Remand Results</u> should be sustained. See Def.'s Comments on Remand Results, ECF No. 126; Home Products' Comments on Remand Results, ECF No. 127; Def.'s Surreply to Comments on Remand Results, ECF No. 145; Home Products' Surreply to Comments on Remand Results, ECF No. 144. For the reasons that follow, the court sustains Commerce's financial statement selection, but remands [**4] the brokerage and handling issue to Commerce for further consideration.

## I. Standard of Review

When reviewing Commerce's antidumping determinations under *19 U.S.C. § 1516a(a)(2)(B)(iii)* and *28 U.S.C. § 1581(c)*, the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *19 U.S.C. § 1516a(b)(1)(B)(i)*. More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)*. [**5] Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)*. Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative [*1351] agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966)*. Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2014). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 <u>West's Fed. Forms, National Courts</u> § 13342 (2d ed. 2013).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*, governs judicial review of Commerce's [**6] interpretation of the antidumping statute. See *United States v. Eurodif S.A., 555 U.S. 305, 316, 129 S. Ct. 878, 172 L. Ed. 2d 679 (2009)* (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Financial Statement Selection

When selecting financial statements to calculate the financial ratios for respondents' margins, Commerce is guided by a general regulatory preference for publicly available, non-proprietary information. 19 C.F.R. § 351.408(c)(1), (4) (2009). Beyond that, Commerce generally considers the quality, specificity, and contemporaneity of the available financial statements. See Fresh Garlic from the *People's Republic of China, 67 Fed. Reg. 72,139* (Dep't of Commerce Dec. 4, 2002) (final results new shipper review). During the administrative review, Commerce had a choice from among four Indian financial statements: '06-'07 Infiniti Modules Private Ltd. ("Infiniti Modules"); '08- '09 Omax Autos Ltd. ("Omax"); and '07-'08 and '08-'09 Maximaa Systems Ltd. ("Maximaa"). In the <u>Final Results</u> Commerce chose the '06-'07 Infiniti Modules financial statements alone as the best available information [**7] from which to calculate the financial ratios.

### 1. Infiniti Modules

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

[2] Since Hardware also attempted to challenge Commerce's brokerage and handling ("B&H") valuation, but the court deemed the issue waived for inadequate briefing and argument. <u>Since</u> Hardware I at 7; see also Home Prods. Int'l, Inc. v. United States, No. 11-00104 (Jan. 3, 2012), ECF No. 62 (order waiving challenge to B&H calculation), as amended, ECF No. 63; *Home Prods Int'l, Inc. v. United States, 36 CIT ___, 837 F. Supp. 2d 1294, 1300-02*, <u>opinion after remand</u>, *36 CIT ___, 853 F. Supp. 2d 1257 (2012)*.

977 F. Supp. 2d 1347, *1351; 2014 Ct. Intl. Trade LEXIS 43, **7

When first reviewing the issue of Commerce's selection of the '06-'07 Infiniti Modules financial statements, the court could not sustain Commerce's conclusion that those statements were publicly available. See Since Hardware I at 4-5. On remand Commerce acknowledges that it erred in the Final Results when it concluded that the Infiniti Modules financial statements were available through a website. First Remand Results at 7. Commerce clarified, though, that it still believed the financial statements were publicly available because they were used in a prior administrative review and available on the public administrative record of that review. Id. at 29. Commerce also explained that Commerce and all interested parties had significant experience with Infiniti Modules' financial statements. Id. at 5-6.

In reviewing the First Remand Results, the court acknowledged Commerce's reasonable desire to continue to use a data source with which all parties were well acquainted, but could not sustain Commerce's continuing insistence that the Infiniti Modules financial statements were "publicly available." Since Hardware II, 37 CIT at    , 911 F. Supp. 2d at 1368-69. [**8] The problem undermining Commerce's decision was its reliance upon Catfish Farmers of America v. United States, 33 CIT 1258, 1272, 641 F. Supp. 2d 1362, 1377 [*1352] (2009), as providing "the standard for public availability established in our practice." First Remand Results at 29. The court noted that Catfish Farmers nowhere explains Commerce's standards or criteria for public availability. Foshan Shunde, on the other hand, identified a contemporaneous proceeding in which Commerce had applied fairly rigorous standards of public availability: Final Results of Redetermination Pursuant to Court Remand, Yantai Xinke Steel Structure Co. v. United States, Court No. 10-00240, ECF No. 83 at 18-23 ("Steel Grating Remand Results"); see also Certain Steel Grating from the People's Republic of China, 75 Fed. Reg. 32,366 (Dep't of Commerce June 8, 2010) (final LTFV determ.). The court therefore directed Commerce to reconcile its approach here with the Steel Grating Remand Results.

In the Second Remand Results Commerce provides a comprehensive and reasonable justification for its continued reliance on the Infiniti Modules financial statements as among the best available information. Second Remand Results at 20-25. [**9] In doing so Commerce reasonably distinguishes the Steel Grating Remand Results and other administrative decisions relied upon by Foshan Shunde and Since Hardware. Id. at 21-23. Specifically, Commerce explains that "[i]n contrast to the cases cited by Foshan Shunde and Since Hardware, the instant case does not involve the introduction of a new financial statement or the selection of data from a new surrogate country; this case

deals with a familiar financial statement whose provenance has never been called into question by even a scintilla of evidence." Id. at 23. Also, "Infiniti's financial statements were put on the record of multiple reviews of [the antidumping duty orders on] Folding Metal Tables and Chairs [from China] and Hand Trucks [from China], and . . . no party contested the public availability" in those proceedings. Id. at 25 (footnotes omitted). Commerce concludes that the Infiniti Modules financial statements "are publicly available within the meaning of section 351.408(c)(1) of [its] regulations." Id.

Commerce also provides a more in depth analysis of its applicable regulation, 19 C.F.R. § 351.408(c). Id. at 23-24 (analyzing promulgation of regulation). Commerce explains [**10] that the use of publicly available information is relatively more important to value material inputs than it is to value overhead, general expenses and profit because use of public information for material inputs tends to yield more representative data reflecting numerous transactions between many buyers and sellers. Id. at 23. Commerce further explains that the same imperative does not exist for overhead, general expenses and profit "because such data do not exist on an aggregated basis, and because [Commerce] uses overhead, general expenses and profit on a company-specific basis, as it must, since that is the only data available." Id. at 24 (citing 19 C.F.R. § 351.408(c)(4)). Instead, Commerce explains that the primary purpose for obtaining publicly available information for financial statements "is to ensure that all interested parties have access to such information, and are able to comment on the reliability and relevance of such information in the particular case, and not as much for purposes of obtaining broader information that reflects numerous transactions as is the case for material inputs." Id. And here, Foshan Shunde and Since Hardware had access to, and were able to comment [**11] upon, the financial statements at issue, finding "no basis to question the reliability of the data," which in turn led Commerce to conclude that "the purpose of the regulation is fulfilled in this case." Id.

 [*1353]  Unlike the Final Results and First Remand Results, the court cannot identify any unreasonableness in Commerce's determination here. Commerce addressed those administrative precedents in which it applied rigorous public availability criteria to new financial statements, reasonably distinguishing them given the widespread past use of Infiniti Modules' financial statements in prior segments of the Ironing Tables order, respondents' own substantive reliance on the financial statements in those prior segments, as well the financial statements' use in proceedings under other antidumping duty orders. Indeed,

977 F. Supp. 2d 1347, *1353; 2014 Ct. Intl. Trade LEXIS 43, **11

their "provenance has never been called into question." Id. at 23.[3] Also, to the extent Commerce's decision implicates an interpretation of its regulation, that interpretation is not "plainly erroneous or inconsistent with the regulation," *Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945)*, and is therefore entitled to deference. See *American Signature, Inc. v. United States, 598 F.3d 816, 827 (Fed. Cir. 2010)*. [**12] Accordingly, the court will sustain Commerce's selection of the Infiniti Modules financial statements.

## 2. Maximaa

In Since Hardware II the court determined that Commerce had not reasonably distinguished the Final Results, in which it selected Infiniti Modules' financial statements and rejected Maximaa's, from another administrative proceeding in which it did the exact opposite, Folding Metal Tables and Chairs from the *People's Republic of China, 74 Fed. Reg. 68,568* (Dep't of Commerce Dec. 28, 2009) (final results admin. review) ("Folding Metal Tables and Chairs"); see also Issues and Decision Memorandum for Folding Metal Tables and Chairs from China, A-570-868 (Dec. 18, 2009), available at *http://ia.ita.doc.gov/frn/summary/prc/E9-30695-1.pdf* (last visited this date). Since Hardware II, *37 CIT at , 911 F. Supp. 2d at 1371*.

As with its treatment of Infiniti Modules' financial statement, in the Second Remand Results Commerce provides a comprehensive [**13] and reasonable justification for its rejection of Maximaa's financial statements. Second Remand Results at 6-11, 26-28. The court now has a better understanding of what transpired during the administrative proceeding and how the interested parties developed the administrative record. In response to respondent's addition of the Maximaa financial statements to the administrative record, petitioner augmented the record with documentation and argumentation that enabled Commerce to reasonably pursue an alternative financial statement selection than it had in Folding Metal Tables and Chairs. Id. at 7. Importantly, the record in this proceeding established that Infiniti Modules was a not just an assembler (a conclusion Commerce reached in Folding Metal Tables and Chairs), but a manufacturer. Id. at 9-10. Petitioner also added documentation and information that undermined the suitability of Maximaa as a surrogate (information that apparently was not present in Folding Metal Tables and Chairs). This information and associated reasonable inferences support Commerce's determination that Maximaa

was apparently transitioning from furniture assembly to other lines of business like information technology [**14] services. Id. at 7-8. In short, Commerce has reasonably identified several problems with the Maximaa financial statements that render them unsuitable for use, precluding the court from ordering [*1354] Commerce to incorporate them in the financial ratio calculation.

Interested parties bear the burden of developing the administrative record. *OVD Food Co. v. United States, 658 F.3d 1318, 1325 (Fed. Cir. 2011)*. Here, petitioner was equal to the task, aggressively countering respondents' efforts to supplement the record with additional surrogate financial statements. The result is that respondents have failed to develop an administrative record that would mandate a reasonable mind to include Maximaa's financial statements within the financial ratio calculation. Accordingly, the court will sustain Commerce's rejection of the Maximaa financial statements.

## B. Brokerage and Handling

When the court first reviewed the brokerage and handling issue, it had difficulty understanding exactly what Commerce did when calculating this typically routine and well-known component of most international trade transactions. The seeming impenetrability of Commerce's calculation aroused the court's suspicions about the [**15] reasonableness of Commerce's approach. Since Hardware I at 8. The court thus directed Commerce "to prepare a clear, complete public summary of its calculation of Foshan Shunde's B&H expense." Id. Commerce obliged, attaching a summary to the First Remand Results revealing that it divided a $645 baseline cost described in the World Bank's Doing Business 2010: India publication by "the estimated weight of [Foshan Shunde's] product shipped in 20-foot containers." First Remand Results at Att. A. This formula did not appear to comport with record evidence appearing to show that B&H costs are actually lower than $645 in coastal cities and do not increase proportionately with container size, leading the court to remand again. Since Hardware II, *37 CIT at , 911 F. Supp. 2d at 1374*; see First Remand Results at Att. A.

In the Second Remand Results, Commerce continues to use the $645 Doing Business 2010: India data point as a basis for calculating Foshan Shunde's B&H costs, but adjusts its treatment of the three components underlying that figure in response to the court's observations:

---

[3] Nothing in Yantai Steel Structure Co. v. United States, 38 CIT    , -   , 2014 Ct. Intl. Trade LEXIS 39, at *43 (Apr. 9, 2014) detracts from the reasonableness of Commerce's explanation of its standards for public availability in the Second Remand Results.

977 F. Supp. 2d 1347, *1354; 2014 Ct. Intl. Trade LEXIS 43, **15

In Doing Business India—2010, total brokerage and handling expenses for exporting a 20 foot container is listed **[**16]** as follows:

1) Document Preparation $350

2) Customs Clearance and Technical Control $120

3) Ports and Terminal Handling $175

Because [Commerce] had available data pertaining to shipments in 20 foot containers, while Foshan Shunde shipped ironing tables in 40 foot containers, Commerce adjusted the weight of the ironing tables shipped in a 40 foot container to an estimated weight that would correspond to a 20 foot container size quote from the Doing Business India—2010 study. . . . Therefore, the following adjustment was made to determine the estimated comparable weight of the ironing tables had they been shipped in 20 foot containers (D):

**D=(A*B)/C**

**A** represents the cubic capacity of a 20 foot container, which is 33 cubic meters.

**B** represents the weight of ironing tables shipped in 40 foot containers, which is [ ] kg.

**C** represents the cubic capacity of a 40 foot container (the size in which both **[*1355]** respondents shipped merchandise), which is 67.3 cubic meters.

In this case **D** yields an estimated weight of [ ] kilograms for ironing tables shipped in a 20 foot container.

**D**= 33*[ ]/67.3= [ ].

In the second redetermination, Commerce determined that Foshan Shunde's Document Preparation and Customs Clearance **[**17]** charges increased proportionately with container size. That is, this cost, for use of a 40 foot container increases 100 percent, relative to this cost for use of a 20 foot container. However, for Ports and Terminal Handling Charges, Commerce determined that it increased by only 50 percent as a result of using a 40 foot container in lieu of a 20 foot container. Thus, Commerce used the following variables and formula to calculate Foshan Shunde's brokerage and handling expense (B & H) (per kilogram):

**E**= Documents Preparation Charge, which is $350.

**F**=Customs Clearance and Technical Control Charges, which is $120.

**G**=Ports and Terminal Handling Charges, which is $175.

**B & H** represents the calculated expense for brokerage and handling (per kilogram).

**B & H**= $((E+F)/D)+((G*1.5*0.5)/D)=\$[\ ]$ per kilogram.[8]

[8] In the formula, "1.5" represents the 50 percent proportionate increase in Ports and Terminal Handling Charges through the use of a 40 foot container in lieu of a 20 foot container, and "0.5" represents the shipment weight of a 20 foot container (which is half that of a 40 foot container).

In this redetermination, this formula equates to:

**B & H** = **[**18]** $((350+120)/[\ ]) + ((175*1.5*0.5)/[\ ])=\$[\ ]$ per kilogram.

Def.'s Resp. to Ct.'s Feb. 27, 2014 Order 1-3 (footnotes omitted, emphasis in original), ECF No. 140 ("Calculation Submission").[4]

Foshan Shunde now objects to four aspects of Commerce's revised B&H calculation. First, Foshan Shunde again disputes the $645 data point, albeit for reasons premised upon new evidence in the administrative record. Second, Foshan Shunde objects to Commerce's selection of a 50% increase to convert ports and terminal handling costs for 20-foot to 40-foot containers in light of record evidence showing such cost increases can be as low as 30%. Third, Foshan Shunde argues that Commerce ignores record evidence demonstrating that Foshan Shunde actually incurred document preparation and customs clearance costs only once every 6.2 40-foot containers it shipped. Lastly, Foshan Shunde insists that Commerce's reliance on an estimated 20-foot container weight is unreasonable because **[**19]** it implies a relationship between B&H costs and container weight that is not supported by the record. The court largely agrees and therefore remands this issue to Commerce for clarification or reconsideration, as may be appropriate.

### 1. The World Bank's Doing Business 2010 Publication

As a preliminary matter, the court in Since Hardware II directed Commerce to address evidence appearing to show that B&H costs are lower on average for Indian companies that, like Foshan Shunde, are located near a seaport. In so doing, the court made the following observation: "The data that Commerce relied upon, the **[*1356]** World Bank's

---

[4] It is unclear whether "the weight of ironing tables shipped in 40 foot containers" is itself the result of a conversion based on the average number of units Foshan Shunde shipped per 40-foot container. See Decision Memorandum at 16-19.

977 F. Supp. 2d 1347, *1357; 2014 Ct. Intl. Trade LEXIS 43, **19

Doing Business in India: 2010, is composed of the B&H costs of 17 Indian cities/regions[.] . . . [B]ased on the aggregate data of all 17 cities, Commerce calculated $645 in B&H costs." Since Hardware II, *37 CIT at   , 911 F. Supp. 2d at 1379*. What is now clear, however, is that the $645 figure is not based on the aggregate data of 17 Indian cities. $645 is in fact the estimated cost for one city: Mumbai. The court's misunderstanding stemmed in large part from Foshan Shunde's inaccurate but uncontested representations of the Doing Business 2010 evidence. Compare Mot. for J. on the **[**20]** Agency R. of Foshan Shunde Yongjan Housewares & Hardwares Co., 27-30, ECF No. 44, and Pl. Foshan Shunde's Comments on the Commerce Department's Remand Determination 16, ECF No. 89, with First Remand Results at 38-41 and Def.'s Resp. to Pls.' Comments Concerning Remand Results 14-21, ECF No. 100.[5]

To clarify, the World Bank's Doing Business 2010 publication compares the costs of doing business in 183

different economies based upon surveys of local experts. Foshan Shunde Surrogate Values for the Final Results Ex. 8 at 26 (Dep't of Commerce Oct. 18, 2010) PD 96 [6] ("Foshan Shunde SV Submission"). These surveys "are built on the basis of standardized case scenarios," which evaluate the costs a hypothetical business would incur when undertaking various activities in an economy. See id. at 2. The "trading across borders" segment of each economy-specific study details the costs a hypothetical business located within that economy's largest city would incur when exporting product in a single 20-foot shipping container. Id. at 6. The "trading across borders segment" of **[**21]** the India-specific Doing Business 2010: India thus estimates the following costs a hypothetical company would incur when exporting a single 20-foot container from India's largest city, Mumbai:

| City | Document Preparation | Customs Clearance | Ports & Terminal Handling | Inland Transportation | Total |
|------|------|------|------|------|------|
| Mumbai | $350 | $120 | $175 | $300 | $945 |

See id. Ex. 4 at 10. Commerce subtracted the $300 inland transportation component, resulting in the $645 baseline cost used in both remand determinations. Second Remand Results at 13.

The World Bank's methodology "come[s] at the expense of generality," as costs in an economy's largest city "may not be representative of regulation [costs] in other parts of the

economy." Foshan Shunde SV Submission Ex. 8 at 6, 26. To address this limitation, the World Bank also produces "subnational" reports for additional cities in several large economies, including India. Id. at 6, 26. The 2010 subnational reports for India estimate the following "trading across borders" costs for 16 additional cities:

| City | Document Preparation | Customs Clearance | Ports & Terminal Handling | Total (Excluding Inland Transportation) |
|------|------|------|------|------|
| Chennai | $252 | $61 | $125 | $438 |
| Kochi | $210 | $57 | $108 | $375 |
| Kolkata | $224 | $95 | $143 | $462 |
| Ranchi | $252 | $78 | $143 | $473 |
| Patna | $230 | $91 | $143 | $464 |
| Jaipur | $187 | $227 | $318 | $732 |
| Indore | $226 | $57 | $175 | $458 |
| Bhubaneswar | $217 | $59 | $81 | $357 |
| Ahmedabad | $217 | $93 | $318 | $628 |
| Ludhiana | $213 | $13 | $175 | $401 |
| Guwahati | $204 | $60 | $143 | $407 |
| New Delhi | $230 | $65 | $175 | $470 |
| Noida | $230 | $65 | $175 | $470 |
| Gurgaon | $230 | $65 | $175 | $470 |
| Bengaluru | $206 | $66 | $125 | $397 |
| Hyderabad | $228 | $57 | $125 | $410 |

**[*1357]**

---

[5] Neither Commerce nor Home Products filed a motion to amend or correct Since Hardware II's treatment of the World Bank evidence.

[6] "PD" refers to a document contained in the public administrative record.

977 F. Supp. 2d 1347, *1358; 2014 Ct. Intl. Trade LEXIS 43, **21

See  [**22] Foshan Shunde Comments on Remand Results Att. 1 Ex. 2; Second Remand Results at 13.[7] Confusingly, the record also contains a subnational report for Mumbai, which repeats the data summarized in the broader study without clarification. Foshan Shunde SV Submission at Ex. 4. For ease of reference, the court refers to Commerce's adjusted India-specific "trading across borders" value as the "Doing Business 2010: India" or "Mumbai-only" data point.

At first, the administrative record only included the Doing Business 2010: India study detailing costs in Mumbai as a proxy for India as a whole, as well as subnational reports detailing costs in the seaport cities of Chennai, Kochi, Kolkata, and Mumbai.

Foshan Shunde SV Submission Exs. 3, 4; see Since Hardware II, 37 CIT at  , 911 F. Supp. 2d at 1373-80. During the second remand proceedings, Commerce supplemented the record with subnational  [**23] reports for an additional seven inland cities: Ludhiana, New Delhi, Noida, Gurgaon, Bengaluru, and Hyderabad. Second Remand Results at 12-13 & n.49; Foshan Shunde Comments on Remand Results Att. 1 at 24. Foshan Shunde responded by submitting subnational reports for the six remaining inland cities, namely, Ahmedabad, Bhubaneswar, Indore, Jaipur, Patna, and Ranchi. Foshan Shunde Comments on Remand Results Att. 1 at Ex. 1.

In the table below the court summarizes the Doing Business 2010: India and 16 subnational report data for analysis in the B&H calculation:

| Data Source | Document Preparation | Customs Clearance | Ports & Terminal Handling | Total (Excluding Inland Transportation) |
|---|---|---|---|---|
| **Mumbai only** (i.e., Doing Business 2010: India) | $350.00 | $120.00 | $175.00 | **$645.00** |
| **Average of all seaport cities** (i.e., Mumbai, Kochi, Kolkata, and Chennai) | $259.00 | $83.25 | $137.75 | **$480.00** |
| **Average of Commerce's inland cities** (i.e., Ludhiana, Guwahati, New Delhi, Noida, Gurgaon, Bengaluru and Hyderabad) | $220.14 | $55.86 | $156.14 | **$432.14** |
| **Average of all inland cities** (i.e., the 13 cities other than the seaport cities above) | $220.77 | $76.62 | $174.69 | **$472.08** |
| **Average of all 17 cities** | $229.76 | $78.18 | $166.00 | **$473.94** |

[*1358]

See id. at Att. 1 Ex. 2; Foshan Shunde  [**24] SV Submission Exs. 3, 4; Second Remand Results at 13.

## 2. The $645 Mumbai-Only Data Point

Turning to the substance of Commerce's revised B&H calculation, when reviewing substantial evidence issues involving Commerce's selection of the best available surrogate values, the court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006); see also CITIC Trading Co. v. United States, 27 CIT 356, 366 (2003) ("[W]hile the standard of review precludes the court from determining whether [Commerce's] choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices.").

In the court's view, no reasonable mind would conclude that the Mumbai-only data point is the "best available"

information on the administrative record to provide the baseline for calculating Foshan Shunde's B&H costs. Commerce announced criteria for selecting surrogate values in accordance with 19 U.S.C. § 1677b(c)(1) is to "select surrogate values which are product-specific, representative of a broad-market  [**25] average, publicly available, contemporaneous with the POR, and free of taxes and duties." First Remand Results at 17-18 (citing Certain Polyester Staple Fiber from the People's Republic of China, 75 Fed. Reg. 1336 (Dep't of Commerce Jan. 11, 2010) (final results admin. review)). The World Bank apparently derived and published the Mumbai-only data point and the subnational report data points using the same methodology, meaning all 17 data points are equally available to the public, specific to the costs in question, and contemporaneous to the POR. The Mumbai-only data point, however, is limited to a hypothetical shipment of goods from one city, whereas the subnational reports offer data points for hypothetical shipments of goods from 16 additional cities. In other words, all 17 data points on the record are qualitatively equal in all respects except that they, in

---

[7] Foshan Shunde and Commerce's summaries contain immaterial discrepancies, apparently due to differing treatment of rounded values in the subnational reports. See, e.g., Foshan Shunde SV Submission Ex. 4 at 1-2, 4 (listing the total export cost for Chennai as "541," even though the components' sum is only 540).

977 F. Supp. 2d 1347, *1358; 2014 Ct. Intl. Trade LEXIS 43, **25

aggregate, represent a broader market average than the Mumbai-only data point in isolation.

Commerce attempts to justify its selection by explaining that "the World Bank assigned importance to the accessibility of a larger port relative to the accessibility of other, smaller ports within that country," and that it would "decline [**26] to second-guess the statistical assumptions underlying the design of [the Doing Business 2010: India] study." Second Remand Results at 33-34. But the weakness Commerce "decline[s]" to consider is precisely that which led the World Bank to issue subnational reports for other Indian cities in the first place:

> The Doing Business methodology has 5 limitations that should be considered when interpreting the data. First, the collected data refer to businesses in the economy's largest business city and may [*1359] not be representative of regulation [costs] in other parts of the economy. To address this limitation, subnational Doing Business indicators were created for 17 economies in 2008/2009[, including] . . . India . . . .

Foshan Shunde SV Submission Ex. 8 at 26 (emphasis added). The World Bank recognized that the Indian economy is too large to support the assumption that costs in Mumbai alone are the most useful approximation of costs in India as a whole. Indeed, the administrative record appears to bear this out. Costs vary from as low as $357 in Bhubaneswar to as high as $732 in Jaipur. Costs in Mumbai are the second highest of any city on the administrative record, and almost 27% higher than [**27] the $473.94 average cost of all 17 cities. See Foshan Shunde Comments on Remand Results Att. 1 Ex. 2. Commerce's selective reliance on the "statistical assumptions" underlying the Doing Business 2010: India data point is therefore not a reasonable basis to ignore the 16 additional and identical-quality data points for other Indian cities on the administrative record.

Nevertheless, Commerce reasonably declined to use Foshan Shunde's preferred alternative figure, the $480 average seaport city cost. As Commerce correctly explains, "within the four Subnational Report data points [for seaport cities], [B&H] charges range from range from a low of $375 (Kochi) to a high of $645 (Mumbai)," a 72% difference. Second Remand Results at 14. Moreover, brokerage and handling charges in the other seven inland cities that Commerce analyzed "range from a low of $397 (Bengaluru) to a high of $469 (Gurgaon, New Delhi, Noida)," all of which "are substantially **lower** than the $645 brokerage and handling charges associated with Mumbai, a data point that is close to a seaport." Id. (emphasis in original). As Home

Products points out, costs in the most remote city, Ludhiana, are lower than costs at three of [**28] the four seaport cities on the record. Home Products' Surreply to Comments on Remand Results 7, 13, ECF No. 144. Beyond the limited set of inland cities Commerce analyzed, the average cost of all 13 inland cities on the record is $472.08, $7.92 lower than the seaport city average. There does not appear to be any meaningful connection between distance from a seaport and B&H costs, at least outside of the inland transportation costs Commerce excluded from the calculation.

Commerce may not have intended to undercut its selection of the $645 Mumbai-only data point when it took the risk of adding subnational reports for inland cities to the administrative record. But now that it has, Commerce must reconsider its calculation of Foshan Shunde's B&H costs. Relying on the Mumbai-only data point in isolation is not reasonable in light of identical-quality record evidence of B&H costs for 16 additional Indian cities, which when averaged with the Mumbai-only data point yield the broadest B&H cost data on the record. It therefore appears that a reasonable mind would conclude that the only reasonable option on remand would be to select the average of the data from all 17 cities as its baseline for [**29] calculating Foshan Shunde's B&H costs. This therefore is what Commerce must do.

## 2. Foshan Shunde's Rate Schedule Evidence

In the Second Remand Results, Commerce evaluated rate schedules for various port fees at seaport cities appearing to demonstrate that costs for handling 40-foot containers are not double the costs for handling 20-foot containers. Second Remand Results at 11-12, 31-32; see Since Hardware II, 37 CIT at __, 911 F. Supp. 2d at 1380-81. Commerce found [*1360] that this evidence was relevant to only one of the three components of its preferred $645 B&H baseline cost, namely, ports and terminal handling charges. Second Remand Results at 11-12. Commerce thus opted to treat the three components of its baseline cost as discreet elements of the B&H calculation, and limited its use of the rate schedule evidence to the ports and terminal handling component. To this extent, Commerce's treatment of the rate schedule evidence is reasonable. See id.

Commerce acted unreasonably, however, in how it applied the rate schedule evidence to the ports and terminal handling component. Commerce acknowledged "that the rate schedule information . . . establishes that the ports and terminal handling charges [**30] associated with use of a 40-foot container increased from approximately 30 to 50 percent relative to a 20-foot container rather than proportionately

977 F. Supp. 2d 1347, *1360; 2014 Ct. Intl. Trade LEXIS 43, **30

[*i.e.*, by roughly 100 percent]." *Id.* at 11. Rather than apply an increase based on the average of 30 and 50 percent as Foshan Shunde suggested, or the average of actual cost differences listed in the rate schedules, Commerce selected the highest available data point in that range. According to Commerce, "a 50 percent increase in [container] costs is within the range of experience set forth" in the rate schedules on the record, and there is "nothing in the record . . . that renders our estimate of a 50 percent increase in container charges to be unreasonable." *Id.* at 31-32. To the contrary, there is evidence on the administrative record of cost increases as low as 30 percent, and that evidence renders Commerce's selection of 50 percent unreasonable. Commerce's selection of the highest available value feels more like the application of an adverse inference to derive a higher margin than a reasonable attempt to determine the best available value on the record. *See 19 U.S.C. § 1677e(b)*; cf. *Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1340 (Fed. Cir. 2002)* [**31] (sustaining application of adverse facts available rate featuring a built-in increase intended as a deterrent to noncompliance because it was "within the range of Ta Chen's actual sales data").

On remand, Commerce must reconsider its application of a 50 percent increase in ports and terminal handling costs to account for evidence demonstrating that such costs may increase by as little as 30 percent. In other words, Commerce should replace the "1.5" multiplicand in its formula with a lower, reasonable value, such as the 1.4 average value that Foshan Shunde suggests.

### 3. Foshan Shunde's Bill of Lading Evidence

Next, Foshan Shunde argues, as it has at every possible opportunity, that Commerce should alter its B&H calculation to reflect evidence indicating that Foshan Shunde actually incurred document preparation and customs clearance fees once every 6.2 containers it shipped. Commerce, however, chose not to address this argument at all in the Second Remand Results: "Regarding Foshan Shunde's argument that we should apply only one single document preparation fee and one single Customs clearance fee for every 6.2 containers (based on Foshan Shunde's claims it shipped an average of 6.2 containers [**32] per bill of lading used), we note that these arguments are not part of the Foshan Shunde surrogate value information identified by the Court in Since Hardware II, [namely, port fee schedules attached as exhibits 1 and 2 to Foshan Shunde's August 24, 2010 surrogate value submission,] and thus not at issue in this redetermination." Second Remand Results at 31-32 & n.113.

[*1361] Commerce's refusal to address Foshan Shunde's evidence contravenes the court's finding that "Commerce

unreasonably concluded [in the First Remand Results] that Foshan Shunde has failed to demonstrate which, if any, of the costs . . . do not increase proportionately with volume.'" *Since Hardware II, 37 CIT at ___, 911 F. Supp. 2d at 1380-81*. Nowhere did the court state that this finding was limited to ports and terminal handling charges, only one of the three cost components of the $645 data point. More to the point, the court did not sustain Commerce's treatment of document preparation and customs clearance fees, the other two cost components. *See id.* In fact, given that Commerce treated all three cost components as a single value in the First Remand Results, there was no occasion for the court to do so in the first place. [**33] Compare First Remand Results at Att. A with Calculation Submission at 1-5. Commerce's position is therefore untenable. *See Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1374-75 (Fed. Cir. 2012)* (noting that "limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue" are generally disfavored); cf. *Am. Silicon Techs. v. United States, 334 F.3d 1033, 1039 (Fed. Cir. 2003)* (CIT remand order "deficient" because it "prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results").

On remand, Commerce must address Foshan Shunde's arguments regarding document preparation and customs clearance costs. Commerce should address in particular record evidence appearing to demonstrate that Foshan Shunde actually incurred such costs only once per 6.2 containers it shipped. If Foshan Shunde's representations prove accurate, Commerce could correct its formula by inserting "(1/6.2)" as a multiplier into the documents preparation and customs clearance cost numerator. *See* Calculation Submission at 1-5.

### 4. Foshan Shunde's Estimated 20-Foot Container Weight

Despite the court's finding in Since [**34] Hardware II, Commerce continued to divide its baseline costs by "D," an estimate of the weight Foshan Shunde would have shipped in 20-foot containers, to convert the per-container World Bank data into a per-kilogram value more readily combined with other surrogate values on the record. Commerce explained that it relied upon Foshan Shunde's estimated 20-foot container weight because "the container size assumed in the [Doing Business] study is for a 20 foot full container load." First Remand Results att. A at 2; *see* Calculation Submission at 2. Commerce's explanation thus rests entirely upon the presumption that the per-container World Bank costs bear some relationship to the weight of product inside.

As Foshan Shunde correctly argues, "[n]o shred of evidence suggests that the container costs presented by Doing

977 F. Supp. 2d 1347, *1361; 2014 Ct. Intl. Trade LEXIS 43, **34

Business, or any other source, are dependent on the kilograms inside the container. Rather, the evidence submitted by Foshan Shunde indicates that the fee structure is per container; not per kilograms in a container." Foshan Shunde Comments on Remand Results 16-17; see also Foshan Shunde's Reply at 16-17, ECF No. 128. Commerce's reliance on the parameters of the World Bank study [*35] is inapposite. The fact that the World Bank expressed all "trading across borders" costs on a per-20-foot-container basis establishes nothing about the relationship between costs of 20-foot containers versus 40-foot containers. Since Hardware II, 37 CIT at __, 911 F. Supp. 2d at 1380-81; see Foshan Shunde Comments on Remand Results 16-17; [*1362] see also Foshan Shunde's Reply at 16-17. Commerce admitted as much in a similar context during the course of this litigation, noting that "$645 is not derived from the weight of the container." Def.'s Resp. to Pls.' Mots. for J. upon the Agency R. 31, ECF No. 49 (emphasis added); see also HPI Case Brief, at 16 (Dep't of Commerce Nov. 15, 2010), PD 107 (noting that Commerce adjusted the per-container World Bank figure "to derive" a per-kilogram cost). Commerce never explains how costs "not derived" from container weight nevertheless increase on the basis of container weight. On the other hand, Foshan Shunde identifies bill of lading evidence suggesting that document preparation and customs clearance costs accrue on a per-container basis, as well as fee schedules demonstrating that ports and terminal handling costs increase slightly with container [**36] capacity (but not proportionately with weight). The only evidence on the record with respect to the relationship between container size and B&H costs thus does not support increasing any cost component relative to container weight. See Since Hardware II, 37 CIT at __, 911 F. Supp. 2d at 1380-81.

In fact, by insisting on using Foshan Shunde's estimated 20-foot container weight as its conversion factor, Commerce forces an unexplained increase into Foshan Shunde's B&H surrogate value. Commerce used the formula "(G*1.5*0.5)/D" to calculate Foshan Shunde's ports and terminal handling costs. Calculation Submission at 3 & n.8. According to Commerce, "'0.5' represents the shipment weight of a 20 foot container (which is half that of a 40 foot container)." Id. at 3 n.8. In calculating "D," however, Commerce multiplied Foshan Shunde's 40-foot container weight by 33/67.3, or approximately 0.49. Substituting "D" for its mathematical equivalent reveals the problem: $(0.5/0.49)*((G*1.5)/W)$, or more simply, $1.02*((G*1.5)/W)$, where W represents Foshan Shunde's 40-foot container weight. In other words, Commerce applied two different downward conversion factors, 0.5 and approximately 0.49, to account [**37] for the same concept, resulting in a

facially unreasonable 2% increase in ports and terminal handling costs. Cf. id. at 3 n.9 (declining to "double the Documents Preparation and Customs Clearance and Technical Control charges and then hal[ve] that total" because the result would be identical).

It may seem reasonable to adjust Foshan Shunde's actual container weight to be consistent with the parameters of the study, especially since Foshan Shunde's estimated 20-foot container shipping weight reflects certain quantifiable aspects of its shipping experience not present in the World Bank data. See Final Results at 17-19 (selecting an estimated 20-foot container weight over the hypothetical weight used in the World Bank study because of the nature of Foshan Shunde's per-container shipping experience); Calculation Submission at 2 (discussing proprietary information underpinning Foshan Shunde's estimated 20-foot container weight); HPI Case Brief, at 16-17 & n.12 (arguing in favor of using an estimated 20-foot container weight). But by using Foshan Shunde's estimated 20-foot container weight, Commerce implicitly relies upon a relationship between B&H costs and container weight that, as Foshan [**38] Shunde argues, does not appear to find support in the record. Since Hardware II, 37 CIT at __, 911 F. Supp. 2d at 1380-81. Therefore, there appear to be only two reasonable alternatives remaining on the record. First, as Foshan Shunde suggests, Commerce could use Foshan Shunde's actual 40-foot container weight, which would yield a per-kilogram value free of any unreasonable presumption regarding the relationship between the [*1363] World Bank's estimated costs and container weight. Second, there may be evidence on the record concerning the average number of units Foshan Shunde shipped per 40-foot container. See Final Results at 17-19; HPI Case Brief, at 16-17 & n.12. The court wonders what prevents Commerce from simply using Foshan Shunde's average number of units shipped per 40-foot container instead of weight. Given that Commerce converted Foshan Shunde's final per-kilogram B&H value into a per-unit price to achieve consistency with other surrogate values, Final Results at 17-19, such an approach could spare Commerce the additional conversion effort as well as the additional risk of further error.

## 5. Summary of B&H Remand Instructions

The court expects Commerce's efforts on remand to be a [**39] straightforward exercise in adjusting its formula and making simple mathematical substitutions in accordance with the discussion above. As a demonstration, the table below provides a summary of what changes Commerce could make to bring its current calculation into alignment

977 F. Supp. 2d 1347, *1363; 2014 Ct. Intl. Trade LEXIS 43, **39

with the evidence on the record. As above, the variable "W" represents Foshan Shunde's 40-foot container weight, "X" represents a reasonable conversion factor somewhere between 1.3 and 1.5, perhaps 1.4, and the remaining variables are the same as Commerce defined them in its Calculation Submission.

| Element | Commerce's First Formula | Commerce's Second Formula | Adjustment Suggestions | Result (Changes in Bold) |
|---------|--------------------------|---------------------------|------------------------|--------------------------|
| Baseline Costs | $645 | E = $350 | Use 17-city average instead of Mumbai-only data point | E = **$229.76** |
| | | F = $120 | | F = **$78.18** |
| | | G = $175 | | G = **$166.00** |
| Augend | Not applicable; $645/D used alone | (E+F)/D | Replace estimated 20-foot weight with actual weight and insert multiplier to account for multiple containers per bill of lading | ((E+F)*(**1/6.2**))/**W** |
| Addend | Not applicable; $645/D used alone | (G*1.5*0.5)/D | Replace estimated 20-foot weight with actual weight and replace "1.5" with a lower, reasonable conversion factor | (G*__X__)/__W__ |

After incorporating all changes, Commerce's **[**40]** current formula, (($350+$120)/D) + (($175*1.5*0.5)/D), would become (($229.76+$78.18)*(1/6.2))/W) + (($166*X)/W).[8] Commerce may also substitute "W" for Foshan Shunde's average units per container value, should such an approach comport with the evidence available on the administrative record. Having been through multiple remands on this issue, the court merely offers this approach in the interest of efficiency as a reasonable **[*1364]** means of calculating Foshan Shunde's B&H costs that the court could ultimately sustain.

**C. Zeroing**

In a prior order the court delayed its remand on Foshan Shunde's zeroing issue to coincide with its decision on the Second Remand Results. Since Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 115 (order). Accordingly, the issue of zeroing is remanded to Commerce to address Foshan Shunde's arguments about zeroing in the nonmarket economy context. See Foshan Shunde Submission, ECF No. 110.

**III. Conclusion**

Accordingly, it is hereby

**ORDERED** that Commerce's financial statement selection is sustained; it is further

**ORDERED** that Commerce's brokerage and handling calculation is remanded for reconsideration; it is further

**ORDERED** that Commerce prepare and attach to its remand results a clear, complete public summary of its calculation of Foshan Shunde's B&H expense suitable for the court to incorporate into a written disposition of this action; it is further

**ORDERED** that the zeroing issue is remanded for Commerce to address in the first instance Foshan Shunde's arguments about zeroing in the nonmarket economy context; it is further

**ORDERED** that Commerce shall report its remand results on or before May 29, 2014; and **[**42]** it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

/s/ Leo M. Gordon

Judge Leo M. Gordon

Dated: April 15, 2014

New York, New York

---

[8] Some of these suggested changes may individually have a small impact on Foshan Shunde's overall dumping margin. See Home Products' Surreply to Comments on Remand Results 16, ECF No. 144. But in aggregate, these changes appear to be significant. Assuming that X=1.4, and substituting "D" for the equivalent (33/67.3)*W, the drastic difference between Commerce's calculated per-kilogram B&H surrogate value in both remand determinations and the court's model alternative becomes obvious. Expressed in terms of W and numerals rounded to the nearest integer, Commerce's calculations in the first and second remand determinations yield 1315/W and 1226/W respectively, whereas the court's **[**41]** model alternative calculation yields 282/W.



Neutral

As of: May 20, 2015 1:12 PM EDT

# *Since Hardware* **(Guangzhou) Co. v. United States**

United States Court of International Trade

December 30, 2014, Decided

Consol. Court No. 11-00106

**Reporter**

37 F. Supp. 3d 1354; 2014 Ct. Intl. Trade LEXIS 154; 36 Int'l Trade Rep. (BNA) 1573; SLIP OP. 2014-159

SINCE HARDWARE (GUANGZHOU) CO., LTD., Plaintiff, v. UNITED STATES

**Prior History:** *Since Hardware (Guangzhou) Co. v. United States, 977 F. Supp. 2d 1347, 2014 Ct. Intl. Trade LEXIS 43 (2014)*

**Disposition:** Motion for reconsideration denied; order on second remand results vacated in part; third remand results sustained.

**Counsel:** [**1] William E. Perry and Emily Lawson, Dorsey & Whitney LLP of Seattle, Washington for Plaintiff Since Hardware (Guangzhou) Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, DeKieffer & Horgan of Washington, DC for Plaintiff-Intervenor Foshan Shunde.

Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief were Nathanial J. Halvorson and Aman Kakar, Office of the Chief Counsel for Import Administration, U. S. Department of Commerce of Washington, DC.

Frederick L. Ikenson, Larry Hampel, and Kierstan L. Carlson, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

**Judges:** Before: Leo M. Gordon, Judge.

**Opinion by:** Leo M. Gordon

## Opinion

[*1355] **OPINION and ORDER**

Gordon, Judge: This consolidated action involves the U.S. Department of Commerce's ("Commerce") fifth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain [**2] Parts Thereof from the *People's Republic of China, 76 Fed. Reg. 15,297* (Dep't of Commerce Mar. 21, 2011) (final results admin. review), as amended by *76 Fed. Reg. 23,543* (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review); see also Issues and Decision Memorandum for Ironing Tables from China, A-570-888 (Mar. 22, 2011), available at *http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf* (last visited this date) ("Decision Memorandum"). Before the court are the Final Results of Redetermination (July 8, 2014), ECF No. 162 ("Third Remand Results") filed by Commerce pursuant to *Since Hardware (Guangzhou) Co. v. United States, 977 F. Supp. 2d 1347 (2014)* ("Since Hardware III"); see also Final Results of Redetermination (Aug. 14, 2013), ECF No. 113 ("Second Remand Results"); *Since Hardware (Guangzhou) Co. v. United States, 37 CIT ___, 911 F. Supp. 2d 1362 (2013)* ("Since Hardware II"); Final Results of Redetermination (Dec. 17, 2012), ECF No. 85 ("First Remand Results"); Since Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 81 (CIT Aug. 14, 2012) ("Since Hardware I") (order remanding to Commerce). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, *19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),*[1] and *28 U.S.C. § 1581(c) (2012).* [*1356] Familiarity with the prior judicial and administrative decisions in this action is presumed.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

37 F. Supp. 3d 1354, *1356; 2014 Ct. Intl. Trade LEXIS 154, **3

Before the court are Foshan [**3] Shunde, and Since Hardware, and Home Products' comments on the Third Remand Results. Pl. Foshan Shunde's Comments on the U.S. Dep't of Commerce's Third Remand Redetermination (July 24, 2014), ECF No. 168 ("Foshan Comments"); Since Hardware (Guangzhou) Co. Objection to the Dep't of Commerce's Third Remand Results (July 24, 2014), ECF No. 170; Comments of Home Prods. Int'l, Inc. on the Final Results of Redetermination by the U.S. Dep't of Commerce (July 24, 2014), ECF No. 169 ("Home Products Comments"); see also Def.'s Resp. to Comments to the Remand Redetermination (Aug. 21, 2014), ECF No. 179.

Home Products has also moved for reconsideration of Since Hardware III. Mot. of Home Prods. Int'l, Inc. for Reh'g of Slip Op. 14-44, Insofar as it Relates to the Issue of Brokerage and Handling (May 15, 2014), ECF No. 153 ("Home Products Mot. for Reh'g"); see also Pls. Foshan Shunde and Since Hardware Joint Opp'n to Def.-Intervenor Home Prods. Int'l's Mot. for Recons. (June 23, 2014), ECF No. 158 ("Joint Reh'g Resp."); Def.'s Resp. to Def.-Intervenor's Mot. for Recons. (June 23, 2014), ECF No. 159; Reply of Home Prods. Int'l, Inc. to the Resps. to its Mot. for Reh'g (July 14, 2014), ECF No. 166.

For the reasons [**4] that follow, the court denies Home Products' motion to reconsider, and sustains the Third Remand Results.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." _19 U.S.C. § 1516a(b)(1)(B)(i)_. More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. _Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)_. Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." _DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005)_ (quoting _Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938))_. Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." _Consolo v. Fed. Mar. Comm'n_, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed.

2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2014). Therefore, when addressing [**5] a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan K. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).

Separately, the two-step framework provided in _Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)_, governs judicial review of Commerce's interpretation of the antidumping statute. See _United States v. Eurodif S.A., 555 U.S. 305, 316, 129 S. Ct. 878, 172 L. Ed. 2d 679 (2009)_ (Commerce's "interpretation [*1357] governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

In its comments on the Third Remand Results, Foshan Shunde challenges Commerce's failure to adjust its brokerage and handling ("B&H") valuation for document preparation and customs clearance costs as unreasonable and Commerce's zeroing methodology in the non-market economy context as inconsistent with law. Foshan Comments at 7-19. In its comments on the Third Remand Results, Since Hardware also challenges Commerce's surrogate valuation for B&H as unreasonable, though the court in its first decision in this action deemed the issue waived due to the incompleteness of Since Hardware's opening brief. Since Hardware I at 7. One portion of Commerce's remand [**6] results has been submitted under protest: Commerce's use of the $473.94 baseline for B&H that the court directed Commerce to use as the best available information. See _Since Hardware III, 38 Ct. at ___, 977 F. Supp. 2d at 1358-59, 1364_. Commerce avers that its original choice of $645 remains reasonable on the administrative record. Third Remand Results at 6-9. Home Products agrees and argues that the court should remand to Commerce to calculate Foshan Shunde's surrogate B&H value using the $645 data point. Home Products Comments at 2. For the reasons that follow, the court sustains the Third Remand Results with the $473.94 baseline calculation as the "best available information." The court also sustains Commerce's other B&H determinations, vacates that portion of Since Hardware II addressing the container size conversion factor, and sustains Commerce's justification for zeroing.

### A. B&H Baseline Cost

37 F. Supp. 3d 1354, *1357; 2014 Ct. Intl. Trade LEXIS 154, **6

In Since Hardware III the court reviewed Foshan Shunde's challenge to Commerce's calculation of its B&H costs. Commerce originally chose $645 as the best available information to value respondents' B&H costs, a number derived from the World Bank's Doing Business in India: 2010 publication. Commerce and the parties appear to have believed that number was an average derived from costs in 17 cities across India, [**7] which for Commerce represented a "broad market average." First Remand Results at 18; see Decision Memorandum at 19 (describing the World Bank data point as, inter alia, a "broad market average" that is "a more credible and representative source than the data provided by Foshan Shunde that are limited to select Indian companies and ports"). Commerce and the parties, however, were incorrect about the $645 data point. That number was not a "broad market average" of multiple port city data points, but instead, a Mumbai-only data point. This was a somewhat surprising fundamental error with the administrative record because Commerce and the parties had been litigating the B&H issue since at least 2010 over the course of three administrative and three judicial proceedings. The complexity of surrogate valuations and margin calculations normally means that Commerce and the interested parties have a better command of the administrative record than the court.

Here, however, to help with closure on the B&H issue, the court in Since Hardware III provided a thorough explanation of the various B&H data as the record grew during successive remand proceedings. Since Hardware III, 38 CIT at ___, 977 F. Supp. 2d at 1354-55. As the court explained, only during the second remand proceedings [**8] when individual data points for all 17 Indian cities were on the [*1358] record did Commerce and the parties appear to understand that the World Bank's $645 figure was in fact a Mumbai-only data point as opposed to a 17-city average. Id. The court also observed that the $645 Mumbai-only data point, the second highest value for any individual city on the record, was significantly higher than the $473.94 average for all 17 cities on the record. See id. at ___, 977 F. Supp. 2d at 1354-59.

Recall that when Commerce selected the $645 data point, it did so in the belief that the $645 data point was "publicly available, specific to the costs in question, represents a broad market average, and [was] contemporaneous to the POR." Decision Memorandum at 19; see First Remand Results at 17-18; see 19 U.S.C. § 1677b(c)(1). Applying

those very same selection criteria to the properly interpreted surrogate B&H data, the court in Since Hardware III concluded that a reasonable mind would only choose the $473.94 17-city average as the "best available" baseline B&H surrogate value. The court reasoned that the only difference between the Mumbai-only data point and the 17-city average under Commerce's own selection criteria was that the 17-city average represented a broader "market average" [**9] for B&H, and directed Commerce to use that figure. Since Hardware III, 38 CIT at ___, 977 F. Supp. 2d at 1358-59, 1364.

On remand, Commerce used that data point, but has done so under protest. Commerce now explains that it has concerns about the reliability of the data from the other Indian cities and that the Mumbai-only data point is the best available information. Commerce's reasons include the frequency at which the Mumbai-only data point is updated in comparison to the 16 other data points, the high level of population and container traffic in Mumbai as compared to the remaining 16 cities, and Foshan Shunde's location in a large urban area in China that is more comparable to Mumbai than the 16 other Indian cities. Third Remand Results at 6-7.

Standing alone, without any consideration of the prior substantive and procedural posture of this action, Commerce's explanation and choice of the $645 baseline might pass as reasonable. The Third Remand Results, however, do not stand alone, but represent the fourth opportunity for Commerce to reasonably explain Foshan Shunde's surrogate B&H calculation. The $645 data point has always been a surrogate value selection in search of a reasoned basis. The prior administrative and judicial proceedings necessarily inform Commerce's decision-making, [**10] and in the Third Remand Results Commerce has arbitrarily altered the application of its surrogate value selection criteria. Had Commerce been concerned about the reliability of the World Bank's data for the 16 smaller cities or the importance of selecting B&H data from an individually comparable city, it could have articulated those concerns in any of the three prior administrative determinations.[2] Instead, what Commerce continually emphasized was the importance of selecting "surrogate values which are . . . representative of a broad market average." First Remand Results at 17-18 (citing Certain Polyester Staple Fiber from the People's Republic of China, 75 Fed. Reg. 1336 (Dep't of Commerce Jan. 11, 2010) (final results admin. review)). In those prior

---

[2] Foshan Shunde first placed the subnational reports for four seaport cities on the record on October 18, 2010, well before Commerce issued its Final Determination. Third Remand Results at 7 n.29. Commerce and Foshan Shunde placed the remaining subnational report data on the record during the second remand proceedings.

administrative proceedings, **[\*1359]** Commerce did not distinguish the Mumbai-only data point from the 16 other ports, and "reliability" was not mentioned or analyzed as a significant concern. Compare Third Remand Results at 6-9, 21-22 (explaining preference for the Mumbai-only data point due to concerns over the reliability of the subnational data for the 16 other Indian cities and the level of port traffic in Mumbai as compared to Foshan Shunde's home city with reference to new evidence added to the record), with Decision Memorandum at 18-19 (no similar **[\*\*11]** discussion), First Remand Results at 15-22, 38-41 (no similar discussion), and Second Remand Results at 12-14, 31-35 (explaining preference for the Mumbai-only data point but omitting any reference to the relative reliability of the data points or the importance of selecting data from a particular city that is more comparable to Foshan Shunde's home city).

In the Third Remand Results, therefore, Commerce altered its selection criteria by suddenly shifting its emphasis away from identifying a "broad market average" to a focus on reliability and single-city comparability. Commerce apparently derived this new thinking from Home Products' motion to reconsider, which was filed with the court one month before Commerce circulated its draft remand results. Turning briefly to the merits of Home Products' motion, disposition of a Rule 59 motion is "within the sound discretion of the court." *USEC, Inc. v. United States, 25 CIT 229, 230, 138 F. Supp. 2d 1335, 1336 (2001).* Such motions do not permit an unsuccessful party to re-litigate a case, but are supposed "to address a fundamental or **[\*\*12]** significant flaw in the original proceeding." Id. To that end, "a court's previous decision will not be disturbed unless it is 'manifestly erroneous.'" *Id. at 230, 138 F. Supp. 2d at 1337.* Home Products' motion does not identify manifest error in Since Hardware III, but instead, as Foshan Shunde points out, raises arguments that Home Products could have made earlier in the litigation either before the court or Commerce. See Joint Reh'g Resp. at 3-16. The court does not entertain afterthought arguments in a motion for reconsideration. See *Donguan Sunrise v. United States, 38 CIT ___, ___, 2014 Ct. Intl. Trade LEXIS 120 (2014)* ("Because AFMC had ample opportunity to raise its concerns about the general context of Commerce's choice previously but failed to do so, the court will not entertain them now."); see also *United States v. Matthews, 32 CIT 1087, 1089, 580 F. Supp. 2d 1347, 1349 (2008)* (arguments raised for first time on rehearing not properly before the court when prior opportunity existed for moving party to make its position known).

Apart from creating a tactical annoyance for Foshan Shunde (which had to simultaneously answer the motion and file

comments on the remand), the real motivation behind the motion may have been, as Foshan Shunde alleges, Joint Reh'g Resp. at 2-3, to communicate to Commerce a dispositional path for the Third Remand Results. In addition to the timing **[\*\*13]** between Home Products' motion and Commerce's draft remand results described above (with the motion filed one month before issuance of the draft remand results), Foshan Shunde identifies a substantive similarity between the two. Id.; Foshan Comments at 4-5. Compare, e.g., Home Products Mot. for Reh'g at 8-9 (discussing the frequency of publication of the subnational reports, citing to the World Bank's website), and id. at 12-14 (discussing Mumbai's population and port volume as compared to other Indian cities and citing to Wikipedia entries), with Third Remand Results at 7-8 & n.30 (discussing the frequency of publication of the subnational reports, citing to printouts of pages **[\*1360]** from the World Bank's website that no party had submitted as evidence or cited to at any earlier proceeding), and id. at 8-9 (discussing Mumbai's population and port volume as compared to other Indian cities and citing to printouts of pages from Indian internet sources that no party had submitted as evidence or cited to at any earlier proceeding).

There is nothing inherently wrong or improper with Commerce adopting the arguments of a party in its findings, conclusions, and determinations. The problem here, as noted above, is that Commerce's choice of the $645 B&H baseline measure **[\*\*14]** has, from the outset of the litigation, been in search of a reasoned basis. By co-opting Home Products' belated justification for the $645 measure, Commerce arbitrarily shifts the application of its selection criteria away from a desire to obtain a "broad market average" toward a sudden emphasis on "reliability" and single-city comparability. Had Commerce consistently applied that focus earlier in the proceeding, it may have provided a reasonable justification for the $645 measure. Coming as it does, however, so late in the game, Commerce's change in emphasis reads like an arbitrary effort to reach a desired outcome rather than a reasonable attempt to identify the best available information to value Foshan Shunde's B&H costs. The court will therefore sustain the Third Remand Results in which Commerce used the court-directed $473.94 baseline measure for Foshan Shunde's B&H costs.

**B. Document Preparation and Customs Clearance Cost Component**

Foshan Shunde has consistently argued that Commerce should alter its B&H calculation to reflect evidence suggesting that Foshan Shunde may have incurred document preparation and customs clearance fees only once every 6.2

37 F. Supp. 3d 1354, *1360; 2014 Ct. Intl. Trade LEXIS 154, **14

containers it shipped. In the [**15] Second Remand Results, Commerce declined to address this argument, indicating that it was "not part of the Foshan Shunde surrogate value information identified by the court in Since Hardware II . . . at issue in this redetermination." Second Remand Results at 31-32. The court in Since Hardware III disagreed, and remanded to Commerce with instructions to "address Foshan Shunde's arguments regarding document preparation and customs clearance costs," and "in particular record evidence appearing to demonstrate that Foshan Shunde actually incurred such costs only once per 6.2 containers it shipped." Since Hardware III, 38 CIT at __, 977 F. Supp. 2d at 1361. Commerce in the Third Remand Results considered and rejected Foshan Shunde's argument, explaining that the World Bank data is not specific enough to adjust bill of lading costs in the way Foshan Shunde requests, and that Foshan Shunde's bill of lading evidence is drawn from too small and unreliable a data set to conclude that Foshan Shunde actually incurred bill of lading costs once per 6.2 containers.

Foshan Shunde now argues that "[t]he World Bank materials on the record of this case preclude any consideration of reported costs accounting for multiple shipments or multiple containers with one shipment" due to the "rigidity [**16] with which the World Bank has set its parameters." Foshan Comments at 7-8. Foshan Shunde explains that the World Bank surveyed producers seeking "one quote for a one-time shipment of one container." Id. at 8 (quoting Foshan Shunde Surrogate Values for the Final Results Ex. 8 at 91-92 (Dep't of Commerce Oct. 18, 2010)). According to Foshan Shunde, this parameter "renders the World Bank study inappropriate for calculating Foshan Shunde's [B&H] expenses without important adjustments, including [*1361] accounting for the fact that Foshan Shunde shipped multiple containers included on one bill of lading with one set of export documentation considered together for a single customs clearance." Id. at 8-9. In response to Commerce's finding that the bill of lading evidence may not accurately reflect Foshan Shunde's experience, Foshan Shunde maintains that Commerce's selection is unreasonable because the record demonstrates at minimum that Foshan Shunde did ship multiple containers per bill of lading. Id. at 9-10.

The court understands Foshan Shunde's logical assumption that a "one quote for a one-time shipment of one container" could imply that the World Bank's survey accounts for the full cost of issuing exactly one bill of lading for exactly one container [**17] of goods. Commerce, however, reasonably concluded that the record here supports a different finding. As Commerce explains, the World Bank study "seeks to prescribe the total time and cost of exporting without

specifying the specific number of bills of lading that are issued with each shipment," and does not itemize bill of lading costs independently from the broader document preparation and customs clearance metric. Third Remand Results at 12-14. The record, in other words, does not foreclose the possibility that the World Bank's document preparation and customs clearance figure may instead incorporate the average bill of lading cost for shipping one container, as opposed to the cost of exactly one bill of lading per container. Moreover, as Commerce explains, Foshan Shunde derived its "6.2" figure from an "examination of nine U.S. sales traces examined at verification, which themselves were culled from a U.S. database that is approximately 70 times larger than the sample base used by Foshan Shunde." Id. at 14 (emphasis added). With such concerns over the accuracy of Foshan Shunde's proposed figure and its relevance to the World Bank's data, Commerce reasonably found that using the unadjusted World Bank document preparation [**18] and customs clearance cost component was the "best available" means of estimating that portion of Foshan Shunde's overall B&H costs.

## C. Zeroing

In accordance with a prior order lifting a stay on consideration of the zeroing issue, the court in Since Hardware III remanded for Commerce to address Foshan Shunde's arguments about zeroing in the non-market economy context. Since Hardware III, 38 CIT at __, 977 F. Supp. 2d at 1364. In the Third Remand Results, Commerce continued to apply zeroing and justified its approach largely by reference to Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013), a Court of Appeals for the Federal Circuit ("Federal Circuit") decision affirming Commerce's justification for zeroing in administrative reviews but not in investigations as a reasonable interpretation of an ambiguous statute under Chevron step two. Third Remand Results at 26-30 (citing Union Steel 713 F.3d at 1108).

Foshan Shunde argues that Union Steel does not apply to administrative reviews of non-market economies, and that Commerce's justification for zeroing in such reviews is unreasonable. Foshan Shunde explains that the Federal Circuit in Union Steel upheld Commerce's practice of zeroing in market economies as reasonable because of the "greater specificity" zeroing provided when conducting an average-to-transaction ("A-to-T") comparison in administrative [**19] reviews than the average-to-average ("A-to-A") comparison employed in investigations. Specifically, according to Foshan Shunde, Union Steel determined that Commerce's practice of zeroing in administrative reviews but not investigations "was only

Case: 15-1402     Document: 63-1     Page: 75     Filed: 10/19/2015

Page 6 of 8

37 F. Supp. 3d 1354, *1361; 2014 Ct. Intl. Trade LEXIS 154, **19

justified by the greater **[*1362]** accuracy resulting from the use of monthly normal values (calculated from actual invoiced sales prices)." Foshan Shunde Comments at 18 (emphasis added); see *Union Steel, 713 F.3d at 1108* (citing *Union Steel v. United States, 36 CIT ___, ___, 823 F. Supp. 2d 1346, 1359 (2012))*. Because Commerce uses a yearly average normal value instead of monthly average normal values in non-market economy administrative reviews, Foshan Shunde argues that <u>Union Steel</u> does not apply. <u>Id.</u> Foshan Shunde requests the court to hold Commerce's justification for zeroing here to be unreasonable because it, among other things, "tends to artificially drive some sales below fair value and others above fair value" and "unfairly disadvantages NME [non-market economy] respondents." <u>Id.</u> at 19.

The main focus of Foshan Shunde's argument is on the normal value side of the antidumping duty margin equation. Foshan Shunde does not examine or consider the export or constructed export price side of the equation. Problematically for Foshan Shunde, <u>Union Steel</u> did not uphold zeroing as reasonable "only" **[**20]** because of the greater specificity Commerce attains by using monthly average <u>normal values</u> in market economy reviews. <u>See</u> Foshan Shunde Comments at 18. Instead, *Union Steel* consistently emphasized that zeroing in combination with the A-to-T methodology can increase accuracy and reveal masked dumping because Commerce compares normal value to <u>transaction-specific export prices</u> as opposed to <u>average export prices</u> under the A-to-A methodology used in investigations. As the Federal Circuit explained:

When using average-to-average comparisons, transactions are divided into "averaging groups." <u>Remand Results</u> at 11. Transactions are divided into averaging groups on the basis of physical characteristics and level of trade for the purpose of price comparison. <u>Id.</u> When calculating the average export price or constructed export price, Commerce calculates a comparison result for each averaging group, and averages together high and low export prices within the group. Thus, those export prices above normal value offset those below normal value within the averaging group. Commerce then aggregates the results of the comparison for each averaging group to calculate a weighted average dumping margin. <u>Id.</u> at 11-12. Accordingly, this comparison methodology masks **[**21]** individual transaction prices below normal value with other above normal value prices within the same averaging group.

In contrast, when Commerce uses the average-to-transaction comparison method, as it did in

this administrative review, Commerce compares the export price (or constructed export price) for a particular export transaction with an average normal value for the comparable sales of foreign like products within the averaging group. <u>Id.</u> at 12. For specific export transactions, Commerce calculates a comparison result which establishes the amount that transaction is priced at less than its normal value. <u>Id.</u> Using this methodology, Commerce does not average export transaction prices before comparing the export price (or constructed export price) to normal value. Instead, Commerce uses a single export transaction price and aggregates the transaction-specific comparison result. The average-to-transaction comparison methodology thus reveals individual dumping.

Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies. In average-to-average comparisons, as used in investigations, Commerce examines average **[*1363]** export prices; **[**22]** zeroing is not necessary because high prices offset low prices within each averaging group. When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping. This ensures the amount of antidumping duties assessed better reflect the results of each average-to-transaction comparison. Commerce's differing interpretation is reasonable because the comparison methodologies compute dumping margins in different ways and are used for different reasons.

*Id. at 1108-09*. The Federal Circuit agreed that using "the export price (or constructed export price) for a particular export transaction" under the A-to-T methodology reasonably justified zeroing because it enabled Commerce to "reveal[] individual dumping." <u>Id.</u> In its comments on the <u>Third Remand Results</u>, Foshan Shunde does not address the export price side of the equation, perhaps in recognition that Commerce's use of transaction-specific export prices in <u>both</u> non-market and market economy administrative reviews weakens Foshan Shunde's argument. <u>See</u> Foshan Shunde Comments at 12-19. For example, Foshan Shunde makes no effort to explain why using individual export transaction prices with zeroing **[**23]** does not "reveal individual dumping" in non-market economy reviews like it does in market economy reviews, or why it believes the accuracy of monthly average normal values is more important to revealing individual dumping than using individual export prices. <u>See id.</u> By leaving off one side of the ledger, Foshan Shunde has not provided the court with a sufficient basis to

37 F. Supp. 3d 1354, *1363; 2014 Ct. Intl. Trade LEXIS 154, **23

distinguish *Union Steel*.

Consistent with *Union Steel*, Commerce explained below that "the examination of individual export transactions, as opposed to averaging the export transactions, allows [Commerce] to further its recognized interest in greater specificity to determine pricing behavior for individual transactions and to identify masked dumping in administrative reviews," even when comparing that export price to a single average normal value. Third Remand Results at 29 (emphasis added). As the Federal Circuit explained, "[n]o rule of law precludes Commerce from interpreting *19 U.S.C. § 1677(35)* differently in different circumstances as long as it provides an adequate explanation." *Id. at 1110*. Here, Commerce's explanation is consistent with that sustained as reasonable in Union Steel and other market and non-market economy cases. See, e.g., *id. at 1108-11*; *Dongguan Sunrise Furniture Co. v. United States, 37 CIT __, __, 904 F.Supp.2d 1359, 1367 (2013)*; *Xiamen Int'l Trade & Indus. Co. v. United States, 37 CIT __, __, 953 F. Supp. 2d 1307, 1310 n.1 (2013)*; *Grobest, 36 CIT at __, 853 F. Supp. 2d at 1356-62*. That explanation rests [**24] on fundamental differences between A-to-A and A-to-T comparison methodologies and the purposes of conducting reviews as opposed to investigations that are applicable in non-market economy contexts as well as market economy contexts. See *19 U.S.C. §§ 1677(35)*, *1677f-1(d)*; *19 C.F.R. § 351.414*. The court therefore must sustain Commerce's use of zeroing in this administrative review.

**D. Container Size Cost Conversion Factor**

Foshan Shunde has now voluntarily abandoned its claim that the 20-foot to 40-foot container cost conversion factor should be lower than a 50% increase. Joint Reh'g Resp. at 9. The court accordingly will vacate the portion of Since Hardware III that deals with this issue, **[*1364]** and sustain Commerce's selection of a 50% increase in the Third Remand Results. See *Since Hardware III, 38 CIT at __, 977 F. Supp. 2d at 1359-60*.

**E.** Since Hardware's B&H

In its first decision in this action the court deemed Since Hardware's B&H issue waived because of incompleteness, Since Hardware (Guangzhou) Co. v. United States, No. 11-00106 (Aug. 14, 2012), ECF. No. 81 (order), just as it did in the immediate prior action. Home Prods. Int'l, Inc. v. United States, No. 11-00104 (Jan. 3, 2012), ECF No. 62 (order deeming challenge to B & H calculation waived), as amended, ECF No. 63; *Home Prods. Int'l, Inc. v. United*

*States, 36 CIT __, __, 837 F. Supp. 2d 1294, 1300-02 (2012)*; opinion after remand, *Home Prods. Int'l, Inc. v. United States, 36 CIT __, 853 F. Supp. 2d 1257 (2012)*.

**[**25]** Missing from Since Hardware's brief was any effort at identifying standards against which the court could evaluate the reasonableness of Commerce's findings and conclusions for Since Hardware's surrogate B&H calculation (e.g., how Commerce typically calculates B&H in the non-market economy context, etc.). Since Hardware's R. 56.2 Mem. in Supp. of Mot. for J. upon Agency Rec. at 9-10, ECF. No. 42. In marked contrast to Since Hardware's approach is the well-developed argumentation of Foshan Shunde. See Foshan Shunde's R. 56.2 Mem. in Supp. of Mot. for J. upon Agency Rec. at 16-33, ECF No. 44.

It is just not possible to read the B&H section of Since Hardware's opening brief and understand what is being argued, challenged or contested. Since Hardware cites no statutes, regulations, or administrative or judicial precedents. The court could not understand this section of Since Hardware's brief. The court could not rightly review Since Hardware's B&H issue without assuming the role of co-plaintiff and framing the issue against the operative standard of review. This is not the role of the court. See *United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013)* ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *MTZ Polyfilms, Ltd. v. United States, 33 CIT 1575, 1578, 659 F. Supp. 2d 1303, 1308 (2009)* ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most **[**26]** skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" (quoting *United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))*.

Since Hardware suggests that it nevertheless is entitled to the same adjustments to B&H that Foshan Shunde received. Since Hardware though does not understand the posture of the litigation. When the court deemed the issue waived for Since Hardware, it sustained Commerce's determination for Since Hardware. There is, therefore, a real consequence for Since Hardware inadequately briefing the issue.

**III. Conclusion**

In accordance with the foregoing, it is hereby

**ORDERED** that the portion of the court's decision in Since Hardware III dealing with the reasonableness of Commerce's

37 F. Supp. 3d 1354, *1364; 2014 Ct. Intl. Trade LEXIS 154, **26

use of a 50% increase to convert prices for 20-foot containers into prices for 40-foot containers, Since Hardware III, *38 CIT at ___, 977 F. Supp. 2d at 1359-60*, is vacated; it is further

**ORDERED** that the portion of the Second Remand Results pertaining to Commerce's application of a 50% increase for **[*1365]** converting 20-foot container costs to 40-foot container costs is sustained; it is further

**ORDERED** that HPI's motion for reconsideration of Since Hardware III is denied; and it is further

**ORDERED** that Commerce's Third Remand Results are sustained.

Judgment **[**27]** will issue separately.

/s/ Leo M. Gordon

Judge Leo M. Gordon

Dated: December 30, 2014

New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SINCE HARDWARE (GUANGZHOU) CO., LTD., | |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Court No. 11-00106 |
| UNITED STATES, | |
| Defendant. | |

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered opinions; now in conformity with those opinions, it is hereby

**ORDERED** that final results of administrative review of the antidumping duty order covering floor-standing, metal-top ironing tables from the People's Republic of China, see Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011), as amended by 76 Fed. Reg. 23,543 (Dep't of Commerce Apr. 27, 2011) (amended final results admin. review) are sustained, except for the matters remanded by Since Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 81 (CIT Aug. 14, 2012) (order remanding to Commerce); and it is further

**ORDERED** that the first remand results, Final Results of Redetermination (Dec. 17, 2012), ECF No. 85, are sustained, except for the matters remanded by Since

Court No. 12-00384                                                    Page 2

Hardware (Guangzhou) Co. v. United States, 37 CIT ___, 911 F. Supp. 2d 1362 (2013);

and it is further

    **ORDERED** that the second remand results, Final Results of Redetermination

(Aug. 14, 2013), ECF No. 113, are sustained, except for the matters remanded by Since

Hardware (Guangzhou) Co. v. United States, 38 CIT ___, 977 F. Supp. 2d 1347 (2014),

excluding the court's treatment of Commerce's application of a 50% increase for

converting 20-foot container costs to 40-foot container costs, id. at ___, 977 F. Supp. 2d

at 1359-60, which the court has since vacated; and it is further

    **ORDERED** that the Final Results of Redetermination (July 8, 2014), ECF No.

162 are sustained; and it is further

    **ORDERED** that the subject entries enjoined in this action, see Since Hardware

(Guangzhou) Co. v. United States, Court No. 11-00106 (CIT Apr. 29, 2011), ECF No. 14

(prelim. inj. order), must be liquidated in accordance with the final court decision,

including all appeals, as provided for in Section 516A(e) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(e) (2012).

                                                 _____/s/ Leo M. Gordon_____
                                                  Judge Leo M. Gordon

Dated:    December 30, 2014
            New York, New York

APPEAL,CONSOLIDATION,TERMINATED

# U.S. Court of International Trade
# LIVE Database (New York)
# CIT DOCKET FOR CASE #: 1:11-cv-00106-LMG

Since Hardware (Guangzhou) Co., Ltd. v. United States
**Assigned to:** Leo M. Gordon
**Lead Docket:**

| | |
|---|---|
| **Jurisdiction:** 28USC § 1581(c) Antidumping or Countervailing Duty Determination(s) | **Date Filed:** 04/19/2011 **Jury Demand:** No |
| | **Date Terminated:** 12/30/2014 |
| **Category:** Final Determination: 751 Periodic Review 19USC § 1516a (a)(2)(B)(iii) | **Date Reopened:** |
| | **Does this action raise an issue of constitutionality?:** N |
| **Agency:** U.S. Department of Commerce | |

**Product Description:**
Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof

**Export Country:**
China

**Plaintiff**

**Since Hardware (Guangzhou) Co., Ltd.**    represented by    **William Ellis Perry**
Dorsey & Whitney, LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104
(206) 903-8800
Fax: (206) 903-8820
Email: perry.william@dorsey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Derek Allan Bishop**

**JA0049**

Dorsey & Whitney, LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104
(206) 903-8721
Fax: (206) 903-8820
Email: bishop.derek@dorsey.com
*TERMINATED: 11/13/2012*
*Bar Status: ACTIVE*

**Emily Lawson**
Dorsey & Whitney, LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104
(206) 903-2371
Fax: (206) 903-8820
Email: lawson.emily@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Home Products International, Inc.**              represented by    **Frederick L. Ikenson**
Blank Rome, LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 772-5865
Fax: (202) 572-1419
Email: ikenson@blankrome.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Foshan Shunde Yongjian**
**Housewares & Hardwares Co., Ltd.**              represented by    **Gregory Stephen Menegaz**
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6904
Fax: (202) 783-6909
Email: gmenegaz@dhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**James Kevin Horgan**

**JA0050**

           deKieffer & Horgan PLLC
           1455 Pennsylvania Avenue, NW.
           Suite 900B
           Washington, DC 20004
           (202) 783-6902
           Fax: (202) 783-6909
           Email: khorgan@dhlaw.com
           *ATTORNEY TO BE NOTICED*
           ***ATTORNEY IN SEALED GROUP***
           *Bar Status: ACTIVE*

           **John Joseph Kenkel**
           deKieffer & Horgan PLLC
           1455 Pennsylvania Avenue, NW.
           Suite 900B
           Washington, DC 20004
           (202) 783-6900
           Fax: (202) 783-6909
           Email: jkenkel@dhlaw.com
           *ATTORNEY TO BE NOTICED*
           ***ATTORNEY IN SEALED GROUP***
           *Bar Status: ACTIVE*

**Intervenor Plaintiff**

**Foshan Shunde Yongjian**   represented by **Gregory Stephen Menegaz**
**Housewares & Hardwares Co., Ltd.**       (See above for address)
           *LEAD ATTORNEY*
           *ATTORNEY TO BE NOTICED*
           ***ATTORNEY IN SEALED GROUP***
           *Bar Status: ACTIVE*

           **James Kevin Horgan**
           (See above for address)
           *ATTORNEY TO BE NOTICED*
           ***ATTORNEY IN SEALED GROUP***
           *Bar Status: ACTIVE*

           **John Joseph Kenkel**
           (See above for address)
           *ATTORNEY TO BE NOTICED*
           ***ATTORNEY IN SEALED GROUP***
           *Bar Status: ACTIVE*

**Defendant**

**United States**       represented by **Carrie Anna Dunsmore**
           U.S. Department of Justice
           Commerical Litigation Branch - Civil
           Division
           P.O. Box 480

## JA0051

Ben Franklin Station
Washington, DC 20044
(202) 305-7576
Fax: (202) 514-7969
Email: carrie.dunsmore@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Aman Kakar**
**Of Counsel**
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW.
Suite 3627
Washington, DC 20230-0001
(202) 482-2866
Fax: (202) 501-8045
Email: aman.kakar@trade.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Amanda T. Lee**
**Of Counsel**
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3618
Washington, DC 20230-0001
(202) 482-1353
Fax: (202) 482-4912
Email: amanda.lee@trade.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Michael Damien Snyder**
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0842
Fax: (202) 514-8624

Email: michael.snyder@usdoj.gov
*ATTORNEY TO BE NOTICED*
**ATTORNEY IN SEALED GROUP**
*Bar Status: ACTIVE*

**Nathaniel James Halvorson**
**Of Counsel**
U.S. Department of Commerce
Office of Chief Counsel for Import
Administration
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
(202) 482-1434
Fax: (202) 482-4912
Email: nathaniel.halvorson@trade.gov
*TERMINATED: 12/04/2014*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Home Products International, Inc.**          represented by  **Frederick L. Ikenson**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              **ATTORNEY IN SEALED GROUP**
                                                              *Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/19/2011 | 1 | Summons. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/19/2011) |
| 04/19/2011 | 2 | Form 5 Information Statement. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/19/2011) |
| 04/19/2011 | 3 | Form 13 Corporate Disclosure Statement. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/19/2011) |
| 04/19/2011 | 4 | Form 17 Business Proprietary Information Certification filed on behalf of *William E. Perry*. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/19/2011) |
| 04/19/2011 | 5 | Certificate of service. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/19/2011) |
| 04/20/2011 | 6 | |

**JA0053**

| | | |
|---|---|---|
| | | Amended Form 5 Information Statement. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/20/2011) |
| 04/20/2011 | 7 | Certificate of service. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/20/2011) |
| 04/21/2011 | 8 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies. (Benbow, Troy) (Entered: 04/21/2011) |
| 04/28/2011 | 9 | Complaint against United States. Administrative Record due by 6/13/2011. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 04/28/2011) |
| 04/28/2011 | 10 | Consent Application/Motion for preliminary injunction. Responses due by 5/17/2011. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 04/28/2011) |
| 04/28/2011 | 11 | Amended Form 17 Business Proprietary Information Certification filed on behalf of *Emily Lawson and Elizabeth C. Crouse*. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/28/2011) |
| 04/28/2011 | 12 | Certificate of service. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 04/28/2011) |
| 04/28/2011 | 13 | Form 11 Notice of Appearance. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 04/28/2011) |
| 04/29/2011 | 14 | Order entered on 4/29/2011 granting Motion for preliminary injunction (Related Doc # 10 ). (Goell, Geoffrey) (Entered: 04/29/2011) |
| 05/02/2011 | 15 | Form 11 Notice of Appearance. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 05/02/2011) |
| 05/02/2011 | 16 | Consent Motion to Intervene as defendant intervenor. Responses due by 5/23/2011. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 05/02/2011) |
| 05/02/2011 | 17 | Form 13 Corporate Disclosure Statement. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 05/02/2011) |
| 05/02/2011 | 18 | Form 17 Business Proprietary Information Certification filed on behalf of *Frederick L. Ikenson, Edward J. Farrell, Peggy A. Clarke, and Larry Hampel*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 05/02/2011) |
| 05/02/2011 | 19 | Certificate of service *of notice of appearance, consent motion to intervene, Form 13, and Forms 17* (related document(s) 15 , 16 , 18 , 17 ). Filed by |

**JA0054**

| | | Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 05/02/2011) |
|---|---|---|
| 05/02/2011 | 20 | Order entered on 5/2/2011, Granting Home Products International, Inc. consent motion to intervene as a Deft-Intervenor. (Related Doc # 16 ) (Taronji, Steve) (Entered: 05/02/2011) |
| 05/03/2011 | 21 | Proof of service *of Order Granting Preliminary Injunction*. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of All Plaintiffs. (Lawson, Emily) (Entered: 05/03/2011) |
| 05/03/2011 | 22 | Confidential and Public Application/Motion for temporary restraining order *and Certificate of Service*. Responses due by 5/23/2011. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of All Plaintiffs.(Lawson, Emily). (Entered: 05/03/2011) |
| 05/03/2011 | 23 | Notice of Manual Filing. The document for Docket Entry *# 22* has been filed manually. (related document(s) 22 ). Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Taronji, Steve) (Entered: 05/03/2011) |
| 05/03/2011 | 24 | Order entered on 5/3/2011, Granting pltf's motion for temporary restraining order (Related Doc # 22 ). (Taronji, Steve) (Entered: 05/03/2011) |
| 05/04/2011 | 25 | Proof of service *of Temporary Restraining Order*. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of All Plaintiffs. (Lawson, Emily) (Entered: 05/04/2011) |
| 05/25/2011 | 26 | Order entered on 5/25/2011 assigning action to Judge Leo M. Gordon. (Swindell, Stephen) (Entered: 05/25/2011) |
| 05/25/2011 | 27 | Consent Motion to Intervene as plaintiff intervenor. Responses due by 6/13/2011. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order, # 2 Certificate of Service)(Menegaz, Gregory) (Entered: 05/25/2011) |
| 05/25/2011 | 28 | Form 11 Notice of Appearance. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Form 13, # 2 Form 17, # 3 Form 17, # 4 Form 17, # 5 Form 17)(Menegaz, Gregory) (Entered: 05/25/2011) |
| 05/25/2011 | 30 | Form 17 Business Proprietary Information Certification filed on behalf of *DeKieffer & Horgan*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Form 17, # 2 Form 17, # 3 Form 17)(Swindell, Stephen) (Entered: 05/27/2011) |
| 05/26/2011 | 29 | Order entered on 5/26/2011 granting Motion to intervene (Related Doc # 27 ).. (Swindell, Stephen) (Entered: 05/26/2011) |
| 06/02/2011 | 31 | Order entered on 6/2/2011:Ordered that the following actions, Since Hardware (Guangzhou) Co. v. United States, Court No. 11-00106; Home Products International, Inc. v. United States, Court No. 11-00108; and Foshan Shunde |

**JA0055**

| | | |
|---|---|---|
| | | Yongjian Housewares & Hardwares Co. v. United States, Court No. 11-00118, are consolidated as Since Hardware (Guangzhou Co. v. United States, Consol. Court No. 11-00106..(Love, Cynthia) (Entered: 06/02/2011) |
| 06/06/2011 | 32 | Confidential and Public Administrative record for U.S. Department of Commerce filed. (Attachments: # 1 PART 1) (Swindell, Stephen) (Entered: 06/09/2011) |
| 06/06/2011 | 33 | Notice of Manual Filing. The document for Docket Entry # *32* has been filed manually. (related document(s) 32 ). Filed by United States United States. (Swindell, Stephen) (Entered: 06/09/2011) |
| 06/27/2011 | 34 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Elizabeth C. Crouse*. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Lawson, Emily) (Entered: 06/27/2011) |
| 07/08/2011 | 35 | Letter filed by Judge Gordon concerning *proposed dates on draft scheduling order*. (Swindell, Stephen) (Entered: 07/08/2011) |
| 07/12/2011 | 36 | Order entered on 7/12/2011 Scheduling Order: 56.2 motions due by 9/8/2011. Response to 56.2 motions due by 11/10/2011. Reply brief due by 12/8/2011. Joint Appendix due by 12/22/2011.(Swindell, Stephen) (Entered: 07/12/2011) |
| 08/26/2011 | 37 | Amended Administrative record for U.S. Department of Commerce filed *[CONFIDENTIAL VERSION]*. (Swindell, Stephen) (Entered: 08/31/2011) |
| 08/26/2011 | 38 | Notice of Manual Filing. The document for Docket Entry # *37* has been filed manually. (related document(s) 37 ). Filed by United States United States. (Swindell, Stephen) (Entered: 08/31/2011) |
| 09/02/2011 | 39 | Second Amended Administrative record for U.S. Department of Commerce filed *[CONFIDENTIAL VERSION]*. (Swindell, Stephen) (Entered: 09/06/2011) |
| 09/02/2011 | 40 | Notice of Manual Filing. The document for Docket Entry # *39* has been filed manually. (related document(s) 39 ). Filed by United States United States. (Swindell, Stephen) (Entered: 09/06/2011) |
| 09/08/2011 | 41 | Motion for judgment on agency record 56.2 *with proposed order and supporting brief*. Response to 56.2 Motion due by 11/10/2011. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 09/08/2011) |
| 09/08/2011 | 42 | Public Motion for judgment on agency record 56.2 *and Memorandum in Support of Motion*. Response to 56.2 Motion due by 11/10/2011. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 09/08/2011) |
| 09/08/2011 | 43 | Exhibits *1 of Motion for judgment on agency record 56.2 and Memorandum in Support of Motion* (related document(s) 42 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 09/08/2011) |
| 09/08/2011 | 44 | Public Motion for judgment on agency record 56.2 *& Proposed Order with Memorandum in Support*. Response to 56.2 Motion due by 11/10/2011. Filed |

**JA0056**

| | | by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Exhibit Admin. Case Brief, # 2 Exhibit Admin. Rebuttal Brief, # 3 Certificate of Service Public Cert. of Service)(Menegaz, Gregory) (Entered: 09/08/2011) |
|---|---|---|
| 09/08/2011 | 45 | Confidential Motion for judgment on agency record 56.2 *w/ memorandum in support*. Response to 56.2 Motion due by 11/10/2011. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 09/14/2011) |
| 09/08/2011 | 46 | Notice of Manual Filing. The document for Docket Entry # *45* has been filed manually. (related document(s) 45 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 09/14/2011) |
| 11/08/2011 | 47 | Consent Motion for extension of time until 11/30/2011 to file response brief . Responses due by 11/28/2011. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 11/08/2011) |
| 11/08/2011 | 48 | Order entered on 11/8/2011 granting Motion for extension of time to file response brief. ORDERED that defendants response to plaintiffs motion for judgment on the administrative record be submitted by November 30, 2011, and all other deadlines are extended by 20 days. (Related Doc # 47 ). (Swindell, Stephen) (Entered: 11/08/2011) |
| 11/30/2011 | 49 | Public Response to motion *for judment on the agency record* (related document (s) 45 , 44 , 41 , 42 ). Reply due by 1/3/2012. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 11/30/2011) |
| 11/30/2011 | 50 | Confidential Response *in opposition* to motion *for judgment on the agency record* (related document(s) 45 ). Reply due by 1/3/2012. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Swindell, Stephen) (Entered: 12/06/2011) |
| 12/06/2011 | 51 | Notice of Manual Filing. The document for Docket Entry #*50* has been filed manually. (related document(s) 50 ). Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Swindell, Stephen) (Entered: 12/06/2011) |
| 12/07/2011 | 52 | Response *of Home Products International, Inc.* to motion *of Since Hardware (Guangzhou) Co., Ltd. and to motion of Foshan Shunde Yongjian Housewares & Hardware Co., Ltd.* (related document(s) 45 , 44 , 42 ). Reply due by 1/9/2012. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 12/07/2011) |
| 12/07/2011 | 53 | Public Response *of Foshan Shunde* to motion *for Judgment by HPI* (related document(s) 41 ). Reply due by 1/9/2012. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd..(Menegaz, Gregory) (Entered: 12/07/2011) |
| 12/07/2011 | 54 | |

**JA0057**

| | | |
|---|---|---|
| | | Public Response *Brief of Defendant-Intervenor Since Hardware (Guangzhou) Co., Ltd.* to motion *of Home Products International, Inc. R. 56.2 Judgment on the Agency Record* (related document(s) 41 ). Reply due by 1/9/2012. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 12/07/2011) |
| 12/07/2011 | 55 | Confidential Response *in opposition* to motion *for judgment on the agency record* (related document(s) 44 ). Reply due by 1/9/2012. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 12/09/2011) |
| 12/07/2011 | 56 | Notice of Manual Filing. The document for Docket Entry #55 has been filed manually. (related document(s) 55 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 12/09/2011) |
| 12/07/2011 | 57 | Confidential Response *in opposition* to motion *for judgment on the agency record* (related document(s) 45 , 44 ). Reply due by 1/9/2012. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Swindell, Stephen) (Entered: 12/09/2011) |
| 12/07/2011 | 58 | Notice of Manual Filing. The document for Docket Entry #57 has been filed manually. (related document(s) 57 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Swindell, Stephen) (Entered: 12/09/2011) |
| 12/21/2011 | 59 | Consent Motion for extension of time until 1/11/2012 to *file reply briefs*. Responses due by 1/9/2012. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Lawson, Emily) (Entered: 12/21/2011) |
| 12/22/2011 | 60 | Order entered on 12/22/2011 granting Motion for extension of time (Related Doc # 59 ). ORDERED that the Since Hardware, Foshan Shunde Yongjian Housewares &Hardwares Co., Ltd., and Home Products International, Inc. reply briefs to the respective response briefs be submitted by January 11, 2012, and all other deadlines are extended by 14 days.(Swindell, Stephen) (Entered: 12/22/2011) |
| 01/11/2012 | 61 | Reply *Brief of Home Products International, Inc.* (related document(s) 49 , 53 , 54 , 55 , 50 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 01/11/2012) |
| 01/11/2012 | 62 | Public Reply *Brief of Foshan Shunde* (related document(s) 49 , 53 , 57 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd..(Menegaz, Gregory) (Entered: 01/11/2012) |
| 01/11/2012 | 63 | Reply *Brief of Since Hardware (Guangzhou) Co., Ltd.* (related document(s) 52 , 49 , 50 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 01/11/2012) |
| 01/11/2012 | 64 | |

**JA0058**

| | | Confidential Reply (related document(s) 63 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Swindell, Stephen) (Entered: 01/19/2012) |
|---|---|---|
| 01/11/2012 | 65 | Notice of Manual Filing. The document for Docket Entry #64 has been filed manually. (related document(s) 64 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 01/19/2012) |
| 01/23/2012 | 66 | Consent Motion for extension of time until 2/1/2012 to *file parties' Joint Appendix*. Responses due by 2/13/2012. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Lawson, Emily) (Entered: 01/23/2012) |
| 01/23/2012 | 67 | Order entered on 1/23/2012 granting Motion for extension of time (Related Doc # 66 ). Joint Appendix due by 2/1/2012. (Swindell, Stephen) (Entered: 01/23/2012) |
| 01/30/2012 | 68 | Partial Consent Motion for oral argument on motion for judgment on the agency record . Responses due by 2/21/2012. Filed by Emily Lawson of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Lawson, Emily) (Entered: 01/30/2012) |
| 01/31/2012 | 69 | Response *in opposition* to motion *of Since Hardware (Guangzhou) Co., Ltd. for oral argument* (related document(s) 68 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 01/31/2012) |
| 02/01/2012 | 70 | Public Notice of Supplemental Authority filed. . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Exhibit Attach. I - CIT New Authority, # 2 Exhibit Attach. II - DOC New Authority, # 3 Certificate of Service Service List)(Menegaz, Gregory) (Entered: 02/01/2012) |
| 02/01/2012 | 71 | Joint Appendix . Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Attachments: # 1 Appendix Joint Appendix - Part 1B - Tab 4 (cont.), # 2 Appendix Joint Appendix - Part 2 - Tabs 5-8, # 3 Appendix Joint Appendix - Part 3A - Tabs 9-12, # 4 Appendix Joint Appendix - Part 3B - TOC and Tab 12 (cont.)-16, # 5 Appendix Joint Appendix - Part 4A - Tab 17, # 6 Appendix Joint Appendix - Part 4B - Tab 17 (cont.), # 7 Appendix Joint Appendix - Part 5 - Tabs 18-20, # 8 Appendix Joint Appendix - Part 6 - Tabs 21-31)(Perry, William) (Entered: 02/01/2012) |
| 02/01/2012 | 72 | Certificate of service *of Joint Appendix* (related document(s) 71 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 02/01/2012) |
| 02/01/2012 | 73 | Confidential Appendix *(JOINT)* (related document(s) 71 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Swindell, Stephen) (Entered: 02/09/2012) |
| 02/01/2012 | 74 | Notice of Manual Filing. The document for Docket Entry #73 has been filed manually. (related document(s) 73 ). Filed by William Ellis Perry of Dorsey & |

**JA0059**

| | | Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Swindell, Stephen) (Entered: 02/09/2012) |
|---|---|---|
| 03/12/2012 | 75 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Peggy A. Clarke, Esq.*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 03/12/2012) |
| 03/20/2012 | 76 | Form 17 Business Proprietary Information Certification filed on behalf of *Kierstan L. Carlson, Esq.*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 03/20/2012) |
| 05/14/2012 | 77 | Form 17 Business Proprietary Information Certification filed on behalf of *Derek Allan Bishop*. Filed by Derek Allan Bishop of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Bishop, Derek) (Entered: 05/14/2012) |
| 05/24/2012 | 78 | Order entered on 5/24/2012 denying Motion for oral argument (Related Doc # 68 ). (Demb, Rebecca) (Entered: 05/24/2012) |
| 06/11/2012 | 79 | Letter *providing notice of subsequent judicial authority*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 06/11/2012) |
| 06/19/2012 | 80 | Public Letter *Objecting to HPI Notice of New Authority*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 06/19/2012) |
| 08/14/2012 | 81 | Order entered on 8/14/2012, ORDERED that this matter is remanded for Commerce to reconsider Since Hardware's cotton fabric weight and recalculate the conversion factor based on the remand. ORDERED that this matter is remanded for Commerce to reconsider its selection of financial statements consistent with the direction outlined above. ORDERED that this matter is remanded for Commerce to reconsider or explain its determination regarding Foshan Shunde's requested letter of credit deduction and to correct Foshan Shunde's container weight as well as to reconsider its surrogate valuation of Foshan Shunde's brokerage and handling expenses consistent with the direction outlined above. ORDERED that this matter is remanded for Commerce to conform its decision to its Remand Redetermination from the prior administrative review, and include data from India (and any other appropriate countries, such as Nicaragua), within its labor wage rate valuation. See Home Products I, Consol. Court. No. 11-00104, Final Results of Redetermination ("Remand Results"), Mar. 14, 2012, ECF No. 83 (including data from India and Nicaragua). ORDERED that the issue of zeroing is stayed pending resolution of the issue by the Federal Circuit. ORDERED that Commerce shall file its remand results on or before October 16, 2012. ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (Taronji, Steve) (Entered: 08/14/2012) |
| | | |

**JA0060**

| 10/15/2012 | 82 | Consent Motion for extension of time until 12/17/2012 to *File Remand Results*. Responses due by 11/5/2012. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 10/15/2012) |
|------------|----|-----|
| 10/15/2012 | 83 | Order entered on 10/15/2012, ORDERED that Commerce shall file remand results no later than December 17, 2012. ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the Court. (Related Doc # 82 ). (Taronji, Steve) (Entered: 10/15/2012) |
| 11/13/2012 | 84 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Derek A. Bishop*. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 11/13/2012) |
| 12/17/2012 | 85 | Remand results filed by U.S. Department of Commerce . Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Letter Cover Letter)(Halvorson, Nathaniel) (Entered: 12/17/2012) |
| 12/26/2012 | 86 | Proposed scheduling order . Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 12/26/2012) |
| 01/02/2013 | 87 | Order entered on 1/2/2013, ORDERED that the briefing of the Remand Results shall be in accordance with the following schedule and page limitations: Comments on the Remand Results shall be filed by January 25, 2013, and shall not exceed 20 pages; Reply by the United States to such comments shall be filed by February 15, 2013, and shall not exceed 40 pages; and Reply by any other party to such comments shall be filed by March 1, 2013, and shall not exceed 20 pages. (Taronji, Steve) (Entered: 01/02/2013) |
| 01/15/2013 | 88 | Motion to sever and dismiss *for lack of subject matter jurisdiction, and for other relief*. Response to Dispositive Motion due by 2/19/2013. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 01/15/2013) |
| 01/25/2013 | 89 | Public Comments on remand results (related document(s) 85 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 01/25/2013) |
| 01/25/2013 | 90 | Comments on remand results (related document(s) 85 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 01/25/2013) |
| 01/28/2013 | 91 | Confidential Comments on remand results *Exhibit 2 of Remand Comments* (related document(s) 90 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 01/28/2013) |

**JA0061**

| 01/29/2013 | 92 | Form 11 Notice of Appearance . Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States.(Halvorson, Nathaniel) (Entered: 01/29/2013) |
|---|---|---|
| 01/29/2013 | 93 | Administrative record for U.S. Department of Commerce filed *pursuant to the Remand Redetermination filed on 12/17/2012*. Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States. (Halvorson, Nathaniel) (Entered: 01/29/2013) |
| 02/14/2013 | 94 | Consent Motion for extension of time until 2/22/2013 to *File Response To Comments on Remand*. Responses due by 3/5/2013. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States. (Dunsmore, Carrie) (Entered: 02/14/2013) |
| 02/14/2013 | 95 | Revised Motion for extension of time until 2/22/2013 to *File Defendant's Response to Remand Comments* (related document(s) 94 ). Responses due by 3/5/2013. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 02/14/2013) |
| 02/15/2013 | 96 | Order entered on 2/15/2013, Granting consent motion for extension of time (Related Doc # 95 ). Reply on Comments on Remand Results due by 2/22/2013 and all other deadlines are extended by seven days.(Taronji, Steve) (Entered: 02/15/2013) |
| 02/19/2013 | 97 | Response to motion (related document(s) 88 ). Replies due by 3/11/2013. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 02/19/2013) |
| 02/19/2013 | 98 | Response *of Since Hardware* to motion *to sever and dismiss* (related document (s) 88 ). Replies due by 3/11/2013. Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) (Entered: 02/19/2013) |
| 02/21/2013 | 99 | Reply *to Responses to Motion to Dismiss and for Other Relief* (related document(s) 98 , 97 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 02/21/2013) |
| 02/22/2013 | 100 | Reply to comments on remand results (related document(s) 89 , 90 , 91 ). Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States. (Dunsmore, Carrie) (Entered: 02/22/2013) |
| 03/01/2013 | 101 | Reply to comments on remand results (related document(s) 89 , 100 , 90 , 91 , 93 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 03/01/2013) |
| 03/04/2013 | 102 | Notice of Supplemental Authority filed. . Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 03/04/2013) |
| 03/05/2013 | 103 | Order entered on 3/5/2013, ORDERED that Defendant-Intervenor Home Products' motion to dismiss is denied. (Related Doc # 88 ) (Taronji, Steve) (Entered: 03/05/2013) |
| | | |

**JA0062**

| | | |
|---|---|---|
| 03/05/2013 | 104 | Letter *in Response to Notice of Subsequent Judicial Authority*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 03/05/2013) |
| 05/20/2013 | 105 | Notice of Supplemental Authority filed. . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Exhibit Steel Nails Final Results, # 2 Exhibit Steel Nails Issues Memorandum)(Menegaz, Gregory) (Entered: 05/20/2013) |
| 05/30/2013 | 106 | Order entered on 5/30/2013, Slip Op. 13-69, Final results of administrative review sustained in part and remanded in part. (related document(s) 85 ) Remand Results due by 7/30/2013. If applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (Demb, Rebecca) (Additional attachment(s) added on 6/3/2013: # 1 Web Pages Cited in the Opinion (Page 2), # 2 Page 14) (Taronji, Steve). (Entered: 05/30/2013) |
| 07/08/2013 | 107 | Order entered on 7/8/2013, ORDERED that the stay in this action is lifted. ORDERED that Plaintiff Foshan Shunde file a voluntary dismissal of its zeroing issue pursuant to USCIT Rule 41(a)(1)(A) on or before July 24, 2013. If Plaintiff fails to file a voluntary dismissal by July 24th, the court will sua sponte enter an order sustaining Commerces zeroing practice. (Taronji, Steve) (Entered: 07/08/2013) |
| 07/23/2013 | 108 | Consent Motion for extension of time until 8/14/2013 to *file Remand Redetermination*. Responses due by 8/12/2013. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 07/23/2013) |
| 07/24/2013 | 109 | Order entered on 7/24/2013, Granting consent motion for extension of time (Related Doc # 108 ). ORDERED that Defendant's consent motion is granted.ORDERED that Commerce shall file its remand determination on or before August 14, 2013. ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand determination no later than seven days after Commerce files its remand determination with the court. (Taronji, Steve) (Entered: 07/24/2013) |
| 07/24/2013 | 110 | Motion for reconsideration (related document(s) 107 ). Response to Non Dispositive Motion due by 8/12/2013. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) Modified on 7/31/2013 (Taronji, Steve). (Entered: 07/24/2013) |
| 08/12/2013 | 111 | Response *of Home Products International, Inc.* to motion *of Foshan Shunde for reconsideration* (related document(s) 110 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 08/12/2013) |
| 08/12/2013 | 112 | |

**JA0063**

| | | |
|---|---|---|
| | | Response to motion *for reconsideration* (related document(s) 110 ). Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States.(Snyder, Michael) (Entered: 08/12/2013) |
| 08/14/2013 | 113 | Second Remand results filed by U.S. Department of Commerce . Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Letter Cover Letter)(Halvorson, Nathaniel) (Entered: 08/14/2013) |
| 08/21/2013 | 114 | Consent Motion for entry of scheduling order . Responses due by 9/9/2013. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 08/21/2013) |
| 08/22/2013 | 115 | Order entered on 8/22/2013, ORDER, Because the agency has yet to consider Foshan Shunde's arguments in the first instance, however, the court must remand the issue to Commerce to do just that. The court has before it the Second Remand Results, ECF No. 113. The court therefore will incorporate the zeroing remand order into its disposition of the Second Remand Results. (related document(s) 81 , 107 , 113 , ). (Taronji, Steve) (Entered: 08/22/2013) |
| 08/22/2013 | 116 | Order entered on 8/22/2013, Granting consent motion for Entry of Scheduling order. ORDERED that the briefing of the Remand Results shall be in accordancewith the following schedule and page limitations: Comments on the Remand Results shall be filed on or before September 30, 2013, and shall not exceed 20 pages; Reply by the United States to any initial comments shall be filed on orbefore October 31, 2013, and shall not exceed 40 pages; and Reply comments shall be filed on or before November 14, 2013, and shall not exceed 20 pages. (Related Doc # 114 ). (Taronji, Steve) (Entered: 08/22/2013) |
| 09/05/2013 | 117 | Administrative record for U.S. Department of Commerce filed . Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States. (Halvorson, Nathaniel) (Entered: 09/05/2013) |
| 09/30/2013 | 118 | Comments on remand results *II* (related document(s) 113 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Exhibit Attachments 1 & 2)(Menegaz, Gregory) (Entered: 09/30/2013) |
| 09/30/2013 | 119 | Comments on remand results (related document(s) 113 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 09/30/2013) |
| 09/30/2013 | 120 | Confidential Appendix *to Comments on Second Remand Results* (related document(s) 119 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 09/30/2013) |
| 09/30/2013 | 121 | Public Appendix *to Comments on Second Remand Results* (related document(s) 119 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 09/30/2013) |
| | | |

**JA0064**

| 10/23/2013 | 122 | Consent Motion for extension of time until 11/18/2013 to file response brief *to remand comments*. Responses due by 11/12/2013. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 10/23/2013) |
| --- | --- | --- |
| 10/24/2013 | 123 | Order entered on 10/24/2013, ORDERED that the remaining briefing of the Remand Results shall be in accordance with the following schedule and page limitations: Response by the United States to the comments on the Remand Results shall be filed on or before November 18, 2013, and shall not exceed 40 pages; and Any other response to the comments on the Remand Results shall be filed on or before December 2, 2013, and shall not exceed 20 pages. (Related Doc # 122 ). (Taronji, Steve) (Entered: 10/24/2013) |
| 11/14/2013 | 124 | Consent Motion for extension of time until 11/25/2013 to file response brief . Responses due by 12/4/2013. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 11/14/2013) |
| 11/15/2013 | 125 | Order entered on 11/15/2013 granting Motion for extension of time to file response brief. Response by the United States to the comments on the remand results shall be filed on or before November 25, 2013, and shall not exceed 40 pages; and Any other response to the comments on the Remand Results shall be filed on or before December 9, 2013, and shall not exceed 20 pages. (Related Doc # 124 ). (Love, Cynthia) (Entered: 11/15/2013) |
| 11/25/2013 | 126 | Comments on remand results *(Response)*. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Appendix Index, # 2 Appendix) (Snyder, Michael) (Entered: 11/25/2013) |
| 12/09/2013 | 127 | Reply to comments on remand results (related document(s) 126 , 118 , 119 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 12/09/2013) |
| 12/09/2013 | 128 | Reply to comments on remand results (related document(s) 126 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 12/09/2013) |
| 12/10/2013 | 129 | Motion to strike *Plaintiff Foshan Shunde's Reply Comments* (related document(s) 128 ). Responses due by 12/30/2013. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 12/10/2013) |
| 12/11/2013 | 130 | Response *In Opposition* to motion *to strike Reply* (related document(s) 129 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 12/11/2013) |
| 12/11/2013 | 131 | Response *of Since Hardware in Opposition* to motion *to strike Plaintiff Foshan Shunde's Reply* (related document(s) 129 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 12/11/2013) |

**JA0065**

| | | |
|---|---|---|
| 01/14/2014 | 132 | Order entered on 1/14/2014 (Related Doc # 129 ). ORDERED that HPIs Motion to Strike is denied; and it is further ORDERED Defendant and HPI may each file a surreply on or before January 29, 2014. (Love, Cynthia) (Entered: 01/14/2014) |
| 01/16/2014 | 133 | Consent Motion for extension of time until 2/19/2014 to *for the parties to File Surreplies*. Responses due by 2/4/2014. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 01/16/2014) |
| 01/17/2014 | 134 | Order entered on 1/17/2014, ORDERED that the remaining briefing of the Remand Results shall be in accordance with the following schedule: Response by the parties to the reply brief in support of Foshan Shundes comments on the Remand Results shall be filed on or before February 19, 2014. (Related Doc # 133 ). (Taronji, Steve) (Entered: 01/17/2014) |
| 02/10/2014 | 135 | Form 11 Notice of Appearance . Filed by Aman Kakar of U.S. Department of Commerce on behalf of United States.(Kakar, Aman) (Entered: 02/10/2014) |
| 02/12/2014 | 136 | Consent Motion for extension of time until 3/21/2014 to *file surreplies*. Responses due by 3/3/2014. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 02/12/2014) |
| 02/12/2014 | 137 | Order entered on 2/12/2014, granting unopposed Motion for extension of time (Related Doc # 136 ). ORDERED that the remaining briefing of the Remand Results shall be in accordance with the following schedule: Responses by the parties to the reply brief in support of Foshan Shunde's comments on the Remand Results shall be filed on or before March 21, 2014. (Taronji, Steve) (Entered: 02/12/2014) |
| 02/27/2014 | 138 | Order entered on 2/27/2014, ORDER Requesting further summary. The court requests that Defendant please prepare (1) a clear and complete one or two page document explaining the brokerage and handling calculation that includes: (a) the formula (identifying each variable), (b) an explanation of each variable and the data source from the record to calculate that variable, and (c) a step-by-step calculation using the actual data; and (2) a public summary of the same suitable for the court to incorporate into a written disposition of this action. Something modeled on Defendant's previous brokerage and handling public summary (filed as "Attachment A" to the first remand results) with the additional items noted above (data sources) would be helpful. ORDERED that Defendant file the above-referenced documents on or before 5 p.m. March 14, 2014. (Taronji, Steve) (Entered: 02/27/2014) |
| 03/14/2014 | 139 | Form 11 Notice of Appearance . Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States.(Snyder, Michael) (Entered: 03/14/2014) |
| 03/14/2014 | 140 | Public Response to Court's Request/Order . Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Snyder, Michael) (Entered: 03/14/2014) |
| 03/14/2014 | 141 | |

**JA0066**

| | | Confidential Response to Court's Request/Order . Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Snyder, Michael) (Entered: 03/14/2014) |
|---|---|---|
| 03/19/2014 | 142 | Consent Motion for extension of time until 3/28/2014 to *file surreply*. Responses due by 4/7/2014. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 03/19/2014) |
| 03/19/2014 | 143 | Order entered on 3/19/2014, granting consent motion for extension of time (Related Doc # 142 ). ORDERED that the remaining briefing of the Remand Results shall be amended as follows: Defendant's response to the reply brief in support of Foshan Shunde's comments on the Remand Results shall be filed on or before March 28, 2014. (Taronji, Steve) (Entered: 03/19/2014) |
| 03/19/2014 | 144 | Reply to comments on remand results *(Surreply)* (related document(s) 128 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 03/19/2014) |
| 03/28/2014 | 145 | Reply to comments on remand results (related document(s) 128 ). Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Snyder, Michael) (Entered: 03/28/2014) |
| 04/11/2014 | 146 | Letter *re New Authority*. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 04/11/2014) |
| 04/15/2014 | 147 | Order entered on 4/15/2014, Slip Op. 14-44; ORDERED that Commerce's financial statement selection is sustained. ORDERED that Commerce's brokerage and handling calculation is remanded for reconsideration. ORDERED that Commerce prepare and attach to its remand results a clear, complete public summary of its calculation of Foshan Shunde's B&H expense suitable for the court to incorporate into a written disposition of this action. ORDERED that the zeroing issue is remanded for Commerce to address in the first instance Foshan Shunde's arguments about zeroing in the nonmarket economy context. ORDERED that Commerce shall report its remand results on or before May 29, 2014. ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (related document(s) 113 ) (Taronji, Steve) (Additional attachment(s) added on 4/15/2014: # 1 Web Pages Cited in the Opinion (Page 2), # 2 Page 9) (Taronji, Steve). (Entered: 04/15/2014) |
| 04/16/2014 | 148 | Motion to sever *Court No. 11-00118 from this Consolidated Action*. Responses due by 5/5/2014. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 04/16/2014) |
| 04/22/2014 | 149 | Notice of destruction of confidential documents filed *on behalf of E. Farrell (Form 18)*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) Incorrect Docket Event Used. Modified on 4/22/2014 (Taronji, Steve). (Entered: 04/22/2014) |

**JA0067**

| 04/22/2014 | 150 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *E. Farrell*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Taronji, Steve) (Entered: 04/22/2014) |
| --- | --- | --- |
| 05/02/2014 | 151 | Joint Response *of Since Hardware and Foshan Shunde* to motion *to sever* (related document(s) 148 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of All Plaintiffs.(Perry, William) (Entered: 05/02/2014) |
| 05/05/2014 | 152 | Response to motion *to sever* (related document(s) 148 ). Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States. (Dunsmore, Carrie) Modified on 5/5/2014 (Taronji, Steve). (Entered: 05/05/2014) |
| 05/15/2014 | 153 | Motion for reconsideration *and rehearing of Slip Op. 14-44 regarding Brokerage and Handling* (related document(s) 147 ). Response to Dispositive Motion due by 6/23/2014. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 05/15/2014) |
| 05/28/2014 | 154 | Partial Consent Motion for extension of time until 6/30/2014 to *File Remand Results*. Responses due by 6/16/2014. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 05/28/2014) |
| 05/28/2014 | 155 | Order entered on 5/28/2014, ORDERED that Defendant's partial consent motion is granted. ORDERED that Commerce shall file its remand redetermination by June 30, 2014. ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (Related Doc # 154 ). (Taronji, Steve) (Entered: 05/28/2014) |
| 06/18/2014 | 156 | Order entered on 6/18/2014, Slip Op. 14-68, ORDERED that HPI's motion to sever is denied. (related document(s) 148 ).(Taronji, Steve) (Entered: 06/18/2014) |
| 06/19/2014 | 157 | Errata filed for slip opinion 14-44, Page 1: Delete the following paragraph: Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Barbara S. Williams, Attorney in Charge. Of counsel on the brief was Nathanial J. Halvorson, and Aman Kakar, Office of the Chief Counsel for Import Administration, U. S. Department of Commerce of Washington, DC. Insert the following paragraph: Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nathanial J. Halvorson and Aman Kakar, Office of the Chief Counsel for Import Administration, U. S. Department of Commerce of Washington, DC. (related document(s) 147 ). (Taronji, Steve) (Entered: 06/19/2014) |
|  |  |  |

**JA0068**

| 06/23/2014 | 158 | Response to motion *for reconsideration* (related document(s) 153 ). Replies due by 7/14/2014. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States.(Dunsmore, Carrie) (Entered: 06/23/2014) |
| 06/23/2014 | 159 | Joint Response *in Opposition* to motion *for rehearing* (related document(s) 153 ). Replies due by 7/14/2014. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd., Since Hardware (Guangzhou) Co., Ltd..(Menegaz, Gregory) (Entered: 06/23/2014) |
| 06/24/2014 | 160 | Consent Motion to stay *the filing of remand results until the Court rules on HPI's motion for reconsideration*. Responses due by 7/14/2014. Filed by Carrie Anna Dunsmore of U.S. Department of Justice on behalf of United States. (Dunsmore, Carrie) (Entered: 06/24/2014) |
| 06/25/2014 | 161 | Order entered on 6/25/2014, denying Motion to stay. ORDERED that Commerce shall file its remand results on or before July 8, 2014; and it further ORDERED that, if applicable, the parties shall file a proposed scheduling order for comments on the remand results the day after Commerce files its remand results.(Related Doc # 160 ). (Taronji, Steve) (Entered: 06/25/2014) |
| 07/08/2014 | 162 | Third Remand results filed by Department of Commerce . Filed by Aman Kakar of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Cover Letter)(Kakar, Aman) (Entered: 07/08/2014) |
| 07/09/2014 | 163 | Partial Consent Motion for entry of scheduling order . Responses due by 7/28/2014. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 07/09/2014) |
| 07/09/2014 | 164 | Response *of Home Products International,Inc.* to motion *of Foshan Shunde for scheduling order* (related document(s) 163 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 07/09/2014) |
| 07/11/2014 | 165 | Order entered on 7/11/2014: (Related Doc # 163 ). Ordered that comments on the Remand Results by Foshan Shunde, Since Hardware (Guangzhou) Co., Ltd., and Home Products are due on or before Thursday, July 24, 2014 and any response comments by the United States are due on or before Thursday, August 7, 2014. (Love, Cynthia) (Entered: 07/11/2014) |
| 07/14/2014 | 166 | Reply *to Responses to Motion for Rehearing* (related document(s) 158 , 159 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 07/14/2014) |
| 07/16/2014 | 167 | Administrative record for Department of Commerce filed . Filed by Aman Kakar of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Cover Letter, # 2 Declaration)(Kakar, Aman) (Entered: 07/16/2014) |
| 07/24/2014 | 168 | Comments on remand results *Remand Redet III* (related document(s) 162 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of |

**JA0069**

| | | Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 07/24/2014) |
|---|---|---|
| 07/24/2014 | 169 | Comments on remand results *filed by the Department of Commerce on July 8, 2014* (related document(s) 165 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 07/24/2014) |
| 07/24/2014 | 170 | Confidential Comments on remand results (related document(s) 162 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 07/24/2014) |
| 07/24/2014 | 171 | Public Comments on remand results (related document(s) 162 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd.. (Perry, William) (Entered: 07/24/2014) |
| 07/25/2014 | 172 | Certificate of Compliance *Word Count* (related document(s) 168 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Menegaz, Gregory) (Entered: 07/25/2014) |
| 07/28/2014 | 173 | Certificate of Compliance *of Home Products International, Inc. relating to ECF No. 169*. Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc.. (Ikenson, Frederick) (Entered: 07/28/2014) |
| 08/05/2014 | 174 | Unopposed Motion for extension of time until 8/21/2014 to file response brief . Responses due by 8/25/2014. Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 08/05/2014) |
| 08/06/2014 | 175 | Order entered on 8/6/2014, granting consent motion for extension of time. ORDERED that the remaining briefing of the Remand Results shall be in accordance with the following schedule and page limitations: Response by the United States to the comments on the Remand Results shall be filed on or before August 21, 2014. (Related Doc # 174 ) (Taronji, Steve) (Entered: 08/06/2014) |
| 08/08/2014 | 176 | Motion for errata to correct . Filed with the Court electronically on 7/24/2014 as document number 168 (related document(s) 168 ). Responses due by 8/27/2014. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 08/08/2014) |
| 08/11/2014 | 177 | Response to motion *of Foshan Shunde for notice of errata* (related document(s) 176 ). Filed by Frederick L. Ikenson of Blank Rome, LLP on behalf of Home Products International, Inc..(Ikenson, Frederick) (Entered: 08/11/2014) |
| 08/11/2014 | 178 | Response to motion (related document(s) 176 ). Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Snyder, Michael) (Entered: 08/11/2014) |
| 08/21/2014 | 179 | Response to Comments on remand results . Filed by Michael Damien Snyder of U.S. Department of Justice on behalf of United States. (Attachments: # 1 |

**JA0070**

| | | Proposed Order)(Snyder, Michael) Modified on 8/25/2014 (Taronji, Steve). (Entered: 08/21/2014) |
|---|---|---|
| 12/04/2014 | 180 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of *Nathaniel J. Halvorson*. Filed by Nathaniel James Halvorson of U.S. Department of Commerce on behalf of United States. (Halvorson, Nathaniel) (Entered: 12/04/2014) |
| 12/30/2014 | 181 | Order entered on 12/30/2014 denying Plaintiff's partial consent motion for a notice of errata. (Related Doc # 176 ). (Love, Cynthia) (Entered: 12/30/2014) |
| 12/30/2014 | 182 | Order entered on 12/30/2014, Slip opinion: 14-159. Motion for reconsideration denied; order on second remand results vacated in part; third remand results sustained. (related document(s) 153 , 113 ).(Love, Cynthia) (Additional attachment(s) added on 1/5/2015: # 1 Web Pages Cited in the Opinion (Page 2)) (Taronji, Steve). (Entered: 12/30/2014) |
| 12/30/2014 | 183 | Judgment entered on 12/30/2014, Re: Slip Op. 14-159. (related document(s) 182 ).(Love, Cynthia) (Entered: 12/30/2014) |
| 01/05/2015 | 184 | Form 11 Notice of Appearance . Filed by Amanda T. Lee of U.S. Department of Commerce on behalf of United States.(Lee, Amanda) (Entered: 01/05/2015) |
| 02/25/2015 | 185 | Notice of Appeal of Slip Op. 14-159 and Judgment filed. (related document(s) 182 , 183 , 81 , 106 , 147 ). Filed by William Ellis Perry of Dorsey & Whitney, LLP on behalf of Since Hardware (Guangzhou) Co., Ltd..(Perry, William) Modified on 2/26/2015 (Taronji, Steve). (Entered: 02/25/2015) |
| 02/27/2015 | 186 | Notice of Appeal of Slip Op. 14-159 and Judgment filed. (related document(s) 182 , 183 , 106 , 147 , 81 ). Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd..(Menegaz, Gregory) Modified on 2/27/2015 (Taronji, Steve). (Entered: 02/27/2015) |
| 02/27/2015 | 187 | *Plaintiff's Since Hardware (Guangzhou) Co., Ltd. Appeal of Slip Op. 14-159 and Judgment* docketed on 2/27/2015 by the USCAFC as appeal no. 2015-1402 (related document(s) 185 ). (Taronji, Steve) (Entered: 02/27/2015) |
| 03/12/2015 | 188 | *Consol. Plaintiff Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd. Appeal of Slip Op. 14-159 and Judgment* docketed on 3/12/2015 by the USCAFC as appeal no. 2015-1435 (related document(s) 186 ). (Taronji, Steve) (Entered: 03/12/2015) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/21/2015 12:23:02 | | |
| **PACER Login:** | dh0429:2536371:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00106-LMG |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

## JA0071

**JA0072**

ORIGINAL
FOR OFFICIAL FILE

RECEIVED
OCT 2 9 2009
DEPT. OF COMMERCE
IMPORT ADMINISTRATION

GARVEY SCHUBERT BARER

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

WASHINGTON, D.C. OFFICE
*fifth floor*
*flour mill building*
*1000 potomac street nw*
*washington, d.c. 20007-3501*
TEL 202 965 7880 FAX 202 965 1729

*beijing, china*
*new york, new york*
*portland, oregon*
*seattle, washington*
GSBLAW.COM

*Please reply to* RONALD M. WISLA
*rwisla@gsblaw.com*   (202) 298-2470

October 29, 2009

**983**

ITA Case No. A-570-888
Total Pages: 204
5th Administrative Review
(08/01/2008 – 7/31/2009)
NME Office 7

**PUBLIC VERSION**
Business Proprietary Information has
been deleted from Brackets on Page 1
of the Narrative Response and in
Appendices A-1, A-6, A-9, A-10, A-
12 and A-13.

**BY HAND DELIVERY**

**MAY BE RELEASED UNDER APO**

The Honorable Gary F. Locke
Secretary of Commerce
U.S. Department of Commerce
Attn:  Import Administration
Central Records Unit, Room 1870
14th Street & Pennsylvania Avenue, N.W.
Washington, DC  20230

Re:  **Floor-Standing Metal-Top Ironing Tables from China:**
**Submission of Section A Response of Since Hardware**

Dear Mr. Secretary:

We represent Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware"), a Chinese producer

and exporter to the United States of ironing tables, in the above referenced investigation.  We hereby

submit the original and two copies of the public version of Since Hardware's response to section A of

**JA0073**

000014

# Appendix List (08-09 review)

A-1  Share transfer agreement;

A-2  Since Hardware's new Business License, Articles or Association and Registration Form of Foreign Trade Operator;

A-3 the latest PRC Company Law and the latest PRC Foreign Trade Law;

A-4 the business licenses of Since Hardware covering the POR;

A-5 the original documents that Since Hardware submitted for business license;

A-6 A set of sales documents;

A-7 management list of Since Hardware;

A-8 organization chart of Since Hardware;

A-9  legal structure chart for Since Hardware;

A-10 Since Hardware's capital verification report during the POR;

A-11 Since Hardware's chart of accounts

A-12 2008 financial statements of Since Hardware;

A-13  product list;

A-14 Since Hardware's brochure

# APPENDIX A-6

PUBLIC VERSION
BRACKETED ITEMS HAVE
BEEN DELETED FOR PUBLIC
SUMMARY

# PURCHASE ORDER

Purchase Order Number: 0013135
Purchase Order Date: 11/17/08
Page: 1

Vendor:

Ship To:

020740 SINCE HARDWARE (GuangZhou) CO, LT
XIANGSHAN VILLAGE,
HUADONG TOWN, HUADU DIST
GUANGZHOU CITY, CHINA

Terms: NET 45          Ship Via: PHOENIX

Acknowledged By Vendor Contact: JANET

| Quantity | Item And Description | Date Req'd | Cost | UM | Extension |
|---|---|---|---|---|---|
| 005 | 5,0 ω | 111101 S08110444 T-LEG BOARD, ASSORTED CVR.W-PAD ASSORTMENT TO INCLUDE 2 EACH INDIGO STRI E 2 EACH SOLID LIGHT BLUE WITH 5MM FOAM PA WITH NEW PLASTIC LEG LOCK. 2 EACH 4 POSITION HEIGHT BARS Your Item Number SFT28-I-1454 Ship By 12/26/08 | 01/30/09 | ) | EA | 40ω |
| 010 | 2 6ωω | 111148 S08110448 T-LEG BOARD WHITE, BLUE COATED CVR-PAD 4P WITH NEW PLASTIC LEG LOCK. ONE PIECE CONSTRUCTION, 4MM FIBER PAD WITH BUNGEE CORD. Your Item Number SFT28-I-1454 Ship By 12/26/08 | 01/30/09 | 1 | EA | 4ωωω |
| 015 | 11 0ω | 114120W S08110449 STABILITY PLUS IRON BRD.141237H 4LEG New Stripe. Pattern X304154 Blue Comes & Brownstone on off white ground. Insert placed at nose of board. Ship By 12/26/08 | 01/30/09 | | EA | 500ωω |
| 020 | 2 6ωω | 165200L S08110450 IRONING BOARD W-IRONREST PAINTED WHITE WITH IRONREST, FOAM PAD, SOLID BLUE COVER INSERT PLACED AT NOSE OF BOARD 2 EA 6 POSITION HEIGHT ADJUSTMENT BARS Ship By 12/26/08 | 01/30/09 | | EA | 290ωω |
| 025 | 5 5ω | 173210L S08110451 4-LEG BOARD SILVER, IRONREST FOLDING RACK WITH KRUSH BOX 5MM FIBER PAD, 100 NATURAL COVER | 01/30/09 | | EA | 500ω |

(Continued)

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

**JA0207**



PURCHASE ORDER

Purchase Order Number: 0013135
Purchase Order Date: 11/17/08
Page: 2

Vendor:                                          Ship To:

020740 SINCE HARDWARE (GuangZhou) CO,LT
       XIANGSHAN VILLAGE,
       HUADONG TOWN, HUADU DIST
       GUANGZHOU CITY, CHINA

Terms: NET 45          Ship Via: PHOENIX          FOB: YANTIAN

Acknowledged By Vendor Contact: JANET

| Seq | Quantity | Item And Description | Date Req'd | Cost | UM | Extension |
|-----|----------|---------------------|------------|------|----|-----------|
| | | FIXED IRONREST WITH HANGER WIRE | | | | |
| | | 2 EACH 4 POSITION HEIGHT BARS | | | | |
| | | Ship By 12/26/08 | | | | |
| 030 | | 174406W S08 1104452 | 01/30/09 | | EA | 8200 |
| | | WIDETOP BRD.18x49 1446837 2PK | | | | |
| | | BRONZE FINISH, NATURAL COVER, FIXED | | | | |
| | | IRONREST W/HANGER BAR AND FOLDING RACK | | | | |
| | | INSERT PLACED AT NOSE OF BOARD. | | | | |
| | | Ship By 12/26/08 | | | | |
| 035 | | 110210PV S08 1104453 | 01/30/09 | | EA | 7000 |
| | | 1.125in. (28mm) T-LEG, SILVER COVER | | | | |
| | | TOP SIZE: 13" WIDE X 53" LONG | | | | |
| | | LEG SIZE: 28MM | | | | |
| | | PAD: 5MM FOAM | | | | |
| | | COVER: SILVER COATED | | | | |
| | | PRESSTO ITEM #PV0210 | | | | |
| | | Ship By 12/26/08 | | | | |
| 040 | | 111157 S08 1104454 | 01/30/09 | | EA | 12000 |
| | | T-LEG BOARD W-BROWN COATED COVER-PAD | | | | |
| | | WITH NEW PLASTIC LEG LOCK. | | | | |
| | | ONE PIECE CONSTRUCTION, 4MM FIBER PAD | | | | |
| | | WITH BUNGEE CORD. | | | | |
| | | Your Item Number SFT28-I-1454 | | | | |
| | | Ship By 12/26/08 | | | | |
| 045 | | 161000 S08 1104455 | 01/30/09 | | EA | 6000 |
| | | IRONING BOARD SFT1345 BLUE CTD CVR | | | | |
| | | ONE PIECE CONSTRUCTION, 4MM FIBER PAD | | | | |
| | | BUNGEE CORD AND LEG LOCK | | | | |
| | | Your Item Number SFT28-1345 | | | | |
| | | Ship By 12/26/08 | | | | |

(Continued)

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA



PURCHASE ORDER

Purchase Order Number: 0013135
Purchase Order Date: 11/17/08
Page: 3

Vendor:                                                    Ship To:

020740 SINCE HARDWARE(GuangZhou)CO,LT
       XIANGSHAN VILLAGE,
       HUADONG TOWN,HUADU DIST
       GUANGZHOU CITY, CHINA

Terms: NET 45              Ship Via: PHOENIX              FOB: YANTIAN

Acknowledged By Vendor Contact: JANET

| Quantity | Item And Description | Date Req'd | Cost | UM | Extension |
|---|---|---|---|---|---|

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

0

Consignee:
Notify Party:
Special Instru

Total 295211.00

Purchasing Agent

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

# 广州新新日用制品有限公司
# SINCE HARDWARE （GUANGZHOU）CO.LTD
## COMMERCIAL INVOICE

TO:

日期
DATE: DEC 17 2008

发票号
INVOICE NO:    SZ0812171069-442

合约号
CONTRACT NO:

信用证号
L/C NO    PAYMENT BY T/T

开运日期
装由
SHIPPED PER OOCL KUALA LUMPU    VESSEL    15E51
SAILING ABOUT: 2008-12-23

由                            至
FROM        SHENZHEN        TO    LONG BEACH USA

提单号码
B/L NO: CAN30005647

| 唛头 SHIPPING MARKS | 数量及品名 QUANTITIES& DESCRIPTION | 单价 UNIT PRICE | 总值 AMOUNT |
|---|---|---|---|
| | IRONING    BOARD | FOB SHENZHEN | |
| P/ORDER NO:0013135 ITEM NO:111101(SFT28-I-1454) QTY[4.4] MADE IN CHINA C/NO: | IRONING BOARD 111101(SFT28-I-1454) (PO0013135) | [2400] [8.0] | [ ] |
| | ORC    1 X40HQ | [280] | [280] |
| | TOTAL:    [2400] | | [ ] |

TOTAL SAY: [ ]

THE CONTAINER NO: CAXU4918554/40HQ

PAYMENT BY T/T TO:
BANK NAME:INDUSTRIAL AND COMMERCIAL BANK OF CHINA,
        GUANGDONG PROVINCIAL BRANCH
BANK ADD:NO.8 FENG SHEN ROAD,HUADU DISTRICT,GUANGZHOU CITY GUANGDONG,CHINA
BENEFICIARY: SINCE HARDWARE(GUANGZHOU) CO.,LTD.
XIANGSHAN VILLAGE,HUADONG TOWN,HUADU DISTRICT,GUANGZHOU CITY,CHINA
ACCOUNT NO:3602026809200152162
SWIFT CODE:ICBKCNBJGDG

## COUNTRY OF ORIGIN:CHINA
## THIS SHIPMENT DOES NOT CONTAIN SWPM

For and on behalf of
广州新新日用制品有限公司
SINCE HARDWARE (GUANGZHOU) CO. LTD.

Authorized Signature

JA0210

广州新新日用制品有限公司
# SINCE HARDWARE（GUANG ZHOU）CO.LTD
装箱单和重量单
## PACKING LIST & WEIGHT NOTE

TO:

INVOICE NO: SZ0812171069-442

BILL OF LADING NO:CAN30005647

CLEAN ON BOARD DATE:2008-12-23

VESSEL NO./VOY NO.: OOCL KUALA LUMPUR / 15E51

| MARKS & NOS | ARTICLE & SPECIFICATION | Q'TY (PCS) | PACKAGE (CARTON) | G.WT. (KGS) | N.WT. (KGS) | MEAS. (CBM) |
|---|---|---|---|---|---|---|
| P/ORDER NO:0013135 ITEM NO:111101(SFT28-I-1454) TY 4.4 MADE IN CHINA C/NO: | IRONING BOARD 111101(SFT28-I-1454) (PO0013135) | 2400 | 600 4.4 | 10000 171 | 9000 kgs/ctn | 65 cbm 144.5 x 21.5 x 37.0 cm |
| TOTAL: | | | | | | 65 cbm |

TOTAL: 1X(40HQ)CONTAINER

THE CONTAINER NO: CAXU4918554/40HQ

SEAL NO:1474914

TOTAL:

**COUNTRY OF ORIGIN:CHINA**
**THIS SHIPMENT DOES NOT CONTAIN SWPM**

广州新新日用制品有限公司
SINCE HARDWARE (GUANGZHOU) CO. LTD.

Authorized Signature(s)

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

Shipper

SINCE HARDWARE (GUANGZHOU) CO LTD.
MINGHUC LONG, XIANGSHAN VILLAGE, HUADONG TOWN HUADU DISTRICT.
GUANGZHOU CITY, CHINA
TEL: +86-20-86765205 FAX: +86-20-86768022

☑ BILL OF LADING    ☐ SEAWAY BILL    | ORIGINAL |

B/L NO.    CAN30005647

Consignee

**PHOENIX**
**BILL OF LADING**

PHOENIX INT'L FREIGHT SERVICES, LTD.

Notify Party

PHOENIX INTERNATIONAL FREIGHT SERVICES LTD. (STL)
4659 WORLD PARKWAY CIRCLE
ST. LOUIS, MO, 63134-3115, UNITED STATES, TEL: +1-314-4274222
FAX: +1-314-4271701

上海定展航运有限公司

[1 ct?]

| Place of Receipt | | Pro Carriage by |
|---|---|---|
| SHEKOU, CN | | |

| Port Of Loading | |
|---|---|
| SHEKOU, CN | |

| Port Of Discharge | Place Of Delivery | Ocean Vessel Voy No. |
|---|---|---|
| SEATTLE, WA | ST. LOUIS, MO | OOCL KUALA LUMPUR 15E51 |

| Marks and numbers. | Number and kind of package | Description of goods | Gross weight | Measurement |
|---|---|---|---|---|
| P/ORDER NO.:0013135 | 2 X 40HC | [340] CTNS | | |
| ITEM NO.: | | IRONING BOARD | | |
| .11101(SET28-I-1454) | | | | |
| QTY [4.4] | | | | |
| MADE IN CHINA | | | | |
| C/NO.: | | | | |

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

SHIPPER'S LOAD, COUNT AND SEAL CY-CY
CNTR No./SEAL No.:
CAXU4918554/AHL1474914/40HC [600]    [10000]    [70]
FSCU6531831/AHL1474913/40HC [600]    [10000]    [70]

SAY TOTAL [        ]S) ONLY
THIS SHIPMENT CONTAINS NO SOLID WOOD PACKING MATERIALS

ON BOARD DATE:
Dec.23,2008

| FREIGHT & CHARGE | REVENUE TONS | UNIT | RATE | PREPAID | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | COLLECT | |
| | | | | | | FREIGHT COLLECT | |

According to the declaration of the consigner

The goods and containers are received packed with respect to the kind and condition prescribed in Tables in the goods against good order and condition, unless otherwise noted herein, at the place of receipt for carriage as described or mentioned above if only the Bill of Lading has checked, that this same will constitute a disposable bill of lading which must be surrendered before the Goods can be released. Taken the World has checked that the terms will constitute a non-negotiable service was bill, which does not have to be surrendered on release of the Goods. If either has to checked, or both boxes are checked, this document will be non-negotiable sea service bill, but the Carrier may deem all its remedies.

| Freight amount | Freight Payable at DESTINATION | Place and date of issue GUANGZHOU    Dec.23,2008 |
|---|---|---|
| Cargo Insurance through the undersigned ☑ Not covered ☐ Covered according to Attached Policy | Number of Original HBL's THREE | Stamp and signature PHOENIX INT'L FREIGHT SERVICES,LTD. |
| For delivery of goods please apply to PHOENIX INTERNATIONAL FREIGHT SERVICES LTD. (STL) 4659 WORLD PARKWAY CIRCLE  ST.LOUIS MO 63134-3115 UNITED STATES T: +1-314-4274222 F: +1-314-4271701 | | BY: AS CARRIER |

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

75·1 & #106 P

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

Form Approved
OMB No. 1651-1024
Exp. 10-00-2008

# ENTRY/IMMEDIATE DELIVERY

PHOENIX INTL FRT SVCS LTD
4659 WORLD PARKWAY CIRCLE
BERKELEY, MO 63134

STL

ABI CERTIFIED
PAPERLESS

19 CFR 142.3, 142.16, 142.22, 142.24

BOX NO.
CST: 389

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE/NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 11709 | 11709 | 03 | CNSMPTN-AD | 279-4120647-9 |
| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
| 4503 | | 01040209 | 168596 | |
| | 8. CONSIGNEE NUMBER | | 9. IMPORTER NUMBER |
| | 22-334122400 | | SAME |
| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME | | |
| | SAME | | |
| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS/CODE(S)/NAME(S) | |
| HLCU HAPAG LLOYD LINES | 15E51 | K078    UNION PACIFIC RAILROAD | |
| 15. VESSEL CODE/NAME | | | |
| OOCL KUALA LUMPUR | | | |
| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
| 3001 | | | 38000 |

20. DESCRIPTION OF MERCHANDISE
IRONING BOARD

| 21. ITEM/LINE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER ID |
|---|---|---|---|---|---|
| CODE | | | | | |
| 157018 | V0403726735 | | 9403200011 | CN | CNSINHARGUA |
| M | HLCUCA4081242571 | | | | |
| H | PIFWCAN30005647 | 1200 | | | |

27. CERTIFICATION
I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT    PHOENIX INTL FRT ATTORNEY
X  Kimberly R. Whalin    IN-FACT
PHONE NO. 314-427-4222    DATE
FAX 3144271701    1/14/09

29. BROKER OR OTHER GOVT. AGENCY USE

CAXU4918554,FSCU6531831,

EXAM SITE:J862 COPP OF ST. LOUIS, IN

THE ENTRY BOND WILL BE OBLIGATED FOR
THE MOVEMENT OF MERCHANDISE TO THE
EXAM SITE.

28. CUSTOMS USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

## ABI ELECTRONIC RELEASE ##
☐ CUSTOMS EXAMINATION REQUIRED.
☐ ENTRY REJECTED, BECAUSE:

I CERTIFY THAT PROPER RELEASE FOR
THIS CARGO HAS BEEN RECEIVED FROM
##    U.S. CUSTOMS,    ##

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

COMPANY: PHOENIX INTL FRT SVCS LTD
ATTY-IN-FACT
AUTHORIZED BY: KIM MAVIN  Kimberly R. Whalin

RELEASE TIME/DATE 17:01  1/14/09

PAPERWORK REDUCTION ACT NOTICE: This information is to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for the payment of duties and taxes. Your response is necessary. This estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to U.S. Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

ABI DISPOSITION: PAPERLESS    KMALIN    PAGE 1

Customs Form 3461 (01/89)

Bank Notice of Payment Receipt

（⼯） 中国工商银行　　外汇汇款收账通知　　凭证号：№ 00901313
　　　　　　　　　　　　　汇入金额 [ 600,000 ]　　汇率：

行名： 工行广州市花都支行
收款人账号： 3602026809200152162
收款人户名： 广州新日用制品有限公司 Since Hardware

付款人账号： 4010001953
付款人户名：
大写金额： 美元陆拾贰万贰仟壹佰壹拾壹圆整
小写金额： [ 600,000 ]　　　汇款金额： [ 600,000 ]
汇款详情： INV. NO.SZ0811279984, 0811279994-415, 0811279994-416,
0811279994-417, 0811128998-418, 0811128998-419, 0811128998-420,
0811301007-421, 0811301007-422, 0811301007-423, 0812031011-424,
0812051021-425, 0812051021-426, 0812051021-427, 0812051023-428,
0812071040-429, 0812071040-430, 0812074040-431, 0812091048-432,
0812091048-433, 0812091048-434, 0812121027-435, 0812121027-436,
0812121027-437, 0812141047-438, 0812141047-439, 0812141047-440,
0812151056-441, SZ0812171069-442, SZ0812171069-443

银行指示代码：
客户附言：

费用负担71A：　　发报行费用71F： USD [ 25 ]　　收报行费用71G：
手续费 :0.00　　　　　扣费摘要：
国际收支申报代码：　　　　　　　　　　　　涉外收入申报号码：
业务编号:012427213　　数据流水号：38401　　打印日期:2009-01-13　　打印次数:1

主管　　　　复核　　　　记帐

PUBLIC VERSION
WHERE CAPABLE OF PUBLIC SUMMARY
BRACKETED ITEMS REPRESENT RANGED DATA

RECEIVED FOR OFFICIAL FILE
NOV 13 2009
DEPT. OF COMMERCE
ADMINISTRATION

LAW OFFICES OF
DEKIEFFER & HORGAN
SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

TELEPHONE
(202) 783-6900
GREGORY S. MENEGAZ

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

November 13, 2009

**PUBLIC VERSION**

HAND-DELIVERED                997

Honorable Gary Locke
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230
Attention: Scot Fullerton, Toni Dach

A-570-888
Pages: 91
Admin. Review
POI: 8/1/2008-7/31/2009
AD/CVD Operations
Office 9

**Public Version**
Business Proprietary Information
has been deleted/redacted
contained within brackets on
Pages: 2-4, 7, 10, 15
Exhibits: 1-9

RE: Floor-Standing, Metal-Top Ironing Tables And Parts Thereof from the
People's Republic Of China: *Section A Response of Shunde Yongjian*

Dear Secretary Locke:

On behalf of Foshan Shunde Yongjian Housewares & Hardware Co. Ltd. ("Shunde Yongjian"), an exporter of floor-standing, metal-top ironing tables from the People's Republic of China, we hereby submit its response to the Department's Section A Questionnaire.

Certain information contained herein is business confidential data that is proprietary to Shunde Yongjian. This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause substantial competitive and commercial harm to Shunde Yongjian. Such data is marked "Contains Proprietary Information." Confidential treatment, subject to

# Exhibit List

## FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.
## ("FOSHAN SHUNDE")

### SECTION A
### November 13, 2009

Exhibit A-1    Quantity & Value

Exhibit A-2    Legal Structure Chart

Exhibit A-3    Business License

Exhibit A-4    Certificate of Approval

Exhibit A-5    Internal Organization Chart

Exhibit A-6    Sample Sales Package

Exhibit A-7    2007 Audited Financial Statements

Exhibit A-8    2008 Audited Financial Statements

Exhibit A-9    Chart of Accounts

# Exhibit A-6

# Sample Sales Package

PUBLIC VERSION

PURCHASE ORDER
Order no.:
Order date: 12/23/08

Vendor: Foshan Shunde Yong Jian BH
B. Yangda Rd
Sunzhen Lunjiao St
Shunde Foshan City Guangdong Chin
BOSNIA

Ship To:

Page: 1

Cancel on: 3/15/09

Price & U/M    Amount

Qty Item

14    75,000

Authorized by:

PUBLIC VERSION

DOMBINED TRANSPORT BILL OF LADING

B/L No.

FOSHAN SHUNDE YONGJIAN HOUSEWARES
& HARDWARE CO. LTD
NO. 3GA, TAIGOA ROAD, SANZHOU, LUNJIAO
STREET, SHUNDE, FOSHAN CITY, GUANGDONG,
CHINA

3000                    40000    270

PUBLIC VERSION

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**ATTACHED LIST**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

700     10,000

# FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO LTD

NO.38A YANGDA ROAD SANZHOU LUNJIAO STREET SHUNDE FOSHAN CITY, GUANGDONG CHINA

TEL: +86-757-27339678, 27339682, FAX: +86-757-27339887  E-MAIL: Sales@yongjian.cn

**PUBLIC VERSION**

## COMMERCIAL INVOICE

M/S:

DATE: 25 Feb 2009

INVOICE NO:

ORDER NO:

HTSUS NO:

FROM:

TO:

| MARKS & NO. | ITEM NO. | DESCRIPTION OF GOODS | QTY (PCS) | package (CTN) | U/P FOB SHENZHEN | AMOUNT |
|---|---|---|---|---|---|---|
| | | | 5560 | | 14 | 75,000 |
| | | | | | | |
| TOTAL: | | | | | | |

FOR AND OF BEHALF OF

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO LTD

JA0320

# FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO LTD

*NO. 38A YANGDA ROAD SANZHOU LUNJIAO STREET SHUNDE FOSHAN CITY GUANGDONG CHINA*

*TEL: +86-757-27339678, 27339882  FAX: +86-757-27339887   E-MAIL: Sales@yongjian.cn*

## PACKING LIST

PUBLIC VERSION

M/S:

DATE: 25 Feb 2009

INVOICE NO.:

ORDER NO.

FROM:

TO:

| MARKS & NO. | ITEM NO. | DESCRIPTION OF GOODS | QTY/ | CTNS | G.W. (KGS) | MEAS cbm | CONTAINER NO. |
|---|---|---|---|---|---|---|---|
| | | | 1400 | | 10,000 | | |
| | | | | 700 | | | |
| MADE IN CHINA QUANTITY | | | | | | | |
| GWT: NWT: CU.FT: PO#: CARTON COUNT | | | 1400 | | 10,000 | | |
| | | | | 700 | | | |
| TOTAL | | | | | | | |

*FOR AND OF BEHALF OF*

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO LTD

PUBLIC VERSION



中华人民共和国海关出口货物报关单

14    75000

2009.02.26

**FOR OFFICIAL FILE**

*1004*

LAW OFFICES OF
## DeKieffer & Horgan
SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

TELEPHONE
(202) 783-6900
GREGORY S. MENEGAZ

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

November 20, 2009

**PUBLIC VERSION**

A-570-888
Pages: [ ]
Admin. Review
POI: 8/1/2008-7/31/2009
AD/CVD Operations
Office 9

**Public Version**

Business Proprietary Information
ranged/redacted within brackets
On Pages: C: 22, 24, 32; D: 4-5
Exhibits: C: 1-4; D: 1-6

**May be released under APO**

HAND-DELIVERED

Honorable Gary Locke
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230
Attention: Robert James, Michael Heaney

RE:  Floor-Standing, Metal-Top Ironing Tables And Parts Thereof from the
People's Republic Of China:  *Sections C and D Response of Shunde
Yongjian*

Dear Secretary Locke:

On behalf of Foshan Shunde Yongjian Housewares & Hardware Co. Ltd. ("Shunde

Yongjian"), an exporter of floor-standing, metal-top ironing tables from the People's Republic of

China, we hereby submit its response to the Department's Sections C and D Questionnaire.

Certain information contained herein is business confidential data that is proprietary to

Shunde Yongjian.  This information is enclosed with brackets ("[ ]").  Disclosure of this

information would cause substantial competitive and commercial harm to Shunde Yongjian.

000023

# Exhibit List

### FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. ("FOSHAN SHUNDE")

### SECTION C
### November 20, 2009

Exhibit C-1        CONNUMs & Matching Product Codes

Exhibit C-2        Customer Codes

Exhibit C-3        Sales Reconciliation

Exhibit C-4        U.S. Sales Database

# Exhibit C-4

# U.S. Sales Database

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    1
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUS01)

The CONTENTS Procedure

| | | | |
|---|---|---|---|
| Data Set Name | WORK.SHNDUS01 | Observations | 603 |
| Member Type | DATA | Variables | 48 |
| Engine | V9 | Indexes | 0 |
| Created | Friday, November 20, 2009 12:33:51 PM | Observation Length | 600 |
| Last Modified | Friday, November 20, 2009 12:33:51 PM | Deleted Observations | 0 |
| Protection | | Compressed | NO |
| Data Set Type | | Sorted | YES |
| Label | | | |
| Data Representation | WINDOWS_32 | | |
| Encoding | wlatin1 Western (Windows) | | |

Engine/Host Dependent Information

| | |
|---|---|
| Data Set Page Size | 16384 |
| Number of Data Set Pages | 23 |
| First Data Page | 1 |
| Max Obs per Page | 27 |
| Obs in First Data Page | 17 |
| Number of Data Set Repairs | 0 |
| File Name | C:\SHNDUS01.sas7bdat |
| Release Created | 9.0101M2 |
| Host Created | XP_PRO |

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|---|---|---|---|---|---|
| 17 | ASSEMU | Char | 12 | 12. | 12. | |
| 45 | BROKU | Char | 12 | 12. | 12. | |
| 18 | COMPU | Char | 12 | 12. | 12. | |
| 16 | CONNECTU | Char | 12 | 12. | 12. | |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    2
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDUSO1)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|----------|------|-----|--------|----------|-------|
| 3 | CONNUMU | Char | 56 | 56. | 56. | |
| 33 | CUSCODU | Char | 18 | 18. | 18. | |
| 43 | DINLFTPU | Num | 8 | BEST6.2 | 12. | KM |
| 46 | DMEBROKU | Char | 12 | 12. | 12. | |
| 28 | FLMCOVFTU | Char | 12 | 12. | 12. | |
| 30 | FLTPDSFTU | Char | 12 | 12. | 12. | |
| 42 | GRSUPRU | Num | 8 | BEST6.2 | 12. | USD |
| 5 | HEIGHTMECU | Char | 12 | 12. | 12. | |
| 6 | HEIGHTU | Char | 12 | 12. | 12. | |
| 48 | IMPORTER | Char | 12 | 12. | 12. | |
| 24 | INSLVBRDFTU | Char | 12 | 12. | 12. | |
| 44 | INSURU | Char | 12 | 12. | 12. | |
| 47 | INTNFRU | Char | 12 | 12. | 12. | |
| 35 | INVOICU | Char | 14 | 14. | 14. | |
| 26 | INXCORDFTU | Char | 12 | 12. | 12. | |
| 22 | IRCRDHLDRFTU | Char | 12 | 12. | 12. | |
| 19 | IRNRESTFTU | Char | 12 | 12. | 12. | |
| 14 | LEGCIRCU | Char | 12 | 12. | 12. | |
| 31 | LEGCPSFTU | Char | 12 | 12. | 12. | |
| 15 | LEGFIU | Char | 12 | 12. | 12. | |
| 8 | LEGMETALU | Char | 12 | 12. | 12. | |
| 13 | LEGSHPU | Char | 12 | 12. | 12. | |
| 12 | LEGSU | Char | 12 | 12. | 12. | |
| 21 | LINRKFTU | Char | 12 | 12. | 12. | |
| 27 | LVLFTU | Char | 12 | 12. | 12. | |
| 37 | PAYDATEU | Num | 8 | DATE9. | | DATE |
| 39 | PAYTERMU | Num | 8 | BEST12. | 12. | |
| 2 | PRODCODU | Char | 22 | 22. | 22. | |
| 41 | QTUMU | Num | 8 | BEST12. | 12. | |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    3
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO

CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUS01)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| #  | Variable       | Type | Len | Format  | Informat | Label  |
|----|----------------|------|-----|---------|----------|--------|
| 40 | QTYU           | Num  | 8   | BEST6.2 | 12.      | PIECES |
| 25 | RETSLVBRDFTU   | Char | 12  | 12.     | 12.      |        |
| 38 | SALETERU       | Num  | 8   | BEST12. | 12.      |        |
| 32 | SALEU          | Char | 12  | 12.     | 12.      |        |
| 34 | SALINDTU       | Num  | 8   | DATE9.  |          | DATE   |
| 1  | SEQU           | Num  | 8   | BEST12. | 12.      |        |
| 36 | SHIPDTU        | Num  | 8   | DATE9.  |          | DATE   |
| 20 | SLIDIRNRESTFTU | Char | 12  | 12.     | 12.      |        |
| 23 | SPRSTRCHLDFTU  | Char | 12  | 12.     | 12.      |        |
| 29 | TFLCOVFTU      | Char | 12  | 12.     | 12.      |        |
| 10 | TOPLENU        | Char | 12  | 12.     | 12.      |        |
| 7  | TOPMETALU      | Char | 12  | 12.     | 12.      |        |
| 9  | TOPU           | Char | 12  | 12.     | 12.      |        |
| 11 | TOPWIDU        | Char | 12  | 12.     | 12.      |        |
| 4  | WEIGHTU        | Char | 12  | 12.     | 12.      |        |

Sort Information

| | |
|---|---|
| Sortedby | CONNUMU SALINDTU |
| Validated | YES |
| Character Set | ANSI |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    11

PUBLIC VERSION *** RANGED DATA

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUS01)

| Obs | SEQU | PRODCODU | CONNUMU | WEIGHTU |
|-----|------|----------|---------|---------|
| 1 | 480 | | . | . |
| 2 | 460 | | . | . |
| 3 | 600 | | . | . |
| 4 | 60 | | . | . |
| 5 | 80 | | . | . |
| 6 | 100 | | . | . |
| 7 | 140 | | . | . |
| 8 | 160 | | . | . |
| 9 | 180 | | . | . |
| 10 | 580 | | . | . |
| 11 | 20 | | . | . |
| 12 | 200 | | . | . |
| 13 | 360 | | . | . |
| 14 | 300 | | . | . |
| 15 | 440 | | . | . |
| 16 | 320 | | . | . |
| 17 | 500 | | . | . |
| 18 | 540 | | . | . |
| 19 | 260 | | . | . |
| 20 | 220 | | . | . |
| 21 | 240 | | . | . |
| 22 | 280 | | . | . |
| 23 | 380 | | . | . |
| 24 | 420 | | . | . |
| 25 | 1 | | . | . |
| 26 | 40 | | . | . |
| 27 | 120 | | . | . |
| 28 | 340 | | . | . |
| 29 | 400 | | . | . |
| 30 | 520 | | . | . |
| 31 | 560 | | . | . |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    12

PUBLIC VERSION *** RANGED DATA

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUS01)

| Obs | HEIGHTMECU | HEIGHTU | TOPMETALU | LEGMETALU | TOPU | TOPLENU | TOPWIDU | LEGSU |
|-----|-----------|---------|-----------|-----------|------|---------|---------|-------|
| 1 | . | . | . | . | . | . | . | . |
| 2 | . | . | . | . | . | . | . | . |
| 3 | . | . | . | . | . | . | . | . |
| 4 | . | . | . | . | . | . | . | . |
| 5 | . | . | . | . | . | . | . | . |
| 6 | . | . | . | . | . | . | . | . |
| 7 | . | . | . | . | . | . | . | . |
| 8 | . | . | . | . | . | . | . | . |
| 9 | . | . | . | . | . | . | . | . |
| 10 | . | . | . | . | . | . | . | . |
| 11 | . | . | . | . | . | . | . | . |
| 12 | . | . | . | . | . | . | . | . |
| 13 | . | . | . | . | . | . | . | . |
| 14 | . | . | . | . | . | . | . | . |
| 15 | . | . | . | . | . | . | . | . |
| 16 | . | . | . | . | . | . | . | . |
| 17 | . | . | . | . | . | . | . | . |
| 18 | . | . | . | . | . | . | . | . |
| 19 | . | . | . | . | . | . | . | . |
| 20 | . | . | . | . | . | . | . | . |
| 21 | . | . | . | . | . | . | . | . |
| 22 | . | . | . | . | . | . | . | . |
| 23 | . | . | . | . | . | . | . | . |
| 24 | . | . | . | . | . | . | . | . |
| 25 | . | . | . | . | . | . | . | . |
| 26 | . | . | . | . | . | . | . | . |
| 27 | . | . | . | . | . | . | . | . |
| 28 | . | . | . | . | . | . | . | . |
| 29 | . | . | . | . | . | . | . | . |
| 30 | . | . | . | . | . | . | . | . |
| 31 | . | . | . | . | . | . | . | . |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888) 13

PUBLIC VERSION *** RANGED DATA

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDUS01)

| Obs | LEGSHPU | LEGCIRCU | LEGFIU | CONNECTU | ASSEMU | COMPU | IRNRESTFTU | SLIDIRNRESTFTU |
|---|---|---|---|---|---|---|---|---|
| 1 | . | . | . | . | . | . | . | . |
| 2 | . | . | . | . | . | . | . | . |
| 3 | . | . | . | . | . | . | . | . |
| 4 | . | . | . | . | . | . | . | . |
| 5 | . | . | . | . | . | . | . | . |
| 6 | . | . | . | . | . | . | . | . |
| 7 | . | . | . | . | . | . | . | . |
| 8 | . | . | . | . | . | . | . | . |
| 9 | . | . | . | . | . | . | . | . |
| 10 | . | . | . | . | . | . | . | . |
| 11 | . | . | . | . | . | . | . | . |
| 12 | . | . | . | . | . | . | . | . |
| 13 | . | . | . | . | . | . | . | . |
| 14 | . | . | . | . | . | . | . | . |
| 15 | . | . | . | . | . | . | . | . |
| 16 | . | . | . | . | . | . | . | . |
| 17 | . | . | . | . | . | . | . | . |
| 18 | . | . | . | . | . | . | . | . |
| 19 | . | . | . | . | . | . | . | . |
| 20 | . | . | . | . | . | . | . | . |
| 21 | . | . | . | . | . | . | . | . |
| 22 | . | . | . | . | . | . | . | . |
| 23 | . | . | . | . | . | . | . | . |
| 24 | . | . | . | . | . | . | . | . |
| 25 | . | . | . | . | . | . | . | . |
| 26 | . | . | . | . | . | . | . | . |
| 27 | . | . | . | . | . | . | . | . |
| 28 | . | . | . | . | . | . | . | . |
| 29 | . | . | . | . | . | . | . | . |
| 30 | . | . | . | . | . | . | . | . |
| 31 | . | . | . | . | . | . | . | . |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    14
PUBLIC VERSION *** RANGED DATA
FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUSO1)

| Obs | LINRKFTU | IRCRDHLDRFTU | SPRSTRCHLDFTU | INSLVBRDFTU | RETSLVBRDFTU | INXCORDFTU | LVLFTU | FLMCOVFTU |
|-----|----------|--------------|---------------|-------------|--------------|------------|--------|-----------|
| 1   | .        | .            | .             | .           | .            | .          | .      | .         |
| 2   | .        | .            | .             | .           | .            | .          | .      | .         |
| 3   | .        | .            | .             | .           | .            | .          | .      | .         |
| 4   | .        | .            | .             | .           | .            | .          | .      | .         |
| 5   | .        | .            | .             | .           | .            | .          | .      | .         |
| 6   | .        | .            | .             | .           | .            | .          | .      | .         |
| 7   | .        | .            | .             | .           | .            | .          | .      | .         |
| 8   | .        | .            | .             | .           | .            | .          | .      | .         |
| 9   | .        | .            | .             | .           | .            | .          | .      | .         |
| 10  | .        | .            | .             | .           | .            | .          | .      | .         |
| 11  | .        | .            | .             | .           | .            | .          | .      | .         |
| 12  | .        | .            | .             | .           | .            | .          | .      | .         |
| 13  | .        | .            | .             | .           | .            | .          | .      | .         |
| 14  | .        | .            | .             | .           | .            | .          | .      | .         |
| 15  | .        | .            | .             | .           | .            | .          | .      | .         |
| 16  | .        | .            | .             | .           | .            | .          | .      | .         |
| 17  | .        | .            | .             | .           | .            | .          | .      | .         |
| 18  | .        | .            | .             | .           | .            | .          | .      | .         |
| 19  | .        | .            | .             | .           | .            | .          | .      | .         |
| 20  | .        | .            | .             | .           | .            | .          | .      | .         |
| 21  | .        | .            | .             | .           | .            | .          | .      | .         |
| 22  | .        | .            | .             | .           | .            | .          | .      | .         |
| 23  | .        | .            | .             | .           | .            | .          | .      | .         |
| 24  | .        | .            | .             | .           | .            | .          | .      | .         |
| 25  | .        | .            | .             | .           | .            | .          | .      | .         |
| 26  | .        | .            | .             | .           | .            | .          | .      | .         |
| 27  | .        | .            | .             | .           | .            | .          | .      | .         |
| 28  | .        | .            | .             | .           | .            | .          | .      | .         |
| 29  | .        | .            | .             | .           | .            | .          | .      | .         |
| 30  | .        | .            | .             | .           | .            | .          | .      | .         |
| 31  | .        | .            | .             | .           | .            | .          | .      | .         |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)  15
PUBLIC VERSION *** RANGED DATA
FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDUS01)

| Obs | TFLCOVFTU | FLTPDSFTU | LEGCPSFTU | SALEU | CUSCODU | SALINDTU | INVOICU |
|-----|-----------|-----------|-----------|-------|---------|----------|---------|
| 1 | . | . | . | EP | | . | . |
| 2 | . | . | . | EP | | . | . |
| 3 | . | . | . | EP | | . | . |
| 4 | . | . | . | EP | | . | . |
| 5 | . | . | . | EP | | . | . |
| 6 | . | . | . | EP | | . | . |
| 7 | . | . | . | EP | | . | . |
| 8 | . | . | . | EP | | . | . |
| 9 | . | . | . | EP | | . | . |
| 10 | . | . | . | EP | | . | . |
| 11 | . | . | . | EP | | . | . |
| 12 | . | . | . | EP | | . | . |
| 13 | . | . | . | EP | | . | . |
| 14 | . | . | . | EP | | . | . |
| 15 | . | . | . | EP | | . | . |
| 16 | . | . | . | EP | | . | . |
| 17 | . | . | . | EP | | . | . |
| 18 | . | . | . | EP | | . | . |
| 19 | . | . | . | EP | | . | . |
| 20 | . | . | . | EP | | . | . |
| 21 | . | . | . | EP | | . | . |
| 22 | . | . | . | EP | | . | . |
| 23 | . | . | . | EP | | . | . |
| 24 | . | . | . | EP | | . | . |
| 25 | . | . | . | EP | | . | . |
| 26 | . | . | . | EP | | . | . |
| 27 | . | . | . | EP | | . | . |
| 28 | . | . | . | EP | | . | . |
| 29 | . | . | . | EP | | . | . |
| 30 | . | . | . | EP | | . | . |
| 31 | . | . | . | EP | | . | . |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)   16

PUBLIC VERSION *** RANGED DATA

FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDUS01)

| Obs | SHIPDTU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTUMU | GRSUPRU | DINLFTPU | INSURU |
|---|---|---|---|---|---|---|---|---|---|
| 1 | . | . | 2 | 5 | . | 3 | . | 164.7 | NO |
| 2 | . | . | 2 | 3 | 785.57 | 3 | . | 164.7 | NO |
| 3 | . | . | 2 | 3 | 759.57 | 3 | . | 164.7 | NO |
| 4 | . | . | 2 | 5 | 320.05 | 3 | . | 164.7 | NO |
| 5 | . | . | 2 | 5 | 1400.8 | 3 | . | 164.7 | NO |
| 6 | . | . | 2 | 5 | 1884.9 | 3 | . | 164.7 | NO |
| 7 | . | . | 2 | 5 | 1587.6 | 3 | . | 164.7 | NO |
| 8 | . | . | 2 | 5 | 1645.1 | 3 | . | 164.7 | NO |
| 9 | . | . | 2 | 5 | 1639.6 | 3 | . | 164.7 | NO |
| 10 | . | . | 2 | 3 | 1453.3 | 3 | . | 164.7 | NO |
| 11 | . | . | 2 | 5 | 621.12 | 3 | . | 164.7 | NO |
| 12 | . | . | 2 | 7 | 1797.7 | 3 | . | 164.7 | NO |
| 13 | . | . | 2 | 2 | 1916.3 | 3 | . | 164.7 | NO |
| 14 | . | . | 2 | 5 | 38.282 | 3 | . | 164.7 | NO |
| 15 | . | . | 2 | 3 | 94.523 | 3 | 10.876 | 164.7 | NO |
| 16 | . | . | 2 | 3 | 2062.7 | 3 | 9.6759 | 164.7 | NO |
| 17 | . | . | 2 | 3 | 2035.9 | 3 | 10.731 | 164.7 | NO |
| 18 | . | . | 2 | 3 | 2024.6 | 3 | 10.859 | 164.7 | NO |
| 19 | . | . | 2 | 5 | 1458.4 | 3 | 12.955 | 164.7 | NO |
| 20 | . | . | 2 | 5 | 901.81 | 3 | 12.072 | 164.7 | NO |
| 21 | . | . | 2 | 5 | 1429.3 | 3 | 13.078 | 164.7 | NO |
| 22 | . | . | 2 | 5 | 674.91 | 3 | 12.81 | 164.7 | NO |
| 23 | . | . | 2 | 5 | 86.306 | 3 | 11.994 | 164.7 | NO |
| 24 | . | . | 2 | 5 | 1166.3 | 3 | 12.925 | 164.7 | NO |
| 25 | . | . | 2 | 5 | 683.1 | 3 | 13.771 | 164.7 | NO |
| 26 | . | . | 2 | 5 | 1125.8 | 3 | 13.484 | 164.7 | NO |
| 27 | . | . | 2 | 5 | 247.65 | 3 | 13.211 | 164.7 | NO |
| 28 | . | . | 2 | 3 | 1201.4 | 3 | 16.842 | 164.7 | NO |
| 29 | . | . | 2 | 3 | 1216.4 | 3 | 16.728 | 164.7 | NO |
| 30 | . | . | 2 | 3 | 1330.6 | 3 | 15.07 | 164.7 | NO |
| 31 | . | . | 2 | 3 | 1124.9 | 3 | 14.402 | 164.7 | NO |

Friday, November 20, 2009 - 12:33

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)   17
PUBLIC VERSION *** RANGED DATA
FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDUS01)

| Obs | BROKU | DMEBROKU | INTNFRU | IMPORTER |
|-----|-------|----------|---------|----------|
| 1 | NO | NO | NO | UNK |
| 2 | NO | NO | NO | UNK |
| 3 | NO | NO | NO | UNK |
| 4 | NO | NO | NO | UNK |
| 5 | NO | NO | NO | UNK |
| 6 | NO | NO | NO | UNK |
| 7 | NO | NO | NO | UNK |
| 8 | NO | NO | NO | UNK |
| 9 | NO | NO | NO | UNK |
| 10 | NO | NO | NO | UNK |
| 11 | NO | NO | NO | UNK |
| 12 | NO | NO | NO | UNK |
| 13 | NO | NO | NO | UNK |
| 14 | NO | NO | NO | UNK |
| 15 | NO | NO | NO | UNK |
| 16 | NO | NO | NO | UNK |
| 17 | NO | NO | NO | UNK |
| 18 | NO | NO | NO | UNK |
| 19 | NO | NO | NO | UNK |
| 20 | NO | NO | NO | UNK |
| 21 | NO | NO | NO | UNK |
| 22 | NO | NO | NO | UNK |
| 23 | NO | NO | NO | UNK |
| 24 | NO | NO | NO | UNK |
| 25 | NO | NO | NO | UNK |
| 26 | NO | NO | NO | UNK |
| 27 | NO | NO | NO | UNK |
| 28 | NO | NO | NO | UNK |
| 29 | NO | NO | NO | UNK |
| 30 | NO | NO | NO | UNK |
| 31 | NO | NO | NO | UNK |

Friday, November 20, 2009 - 12:33



A-570-888
AR 08/01/2008 – 7/31/2009
Public Document
AD/CVD7:MJH

*1129*

TO ALL INTERESTED PARTIES:

Re:    Administrative Review of Floor-Standing, Metal-Top, Ironing Tables and Parts Thereof
from the People's Republic of China (the PRC): Surrogate Country List

As you are aware, the Department considers the PRC a non-market economy. Accordingly, it is
necessary for the Department to search for a surrogate market-economy country. The
Department of Commerce (the Department) is providing all interested parties the opportunity to
submit any information which they wish the Department to consider when deciding upon the
appropriate surrogate country.

Attached is a memorandum outlining the appropriate surrogate countries in this case based solely
on economic comparability. See Attachment 1. Policy Bulletin 04.1, entitled "Non-Market
Economy Surrogate Country Selection Process," further outlines the Department's policy,
specifying that in addition to being economically comparable, the surrogate country should also
be a significant producer of merchandise comparable to the subject merchandise. (See
Attachment II. It may also be found at http://ia.ita.doc.gov/policy/bull04-1.html.) Thus, if you
submit comments on surrogate country selection, you should address the question of whether the
country you recommend as the surrogate country is a significant producer of comparable
merchandise.

If you choose to submit comments on surrogate country selection, please submit your comments
to the Department no later than **August 17, 2010.**

Under the Department's regulations, the deadline for submission of publicly available factor
values information in a review is twenty days after the publication date of the preliminary results.
See 19 CFR 351.303(c)(3)(ii). Notwithstanding this deadline, if you wish to submit publicly
available information to value factors of production for consideration of the Department's
preliminary results, you must submit comments and relevant information to the Department no
later than **August 17, 2010.**

000071

-2-

If you have any questions regarding this matter, please contact Michael J. Heaney at (202) 482-4475.

Sincerely,

Robert James
Program Manager
AD/CVD Operations

Attachments



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-888
POR: 8/01/2008-7/31/2009
Public Document

**MEMORANDUM TO:**     Richard Weible
Director
AD/CVD Operations, Office 7
Import Administration

**FROM:**     Carole Showers
Director
Office of Policy
Import Administration

**DATE:**     July 8, 2010

**SUBJECT:** Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Floor Standing Metal-Top Ironing Tables and Certain Parts ("Ironing Tables") from the People's Republic of China ("PRC").

If you base normal value in this review on surrogate country factor prices, then section 773(c)(4) of the statute requires, to the extent possible, that you use a surrogate country that (1) is at a level of economic development comparable to that of the PRC and (2) is a significant producer of merchandise comparable to ironing tables.

With regard to the first statutory requirement, the six countries on the non-exhaustive list below are at a level of economic development comparable to the PRC in terms of per capita gross national income (GNI). We use per capita GNI as the primary basis for determining economic comparability. While we recognize that India is not as close to China as the other surrogate countries in the list, relative to all countries and GNI levels worldwide, India still remains sufficiently close to China in terms of per capita GNI to be considered economically comparable. Moreover, like China, India has a broad and diverse production base. In addition, India has been the primary surrogate in many of the Department's past NME proceedings involving China, and has a robust set of well-developed and reliable data sources. However, we note that the disparity in per capita GNI between India and China has consistently grown in recent years and, should this trend continue, the Department may determine in the future that the two countries are no longer "at a comparable level of economic development" within the meaning of the statute.

For purposes of selecting a surrogate country, you should, following <u>Magnesium from the PRC</u> (59 FR 55424) and <u>Saccharin from the PRC</u> (59 FR 58818), treat the six countries listed below as being equally comparable in terms of economic development and determine which, if any, is a significant producer of merchandise comparable to ironing tables. The statute does not

define "significant" or "comparable," although "comparable" encompasses a larger set of products than "like product." We have in past cases identified comparable merchandise on the basis of similarities in production factors (physical and non-physical) and factor intensities (see, for example, <u>Magnesium</u>). See Import Administration Policy Bulletin 04.1 for further guidance.

If you find that more than one of the six countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality. See <u>Pencils from the PRC</u> (59 FR 55625). Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures. You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

The following six countries are economically comparable to the PRC and likely to have good data availability and quality.[1] However, you may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:  Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input. You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2008 US$ * |
|---------|-----------|
| PRC | 2940 |
| India | 1070 |
| Philippines | 1890 |
| Indonesia | 2010 |
| Thailand | 2840 |
| Ukraine | 3210 |
| Peru | 3990 |

* World Development Report 2010, World Bank.

1 The Department does not consider nonmarket economies or non-state territories as suitable surrogate countries for use in its analysis.

Import Administration Policy Bulletin

Number: 04.1
Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

James Jochum
Assistant Secretary
for Import Administration

Date: _____

Statement of Issue

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

Background

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

1. at a level of economic development comparable to that of the nonmarket economy country, and

2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[1] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

Statement of Policy

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different

products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of

comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

*Data Considerations*

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Exceptions to the Sequencing Procedure*

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the

Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

---

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary

surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.

**FOR OFFICIAL FILE**

LAW OFFICES OF

**deKIEFFER & HORGAN**

SUITE 800

729 FIFTEENTH STREET, N.W.

WASHINGTON, D.C. 20005

Affiliated Office

Saarbrücken, Germany

RECEIVED

JUL 15 2010

DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

TELEPHONE

(202) 783-6900

GREGORY S. MENEGAZ

FACSIMILE

(202) 783-6909

gmenegaz@dhlaw.com

**PUBLIC VERSION**

July 15, 2010

1126

A-570-888

Pages: 20

Admin. Review

POI: 8/1/2008-7/31/2009

AD/CVD Operations

Office 9

**Public Version**

HAND-DELIVERED

Honorable Gary Locke

Secretary

Room 1870

U.S. Dept. of Commerce

Washington, D.C. 20230

Business Proprietary Information
has been deleted/ranged
contained within brackets in
Exhibits 1 and 2.

**May be released under APO**

RE: <u>Floor-Standing, Metal-Top Ironing Tables And Parts Thereof from the
People's Republic Of China</u>: *Revised FOP and US Sales Databases*

Dear Secretary Locke:

On behalf of Foshan Shunde Yongjian Housewares & Hardware Co. Ltd. ("Shunde

Yongjian"), an exporter of floor-standing, metal-top ironing tables from the People's Republic of

China, we hereby submit revised FOP and US Sales databases.

Certain information contained herein is business confidential data that is proprietary to

Shunde Yongjian. This information is enclosed with brackets ("[ ]"). Disclosure of this

information would cause substantial competitive and commercial harm to Shunde Yongjian.

Such data is marked "Contains Proprietary Information." Confidential treatment, subject to

000072

# EXHIBIT 1

## Revised FOP Database

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    1
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

The CONTENTS Procedure

| Data Set Name | WORK.SHNDFP03 | Observations | 45 |
|---|---|---|---|
| Member Type | DATA | Variables | 137 |
| Engine | V9 | Indexes | 0 |
| Created | Thursday, July 15, 2010 10:13:20 AM | Observation Length | 1320 |
| Last Modified | Thursday, July 15, 2010 10:13:20 AM | Deleted Observations | 0 |
| Protection | | Compressed | NO |
| Data Set Type | | Sorted | YES |
| Label | | | |
| Data Representation | WINDOWS_32 | | |
| Encoding | wlatin1 Western (Windows) | | |

Engine/Host Dependent Information

| Data Set Page Size | 16384 |
|---|---|
| Number of Data Set Pages | 5 |
| First Data Page | 2 |
| Max Obs per Page | 12 |
| Obs in First Data Page | 12 |
| Number of Data Set Repairs | 0 |
| File Name | C:\SHNDUS03.sas7bdat |
| Release Created | 9.0101M2 |
| Host Created | XP_PRO |

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|---|---|---|---|---|---|
| 39 | ACETYLENE | Num | 8 | BEST6.2 | 12. | KG |
| 41 | ACETYLENEDIS | Num | 8 | BEST5.2 | 12. | KM |
| 40 | ACETYLENEMOD | Char | 12 | | 12. | |
| 84 | ADHESIVELABEL1 | Num | 8 | BEST6.2 | 12. | KG |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    2
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDFP03)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|----------|------|-----|--------|----------|-------|
| 90 | ADHESIVELABEL2 | Num | 8 | BEST6.2 | 12. | KG |
| 86 | ADHESIVELABEL1DIS | Num | 8 | BEST5.2 | 12. | KM |
| 85 | ADHESIVELABEL1MOD | Char | 12 | 12. | 12. | |
| 92 | ADHESIVELABEL2DIS | Num | 8 | BEST5.2 | 12. | KM |
| 91 | ADHESIVELABEL2MOD | Char | 12 | 12. | 12. | |
| 75 | ADHESIVETAPE | Num | 8 | BEST6.2 | 12. | KG |
| 77 | ADHESIVETAPEDIS | Num | 8 | BEST5.2 | 12. | KM |
| 76 | ADHESIVETAPEMOD | Char | 12 | 12. | 12. | |
| 36 | ARGONGAS | Num | 8 | BEST6.2 | 12. | KG |
| 38 | ARGONGASDIS | Num | 8 | BEST5.2 | 12. | KM |
| 37 | ARGONGASMOD | Char | 12 | 12. | 12. | |
| 8 | BLACKANNEAL | Num | 8 | BEST6.2 | 12. | KG |
| 10 | BLACKANNEALDIS | Num | 8 | BEST5.2 | 12. | KM |
| 9 | BLACKANNEALMOD | Char | 12 | 12. | 12. | |
| 105 | BOLT | Num | 8 | BEST6.2 | 12. | KG |
| 107 | BOLTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 106 | BOLTMOD | Char | 12 | 12. | 12. | |
| 32 | CARBONDIOXIDE | Num | 8 | BEST6.2 | 12. | KG |
| 34 | CARBONDIOXIDEDIS | Num | 8 | BEST5.2 | 12. | KM |
| 33 | CARBONDIOXIDEMOD | Char | 12 | 12. | 12. | |
| 96 | CARTON | Num | 8 | BEST6.2 | 12. | KG |
| 98 | CARTONDIS | Num | 8 | BEST5.2 | 12. | KM |
| 97 | CARTONMOD | Char | 12 | 12. | 12. | |
| 1 | CONNUM | Char | 56 | 56. | 56. | |
| 69 | CORRUGATEDPAPER | Num | 8 | BEST6.2 | 12. | KG |
| 71 | CORRUGATEDPAPERDIS | Num | 8 | BEST5.2 | 12. | KM |
| 70 | CORRUGATEDPAPERMOD | Char | 12 | 12. | 12. | |
| 129 | COTTONTHREAD | Num | 8 | BEST6.2 | 12. | KG |
| 131 | COTTONTHREADDIS | Num | 8 | BEST5.2 | 12. | KM |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    3
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDFP03)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|---|---|---|---|---|---|
| 130 | COTTONTHREADMOD | Char | 12 | 12. | 12. | |
| 117 | CTERPN | Num | 8 | BEST6.2 | 12. | KG |
| 119 | CTERPNDIS | Num | 8 | BEST5.2 | 12. | KM |
| 118 | CTERPNMOD | Char | 12 | 12. | 12. | |
| 54 | DEGREASINGAGENT | Num | 8 | BEST6.2 | 12. | KG |
| 56 | DEGREASINGAGENTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 55 | DEGREASINGAGENTMOD | Char | 12 | 12. | 12. | |
| 72 | DESICCANT | Num | 8 | BEST6.2 | 12. | KG |
| 74 | DESICCANTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 73 | DESICCANTMOD | Char | 12 | 12. | 12. | |
| 134 | DIRLAB | Num | 8 | BEST6.2 | 12. | HRS |
| 14 | DYECOTTONCLOTH | Num | 8 | BEST6.2 | 12. | KG |
| 16 | DYECOTTONCLOTHDIS | Num | 8 | BEST5.2 | 12. | KM |
| 15 | DYECOTTONCLOTHMOD | Char | 12 | 12. | 12. | |
| 133 | ELECTRICITY | Num | 8 | BEST6.2 | 12. | KWH |
| 66 | HYDROCHLORICACID | Num | 8 | BEST6.2 | 12. | KG |
| 68 | HYDROCHLORICACIDDIS | Num | 8 | BEST5.2 | 12. | KM |
| 67 | HYDROCHLORICACIDMOD | Char | 12 | 12. | 12. | |
| 136 | INDLAB | Num | 8 | BEST6.2 | 12. | HRS |
| 87 | LABEL | Num | 8 | BEST6.2 | 12. | KG |
| 89 | LABELDIS | Num | 8 | BEST5.2 | 12. | KM |
| 88 | LABELMOD | Char | 12 | 12. | 12. | |
| 114 | MESON | Num | 8 | BEST6.2 | 12. | KG |
| 116 | MESONDIS | Num | 8 | BEST5.2 | 12. | KM |
| 115 | MESONMOD | Char | 12 | 12. | 12. | |
| 35 | NATURALGAS | Num | 8 | BEST6.2 | 12. | KG |
| 102 | NUT | Num | 8 | BEST6.2 | 12. | KG |
| 104 | NUTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 103 | NUTMOD | Char | 12 | 12. | 12. | |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    4
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|---|---|---|---|---|---|
| 29 | NYLONLABEL | Num | 8 | BEST6.2 | 12. | KG |
| 31 | NYLONLABELDIS | Num | 8 | BEST5.2 | 12. | KM |
| 30 | NYLONLABELMOD | Char | 12 | 12. | 12. | |
| 78 | NYLONROPE | Num | 8 | BEST6.2 | 12. | KG |
| 80 | NYLONROPEDIS | Num | 8 | BEST5.2 | 12. | KM |
| 79 | NYLONROPEMOD | Char | 12 | 12. | 12. | |
| 126 | NYLONTHREAD | Num | 8 | BEST6.2 | 12. | KG |
| 128 | NYLONTHREADDIS | Num | 8 | BEST5.2 | 12. | KM |
| 127 | NYLONTHREADMOD | Char | 12 | 12. | 12. | |
| 57 | PAGENT | Num | 8 | BEST6.2 | 12. | KG |
| 59 | PAGENTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 58 | PAGENTMOD | Char | 12 | 12. | 12. | |
| 135 | PAKLAB | Num | 8 | BEST6.2 | 12. | HRS |
| 93 | PAPER | Num | 8 | BEST6.2 | 12. | KG |
| 95 | PAPERDIS | Num | 8 | BEST5.2 | 12. | KM |
| 94 | PAPERMOD | Char | 12 | 12. | 12. | |
| 26 | PEFOAM | Num | 8 | BEST6.2 | 12. | KG |
| 28 | PEFOAMDIS | Num | 8 | BEST5.2 | 12. | KM |
| 27 | PEFOAMMOD | Char | 12 | 12. | 12. | |
| 45 | PEPART | Num | 8 | BEST6.2 | 12. | KG |
| 47 | PEPARTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 46 | PEPARTMOD | Char | 12 | 12. | 12. | |
| 60 | PHOSPHORICACID | Num | 8 | BEST6.2 | 12. | KG |
| 62 | PHOSPHORICACIDDIS | Num | 8 | BEST5.2 | 12. | KM |
| 61 | PHOSPHORICACIDMOD | Char | 12 | 12. | 12. | |
| 81 | POLYSTYRENESHEET | Num | 8 | BEST6.2 | 12. | KG |
| 83 | POLYSTYRENESHEETDIS | Num | 8 | BEST5.2 | 12. | KM |
| 82 | POLYSTYRENESHEETMOD | Char | 12 | 12. | 12. | |
| 51 | POWDERCOATING | Num | 8 | BEST6.2 | 12. | KG |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    5
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|----------|------|-----|--------|----------|-------|
| 53 | POWDERCOATINGDIS | Num | 8 | BEST5.2 | 12. | KM |
| 52 | POWDERCOATINGMOD | Char | 12 | 12. | 12. | |
| 17 | PRINTCOTTONCLOTH | Num | 8 | BEST6.2 | 12. | KG |
| 19 | PRINTCOTTONCLOTHDIS | Num | 8 | BEST5.2 | 12. | KM |
| 18 | PRINTCOTTONCLOTHMOD | Char | 12 | 12. | 12. | |
| 23 | PUFOAM | Num | 8 | BEST6.2 | 12. | KG |
| 25 | PUFOAMDIS | Num | 8 | BEST5.2 | 12. | KM |
| 24 | PUFOAMMOD | Char | 12 | 12. | 12. | |
| 48 | PVCPART | Num | 8 | BEST6.2 | 12. | KG |
| 50 | PVCPARTDIS | Num | 8 | BEST5.2 | 12. | KM |
| 49 | PVCPARTMOD | Char | 12 | 12. | 12. | |
| 108 | RIVET | Num | 8 | BEST6.2 | 12. | KG |
| 99 | RIVET2 | Num | 8 | BEST6.2 | 12. | KG |
| 123 | RIVET3 | Num | 8 | BEST6.2 | 12. | KG |
| 101 | RIVET2DIS | Num | 8 | BEST5.2 | 12. | KM |
| 100 | RIVET2MOD | Char | 12 | 12. | 12. | |
| 125 | RIVET3DIS | Num | 8 | BEST5.2 | 12. | KM |
| 124 | RIVET3MOD | Char | 12 | 12. | 12. | |
| 110 | RIVETDIS | Num | 8 | BEST5.2 | 12. | KM |
| 109 | RIVETMOD | Char | 12 | 12. | 12. | |
| 111 | SPRING | Num | 8 | BEST6.2 | 12. | KG |
| 120 | SPRING1 | Num | 8 | BEST6.2 | 12. | KG |
| 122 | SPRING1DIS | Num | 8 | BEST5.2 | 12. | KM |
| 121 | SPRING1MOD | Char | 12 | 12. | 12. | |
| 113 | SPRINGDIS | Num | 8 | BEST5.2 | 12. | KM |
| 112 | SPRINGMOD | Char | 12 | 12. | 12. | |
| 137 | STEELSCRAP | Num | 8 | BEST6.2 | 12. | KG |
| 5 | STEELWIRE | Num | 8 | BEST6.2 | 12. | KG |
| 7 | STEELWIREDIS | Num | 8 | BEST5.2 | 12. | KM |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    6
PROPRIETARY BUSINESS INFORMATION --- CONFIDENTIAL TREATMENT REQUESTED --- SUBJECT TO APO
CONTENTS OF FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat | Label |
|---|----------|------|-----|--------|----------|-------|
| 6 | STEELWIREMOD | Char | 12 | 12. | 12. | |
| 11 | TCFABRIC | Num | 8 | BEST6.2 | 12. | KG |
| 13 | TCFABRICDIS | Num | 8 | BEST5.2 | 12. | KM |
| 12 | TCFABRICMOD | Char | 12 | 12. | 12. | |
| 20 | TEFLONFABRIC | Num | 8 | BEST6.2 | 12. | KG |
| 22 | TEFLONFABRICDIS | Num | 8 | BEST5.2 | 12. | KM |
| 21 | TEFLONFABRICMOD | Char | 12 | 12. | 12. | |
| 63 | VITRIOLICACID | Num | 8 | BEST6.2 | 12. | KG |
| 65 | VITRIOLICACIDDIS | Num | 8 | BEST5.2 | 12. | KM |
| 64 | VITRIOLICACIDMOD | Char | 12 | 12. | 12. | |
| 132 | WATER | Num | 8 | BEST6.2 | 12. | MT |
| 42 | WELDINGWIRE | Num | 8 | BEST6.2 | 12. | KG |
| 44 | WELDINGWIREDIS | Num | 8 | BEST5.2 | 12. | KM |
| 43 | WELDINGWIREMOD | Char | 12 | 12. | 12. | |
| 2 | WHITEANNEAL | Num | 8 | BEST6.2 | 12. | KG |
| 4 | WHITEANNEALDIS | Num | 8 | BEST5.2 | 12. | KM |
| 3 | WHITEANNEALMOD | Char | 12 | 12. | 12. | |

Sort Information

Sortedby         CONNUM
Validated        YES
Character Set     ANSI

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)     24
PUBLIC VERSION *** RANGED DATA

PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | CONNUM | WHITEANNEAL | WHITEANNEALMOD | WHITEANNEALDIS | STEELWIRE |
|-----|--------|-------------|----------------|----------------|-----------|
| 1   |        | .           | T              | 47.59          | .         |
| 2   |        | .           | T              | 47.59          | .         |
| 3   |        | .           | T              | 47.59          | .         |
| 4   |        | .           | T              | 47.59          | .         |
| 5   |        | .           | T              | 47.59          | .         |
| 6   |        | .           | T              | 47.59          | .         |
| 7   |        | .           | T              | 47.59          | .         |
| 8   |        | .           | T              | 47.59          | .         |
| 9   |        | .           | T              | 47.59          | .         |
| 10  |        | .           | T              | 47.59          | .         |
| 11  |        | .           | T              | 47.59          | .         |
| 12  |        | .           | T              | 47.59          | .         |
| 13  |        | .           | T              | 47.59          | .         |
| 14  |        | .           | T              | 47.59          | .         |
| 15  |        | .           | T              | 47.59          | .         |
| 16  |        | .           | T              | 47.59          | .         |

Thursday, July 15, 2010 - 10:13

JA0547

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    25

PUBLIC VERSION *** RANGED DATA

PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | STEELWIREMOD | STEELWIREDIS | BLACKANNEAL | BLACKANNEALMOD | BLACKANNEALDIS | TCFABRIC | TCFABRICMOD | TCFABRICDIS | DYECOTTONCLOTH |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 2 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 3 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 4 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 5 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 6 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 7 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 8 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 9 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 10 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 11 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 12 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 13 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 14 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 15 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |
| 16 | 22.99 | . | T | . | 96.17 | . | T | 54.25 | . |

| Obs | DYECOTTONCLOTHMOD | DYECOTTONCLOTHDIS | PRINTCOTTONCLOTH | PRINTCOTTONCLOTHMOD | PRINTCOTTONCLOTHDIS | TEFLONFABRIC |
|---|---|---|---|---|---|---|
| 1 | T | 115.7 | . | T | 107.5 | . |
| 2 | T | 115.7 | . | T | 107.5 | . |
| 3 | T | 115.7 | . | T | 107.5 | . |
| 4 | T | 115.7 | . | T | 107.5 | . |
| 5 | T | 115.7 | . | T | 107.5 | . |
| 6 | T | 115.7 | . | T | 107.5 | . |
| 7 | T | 115.7 | . | T | 107.5 | . |
| 8 | T | 115.7 | . | T | 107.5 | . |
| 9 | T | 115.7 | . | T | 107.5 | . |
| 10 | T | 115.7 | . | T | 107.5 | . |
| 11 | T | 115.7 | . | T | 107.5 | . |
| 12 | T | 115.7 | . | T | 107.5 | . |
| 13 | T | 115.7 | . | T | 107.5 | . |
| 14 | T | 115.7 | . | T | 107.5 | . |
| 15 | T | 115.7 | . | T | 107.5 | . |
| 16 | T | 115.7 | . | T | 107.5 | . |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    27

PUBLIC VERSION *** RANGED DATA

PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | TEFLONFABRICMOD | TEFLONFABRICDIS | PUFOAM | PUFOAMMOD | PUFOAMDIS | PEFOAM | PEFOAMMOD | PEFOAMDIS | NYLONLABEL | NYLONLABELMOD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 2 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 3 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 4 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 5 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 6 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 7 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 8 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 9 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 10 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 11 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 12 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 13 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 14 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 15 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |
| 16 | T | 45.5 | . | T | . | . | T | 54.37 | . | T |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    28
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDFP03)

| Obs | NYLONLABELDIS | CARBONDIOXIDE | CARBONDIOXIDEMOD | CARBONDIOXIDEDIS | NATURALGAS | ARGONGAS | ARGONGASMOD | ARGONGASDIS |
|---|---|---|---|---|---|---|---|---|
| 1 | . | . | T | . | . | . | T | . |
| 2 | . | . | T | . | . | . | T | . |
| 3 | . | . | T | . | . | . | T | . |
| 4 | . | . | T | . | . | . | T | . |
| 5 | . | . | T | . | . | . | T | . |
| 6 | . | . | T | . | . | . | T | . |
| 7 | . | . | T | . | . | . | T | . |
| 8 | . | . | T | . | . | . | T | . |
| 9 | . | . | T | . | . | . | T | . |
| 10 | . | . | T | . | . | . | T | . |
| 11 | . | . | T | . | . | . | T | . |
| 12 | . | . | T | . | . | . | T | . |
| 13 | . | . | T | . | . | . | T | . |
| 14 | . | . | T | . | . | . | T | . |
| 15 | . | . | T | . | . | . | T | . |
| 16 | . | . | T | . | . | . | T | . |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    29
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | ACETYLENE | ACETYLENEMOD | ACETYLENEDIS | WELDINGWIRE | WELDINGWIREMOD | WELDINGWIREDIS | PEPART | PEPARTMOD | PEPARTDIS |
|-----|-----------|--------------|--------------|-------------|----------------|----------------|--------|-----------|-----------|
| 1   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 2   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 3   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 4   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 5   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 6   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 7   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 8   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 9   | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 10  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 11  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 12  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 13  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 14  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 15  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |
| 16  | .         | T            | .            | .           | T              | 22.82          | .      | T         | .         |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    30
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | PVCPART | PVCPARTMOD | PVCPARTDIS | POWDERCOATING | POWDERCOATINGMOD | POWDERCOATINGDIS | DEGREASINGAGENT | DEGREASINGAGENTMOD |
|-----|---------|------------|------------|---------------|------------------|------------------|-----------------|---------------------|
| 1 | . | T | . | . | T | 174.4 | . | T |
| 2 | . | T | . | . | T | 174.4 | . | T |
| 3 | . | T | . | . | T | 174.4 | . | T |
| 4 | . | T | . | . | T | 174.4 | . | T |
| 5 | . | T | . | . | T | 174.4 | . | T |
| 6 | . | T | . | . | T | 174.4 | . | T |
| 7 | . | T | . | . | T | 174.4 | . | T |
| 8 | . | T | . | . | T | 174.4 | . | T |
| 9 | . | T | . | . | T | 174.4 | . | T |
| 10 | . | T | . | . | T | 174.4 | . | T |
| 11 | . | T | . | . | T | 174.4 | . | T |
| 12 | . | T | . | . | T | 174.4 | . | T |
| 13 | . | T | . | . | T | 174.4 | . | T |
| 14 | . | T | . | . | T | 174.4 | . | T |
| 15 | . | T | . | . | T | 174.4 | . | T |
| 16 | . | T | . | . | T | 174.4 | . | T |

Thursday, July 15, 2010 - 10:13

| Obs | DEGREASINGAGENTDIS | PAGENT | PAGENTMOD | PAGENTDIS | PHOSPHORICACID | PHOSPHORICACIDMOD | PHOSPHORICACIDDIS | VITRIOLICACID |
|---|---|---|---|---|---|---|---|---|
| 1 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 2 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 3 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 4 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 5 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 6 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 7 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 8 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 9 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 10 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 11 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 12 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 13 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 14 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 15 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |
| 16 | 21.58 | . | T | 31.88 | . | T | 32.55 | . |

Case: 15-1402    Document: 63-1    Page: 163    Filed: 10/19/2015

JA0554

| Obs | VITRIOLICACIDMOD | VITRIOLICACIDDIS | HYDROCHLORICACID | HYDROCHLORICACIDMOD | HYDROCHLORICACIDDIS | CORRUGATEDPAPER |
|---|---|---|---|---|---|---|
| 1 | T | . | . | T | . | . |
| 2 | T | . | . | T | . | . |
| 3 | T | . | . | T | . | . |
| 4 | T | . | . | T | . | . |
| 5 | T | . | . | T | . | . |
| 6 | T | . | . | T | . | . |
| 7 | T | . | . | T | . | . |
| 8 | T | . | . | T | . | . |
| 9 | T | . | . | T | . | . |
| 10 | T | . | . | T | . | . |
| 11 | T | . | . | T | . | . |
| 12 | T | . | . | T | . | . |
| 13 | T | . | . | T | . | . |
| 14 | T | . | . | T | . | . |
| 15 | T | . | . | T | . | . |
| 16 | T | . | . | T | . | . |

Thursday, July 15, 2010 - 10:13

JA0555

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)     33
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | CORRUGATEDPAPERMOD | CORRUGATEDPAPERDIS | DESICCANT | DESICCANTMOD | DESICCANTDIS | ADHESIVETAPE | ADHESIVETAPEMOD |
|-----|--------------------|--------------------|-----------|--------------|--------------|--------------|-----------------|
| 1 | T | 31.61 | . | T | . | . | T |
| 2 | T | 31.61 | . | T | . | . | T |
| 3 | T | 31.61 | . | T | . | . | T |
| 4 | T | 31.61 | . | T | . | . | T |
| 5 | T | 31.61 | . | T | . | . | T |
| 6 | T | 31.61 | . | T | . | . | T |
| 7 | T | 31.61 | . | T | . | . | T |
| 8 | T | 31.61 | . | T | . | . | T |
| 9 | T | 31.61 | . | T | . | . | T |
| 10 | T | 31.61 | . | T | . | . | T |
| 11 | T | 31.61 | . | T | . | . | T |
| 12 | T | 31.61 | . | T | . | . | T |
| 13 | T | 31.61 | . | T | . | . | T |
| 14 | T | 31.61 | . | T | . | . | T |
| 15 | T | 31.61 | . | T | . | . | T |
| 16 | T | 31.61 | . | T | . | . | T |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    34
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | ADHESIVETAPEDIS | NYLONROPE | NYLONROPEMOD | NYLONROPEDIS | POLYSTYRENESHEET | POLYSTYRENESHEETMOD | POLYSTYRENESHEETDIS |
|---|---|---|---|---|---|---|---|
| 1 | . | . | T | . | . | T | . |
| 2 | . | . | T | . | . | T | . |
| 3 | . | . | T | . | . | T | . |
| 4 | . | . | T | . | . | T | . |
| 5 | . | . | T | . | . | T | . |
| 6 | . | . | T | . | . | T | . |
| 7 | . | . | T | . | . | T | . |
| 8 | . | . | T | . | . | T | . |
| 9 | . | . | T | . | . | T | . |
| 10 | . | . | T | . | . | T | . |
| 11 | . | . | T | . | . | T | . |
| 12 | . | . | T | . | . | T | . |
| 13 | . | . | T | . | . | T | . |
| 14 | . | . | T | . | . | T | . |
| 15 | . | . | T | . | . | T | . |
| 16 | . | . | T | . | . | T | . |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    35
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | ADHESIVELABEL1 | ADHESIVELABEL1MOD | ADHESIVELABEL1DIS | LABEL | LABELMOD | LABELDIS | ADHESIVELABEL2 | ADHESIVELABEL2MOD |
|---|---|---|---|---|---|---|---|---|
| 1 | . | T | 25.65 | . | T | 39.28 | . | T |
| 2 | . | T | 25.65 | . | T | 39.28 | . | T |
| 3 | . | T | 25.65 | . | T | 39.28 | . | T |
| 4 | . | T | 25.65 | . | T | 39.28 | . | T |
| 5 | . | T | 25.65 | . | T | 39.28 | . | T |
| 6 | . | T | 25.65 | . | T | 39.28 | . | T |
| 7 | . | T | 25.65 | . | T | 39.28 | . | T |
| 8 | . | T | 25.65 | . | T | 39.28 | . | T |
| 9 | . | T | 25.65 | . | T | 39.28 | . | T |
| 10 | . | T | 25.65 | . | T | 39.28 | . | T |
| 11 | . | T | 25.65 | . | T | 39.28 | . | T |
| 12 | . | T | 25.65 | . | T | 39.28 | . | T |
| 13 | . | T | 25.65 | . | T | 39.28 | . | T |
| 14 | . | T | 25.65 | . | T | 39.28 | . | T |
| 15 | . | T | 25.65 | . | T | 39.28 | . | T |
| 16 | . | T | 25.65 | . | T | 39.28 | . | T |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)     36

PUBLIC VERSION *** RANGED DATA

PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | ADHESIVELABEL2DIS | PAPER | PAPERMOD | PAPERDIS | CARTON | CARTONMOD | CARTONDIS | RIVET2 | RIVET2MOD | RIVET2DIS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 2 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 3 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 4 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 5 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 6 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 7 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 8 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 9 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 10 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 11 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 12 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 13 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 14 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 15 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |
| 16 | 22.7 | . | T | 31.85 | . | T | 83.56 | . | T | 118.8 |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    37
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFP03)

| Obs | NUT | NUTMOD | NUTDIS | BOLT | BOLTMOD | BOLTDIS | RIVET | RIVETMOD | RIVETDIS | SPRING | SPRINGMOD | SPRINGDIS |
|-----|-----|--------|--------|------|---------|---------|-------|----------|----------|--------|-----------|-----------|
| 1 | . | T | . | . | T | . | . | T | . | . | T | . |
| 2 | . | T | . | . | T | . | . | T | . | . | T | . |
| 3 | . | T | . | . | T | . | . | T | . | . | T | . |
| 4 | . | T | . | . | T | . | . | T | . | . | T | . |
| 5 | . | T | . | . | T | . | . | T | . | . | T | . |
| 6 | . | T | . | . | T | . | . | T | . | . | T | . |
| 7 | . | T | . | . | T | . | . | T | . | . | T | . |
| 8 | . | T | . | . | T | . | . | T | . | . | T | . |
| 9 | . | T | . | . | T | . | . | T | . | . | T | . |
| 10 | . | T | . | . | T | . | . | T | . | . | T | . |
| 11 | . | T | . | . | T | . | . | T | . | . | T | . |
| 12 | . | T | . | . | T | . | . | T | . | . | T | . |
| 13 | . | T | . | . | T | . | . | T | . | . | T | . |
| 14 | . | T | . | . | T | . | . | T | . | . | T | . |
| 15 | . | T | . | . | T | . | . | T | . | . | T | . |
| 16 | . | T | . | . | T | . | . | T | . | . | T | . |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    38
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (SHNDFPO3)

| Obs | MESON | MESONMOD | MESONDIS | CTERPN | CTERPNMOD | CTERPNDIS | SPRING1 | SPRING1MOD | SPRING1DIS | RIVET3 | RIVET3MOD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 2 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 3 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 4 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 5 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 6 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 7 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 8 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 9 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 10 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 11 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 12 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 13 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 14 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 15 | . | T | . | . | T | 83.75 | . | T | . | . | T |
| 16 | . | T | . | . | T | 83.75 | . | T | . | . | T |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)      39
PUBLIC VERSION *** RANGED DATA
PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDFP03)

| Obs | RIVET3DIS | NYLONTHREAD | NYLONTHREADMOD | NYLONTHREADDIS | COTTONTHREAD | COTTONTHREADMOD | COTTONTHREADDIS | COTTONTHREADDIS | WATER | ELECTRICITY |
|-----|-----------|-------------|----------------|----------------|--------------|-----------------|-----------------|-----------------|-------|-------------|
| 1   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 2   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 3   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 4   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 5   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 6   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 7   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 8   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 9   | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 10  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 11  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 12  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 13  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 14  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 15  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |
| 16  | .         | T           | .              | .              | .            | T               | .               | .               | .     | .           |

Thursday, July 15, 2010 - 10:13

ADMIN. REVIEW - IRONING BOARDS FROM THE PRC: FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD. (A-570-888)    40
PUBLIC VERSION *** RANGED DATA

PUBLIC FOP FILE - FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.(SHNDFP03)

| Obs | DIRLAB | PAKLAB | INDLAB | STEELSCRAP | OBS |
|-----|--------|--------|--------|------------|-----|
| 1   | .      | .      | .      | .          | 1   |
| 2   | .      | .      | .      | .          | 3   |
| 3   | .      | .      | .      | .          | 6   |
| 4   | .      | .      | .      | .          | 9   |
| 5   | .      | .      | .      | .          | 12  |
| 6   | .      | .      | .      | .          | 15  |
| 7   | .      | .      | .      | .          | 18  |
| 8   | .      | .      | .      | .          | 21  |
| 9   | .      | .      | .      | .          | 24  |
| 10  | .      | .      | .      | .          | 27  |
| 11  | .      | .      | .      | .          | 30  |
| 12  | .      | .      | .      | .          | 33  |
| 13  | .      | .      | .      | .          | 36  |
| 14  | .      | .      | .      | .          | 39  |
| 15  | .      | .      | .      | .          | 42  |
| 16  | .      | .      | .      | .          | 45  |

Thursday, July 15, 2010 - 10:13

FOR OFFICIAL FILE

LAW OFFICES OF
## DeKieffer & Horgan
SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

TELEPHONE
(202) 783-6900
GREGORY S. MENEGAZ

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

August 24, 2010

RECEIVED
AUG 24 2010
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

HAND-DELIVERED

1136

A-570-888
Pages: 185
Admin. Review
POI: 8/1/2008-7/31/2009
AD/CVD Operations
Office 9

**Public Document**

Honorable Gary Locke
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230
Attention: Michael Heaney

RE: <u>Floor-Standing, Metal-Top Ironing Tables And Parts Thereof from the
People's Public Of China</u>: *Surrogate Values for the Preliminary Results*

Dear Secretary Locke:

On behalf of Foshan Shunde Yongjian Housewares & Hardware Co. Ltd. ("Shunde

Yongjian"), an exporter of floor-standing, metal-top ironing tables from the People's Republic of

China, we hereby submit publicly available information concerning surrogate values for the

Department's preliminary determination in the above-captioned administrative review.

Surrogate financial data specific to Shunde Yongjian's production experience is being

submitted by the other mandatory respondent today under separate cover. Exhibits 1-3, attached

hereto, provide actual port quotes and actual brokerage and handling costs of large Indian

exporters similarly situated as mandatory respondents in U.S. antidumping duty proceedings. As

such the actual Indian costs most closely approximate the costs to Shunde Yongjian because the

volume of exports is high. Single price quotes or studies based on price quotes for a single

container simply are not comparable to the types of fees offered by brokers for substantial

000077

volume repeat business. Moreover, at Exhibit 4, we attach information on the cost of letters of credit. It is important to note that Shunde Yongjian does not secure brokerage and handling by letter of credit so it would be entirely inappropriate for the Department to base Shunde Yonjian's brokerage and handling on any price quote or study that included fees for securing the services by letter of credit.

Finally, we have submitted wage rate data for India. Exhibit 5 contains wage rate data for the textile sector. As the Department verified, Shunde Yongjian sews the cloth cover components for its ironing tables. Thus, it would be appropriate to simple average this data with the Indian country wide wage rate data included in Exhibit 6 to arrive at a wage rate for this POR.[1]

Please let us know if you require any additional information.

Sincerely,

Gregory S. Menegaz
John J. Kenkel
J. Kevin Horgan

---

1 We note that Shunde Yongjian filed certain surrogate value information on April 9, 2010 in response to the Department's questionnaire. At Exhibit 1 of that submission Shunde Yongjian set forth what was at the time the Department's standard policy for calculating a wage rate. These comments and data filed today supercede that submission and the wage value Shunde Yongjian included in the earlier submission.

2

**FOSHAN SHUNDE YONGJIAN HOUSWARE & HANDWARE CO.,LTD.**
NO.88 YANGDA ROAD SANZHOU  LUNJIAO STREET SHUNDE FOSHAN CITY GUANGDONG
PROVINCE.CHINA

---

## CERTIFICATION

I, Xiejianmin,board chairman, currently employed by Foshan shunde

yongjian housware & handware co.,LTD, certify that: (1) I have    read the

attached submission; and (2) the certifications contained in this submission

are, to the    best of my knowledge, complete and accurate.


(signature of certifying official)

Foshan shunde yongjian housware & handware co.,LTD

**Floor-Standing, Metal-Top Ironing Tables And Parts Thereof from the PRC**
**POR: August 1, 2008 through July 31, 2009**

## FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARE CO. LTD.
### ("FOSHAN SHUNDE")

### SURROGATE VALUES FOR PRELIMINARY DETERMINATION
### August 24, 2010

### List of Exhibits

Exhibit 1     Indian Port Charges for Brokerage & Handling

Exhibit 2     Brokerage & Handling Quotes

Exhibit 3     Administrative Reviews of Various Products from India

Exhibit 4     Import / Export Letters of Credit

Exhibit 5     India 2007 Wage Rate For Spinning Industry

Exhibit 6     India 2006 Country-Wide Labor Wage Rate

# Exhibit 1

# Indian Port Charges For
# Brokerage & Handling

# Chennai Container Terminal

## Scale of Rates

**CHENNAI CONTAINER TERMINAL PRIVATE LIMITED**

## Scale of Rates

G NO :105                    New Delhi,                    2-Jul-08

**PREFACE**

This Scale of Rates sets out the charges payable to Chennai Container Terminal Private Limited for use of services and facilities provided at the Chennai Container Terminal.

1      **DEFINITIONS**

In this Scale of Rates, unless the context otherwise requires, the following definitions shall apply:

1.1.    "CCT" means Chennai Container Terminal.

1.2.    "CCTPL" means Chennai Container Terminal Pvt Limited, a company incorporated in India its successors and assigns.

1.3.    "CFS" means Container Freight Station at the CCTL.

1.4.    "Coastal Vessel" shall mean any vessel exclusively employed in trading between any port or place in India to any other port or place in India having a valid coastal license issued by the competent authority.

1.5.    "Container" means the standard ISO container, suitable for the transport and stacking of cargo and must be capable of being handled as a unit and lifted by a crane with a container spreader.

1.6.    "FCL" means Containers said to contain Full Container Load.

1.7.    "Foreign-going Vessel" shall mean any vessel other than a coastal vessel.

1.8.    "Hazardous container" means a Container containing hazardous goods as classified under IMO.

1.9.    "ICD" means Inland Container Depot.

1.10.   "LCL" means Containers said to contain Less than full Container Load (Container having cargo of more than one importer/ exporter).

1.11.   "Over Dimensional Container" means a Container carrying over dimensional cargo beyond the normal size of standard containers and needing special devices like slings, shackles, lifting beam, etc.  Damaged Containers (including boxes having corner casting problem) and container requiring special devices for lifting is also classified as Over Dimensional Container.

1.12.   "Per day" means per calendar day or part thereof.

1.13.   "Reefer" means any Container for the purpose of the carriage of goods, which require power supply to maintain the desired temperature.

1.14.   "Port" means Chennai Port Trust.

1.15.   "Shut Out Container" means a container, which has entered the terminal for export for a vessel as indicated by VIAN and is not connected to the vessel for whatsoever reason.

1.16.   "Tonne" means one metric Tonne of 1,000 kilograms or one cubic metre.

1.17.   "Transhipment container" means a Container discharged from one vessel, stored in CCT and transported through another vessel.

1.18.   "VIAN" means Vessel Identification Advise Number.

1.19.   "Fumigation Facility" means facilitating decontamination of cargo which are prone to be affected by pests and which requires pesticides to decontaminate by way of fumigation or degassing or both.

1

**1.20.** "Accredited Clients Programme" means a programme being introduced by the Customs Department by which importers registered by the department as "Accredited Clients" will form a separate category to which assured facilitation would be provided. Except for a small percentage of consignments selected on a random basis by the RMS, or cases where specific intelligence is available or where a specifically observed pattern of non-compliance is required to be addressed, the Accredited Clients will be allowed clearance on the basis of self assessment i.e. as a matter of course, clearance would be allowed on the basis of their declarations, and without examination of goods. Further, this benefit would be available to the registered Accredited Clients at all the ports in the country where EDI and the RMS are operational.

Customs Department expects that this measure will bring about reduction in the dwell time of cargo and transaction costs for such importers. Custom Houses may create separately earmarked facility/counters for providing customs clearance service to the Accredited Clients. Commissioners of Customs are also required to work with the Custodians for earmarking separate storage space, handling facility and expeditious clearance procedures for these clients. Further IMG has also recommended 'faster delivery system by creating separate area in the port premises clearly earmarked for immediate delivery of cargo to specified accredited importers'. This programme has been defined in detail in Customs Circular No. 42/2005-Cus dated 24th November 2005.

## 2    GENERAL

**2.1.**    Containers less than and upto 20' in length will be reckoned as one TEU for the purpose of tariff.

**2.2.**    Containers other than that of standard size requiring special devices / slings / handling will be charged as per Section 3.5 below.  Such containers will also include damaged containers and any other type requiring special devices.

**2.3.**    Container-related charges denominated in US dollar terms shall be collected in equivalent Indian rupees.  For this purpose, the market buying rate notified by the Reserve Bank of India, State Bank of India or its subsidiary or any other Public Sector Bank as may be specified from time to time prevalent on the date of entry of the vessel into the port limits (in case of import containers) and on the date of arrival of containers in the Terminal premises (in case of export containers) shall be applied for re-conversion of the dollar-denominated charges into Indian rupees.

**2.4.**    All charges worked out shall be rounded off to the next higher rupee on the grand total of each bill.

**2.5.**    All invoices are issued as due on presentation.  Failure to pay may cause a lien to be placed on the goods handled at the Terminal and the responsible party may be denied further use of the Terminal until all outstanding charges have been paid.

**2.6. (i)**    The user shall pay penal interest on delayed payments of any charge under this Scale of Rates.  Likewise, the CCTL shall pay penal interest on delayed refunds.

   **(ii).**    The rate of penal interest will be 14.25% per annum. The penal rate chosen will apply to both the CCTL and the port-users equally.

   **(iii).**    The delay in refunds will be counted only 20 days from the date of completion of services or on production of all the documents required from the users, whichever is later.

   **(iv).**    The delay in payments by the users will be counted only 10 days after the date of raising the bills by the CCTL. This provision shall, however, not apply to the cases where payment is to be made before availing the services as stipulated in the Major Port Trusts Act and/or where payment of charges in advance is prescribed in this Scale of Rates.

**2.7. (i)**    A foreign-going vessel of Indian flag having a General Trading Licence can convert to coastal run on the basis of a Customs Conversion Order.

   **(ii).**    A foreign going vessel of foreign flag can convert to coastal run on the basis of a Coastal Voyage Licence issued by the Director General of Shipping.

   **(iii).**    In cases of such conversion, coastal rates shall be chargeable by the load port from the time the vessel starts loading coastal goods.

   **(iv).**    In cases of such conversion coastal rates shall be chargeable only till the vessel completes coastal cargo discharging operations; immediately thereafter, foreign going rates shall be chargeable by the discharge ports.

   **(v).**    For dedicated Indian coastal vessels having a Coastal licence from the Director General of Shipping, no other documents will be required to be entitled to coastal rates.

**2.8.**    An LCL Container coming in and going out of the CCT as a unit load will be regarded as an FCL for the purpose of levying charges.

**2.9.**    Users shall not be required to pay charges for delays beyond a reasonable level attributable to the CCTL.

**2.10.**    Incase a vessel idles due to breakdown or non-availability of the shore based facilities of CCTL or any other reasons attributable to CCTL, rebate equivalent to berth hire charges payable to Chennai Port Trust accrued during the period of idling of vessel shall be allowed by CCTL.

**2.11.**    If a terminal user provides, with prior consent of CCTL, lashing/ unlashing gang for lashing operations of all containers in the vessel, then a rebate of Rs.33/- per container in handling charges prescribed in Section 3.1.1, 3.2.1, 3.3.1 and 3.4 shall be allowed, subject to the terminal user agreeing to follow safety regulations.

**2.12.**    The benchmark of the level of productivity will be 22 moves per hour per crane in the year 2007, 23.50 moves per hour per crane in the year 2008 and 25 moves per hour per crane in the year 2009, for handling of FCL , LCL and ICD import and export containers by quay cranes as mentioned at Section 3.1.1, 3.2.1 and 3.3.1.

**3**    <u>CHARGES FOR CONTAINER OPERATIONS</u>

**3.1.**    Charges for handling FCL import and export containers and empty containers.

**3.1.1.**    Handling by Quay Crane including lashing/unlashing charges.

| | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Per FCL Container** | | |
| - Not exceeding 20' in length | 22.53 | 567.76 |
| - Exceeding 20' and upto 40' in length | 33.78 | 851.26 |
| - Over 40' in length | 45.05 | 1135.26 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 22.53 | 567.76 |
| - Exceeding 20' and upto 40' in length | 33.78 | 851.26 |
| - Over 40' in length | 45.05 | 1135.26 |

Services include handling by quay crane and lashing/unlashing.

**3.1.2.**    Transportation from QC to Yard & Vice Versa

| | Foreign-going Vessel Rs. | Coastal Vessel Rs. |
|---|---|---|
| **Per FCL Container** | | |
| - Not exceeding 20' in length | 641.91 | 385.15 |
| - Exceeding 20' and upto 40' in length | 962.83 | 577.70 |
| - Over 40' in length | 1283.81 | 770.29 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 317.90 | 190.74 |
| - Exceeding 20' and upto 40' in length | 476.85 | 286.11 |
| - Over 40' in length | 635.80 | 381.48 |

Services include transport to and from the quayside.

**3.1.3.**    Handling at Container Yard including lift on/off, delivery / receipt to and from customers.

| | Foreign-going Vessel Rs. | Coastal Vessel Rs. |
|---|---|---|
| **Per FCL Container** | | |
| - Not exceeding 20' in length | 709.45 | 425.67 |
| - Exceeding 20' and upto 40' in length | 1064.19 | 638.51 |
| - Over 40' in length | 1418.89 | 851.33 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 351.34 | 210.80 |
| - Exceeding 20' and upto 40' in length | 527.01 | 316.21 |
| - Over 40' in length | 702.68 | 421.61 |

Services include lifts at CY for storage and for landing or loading the container from or to customer's vehicle

**3.2.**    Charges for handling LCL import and export container.

**3.2.1.**    Handling by Quay Crane including lashing/unlashing charges

| | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Per LCL Container** | | |
| - Not exceeding 20' in length | 22.53 | 567.76 |
| - Exceeding 20' and upto 40' in length | 33.78 | 851.26 |
| - Over 40' in length | 45.05 | 1135.26 |

Services include handling by quay crane and lashing/unlashing.

3

**3.2.2.    Handling at Container Yard including lift on/off and transportation to and from CFS**

|  | Foreign-going Vessel Rs. | Coastal Vessel Rs. |
|---|---|---|
| **Per LCL Container** | | |
| - Not exceeding 20' in length | 2380.95 | 1428.57 |
| - Exceeding 20' and upto 40' in length | 3571.43 | 2142.86 |
| - Over 40' in length | 4761.90 | 2857.14 |

Services include transport to CY, CFS, lifts at CY for storage and for landing or loading the container from or to customer's vehicle, stowage planning on vessel and yard, data handling, processing and transfer of data between vessel, CCT and shipping line. Delivery of empty container will be charged a lift on/lift off charged separately.

**3.2.3.    Stuffing / destuffing of cargo at the CCT**

|  | Foreign-going Vessel US $ | Coastal Vessel Rs. |
|---|---|---|
| **Destuffing/stuffing per container** | | |
| - Not exceeding 20' in length | 23.38 | 589.18 |
| - Exceeding 20' and upto 40' in length | 35.07 | 883.76 |
| - Over 40' in length | 46.75 | 1178.10 |

**Note: (i)**   Services include stuffing or destuffing of LCL containers.

(ii)   For stuffing/destuffing half-a-container, 50% of the above-mentioned rates will be levied.  For this purpose, part stuffing / destuffing of 50% or less than 50% of a container will be treated as half-a-container.  If a container is, however to be topped up or stuffed/ destuffed more than 50%, it will be treated as a full container. For customs examination at CFS if only 25% or less than 25% of a container is destuffed/stuffed then charges will be 25% of above mentioned rates.

**3.3.    Charges for handling ICD import and export container.**

**3.3.1.    Handling by Quay Crane including lashing/unlashing charges.**

|  | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Per loaded Container** | | |
| - Not exceeding 20' in length | 22.53 | 567.76 |
| - Exceeding 20' and upto 40' in length | 33.78 | 851.26 |
| - Over 40' in length | 45.05 | 1135.26 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 22.53 | 567.76 |
| - Exceeding 20' and upto 40' in length | 33.78 | 851.26 |
| - Over 40' in length | 45.05 | 1135.26 |

Services include handling by quay crane and lashing/unlashing.

**3.3.2.    Transportation from QC to  container Rail Yard & Vice Versa**

|  | Foreign-going Vessel Rs. | Coastal Vessel Rs. |
|---|---|---|
| **Per loaded Container** | | |
| - Not exceeding 20' in length | 609.84 | 365.90 |
| - Exceeding 20' and upto 40' in length | 914.71 | 548.83 |
| - Over 40' in length | 1219.63 | 731.78 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 302.01 | 181.21 |
| - Exceeding 20' and upto 40' in length | 452.98 | 271.79 |
| - Over 40' in length | 604.01 | 362.41 |

Services include transport to container rail yard, stowage planning on vessel and yard, data handling, processing and transfer between vessel, CCT and shipping line.

4

### 3.3.3. Handling at Container Yard including lift on/off at container Rail Yard

| | Foreign-going Vessel Rs. | Coastal Vessel Rs. |
|---|---|---|
| **Per loaded Container** | | |
| - Not exceeding 20' in length | 709.45 | 425.67 |
| - Exceeding 20' and upto 40' in length | 1064.19 | 638.51 |
| - Over 40' in length | 1418.89 | 851.33 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 351.34 | 210.80 |
| - Exceeding 20' and upto 40' in length | 527.01 | 316.21 |
| - Over 40' in length | 702.68 | 421.61 |

Services include lift at container rail yard, data handling, processing and transfer between vessel, CCT and shipping line.

### 3.4. Charges for handling Transhipment Containers including handling by on board stevedoring labour at Quay side, lashing/unlashing charges

| | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Per loaded Container** | | |
| - Not exceeding 20' in length | 27.02 | 680.90 |
| - Exceeding 20' and upto 40' in length | 40.54 | 1021.61 |
| - Over 40' in length | 54.05 | 1362.06 |
| **Per empty Container** | | |
| - Not exceeding 20' in length | 27.02 | 680.90 |
| - Exceeding 20' and upto 40' in length | 40.54 | 1021.61 |
| - Over 40' in length | 54.05 | 1362.06 |

Services include handling by quay crane (discharge and loading), transport and, lifts, stowage planning on vessel and yard, data handling, processing and transfer between vessel, CCT and shipping line.

**Note:** (i)  A transhipment container sent to CFS, ICD or taken delivery locally shall be charged the local container rate.

(ii)  A Shut out charge as per Section 3.10 shall apply if -
(a). The vessel nomination is changed ; or
(b). If the vessel nomination is changed from a later vessel to an earlier vessel after the earlier vessel is berthed.

### 3.5. Charges for Hazardous Cargo Containers / Over-dimensional Cargo Containers.

A premium of 25% will be levied over the applicable handling charges prescribed above for respective categories of containers.

### 3.6. Charges for Wharfage

| | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Per Container (box only)** | | |
| - Not exceeding 20' in length | 1.29 | 32.51 |
| - Exceeding 20' and upto 40' in length | 1.94 | 48.89 |
| - Over 40' in length | 2.57 | 64.76 |
| **Per Containerised Cargo** | Rs. | Rs. |
| - Not exceeding 20' in length | 707.85 | 424.71 |
| - Exceeding 20' and upto 40' in length | 1061.78 | 637.07 |
| - Over 40' in length | 1415 70 | 849.42 |

**Note:**

(i)  The charge for containerised cargo in all cases will be in Rupee terms.

(ii)  The charge for containers in cases of 'foreign arrival' and 'foreign departure' will be in Dollar terms.

(iii)  The charges for containers in cases of 'coastal arrival' and 'coastal departure' will be in Rupee terms.

(iv)  Wharfage will be charged on all containers including ICDs, transhipment, LCL and FCL and empty

### 3.7. Charges for handling hatch covers for one operation (both opening and closing).

| | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| Without landing hatch cover on quay | 18.02 | 454.10 |
| With landing hatch cover on quay | 45.05 | 1135.26 |

operation.

5

**3.8    Charges for shifting containers within vessel (Restows).**

|  | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|
| **Within hatch (without landing and reshipping) per container** |  |  |
| - Not exceeding 20' in length | 10.95 | 275.94 |
| - Exceeding 20' and upto 40' in length | 16.41 | 413.53 |
| - Over 40' in length | 21.88 | 551.38 |
| **Via Quay (shifted by landing on Quay & reshipping) per container** |  |  |
| - Not exceeding 20' in length | 32.18 | 810.94 |
| - Exceeding 20' and upto 40' in length | 48.27 | 1216.40 |
| - Over 40' in length | 64.35 | 1621.62 |

**Note:**    No Wharfage will be levied on the restow containers and containerised cargo.

**3.9    Reefer related and other General Services**

|  |  | Foreign-going Vessel US$ | Coastal Vessel Rs. |
|---|---|---|---|
| a) | **Pre-trip inspection (including supply of electricity)** | 33.00 | 831.60 |
| b) | **Connection or disconnection Services On board a Vessel** | 2.20 | 55.44 |
| c) | **Cleaning of Container** |  |  |
|  | - Not exceeding 20' in length | 1.65 | 41.58 |
|  | - Exceeding 20' and upto 40' in length | 3.30 | 83.16 |
|  | - Over 40' in length | 4.95 | 124.74 |
| d) | **Supply of electricity (including connection and disconnection, monitoring of temperature at reefer yard) Per container per 4 hours shift or part thereof** |  |  |
|  | - Not exceeding 20' in length | 3.54 | 89.21 |
|  | - Exceeding 20' and upto 40' in length | 5.31 | 133.81 |
|  | - Over 40' in length | 7.08 | 178.42 |

**Notes**

(i)    Above tariff does not include parameter setting or repair & maintenance of malfunctioning reefers. Above charges are also applicable to restow reefer containers.

(ii)    Pre-trip inspection of the reefer containers, connection or disconnection services on board the vessel and cleaning of containers are optional services and shall be rendered when requested.

**3.10    Charges for a shut out container / renomination of containers**

|  | Foreign-going vessel US $ | Coastal Vessel Rs. |
|---|---|---|
| **Per Container** |  |  |
| - Not exceeding 20' in length | 24.45 | 1026.90 |
| - Exceeding 20' and upto 40' in length | 36.69 | 1540.98 |
| - Over 40' in length | 48.91 | 2054.22 |

**Note:**    Above charge shall apply where -

(i)    an export container or a transhipment container or a re-export container is shut out and subsequently delivered out of CCT.

(ii)    a container is shut out by one vessel and subsequently shipped on another vessel, in addition to the charges for handling by quay crane charges. In this case, the free storage period will be given to the Container in accordance with section 3.11 from the time the container is first received. If the free storage period is exceeded, storage charges shall be calculated after the expiry of the free period up to the time of lift on.

6

**3.12.13. Miscellaneous Charges**

| S. No. | Particulars | Rate per Container (in Rs.) | | |
|---|---|---|---|---|
| | | Not exceeding 20' in length | Exceeding 20' in length and upto 40' in length | Exceeding 40' in length |
| (i). | Fixing/removal of seal | 220.00 | 220.00 | 220.00 |
| (ii). | Lift on/lift off in the CY | 707.85 | 1061.78 | 1415.70 |
| (iii). | Charges for shifting within the Terminal | 965.25 | 1447.88 | 1930.50 |
| (iv). | POD Change | 965.25 | 1447.88 | 1930.50 |
| (v). | Additional movement – Terminal to Rail or Rail to Terminal / Charges for extra movement/ transportation | 965.25 | 1447.88 | 1930.50 |
| (vi). | Change of status of Container from Rail to Road or vice-versa. | 965.25 | 1447.88 | 1930.50 |
| (vii). | Charges for export containers arriving in the terminal after the gate cut-off time for the particular VIAN | 965.25 | 1447.88 | 1930.50 |
| (viii). | Fixing/removal of Hazardous Sticker ( per containers) | 110.00 | 110.00 | 110.00 |
| (ix). | One Door Open Charges per container | 660.00 | 660.00 | 660.00 |
| (x). | Cancellation of documents - per EIR | 110.00 | 110.00 | 110.00 |
| (xi). | Non- declaration / Mis-declaration of Hazardous and Over Dimensional containers | 3300.00 | 3300.00 | 3300.00 |
| (xii). | On- Wheel Customs inspection ( per container) | 440.00 | 440.00 | 440.00 |
| (xiii). | Fumigation of Tobacco Containers | 2200.00 | 2200.00 | 2200.00 |
| (xiv). | Forklift charges for movement of Lashing Bins within the Terminal (per Lashing Bin) | 110.00 | 110.00 | 110.00 |

**Notes**

(i)   Cancellation charges applies when *EIR* is cancelled at the request of *customers*.

(ii)  "One Door Open" charge is applicable for handling container which requires only one door to be kept open ( eg. Onion) and when door opening and securing is carried in the terminal.

(iii) "Fixing of Seal ". Bottle seals shall be fixed on every container arriving at the terminal - by rail /road/sea without a proper bottle seal on it, prior to allowing its entry. This shall be done without the written consent of the shipping lines. The list of such containers on which a seal is affixed by the terminal shall be intimated to the lines.

(iv)  "Fixing/ removal of Hazardous Sticker". Hazardous stickers indicating IMCO class only shall be affixed on a container carrying hazardous cargo. Similarly old stickers on the container shall be removed from a container carrying non-hazardous cargo. In either case, the customer has to intimate in writing to CCT to undertake the said activity, within the terminal.

(v)   On- Wheel Customs inspection. The on-wheel inspection of a container shall be allowed at the nominated point only, on the written request of the customer. The container doors can be opened only under customs supervision. No stuffing/ destuffing, even partially, shall be permitted within the terminal premises.

(vi)  Additional movement - from terminal to rails siding or rail siding to terminal will be applicable for ICD container moved by

(vii) Non- Declaration / Mis-declaration of Hazardous container. The Customer has to declare the hazardous nature of the cargo as per the IMCO rules and furnish the relevant hazardous details to CCT. The above charges are only for non-declaration/mis-declaration of the hazardous nature of the container.
The liabilities and cost towards the consequences arising due to non declaration or mis declaration shall, however , be on the customer's account.

**3.13.    Charges for supply of Fresh Water to shipping alongside the container berths.**

| | Foreign-going US$. | Coastal Rs. |
|---|---|---|
| Per 1000 Liters or part thereof | 7.47 | 313.74 |

**3.14.    Charges for clearance of Garbage on-board**

| | Rs. |
|---|---|
| Per 1/2 cubic meter bag | 257.40 |

**4    CHARGES LEVIABLE AT THE CFS**

**4.1.    Storage charges**

| Period | Rate per ton or part thereof per day or part thereof (Rs.) |
|---|---|
| First 3 days | Free |
| 4 - 10 days | 27.50 |
| 11 days- 20 days | 55.00 |
| 21 days - 30 days | 82.50 |
| Thereafter | 110.00 |

**Note:**    For purposes of calculation of free time, Sundays, Customs notified Holidays, and the Terminal's non-operating days shall be excluded.

7

4.2.    Charges for landing from/ Loading to vehicle Rs.38.50 per ton or part thereof.

4.3     Forklift charges at the request of customer Rs. 192.50 per MT

4.4     Packing/ unpacking charges at the request of the customer Rs.55/- per package

4.5     Admittance and labeling charges for receiving of cargo for stuffing Rs.27.50 per MT

4.6     Documentation charges per consignment Rs.55/-.

4.7     Palletization / Depalletization Per pallet Rs.110/-.

8

**3.11.    Charges for Container storage**

| Sl. No. | Particulars | Foreign-going Vessel | | | Coastal Vessel |
|---|---|---|---|---|---|
| | | Rate per container per day or part thereof (in US $) | | | Rate per container per day or part |
| | | Upto 20' | Above 20' and upto 40' | Above 40' | Above 40' |
| 1 | **Import-FCL, LCL & Empty** | | | | |
| | 0- 3 days | Free | Free | Free | Free |
| | 4-15 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 16-30 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 30 days | 22.00 | 44.00 | 66.00 | 2772.00 |
| 2 | **Export–FCL, LCL & Empty** | | | | |
| | 0- 7 days | Free | Free | Free | Free |
| | 8-15 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 16-30 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 30 days | 22.00 | 44.00 | 66.00 | 2772.00 |
| 3 | **ICD – Import & Export – Loaded & empty** | | | | |
| | First 10 days | Free | Free | Free | Free |
| | 11-30 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 31-45 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 45 days | 22.00 | 44.00 | 66.00 | 2772.00 |
| 4 | **Transhipment – Loaded & empty** | | | | |
| | First 30 days | Free | Free | Free | Free |
| | 31-45 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 46-60 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 60 days | 22.00 | 44.00 | 66.00 | 2772.00 |
| 5 | **Shutout – Loaded & empty** | | | | |
| | First 15 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 16-30 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 30 days | 22.00 | 44.00 | 66.00 | 2772.00 |
| 6 | **Change of status to local delivery** | | | | |
| | First 3 days | Free | Free | Free | Free |
| | 4—15 days | 5.50 | 11.00 | 16.50 | 693.00 |
| | 16-30 days | 11.00 | 22.00 | 33.00 | 1386.00 |
| | Beyond 30 days | 22.00 | 44.00 | 66.00 | 2772.00 |

**3.12.1.**   Storage period for a container shall be reckoned from the day following the day of landing upto the day of loading / delivery

**3.12.2.**   For purposes of calculation of free time, Sundays, Customs

**3.12.3**   The storage charges shall not accrue for the period during which the CCTL is not in a position to deliver/ ship containers

**3.12.4.**   Transhipment containers whose status is subsequently changed to local FCL/LCL/ICD shall lose the concessional storage charges.  The storage charges for such containers

**3.12.5.**   For hazardous container, the storage charges shall be 25% more under the respective slab as given above.

**3.12.6.**   For over dimensional containers including the windmill boxes, the storage charges shall be based on the actual number of

**3.12.7.**   If boxes meant for delivery under the "Accredited Client Programme" (ACP) as explained at Section 1.21 above are not moved out within 3 days of its landing at the terminal, these boxes would be shifted to the normal import stack area from the designated ACP import stack area, in which case extra Lift on/Lift off and/or Shifting charges as applicable would be charged.

**3.12.8.**   The free time and storage rates prescribed in case of ICD containers are applicable only for movement of containers to/from ICDs going by rail only.

**3.12.9.**   Normal import containers subsequently changing the mode to either LCL or ICD containers will enjoy the free period

**3.12.10.**   Total storage period for a shut out container shall be calculated from the day following the day when the container

**3.12.11.**   The storage charges on abandoned FCL containers/shipper owned containers shall be levied upto the date of receipt of

(i).   The consignee can issue a letter of abandonment at any time.

9

(ii).    If the consignee chooses not to issue such letter of
abandonment, the container Agent/MLO can also issue
(a). the Line shall resume custody of container along with
(b). the Line shall pay all port charges accrued on the cargo
and container before resuming custody of the container.

(iii).   The container Agent/MLO shall observe the necessary
formalities and bear the cost of transportation and
destuffing.  In case of their failure to take such action within

(iv).    Where the container is seized/confiscated by the Custom
Authorities and the same cannot be destuffed within the
prescribed time limit of 75 days, the storage charges will
cease to apply from the date the Customs order release of
the cargo subject to lines observing the necessary formalities
and bearing the cost of transportation and destuffing.
Otherwise, seized/confiscated containers should be removed
by the Lines/consignee from the port premises to the
Customs bonded area and in that case the storage charge
shall cease to apply from the date of such removal.

3.12.12.  The ground slots for export containers will be reserved for 7
days for weekly call of the vessel and for 5 days for bi-weekly
calls of vessel.

10

# India Gateway Terminal
## Cochin (Kochi)

## Scale of Rates



**DP WORLD**
Cochin

## INDIA GATEWAY TERMINAL

DP World | Check Mail
Site Map | Co tact us

About us  Management  Prefered Port  Facilities  We Care  Vessel  Tenders  Tariff  Downloads  Careers  Customer Support  News  Related Links  Home

**Tariff**



## DEFINITIONS

In this Scale of Rates, unless the context otherwise requires, the following definitions shall apply:

(i)     *"CFS"* means Container Freight Station of COPT.

(ii)    *"Coastal Vessel"* shall mean any vessel exclusively employed in trading between any port or place in India to any other port or place in India having a valid coastal license issued by the competent authority.



(iii)   *"Container"* means the standard ISO container, suitable for the transport and stacking of cargo and must be capable of being handled as a unit and lifted by a crane with a container spreader.

(iv)    *"Foreign-going Vessel"* shall mean any vessel other than a coastal vessel.

(v)     *"Hazardous container"* means a container containing hazardous goods as classified   under IMO.

(vi)    *"ICD"* means Inland Container Depot.

(vii)   *"IGTPL"* means India Gateway Terminal Private Limited, a company incorporated in India, its successors and assigns.

(viii)  *"Over Dimensional Container"* means a container carrying over dimensional cargo beyond the normal size of standard containers and needing special devices like slings, shackles, lifting beam' etc.  Damaged containers and container requiring special devices for lifting is also classified as Over Dimensional Container.

(ix)    *"Per Day"* means per calendar day or part thereof.



(x)     *"Reefer"* means any Container for the purpose of the carriage of goods, which require refrigeration.

(xi)    *"Port"* means the Cochin Port Trust.

(xii)   *"Shut Out Container"* shall mean any container brought into the port for shipment but not shipped by the designated vessel and is lying in the port premises.

(xiii)  *"Tonne"* means one metric Tonne of 1,000 kilograms or one cubic metre.

(xiv)   *"Transhipment Container"* shall mean any container which is discharged from one vessel, stored in the yard and transported through another vessel.

11

India Gateway Terminal





# Tariff

# GENERAL



(i)   Status of a vessel as borne out by its certification issued by Director General of Shipping is the relevant factor for deciding whether the vessel is 'foreign-going' or 'coastal'. Foreign going vessels permitted to undertake coastal voyages and the cargo / container carried by them will also qualify for the concession in respect of such permissible voyages.

(ii)  (a)   A foreign-going vessel of Indian flag having a General Trading Licence can convert to coastal run on the basis of a Customs Conversion Order.

     (b)   A foreign-going vessel of foreign flag can convert to coastal run on the basis of a Coastal Voyage License issued by the Director General of Shipping.

     (c)   In cases of such conversion, coastal rates shall be chargeable by the load port from the time the vessel starts loading coastal goods.

     (d)   In cases of such conversion coastal rates shall be chargeable only till the vessel completes coastal cargo discharging operations; immediately thereafter, foreign going rates shall be chargeable by the discharge ports.

     (e)   For dedicated Indian coastal vessels having a Coastal Licence from the Director General of Shipping, no other documents will be required to be entitled to coastal rates

(iii)  Container-related charges denominated in US dollar terms shall be collected in equivalent Indian rupees. For this purpose, the market buying rate notified by the Reserve Bank of India, State Bank of India or its associates or any of the public sector banks as may be specified from time to time prevalent on the day of entry of the vessel into the Terminal (in case of import container) and on the day of arrival of containers in the Terminal premises (in case of export containers) shall be applied for conversion of the dollar-denominated charges into Indian rupees.

(iv)  A regular review of exchange rate shall be made once in 30 days from the date of arrival in the cases of vessels staying in the port for longer period. The basis of billing shall change prospectively with reference to the appropriate exchange rate prevailing at the time of review.



(v)  (a)   All charges worked out shall be rounded off to the next higher rupee on the grand total of each bill

     (b)   The minimum charge recovered in any application / bill shall be rupees fifty only Rs.50.00.

     (c)   No claim of refund shall be entertained unless the amount refundable is Rupees fifty Rs.50.00 or more. This limit of Rs.50.00 shall also be applied for supplementary claims of under charge.

(vi)  (a)   The user shall pay penal interest on delayed payments of any charge under this Scale of Rates. Likewise, the IGTPL shall pay penal interest on delayed refunds.

     (b)   The rate of penal interest will be 13% p.a. The penal rate will apply to both the IGTPL and the port users equally.

     (c)   The delay in refunds by the IGTPL will be counted beyond 20 days from the date of completion of services or on production of all the documents required from the users, whichever is later.

     (d)   **12** The delay in payments by the users will be counted beyond10 days

JA0593



after the date of raising the bills by IGTPL.

This provision shall, however, not apply to the cases where payment is to be made before availing the services as stipulated in the MPT Act, 1963 prescribed as a condition in the tariff.

(vii) The rates prescribed in Schedule 3.1.1, 3.1.2, 3.1.3, 3.1.4,3.2.1, 3.2.2, 3.3, 3.4 and 3.5 will be subject to upward revision of 8% with effect from 1 April 2007.

(viii) Premium of 25% will be levied over the applicable handling charges prescribed in Schedule 3.1 and Schedule 3.2 for hazardous Cargo Container / Over-dimensional Cargo Containers.

(ix) In case a vessel idles due to non-availability or breakdown of the shore based facilities of IGTPL or any other reasons attributable to the IGTPL, rebate equivalent to berth hire charges payable to COPT accrued during the period of idling of vessel shall be allowed.

(x) Administrative charges of Rupees Two hundred (Rs.200.00) will be charged for:

    (a)   Requests for amendments in the import or export application or import general manifest or delivery order.

    (b)   Change of Status.

    (c)   Computer data amendment per unit.

13

JA0594

# CHARGES FOR CONTAINER OPERATIONS

## Gantry Cranes Charges

**For handling import / export Containers**

| Particular | Foreign–going(in US $) | | | Coastal(in Rs.) | | |
|---|---|---|---|---|---|---|
| | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| (i). Laden container | 27.26 | 40.89 | 54.52 | 712.8 | 1069.2 | 1425.6 |
| (ii). Empty container | 27.26 | 40.89 | 54.52 | 712.8 | 1069.2 | 1425.6 |

**Note:** Services in case of Schedule 3.1.1 include handling by quay crane only.

## Bay shifting Charges (Restows)

| Particular | Foreign–going  (in US $) | | | Coastal   (in Rs.) | | |
|---|---|---|---|---|---|---|
| | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| (i) Shifting Containers within the bay itself (laden and empty) | 27.26 | 40.89 | 54.52 | 712.8 | 1069.2 | 1425.6 |
| (ii) Shifting Containers from one bay to another (laden and empty) | 60.65 | 90.98 | 121.31 | 1585.98 | 2378.97 | 3171.96 |

## Charges for handling hatches (For opening or closing or shifting the hatch cover).

| Particular | Rate per hatch cover per | |
|---|---|---|
| | Foreign-going  (in US$) | Coastal  (in Rs.) |
| (i). Without landing hatch cover on / quay. | 16.36 | 427.68 |
| (ii). With landing hatch cover on / quay. | 40.89 | 1069.2 |

## For handling any item of heavy cargo / container which requires usage of 60 tonne hook (cargo beam) of the gantry crane

| Particular | Foreign-going (in US$) | Coastal   (in Rs.) | | | |
|---|---|---|---|---|---|
| i) First one hour or part thereof | 272.6 | 7128 | | | |
| ii) For each 30 minutes or part thereof | 136.3 | 3564 | | | |

**Note:** For the purpose of calculating the total time taken, in the case of (i) & (ii) above, the total deployment time of the crane for the particular work will be taken.

14

## General notes for Schedule

Gantry crane charges for handling multi-dimension containers, over high containers etc. by using extension piece will be charged at the rate prescribed for 45 feet containers.

Gantry Crane charges for handling containers by using slings put on spreader will also be charged at the rate prescribed for 45 feet.

## Charges for use of other containers handling equipmen

**Transportation from QC to Yard & Vice Versa**

| Particular | Normal Containers (in Rs.) | | | Coastal   (in Rs.) | | |
|---|---|---|---|---|---|---|
| | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| Laden container | 267.3 | 400.95 | 534.6 | 160.38 | 240.57 | 320.76 |
| Empty container | 237.6 | 356.4 | 475.2 | 142.56 | 213.84 | 285.12 |

**Note:** The rate prescribed above will be levied per container movement to or from the quayside.

## Handling at Container Yard for lift on / off, or delivery / receipt to and from customers.

| Particular | Normal Containers (in Rs.) | | | Coastal   (in Rs.) | | |
|---|---|---|---|---|---|---|
| | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| Laden container | 570.24 | 855.36 | 1140.48 | 342.14 | 513.22 | 684.29 |
| Empty container | 178.2 | 267.3 | 356.4 | 106.92 | 160.38 | 213.84 |

**Note:** The rate prescribed will be levied per container movement at CY.

## Composite Handling Charges for Transhipment Containers.

| Particular | Foreign-going  (in US$) | | | Coastal (in Rs.) | | |
|---|---|---|---|---|---|---|
| | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| i) Laden container | 81.78 | 122.67 | 163.57 | 2138.4 | 3207.6 | 4276.8 |
| ii) Empty Container | 70.87 | 106.32 | 141.75 | 1853.28 | 2779.92 | 3706.56 |

**Note:**

The composite rates given above cover gantry charges, charges for transportation from quay to yard and vice-versa, charges for grounding and lifting by transfer crane at the yard and wharfage on container as well as containerized cargo.

If any of the services covered by the composite rates are not provided by the port, a rebate equivalent to the notified charges for that service shall be allowed on the composite rates.

container from foreign port landing at the IGTPL for subsequent transhipment to an Indian Port on a costal voyage or vice versa would be charged at 50% of the transhipment charge prescribed for foreign-going vessel and 50% of that prescribed for the coastal category.

A transhipment container sent to CFS, ICD or taken delivery locally shall be charged the local container rate.

15

| Wharfage Charges | | | | | |
|---|---|---|---|---|---|
| | Normal Containers (in Rs.) | | | Coastal (in Rs.) | | |
| Particular | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| Laden container | 594 | 891 | 1188 | 356.4 | 534.6 | 712.8 |
| Empty Container | 124.74 | 187.11 | 249.48 | 74.84 | 112.27 | 149.69 |

| Reefer Charges | | | | | |
|---|---|---|---|---|---|
| | Foreign-going (in US$) | | | Coastal (in Rs.) | | |
| Particular | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| Electricity supply & monitoring charges per 4 hrs or part thereof | 3.18 | 4.76 | 6.35 | 138.4 | 207.58 | 276.8 |

| Storage Charges – per day or part thereof | | | | | |
|---|---|---|---|---|---|
| | Rate per container per day or part thereof | | | | | |
| | Foreign-going (in US$) | | | Coastal (in Rs.) | | |
| Particular | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length | Container not exceeding 20 feet in length | Container exceeding 20 feet in length and upto 40 feet length | Container exceeding 40 feet in length and upto 45 feet length |
| Laden container | | | | | | |
| i) First 7 days | Free | Free | Free | Free | Free | Free |
| ii) 8-15 days | 4.5 | 9 | 13.5 | 196.1 | 392.2 | 588.3 |
| iii) 16-30 days | 9 | 18 | 27 | 392.2 | 784.45 | 1176.7 |
| iv) Thereafter | 18 | 36 | 54 | 784.45 | 1568.9 | 2353.3 |
| Empty container | | | | | | |
| i) First 3 days | Free | Free | Free | Free | Free | Free |
| ii) 4-10 days | 4.5 | 9 | 13.5 | 196.1 | 392.2 | 588.3 |
| iii) 11-15 days | 9 | 18 | 27 | 392.2 | 784.45 | 1176.7 |
| iv) Thereafter | 18 | 36 | 54 | 784.45 | 1568.9 | 2353.3 |
| Transhipment container – Laden | | | | | | |
| i) First 30 days | Free | Free | Free | Free | Free | Free |
| ii) 31-45 days | 9 | 18 | 27 | 392.2 | 784.45 | 1176.7 |
| iii) Thereafter | 13.5 | 27 | 40.5 | 588.3 | 1176.7 | 1765 |
| Transhipment container - Empty | | | | | | |
| i) First 15 days | Free | Free | Free | Free | Free | Free |
| ii) 16-30 days | 9 | 18 | 27 | 392.2 | 784.45 | 1176.7 |
| iii) Thereafter | 13.5 | 27 | 40.5 | 588.3 | 1176.7 | 1765 |

16

**Notes:**

The free period for import containers starts from the day after the day of landing of the container from the vessel.

The free period for export containers starts from the date of admission of the container.

For the purpose of calculation of free period Sundays, Customs notified holidays and Terminal's non-working days shall be excluded.

Transhipment containers whose status is subsequently changed to local FCL / LCL / ICD shall loose the concessional storage charges. The storage charges for such containers shall be recovered at par with the relevant import containers storage tariff.

The storage charges shall not accrue for the period during which the IGTPL is not in a position to deliver / ship the empty container when requested by the user.

For hazardous container, the storage charges shall be 25% more under the respective slab as given above.

Total storage period for a shut out container shall be calculated from the day following the day when the container has become shut out till the day of shipment / delivery.

The storage charges on abandoned FCL container / shipper owned containers shall be levied upto the date of receipt of intimation of abandonment in writing or 75 days from the day of landing of the container, whichever is earlier subject to the following conditions.

    (i) The consignee can issue a letter of abandonment at any time.

    (ii) If the consignee chooses not to issue such letter of abandonment, the container Agent / MLO can also issue abandonment letter subject to the condition that,

        (a) the Line shall resume custody of container along with cargo and either take back it or remove it from the port premises; and

        (b) the line shall pay all port charges accrued on the cargo and container before resuming custody of the container.

    (iii) The container Agent / MLO shall observe the necessary formalities and bear the cost of transportation and destuffing. In case of their failure to take such action within the stipulated period, the storage charge on container shall be continued

    (iv) Where the container is seized / confiscated by the Custom Authorities and the same cannot be destuffed within the prescribed time limit of 75 days, the storage charges will cease to apply from the day the Custom order release of the cargo subject

17

# Kolkata Port Trust (Calcutta)

# Scale of Rates

KOLKATA PORT TRUST
**SCALE OF RATES  As on 6-2-2007 G. No.-34**
**GENERAL**

S.1  **Short title of Commencement**

The Scale of Tolls, Dues and Rates set out herein shall be called " SCALE OF RATES" of the Kolkata Port Trust and charges shall be levied by Kolkata Port Trust in terms of provisions of the Scale of Rates.

S.2. **Definition**

In this Scale of Rates, unless the context otherwise requires, the following definitions shall apply.

(i)     'Ad valorem' in respect of exports shall mean FOB value of exports, as accepted by the Customs on the Shipping Bill.

(ii)    'Ad Valorem' in respect of Imports shall mean CIF value of imports, as accepted by the Customs on the Bill of Entry.

(iii)   'Board' shall have the same meaning as assigned to it in the Major Port Trust Act, 1963.

(iv)    'Coastal Vessel' shall mean any vessel exclusively employed in trading between any Port or place in India to any other Port or place in India having a valid coastal licence issued by the competent authority.

(v)     'Day' in respect of Kolkata Dock System shall mean the period starting from 6.30 am of a day and ending at 6.30 am on the next day. 'Day' in respect of Haldia Dock Complex shall mean the period starting from 6 am of a day and ending at 6 am on the next day.

(vi)    'Demurrage' shall mean charges payable for storage of cargo within Port premises beyond free period as specified in the Scale of Rates and shall not include the cargo stored at the area allotted to a port user on licence basis for storage of cargo during the licence period.

(vii)   'Foreign Going Vessel' shall mean any vessel other than coastal vessel, Inland vessel, boat and flat.

(viii)  'Full  Container  Load  (FCL)' shall mean a container having cargo of a single Importer/Exporter.

(ix)    'Haldia Dock Complex (HDC)' shall mean the Oil Jetties, Other Jetties, Wharves and Berths at Haldia and River Moorings at Haldia Anchorages.

(x)     'Hazardous I' shall mean the cargo categorized as Hazardous-I in the list of Hazardous Cargo adopted by the Board from time to time.

(xi)    'IWT Cargo'/ 'IWT Container' shall mean cargo/container, carried by Inland Vessel / barge/ boat/ flat through Inland Waterways but shall not include lighterage cargo/container.

(xii)   'Inland Vessel' shall mean any vessel registered as such under the provision of the Inland Vessels Act, 1917.

<div align="center">

18

**JA0600**

</div>

Note: The charges leviable on 'Inland Vessels' will also be applicable on vessels operating through riverine route between Bangladesh and KOPT under protocol.

(xiii) 'Kolkata Dock System (KDS)' shall mean Netaji Subhash Dock, Kidderpore Dock, Sandhead, Saugor, River Anchorages, River Moorings, Budge-Budge Petroleum Wharves, Inland Vessel's Wharves and all other establishments of KOPT, excepting those specifically under Haldia Dock Complex.

(xiv) 'Kolkata Port Trust (KOPT)' shall mean the corporate entity and will include Kolkata Dock System and Haldia Dock Complex.

(xv) 'Less than a Container Load (LCL)' shall mean a container having cargo of more than one Importers/Exporters.

(xvi) 'Lighterage Cargo'/ 'Lighterage Container' shall mean cargo/ container which the foreign going vessel/coastal vessel off-load/load at any river anchorage/mooring/ virtual jetty/ sandhead into/ from smaller vessels.

(xvii) 'Month' shall mean 30 consecutive calendar days including holidays unless otherwise specified.

(xviii) 'On Board handling Charges' shall mean charges on Cargo/ Commodity/ Article / Package/ Container for rendering on board services by the port in the form of supply of manpower for loading / unloading operation.

(xix) 'Overside Discharge/Shipment' shall mean the operation of unloading/loading of cargo ex/into vessel without passing through the quay at the time of discharge / shipment operation.

(xx) 'Shore Handling Charges' shall mean charges on Cargo/Commodity/Article/ Package/Container for rendering shore services by the port in the form of supply of labour and /or equipment for transportation of cargo from hook point to stacking point, unloading of the same at the stacking point and subsequent loading for delivery, or vice-versa and in case of mechanical receiving of cargo shall also include charges for tippling of wagon by Wagon Tippler.

(xxi) 'Shut out' cargo shall mean export cargo left in the Port having not been shipped on board the vessel for which it was received in Port premises.

(xxii) 'TEU' shall mean Twenty Feet Equivalent Unit of container.

(xxiii) 'Transhipment' shall mean transfer of cargo/container from a sea going vessel/barge to another sea going vessel/barge for destination to other Port/Ports.

(xxiv) 'Wharfage' shall mean the basic dues recoverable on all cargo/ container landed or shipped or transhipped within the port limit and approaches or passing through the declared landing stage of the port, whether porterage was provided by the port or not and shall include hooking/unhooking operation on shore, where necessary.

(xxv) 'Week' shall mean 7 consecutive calendar days including holidays.

<div align="center">

19

**JA0601**

</div>

S.3   **General Principles of Assessment**

(i)     The minimum weight/measurement chargeable shall be 1 tonne/1 CBM although the gross weight/measurement may be less than 1 tonne/1 CBM. In case where the charge is on weight basis and the gross weight is not an exact multiple of 100 Kgs, the same will be rounded of to the next higher multiple of 100 Kgs. Where the gross CBM includes decimals, the same should be rounded of to the next higher whole unit of CBM.

(ii)    Rates applicable for a period/unit other than weight shall be applicable to the part of a period/unit thereof.

(iii)   Unless otherwise specified, if port equipment is booked for landing/shipment of cargo/container from/into vessel or for any other purpose by the vessel, equipment hire charge as specified in Section 17.1 shall be levied on the vessel agent/owner.

(iv)    Cargo Related Charges shall be levied on the owners of the cargo or their Clearing and Forwarding Agents / Handling Agents except where specified otherwise, or in cases where Ship Owners/Steamer Agents agree to pay such charges.

(v)     In case of FCL container, except the containers from/to ICDs/Customs Notified CFS, the charges related to container and the containerised cargo including the on-board (also for use of equipment if any), shore handling and storage charges thereon shall be levied on the owner of the cargo or his Clearing & Forwarding Agent/Handling Agent. However, port may recover such charges from Container Agents/ Main Line Operators (MLO) if the Container Agents/ Main Line Operators (MLO) applies for destuffing of FCL container in absence of Importer/Exporter arranging delivery/shipment of the container.

In case of LCL container, empty container and container from/to ICDs/Customs Notified CFS, the charges related to container and the containerised cargo including the on-board (also for use of equipment if any), shore handling and storage charges thereon shall be levied on the Container Agents/ Main Line Operator (MLO)s.

However, after destuffing or prior to stuffing, the cargo related charges, if any, shall be levied on the owner of the cargo or his Clearing & Forwarding Agent / Handling Agent.

(vi)    Storage charges on Containers have been denominated in US Dollar terms. However, charge in such case shall be recovered in Indian Rupee after conversion of US currency to Indian Rupee at the Reserve Bank of India's reference rates. The exchange rate prevalent on the date of entry of the vessel into port limit shall be reckoned as the date for such conversion.

However, if a container received for shipment is subsequently removed from docks without being shipped, the date of entry for such container in the port premises shall be reckoned as the date for this purpose.

(vii)    (a). Vessel related charges shall be levied on the Ship Owners/Steamer Agents. Wherever rates have been denominated in US Dollar terms, the charge shall be recovered in Indian Rupees after conversion of US currency to Indian Rupee at the Reserve Bank of India's reference rate. The date of entry of vessel into port limit shall be reckoned as the date for such conversion.

(b). Container related charges denominated in US dollar terms shall be collected in equivalent Indian Rupees based on the market buying rate prevalent on the date of entry of the vessel in case of import containers; and on the date of arrival of the containers into the port in case of export containers.

(viii)    (a). The Vessel related charges for all Coastal vessels should not exceed 60% of the corresponding charges for other vessels.

(b). The cargo / container related charges for all Coastal cargo / containers, other than thermal coal, POL including crude oil, Iron Ore and Iron pallets, should not exceed 60% of the normal cargo / container related charges.

(c). In case of cargo related charges, the concessional rates should be levied on all the relevant handling charges for ship-shore transfer and transfer from / to quay to / from storage yard including wharfage.

(d). In case of container related charges, the concession is applicable on composite box rate. Where itemized charges are levied, the concession will be on all the relevant charges for ship-shore transfer, and transfer from / to quay to / from storage yard as well as wharfage on cargo and containers.

(e). For the purpose of this concession, cargo/ container from a foreign port which reaches an Indian Port 'A' for subsequent transhipment to Indian Port 'B' will also qualify insofar as the charges relevant for its coastal voyage. In other words, cargo/containers from/to Indian Ports carried by vessels permitted to undertake coastal voyage will qualify for the concession.

(f). The charges for coastal cargo/ containers/ vessels shall be denominated and collected in Indian Rupee.

(ix)    In all cases where charges are levied in US Dollar terms, the exchange rate shall be reviewed once in every 30 days from the date of applicable exchange rate adopted initially in respect of storage charge for containers staying inside the Port for more than 30 days or in respect of vessel related charges for vessels staying in the Port for more than 30 days. In such cases, the basis of billing shall change prospectively with reference to the appropriate exchange rate prevailing at the time of review.

(x)    Samples, Catalogues and other articles for which Shipping Companies charge no freight and on which no Customs duty is payable, diplomatic mail bags, crew baggage and all goods meant for KOPT's use shall be exempted from payment of all cargo related charges.

(xi)    No charge shall be levied on stores/ provisions supplied on board KOPT crafts/vessels.

<div align="center">

21

**JA0603**

</div>

(xii)    No demurrage shall be charged for the days during which delivery cannot be effected due to strike by the Port employees provided, the concerned Importer or his Authorized Agent files the complete delivery documents on payment of all Port charges prior to commencement of the strike.

(xiii) (a) Berth hire shall stop 4 hours after the time of the vessel signaling its readiness to sail. The time limit prescribed for cessation of berth hire shall exclude the ship's waiting time for want of favorable tidal conditions or on account of inclement weather or due to absence of night navigation facilities.

(b)    There shall be penal berth hire equal to berth hire charges of one days berth hire charge for a false signal.

(xiv)    Interest on delayed payments / refunds:

(a)    The user shall pay penal interest on delayed payments under this Scale of Rates.  Likewise, the KOPT shall pay penal interest on delayed refunds.

(b)    The rate of penal interest will be 13%. The penal interest rate will apply to both the KOPT and the port users equally.

(c)    The delay in refunds will be counted only 20 days from the date of completion of services or on production of all the documents required from the users, whichever is later.

(d)    The delay in payments by the users will be counted only 10 days after the date of raising the bills by the KOPT.  This provision shall, however, not apply to the cases where payment is to be made before availing the services / use of Port Trust's properties as stipulated in the Major Port Trust Act and / or where payment of charges in advance is prescribed as a condition in this Scale of Rates.

(xv)    Before classifying any cargo under "unspecified category" or otherwise, if required, to know the nature of cargo for levy of Port charges, the relevant Customs classification shall be referred to in order to find out whether the cargo can be classified under any of the specified categories mentioned in the schedules.

(xvi)(a) A foreign going vessel of Indian flag having a General Trading Licence can convert to coastal run on the basis of a Customs Conversion Order.

(b)    A foreign going vessel of foreign flag can convert to coastal run on the basis of a Coastal Voyage Licence issued by the Director General of Shipping.

(c)    For dedicated Indian coastal vessels having a Coastal Licence from the Director General of Shipping, no other document will be required by her to be entitled for coastal rates.

(d)    The status of the vessel, as borne out by its certification by the Customs or Director General of Shipping, shall be the deciding factor for its classification as 'Coastal' or 'Foreign-going' for the purpose of levy of vessel related charges; and, the nature of cargo or its origin will not be of any relevance for this purpose.

22

(e) The corresponding vessel related rates should be applied depending on the status of the vessel at the time of the incidence of such charge.

(xvii)     For the purpose of charging, Shipper's Own Containers will be at par with the Marine Freight Containers

(xviii)     Users will not be required to pay charges for delays beyond a reasonable level attributable to the KOPT.

(xix) (a).     Wherever a specific tariff for a service/cargo is not available in the notified Scale of Rates, the KOPT can submit a suitable proposal to the TAMP.

(b).     Simultaneously with the submission of proposal, the proposed rate can be levied on an ad hoc basis till the rate is finally notified.

(c).     The ad hoc rate to be operated in the interim period must be derived based on existing notified tariffs for comparable services/ cargo; and, it must be mutually agreed upon by the Port/ Terminal and the concerned user(s).

(d).     The final rate fixed by the TAMP will ordinarily be effective only prospectively. The interim rate adopted in an ad hoc manner will be recognised as such unless it is found to be excessive requiring some moderation retrospectively.

(xx) (a).     The rates prescribed in this Scale of Rates are ceiling levels; likewise, rebates and discounts are floor levels. The KOPT may, if it so desires, charge lower rates and/ or allow higher rebates and discounts.

(b).     The KOPT may also, if it so desires, rationalize the prescribed conditionalities governing the application of rates prescribed in the Scale of Rates if such rationalization gives relief to the user in rate per unit and the unit rates prescribed in the Scale of Rates do not exceed the ceiling levels.

(c).     Provided that the KOPT should notify the public such lower rates and / or rationalization of the conditionalities governing the application of such rates and continue to notify the public any further changes in such lower rates and / or in the conditionalities governing the application of such rates provided the new rates fixed shall not exceed the rates notified by the TAMP.

<div align="center">

23

**JA0605**

</div>

## PART – I

### Charges on Break-bulk and Bulk Cargo

S.4.    **Wharfage:**

S.4.1    Wharfage on **Foreign cargo** landed/shipped at any places within Kolkata port Trust shall be levied at the following rates, except where specified otherwise: -

| Sl. No. | Description | Rates in Rupees per tonne or part thereof |
|---|---|---|
| **Liquids handled through pipeline** | | |
| 1. | Crude oil | 76.50 |
| 2. | POL/POL products, CBFS or any other liquid/gas having a flash point of 23⁰C (73.4⁰F) and above and not specified below, ship's bunker. | 76.50 |
| 3. | POL/POL Products or any other liquid/gas having a flash point of less than 23⁰C (73.4⁰F) and not specified below. | |
| | (a) For quantity upto 50000 tonnes per Financial Year | 112.50 |
| | (b) On the quantity above 50000 tonnes per Financial Year | 85.50 |
| 4. | L.P.G, Naphtha, Butadiene, Butane, Butene, Benzene, Py Gas, Propane Hexane and N-Hexane | 85.50 |
| 5. | Vegetable Oil | 45.00 |
| 6. | Molasses | 27.00 |
| 7. | Acids, Fatty Acid, Mineral Oil, Tallow, Alcohols | 58.50 |
| **Liquids handled other than through pipeline** | | |
| 8. | All liquids including ship's bunker | 76.50 |
| **Cargo handled through mechanical system** | | |
| 9. | Export Iron Ore | 36.00 |

| Sl. No. | Description | Rates in Rupees |
|---|---|---|
| 10. | Export Thermal Coal | 40.50 |
| 11. | All other types of coals not specified, Fertiliser, Fertiliser Raw materials, Soda Ash and all other dry bulks. | 81.00 |
| **Cargo handled other than through mechanical system** | | |
| 12 | Salt, Fly Ash | 18.00 |
| 13 | Iron Ore, Sand | 18.00 |
| 14. | Limestone, Bitumen, Pig Iron, Sponge Iron and other Ferrous metal, All types of Coal/Coke/Ore/other dry bulk cargo not specified. | 36.00 |
| 15 | Wheat, Rice, Sugar, Pulses, Rapeseed, Cereals and their products, Bulgur wheat, Corn Soya blend, Milk powder, Seeds of all kinds, Soda (Caustic or Ash), Cement, Clinker, Newsprint, Gypsum, Slag. | 45.00 |

| Sl. No. | Description | Rates in Rupees per tonne or part thereof |
|---|---|---|
| 16. | Mill Scale, Magnesite, Granite, All types of scraps, Oil cake, Bone & Bone meal, Bran, Fire bricks and other Refractory materials, Mica block/flake/spitting/waste/scrap/powder, Non-ferrous metals of all kinds except Ingots of Zinc/Aluminium/Copper/Lead, C.I.Goods, Rock phosphate, Sulphur & Other Fertilizer raw materials, Finished Fertiliser, Asphalt pitch (including Coal Tar pitch). Lead concentrate, Carbon black, Jute, Gunnies, Jute products/waste/caddies/twist/cuttings, Hemp, Cotton, Cotton yarn/twist/waste/cuttings, Other vegetable fibres, Raw wool, Synthetic Resin, Asbestos raw /fibre, Synthetic yarn/rags, Cotton piece goods, Waste paper, Wood pulp, Plywood, Shellac, Seedlac, Glass sheet, Glass ware/products, Porcelain ware/products, Hides & Skins, Hosiery goods. Garment, Polymer and other chemicals in bag, Ship's store, Dunnage, Leather and its products, Project Material, Project Equipment, Machinery and Spares. | 63.00 |
| 17. | Iron and Steel, Pipes & Tubes. | 54.00 |
| 18. | Log, Timber, Veneer | 94.50 per CBM or part thereof |
| 19. | Car, any rubber tyre vehicle, cargo moving equipment, earth-moving equipment. | 3600.00 per unit |
| 20. | **Charges for all other cargo not specified above** | |
| | a) | Import cargo | 0.225% Advalorem |
| | b) | Export cargo | 0.18% Advalorem |

Note:  The lower rate specified in S.4.1, Sl. No. 3(b) shall be allowed by way of refund against claim lodged by the Importer/Exporter after close of a Financial Year. The same shall be calculated separately for each Dock System not considering the quantity handled at the other Dock System. The claim should be accompanied by details of quantity-handled vessel wise as well as payment particulars.

S.4.2  Wharfage on Coastal cargo landed/shipped at/ from any place within Kolkata port Trust shall be levied at the following rates, except where specified otherwise: -

| Sl. No. | Description | Rates in Rupees per tonne or part thereof |
|---------|-------------|-------------------------------------------|
| 1 | Crude oil, POL and POL products, Thermal Coal, Iron Ore and Iron Ore pellets | Same as the rates for Foreign Cargo as specified at S.4.1 |
| 2 | All Other Cargo | 60% of the rates for Foreign Cargo as specified at S.4.1, subject to a maximum of Rs.50/- per tonne or part thereof. |

S.4.3  For Transhipment cargo handled at berth, wharfage is payable at 75% of the applicable rate for landing and 75% of the applicable rate for subsequent shipment. The applicable rates shall be the rates specified at S.4.1 or S.4.2 depending on whether the same is foreign or coastal at the time of discharge/shipment as per definition under S.2.

For Transhipment cargo handled at Sandheads/Virtual Jetty/any other anchorage point/ mooring, wharfage shall be levied at the rate of Rs.18.00 per tonne or part thereof irrespective of the nature & description of the cargo.

S.4.4  For Crude Oil/POL/POL product discharged at Sandheads/Virtual Jetty/any other anchorage point/ mooring, for subsequent landing at berth or vice-versa in case of shipment, only one full wharfage shall be levied, even if the cargo operation takes place at both the dock systems. Each dock system in such cases shall realise 50% of the applicable wharfage.

S.4.5  For discharge/shipment of cargo at Sandheads/Virtual Jetty/ any other anchorage point/ mooring, other than the cargo specified at S.4.4, 90% of wharfage as specified at S.4.1 or S.4.2, as the case may be, shall be realised for discharge/ shipment at such point.

In addition, if such cargo is carried by barge/boat/flat or any other vessel for unloading/loading at any berth/jetty/declared Inland Vessel Wharves belonging to port, wharfage shall be realised for such discharge/shipment at the following rates –

| Sl. No. | Place of operation | | Rates in Rs. Per tonne or part thereof |
|---------|--------------------|--|----------------------------------------|
| 1. | Berth/ jetty meant for handling sea-going vessel | | |
| | a) | Iron Ore | 4.50 |
| | b) | All other Cargo | 18.00 |
| 2. | Declared Inland Vessel Wharves of KOPT | | 4.50 |

26

S.4.6   On IWT cargo loaded/unloaded at any berth/jetty/declared Inland Vessel Wharves belonging to port, wharfage shall be realised at the following rates subject to minimum of Rs.9.00 per tonne or part thereof.

| Sl. No. | Place of operation | | Rates in Rs. Per tonne or part thereof |
|---|---|---|---|
| 1. | Berth/jetty meant for handling sea-going vessel | | 50% of wharfage as specified at S.4.1 |
| 2. | Declared Inland Vessel Wharves of KOPT | | |
| | a) | Fly Ash | 9.00 |
| | b) | All Other cargo | 18.00 |

S.4.7   Wharfage shall be levied separately by each dock system for cargo operation within their system unless otherwise specified in this Scale of rates.

S.4.8   On shutout cargo/stock cargo, which is taken back from Port premises, 50% of wharfage shall be levied. In addition, on-board handling charges & shore handling charges, as may be applicable, shall be levied if labour and/or equipment are/is supplied by port for handling of cargo.

No additional wharfage shall be levied on shutout cargo if the same is subsequently shipped without being removed from port premises.

S.4.9   Due to some operational reason if any cargo is landed from a vessel for subsequent shipment by the same vessel, wharfage shall be levied @ Rs.90.00 per tonne or part thereof.

S.4.10  On liquid cargo transferred through pipeline between HDC and KDS or from any other point to KDS/HDC or vice-versa, 50 % of the wharfage shall be levied at the dock system where it is so transferred.

S.4.11  On unspecified cargo, which is sold by auction, tender or otherwise where the CIF/ FOB value is not available, wharfage shall be levied @ Rs.180/- per tonne or part thereof.

S.5.    **On board handling charges**:

S.5.1   For supply of KOPT's manpower for handling of Foreign cargo on board the vessel for loading/ unloading operation, charges at the following rates shall be levied on the Vessel Agents or Importer/Exporter or his Clearing Forwarding Agent/Handling Agent.

| Sl.No. | Description | Rates in Rupees per tonne or part thereof |
|---|---|---|
| 1 | All types of Coal, Coke and Ore, Limestone, Other Dry Bulk cargo not specified discharged/shipped by use of Grab/Magnet. | 27.00 |
| 2 | Iron and Steel, Pipes & Tubes, | 72.00 |
| 3 | All other cargo except those specified at Sl. No. 1, 2, 4 & 5 | 36.00 |
| 4 | Log, Timber, Veneer | 22.50 per CBM |
| 5 | Car, any rubber tyre vehicle, cargo moving equipment, earth moving equipment discharged/shipped by use of slings. | 45.00 per unit |

27

S.5.2    For supply of KOPT's manpower for handling of Coastal cargo, other than Crude oil, POL and POL products, Thermal Coal, Iron Ore and Iron Ore pellets, on board the vessel for loading/ unloading operation, charges at the rate of 60% of the rates specified at S.5.1 shall be levied on the Vessel Agents or Importer/Exporter or his Clearing Forwarding Agent/Handling Agent. For Crude oil, POL and POL products, Thermal Coal, Iron Ore and Iron Ore pellets the rates shall be same that of foreign cargo.

S.5.3    For handling Coking coal all types of Coke, Lime stone, Sulphur, Rock phosphate and Cement in bulk, Cleaning Charges @ Rs.1/- per tonne shall be levied in addition to all other charges.

**Note for Section 5.**

(i)    In case of Coking coal, HDC provides equipment support on board the ships (except those handled through mechanical system at HDC or/and at berth(s) licensed under Section 42 of the Major Port Trust Act, 1963). Where HDC cannot provide such equipment support, a rebate of Rs.2.50 per tonne shall be allowed if the importer arranges the equipment.

(ii)    On board handling charge is not leviable in cases where wharfage is realised on cargo for handling through pipeline or for handling through mechanical system.

(iii)    For shifting of cargo on board, without passing through the quay, 1.5 times of the applicable On board handling charges shall be levied.

S.6.    **Shore handling charge:**

S.6.1    Charges shall be levied at the following rates for rendering shore handling services to foreign cargo as specified in the definition of 'Shore Handling Charges' at S.2 (xx) and for such other services as specified below.

| Sl. No. | Description | Rates in Rupees per tonne or part thereof. | |
|---|---|---|---|
| | | Labour only | Labour & Equipment |
| 1. | Bag cargo and packages (where handling is entirely done manually by using handcart only, if necessary) | 22.50 | - |
| 2. | Iron and Steel, Pipes & Tubes | 18.00 | 108.00 |
| Sl. No. | Description | Rates in Rupees per tonne or part thereof. | |
| | | Labour only | Labour & Equipment |

| | | | | |
|---|---|---|---|---|
| 3. | | All other break bulk cargo for which rates otherwise not specified– (per Pkg. Or Unit weight) | | |
| | a) | Less than 5 tonne | 18.00 | 36.00 |
| | b) | 5 tonne to less than 10 tonne | 18.00 | 67.50 |
| | c) | 10 tonne to less than 20 tonne | 18.00 | 135.00 |
| | d) | 20 tonne to less than 40 tonne | 18.00 | 180.00 |
| | e) | 40 tonne and above | 18.00 | 360.00 |
| 4. | i) | Tippling of Thermal Coal wagon by Wagon Tippler | - | 40.50 |
| | ii) | Manual unloading of Thermal Coal Wagon - | 27.00 | - |
| | iii) | Transfer of Thermal Coal (other than through mechanical system), from unloading point to Stack point, including loading at unloading point and unloading at Stack point. | 36.00 | 40.50 |
| | iv) | Transfer of Thermal Coal (other than through mechanical system), from stack point/unloading point to Hook point, including loading at stack point/unloading point and unloading at hook point as well as heaping of cargo for vessel feeding. | 49.50 | 54.00 |
| 5. | i) | Tippling of Iron ore wagon by Wagon Tippler | - | 36.00 |
| | ii) | Manual unloading of Iron Ore Wagon | 36.00 | - |
| | iii) | Transfer of Iron Ore (other than through mechanical system), from unloading point to Stack point, including loading at unloading point and unloading at Stack point. | 40.50 | 45.00 |
| | iv) | Transfer of Iron Ore (other than through mechanical system), from stack point/unloading point to Hook point, including loading at stack point/unloading point and unloading at hook point as well as heaping of cargo for vessel feeding. | 49.50 | 58.50 |
| 6. | | All types of dry bulk cargo not specified above (other than the cargo landed from or shipped/ to be shipped through Mechanical System) | 63.00 | 81.00 |
| 7. | | Logs, Timber, Veneer | 18.00 per CBM | 36.00 per CBM |

S.6.2    For supply of KOPT's manpower and/or equipment for shore handling of Coastal cargo, other than Crude oil, POL and POL products, Thermal Coal, Iron Ore and Iron Ore pellets, charges at the rate of 60% of the rates specified at S.6.1 shall be levied. For Crude oil, POL and POL products, Thermal Coal, Iron Ore and Iron Ore pellets the rates shall be same as that of foreign cargo.

**Note for Section 6.**

i)    Port reserves the right to supply /not to supply labour or/and equipment for shore handling operation other than in case of tippling of wagon.

ii)    If the Port provides only part of the services specified in the definition of 'Shore Handling Charge' under S.2(xx), 50% of the shore handling charges specified at Sl. No. 1, 2, 3 and 7 of S.6.1 shall be levied. This clause shall not be applicable for not providing Tippling, which is a stand alone service.

iii)    No Shore handling charge shall be levied where port provides none of the services specified in the definition of 'shore handling charge' under S.2(xx) and where wharfage is realised on cargo for handling through pipeline.

iv) If, after Tippling of wagon, the other shore handling services specified under S.2(xx) is provided, in full or in part, the applicable charge for the said services shall be levied, in addition to Tippling Charge.

v) In case the manual unloading of Thermal Coal wagon and/or manual loading of Thermal Coal is done at the option of the Port, a rebate of 30% in the rates specified under Sl. No. 4 (ii), (iii) and (iv) shall be allowed.

**S.7.** **Demurrage on Cargo:**

S.7.1 Demurrage shall be levied on Import cargo (other than containerised cargo) after allowing a demurrage-free period as specified below: -

| Sl. No. | Description | Demurrage-free period |
|---|---|---|
| 1. | Hazardous-I cargo | Actual date of landing |
| 2. | All other cargo except those mentioned at Sl. No. 1,3 & 4 | 3 days after the last landing date of the vessel by which the cargo is imported. |
| 3. | Non-hazardous cargo using port equipment for delivery, non-hazardous cargo for Nepal and Bhutan, Log, Timber and Veneer. | 6 days after the last landing date of the vessel by which the cargo is imported. |
| 4. | Cargo imported by voluntary/relief organization like Missionaries of Charity, Bharat Sevashram Sangha, Ramkrishna Mission, CARE, CRS, WFP and others as may be accepted by Kolkata Port Trust from time to time on the basis of certification by the Appropriate Govt. Authority of Central Govt./State Govt. and Govt. of Nepal/ Bhutan or their local Consulate General. | 30 days after the last landing date of the vessel by which cargo is imported. |

Note:

i) Last Landing Date (LLD) is the date on which a vessel completes her import discharge. However, KOPT may declare any other date as such LLD for cargo already discharged from the vessel when the vessel is not doing cargo operation work in working berth for more than 24 hours for any fault/ reason not attributable to Port. In such cases, a vessel may have more than one LLD.

ii) For the purpose of calculation of free time, Customs notified holidays and the KOPT's non-operational days shall be excluded. Sundays shall not be excluded for the purpose of calculation of free time unless Customs notified holidays and the KOPT's non-operational days fall on Sundays.

After demurrage charge begins to accrue no allowance is made for Customs notified holidays or KOPT's non-operational days.

S.7.2 Demurrage on Import cargo (except log, timber, veneer) shall be levied after the expiry of demurrage free period at the following rates: -

| Sl. No. | Type of cargo | Rate in Rupees per tonne per day or part thereof. | |
|---|---|---|---|
| | | For the first 15 days. | 16th day onwards |
| 1. | Hazardous – I | 153.00 per tonne | 180.00 per tonne |
| 2 | All other cargo | 36.00 per tonne | 54.00 per tonne |

S.7.3 Demurrage on Import log, timber, veneer shall be levied after the expiry of demurrage free period at the following rates: -

| Sl. No | Type of cargo | Rate in Rupees per CBM perday or part thereof. | | |
|---|---|---|---|---|
| | | For the first 7 days. | 8th to 14th day | From 15th day onwards |
| 1. | Log, Timber, Veneer | 5.40 | 10.80 | 16.20 |

S.7.4   No demurrage shall be levied on export/stock cargo, except Hazardous-I category, if such cargo is shipped within 30 days from the date of receipt. However, after the 31st day, demurrage on such cargo shall be levied @ Rs.36.00 per tonne per week or part thereof from the date of receipt till the date of shipment.

S.7.5   Export cargo of Hazardous-I category shall be received only for direct shipment. In case such cargo is not shipped on the date of receipt, demurrage shall be levied at rate of Rs.153/- per tonne per day or part thereof from the day following the date of receipt upto the date of shipment or removal from port premises.

S.7.6   Demurrage shall be levied on shutout cargo/ stock, other than Hazardous I cargo,  @ Rs.9.00 per tonne per day or part thereof from the date of receipt of cargo upto the date of removal of cargo from the port premises without being shipped. If shutout cargo is shipped by any subsequent vessel provision of S.7.4 shall apply.

S.7.7   On cargo/commodity which is received neither as import nor as export nor as stock for shipment, demurrage shall be levied  @ Rs.36.00 per tonne per day or part thereof from the date of receipt upto the date of removal of the cargo from the port premises.

S.7.8   On uncleared /Customs confiscated cargo sold by auction or tender or private agreement or in any other manner demurrage shall be levied at the rates specified at S.7.2 or S.7.3, as the case may be, after allowing free time of 10 days after the date the cargo is made available for delivery.

S.7.9   The demurrage on cargo shall not accrue for the period during which the KOPT is not in a position to deliver cargo for reasons attributable to the port when requested by the user.

S.8.   **Transportation**

S.8.1   The following charges shall be levied on cargo, for which KOPT shall undertake any transportation (excluding loading and/or unloading) not covered under Shore Handling Charge.

| Sl.No. | Description | Rate in Rs. per tonne or part thereof. |
|---|---|---|
| 1. | Within the dock | 31.50 |
| 2. | From one dock enclosure to another dock enclosure within the same dock system. | 45.00 |

S.9.   **Loading /Unloading/Re-stacking charge**

S.9.1   The following charges shall be levied on cargo, for which KOPT shall undertake any loading/unloading/re-stacking not covered under Shore Handling Charge.

| Sl.No. | Description | Rate in Rs. Per tonne or part thereof. |
|---|---|---|
| 1. | Article/package weighing less than 1 tonne | 18.00 |
| 2. | Article /package weighing 1 tonne. & above but less than 10 tonne | 36.00 |

31

| 3. | Article/package weighing 10 tonne & above but less than 20 tonne | 45.00 |
|----|------------------------------------------------------------------|-------|
| 4. | Article/package weighing 20 tonne & above but less than 40 tonne | 90.00 |
| 5. | Article/package weighing 40 tonne & above | 225.00 |

S.10.   **Rebate**
     **At HDC:**
     Rebate on Wharfage shall be allowed in applicable cases as detailed below: -

(a). If any consignee/ consignor handles Crude Oil more than 6.50 million tonnes per financial year, On-board and wharfage charges shall be levied @ Rs.76.50 per tonne on first 6.50 million tonnes and @ Rs.67.50 per tonne on quantity beyond 6.50 million tonnes.

(b). If a Vessel discharges more than 25000 tonnes of coking coal/ limestone/ fertiliser/ raw material for fertiliser in a single call at HDC a rebate of 10% shall be allowed on On-board and wharfage charges on quantity exceeding 25000 tonnes.

(c).If a Vessel loads more than 25000 tonnes of Thermal Coal in a single call at HDC, a rebate of 10% shall be allowed on on-board and wharfage charges on quantity exceeding 25000 tonnes.

**At KDS:**

Importer/ Exporter shall be granted a rebate on wharfage on the basis of each of the cargo handled by them through KDS as mentioned below, during a financial year.

| Sr. No. | Type of Cargo | Tonnage handled | Quantum of Rebate on applicable wharfage |
|---------|---------------|-----------------|------------------------------------------|
| (a). | Coking Coal, Sugar, Pulses, Wheat, Rice, Jute and Jute products, Iron & Steel, Log, Sulphur, Rock Phosphate, Finished Fertiliser, Vegetable Oil, CI Goods, LPG | Upto 75000 tonnes | NIL |
|  |  | 75001 to 100000 tonnes | 10% |
|  |  | Above 100000 tonnes | 15% |
| (b). | Crude Oil, POL and its products | Upto 4000000 tonnes | NIL |
|  |  | 4000001 to 7500000 tonnes | 10% |
|  |  | Above 7500000 tonnes | 15% |

Note: The above said rebate shall be granted in the form of refund of wharfage at the end of every financial year (i.e. 1st April to 31st March) on submission of documents by the Importers/ Exporters in support of the throughout achieved.

33

JA0615

**P A R T - II**

## CHARGES ON CONTAINER AND CONTAINERISED CARGO HANDLED AT KOLKATA PORT TRUST (KOPT)

**S.11    Wharfage on container and containerised cargo**

S.11.1    Wharfage on Foreign container and containerised cargo (other than ICD container) shall be levied at the following rates:-

| Sl. No | Type | Rate in Rupees per TEU | | | | | |
|--------|------|------------------------|--|--|--|--|--|
| | | KDS | | | | HDC | |
| | | Import | | | Export | Import | Export |
| | | Category-I | Category-II | Category-III | | | |
| 1. | Loaded | 1980.00 | 3600.00 | 5580.00 | 1980.00 | 1980.00 | 1980.00 |
| 2. | Empty | 405.00 | | | 405.00 | 405.00 | 405.00 |

**Note:**

i)    'Category-I' means container-containing cargo consigned to Nepal, Bhutan and cargo other than that of 'Category-II' and 'Category-III'.

ii)    'Category-II' means container (other than for Nepal and Bhutan) containing Edible Oil/ Non-Edible Oil, Ferrous/ Non-ferrous Alloys, Pig Leads and All types of Metal Ingot.

iii)    'Category-III' means container (other than for Nepal and Bhutan) containing Electric & Electronic goods, All types of Chemicals, Resin, Wine & Beverages, Machinery & Spares, Ball Bearings, Paper & Paper Products (other than Newsprint), Polythene Granules, Personal Effect, Diplomatic Goods, Silk.

iv)    In case of import container containing more than one 'Category' cargo, the higher rate shall be levied.

v)    If the shutout export loads container or container received without shipment paper is taken delivery instead of being shipped, 50% of the Wharfage specified at Section-11 shall be levied. In addition, Shore handling charges and other charges shall be levied for the operations actually undertaken for such container.

vi)    If the containerised export cargo is destuffed and taken delivery as break-bulk, 50% of Wharfage as specified at S.4 shall be levied. In addition, all other charges shall be levied on such container for the operations actually undertaken for such cargo and container.

S.11.2    Wharfage on Foreign container and containerised cargo destined to/ from ICD (other than Cossipore ICD) shall be levied at the following rates: -

| Types | Rate in Rupees per TEU | |
|-------|------------------------|--|
| | ICDs at Delhi (Tughlakabad/Dadri), Ludhiana, Kanpur, Varanasi, Bhadoi, Jaipur, Nagpur, Jamshedpur, Balasore, & Fatwa | All other ICDs |
| Loaded | 90.00 | 1080.00 |
| Empty | 45.00 | 270.00 |

S.11.3    On coastal container and containerised cargo, wharfage shall be levied at 60% of the rates specified at S.11.1 or S11.2, as the case may be.

34

S.11.4   On IWT container and containerised cargo, including those of Bangladesh moving through IWT mode, wharfage shall be levied at the following rates:-

| Types | Rate in Rupees per TEU | |
|---|---|---|
| | Loaded | Empty |
| Containers from/to ICDs at Delhi (Tughlakabad/Dadri), Ludhiana, Kanpur, Varanasi, Bhadoi, Jaipur, Nagpur, Jamshedpur, Balasore, & Fatwa. | 90.00 | 45.00 |
| All other ICDs and Non-ICDs container | 630.00 | 90.00 |

**S.12.   On board Handling charge on container**

S.12.1   In case of Foreign containers (both loaded and empty), On board Handling charge @ Rs.247.50 per TEU shall be levied for providing on board labour/ manpower for landing/shipment of container-er. For providing any equipment support, the same shall be levied separately.

S.12.2   In case of Coastal Containers (both loaded and empty), On board Handling charge shall be levied at 60% of the rate applicable for Foreign containers as specified at S.12.1. For providing any equipment support, the same shall be levied separately.

S.12.3   On Board handling charge is not applicable where deployment of Calcutta Dock Labour Board (CDLB) gang is a statutory requirement.

S.12.4   If an Importer/ Exporter handles between 51 TEU's to 100 TEU's in a single call of a vessel at HDC by way of import and/ or export, a rebate of 5% shall be allowed on charges at S.11.1 (Sl. No.1) and S.12.1.

S.12.5   If an Importer/ Exporter handles above 100 TEU's in a single call of a vessel at HDC by way of import and/ or export, a rebate of 10% shall be allowed on charges at S.11.1(Sl. No.1) and S.12.1.

**S.13.   Shore Handling charges on container**

S.13.1   In case of Foreign containers (both loaded and empty), Shore Handling charges at the following rates shall be levied for providing shore handling services:

| Sl. No. | Services | Rate in Rupees per TEU | | |
|---|---|---|---|---|
| | | Where port provides all labour and equipment services | Where port provides part of the labour/ equipment services | Where port provides no labour and equipment services |
| 1. | Transportation from quay to Container Yard or vice-versa, including lift-on at quay & lift-off at yard. | 198.00 | 49.50 | Nil |

| No. | Service | | | |
|---|---|---|---|---|
| 2. | Transportation from Container Yard to Port Container Freight Station and back to Container Yard including Lift-on at container yard, Lift-off at Port CFS, subsequent Lift-on at Port CFS and Lift-off at container yard, or vice-versa. | 495.00 | 247.50 | Nil |
| 3. | Lifting of container from Container Yard to Railway flat, or vice-versa. | 162.00 | 63.00 | Nil |
| 4. | Lifting of container from Container Yard to truck, or vice-versa | 148.50 | 49.50 | Nil |

S.13.2   Incase of Coastal Containers, Shore handling charges shall be levied at 60% of the rate applicable for foreign containers as specified at S.13.1 for providing shore handling services.

S.13.3   Importer/ Exporter shall be granted on the additional TEUs handled in excess of 1200 TEUs in a financial year at KDS, a rebate of 10% on rates specified under S.11.1(Sl. No.1) and S.13.1.

S.14   **Charges for Miscellaneous Services rendered to container/container vessel**.

S.14.1   For the services not covered under S.11, S.12 & S.13. miscellaneous charges on loaded/ empty container shall be levied at the following rates:-

| Sl. No. | Services | | Rate in Rs. per TEU |
|---|---|---|---|
| 1. | Shifting of containers on board via quay head **Note:** For use of port equipment additional charge as specified at Sl. No. 5 and 8, as the case may be, shall be levied | | 630.00 |
| 2. | Transportation of container by port equipment for operation not included in any charge under Sections 13: - | | |
| | a) | Within same berth | 270.00 |
| | b) | Between two berths | 360.00 |
| 3. | Supply of power to Reefer Container | | 135.00 per 4 hrs or part thereof |
| 4. | Lift on/Lift off/Re-stacking by port equipment not included in the services mentioned at S.13 or any other services under S.14. | | 324.00 |
| 5. | Use of Port equipment (other than Mobile Harbour Crane/ Rail Mounted Quay Crane) for ship/barge to shore discharge or vice-versa. or for any other on board operation. | | 432.00 |

36

| | | |
|---|---|---|
| 6 | Stuffing /De-stuffing | |
| | (i). Where operation inside & outside container is done by port:- | |
| |     (a). Where CDLB gang is required to be booked. | 2700.00 |
| |     (b). Where CDLB gang is not required to be booked and operation inside and outside is done by Port labour. | 270.00 |
| | (ii). Where operation inside container is done by agencies other than by port: - | |
| |     (a). Operations outside container are carried out by port. | 900.00 |
| |     (b). Operations outside the container are done by agencies other than Port | 112.50 |
| | (iii). Where operation inside the container only is done by port (in part or full). | 135.00 |
| 7. | For services provided to Container loaded with Hazardous -I cargo including deployment of fireman in addition to other charges. | 900.00 |
| 8. | Use of Rail Mounted Quay Crane (RMQC)/Mobile Harbour Crane (MHC) for ship/barge to shore discharge or vice-versa or for any other operation. | 750.00 |
| 9. | Use of Mobile Harbour Crane (MHC)/ Rail Mounted Quay Crane (RMQC)/ any other port equipments for opening of Hatch Cover and replacing it. | 2000.00 |

**Note for Sections 11, 12, 13 & 14**

i)     Charges for handling of containers above 20' and upto 40' in length shall be 1.5 times the rates specified at S.11, S.12, S.13, & S.14. Charges for handling of container above 40' shall be 2 times the rates specified at S.11, S.12, S.13, & S.14.

ii)    Where rates include services inclusive of port equipments, the same excludes the service of MHC/RMQC. For use of MHC/RMQC rates specified at S.14, Sl. No. 8 shall be levied, as the case may be.

iii)   The rates specified under S.11.2 shall also be applied to containers carried by Railway from/to destinations other than ICDs (excepting Cossipore), which are landed/ shipped through KOPT.

iv)   If only one operation is carried out, half of the Hatch cover handling charge rates specified at Sl. No.14, Sl. No.9 shall be levied.

S.15.    **Storage charge on container and containerised cargo.**

S.15.1   Storage charge on loaded import container other than those specified at S.15.2, S.15.4 and S.15.8 shall be levied at the following rates: -

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 3 days after the day of landing | Free | Free |
| From the 4th day to 9th day | 2.25 | 100.39 |
| From the 10th day to 15th day | 4.50 | 200.79 |
| From the 16th day to 20th day | 6.75 | 301.18 |

37

| | | |
|---|---|---|
| From the 21st day to 30th day | 13.50 | 602.37 |
| From the 31st day onwards | 27.00 | 1204.74 |

S.15.2    Storage charge on loaded import container, containing relief commodities, shall be levied at the following rates: -

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 3 days after the day of landing | Free | Free |
| From the 4th day to 9th day | 2.25 | 100.39 |
| From the 10th day to 15th day | 4.50 | 200.79 |
| From the 16th day to 20th day | 5.40 | 240.95 |
| From the 21st day to 30th day | 6.75 | 301.18 |
| From the 31st day onwards | 9.00 | 401.58 |

Note: -    Relief commodities for the purpose of S.15.2 shall mean the cargo imported by voluntary /relief organization like Missionaries of Charity, Bharat Sevashram Sangha, Ramkrishna Mission, CARE, CRS, WFP and others, as may be accepted by Kolkata Port Trust from time to time on the basis of certification by the appropriate Govt. Authority of Central Govt./State Govt. or Govt. of Nepal/Bhutan or their local Consulate General.

S.15.3    Storage charge on loaded export/stock container, excepting ICD containers (other than that from Cossipore and container loaded with Hazardous –I cargo) shall be levied at the following rates.

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 10 days from the day of receiving /stuffing | Free | Free |
| From the 11th to 15thday | 2.25 | 100.39 |
| From 16th day onwards | 3.15 | 140.55 |

S.15.4    Storage charge on loaded import ICD container, excepting that for Cossipore and those loaded with Hazardous –I cargo, shall be levied at the following rates.

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 20 days after the day of landing. | Free | Free |
| From the 21st day to 30th day | 2.25 | 100.39 |
| From the 31st day onwards | 4.50 | 200.79 |

S.15.5    Storage charge on loaded export ICD container, excepting that from Cossipore and those loaded with Hazardous –I cargo, shall be levied at the following rates.

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 20 days from the day of receiving | Free | Free |
| From the 21st day to 30th day | 2.25 | 100.39 |
| From the 31st day onwards | 4.50 | 200.79 |

S.15.6     Storage charge on import empty containers shall be levied at the following rates.

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| For the first 3 days after the day of landing | N I L | Free |
| From 4th day to 9th day | 2.25 | 100.39 |
| From 10th day to 15th day | 4.50 | 200.79 |
| From 16th day to 20th day | 6.75 | 301.19 |
| From 21st day to 30th day | 9.00 | 401.58 |
| From the 31st day onwards | 13.50 | 602.37 |

S.15.7     Storage charge on export/stock empty containers shall be levied at the following rates.

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 3 days from the day of receiving. | Free | Free |
| From 4th day to 9th day | 2.25 | 100.39 |
| From 10th day to 15th day | 4.50 | 200.79 |
| From 16th day to 20th day | 6.75 | 301.19 |
| From 21st day to 30th day | 9.00 | 401.58 |
| From the 31st day onwards | 13.50 | 602.37 |

S.15.8     Storage charge on loaded import/ export containers containing Hazardous-I cargo shall be levied 1.25 times the storage charges applicable for normal loaded import/ export containers.

S.15.9     Storage charge on loaded transhipment container (including cargo other than Hazardous – I cargo) shall be levied at the following rates: -

| Period | US $ per TEU per day or part thereof | Coastal rates in Rs. Per TEU per day or part thereof |
|---|---|---|
| First 20 days after the day of landing. | Free | Free |
| From 21st day to 30th day | 2.25 | 100.39 |
| From 31st day onwards | 4.50 | 200.79 |

**NOTE FOR SECTION 15**

1.     For the purpose of calculation of free period Customs notified holidays and the KOPT's non-operational days shall be excluded. Sundays shall not be excluded for the purpose of calculation of free time unless Customs notified holidays and the KOPT's non-operational days fall on Sundays. After demurrage charge begins to accrue no allowance is made for Customs notified holidays or KOPT's non-operational days.

2.     On container above 20' and upto 40' in length, storage charge shall be levied @ 2 times the rates specified at S.15. and on containers above 40' in length, storage charges shall be levied at @ 3 times the rates specified at S.15.

3. The day of landing of import load and empty container /transhipment container (except container loaded with Hazardous-I cargo) shall be the last landing date of the vessel by which the container is imported under a single call to a specific Dock System. For container with Hazardous-I cargo the date of landing for the purpose of Storage charge shall be the actual date of landing.

4. Last Landing Date (LLD) is the date on which the vessel completes her import discharge. However, KOPT may declare any other date as such LLD for container already discharged from the vessel, when the vessel is not doing cargo operation work in the working berth for more than 24 hours for any fault/ reason not attributable to port. In such cases, a vessel may have more than one LLD.

5. Free dwell time (storage) period for import containers shall commence from the day after the day of landing of the containers and for export containers the free period shall commence from the time containers enter the terminal.

6. In case of export load container, which has been stuffed inside the docks, the date of commencement of stuffing with export cargo shall be reckoned as the first day to ascertain rate as per S.15.3.

7. In case, loading of import load container for the purpose of delivery cannot be done by KOPT within 24 hours from the time of entry of the truck/trailer, as indicated in the entry gate pass (EGP) at KDS /issuance of Loading Order at HDC or such other documents as may be decided by KOPT from time to time, 75% rebate on the storage charge shall be allowed for the period during which such containers are not loaded beyond the said 24 hours. The aforesaid rebate shall be allowed provided the container is being loaded from the area where only port equipment is used exclusively. Such rebate shall not apply when importer applies for advance loading prior to submission of complete delivery documents.

8. The Storage charges on abandoned FCL container/Shipper Owned containers shall be levied upto the date of receipt of intimation of abandonment in writing or 75 days from the date of landing of the container whichever is earlier subject to the following conditions:

(a)  i)   The consignee can issue a letter of abandonment at any time; **or**
     ii)  If the consignee chooses not to issue such letter of abandonment, the container Agent/MLO can also issue abandonment letter subject to the conditions that,
          a)     the Line/MLO shall resume the custody of container along with cargo and either take back it or remove it from the port premises; and
          b)     the Line/MLO shall pay all port charges accrued on the cargo and container before resuming custody of the container.

(b)  The container agent/MLO shall observe the necessary formalities and bear the cost of transportation and de-stuffing. In case of their failure to take such action within the stipulated period, the storage charge on container shall be continued to be levied till such time all necessary actions are taken by the shipping lines/MLO for de-stuffing the cargo or removal of the load container from the port premises.

(c)  Where the container is seized/confiscated by Customs Authorities and the same cannot be de-stuffed within the prescribed time limit of 75 days, the storage charges will seize to apply from the day the Customs order release of the cargo, subject to the line's observing the necessary formalities & bearing the cost of transportation and destuffing. Otherwise, seized/confiscated containers should be removed by the Line/Consignee from the port premises to the Customs' bonded area and in that case the storage charge shall cease to apply from the day of such removal.

9.   No free storage period shall be allowed for export load container received at docks but subsequently taken back without being shipped. For such containers the highest rate specified at S.15.3 shall apply from the date of receiving till the date of removal from port premises.

10.   No free storage period shall be allowed for export load container received at docks if subsequently de-stuffed and the cargo is taken back from port premises. For such containers the highest rate specified at S.15.3 shall apply from the date of receiving till the date of de-stuffing and on cargo the rate specified at S.7.6 shall be applied from the date following the date of de-stuffing till the date of delivery.

11.   If during the course of stayal of a Container inside Dock Premises any change in status of the Container from Load to Empty or vice versa is effected, the free period for the said Container shall be calculated for each stage separately.

12.   No storage charge shall accrue for the period during which the KOPT is not in a position to deliver containers for reasons attributable to it when requested by the user.

## P A R T - III
## MISCELLANEOUS CHARGES

S.16.   **Miscellaneous charges**

S.16.1   Charge at the following rates shall be levied for miscellaneous services: -

| Sl. No. | Description | Rate in Rupees. |
|---|---|---|
| 1. | Issue of duplicate short landing certificate /Out -Turn Report or any certificate or amendment. | 40.00 per certificate / report / amendment. |
| 2. | a) Gazette & Advertisement cost of sale. | 100.00 per publication. |
|  | b) Cost of sale of berthing list/movement/ gate notice to the trade. | 2.00 each. Monthly subscription Rs.40/- each. Yearly subscription Rs.450/- each. |
| 3. | Supply of tally staff for tallying loading / unloading of wagon at siding. | 200.00 per axle. |
| 4. | Supply of staff for escorting lorry. | 400/- per shift per head. |
| 5. | Deployment of extra labours (on requisition by port users). | 300.00 per shift per labour |
| 6 | Use of KOPT Road Weigh bridge | 4.00 per ton subject to a minimum of Rs.20.00 for an empty vehicle and Rs 40.00 for a loaded vehicle. |
| 7. | Gate delivery / receiving charge on cargo on which Wharfage charge is not levied. | 22.50 per ton |

41

| | | |
|---|---|---|
| | Note: Gate delivery / receiving charge is leviable when the KOPT provides the service with reference to the cargo handled by it. | |
| 8. | Hire of Locomotive | 2500.00 per hour subject to a minimum of Rs 10000.00 |
| 9. | Stabling charge on non-commissioned wagon or wagon owned by party other than Indian Railway. | 12.00 per axle per day. For haulage of such wagon locomotive hire charge shall be levied as specified under Sl. No. 8. |
| 10. | Infringement, local haulage and wagon demurrage charge. | Rate as decided/sanctioned by the Rly. Board from time to time shall be levied & will be effective from the date of receipt of Railway Notification by KOPT. |
| | Consolidated charge on rail borne cargo on wagons arriving in KDS Rly. System. | |
| | a) | On wagons not carrying containers loaded or un-loaded at berth/shed inside the Dock/Jetty | 12.00 per ton on marked carrying capacity of the wagon. |
| | b) | On wagon not carrying containers loaded or un-loaded at sidings or places outside the Docks. | 35.00 per ton on the marked carrying capacity of the wagon. |

| Sl. No. | Description | | | Rate in Rupees. |
|---|---|---|---|---|
| 12. | Hiring charge for each of the following port Equipment: - | | | |
| | a) | Mobile / wrecking Crane | | 3000.00     Per shift |
| | b) | Forklift | | 1000.00     - do - |
| | c) | Shore Crane | | 1200.00     - do - |
| | d) | Tractor | | 500.00     - do - |
| | e) | Trailer: - | | |
| | | i) | Upto 10 MT SWL | 500.00     Per shift. |
| | | ii) | Above 10 MT SWL | 750.00     - do - |
| | f) | Pay loader | | |
| | | i) | Upto 1 Cu.m capacity | 2500.00     Per shift. |
| | | ii) | Above 1 Cu.m capacity | 5000.00     - do - |
| | g) | Hand Truck | | 25.00     - do -. |
| | h) | Air Compressor | | 1250.00     - do -. |
| | i) | Bull Dozer 10 MT and above | | 7000.00     - do - |
| | j) | Bull Dozer less than 10 MT | | 3500.00     - do - |
| | k) | Cantilever Crane | | 20000.00     - do - |
| | l) | Floating Crane (above 30 tonne capacity) | | 30000.00 per equipment per shift |
| | m) | Toplift Truck/Reach Stacker | | 13000.00     - do - |
| | n) | Spreader (20 Ft.) | | 1500.00     - do - |
| | o) | Use of fire fighting apparatus and equipment excluding use of fire floats. | | 2000.00 Per hour plus consumables at cost. |

S.16.2    For haulage of wagon to any Railway weighbridge for weighment/re-weighment, locomotive hire charge, as specified under Sl.No.8 of S.16.1, shall be levied. This is in addition to re-weighment charge as fixed by the Railway Board from time to time.

S.16.3    In case a wagon after arriving at Kolkata dock Railway system is re-booked without unloading, Consolidated charge, as specified under Sl No. 11 of S.16.1, shall levied only once.

S.16.4    On wagon carrying export cargo unloaded at places other than berth/shed inside the Dock/Jetty and if shipped subsequently through KDS, Consolidated charge at the rate specified under Sl.No.11. (a) of S.16.1 shall be levied, provided the exporter/his agent submit documents in support of such shipment which is acceptable to KOPT.

S.16.5    For vessel engaged in Coastal trade between Andaman and KOPT, a rebate of 50% shall be allowed on the Shore crane hire charge specified at S.16.1, Sl. 12(c).

S.16.6    Where Surveyor/Valuer is appointed by KOPT for valuation of any cargo for the purpose of sale, the cost of such valuation shall be recovered from the Importer or his Clearing Agent if the cargo is taken delivery by them prior to sale.

S.16.7    **Permit Licences:-**

Charges shall be levied at the following rates for issue/renewal of permits/ licences for entering into or operating at Docks, Jetties, Wharves and Ghats Where applicable.

| Sl.No. | Description | Rate in Rs. |
|--------|-------------|-------------|
| 1. | Dock Permit per person | 5/- per daily permit (maximum 12 hrs. validity). 135/- per monthly permit 375/- per quarterly permit |
| 2. | Dock Permit for Watchman on board the vessel. | 400/- Per biennial permit |
| 3. | Dock Permit per vehicle/ trailer and circular permit for vehicle carrying ship's gear and stores (inclusive of | 25/- per daily permit 2,000/- per annual permit |
| 4. | Dock Permit for mobile crane/ Reach Stacker/ Toplifter for handling container (inclusive of overnight stayal). | 100/- per daily permit 9,000/- per annual permit |
| 5. | Dock Permit for Fork-lift/ Container carrying trailer or any other handling equipment (inclusive of | 60/- per daily permit 5,400/- per annual permit |
| 6. | Dock Permit for cart (inclusive of overnight stayal). | 10/- per daily permit 1,100/- per annual permit |
| 7. | Permit for Hawkers/Vendors. | 750/- per annual permit |

43

JA0625

| 8. | Ship personnel permit book (consisting of 50 permits). | 500/- per book |
|---|---|---|
| 9. | Clearing & Forwarding/ Handling Agents Licence. | 200/- per licence for 1 month<br>2,160/- per licence for 1 year<br>5,400/- per licence for 3 years |
| 10. | Jetty Sircar's/Cooper Licence (inclusive of Dock entry). | 120/- per licence for 1 month.<br>1,080/- per licence for 1 year.<br>2,600/- per licence for 3 years. |
| 11. | Ship Repairing/Ship Chandling/Ship Survey/ General on Board services /GOS)/Ship Breaking Licence. | 2,200/- per licence per year. |
| 12. | Stevedoring Licence | 10,000/- per licence for 2 years. |
| 13. | Licence for occupation of Panda seats at CDS. | 30/- per monthly licence. |
| 14. | Licence for occupation of 1 Sq.mtr. of space or for temporary construction at any place in the Inland Vessel Wharves at CDS. | 6/- per day.<br>270/- per quarter. |
| 15. | Licence for occupation of 1 Sq.mtrs. of space or for temporary construction at any place in the Inland Vessel Wharves at HDC. | 5/- per day.<br>150/- per quarter. |
| 16. | Permit for using Truck Terminal at HDC Per truck/ lorry/trailer. | 15/- per daily permit.<br>300/- per monthly permit. |

16.8.    In case of damage/ loss, charge for issue of duplicate/ triplicate permit/ licence shall be levied at 50% of the rate applicable for the original.  For permit issued free of cost such charge shall be 25% of the rate provided for similar permit at section-16.7

16.9.    For any amendment in the permit/licence, amendment charge as mentioned at section-16.1 Sl.No.1 shall be levied.

16.10.    In case of licenses issued under Sl. No.11  &  12 of section- 16.7 the application for renewal shall be submitted at least one month before the date of expiry of the licence.    Application received after the period specified above, shall be liable to an additional fee of 25% of the original.

## P A R T - IV
## C H A R G E S   R E L A T E D   T O   S H I P – B R E A K I N G

S.17    **Ship breaking charges**

S.17.1    For Ship breaking activities in KOPT, Ship breaking charge @ Rs. 120/- per LDT shall be levied.

**Notes:**

1.    LDT for the purpose of levy of charges under any clause of this Part of the Scale of Rates shall means the LDT of the vessel declared at the time of obtaining ship-breaking permission from KOPT.

44

2.   The rates includes charges for occupation of ship breaking berth along with adjacent land area (including beaching area) of 3250 Sq.m. for the specified period as mentioned below: -

| i) | For Vessel upto 2000 LDT | 35 days |
|------|--------------------------------|---------|
| ii) | For Vessel of 2001 LDT to 3000 LDT | 40 days |
| iii) | For Vessel of 3001 LDT to 5000 LDT | 50 days |
| iv) | For Vessel of 5001 LDT to 8000 LDT | 60 days |
| v) | For Vessel of 8001 LDT and above | 70 days |

3.   The number of days mentioned at Note-2 shall commence from the day following the day on which KOPT grant specific permission for ship breaking of the vessel for which application has been made or the day on which the vessel is placed at the nominated ship breaking berth, whichever is later.

S.17.2   If any ship-breaking berth is under the occupation of a ship breaker and he brings in any ship before completion of ship breaking of the earlier vessel, then that ship breaker shall have the priority over the others in respect of allocation of that particular berth for the vessel he so brings in. The number days in such cases shall be calculated in the same manner as has been stated in the S.18.1, Note-3

S.17.3   The charges for additional land area, other than the quantum of area specified at S.17.1, Note-2 shall be levied extra as per relevant land schedule.

S.17.4   In cases, no additional land area at Off 29 KPD berth is available, the period specified at S.17.1, Note-2 shall be increased by 10 days.

S.17.5   Separate charges shall be levied for supply of port equipment, supply of electricity by port, deployment of port fire service and port fire personnel.

S.17.6   If breaking of a vessel is extended beyond the period specified at S.17.1 or S.17.4, as the case may be, charges at the following rates shall be levied extra for the period of extension.

|  |  | Rate in Rs. per LDT per day. |
|------|--------------------------------|------------------------------|
| i) | For vessel upto 2000 LDT | 11.00 |
| ii) | For vessel of 2001 LDT to 3000 LDT | 10.00 |
| iii) | For vessel of 3001 LDT to 5000 LDT | 8.00 |
| iv) | For vessel of 5001 LDT to 8000 LDT | 7.00 |
| v) | For vessel of 8001 LDT and above | 6.00 |

S.17.7   For completion of ship-breaking before the period specified in S.17.1 and Section-17.4 above, a rebate @ 0.5% of the rate specified at S.17.1 above shall be allowed for each day of saving subject to maximum of 10% of the rates.

S.17.8   Vessel arriving at Kolkata Port for the purpose of dismantling only is exempted from payment of any Port Dues and Towage & Pilotage charge.

45

S.17.9.   For the period vessel is awaiting breaking, the Berth Hire and Mooring Hire, as the case may be, shall be shall be levied at the following rates:-

| i) | For the first 5 days- | 15% of the rates specified at S.20.1 or S.21.1 |
|---|---|---|
| ii) | For the next 10 days- | 10% of the rates specified at S.20.1 or S.21.1 |
| iii) | Thereafter- | 5% of the rates specified at S.20.1 or S.21.1 |

**Note:**  Vessel awaiting breaking shall mean and include the period a vessel is awaiting breaking after discharge of cargo/dis-embarkation of passenger and in case of a vessel which arrives in ballast for breaking, the period of waiting in the river mooring, dock mooring or in any berth including ship breaking berth till the day on which KOPT grant specific permission for ship breaking of the vessel or the day on which the vessel is placed at the nominated ship breaking berth, whichever is later.

S.17.10.  The Ship Breaking charges calculated on the LDT declared at the time of obtaining permission shall be paid in advance before commencement of the ship breaking. Additional charges, if any shall be paid immediately on raising of the bills.

S.17.11.  Taxes, Duties, etc. as may be levied by the State or Central Govt. or any legal/Statutory Authority from time to time, shall be have to be paid extra.

S.17.12.  Ship Breakers shall be granted a rebate at the following rates on the rate specified at S.17.1 for undertaking ship breaking at KOPT-

| Upto 10000 LDT per annum | Nil |
|---|---|
| 10001 to 25000 LDT per annum | 5% |
| 25001 to 40000 LDT per annum | 10% |
| Above 40000 LDT per annum | 15% |

<br>

**PART-V**

**CHARGES FOR DRY DOCKS**

S.18.     **Dry Dock Charges.**

S.18.1.   Charges for Docking & Undocking.

| | 1 & 2 N. S. Dry Dock | | 1 & 2 K.P. Dry Dock | | 3 K. P. Dry Dock | |
|---|---|---|---|---|---|---|
| | **Foreign going vessel** | **Coastal vessel** | **Foreign going vessel** | **Coastal vessel** | **Foreign going vessel** | **Coastal vessel** |
| | **US Dollar** | **Rupees** | **US Dollar** | **Rupees** | **US Dollar** | **Rupees** |
| Upto 1000 GRT | 3000 | 80316 | 3000 | 80316 | 3000 | 80316 |
| Above 1000 GRT | 3000+ 700 for every additional 1000 GRT or part thereof subject to maximum of | 80316+ 15000 for every additional 1000 GRT or part thereof subject to maximum of 257600 only | 3000+ 700 for every additional 1000 GRT or part thereof subject to maximum of | 80316+ 15,000 for every additional 1000 GRT or part thereof subject to maximum of | 3000+ 700 for every additional 1000 GRT or part thereof subject to maximum of | 80316 + 15000 for every additional 1000 GRT or part thereof subject to maximum of |

46

| | 8000 only | | | 7000 only | 225400 only | 5000 only | 161000 only | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

S.18.2    **Dry Dock Hire charges**.

   i)    During first 10 days of occupancy of vessel (per day or part thereof): -

| Size of vessel | 1 & 2 N. S. Dry Dock | | 1 & 2 K.P. Dry Dock | | 3 K. P. Dry Dock | |
|---|---|---|---|---|---|---|
| | Foreign going vessel | Coastal vessel | Foreign going vessel | Coastal vessel | Foreign going vessel | Coastal vessel |
| | US Dollar | Rupees | US Dollar | Rupees | US Dollar | Rupees |
| Upto 1000 GRT | 1000 | 22000 | 900 | 21000 | 900 | 20000 |
| 1001 to 2000 GRT | 1100 | 24000 | 1000 | 23000 | 900 | 21500 |
| 2001 to 3000 GRT | 1200 | 26000 | 1100 | 25000 | 900 | 22000 |
| 3001 to 4000 GRT | 1300 | 30000 | 1200 | 28000 | 900 | 22500 |
| 4001 to 5000 GRT | 1400 | 34000 | 1300 | 31000 | 900 | 23000 |
| 5001 to 10000 GRT | 1600 | 38000 | 1400 | 35000 | 900 | 24000 |
| 10001 & above | 1800 | 42000 | 1500 | 39000 | 900 | 25000 |

   (ii)    From 11th to 30th day of occupation: 125% of rates as stated in S.18.2 (i) for per day or part thereof.

   (iii)    Beyond 30th days of occupation: 150% of rates as stated in S.18.2 (i) for per day or part thereof.

   S.18.3.    In case of vessel requiring laying of special keel Block due to their configuration, extra rental charges at the following rates would be charged: -

| (a) | 2 days hire charge as specified at S.18.2( i ) | For any change from standard layout. |
|---|---|---|
| (b) | 5 days hire charge as specified at S.18.2( i ) | For meeting specific requirement of Ship Owner/Agent/Charterer/Repairer booking the dry dock. |

   S.18.4.    Charges for each operation of re-docking or part of such activity is to be paid as per Docking & Undocking rates prescribed in S.18.1.

47

S.18.5    Charges for removal or repositioning of each block:

| For Foreign going Vessel | 75 US Dollar |
|---|---|
| For Coastal Vessel | Rs.2000.00 |

S.18.6    The period of vessel's occupation of a dry dock counts from the time the Caisson is placed in position after she enters the dry dock, upto the time she vacates the dry dock.

S.18.7    In case a vessel is detained in No.2 N.S.Dry Dock owing to No.1 N.S.Dry Dock being occupied by another vessel, appropriate mooring hire charges as per S.21.1, Sl.No.1 shall be levied instead of usual dry dock hire charges for the period the vessel is so detained.

S.18.8    When more than one vessel are using the same dry dock as a common operation facility a rebate of 25% of the rate specified under S.18.2 above shall be allowed for each vessel. This rebate shall also be applicable when a dry dock is shared with a KOPT vessel.

S.18.9    Services of dry dock crane may be made available for repair and other work at the following rates: -

|  | Crane capacity | Foreign going vessel Rate per 8 hours shift | Other than Foreign going vessel Rate per 8 hours shift |
|---|---|---|---|
| 1. | 25 Tonne | 150 US Dollar | Rs.3000.00 |
| 2. | 7 Tonne | 60 US Dollar | Rs.1606.00 |
| 3. | Upto 6 Tonne | 30 US Dollar | Rs.803.00 |

Note: -    Crane facility is strictly as per availability and shall have no bearing on dry dock occupancy or hire charges.

S.18.10    Vessel shall pay for the electricity supplied to it by the KOPT at actual.

**S.19.    Concession in Vessel related charges under Part VI of Scale of Rates**

S.19.1    Vessel arriving only for Dry Docking shall pay Port Dues, Towage & Pilotage and Berth Hire/ Mooring Hire at 25 % of the applicable rates as specified at Part VI of the Scale of Rates.
However, for such vessel upto 1000 GRT, no Berth Hire/ Mooring Hire shall be levied for the first 20 days from the date of arrival at the berth, dock buoys, river mooring and river anchorages. Similarly no Pilotage shall be levied if the vessel upto 1000 GRT enters or leaves the port without requiring the services of river pilots in terms of the exemption granted under the provision of Section 31 of the Indian Ports Act,1908.

S.19.2    Vessel availing of Dry Dock facilities after cargo discharge/passenger disembarkation shall pay Berth Hire/ Mooring Hire at 25% of the applicable rates as specified at Part VI of the Scale of Rates from the shift following the shift when the vessel is ready for Dry Docking.

S.19.3    Shifting charge, if applicable for shifting of vessel shall be levied at 25% of the applicable rates as specified at Part VI of the Scale of Rates

**P A R T - VI**

**VESSEL RELATED CHARGES FOR VESSEL ENGAGED IN FOREIGN TRADE & VESSEL ENGAGED IN COASTAL TRADE**

S.20          **Berth Hire**

S.20.1        Berth hire on vessel at Dock berth/River side jetty shall be levied at the following rates: -

| Sl.No. | Description of vessel | Rate per hour per GRT |
|--------|----------------------|----------------------|
| 1. | Vessel engaged in Foreign trade and except as specified at Sl. No. 4 (in US Currency) | 0.25 Cents subject to a minimum of $ 6 per hour |
| 2. | Vessel engaged in Coastal trade other than those plying between Andaman and KOPT and except as specified at Sl. No. 4 (in Indian Currency) | Re. 0.038 subject to a minimum of Rs.90/- per hour |
| 3.. | Vessel engaged in Coastal trade between Andaman and KOPT (in Indian Currency) | Re. 0.027subject to a minimum of Rs.27/- per hour |
| 4. | In case of Exhibition Vessel 50% of the rates specified at Sl. No. 1 & 2 above, as the case may be, shall be levied | |

**Note:**

i)    If any vessel does not work against its booking for work on Holiday due to reasons not attributable to port, the Berth Hire for the shifts in which it does not work against such booking shall be levied at twice the rates specified at S.20.1.

ii)   Whenever, a vessel is double/triple banked with another Sea-going vessel occupying a berth, the vessel so double / triple banked will be charged at the rate of 50% of the Berth Hire charges specified above provided the vessel is in non-working condition.

iii)  For fishing trawler occupying barge jetty/anchorage jetty at HDC or any other riverside jetty or landing stage or moorings Rs.12.50 per hour shall be levied.

iv)   In case a vessel idles due to non-availability or breakdown of the port equipment or power failure at KOPT or any other reasons attributable to the KOPT, rebate equivalent to berth hire charges accrued during the period of idling of vessel shall be allowed.

S.20.2        **Priority / Ousting priority charges**.

Charges for according 'Priority/Ousting Priority' berthing for vessels shall be levied at the following rates in addition to berth hire charges as per S.20.1 of the Scale of Rates.

**Priority Berthing:**    A charge equivalent to 75% of berth hire charges calculated for the total period of actual stayal at the berth subject to a minimum of one day's berth hire charge.

**Ousting priority berthing:**    A charge equivalent to 100% of berth hire charges calculated for the total period of actual stayal at the berth and shifting charges at the rates under S.23.9 for 'Shifting In' and 'Shifting Out' of the vessels ousted.

**Note:**  The above charges shall not be leviable for the following categories: -

i)    Vessels carrying defence cargo, hired directly by Defence Authority (Defence Authority certifies to that extent).

ii)   Defence vessels coming on goodwill visits.

iii)  Vessels hired for the purpose of Antarctica expedition by Department of Ocean Development.

iv)   Any other vessel for which the Ministry of Shipping has granted special exemption.

v)    The fee for according 'Priority/Ousting Priority' is not leviable on the vessels, which carry a specified cargo and are berthed at the berth reserved for handing that type of cargo as per general policy. However, whenever 'Priority'/'Ousting Priority' is accorded to any vessel within the category of specified cargo or otherwise, the port shall collect the fee for according 'Priority'/'Ousting Priority' as the case may be.

The fee for according 'Priority/Ousting Priority' is leviable if an exclusive facility has been given on any berth to particular user. The fee shall also be leviable if any other vessel is berthed by according 'Priority/Ousting Priority' at a berth where exclusive facility has been given to a particular user.

vi)   The fee for according 'priority'/'ousting priority' is not leviable on the vessels where though the necessary directions have been issued for according 'Priority/Ousting Priority', but on arrival such vessels are berthed in normal course on their turn.

vii)  The fee for according 'Priority'/'Ousting Priority' is not leviable on the vessels which are berthed at the berth leased on long term basis with the approval of the Government and are on account of lessee. However, the fee shall be leviable if any vessel on account of any other user is berthed at the leased berth by according 'Priority/Ousting Priority'.

## S.21    MOORING /ANCHORAGE

S.22.1  When vessel is moored/anchored at dock buoy/ river mooring or any other mooring/anchorage in KDS/HDC charges at the following rates shall be levied: -

| Sl.No. | Description of vessel and place of occupancy. | Rate per GRT per hr. or part thereof for vessel engaged in foreign trade (in U.S currency) | Rate per GRT per hr. or part thereof for vessel engaged in coastal trade (in Rupees) |
|---|---|---|---|
| 1. | Vessel moored at any dock buoy. | 0.12 cents | Re.0.02 |
| 2. | Vessel moored at any river mooring/any other mooring | 0.06 cents | Re.0.01 |
| 3. | Vessel anchored at any river anchorage or any other anchorage. | 0.035 cents | Re.0.005 |

## S.22.    Miscellaneous.

S.22.1  Charges shall be levied at the following rates for miscellaneous services to vessels.

| Sl.No | S E R V I C E | Vessel engaged in foreign Trade (in US Dollars). | Vessel engaged in Coastal Trade (in Rupees). |
|---|---|---|---|
| 1. | Hire of launch for special job on requisition. | 100 per hour. | 2600.00 per hour. |
| 2. | Hire of Fire Float | 1000 per day | 26000.00 per day. |
| 3. | Hire of Skin Diver/Gas Mask Diver | 10 per hour | 260.00 per hour. |
| 4. | Hire of Dress Diver | 200 per hour | 5200.00 per hour. |
| 5. | Additional labour deployed for diving related work. | 3 per man hour | 75.00 per man hour |

| 6. | Supply of fresh water: - | | |
|---|---|---|---|
| | a) Through pipeline | 5.60 per 1000 litres. | 150 per 1000 litres. |
| | b) Through water barge | 7 per 1000 litres. | 187.00 per 1000 litres. |
| 7. | Supply of electricity | 0.25 per unit plus installation charge of 30 | 5.00 per unit plus installation charge of 500.00 |
| 8. | Additional charges on vessel carrying passengers. | - | 5000.00 per complete voyage or 2500.00 for each leg. |

S.22.2    Charges for cancellation of any requisition under S.22.1 (1 to 5) shall be levied at the rate of 10% of the charge applicable for the particular service.

S.22.3    Charges for treatment of ballast-water from P.O.L. tanker / other vessels handled at KOPT shall be levied at the following rates:

| Capacity of the Vessel in GRT | Vessel engaged in Foreign Trade (in US Dollar) | Vessel engaged in Coastal Trade (in Rupees) |
|---|---|---|
| Vessel upto 5000 GRT | 480.00 per vessel | 12500.00 per vessel. |
| Vessel above 5000 GRT upto 20000 GRT. | 900.00 per vessel. | 23500.00 per vessel. |
| Vessel above 20000 GRT | 4500.00 per vessel | 117500.00 per vessel. |

S.22.4    Charges for cancellation of any requisition under S.22.3 shall be levied at the rate of 20% of the charge applicable for the particular service.

S.23.    **Towage & Pilotage of Vessels**.

S.23.1    Charges for piloting a vessel from Sand heads to any point in Kolkata Dock System or Haldia Dock Complex either directly or via any other point during inward journey and back to Sandheads either direct or via any other point during outward journey shall be levied at the following rates: -

| Sl. No | Vessel size | Rate per GRT | |
|---|---|---|---|
| | | Vessel engaged in Foreign Trade (in US Dollar) | Vessel engaged in Coastal Trade (in Rupees) |
| 1. | For GRT upto 30000 | | |
| | b) Coastal vessel plying between Andaman and KOPT only | - | Rs.11.33 per GRT subject to a minimum of Rs.11440/- |
| | b) Other vessels | 64.35 cents subject to a minimum of 1400 dollars | Rs.11.88 per GRT subject to a minimum of Rs.26000/- |

| 2. | For GRT above 30000 and upto GRT 60000 | | | |
|---|---|---|---|---|
| | a) | Coastal vessel plying between Andaman and KOPT only | - | Rs.3, 39,768/- + Rs.9.06 per GRT on 30001 to 60000 GRT |
| | b) | Other vessels | 19305 dollars + 51.48 cents per GRT on 30001 to 60000 GRT | Rs.3, 56,400/- + Rs.9.504 per GRT on 30001 to 60000 GRT |
| 3. | For GRT above 60000 GRT | | | |
| | a) | Coastal vessel plying between Andaman and KOPT only | - | Rs.6,11,523/- + per Rs.7.92 per GRT on GRT above 60000 |
| | b) | Other vessels | 34749 dollars + 45.045 cents per GRT on GRT above 60000 | Rs.6,41,520 + Rs.8.316 per GRT on GRT above 60000 |

S.23.2   Vessel availing of pilotage from Sandheads to Virtual Jetty or Saugor/Haldia/Diamond Harbour Anchorage or Haldia Anchorage or any other river anchorage below Diamond Harbour and back only but not requiring pilotage to any other point in Kolkata Dock System or Haldia Dock Complex shall be allowed a rebate of 25% in rate specified in S.23.1 above.

S.23.3   Vessel availing of pilotage from Sandheads to Haldia Anchorage and back only but not requiring pilotage to any other point in Kolkata Dock System or Haldia Dock Complex shall be allowed a rebate of 20% in pilotage rate specified in Section 23.1.

S.23.4   50% of the rates at S.23.1 shall apply to inward or outward journey.

S.23.5   Vessels which enters or leaves the port without requiring the services of River pilots in terms of dispensation granted by Director, Marine Dept. under the provision of Section 31 of the Indian Ports Act, 1908 shall be allowed a rebate of 30% of the above rates, including the minimum charge, for the inward or outward journey, as the case may be.

S.23.6   In case of LASH vessels the above rates are inclusive of charge for berthing and fleeting of barges.

S.23.7   For piloting a fishing trawler/ foreign barge/coastal barge including their towing tug/launch, if any, charges shall be levied @ 50% of the rates specified under S. 23.1 or S.23.4, as the case may be.

S.23.8   When a vessel calls both at Kolkata Dock System and Haldia Dock Complex in the same voyage, charge for inward journey shall be levied by the dock system where the vessel calls first and charge for outward journey shall be levied by the other dock system.

S.23.9   For movement of vessels between HDC and Budge Budge/ Saugor/ Diamond Harbour / Roychowk or any point of KDS, which is not forming a part of inward or outward journey as stated in S.23.1, pilotage at the rate of 40% of the rates specified under S. 23.1 shall be levied for each movement by the dock system from where journey commences.

S.23.10   **Shifting Charge**
For shifting of vessel, other than for port convenience, charges shall be levied at the following rates: -

| Sl. No. | Nature of Shifting | Rate per GRT for each shifting | |
|---------|--------------------|----------------------------------------------|--------------------------------------------|
|         |                    | Vessel engaged in Foreign Trade (in US Dollars) | Vessel engaged in Coastal Trade (in Rupees) |
| a)      | Within KDS or within HDC only | 10 cents subject to a minimum of 100 US dollar | 2.50 subject to a minimum of Rs. 2500.00 |
| b)      | Between KDS and HDC | 12 cents subject to a minimum of 120 US dollar | 3.00 subject to a minimum of Rs. 3000.00 |

**Note:**

i)     In case of shifting of vessel from KDS to HDC or vice-versa or within KDS or HDC, charges shall be levied as specified above and each dock system shall levy 50% of the charge.

ii)     No charges shall be levied for shifting of vessel due to port convenience

**Port Convenience for the above purpose shall mean the following-**

(i)     Shifting(s) of a double-banked ship to facilitate sailing and/or shifting of the ship alongside the berth.

(ii)     Shifting(s) of ship from one working berth to another location to accommodate ship having ousting priority as the shifting charges are borne by the other ship. The same would also be considered for 'Port Convenience' if the incoming ship is exempted from paying priority charge unless the ship in question was not idling at berth without doing any cargo handling operation.

(iii)     Shifting of ship from one working berth to other location to accommodate ship having MOU priority, unless the shifted ship also qualifies for priority under the same MOU under which the other ship was accorded priority.

(iv)     Shifting of a ship coming with MOU priority and allotted a different berth other than the berth covered by MOU, due to occupation of the MOU berth by other vessel (excepting vessel getting priority under the same MOU), from the allotted berth to the MOU berth.

(v)     Shifting of ship from one working berth to other location to accommodate ship having cargo priority. Cargo Priority means priority for berthing vessels carrying the specified cargo to be handled at the specific berth.

(vi)     Shifting(s) of a ship to accommodate another vessel having priority at the adjacent berth and unless the vessel shifts, another vessel cannot be berthed at the adjacent berth due to length or other similar technical restriction.

(vii)     Shifting(s) of a ship from one berth/location to another for undertaking dredging, repair & maintenance of berth or any other similar works of the port.

(viii)     Shifting(s) of ship from one berth/location to another for rearranging working ships' position to accommodate other ship in between.

(ix)     Shifting(s) of ship that cannot work due to inclement weather condition for placement of another workable ship in her place at Port's option.

(x)     Shifting(s) of a ship from berth to waiting location after completion of cargo work if the sailing cannot be done due to non-availability of suitable tide or due to Port's inability to provide Pilot, provided that the agent as per stipulation does the booking of Pilot.

(xi)     Shifting(s) of a waiting ship (including ships called on neaping priority, but excluding vessels on distress as per request of the agent) to a working berth.

S.23.11  If the booking of a pilot is cancelled by the Agent / Ship owner / Charterer less than 24 hours before the appointed time of hauling out from berth/buoy/river mooring/anchorage, a charge of 210 US dollars or Rs.5480/- per cancellation shall be levied on vessels engaged in Foreign Trade or Coastal Trade respectively. No cancellation charge for pilot booking shall be levied if sailing is cancelled due to non-availability of pilots/ tugs or for lock gate being out of commission or for any reasons attributable to Port.

S.23.12  For piloting a vessel undergoing trials, a charge of Rs.10000/- shall be levied for trials above and upto Garden Reach and Rs.25000/- per trial below Garden Reach.

S.23.13  For mother vessel doing lighterage operation at Sand heads an all-inclusive charge (including anchorage charge but except Port Dues as per Section 25) of 5 Cents per GRT in case of Foreign going vessel or Rs.1.34 per GRT in case of coastal vessel shall be levied. For daughter vessel proceeding to other port with cargo discharged at Sandhead from mother vessel, the aforesaid rate shall also apply.

S.23.14  The rates under S.23.1, S.23.4, S.23.9 & S.23.11 are inclusive of services of tugs/launches and mooring/unmooring of vessels and turning if necessary except when services of additional tugs or launches is provided against specific requisition of the Shipowner/Agent/Charterer.

S.23.15  For use of the Kolkata Port Trust tugs/despatch vessel/survey vessel/anti pollution vessel etc., on requisition by the Shipowner/Agent/ Charterer, charges shall be levied at the following rates: -

| Sl. No. | Description | Vessel engaged in Foreign Trade rate (in US dollars) | Vessel engaged in Coastal Trade (in Rupees) |
|---------|-------------|-----------------------------------------------------|--------------------------------------------|
| ( i )   | Vessel not exceeding 1,000 IHP. | 200 dollars per hour subject to a minimum of 600 dollars per operation. | 5200.00 per hour subject to a minimum of 15600.00 per operation. |
| ( ii )  | Vessel exceeding 1,000 IHP. | 250 dollars per hour subject to a minimum of 750 dollars per operation. | 6500.00 per hour subject to a minimum of 19500.00 per operation. |

**Note:**  The period shall be counted from the time the vessel leaves for the operation till it comes back or deployed for another work, whichever is earlier.

S.23.16  An additional charge of 25% shall be levied when Kolkata Port Trust tug/vessel is deployed for salvage operation.

S.23.17  Ship owners/Agent of vessels shall be required to pay the actual Insurance premium plus 20% whenever Kolkata Port Trust tug/vessel is deployed on requisition for towage assistance/salvage operation .In such cases claims for damages shall not be made against the hirer in case of accident.

S.24.  **Port Dues.**

S.24.1  Port dues shall be levied on Sea going vessels entering the Port of Kolkata at the following rates:

| Sl No | Description of vessel | Rate per GRT | Frequency of payment in respect of the same vessel. |
|-------|----------------------|--------------|----------------------------------------------------|

54

| i) | Vessel engaged in Foreign trade (in US Currency) | 30 Cents | This due is payable on each entry into the port. |
|---|---|---|---|
| ii) | Vessels engaged in Coastal trade other than those plying between Andaman and KOPT. (in Indian Currency) | Rs. 8.03 | This due is payable on each entry into the port. |
| iii) | Vessel engaged in Coastal trade between Andaman and KOPT (in Indian Currency) | Rs. 4.64 | This due is payable on each entry into the port. |
| iv) | Vessel entering in ballast and not carrying Passengers. | 75% of the respective rates specified at Sl. No. (i), (ii) & (iii) above. | This due is payable on each entry into the Port. |
| v) | Vessel entering for but not discharging or taking any cargo or Passenger therein (with the exception of such unshipment and/or re-shipment as may be necessary for purposes of repair) | 50% of the respective rates specified at Sl. No. (i), (ii) & (iii) above. | This due is payable on each entry into the Port. |
| vi) | Vessels attending at Sandheads for lighterage operation. | 25% of the respective rates specified at Sl. No. (i), (ii) & (iii) above. | This due is payable on each entry into the port. |

**Note:** -

i)   For 'Oil tankers' with segregated ballast, the reduced gross tonnage that is indicated in the "Remarks" column of its international Tonnage Certificate will be taken to be its gross tonnage for the purpose of levy of Port dues.

ii)   LASH Vessel making a "Second Call" to pick up empty LASH barges shall not be charged any Port dues.

iii)   In case of vessel visiting both KDS and HDC 50% of the applicable port dues shall be payable both at KDS and HDC.

## P A R T - VII

### VESSEL RELATED CHARGES FOR INLAND VESSEL AND NON- PROPELLED VESSEL

S.25    The rates under this chapter shall apply to –

    i)    All Inland Vessel and Non- propelled vessel (excluding vessel classified as foreign/coastal).

    ii)    All barges/boats/flats/ motor launches working at Virtual Jetty/Saugor (excluding vessel classified as foreign/coastal)..

S 26    **Stayal Charge on vessels**

S 26.1    Stayal charge shall be levied on vessels at the following rates for occupying berth/ jetty/dock buoy/or any other point at Kidderpore Dock-I, Kidderpore Dock-II, Netaji Subhas Dock, Budge Budge Oil jetty, Haldia Oil Jetty, Haldia Docks-

| Sl. No. | Period | | Rate in Rupees |
|---|---|---|---|
| 1 | **On vessel of less than 200 tonnes** | | |
| | i) | Upto 10 days from the date of entry | 25.00 per vessel per day or part thereof. |
| | ii) | 11th to 20th day | 50.00 per vessel per day or part thereof. |
| | iii) | 21st day onwards | 150.00 per vessel per day or part thereof. |
| 2 | **On vessel of 200 tonnes and above** | | 0.60 per tonne per day or part thereof |

S.26.2    Stayal charge shall be levied at the following rates on vessels for occupying declared riverside IVW of KOPT-

| Sl. No. | Description | | Rate in Rupees. |
|---|---|---|---|
| 1. | On Non-propelled vessel | | |
| | i) | Upto 4 tonne capacity | 15.00 per vessel per day or part thereof. |
| | ii) | Above 4 tonne capacity | 40.00 per vessel per day or part thereof. |
| 2. | On propelled vessel | | 70.00 per vessel per day or part thereof |

S.26.3    Stayal charge shall be levied on vessels other than Tourist/Ferry launch @ Rs. 25/- per day for occupying any other riverside jetty/river mooring/riverside landing stage belonging to KOPT.

S.26.4    Tourist/Ferry launch using riverside jetty belonging to KOPT shall be charged Rs.150/- per visit per day.

S.27    **Dock Toll**

S 27.1    Dock Toll charge shall be levied at the following rates on the vessels for entry inside the impounded docks.

| Sl. No | Capacity | Rates in Rupees |
|---|---|---|
| 1. | Upto 15 tonnes | 200.00 per vessel per entry |
| 2. | Above 15 tonnes | 9.00 per tonne, subject to a minimum of 200.00 per vessel and maximum of Rs. 4000.00. |

S.28.    **Miscellaneous Charges on Non-propelled Vessel**

S.28.1    Registration fees shall be levied @ Rs.85/- per tonne, subject to a minimum of Rs.500/- and maximum of Rs. 10,000/- per craft.

S.28.2    Annual licence fee shall be levied @ Rs.15/- per tonne, subject to a minimum of Rs.300/- and maximum of Rs. 10,000/- per craft.

S.28.3    Charges for extension of annual license shall be levied @ 25% of the annual licence fees per month.

S.28.4    Other charges on non-propelled vessel shall be levied at the following rates: -

| Sl. No. | Services | | | Rate in Rupees. |
|---|---|---|---|---|
| 1. | Majhi licence/licence plate for passenger craft/duplicate licence. | | | 100.00 per issue |
| 2. | Endorsement of change of ownership on certificate of Registry & Licence. | | | 500.00 per issue |
| 3. | Issue of duplicate certificate of Registry | | | 300.00 per issue |
| 4. | Fees for Surveying at owner's workshop: - | | | |
| | a) | Within port limit | | Rs. 15/- per tonne subject to a minimum of Rs. 500/- & maximum of Rs. 1000/- per visit |
| | b) | Outside port limit | | Rs. 30/- per tonne subject to a minimum of Rs.2000/- and maximum of Rs.5000/- per visit |
| 5. | Fees for Special inspection and issuance of certificate | | | |
| | i) | Inspection if carried out within Port limit | | |
| | | a) | For plying upto Haldia | 1000.00 |
| | | b) | For carrying explosives | 1000.00 |
| | ii) | Inspection if carried out outside Port limit | | |
| | | a) | For plying upto Haldia | 5000.00 |
| | | b) | For carrying explosives | 5000.00 |
| 6 | Fees for scrutiny and approval of drawing and plans for new construction. | | | 2000.00 per craft |
| 7. | Fee for Inspection during construction/ reconstruction by the process of cannibalisation or for providing technical advice. | | | |
| | i) | Within Port limit | | |
| | | a) | Wooden/non-metallic boat | 500.00 |
| | | b) | Steel / metallic boat | 1000.00 |
| | ii) | Outside Port limit | | |
| | | a) | Wooden/non-metallic boat | 2000.00 |
| | | b) | Steel / metallic boat | 5000.00 |
| 8. | Supply of Manjhi Book | | | 25.00 per copy |

57

| 9. | Supply of instruction book for guidance and rules of construction/re-construction and survey. | 200.00 per copy |
|---|---|---|
| 10. | Charges for Re-registration | |
| | a) Wooden/non-metallic boat | 300.00 per craft |
| | b) Steel / metallic boat | 1000.00 per craft |

**Note:** If the Special Inspection Survey and the Annual licensing survey are carried out on the same date, Survey fees for annual licensing survey will not be applicable.

S.28.5    Penalty for non-renewal of licence as per Rule 83 (2) of Kolkata Port Rules, 1994 shall be levied at double the rate of annual licence fee (for the expired period) from the date of expiry of the licence, subject to minimum of 1 month charge.

S.29    **Towage & Pilotage for inland vessels and non-propelled crafts**

S.29.1    If a vessel requires services of port for towage & pilotage, 50% of the rates specified at S.24.1 for coastal vessel (other than for Andaman) shall be levied. Similarly for shifting also, where port provides services, 50% of the rates specified at S.24.9 for coastal vessel shall be levied.

S.29.2    If a vessel does not require the services of port as mentioned at S.30.1, Dock Toll charge as specified at section S.28.1 shall be levied.

S 29.3    If any vessel covered under this Part of the Scale of Rates avails any of the services for which no rate has been specified in this Part, the rate applicable for coastal vessel shall apply.

**Note for Part-VII of this of Scale of Rates**

Tonne in respect of vessel under this Part of Scale of Rates shall mean Registered Tonne or Gross Registered Tonne of the vessel unless otherwise specified. In cases, where Registered Tonne or Gross Registered Tonne is not available and only measurement in Cubic Metre is available, for the purpose of realisation of charges conversion factor shall be 1 Cu. Mt. = 0.36 Register Tonne.

**P A R T - VIII**

**SLIPWAY HIRE CHARGES**

S.30.    **Slipway hire charges**

S.30.1    Charges for hire of slipways with back up adjacent land at North Workshop Complex shall be levied at the following rates: -

| | Period | Rate in Rupees per day | | |
|---|---|---|---|---|
| | | Slipway No. 1 | Slipway No. 2 | Slipway No. 3 |
| 1 | 1st to 10th day | 1800.00 | 1050.00 | 1175.00 |
| 2 | 11th day onwards | 1700.00 | 1000.00 | 1125.00 |

S.30.2   Charges for hire of slipways without back up adjacent land at North Workshop Complex shall be levied at the following rates: -

| Period | | Rate in Rupees per day | | |
|---|---|---|---|---|
| | | Slipway No. 1 | Slipway No. 2 | Slipway No. 3 |
| 1 | 1st to 10th day | 1425.00 | 700.00 | 750.00 |
| 2 | 11th day onwards | 1350.00 | 675.00 | 700.00 |

**Note:**   All other charges including electricity and water shall be realised as per Scale of Rates.

# FURTHER ORDERS

# Mumbai Port Trust

## Scale of Rates

# MUMBAI PORT TRUST
## SCALE OF RATES

### CHAPTER - I

**1.1.**    **Definitions**

In this Scale of Rates, unless the context otherwise requires, the following definitions shall apply:

(i).    'Vessel' includes any thing made for the conveyance mainly by water of human being or of goods and a caisson.

(ii).    'Coastal Vessel' shall mean any vessel exclusively employed in trading between any port or place in India to any other port or place in India having valid coastal licence issued by the competent authority.

(iii).    'Foreign-going Vessel' shall mean any vessel other than Coastal vessel.

(iv).    'Pleasure Yacht' means a ship howsoever propelled which is exclusively used for pleasure cruises and does not carry any passengers on a commercial basis.

(v).    'Telegraph Vessel' means a vessel equipped with machinery and gears for lifting, examining and laying sub-marine cables for overseas communications.

(vi).    'GRT' means Gross Registered Tonnage of vessel as per the Ship's Registry or the International Tonnage Certificate issued by the competent authorities or a declaration from Defence Authorities in respect of war ships/ Naval ships.

(vii)    "Cold Move" shall mean the movement of the vessels without the main engines in operation.

(viii)    "Reefer Container" shall mean a refrigerated container used for carriage of perishable goods with provision for electrical supply to maintain the desired temperature.

(ix).    "Hazardous Container" shall mean a container containing hazardous goods as classified under IMO.

(x).    "Transhipment" shall mean any cargo not originally manifested for the port of Mumbai, but landed at Mumbai and subsequently reshipped to other ports.

(xi).    "Transhipment container" shall mean any container, which is discharged from one vessel, stored in the yard and transported by road, rail or by sea through other vessel.

(xii).    "Free period" shall mean the period during which cargo/container shall be allowed storage free of demurrage charges and this period shall exclude Sunday(s), customs holidays and Port's non-working days.

(xiii).    "Over dimensional container" shall mean a container carrying overdimensional cargo beyond the normal size of standard containers and needing special devices like slings, shackles, lifting beam etc. They also include damaged containers and other types which require special devices.

(xiv).    "Shut out Container" shall mean a container which enters into the port as an export intake for a particular vessel (as indicated by the Vessel Identification Advice Number i.e. VIA No.) and is not connected to the particular vessel for reasons whatsoever.

(xv).    "Demurrage" shall mean charges payable for storage of cargo within port premises beyond free period, as specified in the scale of rates.

(xvi).    "Full Container Load" (FCL) shall mean a container containing cargo belonging to one consignee in the vessel's manifest.

(xvii)    "Less than a Container Load" (LCL) shall mean a container containing cargo belonging to more than one consignee in the vessel's manifest.

(xviii).    "Cruise Vessel" shall mean any vessel carrying passengers for an ocean trip taken for pleasure calling at ports and other than pleasure yachts.

(xix).    "Month" shall be reckoned as 1st day (inclusive) of one month to the 1st day (exclusive) of the next month or from the 2nd day(inclusive) of one month to the 2nd day(exclusive) of the next month and so on. E.g.14th of January (inclusive) to 14th of February (exclusive) (i.e. a period of 30 days)

(xx).    "Day" means a calendar day i.e. the period from the midnight of a day to the midnight of the following day.

(xxi).    Vessel Completion Date (VCD) means the date on which import operations of the vessel is fully completed.

**1.2.    General Terms and Conditions**

(i).    The status of the vessel, as borne out by its certification by the Customs or the Director General of Shipping, shall be the deciding factor for its classification as 'coastal' or 'foreign-going' for the purpose of levying vessel related charges; and, the nature of cargo or its origin will not be of any relevance for this purpose.

(ii).    (a).    A foreign going vessel of Indian Flag having a General Trading Licence can convert to Coastal run on the basis of a Customs Conversion Order or on filing of Coastal International General Manifest in Coastal Establishment Section of Customs Department.

(b).    A foreign going vessel of Foreign Flag can convert to coastal run on the basis of a Coastal Voyage Licence issued by the Director General of Shipping.

(c).    In cases of such conversion, coastal rates shall be chargeable by the load port from the time the vessel starts loading coastal goods.

(d).    In cases of such conversion, coastal rates shall be chargeable only till the vessel completes coastal cargo discharging operations; immediately thereafter, foreign-going rates shall be chargeable by the discharge ports.

(e).    For dedicated Indian coastal vessels having a Coastal Licence from the Director General of Shipping, no other document will be required to be entitled to Coastal rates.

(iii).    (a).    All dollar denominated tariff will be recovered in Indian Rupees after conversion of charges in dollar terms into its equivalent Indian Rupees at the market buying rate notified by the Reserve Bank of India, State Bank of India or its associates or any other Public Sector banks as may be specified from time to time.

(b).    The day of entry of the vessel into port limits shall be reckoned as the day for such conversion. In respect of charges on containers, the day of entry of the vessel in the case of import containers and the day of arrival of containers into the port in the case of export containers shall be reckoned as the day for such conversion.

(c).    A regular review of exchange rate shall be made once in 30 days from the date of arrival in the cases of vessels staying in the port for longer period. The basis of billing shall change prospectively with reference to the appropriate exchange rate prevailing at the time of review.

(iv).    Users will not be required to pay charges for delays beyond a reasonable level attributable to the port.

(v).    Interest on delayed payments / refunds:

(a).    The user shall pay penal interest on delayed payments and Port shall pay penal interest on delayed refunds at the rate of 13.00% per annum.

(b).    The delay in payments by user will be counted beyond 10 days after the date of raising the bills. This provision will not apply to the case where payment is to be made before availing of the services / use of port properties as stipulated in the MPT Act, 1963 and / or prescribed as a condition in the tariff.

(c).    The delay in refunds by the port will be counted beyond 20 days from the date of completion of services or on production of all the documents required from the user, whichever is later.

(vi).    (a).    The rates prescribed in the Scale of Rates are ceiling levels; likewise, rebates and discounts are floor levels. The port may, if it so desires, charge lower rates and/or allow higher rebates and discounts.

(b).    The port may , if it so desires, rationalise the prescribed conditionalities governing the application of rates prescribed in the Scale of Rates if such rationalisation gives relief to the user in rate per unit and the unit rates prescribed in the Scale of Rates do not exceed the ceiling level.

(c)    The port should notify the public such lower rates and/or rationalisation of the conditionalities governing the application of such rates and continue to notify the public any further changes in such lower rates and/or in the conditionalities governing the application of such rates provided the new rates fixed shall not exceed the rates notified by the TAMP.

(vii)    (a).    Wherever a specific tariff for a service/cargo is not available in the notified Scale of Rates, the MBPT can submit a suitable proposal to the TAMP.

(b).    Simultaneously with the submission of proposal, the proposed rate can be levied on an ad hoc basis till the rate is finally notified.

(c).    The ad hoc rate to be operated in the interim period must be derived based on existing notified tariffs for comparable services/ cargo; and, it must be mutually agreed upon by the Port and the concerned user(s).

(d).    The final rate fixed by the TAMP will ordinarily be effective only prospectively. The interim rate adopted in an ad hoc manner will be recognised as such unless it is found to be excessive requiring some moderation retrospectively.

(viii).    The minimum charges recovered in any bill shall be Rupees Twenty (Rs.20/-) only.

(ix).    All charges worked out shall be rounded off to the next higher rupee on the grand total of each bill.

(x).    In calculating the gross weight or measurement by volume or capacity of any individual item, fractions upto 0.5 shall be taken as 0.5 unit and fractions of 0.5 and above shall be treated as one unit, except where otherwise specified.

(xi)    (a).    The vessel related charges for coastal ships will be 60% of the charges levied for other vessels.

(b).    The cargo/container related charges for coastal cargo/containers, other than thermal coal and POL including crude oil iron ore and iron ore pellets will be 60% of the normal cargo/container related charges.

(c).    In case of cargo related charges, the concessional rates shall be levied on all the relevant handling charges for ship-shore transfer and transfer from/to quay to/from storage yard including wharfage

(d).    In case of container related charges the concession is applicable on composite box rate. Where itemized charges are levied, the concession shall be on all the relevant charges for ship-shore transfer and transfer from/to quay to/from storage yard as well as wharfage on cargo and containers.

(e).    The charges for coastal cargo/containers/vessels will be denominated and collected in Indian Rupees.

(xii).    Vessel related charges for cruise vessels will be 60% of the relevant applicable charges leviable on for other vessels.

### CHAPTER – II

### VESSEL RELATED CHARGES

Docks are classified as (a) Indira Dock including the Ballard Pier, Ballard Pier Extension and Harbour Wall berths, (b) Prince's & Victoria Docks, (c) Naval Docks, (d) Mazgaon Dock, Kassara Basin, (e) Bunders and Darukhana and (f) Jetties at Jawahar Dweep and Pir Pau.

**2.1.    Composite Pilotage and Towage Charges**
**(A) Cargo Vessels**

| Sr. No. | Size of the vessel | *Docks | @ Stream | *Jawahar Dweep / Pir Pau | Shifting Charges |
|---|---|---|---|---|---|
| 1. | 0-30,000 GRT Rate per GRT | | | | |
| | a. Foreign going (in US $) | 0.3466 | 0.0627 | 0.6249 | 0.0861 |
| | b. Coastal (in Rs.) | 9.480 | 1.714 | 17.096 | 2.381 |
| 2. | 30,001 - 60,000 GRT | | | | |
| | a. Foreign going (in US $) | US $ 10,398 for 1st 30,000 GRT + US $ 0.2772 for every additional GRT | US $ 1,881 for 1st 30,000 GRT + US $ 0.0501 for every additional GRT | US $ 18,744 for 1st 30,000 GRT + US $ 0.4999 for every addnl. GRT | US $ 2,583 for 1st 30,000 GRT + US $ 0.0688 for every addnl. GRT |
| | b. Coastal (in Rs.) | Rs. 2,84,400 for 1st 30,000 GRT + Rs. 7.584 for every additional GRT | Rs. 51,420 for 1st 30,000 GRT + Rs. 1.371 for every additional GRT | Rs. 5,12,880 for 1st 30,000 GRT + Rs.13.676 for every addnl. GRT | Rs. 71,430 for 1st 30,000 GRT + Rs. 1.904 for every additional GRT |

(e)  In cases where packages individually weighing more than 20 tonnes are discharged from other hatches when the Port's heavy lift crane is utilized on one hatch of the same vessel.

4. (B)   **Charges for use of Mobile Cranes and Equipment:**

| Sl. No. | Type of Crane / Equipment | Charges per Crane / Equipment | | Minimum charges |
|---|---|---|---|---|
| | | Per shift Rs. | Per 1/2 shift Rs. | Rs. |
| 1. | Mobile Cranes (10 to 14 tonne capacity) | 2,625 | 1,500 | 1,500 |
| 2. | Tower type cranes (20 tonnes) | 4,375 | 2,500 | 2,500 |
| 3. | Tractor | 625 | 375 | 375 |
| 4. | Forklift (2/3 tonnes) | 750 | 500 | 500 |
| 5. | Platform Truck | 625 | 375 | 375 |
| 6. | Forklift 16 tons | 4500 | 2250 | 2250 |

## CHAPTER – V

## CONTAINER RELATED CHARGES

5. (A) Composite charges on Cargo containers Handled with Quayside Gantry Cranes.

| Description | Containers upto 20' | | | | Containers Above 20' but upto 40' | | | | Containers length above 40' | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | |
| | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty |
| General Containers | 2470 | 1970 | 1482 | 1182 | 3705 | 2955 | 2223 | 1773 | 4940 | 3940 | 2964 | 2364 |
| Hazardous Containers* | 3095 | 2470 | 1857 | 1482 | 4643 | 3705 | 2786 | 2223 | 6190 | 4940 | 3714 | 2964 |
| ICD Containers | 3770 | 3270 | 2262 | 1962 | 5655 | 4905 | 3393 | 2943 | 7540 | 6540 | 4524 | 3924 |
| Transhipment Containers | 2940 | 2540 | 1764 | 1524 | 4410 | 3810 | 2646 | 2286 | 5880 | 5080 | 3528 | 3048 |
| Same Bottom Containers | 2940 | 2540 | 1764 | 1524 | 4410 | 3810 | 2646 | 2286 | 5880 | 5080 | 3528 | 3048 |
| Export containers brought by Barges under Shipping Bills from other ports for shipment | 2970 | 2570 | 1782 | 1542 | 4455 | 3855 | 2673 | 2313 | 5940 | 5140 | 3564 | 3084 |
| Containers moved by barges between MBPT & other ports | 3000 | 2500 | 1800 | 1500 | 4500 | 3750 | 2700 | 2250 | 6000 | 5000 | 3600 | 3000 |

**\* The composite charges for hazardous containers will be applicable in respect of permissible 'A' category containers as also 'B' & 'C' category containers.**

**5.(B) Composite charges on Cargo containers Handled with cranes other than Quayside Gantry Cranes.**

| Description | Containers upto 20' | | | | Containers Above 20' but upto 40' | | | | Containers length above 40' | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | | Rates for Coastal Containers (in Rs.) | |
| | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty |
| General Containers | 1870 | 1670 | 1122 | 1002 | 2805 | 2505 | 1683 | 1503 | 3740 | 3340 | 2244 | 2004 |
| Hazardous Containers* | 2345 | 2095 | 1407 | 1257 | 3518 | 3143 | 2111 | 1886 | 4690 | 4190 | 2814 | 2514 |
| ICD Containers | 3170 | 2970 | 1902 | 1782 | 4755 | 4455 | 2853 | 2673 | 6340 | 5940 | 3804 | 3564 |
| Transhipment Containers | 2790 | 2490 | 1674 | 1494 | 4185 | 3735 | 2511 | 2241 | 5580 | 4980 | 3348 | 2988 |
| Same Bottom Containers | 2790 | 2490 | 1674 | 1494 | 4185 | 3735 | 2511 | 2241 | 5580 | 4980 | 3348 | 2988 |
| Export containers brought by Barges under Shipping Bills from other ports for shipment | 2820 | 2520 | 1692 | 1512 | 4230 | 3780 | 2538 | 2268 | 5640 | 5040 | 3384 | 3024 |
| Containers moved by barges between MBPT & other ports | 2400 | 2200 | 1440 | 1320 | 3600 | 3300 | 2160 | 1980 | 4800 | 4400 | 2880 | 2640 |

**\* The composite charges for hazardous containers will be applicable in respect of permissible 'A' category containers as also 'B' & 'C' category containers.**

Notes:   Sections 5 (A) & 5 (B)

(i)      The above composite rates include the following charges towards onboard stevedoring and inclusion of this element in THC levied by the Shipping Lines/ Agents shall be regulated in accordance with the Order of TAMP passed in case no: TAMP/47/2000-MBPT, dated 12 june 2001.

Quayside Gantry Cranes:

(a)   All general Containers and all ICD Containers                    Rs. 348.00
(b)   All Transhipment containers and all same bottom          Rs. 696.00
        Containers.
(c)   All export containers brought by barges under              Rs. 610.50
        shipping bills from JNPT for shipment through MBPT

Non-Quayside Gantry Cranes:

(a)   All general Containers and all ICD Containers                    Rs. 579.53
(b)   All Transhipment containers and all same bottom          Rs. 1159.06
        Containers.

|       |                                                                                                 |               |
|-------|-------------------------------------------------------------------------------------------------|---------------|
| (c)   | All containers handled by barges to and fro JNPT                                                 | Rs. 262.50    |
| (d)   | All export containers brought by barges under shipping bills from JNPT for shipment to MBPT      | Rs. 842.03    |

(ii)   Cargo container means specifically designed container of uniform size for consolidating goods within compact unit.

(iii)  The above charges include on board stevedoring charges, handling at shipside, lift on of export / lift off import containers at the pre-stack area, removal of container between shipside and pre-stack / RCD yard in docks, loading / off loading of ICD containers on Railway wagons within the Docks.

(iv)   Additional services of loading/unloading of containers on to the wagons/Agents' trailors and hauling to and fro shunting yard at wadala will be provided to the ICD containers.

(v)    Lashing and unlashing containers on board the vessel shall be the responsibility of the vessel agents.  If lashing and unlashing service is provided by the port Rs. 30/-, Rs.45 and Rs.60 extra per 20' unit, 40' unit and above 40' unit respectively shall be leviable.

(vi)   When a transshipment container is unloaded by gantry crane and loaded by Non-Gantry crane or vice versa, 50% of the Box rate for Transhipment containers prescribed at Section-5(A) and Section-5(B) respectively will be applicable.

(vii)  (a).   Container from a foreign port which reaches an Indian Port 'A' for subsequent transshipment to Indian Port 'B' will be levied the concessional charges relevant for its coastal voyage.  In other words, containers from/to Indian ports carried by vessels permitted to undertake coastal voyage will qualify for concession.

       (b).   A container from foreign port landing at MBPT for subsequent transhipment to an Indian Port on a coastal voyage or vice versa would be charged at 50% of the transhipment charge prescribed for foreign-going vessel and 50% of that prescribed for the coastal category.

(viii) Empty containers received from/removed to ICD by road shall be treated on par with local empty containers for levy of charges.

(ix)   Charges for containers handled by Toplift Trucks or Transtainer or Reach Stacker shall be levied separately.

(x)    Import loaded container manifested as local if subsequently transhipped to ICD shall be treated as local container till the date on which the container has been allowed by the Customs to be transshipped to ICD. Similarly ICD import containers destuffed and cleared from the port shall be treated as FCL for levy of Port Charges.

5. (C)   **With the prior permission of the MBPT authorities, rebates shall be applicable to the port users for carrying out various container operations with their own arrangements. The rebates applicable along with the conditions are as follows:**

(i).   Stevedoring Charges
       (a). When Gantry crane is used

| Sr. No. | Particulars                      | Foreign-Going (in Rs.) | | | Coastal (in Rs.) | | |
|---------|----------------------------------|------|------|---------|--------|--------|---------|
|         |                                  | 20'  | 40'  | Over 40' | 20'    | 40'    | Over 40' |
| 1.      | General and ICD containers       |      |      |         |        |        |         |
|         | Loaded                           | 348  | 348  | 348     | 208.80 | 208.80 | 208.80  |
|         | Empty                            | 348  | 348  | 348     | 208.80 | 208.80 | 208.80  |

| Sr. No. | Particulars | Foreign-Going (in Rs.) | | | Coastal (in Rs.) | | |
|---|---|---|---|---|---|---|---|
| | | 20' | 40' | Over 40' | 20' | 40' | Over 40' |
| 2. | Transshipment and same bottom containers | | | | | | |
| | Loaded | 696 | 696 | 696 | 417.60 | 417.60 | 417.60 |
| | Empty | 696 | 696 | 696 | 417.60 | 417.60 | 417.60 |
| 3. | Export Containers brought by barges under shipping bills from other ports for shipment | | | | | | |
| | Loaded | 610.50 | 610.50 | 610.50 | 366.30 | 366.30 | 366.30 |
| | Empty | 610.50 | 610.50 | 610.50 | 366.30 | 366.30 | 366.30 |

**(b). When crane other than Gantry crane is used**

| Sr. No. | Particulars | Foreign-Going (in Rs.) | | | Coastal (in Rs.) | | |
|---|---|---|---|---|---|---|---|
| | | 20' | 40' | Over 40' | 20' | 40' | Over 40' |
| 1. | General and ICD containers | | | | | | |
| | Loaded | 579.53 | 579.53 | 579.53 | 347.72 | 347.72 | 347.72 |
| | Empty | 579.53 | 579.53 | 579.53 | 347.72 | 347.72 | 347.72 |
| 2. | Transshipment and same bottom containers | | | | | | |
| | Loaded | 1159.06 | 1159.06 | 1159.06 | 694.54 | 694.54 | 694.54 |
| | Empty | 1159.06 | 1159.06 | 1159.06 | 694.54 | 694.54 | 694.54 |
| 3. | Containers handled by barges to and fro other ports | | | | | | |
| | Loaded | 262.50 | 262.50 | 262.50 | 157.50 | 157.50 | 157.50 |
| | Empty | 262.50 | 262.50 | 262.50 | 157.50 | 157.50 | 157.50 |
| 4. | Export Containers brought by barges under shipping bills from other ports for shipment | | | | | | |
| | Loaded | 842.03 | 842.03 | 842.03 | 505.22 | 505.22 | 505.22 |
| | Empty | 842.03 | 842.03 | 842.03 | 505.22 | 505.22 | 505.22 |

**(ii).    Transportation Charges**

| Sr. No. | Particulars | Foreign-Going (in Rs.) | | | Coastal (in Rs.) | | |
|---|---|---|---|---|---|---|---|
| | | 20' | 40' | Over 40' | 20' | 40' | Over 40' |
| 1. | General, ICD and containers handled by barges to and fro other ports | | | | | | |
| | Loaded | 565 | 847.50 | 1130 | 339 | 508.50 | 678 |
| | Empty | 460 | 690 | 920 | 276 | 414 | 552 |
| 2. | Transshipment, Same bottom Containers and Export Containers brought by barges under shipping bills from other ports for shipment through MBPT. | | | | | | |
| | Loaded | 1130 | 1695 | 2260 | 678 | 1017 | 1356 |
| | Empty | 920 | 1380 | 1840 | 552 | 828 | 1104 |

**5. (D)    Charges on container handling equipment.**

**(1) Charges will be leviable on container handling equipment per move as follows :-**

| | Containers upto 20' | | Containers Above 20' but upto 40' | | Containers length above 40' | |
|---|---|---|---|---|---|---|
| | Rates for Foreign Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | | Rates for Foreign Containers (in Rs.) | |
| | Foreign | Coastal | Foreign | Coastal | Foreign | Coastal |
| | US $ | Rs. | US $ | Rs. | US $ | Rs. |
| (a). Quayside Gantry Crane | 19 | 496.13 | 28.50 | 744.19 | 38 | 992.26 |
| (b). Rubber Tyred Yard Gantry Crane/ Reach Stacker/ Top Lift Truck (TLT) | 5 | 130.56 | 7.50 | 195.84 | 10 | 261.12 |
| (c). Trailer | 14.50 | 378.62 | 21.75 | 567.94 | 29 | 757.25 |

**(2) Composite box rate for on board shifting operations of containers.**

| Description | Foreign (in Rs.) | | | | | | Coastal (in Rs.) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20' | | 40' | | Above 40' | | 20' | | 40' | | Above 40' | |
| | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty | Loaded | Empty |
| Gantry Crane | 1222 | 1222 | 2096 | 2096 | 2096 | 2096 | 733 | 733 | 1258 | 1258 | 1258 | 1258 |
| Ship Crane | 580 | 580 | 580 | 580 | 580 | 580 | 348 | 348 | 348 | 348 | 348 | 348 |

**(3)    Charges for miscellaneous handling by Quayside Gantry Cranes :**

| | | | Foreign | Coastal |
|---|---|---|---|---|
| (a) | For opening hatch cover / pontoon and placing it - | | | |
| | | (i) by placing it on the quay (full cycle) | US $ 76 | Rs.1984.51 |
| | | (ii) without placing it on the quay | US $ 38 | Rs.992.26 |
| (b) | For discharging/loading packages, units vehicles and / or any other material except containers individually weighing 20 Tonnes and above per operation/move. | | US $ 152 | Rs.3969.02 |
| (c) | For discharging/loading packages, units vehicles and / or any other material except containers individually weighing less than 20 Tonnes per operation/move. | | US $ 76 | Rs.1984.51 |

**5. (E)    Licence (storage) fees on containers:**

| Sr. No. | Place of Storage | Rate per day or Part thereof | | |
|---|---|---|---|---|
| | | Container having length upto 20' | Container having length over 20' but upto 40' | Container having length above 40' |
| (1). | Loaded/Empty container landed and stored or brought for export and stored anywhere in the declared Customs areas of the port. | US $ 2.5 | US $ 5.0 | US $ 7.5 |

| Sr. No. | Place of Storage | Rate per day or Part thereof | | |
|---|---|---|---|---|
| | | Container having length upto 20' | Container having length over 20' but upto 40' | Container having length above 40' |
| (2). | Empty Container stored in the areas other than the declared customs areas of the Port. | US $ 0.5 | US $ 1.0 | US $ 1.5 |
| (3). | Empty or loaded containers received from/ despatched to ICD by Rail/Road. | US $ 2.5 | US $ 5.0 | US $ 7.5 |

(a) In case of import containers above charges are leviable from the date following the date of completion of vessel's import operations.

(b) In case of export containers above charges are leviable from the date of stuffing of containers at Port's CFS or from date of bringing in of fully loaded container till the date prior to the date of shipment (i.e. excluding the date of shipment)/ the date of removal in case of Empty Container.

(c) In the case of ICD containers charges are leviable after the expiry of two days from the date following the date of completion of vessel's import operation till the date of their loading on wagons/ removal by road or from two days following the date of receipt of containers at RCD from the upcountry ICD's or storage yards till the date prior the date of shipment (i.e. excluding the date of shipment). In case a container is not removed/ shipped within 10 days from the date following the date of completion of import operations in case of import or from the date of receipt in case of export, the Licence (Storage) Fees will be levied at double the rate prescribed at 5 (E) (3) above from 11th day.

(d) Hazardous container will be charged at 25% premium.

(e) Demurrage charge on both cargo and container shall not accrue for the period when the port is not in a position to deliver cargo/container when requested by the users.

**Notes:**

(1) Import loaded containers removed out of port area for destuffing shall be charged licence (storage) fees from the date following the date of completion of vessel's import operations till the date of removal including the date of removal. Similarly, export loaded/empty containers received from the areas other than port premises shall be charged licence (storage) fees from the date of receipt till the day prior to the date of shipment(i.e. excluding the date of shipment).

(2) If a container has already been charged licence (storage) fees on a particular day under Section 5(E) above, the same unit will not be charged once again on the same day even if it is moved between the areas referred to above.

(3) The charges on a container shall be levied irrespective of whether the container is stored on chassis or on ground or stacked high.

(4) Licence (storage) fees on Containers brought under Shipping Bill for export shall be charged in terms of provisions of Section 5 (E) above from the date of receipt of the container in the port premises.

(5) The combined Transport Operators/Masters, Owners or Agents of vessels shall remove the containers to the respective site/yard/destuffing point nominated by the Traffic Manager, within a period of 4 calendar days following the date of the vessels completion of import operation. If the combined Transport Operators/Masters, Owners or Agents of vessels fail to remove such containers to the nominated areas within the prescribed period of 4 calendar days, the Traffic Manager shall have the authority to remove such containers to the nominated areas at the risk and cost of combined Transport Operators/Masters, Owners or Agents of vessels. Removal

69

JA0652

charges as notified from time to time will be levied on such containers.

(6) Container stuffed in the Port premises/container received in Docks duly stuffed in the areas other than Mumbai Port premises and removed for shipment through Ports other than Mumbai shall be charged Licence fees as per section 5 (E)(a) above from the day following the date of stuffing/from the date of receipt till the date of removal of container. In the case of containers stuffed in the Port premises/containers received duly stuffed in the areas other than Mumbai Port premises and removed to town shall be charged Licence fees of US $ 2.5 (Coastal – Rs.108.80) for a container having length upto 20 feet, US $ 5 ( Coastal – Rs.217.60) for a container having length above 20 feet but upto 40 feet and US$ 7.5 (Coastal – Rs.326.40) for a container having length above 40 feet per day or part thereof from the day following the date of stuffing/from the date of receipt till the date of removal of the containers. The cargo inside the container shall be charged demurrage at the rate of Rs.500/- per TEU per day or part thereof for the period of its stay in the Port. [No separate wharfage shall be recovered either on such container or on cargo inside the container.]

(7) The Import loaded containers discharged at an Indian port other than Mumbai and brought to Mumbai by Rail/Road for giving delivery shall be charged Licence Fees as per Section 5 (E)(a) above. In the case of containers received by Rail, handling charges of US $ 60 (Coastal – Rs.2611.20) per TEU shall be levied. Demurrage on the cargo inside the containers shall be charged as per Section 3.1.(B) of Chapter-III from the date of receipt. No wharfage on the cargo inside the containers shall be levied.

(8) No Licence (Storage) Fees shall be levied on containers loaded with cargo and seized/detained by the Customs/DRI/CIU etc. from the day of its removal to the area allotted by the Board to the Customs for storage of such containers. Demurrage on the cargo inside the container shall be leviable as under :-

First 30 days of detention                  : 20% of the applicable demurrage
31st day to 60 days of detention       : 50% of the applicable demurrage
61st day onwards of detention          : 100% of the applicable demurrage

(9) Any consignee desires to clear FCL through private CFSs within or outside jurisdiction of the Commissioner of Customs, Mumbai shall remove the containers within 7 working days from the date of following the date of completion of vessel's import operation. On the cargo inside the container a consolidated charge of Rs.2400/- (Coastal – Rs.1440/-) per TEU shall be recovered. In case container is not removed within the said period of 7 working days the demurrage charges at the rate prescribed in Section 3.1. (B) of Chapter-III shall be levied on the cargo inside the container.

(10) Demurrage charges on the cargo stuffed inside the container and subsequently destuffed and removed back to town shall be levied as per (5) above. No wharfage shall be levied thereon. Similarly, in the case of cargo stuffed inside the container and subsequently destuffed and again restuffed in the container and shipped on board the vessel, demurrage charges shall be levied as per (5) above till the date of restuffing of cargo inside the container and wharfage in terms of Section 3.1 (A) of Chapter-III shall also be levied on cargo inside the container.

(11) Storage charges on abandoned FCL containers/ Shipper owned containers shall be levied upto the date of receipt of intimation of abandonment in writing or 75 days from the date of landing of container whichever is earlier subject to following conditions.

(1) The consignee can issue a letter of abandonment at any time.

(2) If the consignee chooses not to issue such letter of abandonment, the container Agent/ MLO can also issue abandonment letter subject to the condition that,

(a) the line shall resume custody of container along with cargo and either take back it or remove it form the port premises; and

(b) the line shall pay all port charges accrued on the cargo and container before resuming custody of the container.

(3) The container Agent/ MLO shall observe the necessary formalities and bear the cost of transportation and destuffing. In case of their failure to take such action within the stipulated period, the storage charge o container shall be continued to be levied till such time all necessary actions are taken by the shipping lines for destuffing the cargo.

(4) Where the container is seized/ confiscated by the Custom Authorities and the same cannot be destuffed witin the prescribed time limit of 75 days, the storage charges will cease to apply from the day the Custom order release of the cargo subject to lines observing the necessary formalities and bearing the cost of transportation and destuffing. Otherwise, seized/confiscated containers should be removed by the line/consignee from the port premises to the Customs bonded area and in that case the storage charge shall cease to apply from the day of such removal.

(12) The container other than 'shipper owned container' shall be removed from the regular storage area and moved to Sales Warehouse / Overflow Sheds by the Port Trust at the cost and responsibility of the Main Line Operators (MLOs) and thereafter, the container can be destuffed before the empty containers are removed from the Trust's premises by the MLOs.

5. (F)   **Charges payable for reefer points :**

(1)    For every reefer plug point allotted, a charge of US $ 6.5 (coastal   Rs. 282.90) per container per Unit of 4 hours or part thereof will be levied.

(2)    Reefer points will be allotted on per container/per point basis.

(3)    The combined Transport Operators/Masters, Owners or Agents of vessels shall provide their own cables from the sources of supply (plug points provided for the purpose) to the Reefer Container and shall employ their own qualified staff to connect the reefer container to this supply and attend on it when in use.

(4)    The Traffic Manager reserves the right to supply power to reefer containers and shall not be responsible for any loss whatsoever that the combined Transport Operators/Masters, Owners or Agents of vessels may incur in the event of the

(a) failure of electric supply due to reasons beyond the control of the Mumbai Port Trust,
(b) Mumbai Port Trust's inability to supply power in time, and
(a) disconnect the supply without assigning any reason, should this become necessary for smooth operation in the Docks.

(5)    Persons employed to connect/disconnect and monitor reefer containers at the reefer power supply points shall have a licence issued by the Chief Mechanical Engineer of the Port.

5. (G)   **Charges in respect of Port Trust labour supplied for stuffing or destuffing of cargo containers:**

| | Per Container | |
|---|---|---|
| | **Foreign** | **Coastal** |
| (i) container having length upto 20' | US $ 28.50 | Rs. 1240.35 |
| (ii) container having length over 20' but upto 40' | US $ 57.00 | Rs. 2480.65 |
| (iii) Container having length above 40' | US $ 85.50 | Rs. 3721.00 |

## 5. (H)   Charges on Containerised Cargo

(1)    Wharfage and demurrage as applicable under Sections 3.1 (A) and 3.1 (B) of Chapter-III shall be payable on import containerised cargo, excepting those destined to ICD and the FCLs cleared through Private CFS in terms of note (8) to Section 5 (E) above.

(2)    The term 'LCL' means the container containing cargo belonging to more than one consignee in the vessel's manifest and the term 'FCL' means container containing cargo belonging to one consignee in the vessel's manifest. The consignee means the person/firm/company in whose name the Bill of Lading is prepared.

(3)    (i)    In the case of containers, other than that destined to or received from ICD and the FCLs cleared through private CFS demurrage on cargo in container shall not accrue for seven working days in respect of FCLs and LCLs from the date following the date of completion of vessels import operation.

(ii)    If FCL/LCL has not reached the notified area/destuffing point when the consignee approaches with the Bill of Entry having Customs order for examination of goods or for delivery, the consignee may make a Log Entry at the nominated area/destuffing point.

(iii)    If the Log Entry is made on the basis that the container has not reached the notified area/destuffing point, no demurrage shall accrue from the date of Log Entry till the receipt of the container at the notified area/destuffing point plus three working days. No intimation regarding receipt of container at the nominated area/destuffing point will be given.

(iv)    The consignee shall have to make a fresh Log Entry every twenty calendar days till the container reaches the notified area/destuffing point. If the consignee fails to make the fresh Log Entry on the twenty first day but makes fresh Log Entry after lapse of some period, demurrage on cargo inside the container shall be levied for the period not covered by the Log Entry. If the twenty first calendar day is a non-working day, being a Docks Holiday, consignee may make the Log Entry on next working day.

(v)    If the FCL container, other than that destined to or received from ICD, transhipment containers and the FCLs cleared through private CFS, having reached the notified area has not been destuffed for no fault of the consignee, the consignee will be entitled to a remission in demurrage charges on obtaining the endorsement on the Bill of Entry as under :

| Conditions to be fulfilled | Endorsement of the B/E by the Docks official | Non-accrual of demurrage. |
|---|---|---|
| (a) B/E to be presented with order for Customs examination of cargo and documents of title | Endorsement "Consignee presented document with orders for Customs examination, but goods could not be forwarded for examination" (reasons to be recorded in writing) to be made by the Shed Supdt., and signed by the Asstt. Manager | 3 Calendar days including the date of presentation of B/E |
| (b) B/E to be presented with "Out of Customs charge" endorsement/ ready for clearance | Endorsement "Cargo not destuffed" , (reasons for not destuffing the container should be recorded in writing) to be made by the Shed Supdt., and signed by the Asstt. Manager | 3 Calendar days including the date of presentation of B/E. |

| (c) On presentation of B/E on the 2nd occasion to the Shed Supdt., ........with endorsement of Customs " out of charge ready for clearance" on the 4th calendar day mentioned in Col.(3) against (b) above. | Endorsement "Cargo not made available for delivery within the period of 3 calendar days as container could not be destuffed". (reasons to be recorded in writing) to be made by Shed Supdt., and signed by the Asstt. Manager. | 3 Calendar days beyond the period as at (b) above. |
|---|---|---|

(vi)   If the LCL container is not destuffed and the consignee approaches on lodgement of document of title to the concerned CDO and the B/E having the Customs orders for examination or for delivery, the consignee may make a Log Entry at the notified area and continue to make fresh Log Entry/Log Entries every twenty calendar days till the container is destuffed. If the twenty first calendar day is a non-working day being a Dock Holiday, consignee may make the Log Entry on the next working day. No demurrage shall accrue for the period covered by Log Entry and for 3 working days following the commencement of destuffing of each container. No intimation regarding destuffing of the container will be given.

(4)   On export cargo received in the Docks, for shipment in containers, wharfage charges and demurrage charges under Section 3.1 (A) and Section 3.1. (B) of Chapter-III shall be levied upto the date of stuffing of cargo in container and not thereafter.

(5)   Wharfage on cargo inside the export loaded container received from other than port premises excluding container received from ICD shall be charged Rs.1000 (Coastal Rs.600/-) for a container having length upto 20 feet, Rs.1500 (Coast Rs.900/-) for a container having length upto 40 feet and Rs.2000 (Coastal Rs.1200/-) for a container having length over 40 feet .

## GENERAL NOTES :

(i)   Mafis and imported chassis shall be treated on par with containers of equal sizes for levy of all charges under this Section and if the same are taken back on board the vessel from which they have been discharged, no charges shall be levied.

(ii)   Transhipment and same bottom containers shall be treated on par with import containers for levy of licence fees for storage.

# Jawaharlal Nehru Port Trust ("JNTP" near Mumbai)

## Scale of Rates

JA0657



Home
Port Details
Facilities
Services
Performance Highlights
Useful Information
Directory
Future Plans
BUSINESS PLAN
Links
Customer Login/Web Access
Right to Info Act - 2005
Safety
List of Registered Vendors
Pending Bills
Contract Details
Job Vacancy
Whats New?
Feedback Form
Main Stores Tenders
Tenders on sale
JNPT RSS Feeds
Site Map

## Geographic Location

JNPT Geographical Location
Latitude 18 Degrees 57 minutes N
Longitude 72 Degrees 57 minutes E

MAJOR & INTERMEDIATE
PORTS OF INDIA

74

# SCALE OF RATES
## As on 31 Oct 2006 G. No. - 162

### CHAPTER - I

## 1.1. DEFINITIONS – GENERAL

(i). **"Coastal vessel"** shall mean any vessel exclusively employed in trading between any port or place in India to any other port or place in India having a valid coastal licence issued by the competent authority.

(ii). **"Foreign-going vessel"** shall mean any vessel other than Coastal vessel.

(iii). **"Cold move"** shall mean the movement of the vessels without the main engines in operation.

(iv). **"Hazardous Chemicals"** mean and include the chemicals referred under Schedule I, Schedule II and Schedule III of Manufacture, Storage and import of Hazardous Chemicals Rules, 1989 framed under Environment (Protection) Act, 1986 and Rules, as applicable from time to time.

(v). **"Port area"** means the custom bound area / Port operational Area of the Port.

(vi). **"Normal Container"** shall mean general type containers, not falling under special categories mentioned subsequently.

(vii). **"Reefer Container"** shall mean a refrigerated container used for carriage of perishable goods with provision for electrical supply to maintain the desired temperature.

(viii). **"Hazardous Container** shall mean a container containing hazardous goods as classified under IMO.

(ix). **"Transhipment Container"** shall mean a container, which is discharged from one vessel, stored in the yard and transported through other vessel.

(x). **"Over dimensional Container"** shall mean a container carrying over dimensional cargo beyond the normal size of standard container and needing special devices like slings, shackles, lifting beam etc. They also include damaged containers and other types which require special devices.

(xi). **"Shut out Container"** shall mean a container which enters into the port as an export intake for a particular vessel (as indicated by the Vessel Identification Advice Number, i.e. VIA No.) and is not connected to the particular vessel for reasons whatsoever, then the container is termed to be a shutout container.

(xii). **"Back To Town Container"** shall mean a container entering the port for export but unable to be exported for whatever reason and taken back to town.

(xiii). **"VIAN"** means Vessel Identification Advise Number.

## 1.2. GENERAL TERMS & CONDITIONS

(i). (a). A foreign going vessel of Indian Flag having a General Trading Licence can convert to Coastal run on the basis of a Customs Conversion Order.

(b). A foreign going vessel of Foreign Flag can convert to coastal run on the basis of a Coastal Voyage Licence issued by the Director General of Shipping.

(c). In cases of such conversion, coastal rates shall be chargeable by the load port from the time the vessel starts loading coastal goods.

75

(d). In cases of such conversion coastal rates shall be chargeable only till the vessel completes coastal cargo discharging operations; immediately thereafter, foreign-going rates shall be chargeable by the discharge ports.

(e). For dedicated Indian coastal vessels having a Coastal Licence from the Director General of Shipping, no other document will be required to be entitled to Coastal rates.

(ii). The status of the vessel, as borne out by its certification by the Customs or the Director General of Shipping, shall be the deciding factor for classifying into 'coastal' or 'foreign-going' category for the purpose of levying vessel related charges; and, the nature of cargo or its origin will not be of any relevance for this purpose.

(iii). (a). Vessel related charges shall be levied on Shipowners/Steamer Agents. Wherever rates have been denominated in US dollar terms the charges shall be recovered in Indian rupees after conversion of US currency to its equivalent Indian rupees at the market-buying rate notified by the Reserve Bank of India. The date of entry of the vessel into the port limit shall be reckoned with as the day for such conversion.

(b). Container related charges denominated in US dollar terms shall be collected in equivalent Indian rupees based on the market buying rate prevalent on the date of entry of the vessel in case of Import containers; and on the date of arrival of the containers in the port premises in case of export containers.

(iv). A regular review of exchange rate shall be made once in thirty days from date of arrival of the vessels in cases of vessels staying in the Port for more than thirty days. In such cases the basis of billing shall change prospectively with reference to the appropriate exchange rate prevailing at the time of review.

(v). For the purpose of calculating the dues the unit by weight shall be 1 tonne or 1,000 kilograms, the unit by volume measurement shall be 1 cubic metre and the unit by capacity measurement for liquids in bulk shall be 1,000 litres.

(vi). (a). The Vessel related charges for all Coastal vessels should not exceed 60% of the corresponding charges for other vessels.

(b). The cargo / container related charges for all Coastal cargo / containers, other than thermal coal, POL including crude oil, Iron Ore and Iron pallets, should not exceed 60% of the normal cargo / container related charges.

(c). In case of cargo related charges, the concessional rates should be levied on all the relevant handling charges for ship-shore transfer and transfer from / to quay to / from storage yard including wharfage.

(d). In case of container related charges, the concession is applicable on composite box rate. Where itemized charges are levied, the concession will be on all the relevant charges for ship-shore transfer, and transfer from / to quay to / from storage yard as well as wharfage on cargo and containers.

(e). For the purpose of this concession, cargo/ container from a foreign port which reaches an Indian Port 'A' for subsequent transhipment to Indian Port 'B' will also qualify insofar as the charges relevant for its coastal voyage. In other words, cargo/containers from/to Indian Ports carried by vessels permitted to undertake coastal voyage will qualify for the concession.

(f). The charges for coastal cargo/ containers/ vessels shall be denominated and collected in Indian Rupee.

(vii).    Interest on delayed payments / refunds:

    (a).    The user shall pay penal interest on delayed payments under this Scale of Rates. Likewise, the JNPT shall pay penal interest on delayed refunds.

    (b).    The rate of penal interest will be 13%. The penal interest rate will apply to both the JNPT and the port users equally.

    (c).    The delay in refunds will be counted only 20 days from the date of completion of services or on production of all the documents required from the users, whichever is later.

    (d).    The delay in payments by the users will be counted only 10 days after the date of raising the bills by the JNPT. This provision shall, however, not apply to the cases where payment is to be made before availing the services / use of Port Trust's properties as stipulated in the Major Port Trust Act and / or where payment of charges in advance is prescribed as a condition in this Scale of Rates.

(viii).    All charges worked out shall be rounded off to the next higher rupee on the grand total of each bill.

(ix).    In calculating the gross weight or measurement by volume or capacity of any individual item, fractions upto 0.5 shall be taken as 0.5 unit and fractions of 0.5 and above shall be treated as one unit, except where otherwise specified.

(x).    The users will not be required to pay charges for delays beyond a reasonable level attributable to the Port.

(xi)    (a).    Wherever a specific tariff for a service/cargo is not available in the notified Scale of Rates, the JNPT can submit a suitable proposal to the TAMP.

    (b).    Simultaneously with the submission of proposal, the proposed rate can be levied on an ad hoc basis till the rate is finally notified.

    (c).    The ad hoc rate to be operated in the interim period must be derived based on existing notified tariffs for comparable services/ cargo; and, it must be mutually agreed upon by the Port/ Terminal and the concerned user(s).

    (d).    The final rate fixed by the TAMP will ordinarily be effective only prospectively. The interim rate adopted in an ad hoc manner will be recognised as such unless it is found to be excessive requiring some moderation retrospectively.

(xii)    (a).    The rates prescribed in this Scale of Rates are ceiling levels; likewise, rebates and discounts are floor levels. The JNPT may, if it so desires, charge lower rates and/ or allow higher rebates and discounts.

    (b).    The JNPT may also, if it so desires, rationalize the prescribed conditionalities governing the application of rates prescribed in the Scale of Rates if such rationalization gives relief to the user in rate per unit and the unit rates prescribed in the Scale of Rates do not exceed the ceiling levels. Provided that the JNPT should notify the public such lower rates and / or rationalization of the conditionalities governing the application of such rates and continue to notify the public any further changes in such lower rates and / or in the conditionalities governing the application of such rates provided the new rates fixed shall not exceed the rates notified by the TAMP.

(8). The fees for according 'priority/ ousting priority' realised in advance alongwith the requisition for priority/ousting priority shall be refunded if berthing is allowed only in the normal course of the vessel's arrival turn.

(9). The berth hire for the period in which the status of the vessel changes shall be charged on the basis of the status of the vessel at the beginning of the relevant of 1 hour.

(10). **Berth hire charges for Shallow Water Berth, Port Craft Berth & Port Craft Jetty:**

Schedule no.2.3 of Berth hire subject to a minimum 20% discount in the applicable rates will apply to these berths. Note no. 1 and 2 to the Berth hire charges shall also be applicable to the above-mentioned berths.

(11). Berth hire charges shall not be levied for the period, when a vessel idles at berth due to breakdown of port equipment or power failure or any other reasons attributable to the Port.

## CHAPTER – III

## CHARGES FOR SERVICES RENDERED TO CONTAINERS AND CONTAINERIZED CARGO

### GENERAL TERMS AND CONDITIONS:

(i). Containers less than and upto 20 feet in length will be reckoned as one TEU for the purpose of Tariff.

(ii). All charges for containers more than 20' in length and upto 40' in length will be 150 per cent of the applicable charges prescribed in clause 3.3.1.

(iii). Handling charges for container more than 40' length and upto 45' in length will be 200 per cent of the applicable charges prescribed in clause 3.3.1.

(iv). Containers other than that of standard size requiring special devices or slings for handling will be charged twice the applicable charges under clause 3.3.1. Such a container will also include damage containers and any other types requiring special devices.

### 3.3.1. CHARGES FOR HANDLING AND MOVEMENT OF CONTAINERS:

The following consolidated charges for handling and movement of container shall be payable by the Shipping Lines or Agents of vessels or cargo agents for services rendered in respect of containers and containerised cargo passing through the port

**A. NORMAL CONTAINERS:**

| Sl. No. | Description | Rate per TEU (in Rs.) | | | |
|---|---|---|---|---|---|
| | | Foreign Container | | Coastal Container | |
| | | Loaded | Empty | Loaded | Empty |
| 1. | From Ship to Container yard or vice versa | 2210 | 1785 | 1326 | 1071 |
| 2. | From container yard to container Freight Station or vice versa | 786 | 786 | 786 | 786 |
| 3. | From Container Yard to Railway flat or vice versa (ICD Container Rail only) | 1105 | 1105 | 1105 | 1105 |
| 4. | From Container Yard to Truck or vice versa (direct delivery and export intake). | 340 | 340 | 340 | 340 |

B.    **REEFER CONTAINERS:**

| Sl. No. | Description | Rate per TEU (in Rs.) | | | |
|---|---|---|---|---|---|
| | | Foreign Container | | Coastal Container | |
| | | Loaded | Empty | Loaded | Empty |
| 1. | From Ship to Container yard or vice versa | 2210 | 1785 | 1326 | 1071 |
| 2. | From container yard to container Freight Station or vice versa | 786 | 786 | 786 | 786 |
| 3. | From Container Yard to Railway flat or vice versa (ICD Container Rail only) | 1105 | 1105 | 1105 | 1105 |
| 4. | From Container Yard to Truck or vice versa (direct delivery and export intake). | 340 | 340 | 340 | 340 |

C.    **HAZARDOUS CONTAINERS:**

| Sl. No. | Description | Rate per TEU (in Rs.) | |
|---|---|---|---|
| | | Foreign Container | Coastal Container |
| | | Loaded | Loaded |
| 1. | From Ship to Container yard or vice versa | 2763.00 | 1658.00 |
| 2. | From container yard to container Freight Station or vice versa | 983.00 | 983.00 |
| 3. | From Container Yard to Railway flat or vice versa (ICD Container Rail only) | 1381.00 | 1381.00 |
| 4. | From Container Yard to Truck or vice versa (direct delivery and export intake). | 425.00 | 425.00 |

D.    **TRANSHIPMENT CONTAINERS:**

| Sl. No. | Description | Rate per TEU (in Rs.) | |
|---|---|---|---|
| | | Foreign Container | |
| | | Loaded | Empty |
| 1. | 1 – 3000 TEUs | 2550 | 2210 |
| 2. | 3001 – 6000 TEUs | 2380 | 2040 |
| 3. | 6001 – 9000 TEUs | 2210 | 1870 |
| 4. | Thereafter | 2040 | 1700 |

Notes:

(1).    Rate is based on total TEUs brought by the Shipping Lines or agents in the same financial year.

(2).    A container originally declared as transhipment container, subsequently moved by rail or road will lose the identity as transhipment container and shall be treated as normal import container and prescribed charges as applicable shall be payable.

(3).    Sliding Volume discount for transhipment containers on incremental trafic moved between Cochin Port/ Tuticorin Port and JNPT are as follows:

| Volume TEUs per year | 1st year rebate | 2nd year rebate | 3rd year rebate | 4th year rebate |
|---|---|---|---|---|
| Upto 6000 TEUs | Nil | Nil | Nil | Nil |
| 6001 - 9000 TEUs | 200 | 150 | 100 | Nil |
| 9001 - 15000 TEUs | 250 | 200 | 150 | Nil |

79

JA0663

(4).     Parking space for mobile harbour cranes away from berths, free of cost to port customers.

### E.     OVER DIMENSIONAL CARGO CONTAINERS:

| Sl. No. | Description | Rate per TEU (in Rs.) | | | |
|---|---|---|---|---|---|
| | | Foreign Container | | Coastal Container | |
| | | Loaded | Empty | Loaded | Empty |
| 1. | From Ship to Container yard or vice versa | 4420 | 3570 | 2652 | 2142 |
| 2. | From container yard to container Freight Station or vice versa | 1573 | 1573 | 1573 | 1573 |
| 3. | From Container Yard to Railway flat or vice versa (ICD Container Rail only) | 2210 | 2210 | 2210 | 2210 |
| 4. | From Container Yard to Truck or vice versa (direct delivery and export intake). | 680 | 680 | 680 | 680 |

### F.     SHUTOUT CONTAINERS:

| Sl. No. | Description | Rate per TEU | |
|---|---|---|---|
| | | Foreign-going vessel (In US $) | Coastal vessels (In Rs.) |
| 1. | Shutout Charges | 35.0115 | 1529 |
| 2. | Transportation of shutout container from any place in the Port to quay and back to the designated area irrespective of location inside the terminal. | 1275 | 1275 |

### G.     REEFER MONITORING AND CONNECTION:

| Sl. No. | Description | Rate per TEU | | | |
|---|---|---|---|---|---|
| | | Foreign-going vessel (In US $) | | Coastal vessel (In Rs.) | |
| | | Loaded | Empty | Loaded | Empty |
| 1. | Additional charges per 4 hours or part thereof for electricity consumption and monitoring of reefer containers | 3.502 | 3.502 | 153 | 153 |

Note:     Additional electricity charge at the prescribed rates will be applicable in case of Reefer Restow Containers also.

### H.     OTHER SERVICES RENDERED:

| Sl. No. | Description | Rate per TEU (in Rs.) | | | |
|---|---|---|---|---|---|
| | | Foreign Container | | Coastal Container | |
| | | Loaded | Empty | Loaded | Empty |
| 1. | Shifting of containers from one yard to another yard within the terminal for customs inspection or any other purpose and subsequent loading of containers for Delivery. | 1445 | 1445 | 1445 | 1445 |
| 2. | Additional service charges for stacking containers in designated yard for custom examination or for any other purpose by prior arrangement. | 170 | 170 | 170 | 170 |

80

Note:   The consolidated charges as above include the following elements, viz. stevedoring, use of Gantry crane, use of transfer crane, wharfage on tare weight of containers, wharfage on containerized cargo, transportation and contribution towards railway infrastructure.

### 3.3.2.  REBATES:

With the prior permission of JNPT authorities, rebates as follows shall be applicable to port users for carrying out various operations with their own arrangements when the JNPT equipments are out of order or not available because they are hired to other user or for any other reason.

| Sl. No. | Description | Rate per TEU (in Rs.) | | | |
|---|---|---|---|---|---|
| | | Foreign vessels | | Coastal vessels | |
| | | Loaded | Empty | Loaded | Empty |
| 1(a | If the ship's gears are used for loading/unloading containers from ship to shore or vice versa – Upto 20' in length - Over 20' in length - | 510 680 | 510 680 | 306 408 | 306 408 |
| 1(b | Transhipment containers handled at Shallow draught berth Upto 20' in length - Over 20' in length - | 255 340 | 255 340 | 153 204 | 153 204 |
| 2. | If the Port user employs his own Tractor Trailer (T.T.) for transporting containers from Quay to container yard or vice versa Upto 20' in length - Over 20' in length - | 255 383 | 255 383 | 153 230 | 153 230 |
| 3. | If the user brings his own equipment for lifting containers from container yard to truck and vice versa. - Upto 20' in length - Over 20' in length - | 213 319 | 213 319 | 213 319 | 213 319 |
| 4. | Rebate on Shut out charges on Containers shut out from Private yard 20' in length - 40' in length - | US$14.875 US$22.3125 | - - | 390 585 | - - |

5.     If the Port user provides lashing/unlashing gang for lashing operations of containers, then a rebate of Rs.26 per foreign container and Rs.16 per coastal container in handling charges shall be allowed. The rebate shall be limited to the number of containers actually lashed.

6.     Any vessel performing more than 1,000 TEUs in a single call, shall qualify for a rebate amounting to the following percentage of the total handling charges applicable for the vessel:

         - More than 1000 TEUs but upto 1200          2%
         - More than 1200 TEU's but upto 1500          3%
         - More than 1500 TEU's but upto 1800          4%
         - More than 1800 TEU's but upto 2200          5%
         - More than 2200 TEU's but upto 2600          6%
         - More than 2600 TEU's                        7%

7.  No rebate will be admissible for back to town containers handled by private equipments.

### 3.3.3.  DWELL TIME CHARGES FOR CONTAINER, STORED IN THE PORT PREMISES:

| Sl. No. | Particulars | Rate per container per day or part thereof (In US $) | | Rate per container per day or part thereof (In Rs.)) | |
|---|---|---|---|---|---|
| | | Upto 20' in length | Over 20' to upto 40' in length | Upto 20' in length | Over 20' to upto 40' in length |
| 1. | Non-ICD Import & export - loaded | | | | |
| | First 3 days | Free | Free | Free | Free |
| | 4-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 2. | Non ICD Import & Export- Empty | | | | |
| | First 3 days | Free | Free | Free | Free |
| | 4-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 3. | ICD Import & export loaded – moved by road | | | | |
| | First 7 days | Free | Free | Free | Free |
| | 8-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 4. | ICD Import & export empty moved by road | | | | |
| | First 3 days | Free | Free | Free | Free |
| | 4-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 5. | ICD Import & Export loaded or empty moved by rail | | | | |
| | First 15 days | Free | Free | Free | Free |
| | 16-30 days | 2.431 | 4.862 | 106 | 212 |
| | 31-45 days | 4.862 | 9.724 | 212 | 425 |
| | Thereafter | 9.724 | 19.448 | 425 | 849 |
| 6. | Transhipment – Loaded | | | | |
| | First 30 days | Free | Free | Free | Free |
| | 31-45 days | 2.7625 | 5.525 | 121 | 241 |
| | Thereafter | 5.525 | 11.05 | 241 | 483 |
| 7. | Transhipment - Empty | | | | |
| | First 15 days | Free | Free | Free | Free |
| | 16-30 days | 2.7625 | 2.7625 | 121 | 121 |
| | 31-45 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 8. | Shutout – loaded & empty | | | | |
| | 1-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |
| 9. | Back to Town - Loaded & Empty | | | | |
| | First 3 days | Free | Free | Free | Free |
| | 4-15 days | 2.7625 | 5.525 | 121 | 241 |
| | 16-30 days | 5.525 | 11.05 | 241 | 483 |
| | Thereafter | 11.05 | 22.10 | 483 | 965 |

82

**Notes:**

(1).    The total storage period for a container shall be reckoned from the day following the day of landing upto the day of shipment/delivery/date of removal of the container and includes Sundays and Holidays but excludes Custom notified holidays and port non working days.

(2).    Transhipment containers subsequently changing the mode of dispatch locally or to the container freight station for destuffing/stuffing shall loose the concessional dwell time as prescribed in Item (4) above. Dwell time charges for such containers shall be recovered at par with import containers as prescribed in item no. 1 or 2 as applicable.

(3).    Transhipment containers subsequently changing the mode of dispatch by rail to ICD shall be treated as other ICD containers for the purpose of levy of Dwell time charges fees and shall be charged at the rates in item (4) above. In such cases additional shifting charge will be applicable for movement of container to container yard to ICD yard.

(4).    A container from foreign port landing at the JNPT for subsequent transhipment to an Indian Port on a coastal voyage or vice versa would be charged at 50% of the transhipment charges prescribed for foreign going vessels and 50% of that prescribed for coastal category.

(5).    Normal import containers subsequently changing the mode of dispatch by rail to ICD will enjoy the free period applicable to normal import container only. In such cases additional shifting charges will be applicable for movement of container from container yard to ICD yard.

(6).    The total storage period for a shutout container shall be calculated from the day following the day when the container has become shutout till the day of Shipment/delivery.

(7).    Over high and over dimensional containers shall attract thrice the normal applicable charges.

(8).    Hazardous containers shall attract 1.25 times the normal applicable charges.

(9).    In case of stuffing the containers inside the port, the dwell time charges will be applicable as follows:

    (i).    Prior to stuffing, dwell time charges as applicable to empty containers will be charged.

    (ii).    Free period and dwell time charges as applicable to loaded export containers will be charged from the day following the day of completion of stuffing and intimation to Port.

(10).    In the case of auction containers, after the auction is over, the empty containers will attract the dwell time charges as empty containers from the following day the destuffing is completed.

(11).    The storage charges on abandoned FCL containers/shipper owned containers shall be levied upto the date of receipt of intimation of abandonment in writing or 75 days from the day of landing of the container, whichever is earlier subject to the following:

    (i).    The consignee can issue a letter of abandonment at any time.

(ii).    If the consignee chooses not to issue such letter of abandonment, the container Agent/MLO can also issue abandonment letter subject to the condition that,

    (a)    the Line shall resume custody of container along with cargo and either take back it or remove it from the port premises; and

    (b)    the line shall pay all port charges accrued on the cargo and container before resuming custody of the container.

(iii).    The container Agent /MLO shall observe the necessary formalities and bear the cost of transportation and destuffing. In case of their failure to take such action within the stipulated period, the storage charge on container shall be continued to be levied till such time all the necessary actions are taken by the shipping lines for destuffing of cargo.

(iv).    Where the container is seized/confiscated by the Custom Authorities and the same cannot be destuffed within the prescribed time limit of 75 days, the storage charges will cease to apply from the day the Custom order release of the cargo subject to lines observing the necessary formalities and bearing the cost of transportation and de-stuffing. Otherwise, seized/confiscated containers should be removed by the line/consignee from the port premises to the Customs bonded area and in that case the storage charge shall cease to apply from the day of such removal.

(12).    The storage charges shall not accrue for the period during which the JNPT is not in a position to deliver containers for reasons attributable to it when requested by the user.

### 3.3.4.    CHARGES FOR MISCELLANEOUS SERVICES RENDERED TO THE CONTAINER VESSELS:

**HATCH COVER CHARGES**

**A.    OPENING OF HATCH COVER AND REPLACING IT:**

| Description | Rate per Hatch Cover | |
| --- | --- | --- |
| | Foreign-going vessels (in US $) | Coastal vessels (in Rs.) |
| When placing it on the quay | 52.513 | 1376 |
| Without placing it on the quay | 21.00 | 551 |

Note:    If only one operation is carried out, half of the hatch cover handling charges as above shall be levied.

**B.    ONE HATCH TO ANOTHER HATCH OR WITHIN THE SAME HATCH:**

| Description | Rate per TEU | | | |
| --- | --- | --- | --- | --- |
| | Foreign-going vessels (in US$) | | Coastal vessels (in Rs.) | |
| | Loaded | Empty | Loaded | Empty |
| (a). Hatch to hatch shifting (involving 1 move only) | 17.502 | 17.502 | 459 | 459 |
| (b). Other than (a) mentioned above | 70.015 | 70.015 | 1838 | 1838 |

84

# Exhibit 2

## Brokerage & Handling Quotes

# Samsara Shipping Pvt. Ltd.

## IMPORT LOCAL CHARGES

### DOCK DESTUFFING/CFS DELIVERY

| | | JNP 20/RS | JNP 40/RS | NSICT 20/RS | NSICT 40/RS | GTI 20/RS | GTI 40/RS |
|---|---|---|---|---|---|---|---|
| THC CHGS | NON-HAZ | 6955 | 11190 | 7375 | 11830 | 8075 | 12870 |
| | HAZ | 7670 | 12265 | 8495 | 13495 | 8740 | 13865 |
| CLEANING CHARGE | GEN CGO | 450 | 900 | 450 | 900 | 450 | 900 |
| | SCRAP/CHEMICAL/METAL | 900 | 1800 | 900 | 1800 | 900 | 1800 |
| | OIL/MACHINERY/NAPHTHALENE | 1200 | 2400 | 1200 | 2400 | 1200 | 2400 |
| PROCESSING FEE | PER B/L | 500 | 500 | 500 | 500 | 500 | 500 |
| ADMIN CHARGE | PER B/L | 50 | | 50 | | 50 | |
| DOCUMENTATION FEE | UPTO 5 CONTAINERS/PER BL | 2500 | | 2500 | | 2500 | |
| | BETWEEN 6-10 CNTRS PER BL | 3000 | | 3000 | | 3000 | |
| | BETWEEN 11-15 CNTRS PER BL | 3500 | | 3500 | | 3500 | |
| | ABOVE 15 CONTAINERS | 4000 | | 4000 | | 4000 | |
| CUSTOM EXAMINATION D/O DO VALIDATION | PER B/L | 700 | 700 | 700 | 700 | 700 | 700 |
| | | 200 | 200 | 200 | 200 | 200 | 200 |
| SERVICE TAX | ON ALL ABOVE CHARGES | 10.3 PER CENT | | | | | |

### DOCK DESTUFFING/CFS DELIVERY (MUMBAI PORT)

| | | MUMBAI PORT 20/RS | MUMBAI PORT 40/RS |
|---|---|---|---|
| THC CHGS | NON-HAZ | 11230 | 19860 |
| CLEANING CHARGE | GEN CGO | 450 | 900 |
| | SCRAP/CHEMICAL/METAL | 900 | 1800 |
| | OIL/MACHINERY/NAPHTHALENE | 1200 | 2400 |
| PROCESSING FEE | PER B/L | 500 | 500 |
| ADMIN CHARGE | PER B/L | 50 | |
| DOCUMENTATION FEE | UPTO 5 CONTAINERS/PER BL | 2500 | |
| | BETWEEN 6-10 CNTRS PER BL | 3000 | |
| | BETWEEN 11-15 CNTRS PER BL | 3500 | |

### FACTORY DESTUFFING/ICY DELIVERY

| | | JNP 20/RS | JNP 40/RS | NSICT 20/RS | NSICT 40/RS | GTI 20/RS | GTI 40/RS |
|---|---|---|---|---|---|---|---|
| THC CHGS | NON-HAZ | 3465 | 5320 | 4165 | 6365 | 4575 | 6985 |
| | HAZ | 4180 | 6395 | 4995 | 7610 | 5340 | 7880 |
| SURVEY CAHRGE | | 200 | 400 | 200 | 400 | 200 | 400 |
| CLEANING CHARGE | GEN CGO | 450 | 900 | 450 | 900 | 450 | 900 |
| | SCRAP/CHEMICAL/METAL | 900 | 1800 | 900 | 1800 | 900 | 1800 |
| | OIL/MACHINERY/NAPHTHALENE | 1200 | 2400 | 1200 | 2400 | 1200 | 2400 |
| PROCESSING FEE | PER B/L | 500 | 500 | 500 | 500 | 500 | 500 |
| ADMIN CHARGE | PER B/L | 50 | | 50 | | 50 | |
| DOCUMENTATION FEE | UPTO 5 CONTAINERS/PER BL | 2500 | | 2500 | | 2500 | |
| | BETWEEN 6-10 CNTRS PER BL | 3000 | | 3000 | | 3000 | |
| | BETWEEN 11-15 CNTRS PER BL | 3500 | | 3500 | | 3500 | |
| | ABOVE 15 CONTAINERS | 4000 | | 4000 | | 4000 | |
| CUSTOM EXAMINATION D/O DO VALIDATION | PER B/L | 700 | 700 | 700 | 700 | 700 | 700 |
| | | 200 | 200 | 200 | 200 | 200 | 200 |
| SERVICE TAX | ON ALL ABOVE CHARGES | 10.3 PER CENT | | | | | |

FOR HDS/LINE / ISPS CHARGES (USD) PER CONTAINER IS APPLICABLE AS PER VESSEL VOYAGE) (EX-RATE IS APPLICABLE)

### FACTORY DESTUFFING/ICY DELIVERY (MUMBAI PORT)

| | | MUMBAI PORT 20/RS | MUMBAI PORT 40/RS |
|---|---|---|---|
| THC CHGS | NON-HAZ | 8000 | 12905 |
| SURVEY CAHRGE | | 200 | 400 |
| CLEANING CHARGE | GEN CGO | 450 | 900 |
| | SCRAP/CHEMICAL/METAL | 900 | 1800 |
| | OIL/MACHINERY/NAPHTHALENE | 1200 | 2400 |
| PROCESSING FEE | PER B/L | 500 | 500 |
| ADMIN CHARGE | PER B/L | 50 | |
| DOCUMENTATION FEE | UPTO 5 CONTAINERS/PER BL | 2500 | |
| | BETWEEN 6-10 CNTRS PER BL | 3000 | |
| | BETWEEN 11-15 CNTRS PER BL | 3500 | |

| CUSTOM EXAMINATION D/O | ABOVE 15 CONTAINERS | 4000 |
|---|---|---|
| PER B/L | 700 | 700 |
| DO VALIDATION | 200 | 200 |
| SERVICE TAX | ON ALL ABOVE CHARGES | 10.3 PER CENT |

## CONTAINER DETENTION CHARGES TARIFF

FOR GENERAL CARGO

FIRST FIVE (5) DAYS FREE FROM THE DAY FOLLOWING THE DATE OF LANDING

| | 20' PER DAY | 40' PER DAY |
|---|---|---|
| NEXT 7 DAYS @ | USD 6.5 | USD 17 |
| NEXT 7 DAYS @ | USD 13.5 | USD 27 |
| NEXT 7 DAYS @ | USD 17.5 | USD 35 |
| THEREAFTER TILL DATE OF CLEARANCE | USD 48.0 | USD 96 |

| CUSTOM EXAMINATION D/O | ABOVE 15 CONTAINERS | 4000 | |
|---|---|---|---|
| PER B/L | | 700 | 700 |
| MOVEMENT COST IS ADDITIONAL FOR CFS DELIVERY | | 2170 | 4070 |
| SERVICE TAX | ON ALL ABOVE CHARGES | 10.3 PER CENT | |

## DIRECT / CGL THRU LINE. THE CHARGES ON WEIGHT OR CBM, WHICHEVER IS HIGHER

| | JNPT | | NSICT | | GTI | | MUMBAI PORT | |
|---|---|---|---|---|---|---|---|---|
| | PER TON | PER CBM | PER TON | PER CBM | PER TON | PER CBM | PER TON | PER CBM |
| NON HAZ | RS897.00 | RS 530.00 | RS 905.00 | RS 535.00 | RS 983.00 | RS 581.00 | RS.772.00 | RS 456.00 |
| HAZ | RS 1028.00 | RS 608.00 | RS.1020.00 | RS 603.0 | RS.1111.00 | RS 658.00 | RS.812.00 | RS 480.0 |
| Delivery order charges | Rs.2500/- per b/l | | Rs.2500/- per b/l | | Rs.2500/- per b/l | | Rs. 2500/- per b/l | |
| Processing fee | Rs.400/- per b/l | | Rs.400/- per b/l | | Rs.400/- per b/l | | Rs. 400/- per b/l | |
| Admin charges | Rs 50/- per B/L | | Rs 50/- per B/L | | Rs 50/- per B/L | | Rs. 50/- per B/L | |
| SERVICE TAX | ON ALL ABOVE CHARGES | | 10.3 PER CENT | | | | | |

### NOTES:

1) FOR FACTORY DESTUFFING / CY DELIVERY :
Indemnity Bond is required.(Blank cheque and insurance policy is not required other than following commodities for CY delivery)

2) ALL PAYMENTS TO BE MADE ONLY BY DEMAND DRAFT OF NATIONALISED BANK OR FOREIGN BANK

3) SEPARATE DEMAND DRAFT FOR : FREIGHT PAYMENT, LOCAL CHARGES AND CONTAINER DETENTION CHARGES

4)COLLECTING SECURITY DEPOSIT OF INR 10000 FOR METAL SCRAP FOR CFS DELIVERY IN D.D (20' & 40')

5) COLLECTING SECURITY DEPOSIT OF INR 20000 FOR BITUMEN AND RUBBER PROCESS OIL FOR CFS DELIVERY (20' & 40')

6) COLLECTING SECURITY DEPOSIT OF INR 5000 FOR STEEL COILS (20' & 40')

7)COLLECTING SECURITY DEPOSIT OF INR 10000 FOR SPECIAL EQUIPMNET

8) COLLECTING HOUSE B/L SUBMISSION FEE INR 1750/- PER HB/L

9) NISHEVA D/O - ADMINISTRATION BUILDING , 2ND FLOOR , CWC LOGISTICS PARK, PLOT NO 4, SECTOR 10, D NODE , NAVI MUMBAI 400707
BOARD NO - 91-22-27231860 / FAX NO - 91-22-27231861 / DO COUNTER - 91-22-27231862

10)VINAY YARD - 39581294, VIRGO YARD - 39581295, CONMART -27868140, HINDUSTAN -27241919/1375

11)IVRS - 40372000

12)EXIM WEB - www.eximin.net (NOTICE WILL REMAIN ON SITE FOR A PERIOD OF 7 DAYS FROM THE DATE OF PUBLICATION]

13)WEB SITES - www.samsarashipping.com

14) DEMAND DRAFT SHOULD BE MADE IN FAVOUR OF SAMSARA SHIPPING PVT LTD

15) SEPERATE DEMAND DRAFTS SHOULD BE MADE FOR DETENTION CHARGES, LOCAL CHARGES AND FREIGHT (FOR COLLECT SHIPMENTS ONLY)

page 2 of 2

# HAPAG-LLOYD (INDIA) PVT.LTD.
## MUMBAI IMPORT DOCUMENTATION

### Imports THD

#### Mumbai (Old Port)

| | 20' | 40' |
|---|---|---|
| Factory  Non Haz | 5135 | 7500 |
| Factory  Haz | 5670 | 8300 |
| Dock  Non Haz | 10030 | 17060 |
| Dock  Haz | 10560 | 17860 |
| LCL  Non Haz | 872/w | 556/m |
| LCL  Haz | 912/w | 580/m |
| Reefer  Factory | 5135 | 7500 |
| Reefer  Dock | 9035 | 15165 |

#### NSICT

| | 20' | 40' |
|---|---|---|
| Factory - Non Haz Upto 23 MT. | 4635 | 7400 |
| Factory - Haz Upto 23 MT. | 5335 | 8545 |
| Dock -  Non Haz Upto 23 MT. | 6065 | 10355 |
| Dock -  Haz Upto 23 MT. | 6760 | 11500 |
| LCL -  Non Haz | 1010/w | 640/m |
| LCL -  Haz | 1115/W | 710/m |
| Reefer | 6126 | 8678 |

#### JNPT

| | 20' | 40' |
|---|---|---|
| Factory - Non Haz Upto 23 MT. | 3465 | 5320 |
| Factory - Haz Upto 23 MT. | 4180 | 6395 |
| Dock -  Non Haz Upto 23 MT. | 5955 | 10190 |
| Dock -  Haz Upto 23 MT. | 6670 | 11265 |
| LCL -  Non Haz | 1000/w | 640/m |
| LCL -  Haz | 1130/w | 715/m |
| Reefer | 3795 | 5980 |

#### GTI

| | 20' | 40' |
|---|---|---|
| Factory - Non Haz Upto 23 MT. | 4575 | 6985 |
| Factory - Haz Upto 23 MT. | 5240 | 7980 |
| Dock -  Non Haz Upto 23 MT. | 7075 | 11870 |
| Dock -  Haz Upto 23 MT. | 7740 | 12865 |
| LCL -  Non Haz | 1095/w | 690/m |
| LCL -  Haz | 1220/w | 760/m |
| Reefer | 4905 | 7650 |

PLEASE NOTE : Only in case of Over Dimension Cargo, THC Charges would be Double, and additon of Ground Rent if any after 3 Free days, rest other charges same.

### Detention Charges

#### Dry Cargo
##### Mumbai, Nhava Sheva & Mulund CFS

| Days | 20' | 40' |
|---|---|---|
| 00 day to 05 day | Free | Free |
| 06 day to 12 day | $10.00 | $20.00 |
| 13 day to 19 day | $15.00 | $30.00 |
| 20 day to 26 day | $19.00 | $38.00 |
| 27 day & above | $50.00 | $100.00 |

#### Reefer Cargo
##### Nhava Sheva (NSICT) & Mumbai

| Days | 20' | 40' |
|---|---|---|
| 00 day to 01 day | Free | Free |
| 02 day to 08 day | $30.00 | $45.00 |
| 09 day & 15 day | $40.00 | $60.00 |
| 15 day & above | $50.00 | $75.00 |

### Plugging Charges

| | |
|---|---|
| Mumbai / Nhava Sheva | USD 50 Per Day |

### Monitoring Charges

| | |
|---|---|
| Mumbai / Nhava Sheva | Rs.1800/- Per Day |

NOTE : Plugging & Monitoring are at actuals in addition to THC

### SSR (Special Service Request) Charges

| | |
|---|---|
| Mumbai / Nhava Sheva | 20'- Rs 1000/- 40'- Rs 1500 + S.Tax |

### Documentation Charges

| | |
|---|---|
| Documentation Charges | Rs. 3000/- |
| Service Tax | Rs. 10.30% |
| Charges per LCL Do | Rs. 850/- |
| House B/L Doc. Charges per B/L-non self-filers | Rs.1500 + S.Tax |

### Manifestation Charges

| | |
|---|---|
| Manifestation Charges - FCL | Rs 1500/- + SERVICE TAX |
| Manifestation Charges - LCL per Bl | Rs 1500/- + SERVICE TAX |
| Amendment Charges | Rs 2800/- + SERVICE TAX |

### Equipment Maintenance Fee

| | |
|---|---|
| General & OOG : 20'- Rs 1000/- 40'- Rs 2000/- | |
| DG/REEFER : 20'- Rs 2000/-  40'- Rs 4000/- | |

### Off Loading Charges

| | 20' | 40' |
|---|---|---|
| Factory Only | 160 | 320 |

From: www.hapag-lloyd.com/downloads/pdf/New_Mumbai_Imports_Tariff(3).pdf (last accessed 8/3/2010)

# Exhibit 3

## Administrative Reviews of
## Various Products from India

## Indian Brokerage & Handling

| Company | Case | POR | DBROKU | original value | conversion |
|---|---|---|---|---|---|
| Lloyds Metals & Engineers | A-533-592 Welded Carbon Steel Pipes from India | 5/1/2008 - 4/30/2009 | 0.374589 Rs/KG | 374.5893 Rs/MT | 0.001 |
| Liberty Frozen Foods | A-533-840 Frozen Warmwater Shrimp from India | 2/1/2008 - 1/31/2009 | 0.161385 Rs/KG | 0.355793 Rs/lb | 0.4535924 |
| Falcon Marine Exports | A-533-840 Frozen Warmwater Shrimp from India | 2/1/2008 - 1/31/2009 | 0.22226 Rs/KG | 0.49 Rs/lb | 0.4535924 |
| Venus | A-533-810 Stainless Steel Bars from India | 2/1/2008 - 1/31/2009 | 0.137393 Rs/KG | 0.3029 Rs/lb | 0.4535924. |
| | | Average: | 0.498627 Rs/KG | | |

**FOR PUBLIC FILE**

Arent Fox LLP / Washington, DC / New York, NY / Los Angeles, CA

RECEIVED

MAY 1 4 2010

DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

# Arent Fox

John M. Gurley
Attorney
202.857.6301 DIRECT
202.857.6395 FAX
gurley.john@arentfox.com

May 14, 2010

**VIA HAND DELIVERY**

The Honorable Gary F. Locke
Secretary of Commerce
Central Records Unit, Room 1870
U.S. Department of Commerce
14th and Constitution Avenue, N.W.
Washington, D.C. 20230

Case No.: A-533-502
Total Pages: 19
Administrative Review
May 1, 2008 – April 30, 2009

Proprietary information REMOVED at
Attachment 1.

**PUBLIC VERSION**

Attention:   Mike Romani
             Minoo Hatten

Re:   **Certain Welded Carbon Steel Standard Pipes and Tubes from India**; Revised Sales
      **Database**

Dear Secretary Locke:

On behalf of Lloyds Metals & Engineers Limited and Lloyds Steel Industries Limited

("Lloyds"), and in response to instructions from the U.S. Department of Commerce (the

"Department") officials conducting the Sales Verification of Lloyds in India the week of May 5,

2010, we hereby file a revised U.S. sales database incorporating changes discussed at the

Department's Sales Verification. A CD-ROM containing the revised U.S. sales database is being

1050 Connecticut Avenue, NW
Washington, DC 20036-5339
T 202.857.6000   F 202.857.6395

1675 Broadway
New York, NY 10019-5820
T 212.484.3900   F 212.484.3990

555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
T 213.629.7400   F 213.629.7401

submitted along with this letter. A computer print-out of the revised U.S. sales database is

provided at Attachment 1.

Certain information in this submission is confidential business proprietary information of

Lloyds. This information is indicated by brackets ("[ ]"). Pursuant to 19 C.F.R. § 351.304,

proprietary numerical data has been summarized by grouping or presenting them in terms of

indices or figures within 10 percent of the actual figure, and where the numerical data have been

voluminous, no less than 1 percent of representative data have been summarized by grouping or

presentation in terms of indices or figures within 10 percent of the actual figure. This

information is not available to the public in any substantially similar form. Disclosure of such

information, which has been marked "Proprietary Treatment Requested," would cause

substantial harm to the business operations and competition position of Lloyds. Furthermore,

disclosure could impede the Department's ability to gather similar information in the future.

Lloyds hereby agrees to limited release of this confidential business proprietary

information, which is indicated by single brackets ("[ ]"), to counsel listed on the administrative

protective order ("APO") service list in this investigation. Information marked as business

proprietary has been marked for one or more of the following reasons, pursuant to 19 C.F.R.

§ 351.105(c):

(2) Production costs (but not the identity of the production components unless a
   particular component is a trade secret);

(3) Distribution costs (but not channels of distribution);

(4) Terms of sale (but not terms of sale offered to the public);

The Honorable Gary Locke
May 14, 2010
Page 3

(5)  Prices of individual sales, likely sales, or other offers (but not components
of prices, such as transportation, if based on published schedules, dates of
sale, product descriptions (other than business or trade secrets described in
paragraph (c)(1) of this section), or order numbers);

(6)  Names of particular customers, distributors, or suppliers (but not destination
of sale or designation of type of customer, distributor, or supplier, unless the
destination or designation would reveal the name);

. . .

(11)  Any other specific business information the release of which to the public
would cause substantial harm to the competitive position of the submitter.

A copy of this request has been served on each party listed in the Department's service

list, as indicated in the attached certificate of service.

Please contact the undersigned should you have any questions regarding this submission.

Respectfully submitted,

John M. Gurley
Mark P. Lunn
Diana Dimitriuc Quaia
Arent Fox LLP

*Counsel to Lloyds Metals &
Engineers Limited and Lloyds Steel
Industries Limited*

INTER/215998.2

**JA0677**

# Attachment 1

PIPE AN TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ann   Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

The CONTENTS Procedure

| | |
|---|---|
| Data Set Name | LLOYDS.LLOYDS_AR0809_US05 |
| Member Type | DATA |
| Engine | v9 |
| Created | Friday, May 07, 2010 09:16:57 AM |
| Last Modified | Friday, May 07, 2010 09:16:57 AM |
| Protection | |
| Data Set Type | |
| Label | |
| Data Representation | WINDOWS_32 |
| Encoding | wlatin1  Western (Windows) |

| | |
|---|---|
| Observations | 3079 |
| Variables | 63 |
| Indexes | 0 |
| Observation Length | 592 |
| Deleted Observations | 0 |
| Compressed | NO |
| Sorted | YES |

Engine/Host Dependent Information

| | |
|---|---|
| Data Set Page Size | 16384 |
| Number of Data Set Pages | 115 |
| First Data Page | 1 |
| Max Obs per Page | 27 |
| Obs in First Data Page | 15 |
| Number of Data Set Repairs | 0 |
| File Name | c:\lloyds_ar0809_us05.sas7bdat |
| Release Created | 9.0101M3 |
| Host Created | WIN_PRO |

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat |
|---|----------|------|-----|--------|----------|
| 18 | CHANNELU | Num | 8 | BEST11. | 11. |
| 51 | COMGU | Num | 8 | COMMA8.2 | 8. |
| 4 | CONNUMU | Char | 17 | 17. | 17. |
| 20 | CONTDATU | Num | 8 | YYMMDD10. | |
| 23 | CONTRACTU | Char | 15 | 15. | 15. |
| 54 | CREDITU | Num | 8 | COMMA8.2 | 9. |
| 36 | CURRU | Char | 7 | 7. | 7. |
| 17 | CUSCATU | Num | 8 | BEST9. | 9. |
| 15 | CUSCODU | Num | 8 | BEST10. | 10. |
| 16 | CUSRELU | Num | 8 | BEST9. | 9. |
| 14 | CUSTNAMU | Char | 37 | 37. | 37. |
| 45 | DBROKU | Num | 8 | COMMA8.2 | 9. |
| 35 | DESSPVALU | Num | 8 | COMMA12.2 | 12. |
| 59 | DINDIRSU | Num | 8 | COMMA8.2 | 9. |
| 43 | DINLFTPU | Num | 8 | COMMA8.2 | 10. |
| 42 | DINLFTWU | Num | 8 | BEST10. | 10. |
| 60 | DINYCARU | Num | 8 | COMMA8.2 | 10. |
| 56 | DIRSELIU | Num | 8 | COMMA8.2 | 10. |
| 57 | DIRSEL2U | Num | 8 | COMMA8.2 | 10. |
| 58 | DIRSEL3U | Num | 8 | COMMA8 | 10. |
| 50 | DTYDRAWU | Num | 8 | BEST11. | 11. |
| 37 | EARLPYU | Num | 8 | BEST9. | 9. |
| 12 | EFINISHU | Num | 8 | BEST9. | 9. |
| 25 | FACTDTU | Num | 8 | YYMMDD10. | 14. |
| 24 | FACTINVU | Char | 14 | 14. | 14. |
| 26 | FACTQTYU | Num | 8 | 8.3 | 12. |

*** PUBLIC VERSION ***

JA0679

PIPE AND TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Anr.  Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

The CONTENTS Procedure

Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat |
|---|----------|------|-----|--------|----------|
| 11 | FINISHU | Num | 8 | BEST8. | 8. |
| 7 | GRADEU | Num | 8 | BEST8. | 8. |
| 33 | GRSUPRDU | Num | 8 | COMMA8.2 | 11. |
| 34 | GRSUPRIU | Num | 8 | COMMA10.2 | 10. |
| 44 | INSUREU | Num | 8 | BEST9. | 9. |
| 46 | INTNFRU | Num | 8 | COMMA8.2 | 9. |
| 22 | INVOICEU | Char | 19 | 19. | 19. |
| 41 | LOTU | Num | 8 | BEST6. | 6. |
| 47 | MARININU | Num | 8 | COMMA8.2 | 12. |
| 39 | OTHDISU | Num | 8 | COMMA8.2 | 9. |
| 5 | OVERRUNU | Char | 11 | 11. | 11. |
| 61 | PACKU | Num | 8 | COMMA8.2 | 11. |
| 28 | PAYDATEU | Num | 8 | YYMMDD10. | 7. |
| 30 | PAYTERMU | Char | 11 | 11. | 11. |
| 6 | PRIMEU | Num | 8 | BEST8. | 8. |
| 2 | PRODCODU | Char | 12 | 12. | 12. |
| 3 | PRODNAMU | Char | 11 | 11. | 11. |
| 38 | QTYDISU | Num | 8 | BEST9. | 9. |
| 31 | QTYU | Num | 8 | 8.3 | 11. |
| 32 | QTYUNITU | Num | 8 | BEST10. | 10. |
| 21 | SALEDATU | Num | 8 | YYMMDD10. | |
| 29 | SALETERU | Char | 10 | 10. | 10. |
| 13 | SALEU | Char | 7 | 7. | 7. |
| 19 | SALINDTU | Num | 8 | YYMMDD10. | |
| 10 | SCHU | Num | 8 | BEST6. | 6. |
| 52 | SELAGENU | Char | 15 | 15. | 15. |
| 53 | SELARELU | Char | 14 | 14. | 14. |
| 1 | SEQU | Num | 8 | BEST6. | 6. |
| 27 | SHIPDATU | Num | 8 | YYMMDD10. | |
| 8 | SIZEU | Num | 8 | BEST9. | 9. |
| 63 | TCOMU | Num | 8 | COMMA10.2 | |
| 40 | TRADEDISU | Num | 8 | COMMA8.2 | 11. |
| 49 | USDUTYU | Num | 8 | BEST9. | 9. |
| 48 | USWAREU | Num | 8 | BEST10. | 10. |
| 62 | VCOMU | Num | 8 | COMMA10.2 | |
| 9 | WALLU | Num | 8 | BEST7. | 7. |
| 55 | WARRU | Num | 8 | COMMA8.2 | 10. |

*** PUBLIC VERSION ***

PIPE A" TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Anr. Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

The CONTENTS Procedure

Variables in Creation Order

| # | Variable | Type | Len | Format | Informat |
|---|----------|------|-----|--------|----------|
| 1 | SEQU | Num | 8 | BEST6. | 6. |
| 2 | PRODCODU | Char | 12 | 12. | 12. |
| 3 | PRODNAMU | Char | 11 | 11. | 11. |
| 4 | CONNUMU | Char | 17 | 17. | 17. |
| 5 | OVERRUNU | Char | 11 | 11. | 11. |
| 6 | PRIMEU | Num | 8 | BEST8. | 8. |
| 7 | GRADEU | Num | 8 | BEST8. | 8. |
| 8 | SIZEU | Num | 8 | BEST9. | 9. |
| 9 | WALLU | Num | 8 | BEST7. | 7. |
| 10 | SCHU | Num | 8 | BEST6. | 6. |
| 11 | FINISHU | Num | 8 | BEST8. | 8. |
| 12 | EFINISHU | Num | 8 | BEST9. | 9. |
| 13 | SALEU | Char | 7 | 7. | 7. |
| 14 | CUSTNAMU | Char | 37 | 37. | 37. |
| 15 | CUSCODU | Num | 8 | BEST10. | 10. |
| 16 | CUSRELU | Num | 8 | BEST9. | 9. |
| 17 | CUSCATU | Num | 8 | BEST9. | 9. |
| 18 | CHANNELU | Num | 8 | BEST11. | 11. |
| 19 | SALINDTU | Num | 8 | YYMMDD10. | |
| 20 | CONTDATU | Num | 8 | YYMMDD10. | |
| 21 | SALEDATU | Num | 8 | YYMMDD10. | |
| 22 | INVOICEU | Char | 19 | 19. | 19. |
| 23 | CONTRACTU | Char | 15 | 15. | 15. |
| 24 | FACTINVU | Char | 14 | 14. | 14. |
| 25 | FACTDTU | Num | 8 | YYMMDD10. | 12. |
| 26 | FACTQTYU | Num | 8 | 8.3 | |
| 27 | SHIPDATU | Num | 8 | YYMMDD10. | |
| 28 | PAYDATEU | Num | 8 | YYMMDD10. | |
| 29 | SALETERU | Char | 10 | 10. | 10. |
| 30 | PAYTERMU | Char | 11 | 11. | 11. |
| 31 | QTYU | Num | 8 | 8.3 | |
| 32 | QTYUNITU | Num | 8 | BEST10. | 10. |
| 33 | GRSUPRDU | Num | 8 | COMMA8.2 | 11. |
| 34 | GRSUPRIU | Num | 8 | COMMA10.2 | 10. |
| 35 | DESPVALU | Num | 8 | COMMA12.2 | 12. |
| 36 | CURRU | Char | 7 | 7. | 7. |
| 37 | EARLPYU | Num | 8 | BEST9. | 9. |
| 38 | QTYDISU | Num | 8 | BEST9. | 9. |
| 39 | OTHDISU | Num | 8 | COMMA8.2 | 9. |
| 40 | TRADEDISU | Num | 8 | COMMA8.2 | 11. |
| 41 | LOTU | Num | 8 | BEST6. | 6. |
| 42 | DINLFTWU | Num | 8 | BEST10. | 10. |
| 43 | DINLFTPU | Num | 8 | COMMA8.2 | 10. |
| 44 | INSUREU | Num | 8 | BEST9. | 9. |
| 45 | DBROKU | Num | 8 | COMMA8.2 | 9. |
| 46 | INTNFRU | Num | 8 | COMMA8.2 | 9. |
| 47 | MARININU | Num | 8 | COMMA8.2 | 12. |
| 48 | USWAREU | Num | 8 | BEST10. | 10. |
| 49 | USDUTYU | Num | 8 | BEST9. | 9. |
| 50 | DTYDRAWU | Num | 8 | BEST11. | 11. |
| 51 | COMMU | Num | 8 | COMMA8.2 | 8. |

*** PUBLIC VERSION ***

PIPE A' TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ani. Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

The CONTENTS Procedure

Variables in Creation Order

| # | Variable | Type | Len | Format | Informat |
|---|----------|------|-----|--------|----------|
| 52 | SELAGENU | Char | 15 | 15. | 15. |
| 53 | SELARELU | Char | 14 | 14. | 14. |
| 54 | CREDITU | Num | 8 | COMMA8.2 | 9. |
| 55 | WARRU | Num | 8 | COMMA8.2 | 10. |
| 56 | DIRSEL1U | Num | 8 | COMMA8.2 | 10. |
| 57 | DIRSEL2U | Num | 8 | COMMA8.2 | 10. |
| 58 | DIRSEL3U | Num | 8 | COMMA8.2 | 10. |
| 59 | DINDIRSU | Num | 8 | COMMA8.2 | 9. |
| 60 | DINVCARU | Num | 8 | COMMA8.2 | 10. |
| 61 | PACKU | Num | 8 | COMMA8.2 | 7. |
| 62 | VCOMU | Num | 8 | COMMA10.2 | |
| 63 | TCOMU | Num | 8 | COMMA10.2 | |

Sort Information

| Sortedby | SEQU |
|----------|------|
| Validated | YES |
| Character Set | ANSI |

*** PUBLIC VERSION ***

PIPE A' TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ani    Review FOR: 5/1/08 through 4/30/0?
U.S. Sales Data

| SEQU | PRODCODU | PRODNAMU | CONNUMU | OVERRUNU | SALEU | EFINISHU | FINISHU | SCHU | WALLU | SIZEU | GRADEU | PRIMEU | CUSCATU | CHANNELU | SALINDTU | CONTDATU | SALEDATU | INVOICEU | SALETERU | SHIPDATU | PAYDATEU | DINLFTPU | GRSUPRIU |
|------|----------|----------|---------|----------|-------|----------|---------|------|-------|-------|--------|--------|---------|----------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 1 | | | | | | | | | | | | | | | | | | | | | | | 40,589 |
| 50 | | | | | | | | | | | | | | | | | | | | | | | 54,078 |
| 100 | | | | | | | | | | | | | | | | | | | | | | | 54,068 |
| 150 | | | | | | | | | | | | | | | | | | | | | | | 47,456 |
| 200 | | | | | | | | | | | | | | | | | | | | | | | 40,212 |
| 250 | | | | | | | | | | | | | | | | | | | | | | | 46,570 |
| 300 | | | | | | | | | | | | | | | | | | | | | | | 42,594 |
| 350 | | | | | | | | | | | | | | | | | | | | | | | 47,904 |

| SEQU | CUSTNAMU | CUSCODU | CUSRELU | GRSUPRDU | QTYUNITU (QTY) | USDUTYU |
|------|----------|---------|---------|----------|----------------|---------|
| 1 | | | | 1,019 | 25 | 0 |
| 50 | | | | 1,180 | 3 | 0 |
| 100 | | | | 1,246 | 19 | 0 |
| 150 | | | | 1,213 | 6 | 0 |
| 200 | | | | | 7 | 0 |
| 250 | | | | 951 | 7 | 0 |
| 300 | | | | 1,035 | 23 | 0 |
| 350 | | | | 1,235 | 24 | 0 |

| SEQU | CONTRACTU | FACTIDTU | FACTQTYU | MARININU | USWAREU | PAYTERMU (DBROKU) | INTNFRU |
|------|-----------|----------|----------|----------|---------|-------------------|---------|
| 1 | | | 26,938 | 0 | 0 | 150 | 3,082 |
| 50 | | | 2,843 | 0 | 0 | 0 | 0 |
| 100 | | | 19,963 | 0 | 0 | 346 | 3,332 |
| 150 | | | 5,237 | 0 | 0 | 0 | 0 |
| 200 | | | 6,618 | 0 | 0 | 331 | 3,388 |
| 250 | | | 7,381 | 0 | 0 | 652 | 3,197 |
| 300 | | | 23,459 | 0 | 0 | 903 | 3,187 |
| 350 | | | 26,195 | 0 | 0 | 939 | 3,390 |

| SEQU | DESPVALU | CURRU | EARLPYU | QTYDISU | OTHDISU | TRADEDISU | CREDITU | LOTU | DINLFTWU | DINLFTPU | INSUREU | DIRSELI3U | DINDIRSU | DINVCARU |
|------|----------|-------|---------|---------|---------|-----------|---------|------|----------|----------|---------|-----------|----------|----------|
| 1 | 1,168,267 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 409 | 0 | 2 | 115 | |
| 50 | 141,261 | USD | 0 | 0 | 0 | 160 | | 1 | 0 | 425 | 0 | 1 | 130 | |
| 100 | 998,866 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 1,486 | 0 | 1 | 132 | |
| 150 | 289,604 | USD | 0 | 0 | 0 | 161 | | 1 | 0 | 446 | 0 | 3 | 114 | |
| 200 | 229,377 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 420 | 0 | 1 | 133 | |
| 250 | 281,442 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 406 | 0 | 1 | 131 | |
| 300 | 971,458 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 417 | 0 | 0 | 127 | |
| 350 | 1,388,780 | USD | 0 | 0 | 0 | 0 | | 1 | 0 | 452 | 0 | 1 | 122 | |

| SEQU | DTYDRAWU | COMMU | SELAGENU | SELARELU | WARRU | DIRSELIU | DIRSELI2U | CREDITU | PACKU | VCOMU | TCOMU |
|------|----------|-------|----------|----------|-------|----------|-----------|---------|-------|-------|-------|
| 1 | 0 | 268 | 0 | | 1,438 | 143 | 14 | 1 | 540 | 37,097 | 35,019 |
| 50 | 0 | 446 | 0 | | 1,314 | 250 | 14 | -2 | 548 | 37,791 | 37,966 |
| 100 | 0 | 268 | 0 | | 1,306 | 191 | 15 | 1 | 467 | 35,752 | 32,622 |
| 150 | 0 | 386 | 0 | | 1,270 | 398 | 13 | 0 | 456 | 39,164 | 38,150 |
| 200 | 0 | 247 | 0 | | 1,436 | 116 | 13 | 2 | 469 | 30,666 | 35,768 |
| 250 | 0 | 254 | 0 | | 1,353 | 148 | 14 | 2 | 546 | 26,880 | 28,411 |
| 300 | 0 | 273 | 0 | | 1,234 | 118 | 13 | 2 | 505 | 36,499 | 33,367 |
| 350 | 0 | 278 | 0 | | 1,270 | 158 | 14 | 2 | 518 | 35,194 | 32,871 |

*** PUBLIC VERSION ***

JA0683

PIPE A' TUBE FROM INDIA (A-533-502) - LLOYDS METAL
An. Review - FOR: 5/1/08 through 4/30/0:
U.S. Sales Data

**Block 1** — SEQU | PRODCODU | PRODNAMU | CONNNAMU | OVERRUNU | PRIMEU | GRADEU | SIZEU | WALLU | SCHU | FINISHU | EFINISHU | SALEU | GRSUPRIU

| SEQU | GRSUPRIU |
|---|---|
| 400 | 52,615 |
| 450 | 38,249 |
| 500 | 67,139 |
| 550 | 56,684 |
| 600 | 62,305 |
| 650 | 59,216 |
| 700 | 61,037 |
| 750 | 63,518 |

**Block 2** — SEQU | CUSTNAMU | CUSCODU | CUSRELU | CUSCAATU | SALEDATU | INVOICRU | SALINDTU | CONTDATU | QTYUNITU | GRSUPRDU

| SEQU | QTYUNITU | GRSUPRDU |
|---|---|---|
| 400 |  | 1.155 |
| 450 |  | 0.931 |
| 500 |  | 1.588 |
| 550 |  | 1.334 |
| 600 |  | 1.461 |
| 650 |  | 1.583 |
| 700 |  | 1.555 |
| 750 |  | 1.347 |

**Block 3** — SEQU | CONTRACTU | FACTINVU | FACTIDTU | FACTQTYU | SHIPDATU | LOTU | DINLFWTU | DINLFTPU | PAYDATEU | SALETERU | PAYTERMU | DBROKU | INTNFRU | MARININU | INSUREU | SIZEU | WALLU | SCHU | QTYU

| SEQU | FACTQTYU | LOTU | DINLFWTU | DINLFTPU | DBROKU | INTNFRU | INSUREU | QTYU |
|---|---|---|---|---|---|---|---|---|
| 400 | 3.386 | 1 | 0 | 472 | 3,611 | 3,830 | 0 | 4 |
| 450 | 0.730 | 1 | 0 | 468 | 248 | 3,800 | 0 | 1 |
| 500 | 12.793 | 1 | 0 | 453 | 1,293 | 3,767 | 0 | 12 |
| 550 | 11.111 | 1 | 0 | 483 |  |  | 0 | 10 |
| 600 | 0.990 | 1 | 0 | 426 |  |  | 0 | 1 |
| 650 | 1.125 | 1 | 0 | 424 |  |  | 0 | 1 |
| 700 | 21.672 | 1 | 0 | 454 | 152 | 4,269 | 0 | 25 |
| 750 | 4.648 | 1 | 0 | 420 | 157 | 4,980 | 0 | 5 |

**Block 4** — SEQU | DESPVALU | CURRU | EARLRPYU | QTYDISU | OTHDISU | TRADEDISU | FACTIDTU

| SEQU | DESPVALU | CURRU | EARLRPYU | QTYDISU | OTHDISU | TRADEDISU |
|---|---|---|---|---|---|---|
| 400 | 176,767 | USD | 0 | 0 | 0 | 0 |
| 450 | 32,733 | USD | 0 | 0 | 0 | 0 |
| 500 | 841,759 | USD | 0 | 0 | 0 | 0 |
| 550 | 676,160 | USD | 0 | 0 | 164 | 0 |
| 600 | 55,021 | USD | 0 | 0 | 150 | 0 |
| 650 | 78,106 | USD | 0 | 0 | 0 | 0 |
| 700 | 1,354,969 | USD | 0 | 0 | 0 | 0 |
| 750 | 239,036 | USD | 0 | 0 | 163 | 0 |

**Block 5** — SEQU | DIYDRAWU | COMMU | SELAGENU | SELARELIU | CREDITU | WARRU | DIRSELIU | DIRSEL2U | DIRSEL3U | DINDIRSU | DINVCARU | USWAREU | USDUTYU | VCOMU | PACKU | TCOMU | MARININU

| SEQU | DIYDRAWU | COMMU | CREDITU | WARRU | DIRSELIU | DIRSEL2U | DIRSEL3U | DINDIRSU | DINVCARU | USWAREU | USDUTYU | VCOMU | PACKU | TCOMU | MARININU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 | 0 | 240 | 2 | 1,441 | 179 | 0 | 13 | 123 | 565 | 0 | 0 | 32,985 | 545 | 37,948 | 0 |
| 450 | 0 | 272 | 1 | 1,425 | 191 | 3 | 13 | 132 | 596 | 0 | 0 | 33,518 | 524 | 33,816 | 0 |
| 500 | 0 | 263 | 5 | 1,302 | 1,709 | 9 | 14 | 135 | 491 | 0 | 0 | 34,662 | 459 | 33,909 | 0 |
| 550 | 0 | 461 | -6 | 1,434 | 300 | 3 | 15 | 131 | 513 | 0 | 0 | 35,874 | 456 | 40,316 | 0 |
| 600 | 0 | 459 | -5 | 1,295 | 359 | 5 | 14 | 116 | 520 | 0 | 0 | 36,771 | 474 | 39,809 | 0 |
| 650 | 0 | 284 | 3 | 1,443 | 381 | 7 | 14 | 120 | 537 | 0 | 0 | 33,995 | 545 | 36,117 | 0 |
| 700 | 0 | 263 | 2 | 1,373 | 413 | 1 | 15 | 132 | 560 | 0 | 0 | 46,361 | 459 | 47,020 | 0 |
| 750 | 0 | 443 | -3 | 1,233 | 98 | 1 | 13 | 131 | 545 | 0 | 0 | 29,029 | 495 | 26,174 | 0 |

*** PUBLIC VERSION ***

JA0684

PIPE A' TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ann. Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

**Strip — SEQU / PRODCODU (GRSUPRIU, GRSUPRDU, QTYU)**

| SEQU | GRSUPRIU | GRSUPRDU | QTYU |
| --- | --- | --- | --- |
| 800 | 53,606 | 1,172 | 1 |
| 850 | 68,405 | 0 | 18 |
| 900 | 58,173 | 0 | 24 |
| 950 | 41,234 | 0 | 9 |
| 1000 | 60,258 | 0 | 4 |
| 1050 | 40,759 | 0 | 3 |
| 1100 | 44,699 | 0 | 7 |
| 1150 | 40,837 | 0 | 25 |

**Strip — SEQU / DESPVALU, CURRU**

| SEQU | DESPVALU | CURRU |
| --- | --- | --- |
| 800 | 43,220 | USD |
| 850 | 1,135,293 | INR |
| 900 | 1,520,921 | INR |
| 950 | 301,698 | INR |
| 1000 | 213,892 | INR |
| 1050 | 118,494 | INR |
| 1100 | 315,256 | INR |
| 1150 | 932,171 | INR |

**Strip — SEQU (EARLIPYU, QTYDISU, OTHDISU, TRADEDISU, FACTQTYU)**

| SEQU | EARLIPYU | QTYDISU | OTHDISU | TRADEDISU | FACTQTYU |
| --- | --- | --- | --- | --- | --- |
| 800 | 0 | 0 | 157 | 0 | 0.888 |
| 850 | 0 | 0 | 0 | 24 | 18.858 |
| 900 | 0 | 0 | 0 | 38 | 24.590 |
| 950 | 0 | 0 | 0 | 23 | 8.640 |
| 1000 | 0 | 0 | 0 | 40 | 3.725 |
| 1050 | 0 | 0 | 0 | 38 | 2.846 |
| 1100 | 0 | 0 | 0 | 13 | 6.269 |
| 1150 | 0 | 0 | 0 |  | 23.066 |

**Strip — SEQU (LOTU, SALETERU, INSUREU, DBROKU, INTNFRU, MARININU, USWAREU, USDUTYU)**

| SEQU | LOTU | SALETERU | INSUREU | DBROKU | INTNFRU | MARININU | USWAREU | USDUTYU |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 800 | 1 | 427 | 0 |  | 0 | 0 | 0 | 0 |
| 850 | 1 | 475 | 0 | 147 | 4,316 | 0 | 0 | 0 |
| 900 | 1 | 412 | 0 | 147 | 4,249 | 0 | 0 | 0 |
| 950 | 1 | 452 | 0 | 160 | 4,545 | 0 | 0 | 0 |
| 1000 | 1 | 479 | 0 | 166 | 5,147 | 0 | 0 | 0 |
| 1050 | 1 | 440 | 0 | 191 | 4,631 | 0 | 0 | 0 |
| 1100 | 1 | 433 | 0 | 195 | 4,981 | 0 | 0 | 0 |
| 1150 | 1 | 443 | 0 | 172 | 3,225 | 0 | 0 | 0 |

**Strip — SEQU / DTYDRAWU (COMMU, SELAGENU, CREDITU, WARRU, DIRSELIU, DIRSEL2U, DIRSELSU, DINDIRSU, DINVCARU, PACKU, VCOMU, TCOMU)**

| SEQU | DTYDRAWU | COMMU | SELAGENU | CREDITU | WARRU | DIRSELIU | DIRSEL2U | DIRSELSU | DINDIRSU | DINVCARU | PACKU | VCOMU | TCOMU |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 800 | 0 | 521 |  | -4 | 1,383 | 421 | 14 | 5 | 115 | 575 | 485 | 42,129 | 43,555 |
| 850 | 0 | 238 |  | 97 | 1,326 | 0 | 13 | 3 | 135 | 533 | 519 | 43,173 | 46,522 |
| 900 | 0 | 0 |  | 318 | 1,326 | 0 | 13 | 1 | 116 | 519 | 506 | 35,305 | 32,486 |
| 950 | 0 | 263 |  | 58 | 1,207 | 0 | 12 | 0 | 117 | 592 | 487 | 31,381 | 31,839 |
| 1000 | 0 | 255 |  | 169 | 1,235 | 0 | 14 | 4 | 136 | 593 | 528 | 33,037 | 33,465 |
| 1050 | 0 | 262 |  | 69 | 1,201 | 0 | 12 | 1 | 134 | 513 | 468 | 35,189 | 40,626 |
| 1100 | 0 | 248 |  | 74 | 1,273 | 0 | 13 | 1 | 137 | 520 | 515 | 32,606 | 34,645 |
| 1150 | 0 | 351 |  | 56 | 1,318 | 0 | 13 | 0 | 118 | 561 | 485 | 37,813 | 33,641 |

Other listed field labels appearing with blank data: SALEU, EFINISHU, FINISHU, SCHU, WALLU, SIZEU, GRADEU, PRIMEU, CUSCATU, CUSRELU, CUSCODU, OVERRUNU, CONNUMU, PRODNAMU, CUSTNAMU, CONTRACTU, FACTDTU, FACTINVU, QTYUNITU, CONTDATU, PAYTERMU, SALINDITU, CHANNELU, CUSCATU, CUSRELU, INVOICEU, SALEDATU, SHIPDATU, PAYDATEU, DINLFTWU, DINLFTPU.

JA0685

*** PUBLIC VERSION ***

PIPE A* TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Anu    Review - POR: 5/1/08 through 4/30/0?
U.S. Sales Data

| SEQU | PRODCODU | PRODNAMU | CONNUMU | OVERRUNU | PRIMEU | GRADEU | SIZEU | WALLU | SCHU | FINISHU | EFINISHU | SALEU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1200 | | | | | | | | | | | | |
| 1250 | | | | | | | | | | | | |
| 1300 | | | | | | | | | | | | |
| 1350 | | | | | | | | | | | | |
| 1400 | | | | | | | | | | | | |
| 1450 | | | | | | | | | | | | |
| 1500 | | | | | | | | | | | | |
| 1550 | | | | | | | | | | | | |

| SEQU | CUSTNAMU | CUSCODU | CUSREIU | CUSCATU | CHANNELU | SALINDIU | CONTDATU | SALEDATU | INVOICEU | GRSUPRIU |
|---|---|---|---|---|---|---|---|---|---|---|
| 1200 | | | | | | | | | | 35,510 |
| 1250 | | | | | | | | | | 34,899 |
| 1300 | | | | | | | | | | 38,288 |
| 1350 | | | | | | | | | | 31,897 |
| 1400 | | | | | | | | | | 36,942 |
| 1450 | | | | | | | | | | 37,219 |
| 1500 | | | | | | | | | | 57,287 |
| 1550 | | | | | | | | | | 59,194 |

| SEQU | CONTRACTU | FACTINVU | FACTDTU | FACTQTYU | QTYUNITU | GRSUPRDU | QTTU | PAYTERMU | DBROKU | INTNFRU | MARININU |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1200 | | | | 21.030 | | 0 | 18 | | 166 | 2,834 | 0 |
| 1250 | | | | 4.304 | | 0 | 4 | | 159 | 2,743 | 0 |
| 1300 | | | | 13.892 | | 0 | 15 | | 887 | 3,122 | 0 |
| 1350 | | | | 4.262 | | 0 | 4 | | 613 | 3,168 | 0 |
| 1400 | | | | 23.971 | | 0 | 21 | | 116 | 5,606 | 0 |
| 1450 | | | | 1.952 | | 0 | 2 | | 1,028 | 4,480 | 0 |
| 1500 | | | | 32.667 | | 0 | 31 | | 505 | 3,709 | 0 |
| 1550 | | | | 18.184 | | 0 | 21 | | 744 | 3,767 | 0 |

| SEQU | SHIPDATU | PAYDATEU | DINLFTWU | DINLFTPU | SALETERU | INSUREU | USWAREU | USDUTYU | QTYUNITU | GRSUPRDU | PACKU | VCOMU | TCOMU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1200 | | | 0 | 0 | | 426 | 0 | | | 0 | 524 | 36,432 | 33,623 |
| 1250 | | | 0 | 0 | | 428 | 0 | | | 0 | 549 | 29,427 | 27,072 |
| 1300 | | | 0 | 0 | | 458 | 0 | | | 0 | 525 | 36,833 | 36,171 |
| 1350 | | | 0 | 0 | | 428 | 0 | | | 0 | 542 | 33,889 | 35,868 |
| 1400 | | | 0 | 0 | | 428 | 0 | | | 0 | 521 | 34,480 | 41,317 |
| 1450 | | | 0 | 0 | | 416 | 0 | | | 0 | 546 | 31,890 | 30,167 |
| 1500 | | | 0 | 0 | | 434 | 0 | | | 0 | 529 | 35,063 | 33,043 |
| 1550 | | | 0 | 0 | | 420 | 0 | | | 0 | 515 | 33,285 | 34,044 |

| SEQU | DESPFVALU | CURRU | EARLPYU | QTYDISU | OTHDISU | TRADEDISU | LOTU | DINLFTWU | DINLFTPU | DBROKU | INTNFRU | MARININU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1200 | 722,379 | INR | 0 | 0 | 0 | 58 | 1 | 0 | 0 | | | |
| 1250 | 130,764 | INR | 0 | 0 | 0 | 54 | 1 | 0 | 0 | | | |
| 1300 | 568,235 | INR | 0 | 0 | 0 | 58 | 1 | 0 | 0 | | | |
| 1350 | 130,286 | INR | 0 | 0 | 0 | 52 | 1 | 0 | 0 | | | |
| 1400 | 794,313 | INR | 0 | 0 | 0 | 54 | 1 | 0 | 0 | | | |
| 1450 | 72,431 | INR | 0 | 0 | 0 | 57 | 1 | 0 | 0 | | | |
| 1500 | 1,963,310 | INR | 0 | 0 | 0 | 24 | 1 | 0 | 0 | | | |
| 1550 | 1,326,072 | INR | | | | 28 | 1 | | | | | |

| SEQU | CREDITU | WARRU | DIRSELIU | DIRSEL2U | DIRSEL3U | DINDIRSU | DINVCARU |
|---|---|---|---|---|---|---|---|
| 1200 | 36 | 1,420 | 0 | 13 | 1 | 138 | 594 |
| 1250 | 53 | 1,383 | 0 | 14 | 1 | 128 | 543 |
| 1300 | 68 | 1,246 | 0 | 13 | 1 | 126 | 542 |
| 1350 | 64 | 1,396 | 0 | 13 | 1 | 137 | 532 |
| 1400 | 72 | 1,232 | 0 | 13 | 1 | 122 | 544 |
| 1450 | 31 | 1,320 | 0 | 15 | 0 | 132 | 501 |
| 1500 | 249 | 1,321 | 0 | 13 | 0 | 118 | 590 |
| 1550 | 255 | 1,454 | | 14 | 1 | 126 | 541 |

| SEQU | DTYDRAWU | CON2OU | SELAGENU | SELAREIU |
|---|---|---|---|---|
| 1200 | 0 | 241 | | |
| 1250 | 0 | 219 | | |
| 1300 | 0 | 252 | | |
| 1350 | 0 | 237 | | |
| 1400 | 0 | 249 | | |
| 1450 | 0 | 249 | | |
| 1500 | 0 | 0 | | |
| 1550 | 0 | 0 | | |

*** PUBLIC VERSION ***

JA0686

PIPE A' TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ani Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

**Strip 1 — SEQU / PRODCODU**

Columns present: SEQU, PRODCODU, PRODNAMU, CONNUMU, OVERRURU, CUSRELIU, PRIMEU, GRADEU, SIZEU, WALLU, SCHU, FINISHU, EFINISHU, SALEU, GRSUPRIU

| SEQU | GRSUPRIU |
|------|----------|
| 1600 | 31,882 |
| 1650 | 66,182 |
| 1700 | 42,558 |
| 1750 | 60,441 |
| 1800 | 35,613 |
| 1850 | 36,705 |
| 1900 | 44,382 |
| 1950 | 43,005 |

**Strip 2 — SEQU / CUSTNAMU**

Columns present: SEQU, CUSTNAMU, CUSCODU, CUSRELIU, CUSCATU, CHANNELU, SALINDITU, INVOICEU, SALEDATU, QTYUNITU, GRSUPRDU, FACTDTYU, FACTQTYU

| SEQU | FACTQTYU |
|------|----------|
| 1600 | 13,672 |
| 1650 | 10,877 |
| 1700 | 3,450 |
| 1750 | 7,733 |
| 1800 | 23,198 |
| 1850 | 16,625 |
| 1900 | 3,864 |
| 1950 | 3,752 |

**Strip 3 — SEQU / CONTRACTU**

Columns present: SEQU, CONTRACTU, FACTINVU, FACTDTYU, SHIPDATU, PAYDATEU, SALETERU, SALINDITU, PAYTERMU, CONTADATU, SIZEU, WALLU, QTYU, SCHU, FINISHU, QTYUNITU, GRSUPRDU, GRSUPRIU

| SEQU | CONTADATU | QTYU |
|------|-----------|------|
| 1600 | 4,539 | 13 |
| 1650 | 4,796 | 9 |
| 1700 | 4,658 | 4 |
| 1750 | 4,892 | 8 |
| 1800 | 5,222 | 22 |
| 1850 | 4,601 | 17 |
| 1900 | 4,392 | 5 |
| 1950 | 5,147 | 4 |

**Strip 4 — SEQU / DESFVALU / CURRU**

Columns present: SEQU, DESFVALU, CURRU, EARLPYU, QTYDISU, OTHDISU, TRADEDISU, LOTU, DINLFTWU, DINLFTPU, INSUREU

| SEQU | DESFVALU | CURRU | QTYDISU | OTHDISU | TRADEDISU | LOTU | DINLFTPU | INSUREU |
|------|----------|-------|---------|---------|-----------|------|----------|---------|
| 1600 | 422,888 | INR | 0 | 0 | 53 | 1 | 482 | 0 |
| 1650 | 578,817 | INR | 0 | 0 | 23 | 1 | 454 | 0 |
| 1700 | 171,729 | INR | 0 | 0 | 52 | 1 | 444 | 0 |
| 1750 | 531,404 | INR | 0 | 0 | 28 | 1 | 413 | 0 |
| 1800 | 830,014 | INR | 0 | 0 | 56 | 1 | 471 | 0 |
| 1850 | 748,981 | INR | 0 | 0 | 0 | 1 | 425 | 0 |
| 1900 | 188,202 | INR | 0 | 0 | 0 | 1 | 402 | 0 |
| 1950 | 159,180 | INR | 0 | 0 | 0 | 1 | 415 | 0 |

**Strip 5 — SEQU / DTYDRAKU / COMMU / SELAGENU**

Columns present: SEQU, DTYDRAKU, COMMU, SELAGENU, SELARELIU, CREDITU, WARRU, DIRSELIU, DIRSEL2U, DIRSEL3U, DINDIRSU, DINVCARU, DBROKU, INTINFRU, MARININU, PACKU, USWAREU, VCOMU, USDUTYU, TCOMU

| SEQU | COMMU | CREDITU | WARRU | DIRSEL3U | DINDIRSU | DINVCARU | DBROKU | INTINFRU | PACKU | VCOMU | TCOMU |
|------|-------|---------|-------|----------|----------|----------|--------|----------|-------|-------|-------|
| 1600 | 270 | 70 | 1,365 | 13 | 2 | 127 | 154 | 582 | 522 | 34,731 | 32,653 |
| 1650 | 0 | 375 | 1,203 | 14 | 2 | 115 | 143 | 531 | 515 | 32,165 | 38,931 |
| 1700 | 0 | 242 | 1,275 | 13 | 1 | 117 | 161 | 563 | 495 | 40,402 | 38,947 |
| 1750 | 0 | 225 | 1,261 | 14 | 2 | 123 | 191 | 538 | 480 | 36,064 | 37,629 |
| 1800 | 0 | 122 | 1,259 | 14 | 2 | 124 | 193 | 569 | 541 | 39,452 | 40,308 |
| 1850 | 0 | -696 | 1,451 | 14 | 0 | 123 | 141 | 541 | 530 | 36,044 | 37,900 |
| 1900 | 0 | -646 | 1,311 | 12 | 0 | 124 | 159 | 566 | 522 | 33,050 | 35,534 |
| 1950 | 0 | -700 | 1,336 | 12 | 0 | 127 | 145 | 594 | 476 | 30,943 | 32,023 |

(DIRSELIU, DIRSEL2U, DTYDRAKU, SELAGENU, MARININU, USWAREU, USDUTYU columns all = 0)

*** PUBLIC VERSION ***

JA0687

PIPE A... TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Ann Review - POR: 5/1/08 through 4/30/09
U.S. Sales Data

*Note: The identifier columns (PRODCODU, PRODNAMU, CONNUMU, CONTRACTU, FACTINVU, CUSTNAMU, CUSCODU, CUSRELU, CUSCATU, CHANNELU, SALINDTU, SALEDATU, INVOICERU, SHIPDATU, PAYDATEU, SALETERU, PAYTERMU, CONTDATU, PRIMEU, GRADEU, SIZEU, WALLU, FINISHU, SELAGENU, SELARELU) are blank in the data rows; CONNUMU shows a dash ("-") for each row. The data-bearing columns are transcribed below.*

| SEQU | SCHU (QTYU) | FACTQTYU | TRADEDDISU | QTYDISU | OTHDISU | EARLPYU | DESPVALU | CURRU | COMMU | DTYDRAWU |
|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 20 | 20.389 | 0 | 0 | 0 | 0 | 651,816 | USD | 310 | 0 |
| 2072 | 20 | 20.804 | 15 | 0 | 0 | 0 | 901,669 | INR | 315 | 0 |
| 2128 | 2 | 2.402 | 15 | 0 | 0 | 0 | 82,455 | INR | 203 | 0 |
| 2181 | 2 | 1.891 | 15 | 0 | 0 | 0 | 79,131 | INR | 224 | 0 |
| 2238 | 2 | 1.756 | 0 | 0 | 0 | 0 | 71,760 | USD | 356 | 0 |
| 2299 | 12 | 12.779 | 16 | 0 | 0 | 0 | 589,130 | INR | 0 | 0 |
| 2350 | 25 | 23.243 | 17 | 0 | 0 | 0 | 937,464 | INR | 0 | 0 |
| 2400 | 11 | 10.300 | 16 | 0 | 0 | 0 | 437,654 | INR | 0 | 0 |

| SEQU | CREDITU | WARRU | DIRSEL1U | DIRSEL2U | DIRSEL3U | DINDIRSU | DINVCARU | PACKU | VCOMU | TCOMU |
|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 1 | 1,286 | 74 | 15 | 0 | 116 | 560 | 466 | 33,135 | 33,973 |
| 2072 | 1 | 1,233 | 74 | 15 | 0 | 127 | 527 | 468 | 36,298 | 35,798 |
| 2128 | 1 | 1,353 | 485 | 16 | 4 | 121 | 580 | 511 | 32,251 | 32,313 |
| 2181 | 1 | 1,381 | 554 | 14 | 3 | 117 | 597 | 496 | 30,289 | 31,082 |
| 2238 | 1 | 1,220 | 49 | 14 | 0 | 137 | 517 | 524 | 39,520 | 35,169 |
| 2299 | 2 | 1,310 | 154 | 15 | 0 | 126 | 596 | 460 | 31,886 | 30,352 |
| 2350 | 72 | 1,393 | 133 | 15 | 0 | 135 | 545 | 534 | 35,142 | 37,422 |
| 2400 | 66 | 1,362 | 151 | 14 | 0 | 127 | 572 | 506 | 33,470 | 31,768 |

| SEQU | DBROKU | INTNFRU | INSUREU | DINLFTPU | DINLFTWU | LOTU | MARININU | USDUTYU | USWAREU | QTYUNITU | GRSUPREU | GRSUPRDU (EFINISHU) | GRSUPRITU (SALEU) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 110 | 4,203 | 0 | 415 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 771 | 35,965 |
| 2072 | 153 | 3,790 | 0 | 435 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 43,406 |
| 2128 | 194 | 4,419 | 0 | 429 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 39,154 |
| 2181 | 170 | 4,558 | 0 | 478 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 37,748 |
| 2238 | 186 | 3,716 | 0 | 457 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 720 | 40,562 |
| 2299 | 162 | 3,335 | 0 | 414 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 43,402 |
| 2350 | 173 | 4,148 | 0 | 479 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 38,292 |
| 2400 | 159 | 4,655 | 0 | 403 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 38,222 |

*** PUBLIC VERSION ***

JA0688

PIPE A*** TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Am Review - POR: 5/1/08 through 4/30/0?
U.S. Sales Data

The report prints many database fields in horizontal bands for records SEQU 2450 through 2800. Field names include (among others): PRODCODU, CUSTNAMU, CONTRACTU, PRODNAMU, CONNUMU, OVERRUNU, CUSRELIU, CUSCODU, SHIEDATU, FACTDTU, FACTQTYU, LOTU, DINLFTWU, DINLFTPU, PAYDATEBU, SALETERU, CHANNELU, CUSCAITU, PRIMEU, GRADEU, SIZEU, WALLU, SCHU, FINISHU, EFINISHU, SALEU, SALEDATU, INVOICEU, CONTDATU, PAYTERMU, SALINDTU, INSUREU, DBROKU, INTNFRU, MARININU, QTY, QTYUNITIU, USWAREU, USDUTYU, GRSUPRDU, GRSUPRIU, DESPVALU, CURRU, EARLPYU, QTYDISU, OTHDISU, TRADEDISU, SELARELIU, SELAGENU, COMMU, DTYDRAWU, CREDITIU, WARRU, DIRSELIU, DIRSEL3U, DIRSELJU, DINDIRSLU, DINVCARU, PACKU, VCOMU, TCOMU, FACTINVU.

The data-bearing columns by record are:

| SEQU | FACTQTYU | DESPVALU | CURRU | SELAGENU | DBROKU | DINVCARU | DINLFTPU | SALETERU | DIRSELIU | WARRU | CREDITIU | QTY | GRSUPRDU | INTNFRU | MARININU | PACKU | VCOMU | TCOMU | GRSUPRIU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2450 | 2.015 | 65,084 | INR | 470 | 153 | 128 | 235 | 427 | 14 | 1,281 | 62 | 2 | 0 | 4,203 | 530 | 466 | 40,152 | 46,967 | 35,259 |
| 2500 | 5.815 | 244,601 | INR | 0 | 193 | 127 | 113 | 434 | 15 | 1,385 | 38 | 7 | 0 | 4,403 | 584 | 508 | 37,838 | 34,680 | 36,327 |
| 2550 | 6.820 | 246,369 | INR | 0 | 180 | 117 | 117 | 456 | 16 | 1,279 | 40 | 7 | 0 | 4,883 | 586 | 466 | 34,357 | 37,974 | 36,559 |
| 2600 | 15.349 | 587,666 | INR | 359 | 184 | 138 | 155 | 458 | 15 | 1,373 | 79 | 15 | 0 | 3,920 | 578 | 483 | 33,585 | 36,038 | 40,488 |
| 2650 | 4.974 | 200,391 | INR | 367 | 171 | 123 | 71 | 452 | 16 | 1,293 | 37 | 5 | 0 | 3,371 | 546 | 485 | 31,195 | 33,696 | 38,604 |
| 2700 | 8.715 | 359,840 | INR | 0 | 155 | 114 | 164 | 408 | 16 | 1,421 | 82 | 8 | 0 | 3,463 | 593 | 475 | 31,075 | 36,851 | 43,953 |
| 2750 | 4.482 | 155,571 | INR | 341 | 190 | 138 | 118 | 483 | 15 | 1,305 | 47 | 4 | 0 | 4,308 | 597 | 523 | 36,585 | 33,416 | 40,690 |
| 2800 | 21.238 | 841,509 | USD | 325 | 162 | 137 | 49 | 474 | 15 | 1,450 | 1 | 21 | 719 | 4,291 | 573 | 478 | 36,015 | 38,386 | 40,172 |

(The fields CONNUMU, EARLPYU, QTYDISU, OTHDISU, TRADEDISU, USWAREU, QTYUNITIU, USDUTYU, INSUREU, DINLFTWU, DIRSEL3U, DIRSELJU, DINDIRSLU and DTYDRAWU show null/zero values for these records; CONNUMU is shown as "-". LOTU = 1 for each record.)

JA0689

*** PUBLIC VERSION ***

PIPE A... TUBE FROM INDIA (A-533-502) - LLOYDS METAL
Am  Review - FOR: 5/1/08 through 4/30/0f
U.S. Sales Data

**SEQU PRODCODU** — PRIMEU  GRADEU  SIZEU  FINISHU  SCHU  WALLU  EFINISHU  SALEU

| SEQU | GRSUPRIU |
|---|---|
| 2850 | 42,983 |
| 2900 | 41,738 |
| 2950 | 36,252 |
| 3000 | 33,725 |
| 3050 | 33,463 |
| 3100 | 36,148 |

**SEQU CUSTNAMU** — CUSCODU  CUSRELU  CUSCATU  SALEDATU  INVOICEU  CONTDATU  SALINDTU  CHANNELU  SALETERU  PAYTERMU

Second-line labels: QTYUNITU  GRSUPRDU  QTY  MARINNU  INTNFRU  DBROKU  INSUREU  SALETERU  PAYDATEU

| SEQU | GRSUPRDU | QTY | INTNFRU | DBROKU | INSUREU | SALETERU | PAYDATEU |
|---|---|---|---|---|---|---|---|
| 2850 | 0 | 6 | 4,195 | 186 | 0 | 415 | 0 |
| 2900 | 0 | 8 | 4,227 | 233 | 0 | 475 | 0 |
| 2950 | 793 | 6 | 3,744 | 108 | 0 | 430 | 0 |
| 3000 | 0 | 3 | 3,744 | 169 | 0 | 449 | 0 |
| 3050 | 760 | 21 | 3,887 | 187 | 0 | 474 | 0 |
| 3100 | 827 | 24 | 4,139 | 188 | 0 | 441 | 0 |

**SEQU CONTRACTU** — FACTDTYU  FACTQTYU  SHIPDATU

Second-line labels: OTHDISU  TRADEDISU

| SEQU | FACTQTYU | TRADEDISU | OTHDISU |
|---|---|---|---|
| 2850 | 5.887 | 18 | 0 |
| 2900 | 7.629 | 16 | 0 |
| 2950 | 5.812 | 0 | 0 |
| 3000 | 2.960 | 15 | 0 |
| 3050 | 20.759 | 0 | 0 |
| 3100 | 20.838 | 0 | 0 |

**SEQU DESPVALU CURRU** — FACTINVU  EARLPYU  QTYDISU

| SEQU | DESPVALU | CURRU | QTYDISU | EARLPYU | FACTINVU |
|---|---|---|---|---|---|
| 2850 | 268.444 | INR | 0 | 0 | - |
| 2900 | 300.416 | INR | 0 | 0 | - |
| 2950 | 196.263 | USD | 0 | 0 | - |
| 3000 | 111.851 | INR | 0 | 0 | - |
| 3050 | 724.126 | USD | 0 | 0 | - |
| 3100 | 788.230 | USD | 0 | 0 | - |

**SEQU DTYDRAWU COMMU SELAGENU** — SELARELU  CREDITU  DINVCARU  DINDIRSU  DIRSEL3U  DIRSEL2U  DIRSELIU  WARRU  LOTU  DINLFTWU  DINLFTPU  PACKU  USWAREU  VCOMU  USDUTYU  TCOMU

| SEQU | COMMU | CREDITU | LOTU | DINLFTWU | DINLFTPU | WARRU | DIRSELIU | DIRSEL2U | DIRSEL3U | DINVCARU | MARININU | PACKU | VCOMU | TCOMU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2850 | 0 | 82 | 1 | 0 | 256 | 1,410 | 82 | 15 | 1 | 122 | 506 | 537 | 34,317 | 34,094 |
| 2900 | 0 | 33 | 1 | 0 | 65 | 1,352 | 33 | 16 | 0 | 116 | 564 | 475 | 31,544 | 33,182 |
| 2950 | 332 | 1 | 1 | 0 | 83 | 1,299 | 1 | 14 | 0 | 136 | 529 | 515 | 37,869 | 36,877 |
| 3000 | 0 | 51 | 1 | 0 | 1,209 | 1,438 | 51 | 16 | 2 | 125 | 495 | 461 | 34,656 | 35,732 |
| 3050 | 366 | 1 | 1 | 0 |  | 1,280 | 1 | 16 | 0 | 136 | 559 | 542 | 32,079 | 32,811 |
| 3100 | 0 | 1 | 1 | 0 | 175 | 1,254 | 1 | 16 | 1 | 118 | 492 | 468 | 35,827 | 34,287 |

DTYDRAWU: 0 / 0 / 0 / 0 / 0 / 0 — SELAGENU / SELARELU / USWAREU / USDUTYU columns blank (0)

*** PUBLIC VERSION ***

JA0690

FOR PUBLIC FILE

```
G W  ®
S ◄
B ⅃
```

G A R V E Y   S C H U B E R T   B A R E R

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

WASHINGTON, D.C. OFFICE
*fifth floor*
*flour mill building*
*1000 potomac street nw*
*washington, d.c. 20007-3501*
TEL 202 965 7880 FAX 202 965 1729

OTHER OFFICES
*beijing, china*
*new york, new york*
*portland, oregon*
*seattle, washington*
GSBLAW.COM

(23-3)

July 7, 2009

*Please reply to* LIZBETH R. LEVINSON
*llevinson@gsblaw.com* TEL EXT 2538

ITA Case No.: A-533-840
Total Pages: 444
4th Administrative Review
(02/01/2008-01/31/2009)
AD/CVD Office 2

**PUBLIC VERSION**

Business Proprietary Information has been
deleted from Brackets on Page C-29 and in
Exhibits B1-B4, B6, B11-B15, B17-B23,
C1-C4, C6, and C11-24 and in the
Accompanying CD.

**BY HAND DELIVERY**

The Honorable Gary F. Locke
Secretary of Commerce
14th Street & Constitution Avenue, N.W.
Attn: Import Administration
Central Records Unit, Room 1870
Washington, DC 20230

—MAY BE RELEASED UNDER APO—

Re:    **Frozen Warmwater Shrimp from India,**
       **Submission of Sections B and C Response of Liberty Frozen Foods Pvt. Ltd.**

Dear Mr. Secretary:

We represent Liberty Frozen Foods Pvt. Ltd. ("Liberty"), an Indian producer and exporter to the
United States of frozen warmwater shrimp, and its affiliated parties in the above referenced
administrative review. We hereby file the original and TWO copies of the public version of Liberty's
response to Sections B and C of the Department's initial questionnaire. This response is timely pursuant
to the Department's letter dated June 19, 2009.

Secretary of Commerce
July 7, 2009
Page 2

In accordance with 19 C.F.R. § 351.304(a), we hereby request business proprietary treatment for the designated information contained in the attached response. The information designated as business proprietary consists of the identity of customers and suppliers, transaction-specific sales volumes, sales values and unit sales values, transaction-specific adjustments to reported unit sales values, period wide-expenses and sales values used to calculate such adjustments and other information obtained from Liberty's sales and accounting records. Such information is business confidential, and, if released to the public, would cause substantial harm to the competitive position of our client. Liberty consents to the release of the designated information under the terms of an appropriately issued administrative protective order.

A CD containing Liberty's proprietary U.S. and 3rd country sales listings has been filed with the Department and served upon counsel for Petitioner. As indicated in the attached certificate of service, a copy of this document has been served upon the parties on the Department's proprietary service list. Thank you for your attention to this matter. Should you have any questions concerning Liberty's Sections B and C response, please contact the undersigned.

Respectfully submitted,

Ronald M. Wisla

Lizbeth R. Levinson
Ronald M. Wisla

cc:    Mr. Henry Almond, Room 3086

DC_DOCS:686633.2 [22530-00100]
07/7/09 11:44 AM

**JA0692**

C-35

with invoices. The aggregate amount of these charges is allocated to all shipments other than those to which direct allocation is made, on a company-wide basis. The invoice-specific amount is allocated on a quantity basis to invoice line items. The detailed workings are shown in Exhibit C-13B.

**FIELD NUMBER 26.0:**      **Country of Manufacture Inland Insurance**

    FIELD NAME:      INSUREU

    DESCRIPTION:      Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.

    NARRATIVE:      Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

No expense was incurred under this head, hence this field is deleted.

**FIELD NUMBER 27.0:**      **Brokerage and Handling Incurred in the Country of Manufacture**

    FIELD NAME:      DBROKU

    DESCRIPTION:      Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.

    NARRATIVE:      Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

Liberty avails of the services of C&F (clearing and forwarding) agents in most cases to facilitate shipment. These agents' services include meeting with the documentary and pre-shipment inspection requirements of the Customs, coordination with the port authorities, etc. A C&F agent incurs expenses in performance of these activities and charges a fee for all the services rendered. The bills of the C&F agent are invoice-specific, which are reported here. This expense is allocated to invoice line items on the basis of quantity as it is not incurred on the basis of value. A worksheet with the calculations is enclosed as Exhibit C-14A.

# EXHIBIT C-1

**LG GROUP OF COMPANIES**
U.S Sales Listing on Entered Date basis (POR from 1st Feb 2008 to 31st Jan 2009)

| 0.0 | 1.0 | 2.0 | 2.1 | 3.1 |
|---|---|---|---|---|
| Sequential Number | Complete Product Code | Matching Control Number (DOC) | Matching Control Number (As Sold) | Cooked Form |
| SEQU | PRODCODU | CONNUMU | CONNUM2U | COOKU |
| 001 | COOKED PD PULLED VEIN TAIL-ON BT | 3215132213103401145 | 3234132113103401145 | 3 |
| 002 | PD TAIL-OFF COOKED BLACK TIGER | 3213132213104541145 | 3226132213104541145 | 3 |
| 003 | PD TAIL-OFF COOKED BLACK TIGER | 3214132213104541145 | 3231132213104541145 | 3 |
| 004 | PD TAIL-OFF COOKED BLACK TIGER | 3215132213104541145 | 3234132213104541145 | 3 |
| 005 | PD TAIL-OFF COOKED BLACK TIGER | 3216132213104541145 | 3238132213104541145 | 3 |
| 006 | PD TAIL-OFF COOKED BLACK TIGER | 3218132213104541145 | 3244132213104541145 | 3 |
| 007 | PD TAIL-OFF COOKED BLACK TIGER | 3219132213104541145 | 3250132213104541145 | 3 |
| 008 | PD TAIL-OFF COOKED BLACK TIGER | 3220132213104541145 | 3254132213104541145 | 3 |
| 009 | PD TAIL-OFF COOKED BLACK TIGER | 3221132213104541145 | 3259132213104541145 | 3 |
| 010 | PD TAIL-OFF COOKED BLACK TIGER | 3223132213104541145 | 3263132213104541145 | 3 |
| 011 | PD TAIL-OFF COOKED BLACK TIGER | 3224132213104541145 | 3265132213104541145 | 3 |
| 012 | PD TAIL-ON PULLED VEIN COOKED  BLACK TIGER | 3215132113103401145 | 3234132113103401145 | 3 |
| 013 | PD TAIL-OFF COOKED BLACK TIGER | 3213132213104541145 | 3226132213104541145 | 3 |
| 014 | PD TAIL-OFF COOKED BLACK TIGER | 3214132213104541145 | 3231132213104541145 | 3 |
| 015 | PD TAIL-OFF COOKED BLACK TIGER | 3215132213104541145 | 3234132213104541145 | 3 |
| 016 | PD TAIL-OFF COOKED BLACK TIGER | 3216132213104541145 | 3238132213104541145 | 3 |
| 017 | PD TAIL-OFF COOKED BLACK TIGER | 3218132213104541145 | 3244132213104541145 | 3 |
| 018 | PD TAIL-OFF COOKED BLACK TIGER | 3219132213104541145 | 3250132213104541145 | 3 |
| 019 | PD TAIL-OFF COOKED BLACK TIGER | 3220132213104541145 | 3254132213104541145 | 3 |
| 020 | PD TAIL-OFF COOKED BLACK TIGER | 3221132213104541145 | 3259132213104541145 | 3 |
| 021 | PD TAIL-ON PULLED VEIN COOKED  BLACK TIGER | 3215132113103401145 | 3234132113103401145 | 3 |
| 022 | PD TAIL-OFF COOKED BLACK TIGER | 3213132213104541145 | 3226132213104541145 | 3 |
| 023 | PD TAIL-OFF COOKED BLACK TIGER | 3214132213104541145 | 3231132213104541145 | 3 |
| 024 | PD TAIL-OFF COOKED BLACK TIGER | 3215132213104541145 | 3234132213104541145 | 3 |
| 025 | PD TAIL-OFF COOKED BLACK TIGER | 3216132213104541145 | 3238132213104541145 | 3 |
| 026 | PD TAIL-OFF COOKED BLACK TIGER | 3218132213104541145 | 3244132213104541145 | 3 |
| 027 | PD TAIL-OFF COOKED BLACK TIGER | 3219132213104541145 | 3250132213104541145 | 3 |
| 028 | PD TAIL-OFF COOKED BLACK TIGER | 3220132213104541145 | 3254132213104541145 | 3 |
| 029 | PD TAIL-OFF COOKED BLACK TIGER | 3221132213104541145 | 3259132213104541145 | 3 |
| 030 | PD TAIL-OFF COOKED BLACK TIGER | 3223132213104541145 | 3263132213104541145 | 3 |
| 031 | PD TAIL-ON COOKED  BLACK TIGER | 3214132113102271145 | 3231132113102271145 | 3 |
| 032 | PD TAIL-ON COOKED  BLACK TIGER | 3214132113102271145 | 3231132113102271145 | 3 |
| 033 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE | 3216132113105673145 | 3238132113105673145 | 3 |
| 034 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 035 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 036 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3214132113102833145 | 3232132113102833145 | 3 |
| 037 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113102833145 | 3240132113102833145 | 3 |
| 038 | PD TAIL-ON PULLED VEIN COOKED  BLACK TIGER | 3215132113103401145 | 3234132113103401145 | 3 |
| 039 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 040 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 041 | COOKED PEELED AND DEVEINED BT | 3214132213104541145 | 3231132213104541145 | 3 |
| 042 | COOKED PEELED AND DEVEINED BT | 3215132213104541145 | 3234132213104541145 | 3 |
| 043 | COOKED PEELED AND DEVEINED BT | 3218132213104541145 | 3244132213104541145 | 3 |
| 044 | COOKED PEELED AND DEVEINED BT | 3219132213104541145 | 3250132213104541145 | 3 |
| 045 | COOKED PEELED AND DEVEINED BT | 3220132213104541145 | 3254132213104541145 | 3 |
| 046 | COOKED PEELED AND DEVEINED BT | 3221132213104541145 | 3259132213104541145 | 3 |
| 047 | COOKED PEELED AND DEVEINED BT | 3223132213104541145 | 3263132213104541145 | 3 |
| 048 | COOKED PEELED AND DEVEINED BT | 3224132213104541145 | 3265132213104541145 | 3 |
| 049 | PD TAIL-ON BLACK TIGER | 1213132113104541145 | 1226132113104541145 | 1 |
| 050 | PD TAIL-ON BLACK TIGER | 1214132113104541145 | 1231132113104541145 | 1 |
| 051 | PD TAIL-ON BLACK TIGER | 1216132113104541145 | 1238132113104541145 | 1 |
| 052 | PD TAIL-ON BLACK TIGER | 1219132113104541145 | 1250132113104541145 | 1 |
| 053 | HEADLESS BLACK TIGER EZ PEEL | 1216112113104541145 | 1238112113104541145 | 1 |
| 054 | HEADLESS BLACK TIGER EZ PEEL | 1219112113104541145 | 1250112113104541145 | 1 |

| | | | | |
|---|---|---|---|---|
| 055 | PD TAIL-ON COOKED BLACK TIGER | 3216132113104541145 | 3238132113104541145 | 3 |
| 056 | PD TAIL-ON COOKED BLACK TIGER | 3218132113104541145 | 3244132113104541145 | 3 |
| 057 | PD TAIL-ON COOKED BLACK TIGER | 3219132113104541145 | 3250132113104541145 | 3 |
| 058 | PD TAIL-OFF COOKED BLACK TIGER | 3224132213104541145 | 3265132213104541145 | 3 |
| 059 | PD TAIL-ON PULLED VEIN COOKED BLACK TIGER | 3215132113104301145 | 3234132113103401145 | 3 |
| 060 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 061 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 062 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 063 | PD TAIL-ON PULLED VEIN COOKED BLACK TIGER | 3215132113103401145 | 3234132113103401145 | 3 |
| 064 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 065 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 066 | COOKED PD TAIL-ON BLACK TIGER-RING WITH SAUCE. | 3216132113105673145 | 3238132113105673145 | 3 |
| 067 | PD TAIL-OFF BLACK TIGER | 1214132213104541145 | 1231132213104541145 | 1 |
| 068 | PD TAIL-OFF BLACK TIGER | 1215132213104541145 | 1234132213104541145 | 1 |
| 069 | PD TAIL-OFF BLACK TIGER | 1216132213104541145 | 1238132213104541145 | 1 |
| 070 | PD TAIL-OFF BLACK TIGER | 1217132213104541145 | 1244132213104541145 | 1 |
| 071 | PD TAIL-OFF BLACK TIGER | 1218132213104541145 | 1244132213104541145 | 1 |
| 072 | PD TAIL-OFF BLACK TIGER | 1219132213104541145 | 1250132213104541145 | 1 |
| 073 | PD TAIL-OFF BLACK TIGER | 1220132213104541145 | 1254132213104541145 | 1 |
| 074 | PD TAIL-OFF BLACK TIGER | 1214132213104541145 | 1231132213104541145 | 1 |
| 075 | PD TAIL-OFF BLACK TIGER | 1216132213104541145 | 1238132213104541145 | 1 |
| 076 | PEELED TAIL-OFF IBT IQF | 1220132213104541145 | 1254132213104541145 | 1 |
| 077 | PEELED TAIL-OFF IBT IQF | 1221132213104541145 | 1259132213104541145 | 1 |
| 078 | Raw HLSO BT | 1214111111109071145 | 1231111111109071145 | 1 |
| 079 | Raw HLSO BT | 1218111111109071145 | 1244111111109071145 | 1 |
| 080 | Raw HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 081 | Raw HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 082 | Raw HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 083 | Raw HLSO BT | 1214111113104541145 | 1231111113104541145 | 1 |
| 084 | Raw Peeled and Deveined Tail on BT IQF | 1215132113105671145 | 1234132113105671145 | 1 |
| 085 | PDPVTON BT | 1215132113103401145 | 1234132113103401145 | 1 |
| 086 | PDPVTON BT | 1215132113103401145 | 1234132113103401145 | 1 |
| 087 | PDPVTON BT | 1215132113103401145 | 1234132113103401145 | 1 |
| 088 | PDPVTON BT | 1215132113103401145 | 1234132113103401145 | 1 |
| 089 | HLSO BT | 1214111111109071145 | 1231111111109071145 | 1 |
| 090 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |
| 091 | HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 092 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |
| 093 | HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 094 | HLSO BT | 1214111113104541145 | 1231111113104541145 | 1 |
| 095 | HLSO BT | 1214111111109071145 | 1231111111109071145 | 1 |
| 096 | HLSO BT | 1215111111109071145 | 1234111111109071145 | 1 |
| 097 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |
| 098 | HLSO BT | 1218111111109071145 | 1244111111109071145 | 1 |
| 099 | HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 100 | HLSO BT | 1214111111109071145 | 1231111111109071145 | 1 |
| 101 | HLSO BT | 1215111111109071145 | 1234111111109071145 | 1 |
| 102 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |
| 103 | HLSO BT | 1219111111109071145 | 1250111111109071145 | 1 |
| 104 | PDPVTON BT | 1215132113103401145 | 1234132113103401145 | 1 |
| 105 | PD TAIL-ON BT | 1214132113104541145 | 1231132113104541145 | 1 |
| 106 | PD TAIL-ON BT | 1218132113104541145 | 1244132113104541145 | 1 |
| 107 | PD TAIL-OFF BT | 1216132213104541145 | 1238132213104541145 | 1 |
| 108 | PD TAIL-OFF BT | 1217132213104541145 | 1241132213104541145 | 1 |
| 109 | PD TAIL-OFF BT | 1218132213104541145 | 1244132213104541145 | 1 |
| 110 | PD TAIL-OFF BT | 1219132213104541145 | 1250132213104541145 | 1 |
| 111 | PD TAIL-OFF BT | 1220132213104541145 | 1254132213104541145 | 1 |
| 112 | HLSO BT | 1213111111109071145 | 1226111111109071145 | 1 |
| 113 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |
| 114 | HLSO BT | 1213111111109071145 | 1226111111109071145 | 1 |
| 115 | HLSO BT | 1216111111109071145 | 1238111111109071145 | 1 |

EXHIBIT C-1

| 3.2 | 3.3 | 3.3.1 | 3.4 | 3.5 | 3.6 | 3.7 | 3.8 | 3.9 | 3.10 | 3.11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Head Status | Count Size (DOC basis) | Count Size (As Sold basis) | Organic Certification | Shell Status | Vein Status | Tail Status | Other Shrimp Preparation | Frozen Form | Flavoring | Container Weight |
| HEADU | CNTSIZU | CNTSIZ2U | ORGANICU | SHELLU | VEINU | TAILU | SHRMPRPU | FROZENU | FLAVORU | CONWGTU |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 13 | 26 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 21 | 59 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 23 | 63 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 24 | 65 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 13 | 26 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 21 | 59 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 13 | 26 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 21 | 59 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 23 | 63 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0227 |
| 2 | 14 | 31 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0227 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 14 | 32 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 40 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0283 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0283 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 14 | 31 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 21 | 59 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 23 | 63 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 24 | 65 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 13 | 26 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 1 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 1 | 2 | 1 | 1 | 3 | 1 | 0454 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 24 | 65 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0340 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 14 | 31 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 17 | 41 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 21 | 59 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 18 | 44 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0567 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 15 | 34 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 18 | 44 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 14 | 31 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 15 | 34 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 19 | 50 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 15 | 34 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0340 |
| 2 | 14 | 31 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 16 | 38 | 1 | 3 | 2 | 1 | 1 | 3 | 1 | 0454 |
| 2 | 17 | 41 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 18 | 44 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 19 | 50 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 20 | 54 | 1 | 3 | 2 | 2 | 1 | 3 | 1 | 0454 |
| 2 | 13 | 26 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 13 | 26 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |
| 2 | 16 | 38 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0907 |

| 3.12 | 3.13 | 3.14 | 3.15 | 3.16 | 3.17 | 4.0 | 5.0 | 6.0 | 6.1 |
|---|---|---|---|---|---|---|---|---|---|
| Presentation | Species | Preservative | Export Quality Grade | Other Quality Grades | Net Weight Factor | Sale Type | Consignment Identifier | Customer Code | Consolidated Customer Code |
| PRESENTU | SPECIESU | PRESERVU | EXPQUALU | QGRADEU | NETWGTU | SALEU | CONSIGNU | CUSCODU | CCUSCODU |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 110 | 110 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 | EP | N.C | 103 | 103 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 3 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 105 | 105 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 105 | 105 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 101 | 101 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 103 | 103 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |
| 1 | 14 | 5 | 3 | 1 | 0 EP | N.C | 102 | 102 |

| 7.0 | 8.0 | 9.0 | 11.0 | 12.0 | 13.0 | 13.0.A | 13.0.B |
|---|---|---|---|---|---|---|---|
| Customer Category | Channel of Distribution | Sale Inoice Date | Sale Invoice Number | Date of Shipment | Date of Receipt of Payment | Date of Receipt of Payment 2 | Date of Receipt of Payment 3 |
| CUSCATU | CHANNELU | SALINDTU | INVOICEU | SHIPDATU | PAYDATEU | PAYDATE1U | PAYDATE2U |
| 2 | 1 | 2008/01/08 | DMF/VIZ/071/2007-2008 | 2008/01/06 | 2008/03/07 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/01/29 | DMF/VIZ/074/2007-2008 | 2008/01/28 | 2008/03/19 | | |
| 2 | 1 | 2008/02/11 | DMF/VIZ/076/2007-2008 | 2008/02/08 | 2008/04/04 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/03/04 | DMF/CHE/078/2007-2008 | 2008/03/04 | 2009/05/09 | | |
| 2 | 1 | 2008/04/21 | DMF/VIZ/003/2008-2009 | 2008/04/14 | 2008/07/18 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/05/19 | DMF/VIZ/007/2008-2009 | 2008/05/17 | 2008/07/14 | | |
| 2 | 1 | 2008/06/27 | DMF/VIZ/018/2008-2009 | 2008/06/27 | 2008/09/12 | | |
| 2 | 1 | 2008/07/28 | DMF/CHE/033/2008-2009 | 2008/07/26 | 2008/10/22 | | |
| 2 | 1 | 2008/09/17 | DMF/VIZ/038/2008-2009 | 2008/09/15 | 2008/11/14 | | |
| 2 | 1 | 2008/10/04 | DMF/CHE/047/2008-2009 | 2008/09/30 | 2008/12/02 | | |
| 2 | 1 | 2008/10/14 | DMF/VIZ/048/2008-2009 | 2008/10/11 | 2008/12/05 | | |
| 2 | 1 | 2008/10/16 | DMF/VIZ/049/2008-2009 | 2008/10/14 | 2008/12/10 | | |
| 2 | 1 | 2008/10/16 | DMF/VIZ/049/2008-2009 | 2008/10/14 | 2008/12/10 | | |
| 2 | 1 | 2008/10/20 | DMF/VIZ/050/2008-2009 | 2008/10/20 | 2009/01/12 | | |
| 2 | 1 | 2008/10/22 | DMF/VIZ/051/2008-2009 | 2008/10/21 | 2008/12/24 | | |
| 2 | 1 | 2008/10/30 | DMF/CHE/053/2008-2009 | 2008/10/27 | 2009/02/25 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/11/06 | DMF/KIT/CHE/055/2008-2009 | 2008/11/04 | 2009/01/06 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |
| 2 | 1 | 2008/09/19 | DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 | | |

| | | | | |
|---|---|---|---|---|
| 2 | 1 | 2008/09/19 DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 |
| 2 | 1 | 2008/09/19 DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 |
| 2 | 1 | 2008/09/19 DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 |
| 2 | 1 | 2008/09/19 DMF/VIZ/042/2008-2009 | 2008/09/18 | 2008/11/10 |
| 2 | 1 | 2008/11/06 DMF/KIT/CHE/054/2008-2009 | 2008/11/03 | 2009/03/02 |
| 2 | 1 | 2008/11/08 DMF/KIT/CHE/056/2008-2009 | 2008/11/06 | 2009/02/25 |
| 2 | 1 | 2008/11/13 DMF/KIT/CHE/057/2008-2009 | 2008/11/10 | 2009/01/21 |
| 2 | 1 | 2008/11/19 DMF/KIT/CHE/058/2008-2009 | 2008/11/18 | 2009/02/27 |
| 2 | 1 | 2008/11/17 DMF/KIT/CHE/059/2008-2009 | 2008/11/15 | 2009/01/21 |
| 2 | 1 | 2008/12/01 DMF/KIT/CHE/061/2008-2009 | 2008/11/27 | 2009/02/27 |
| 2 | 1 | 2008/12/01 DMF/KIT/CHE/062/2008-2009 | 2008/11/29 | 2009/02/27 |
| 2 | 1 | 2008/12/03 DMF/KIT/CHE/063/2008-2009 | 2008/12/01 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/11/28 DMF/KIT/CHE/064/2008-2009 | 2008/11/29 | 2009/02/25 |
| 2 | 1 | 2008/01/24 KIT/VIZ/043/2007-2008 | 2008/01/24 | 2008/02/08 |
| 2 | 1 | 2008/01/24 KIT/VIZ/043/2007-2008 | 2008/01/24 | 2008/02/08 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/01/11 KEPL/VIZ/067/2007-08 | 2008/01/08 | 2008/02/15 |
| 2 | 1 | 2008/02/06 KEPL/VIZ/070/2007-08 | 2008/01/31 | 2008/03/25 |
| 2 | 1 | 2008/02/22 KEPL/VIZ/072/2007-08 | 2008/02/19 | 2008/04/28 |
| 2 | 1 | 2008/02/25 KEPL/VIZ/073/2007-08 | 2008/02/20 | 2008/04/29 |
| 2 | 1 | 2008/02/29 KEPL/TUT/075/2007-08 | 2008/02/26 | 2008/05/13 |
| 2 | 1 | 2008/03/04 KEPL/VIZ/076/2007-08 | 2008/02/29 | 2008/04/11 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/03/12 KEPL/VIZ/077/2007-08 | 2008/03/08 | 2008/04/15 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/04/28 KEPL/VIZ/003/2008-09 | 2008/04/28 | 2008/07/02 |
| 2 | 1 | 2008/05/21 KEPL/VIZ/004/2008-09 | 2008/05/14 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/05/28 KEPL/VIZ/006/2008-09 | 2008/05/30 | 2008/07/09 |
| 2 | 1 | 2008/06/03 KEPL/VIZ/007/2008-09 | 2008/06/03 | 2008/07/17 |
| 2 | 1 | 2008/06/03 KEPL/VIZ/007/2008-09 | 2008/06/03 | 2008/07/17 |
| 2 | 1 | 2008/06/03 KEPL/VIZ/007/2008-09 | 2008/06/03 | 2008/07/17 |
| 2 | 1 | 2008/06/03 KEPL/VIZ/007/2008-09 | 2008/06/03 | 2008/07/17 |

| 13.0.B.1 | 13.0.C | 13.0.D | 13.0.E | 13.0.E.1 | 13.1 | 14.0 | 15.0 | 16.0 | 17.0 |
|---|---|---|---|---|---|---|---|---|---|
| Date of Receipt of Payment 4 | Amount received 1 | Amount received 2 | Amount received 3 | Amount received 4 | Date of Discounting with Bank | Terms of Delivery | Terms of Payment | Quantity | Quantity Unit of Measure |
| PAYDATE2U | PAYAMT1U | PAYAMT2U | PAYAMT3U | PAYAMT3U | DATDISCU | SALETERU | PAYTERMU | QTYU | QTYUNITU |
|  | 251,262.00 | - | - | - | 2008/01/08 | DDP | | 11 | LBS |
|  | 1,039.50 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 6,270.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 20,790.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 24,420.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 22,649.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 21,931.25 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 10,868.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 8,184.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 3,960.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 1,100.00 | - | - | - | 2008/01/31 | DDP | | 11 | LBS |
|  | 242,352.00 | - | - | - | 2008/02/18 | DDP | | 11 | LBS |
|  | 5,128.20 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 9,154.20 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 17,556.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 20,350.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 24,563.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 27,225.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 14,300.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 3,432.00 | - | - | - | 2008/03/07 | DDP | | 11 | LBS |
|  | 242,352.00 | - | - | - | 2008/04/23 | DDP | | 15 | LBS |
|  | 693.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 15,675.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 18,480.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 30,118.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 28,710.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 18,755.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 8,008.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 6,600.00 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 1,237.50 | - | - | - | 2008/05/23 | DDP | | 20 | LBS |
|  | 262,996.80 | - | - | - | 2008/06/30 | DDP | | 13 | LBS |
|  | 262,996.80 | - | - | - | 2008/07/30 | DDP | | 13 | LBS |
|  | 90,750.00 | - | - | - | 2008/09/19 | DDP | | 12 | LBS |
|  | 88,209.00 | - | - | - | 2008/10/06 | DDP | | 12 | LBS |
|  | 87,120.00 | - | - | - | 2008/10/20 | DDP | | 12 | LBS |
|  | 38,784.82 | - | - | - | 2008/10/20 | DDP | | 12 | LBS |
|  | 71,328.40 | - | - | - | 2008/10/20 | DDP | | 12 | LBS |
|  | 229,878.00 | - | - | - | 2008/10/24 | DDP | | 14 | LBS |
|  | 88,209.00 | - | - | - | 2008/10/22 | DDP | | 12 | LBS |
|  | 81,152.28 | - | - | - | 2008/10/31 | DDP | | 12 | LBS |
|  | 9,711.90 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 20,420.40 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 30,110.85 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 17,155.60 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 11,922.35 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 7,815.50 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 6,097.30 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 1,210.00 | - | - | - | 2009/11/10 | DDP | | 11 | LBS |
|  | 8,712.00 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |
|  | 27,104.00 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |
|  | 25,107.50 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |
|  | 24,948.00 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |
|  | 6,624.75 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |
|  | 14,300.00 | - | - | - | 2008/09/22 | DDP | | 12 | LBS |

PUBLIC VERSION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9,075.00 | - | - | - | 2008/09/22 | DDP | 12 | LBS |
| 11,275.00 | - | - | - | 2008/09/22 | DDP | 12 | LBS |
| 16,940.00 | - | - | - | 2008/09/22 | DDP | 12 | LBS |
| 5,445.00 | - | - | - | 2008/09/22 | DDP | 12 | LBS |
| 229,878.00 | - | - | - | 2008/11/10 | DDP | 12 | LBS |
| 81,152.28 | - | - | - | 2008/11/10 | DDP | 12 | LBS |
| 81,152.28 | - | - | - | 2008/11/17 | DDP | 12 | LBS |
| 79,869.24 | - | - | - | 2008/11/19 | DDP | 12 | LBS |
| 206,712.00 | - | - | - | 2008/11/17 | DDP | 12 | LBS |
| 79,869.24 | - | - | - | 2008/12/02 | DDP | 12 | LBS |
| 79,869.24 | - | - | - | 2008/12/02 | DDP | 12 | LBS |
| 79,869.24 | - | - | - | 2008/12/05 | DDP | 12 | LBS |
| 5,555.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 4,620.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 12,045.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 7,480.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 20,820.25 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 24,381.50 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 33,099.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 11,110.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 8,030.00 | - | - | - | 2009/12/02 | DDP | 21 | LBS |
| 53,460.00 | - | - | - | 2008/01/31 | DDP | 16 | LBS |
| 48,620.00 | - | - | - | 2008/01/31 | DDP | 16 | LBS |
| 55,957.77 | 3,283.83 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 15,971.90 | 937.30 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 6,508.46 | 381.94 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 16,271.14 | 954.86 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 9,762.69 | 572.91 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 45,483.35 | 2,669.15 | - | - | 2008/01/11 | DDP | 16 | LBS |
| 186,725.00 | - | - | - | 2008/02/06 | DDP | 16 | LBS |
| 165,418.00 | 11,000.00 | - | - | 2008/02/22 | DDP | 23 | LBS |
| 165,418.00 | 11,000.00 | - | - | 2008/02/25 | DDP | 23 | LBS |
| 176,418.00 | - | - | - | 2008/02/29 | DDP | 23 | LBS |
| 165,418.00 | 11,000.00 | - | - | 2008/03/04 | DDP | 23 | LBS |
| 39,996.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 19,272.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 18,810.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 9,636.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 15,048.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 56,100.00 | - | - | - | 2008/03/12 | DDP | 16 | LBS |
| 26,136.00 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 27,937.80 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 28,116.00 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 15,840.00 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 3,326.40 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 32,670.00 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 6,025.80 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 14,058.00 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 3,326.40 | - | - | - | 2008/05/05 | DDP | 16 | LBS |
| 176,418.00 | - | - | - | 2008/05/22 | DDP | 23 | LBS |
| 82,390.00 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 18,700.00 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 18,480.00 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 11,880.00 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 9,487.50 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 8,937.50 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 12,320.00 | - | - | - | 2008/06/02 | DDP | 16 | LBS |
| 14,700.65 | 875.35 | - | - | 2008/06/06 | DDP | 16 | LBS |
| 8,845.31 | 526.69 | - | - | 2008/06/06 | DDP | 16 | LBS |
| 44,101.95 | 2,626.05 | - | - | 2008/06/06 | DDP | 16 | LBS |
| 17,690.61 | 1,053.39 | - | - | 2008/06/06 | DDP | 16 | LBS |

PUBLIC VERSION

| 18.0 | 20.3 | 22.0 | 24.1 | 25.1 | 25.2 | 25.3.1 | 25.3.2 | 25.3 | 28.0 | 29.0 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Unit Price | Other Discounts | Level of Trade | Outside Cold Storage Charges | Trailor Hire Charges - Invoice Specific | Inland Freight - Allocated | Export Survey Charges - Invoice Specific | Export Survey Charges - Allocated | Brokerage and Handling in the Country of Manufacture | Brokerage & Handling incurred in U.S. | International Freight |
| GRSUPRU | OTHDISU | LOTU | OUTCSU | TRAILISU | INFRTALU | EXPSURU | EXPSUR2U | DBROKU | USBROKU | INTNFRU |
|  | - | 1 | - |  | - | 0.0302 | - | 0.3225 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1208 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1247 | - | 0.3225 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.0182 | - | 0.2195 |  |  |
|  | - | 1 | - |  | - | 0.2580 | - | 0.3225 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.0872 | - | 0.2986 |  |  |
|  | - | 1 | - |  | - | 0.1564 | - | 0.2972 |  |  |
|  | - | 1 | - |  | - | 0.1212 | - | 0.2540 |  |  |
|  | - | 1 | - |  | - | 0.3475 | - | 0.6967 |  |  |
|  | - | 1 | - |  | - | 0.0678 | - | 0.8107 |  |  |
|  | - | 1 | - |  | - | 0.0687 | - | 0.8021 |  |  |
|  | - | 1 | - |  | - | 0.2429 | - | 0.6029 |  |  |
|  | - | 1 | - |  | - | 0.2429 | - | 0.6029 |  |  |
|  | - | 1 | - |  | - | 0.1609 | - | 0.3225 |  |  |
|  | - | 1 | - |  | - | 0.1897 | - | 0.7167 |  |  |
|  | - | 1 | - |  | - | 0.0678 | - | 0.7241 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.0311 | - | 0.3950 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |
|  | - | 1 | - |  | - | 0.1190 | - | 0.3206 |  |  |

PUBLIC VERSION

| | | |
|---|---|---|
| 1 | 0.1190 | 0.3206 |
| 1 | 0.1190 | 0.3206 |
| 1 | 0.1190 | 0.3206 |
| 1 | 0.1190 | 0.3206 |
| 1 | 0.0305 | 0.2779 |
| 1 | 0.0678 | 0.8525 |
| 1 | 0.0678 | 0.7899 |
| 1 | 0.0678 | 0.9899 |
| 1 | 0.0305 | 0.3972 |
| 1 | 0.0678 | 0.6232 |
| 1 | 0.0678 | 0.7594 |
| 1 | 0.0678 | 0.8537 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.1236 | 0.3274 |
| 1 | 0.0809 | 0.2986 |
| 1 | 0.0809 | 0.2986 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1204 | 0.2994 |
| 1 | 0.1091 | 0.2986 |
| 1 | 0.1591 | 0.3225 |
| 1 | 0.1179 | 0.3225 |
| 1 | 0.0267 | 0.1927 |
| 1 | 0.1179 | 0.3225 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1194 | 0.2969 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1157 | 0.2903 |
| 1 | 0.1179 | 0.3225 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2454 | 0.2986 |
| 1 | 0.2288 | 0.2935 |
| 1 | 0.2288 | 0.2935 |
| 1 | 0.2288 | 0.2935 |
| 1 | 0.2288 | 0.2935 |

PUBLIC VERSION

| 29.1 | 29.2 | 36.0 | 37.0 | 38.0 | 40.0 | 41.0 | 42.0 |
|---|---|---|---|---|---|---|---|
| International Freight - Dollars | THC and Other Charges | U.S Customs Duty | Entry Date | Destination and State | Commissions | Selling Agent | Selling Agent Relationship |
| INTNFR2U | THCOCHGU | USDUTYU | ENTRYDTU | DESTU | COMMU | SELAGENU | SELARELU |
| - | 0.7158 | | 26-Feb-08 | NORFOLK, USA | | | |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | - | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 6-Mar-08 | NEW YORK, USA | | | 1 |
| - | 0.6542 | | 15-Mar-08 | CHICAGO, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.4386 | | 1-Apr-08 | NEW YORK, USA | | | 1 |
| - | 0.7158 | | 10-Jun-08 | NORFOLK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | - | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6056 | | 27-Jun-08 | NEW YORK, USA | | | 1 |
| - | 0.6029 | | 1-Aug-08 | INDIANAPOLIS, US/ | | | 1 |
| - | 0.3832 | | 24-Aug-08 | INDIANAPOLIS, US/ | | | 1 |
| - | 1.4131 | | 17-Oct-08 | CHICAGO, USA | | | 1 |
| - | 1.0935 | | 6-Nov-08 | CHICAGO, USA | | | 1 |
| - | 1.4720 | | 12-Nov-08 | LOS ANGELES, US/ | | | 1 |
| - | 1.2229 | | 21-Nov-08 | INDIANAPOLIS, US/ | | | 1 |
| - | 1.2229 | | 21-Nov-08 | INDIANAPOLIS, US/ | | | 1 |
| - | 0.6542 | | 26-Nov-08 | NORFOLK, USA | | | 1 |
| - | 1.5908 | | 26-Nov-08 | NORFOLK, USA | | | 1 |
| - | 1.0935 | | 5-Dec-08 | NORFOLK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.4664 | | 5-Dec-08 | NEW YORK, USA | | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |
| - | 0.6502 | | 17-Oct-08 | NEW YORK, USA | - | | 1 |

**JA0707**

PUBLIC VERSION

| | | | |
|---|---|---|---|
| 0.6502 | 17-Oct-08 | NEW YORK, USA | 1 |
| 0.6502 | 17-Oct-08 | NEW YORK, USA | 1 |
| 0.6502 | 17-Oct-08 | NEW YORK, USA | 1 |
| 0.6502 | 17-Oct-08 | NEW YORK, USA | 1 |
| 0.4578 | 6-Dec-08 | LOS ANGELES, USA | 1 |
| 1.0935 | 6-Dec-08 | LOS ANGELES, USA | 1 |
| 1.0935 | 16-Dec-08 | CHICAGO, USA | 1 |
| 1.0935 | 16-Dec-08 | LOS ANGELES, USA | 1 |
| 0.4921 | 17-Dec-08 | NORFOLK, USA | 1 |
| 1.0935 | 2-Jan-09 | NORFOLK, USA | 1 |
| 1.0935 | 2-Jan-09 | NORFOLK, USA | 1 |
| 1.0817 | 4-Jan-09 | NORFOLK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.4824 | 30-Dec-08 | NEW YORK, USA | 1 |
| 0.6627 | 26-Feb-08 | LOS ANGELES, USA | 1 |
| 0.6627 | 26-Feb-08 | LOS ANGELES, USA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6074 | 9-Feb-08 | LOS ANGELES, CA | 1 |
| 0.6056 | 19-Mar-08 | THEODORE, AL | 1 |
| 0.7158 | 31-Mar-08 | NORFOLK, VA | 1 |
| 0.6542 | 22-Mar-08 | CHICAGO | 1 |
| 0.1515 | 31-Mar-08 | NORFOLK, VA | 1 |
| 0.6542 | 31-Mar-08 | CHICAGO, IL | 1 |
| 0.6589 | 12-Apr-08 | LOS ANGELES, CA | 1 |
| 0.6589 | 12-Apr-08 | LOS ANGELES, CA | 1 |
| 0.6589 | 12-Apr-08 | LOS ANGELES, CA | 1 |
| 0.6589 | 12-Apr-08 | LOS ANGELES, CA | 1 |
| 0.6589 | 12-Apr-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.5888 | 2-Jun-08 | LOS ANGELES, CA | 1 |
| 0.6542 | 14-Jun-08 | CHICAGO,IL | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6056 | 3-Jul-08 | NEWYORK, CTR | 1 |
| 0.6515 | 11-Jul-08 | NEWYORK, NY | 1 |
| 0.6515 | 11-Jul-08 | NEWYORK, NY | 1 |
| 0.6515 | 11-Jul-08 | NEWYORK, NY | 1 |
| 0.6515 | 11-Jul-08 | NEWYORK, NY | 1 |
| | | | 1 |

PUBLIC VERSION

| 43.0 | 43.1 | 49.1 | 49.2 | 49.3 | 49.4.1 | 49.4.2 | 49.5.1 |
|---|---|---|---|---|---|---|---|
| Credit Expenses | Bank fee for Discounted Bills | EIA Inspection Fees | Other Bank Charges | Foreign Bank Charges | Other Selling expenses | Other Selling expenses - Allocated | Outside Inspection/Lab Expenses |
| CREDITU | DISBILLU | EIAIFU | OTHBKCHU | FBCHGSU | OSEXPU | OSEXP2U | INSPEXU |
| | 3.7351 | 0.5692 | | | | | |
| | 2.5547 | 0.4995 | | | | | |
| | 2.3114 | 0.4519 | | | | | |
| | 1.7031 | 0.3330 | | | | | |
| | 1.5004 | 0.2933 | | | | | |
| | 1.1760 | 0.2299 | | | | | |
| | 1.1152 | 0.2180 | | | | | |
| | 1.0543 | 0.2061 | | | | | |
| | 0.9732 | 0.1903 | | | | | |
| | 0.9124 | 0.1784 | | | | | |
| | 0.8110 | 0.1586 | | | | | |
| | 2.7003 | 0.5446 | | | | | |
| | 3.3773 | 0.4942 | | | | | |
| | 3.0557 | 0.4471 | | | | | |
| | 2.2515 | 0.3295 | | | | | |
| | 1.9835 | 0.2902 | | | | | |
| | 1.5546 | 0.2275 | | | | | |
| | 1.4742 | 0.2157 | | | | | |
| | 1.3938 | 0.2039 | | | | | |
| | 1.2866 | 0.1883 | | | | | |
| | 4.8586 | 0.5543 | | | | | |
| | 3.1604 | 0.5035 | | | | | |
| | 2.8594 | 0.4555 | | | | | |
| | 2.1069 | 0.3357 | | | | | |
| | 1.8561 | 0.2957 | | | | | |
| | 1.4548 | 0.2318 | | | | | |
| | 1.3795 | 0.2198 | | | | | |
| | 1.3043 | 0.2078 | | | | | |
| | 1.2039 | 0.1918 | | | | | |
| | 1.1287 | 0.1798 | | | | | |
| | 4.5407 | 0.5923 | | | | | |
| | 5.9038 | 0.6006 | | | | | |
| | 3.3354 | 0.4772 | | | | | |
| | 3.9862 | 0.4654 | | | | | |
| | 3.1245 | 0.5226 | | | | | |
| | 3.9155 | 0.6790 | | | | | |
| | 2.8084 | 0.4870 | | | | | |
| | 7.8018 | 0.6223 | | | | | |
| | 5.1640 | 0.5117 | | | | | |
| | 6.1975 | 0.4985 | | | | | |
| | 3.1349 | 0.4073 | | | | | |
| | 2.6317 | 0.3419 | | | | | |
| | 2.4382 | 0.3168 | | | | | |
| | 2.1673 | 0.2816 | | | | | |
| | 2.0512 | 0.2665 | | | | | |
| | 1.8964 | 0.2464 | | | | | |
| | 1.7803 | 0.2313 | | | | | |
| | 1.7029 | 0.2213 | | | | | |
| | 4.0265 | 0.6459 | | | | | |
| | 3.1318 | 0.5024 | | | | | |
| | 2.3209 | 0.3723 | | | | | |
| | 2.0133 | 0.3229 | | | | | |
| | 2.0412 | 0.3274 | | | | | |
| | 1.8175 | 0.2915 | | | | | |

PUBLIC VERSION

| | |
|---|---|
| 2.7962 | 0.4485 |
| 2.2929 | 0.3678 |
| 2.1531 | 0.3454 |
| 1.8455 | 0.2960 |
| 10.5790 | 0.6703 |
| 6.5748 | 0.5071 |
| 4.7693 | 0.4806 |
| 6.0597 | 0.4986 |
| 5.4646 | 0.6015 |
| 5.0756 | 0.4957 |
| 5.0756 | 0.4957 |
| 4.7557 | 0.4957 |
| 2.7709 | 0.5147 |
| 2.3045 | 0.4281 |
| 2.0027 | 0.3720 |
| 1.8656 | 0.3465 |
| 1.8381 | 0.3414 |
| 1.7010 | 0.3159 |
| 1.6186 | 0.3007 |
| 2.7709 | 0.5147 |
| 2.0027 | 0.3720 |
| 0.1792 | 0.2125 |
| 0.1726 | 0.2046 |
| 1.7665 | 0.4079 |
| 1.0564 | 0.2439 |
| 1.0045 | 0.2319 |
| 1.0045 | 0.2319 |
| 1.0045 | 0.2319 |
| 1.7838 | 0.4119 |
| 2.9245 | 0.3860 |
| 2.6412 | 0.3950 |
| 3.4504 | 0.3930 |
| 4.5166 | 0.4149 |
| 2.7546 | 0.3929 |
| 1.8129 | 0.4080 |
| 1.3103 | 0.2949 |
| 1.0231 | 0.2303 |
| 1.3103 | 0.2949 |
| 1.0231 | 0.2303 |
| 1.8309 | 0.4120 |
| 3.9852 | 0.4255 |
| 3.3411 | 0.3567 |
| 2.8581 | 0.3051 |
| 2.4153 | 0.2579 |
| 2.2543 | 0.2407 |
| 3.9852 | 0.4255 |
| 3.3411 | 0.3567 |
| 2.8581 | 0.3051 |
| 2.2543 | 0.2407 |
| 2.7103 | 0.4048 |
| 2.5018 | 0.4316 |
| 1.5899 | 0.2743 |
| 1.9641 | 0.3388 |
| 1.6835 | 0.2904 |
| 1.6133 | 0.2783 |
| 1.5198 | 0.2622 |
| 1.3094 | 0.2259 |
| 2.9769 | 0.5101 |
| 1.7912 | 0.3069 |
| 2.9769 | 0.5101 |
| 1.7912 | 0.3069 |

PUBLIC VERSION

| 49.5.2 | 50.1 | 51.1 | 52.0 | 55.0 | 56.0 | 61.0 | 62.0 | 63.0 | 64.0 |
|---|---|---|---|---|---|---|---|---|---|
| Outside Inspection/ Lab Expenses - Allocated | Indirect Selling Expenses Incurred in India | Inventory Carrying costs in India | Packing Cost | Variable Manufact uring Cost | Total Manufact uring Cost | Manufact urer | Entered Value | Importer | Exporter |
| INSPEX2U | DINDIRSU | DINVCARU | PACKU | VCOMU | TCOMU | MFRU | ENTVALUE | IMPORTER | EXPORTER |
| | | | 2.95 | | | DMF | 7.2107 | DMF | DMF |
| | | | 4.18 | | | DMF | 6.3009 | DMF | DMF |
| | | | 4.18 | | | DMF | 5.7009 | DMF | DMF |
| | | | 4.18 | | | DMF | 4.2006 | DMF | DMF |
| | | | 4.18 | | | DMF | 3.7006 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.9004 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.7504 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.6004 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.4004 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.2503 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.0003 | DMF | DMF |
| | | | 2.95 | | | DMF | 6.8695 | DMF | DMF |
| | | | 4.18 | | | DMF | 6.2894 | DMF | DMF |
| | | | 4.18 | | | DMF | 5.6905 | DMF | DMF |
| | | | 4.18 | | | DMF | 4.1930 | DMF | DMF |
| | | | 4.18 | | | DMF | 3.6938 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.8951 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.7454 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.5956 | DMF | DMF |
| | | | 4.18 | | | DMF | 2.3960 | DMF | DMF |
| | | | 2.95 | | | DMF | 6.9498 | DMF | DMF |
| | | | 4.18 | | | DMF | 6.2618 | KEPL | DMF |
| | | | 4.18 | | | DMF | 5.6654 | KEPL | DMF |
| | | | 4.18 | | | DMF | 4.1745 | KEPL | DMF |
| | | | 4.18 | | | DMF | 3.6776 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.8824 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.7333 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.5842 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.3855 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.2364 | KEPL | DMF |
| | | | 2.69 | | | DMF | 7.0094 | KEPL | DMF |
| | | | 2.69 | | | DMF | 7.0094 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.3521 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.3738 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.6391 | KEPL | DMF |
| | | | 6.06 | | | DMF | 7.0803 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.0783 | KEPL | DMF |
| | | | 2.95 | | | DMF | 6.7074 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.4871 | KEPL | DMF |
| | | | 6.06 | | | DMF | 5.0607 | KEPL | DMF |
| | | | 4.18 | | | DMF | 4.0779 | KEPL | DMF |
| | | | 4.18 | | | DMF | 3.4234 | KEPL | DMF |
| | | | 4.18 | | | DMF | 3.1717 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.8193 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.6682 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.4669 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.3158 | KEPL | DMF |
| | | | 4.18 | | | DMF | 2.2151 | KEPL | DMF |
| | | | 2.90 | | | DMF | 7.3989 | KEPL | DMF |
| | | | 2.90 | | | DMF | 5.7547 | KEPL | DMF |
| | | | 2.90 | | | DMF | 4.2646 | KEPL | DMF |
| | | | 2.90 | | | DMF | 3.6994 | KEPL | DMF |
| | | | 2.75 | | | DMF | 3.7508 | KEPL | DMF |
| | | | 2.75 | | | DMF | 3.3398 | KEPL | DMF |

PUBLIC VERSION

| | | | |
|---|---|---|---|
| 2.71 | DMF | 5.1381 KEPL | DMF |
| 2.71 | DMF | 4.2132 KEPL | DMF |
| 2.71 | DMF | 3.9563 KEPL | DMF |
| 4.18 | DMF | 3.3912 KEPL | DMF |
| 2.95 | DMF | 6.7274 KEPL | DMF |
| 6.06 | DMF | 5.0897 KEPL | DMF |
| 6.06 | DMF | 4.8964 KEPL | DMF |
| 6.06 | DMF | 5.0042 KEPL | DMF |
| 2.95 | DMF | 6.0407 KEPL | DMF |
| 6.06 | DMF | 4.9819 KEPL | DMF |
| 6.06 | DMF | 4.9819 KEPL | DMF |
| 6.06 | DMF | 4.9508 KEPL | DMF |
| 2.90 | DMF | 5.1853 KEPL | DMF |
| 2.90 | DMF | 4.3125 KEPL | DMF |
| 2.94 | DMF | 3.7478 KEPL | DMF |
| 2.90 | DMF | 3.4911 KEPL | DMF |
| 3.27 | DMF | 3.4397 KEPL | DMF |
| 3.34 | DMF | 3.1831 KEPL | DMF |
| 2.98 | DMF | 3.0290 KEPL | DMF |
| 2.90 | DMF | 5.1853 KEPL | DMF |
| 2.94 | DMF | 3.7478 KEPL | DMF |
| 2.98 | KITCO | 2.6832 KEPL | KITCO |
| 3.01 | KITCO | 2.5838 KEPL | KITCO |
| 1.66 | KEPL | 5.1723 KEPL | KEPL |
| 1.66 | KEPL | 3.0932 KEPL | KEPL |
| 1.66 | KEPL | 2.9411 KEPL | KEPL |
| 1.66 | KEPL | 2.9411 KEPL | KEPL |
| 1.66 | KEPL | 2.9411 KEPL | KEPL |
| 2.89 | KEPL | 5.2230 KEPL | KEPL |
| 2.92 | KEPL | 4.8304 KEPL | KEPL |
| 2.81 | KEPL | 5.0195 KEPL | KEPL |
| 2.81 | KEPL | 4.9391 KEPL | KEPL |
| 2.81 | KEPL | 5.0248 KEPL | KEPL |
| 2.81 | KEPL | 4.9391 KEPL | KEPL |
| 1.66 | KEPL | 5.1082 KEPL | KEPL |
| 1.66 | KEPL | 3.6921 KEPL | KEPL |
| 1.66 | KEPL | 2.8828 KEPL | KEPL |
| 1.66 | KEPL | 3.6921 KEPL | KEPL |
| 1.66 | KEPL | 2.8828 KEPL | KEPL |
| 2.89 | KEPL | 5.1588 KEPL | KEPL |
| 1.66 | KEPL | 5.0189 KEPL | KEPL |
| 1.66 | KEPL | 4.2078 KEPL | KEPL |
| 1.66 | KEPL | 3.5994 KEPL | KEPL |
| 1.66 | KEPL | 3.0418 KEPL | KEPL |
| 1.66 | KEPL | 2.8390 KEPL | KEPL |
| 1.66 | KEPL | 5.0189 KEPL | KEPL |
| 1.66 | KEPL | 4.2078 KEPL | KEPL |
| 1.66 | KEPL | 3.5994 KEPL | KEPL |
| 1.66 | KEPL | 2.8390 KEPL | KEPL |
| 2.81 | KEPL | 4.8889 KEPL | KEPL |
| 2.90 | KEPL | 5.3574 KEPL | KEPL |
| 2.90 | KEPL | 3.4047 KEPL | KEPL |
| 2.94 | KEPL | 4.2058 KEPL | KEPL |
| 2.90 | KEPL | 3.6050 KEPL | KEPL |
| 3.27 | KEPL | 3.4548 KEPL | KEPL |
| 3.34 | KEPL | 3.2545 KEPL | KEPL |
| 2.98 | KEPL | 2.8039 KEPL | KEPL |
| 1.66 | KEPL | 5.9804 KEPL | KEPL |
| 1.66 | KEPL | 3.5984 KEPL | KEPL |
| 1.66 | KEPL | 5.9804 KEPL | KEPL |
| 1.66 | KEPL | 3.5984 KEPL | KEPL |

PUBLIC VERSION

23-2

G M
S ◄
B L

G A R V E Y   S C H U B E R T   B A R E R

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

WASHINGTON, D.C. OFFICE

*fifth floor*

*flour mill building*

*1000 potomac street nw*

*washington, d.c. 20007-3501*

TEL 202 965 7880 FAX 202 965 1729

**FOR PUBLIC FILE**

OTHER OFFICES

*beijing, china*

*new york, new york*

*portland, oregon*

*seattle, washington*

GSBLAW.COM

RECEIVED
DEPT. OF COMMERCE
JUL - 7 2009
IMPORT ADMINISTRATION

July 7, 2009

*Please reply to* LIZBETH R. LEVINSON
llevinson@gsblaw.com TEL 202 965 7880

ITA Case No.: A-533-840
Total Pages: 407
4th Administrative Review
(02/01/2008-01/31/2009)
AD/CVD Office 2

**PUBLIC VERSION**

Business Proprietary Information has been
deleted from Brackets on Pages B20, B31,
B46, C16, C17, C28 and C49, and in
Exhibits, Exhibits B1-B-4, B6, B8, B11 –
B25, C1 – C4, C6, C8, C-11 – C27 and in
the Accompanying CD.

**BY HAND DELIVERY**

The Honorable Gary F. Locke
Secretary of Commerce
14th Street & Constitution Avenue, N.W.
Attn: Import Administration
Central Records Unit, Room 1870
Washington, DC 20230

~~MAY BE RELEASED UNDER APO~~

Re:    **Frozen Warmwater Shrimp from India,
        Submission of Sections B and C Response of Falcon Marine Exports Limited**

Dear Mr. Secretary:

We represent Falcon Marine Exports Limited ("Falcon Marine"), an Indian producer and

exporter to the United States of frozen warmwater shrimp, in the above referenced administrative

review. We hereby file the original and two copies of the public version of Falcon Marine's response to

Sections B and C of the Department's initial questionnaire. This response is timely pursuant to the

Department's letter dated June 19, 2009.

In accordance with 19 C.F.R. § 351.304(a), we hereby request business proprietary treatment for the designated information contained in the attached response. The information designated as business proprietary consists of the identity of customers and suppliers, transaction-specific sales volumes, sales values and unit sales values, transaction-specific adjustments to the reported unit sales values, period wide-expenses and sales values used to calculate such adjustments and other information obtained from Falcon Marine's sales and accounting records. Such information is business confidential, and, if released to the public, would cause substantial harm to the competitive position of our client. Falcon Marine, consents to the release of the designated information under the terms of an appropriately issued administrative protective order.

A CD containing Falcon Marine's proprietary U.S. and 3rd country sales listings has been filed with the Department and served upon counsel for Petitioner. As indicated in the attached certificate of service, a copy of this document has been served upon the parties on the Department's proprietary service list. Thank you for your attention to this matter. Should you have any questions concerning Falcon Marine's Sections B and C response, please contact the undersigned.

Respectfully submitted;

*Ronald M. Wisla*

Lizbeth R. Levinson
Ronald M. Wisla

DC_DOCS:686616.2 [22529-00100]

**Exhibit C-14A.**

**FIELD NUMBER 25.4.2:    Export Survey Charges – Allocated**

FIELD NAME:    EXPSUR2U

There are certain export survey charges that could not be tied to specific invoices. The aggregate of these charges are allocated to all shipments other than those to which direct allocation is made, on a uniform basis. The invoice-specific amount is allocated on a quantity basis to invoice line items. The detailed workings are shown in Exhibit C-14B.

**FIELD NUMBER 26.0:    Country of Manufacture Inland Insurance**

FIELD NAME:    INSUREU

DESCRIPTION:    Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.

NARRATIVE:    Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

**Falcon has not incurred expenses under this head; therefore this field is deleted.**

**FIELD NUMBER 27.0:    Brokerage and Handling Incurred in the Country of Manufacture**

FIELD NAME:    DBROKU

DESCRIPTION:    Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.

NARRATIVE:    Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

C-35

The expenses incurred towards the clearing and forwarding (C&F) at the time of shipment are shown here. These expenses include incidental expenses at the port of shipment, hire charges for local van engaged by the C&F agent as required and the agent's service charges. The invoice-specific amount is allocated on quantity basis to invoice line items. The sample workings are shown in Exhibit C-15.

**FIELD NUMBER 28.0:**    **Brokerage and Handling Incurred in the United States**

    FIELD NAME:    USBROKU

    DESCRIPTION:    Report the unit cost of any brokerage and handling incurred in the United States on sales to the United States.

    NARRATIVE:    Describe how you calculated the unit cost of brokerage and handling incurred in the United States and include your worksheets as attachments to the narrative response.

Falcon is an Importer of Record. For shipments made on Delivered Duty Paid (DDP) terms, Falcon utilized the services of Customs Brokers in the United States to comply with all CBP formalities and requirements. The expenses incurred by and the fees paid to the Customs Broker in this regard are shown here. The invoice-specific amount is allocated on quantity basis to invoice line items. The detailed workings are shown in Exhibit C-16.

**FIELD NUMBER 29.0:**    **International Freight**

    FIELD NAME:    INTNFRU

    DESCRIPTION:    Report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

    NARRATIVE:    Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the

C-36

# EXHIBIT C-15

## FALCON MARINE EXPORTS LIMITED

Exhibit C-15

## Brokerage and Handling in the Country of Manufacture

| Field Number | Field Description | Field Name | Basis of Calculation |
|---|---|---|---|
| 27.0 | Brokerage and Handling in the Country of Manufacture | DBROKU | |

Sale Invoice No                                           267/08-09
Invoice Date                                              2008/10/25
Quantity in LBS

Brokerage and Handling in the Country of Manufacture    INR

Expenditure per unit of mesurement                      INR

Similar Calculation is Adopted for all observations under this category

390.00

16150

.4900

PUBLIC VERSION
Where Capable of Public Summary
Bracketed Items Represent Ranged Data

686613V1
1OF1

**FOR PUBLIC**





Corporate Office.
Raghuvanshi Mills, Lower Parel
Mumbai - 400 013, (India)
Tel. : + 91-22-24972840
Fax : + 91-22-24972844
Email : sales@venuswires.com

Sales Office & Plant
Atkargaon,
Khopoli - 410 203.
Maharashtra, (India)
Tel. : + 91 (2192) 2(
Fax : + 91 (2192) 2(

Date : 6/27/2009

To,

The Assistant Secretary,

Import Administration,

International Trade Administration.

Room No.1870,U.S.Department of Commerce,

14th Street and Constitution Avenue,N.W.,

Washington D.C.20230

Attention : Mr. Brandon Farlander/ Ms. Erika McDonald

Case No. A-533-810
Annual Administrative
Review for the period
AR:2/1/08–1/31/09

**RECEIVED**
JUN 3 0 2009
DEPT. OF COMMERCE
ITA
IMPORT ADMINISTRATION

Re : Section C response

Dear Sirs,

In response to the Department's questionnaire 'Section C' on stainless steel bars from India in the 2008-09 Administrative review period, we are submitting 6 copies of the proprietary version and 4 copies of the public version of our response. Also, we are herewith sending the electronic copy our section C response. The due date of this submission is 30th June . We kindly request the Department to extend the due date by 2 days or till it get delivered, which ever is later, to accommodate any delay in the transit time from India.

A copy of our response, public version and proprietary [including electronic version] has been served on the following party .

Ms. Grace W. Kim
Kelley Drye Collier Shannon
Washington Harbour, Suite 400                  By UPS Courier.
3050 K Street, NW
Washington, DC 20007

Please contact the undersigned , should you have any queries.

Yours truly,

S. Thrideep
Manager –Exports

**JA0719**

DESCRIPTION:        Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.

NARRATIVE:          Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

DESCRIPTION (A):    *We have not incurred any inland insurance on shipment from the factory to the domestic port, and so all the amounts are reported as "0" (zero).*

NARRATIVE (A):      *As we have not incurred any inland insurance, this part is not applicable.*

**FIELD NUMBER 27.0:**    **Brokerage and Handling in the Country of Manufacture**

FIELD NAME:         DBROKU

DESCRIPTION:        Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.

NARRATIVE:          Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

DESCRIPTION (A):    *We have reported in this field handling charges charged by clearing agent and freight forwarders.*

NARRATIVE (A):      *We normally appoint CHA (Clearing & Handling agents) who take care of taking delivery of the product from our factory, fulfilling the various formalities and getting the material loaded in the ship. These CHA agents raise their bills for the inland freight incurred by them for taking the material from our factory to the port and for other*

*services rendered. Since we have reported inland freight cost in field no25.0, other expenses incurred has been listed in this field. Further, We generally appoint a freight forwarder who Negotiate with the shipping co and arrange for the shipment. We pay him ocean freight and other charges such as Terminal handling charges. This other charges have also been included in this field.*

*Worksheet for the calculations used in arriving the unit cost of other services rendered by the CHA and freight forwarders, is enclosed herewith as "Annexure C-5"*

**FIELD NUMBER 28.0:**      **Brokerage and Handling**

FIELD NAME:           USBROKU

DESCRIPTION:          Report the unit cost of any brokerage and handling incurred in the United States on sales to the United States.

NARRATIVE:            Describe how you calculated the unit cost of brokerage and handling incurred in the United States and include your worksheets as attachments to the narrative response.

*DESCRIPTION (A):*   *Since we have sold to some of our customers on delivered duty paid basis, we have incurred, duty and other cost in USA. As our custom broker has to clear and deliver the same to our customers, he incurs the cost of transportation, duty, storage (If any) and other handling charges. We are reporting all charges except duty and transport charges incurred in USA in Annexure C-1 under this field.*

NARRATIVE (A):    *Since we have sold to some of our customers on delivered duty paid basis, we have incurred; duty and other cost in USA. As our custom broker has to clear and deliver the same to our customers, he incurs the cost of transportation, duty, storage (If any) and other handling charges. We are reporting all charges except duty and transport charges incurred in USA in Annexure C-1 under this field. Worksheet for the calculations is enclosed herewith as "Annexure C-9"*

**FIELD NUMBER 29.0:**    **International Freight**

FIELD NAME:    INTNFRU

DESCRIPTION:    Report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

NARRATIVE:    Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under review. Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.

DESCRIPTION (A):    *The unit cost of ocean freight incurred on shipment from the domestic port to the U.S. port of entry is reported in Annexure C-1 under this field.*

NARRATIVE (A):    *We normally appoint Forwarding agents who arrange for the ocean freight carrier. We do not enter into any contracts or tariff rate agreements with carriers. We do not have any affiliated ocean freight carrier. Worksheet for the calculations used in arriving the unit cost of ocean freight, is enclosed herewith as "Annexure C-6"*

**FIELD NUMBER 30.0:**    **Marine Insurance**

ANNEXURE C - 5
FIELD NO. 27 OF C-1

| INVOICE NO. | QTY. LBS. | Custom Clearing Charges (A) | Fumigation Charges (B) | THC & DOC Charges (C) | Total Brokerage & Handling Charge (A+B+C) | Total Brokerage & Handling Charge (D) PER LBS |
|---|---|---|---|---|---|---|
| VW/1305/EXP/2007-2008 | 6286.39 | | | | | 0.3029 |
| VW/1305/EXP/2007-2008 | 15544.78 | | | | | 0.3029 |
| VW/1305/EXP/2007-2008 | 6973.21 | | | | | 0.3029 |
| VW/1305/EXP/2007-2008 | 7475.87 | | | | | 0.3029 |
| VW/1305/EXP/2007-2008 | 4063.11 | | | | | 0.3029 |
| TOTAL | 40353.36 | 2809 | 1740 | 7675 | 12224 | |

We have reported the custom clearance charges charged by our clearing agent, fumigation charges and Terminal Handling charges as well as documentation charges charged by our freight broker. The details of which is given below.

1.   We are enclosing the bill of Rs. 10809/- of Which relate to material shipped in Invoice no. VW/1305.
     The amount of Rs. 10809/- comprises of Rs. 8000/- towards Inland transportation charges
     and Rs. 2500/- plus Rs. 300/- plus Rs. 6/- plus Rs. 3/- towards Custom Clearing charges.
     Since, we have already reported Transportation charges in Field no. 25 the balance
     charges for this invoice comes to Rs. 2809/- (Rs. 2500/- + Rs. 300/- + Rs.6/- + Rs. 3/-)

2.   We are enclosing a sample bill which demonstrate that fumigation charges are charged at a standard rate
     of Rs.1150/- for 20' FCL container & Rs.1450/- for 40' FCL container. All other charges and taxes comes to around 20% of the standard
     rate and accordingly we have revised fumigation charges by 20%.
     Debit Note No. UN/38 of Vishal Shipping Agencies Pvt. Ltd. f or Rs. 1921/50/-.

3.   This invoice of our freight broker which contains International Freight for Rs. 184478/-.
     THC Rs. 6000/-, Documentation Charges Rs. 750/-, Service Tax Rs. 920/- and Education Cess Rs. 25/-. We have Reported THC,
     Documentation Charges, Service Tax and Education Cess in this Field and International Freight in Field no.29.

Rs. 2809/- as described in point no. 1 above is shown in column (A) above
Rs. 1740/- as described in point no. 2 above is shown in column (B) above
Rs. 6080/-, Rs 750/-, Rs. 920/- and Rs. 25/- as described in point no. 3 above which comes to Rs. 7675/- is shown
in column (C) above.

These figures has been divided by the Invoice Quantity and the same has been reported in
the Field no. 27 of Annexure C-1.

NOTE :   We have calculated unit value Per LBS. for Total Brokerage and Handling Charge in the following manner.

D = (A+B+C) / TOTAL BILL QUANTITY

A =   TOTAL CUSTOM CLEARING CHARGES OF THE INVOICE

B =   TOTAL FUMIGATIN EXPENSES OF THE INVOICE

C =   TOTAL THC & DOC OF THE INVOICE

**JA0723**

# Exhibit 4

# Import / Export Letters of Credit



Letter of Credit L/c Documentry Collection Export Import International Trade.

Home    Clients    Testimonials    Feedback    Enquiry    Support    Site Map    Welcome Guest

Sample Data    India Trade Data    Foreign Trade Laws    Trade Resources    About Us    FAQ    Translate

Home > Exim > EXPORT-FINANCE > Letter of Credit L/c Documentry Collection Export Import International Trade.

# Letter of Credit(L/c) Documentry Collection.

- Introduction
- Parties to Letters of Credit
- Types of Letter of Credit
- Standby Letter of Credit  L/c
- Import Operations Under L/c
- Export Operations Under L/c
- Fees And Reimbursements :
- Regulatory Requirements
- Trade Control Requirements
- Exchange Control Requirements
- UCPDC Guidelines
- ISBP 2002
- FEDAI Guidelines
- Fixing limits for Commercial Stand by Letter of Credit  L/c

Search

Page 1 of 12

Free Registr

Our Client

Contact Us

Enquiry For

Fields marked w
are required.

Send enquiry

Describe your
requirements*

☐ Organization/(
☐ Your Name*
☐ Your E-mail*
☐ Phone:(Include
☐ City/State
☐ Country

8/2/2010

Letter of Credit L/c Documentry Collection Export Import International Trade.

## Introduction

Letter of Credit L/c also known as Documentary Credit is a widely used term to make payment secure in domestic and international trade. The document is issued by a financial organization at the buyer request. Buyer also provide the necessary instructions in preparing the document.

The International Chamber of Commerce (ICC) in the Uniform Custom and Practice for Documentary Credit (UCPDC) defines L/C as:

"An arrangement, however named or described, whereby a bank (the Issuing bank) acting at the request and on the Instructions of a customer (the Applicant) or on its own behalf :

1. Is to make a payment to or to the order third party ( the beneficiary ) or is to accept bills of exchange (drafts) drawn by the beneficiary.
2. Authorised another bank to effect such payments or to accept and pay such bills of exchange (draft).
3. Authorised another bank to negotiate against stipulated documents provided that the terms are complied with.

A key principle underlying letter of credit (L/C) is that banks deal only in documents and not in goods. The decision to pay under a letter of credit will be based entirely on whether the documents presented to the bank appear on their face to be in accordance with the terms and conditions of the letter of credit.

## Parties to Letters of Credit

- **Applicant (Opener)**: Applicant which is also referred to as account party is normally a buyer or customer of the goods, who has to make payment to beneficiary. LC is initiated and issued at his request and on the basis of his instructions.

- **Issuing Bank (Opening Bank)**: The issuing bank is the one which create a letter of credit and takes the responsibility to make the payments on receipt of the documents from the beneficiary or through their banker. The payments has to be made to the beneficiary within seven working days from the date] of receipt of documents at their end, provided the documents are in accordance with the terms and conditions of the letter of credit. If the documents are discrepant one, the rejection thereof to be communicated within seven working days from the date of receipt of documents at their end.

- **Beneficiary** : Beneficiary is normally stands for a seller of the goods, who has to receive payment from the applicant. A credit is issued in his favour to enable him or his agent to obtain payment on surrender of stipulated document and comply with the term and conditions of the L/c.
  If L/c is a transferable one and he transfers the credit to another party, then he is referred to as the first or original beneficiary.

- **Advising Bank** : An Advising Bank provides advice to the beneficiary and takes the responsibility for sending the documents to the issuing bank and is normally located in the country of the beneficiary.

- **Confirming Bank** : Confirming bank adds its guarantee to the credit opened by another bank, thereby undertaking the responsibility of payment/negotiation acceptance under the credit, in additional to that of the issuing bank. Confirming bank play an important role where the exporter is not satisfied with the undertaking of only the issuing bank.

---

| Submit | R

### Data in CD

- US Import Data
- UK Import Data
- China Import D
- China Export D
- India Export Da
- India Import Da

### Login

**Username**

**Password**

**LOGIN**

☑ Remember m
Forgot Password
Free Signup

### What is New

8/2/2010

Letter of Credit L/c Documentry Collection Export Import International Trade.

- **Negotiating Bank:** The Negotiating Bank is the bank who negotiates the documents submitted to them by the beneficiary under the credit either advised through them or restricted to them for negotiation. On negotiation of the documents they will claim the reimbursement under the credit and makes the payment to the beneficiary provided the documents submitted are in accordance with the terms and conditions of the letters of credit.

- **Reimbursing Bank :** Reimbursing Bank is the bank authorized to honor the reimbursement claim in settlement of negotiation/acceptance/payment lodged with it by the negotiating bank. It is normally the bank with which issuing bank has an account from which payment has to be made.

- **Second Beneficiary:** Second Beneficiary is the person who represent the first or original Beneficiary of credit in his absence. In this case, the credits belonging to the original beneficiary is transferable. The rights of the transferee are subject to terms of transfer.

Types of Letter of Credit
1. Revocable Letter of Credit L/c

A revocable letter of credit may be revoked or modified for any reason, at any time by the issuing bank without notification. It is rarely used in international trade and not considered satisfactory for the exporters but has an advantage over that of the importers and the issuing bank.

There is no provision for confirming revocable credits as per terms of UCPDC, Hence they cannot be confirmed. It should be indicated in LC that the credit is revocable. If there is no such indication the credit will be deemed as irrevocable.

2. Irrevocable Letter of CreditL/c

In this case it is not possible to revoked or amended a credit without the agreement of the issuing bank, the confirming bank, and the beneficiary. Form an exporters point of view it is believed to be more beneficial. An irrevocable letter of credit from the issuing bank insures the beneficiary that if the required documents are presented and the terms and conditions are complied with, payment will be made.

3. Confirmed Letter of Credit  L/c

Confirmed Letter of Credit is a special type of L/c in which another bank apart from the issuing bank has added its guarantee. Although,  the cost of confirming by two banks makes it costlier, this type of L/c is more beneficial for the beneficiary as it doubles the guarantee.

4. Sight Credit and Usance Credit  L/c

Sight credit states that the payments would be made by the issuing bank at sight, on demand or on presentation. In case of usance credit, draft are drawn on the issuing bank or the correspondent bank at specified usance period. The credit will indicate whether the usance draft are to be drawn on the issuing bank or in the case of confirmed credit on the confirming bank.

Date: 30-07-201
CUSTOMS Notifi
68/2010 (NT)
Amends Notifica
36/2001 - Custo
dated, the 3rd

Date: 30-07-201
Service Tax Circ
125/2010 (ST)
Regarding Acco
the taxable ser
vide the Financ

Exim News

Date: 02-08-201
Duty benefits o
equipment imp

Date: 02-08-201
Japan, China, I
Singapore: Asia
Preview

Date: 02-08-201
Steel Imports u

Date: 02-08-201

http://www.infodriveindia.com/Exim/Guides/Export-Finance/Ch_3_Letter_Of_Credit_Lc.aspx

8/2/2010

Letter of Credit L/c Documentry Collection Export Import International Trade.

## 5. Back to Back Letter of Credit  L/c

Back to Back Letter of Credit is also termed as Countervailing Credit. A credit is known as backtoback credit when a L/c is opened with security of another L/c.

A backtoback credit which can also be referred as credit and countercredit is actually a method of financing both sides of a transaction in which a middleman buys goods from one customer and sells them to another.

The parties to a BacktoBack Letter of Credit are:
1. The buyer and his bank as the issuer of the original Letter of Credit.
2. The seller/manufacturer and his bank,
3. The manufacturer's subcontractor and his bank.

The practical use of this Credit is seen when L/c is opened by the ultimate buyer in favour of a particular beneficiary, who may not be the actual supplier/ manufacturer offering the main credit with near identical terms in favour as security and will be able to obtain reimbursement by presenting the documents received under back to back credit under the main L/c.

The need for such credits arise mainly when :

1. The ultimate buyer not ready for a transferable credit
2. The Beneficiary do not want to disclose the source of supply to the openers.
3. The manufacturer demands on payment against documents for goods but the beneficiary of credit is short of the funds

## 6. Transferable Letter of Credit  L/c

A transferable documentary credit is a type of credit under which the first beneficiary which is usually a middleman may request the nominated bank to transfer credit in whole or in part to the second beneficiary.

The L/c does state clearly mentions the margins of the first beneficiary and unless it is specified the L/c cannot be treated as transferable. It can only be used when the company is selling the product of a third party and the proper care has to be taken about the exit policy for the money transactions that take place.

This type of L/c is used in the companies that act as a middle man during the transaction but don't have large limit. In the transferable L/c there is a right to substitute the invoice and the whole value can be transferred to a second beneficiary.

The first beneficiary or middleman has rights to change the following terms and conditions of the letter of credit:

1. Reduce the amount of the credit.
2. Reduce unit price if it is stated
3. Make shorter the expiry date of the letter of credit.
4. Make shorter the last date for presentation of documents.
5. Make shorter the period for shipment of goods.
6. Increase the amount of the cover or percentage for which insurance cover must be effected.
7.

Letter of Credit L/c Documentry Collection Export Import International Trade.

7. Substitute the name of the applicant (the middleman) for that of the first beneficiary (the buyer).

## Standby Letter of Credit  L/c

Initially used by the banks in the United States, the standby letter of credit is very much similar in nature to a bank guarantee. The main objective of issuing such a credit is to secure bank loans. Standby credits are usually issued by the applicant's bank in the applicant's country and advised to the beneficiary by a bank in the beneficiary's country.

Unlike a traditional letter of credit where the beneficiary obtains payment against documents evidencing performance, the standby letter of credit allow a beneficiary to obtains payment from a bank even when the applicant for the credit has failed to perform as per bond.

A standby letter of credit is subject to "Uniform Customs and Practice for Documentary Credit" (UCP), International Chamber of Commerce Publication No 500, 1993 Revision, or "International Standby Practices" (ISP), International Chamber of Commerce Publication No 590, 1998.

## Import Operations Under  L/c

The Import Letter of Credit guarantees an exporter payment for goods or services, provided the terms of the letter of credit have been met.

A bank issue an import letter of credit on the behalf of an importer or buyer under the following Circumstances

- When a importer is importing goods within its own country.
- When a trader is buying good from his own country and sell it to the another country for the purpose of merchandizing trade.

- When an Indian exporter who is executing a contract outside his own country requires importing goods from a third country to the country where he is executing the contract.

The first category of the most common in the day to day banking

## Fees And Reimbursements

The different charges/fees payable under import L/c is briefly as follows

1. The issuing bank charges the applicant fees for opening the letter of credit. The fee charged depends on the credit of the applicant, and primarily comprises of :

(a) Opening Charges  This would comprise commitment charges and usance charged to be charged upfront for the period of the L/c.

http://www.infodriveindia.com/Exim/Guides/Export-Finance/Ch_3_Letter_Of_Credit_Lc.aspx

8/2/2010

Letter of Credit L/c Documentry Collection Export Import International Trade.

The fee charged by the L/c opening bank during the commitment period is referred to as commitment fees. Commitment period is the period from the opening of the letter of credit untill the last date of negotiation of documents under the L/c or the expiry of the L/c, whichever is later.

Usance is the credit period agreed between the buyer and the seller under the letter of credit. This may vary from 7 days usance (sight) to 90/180 days. The fee charged by bank for the usance period is referred to as usance charges

**(b)Retirement Charges**

1. This would be payable at the time of retirement of LCs. LC opening bank scrutinizes the bills under the LCs according to UCPDC guidelines , and levies charges based on value of goods.

2. The advising bank charges an advising fee to the beneficiary unless stated otherwise The fees could vary depending on the country of the beneficiary. The advising bank charges may be eventually borne by the issuing bank or reimbursed from the applicant.

3. The applicant is bounded and liable to indemnify banks against all obligations and responsibilities imposed by foreign laws and usage.

4. The confirming bank's fee depends on the credit of the issuing bank and would be borne by the beneficiary or the issuing bank (applicant eventually) depending on the terms of contract.

5. The reimbursing bank charges are to the account of the issuing bank.

<u>Risk  Associated  with Opening Imports L/cs</u>

The basic risk associated with an issuing bank while opening an import L/c are :

1.  **The financial standing of the importer**
    As the bank is responsible to pay the money on the behalf of the importer, thereby the bank should make sure that it has the proper funds to pay.
2.  **The goods**
    Bankers need to do a detail analysis against the risks associated with perishability of the goods, possible obsolescence, import regulations packing and storage, etc. Price risk is the another crucial factor associated with all modes of international trade.
3.  **Exporter Risk**
    There is always the risk of exporting inferior quality goods. Banks need to be protective by finding out as much possible about the exporter using status report and other confidential information.
4.  **Country Risk**
    These types of risks are mainly associated with the political and economic scenario of a country. To solve this issue, most banks have specialized unit which control the level of exposure that that the bank will assumes for each country.
5.  **Foreign exchange risk**
    Foreign exchange risk is another most sensitive risk associated with the banks. As the transaction is done in foreign currency, the traders depend a lot on exchange rate fluctuations.

Letter of Credit L/c Documentry Collection Export Import International Trade.

Export  Operations Under L/c

Export Letter of Credit is issued in for a trader for his native country for the purchase of goods and services. Such letters of credit may be received for following purpose:

1.  For physical export of goods and services from India to a Foreign Country.
2.  For execution of projects outside India by Indian exporters by supply of goods and services from Indian or partly from India and partly from outside India.
3.  Towards deemed exports where there is no physical movements of goods from outside India But the supplies are being made to a project financed in foreign exchange by multilateral agencies, organization or project being executed in India with the aid of external agencies.
4.  For sale of goods by Indian exporters with total procurement and supply from outside India. In all the above cases there would be earning of Foreign Exchange or conservation of  Foreign Exchange.

Banks in India associated themselves with the export letters of credit in various capacities such as advising bank, confirming bank, transferring bank and reimbursing bank.

In every cases the bank will be rendering services not only to the Issuing Bank as its agent correspondent bank but also to the exporter in advising and financing his export activity.

1.  **Advising an Export L/c**
    The basic responsibility of an advising bank is to advise the credit received from its overseas branch after checking the apparent genuineness of the credit recognized by the issuing bank.

    It is also necessary for the advising bank to go through the letter of credit, try to understand the underlying transaction, terms and conditions of the credit and advice the beneficiary in the matter.

    The main features of advising export LCs are:

    1.  There are no credit risks as the bank receives a onetime commission for the advising service.
    2.  There are no capital adequacy needs for the advising function.

2.  **Advising of Amendments to L/Cs**
    Amendment of LCs is done for various reasons and it is necessary to follow all the necessary the procedures outlined for advising. In the process of advising the amendments the Issuing bank serializes the amendment number and also ensures that no previous amendment is missing from the list. Only on receipt of satisfactory information/ clarification the amendment may be advised.

3.  **Confirmation of Export Letters of Credit**
    It constitutes a definite undertaking of the confirming bank, in addition to that of the issuing bank, which undertakes the sight payment, deferred payment, acceptance or negotiation.

    Banks in India have the facility of covering the credit confirmation risks with ECGC under their "Transfer Guarantee" scheme and include both the commercial and political risk involved.

Letter of Credit L/c Documentry Collection Export Import International Trade.

4. **Discounting/Negotiation of Export LCs**
   When the exporter requires funds before due date then he can discount or negotiate the LCs with the negotiating bank. Once the issuing bank nominates the negotiating bank, it can take the credit risk on the issuing bank or confirming bank.

   However, in such a situation, the negotiating bank bears the risk associated with the document that sometimes arises when the issuing bank discover discrepancies in the documents and refuses to honor its commitment on the due date.

5. **Reimbursement of Export LCs**
   Sometimes reimbursing bank, on the recommendation of issuing bank allows the negotiating bank to collect the money from the reimbursing bank once the goods have been shipped. It is quite similar to a cheque facility provided by a bank.

   In return, the reimbursement bank earns a commission per transaction and enjoys float income without getting involve in the checking the transaction documents.

   reimbursement bank play an important role in payment on the due date ( for usance LCs) or days on which the negotiating bank demands the same (for sight LCs)

Regulatory Requirements

Opening of imports LCs in India involve compliance of the following main regulation:

Trade Control Requirements

The movement of good in India is guided by a predefined se of rules and regulation. So, the banker needs to assure that make certain is whether the goods concerned can be physically brought in to India or not as per the current EXIM policy.

Exchange Control Requirements

The main objective of a bank to open an Import LC is to effect settlement of payment due by the Indian importer to the overseas supplier, so opening of LC automatically comes under the policies of exchange control regulations.

UCPDC Guidelines

Uniform Customs and Practice for Documentary Credit (UCPDC) is a set of predefined rules established by the International Chamber of Commerce (ICC) on Letters of Credit. The UCPDC is used by bankers and commercial parties in more than 200 countries including India to facilitate trade and payment through LC.

UCPDC was first published in 1933 and subsequently updating it throughout the years. In 1994, UCPDC 500 was released with only 7 chapters containing in all 49 articles .

The latest revision was approved by the Banking Commission of the ICC at its meeting in Paris on 25 October 2006. This latest version, called the UCPDC600, formally commenced on 1 July 2007. It contain a total of about 39 articles covering the following areas, which can be classified as 8 sections according to their functions and operational procedures.

http://www.infodriveindia.com/Exim/Guides/Export-Finance/Ch_3_Letter_Of_Credit_L.c.aspx

Letter of Credit L/c Documentry Collection Export Import International Trade.

| Serial No. | Article | Area | Consisting |
|---|---|---|---|
| 1. | 1 to 3 | General | Application, Definition and Interpretations |
| 2. | 4 to 12 | Obligations | Credit vs. Contracts, Documents vs. Goods |
| 3. | 13 to 16 | Liabilities and responsibilities. | Reimbursement, Examination of Documents, Complying, Presentation, Handling Discrepant Documents |
| 4. | 17 to 28 | Documents | Bill of Lading, Chapter Party Bill of Lading, Air Documents, Road Rail etc. Documents, Courier , Postal etc. Receipt. On board, Shippers' count, Clean Documents, Insurance documents |
| 5. | 29 to 33 | Miscellaneous Provisions | Extension of dates, Tolerance in Credits, Partial Shipment and Drawings. House of Presentation |
| 6. | 34 to 37 | Disclaimer | Effectiveness of Document Transmission and Translation Force Majeure Acts;of an Instructed Party |
| 7. | 38 & 39 | Others | Transferable Credits Assignment of Proceeds |

ISBP 2002

The widely acclaimed International Standard Banking Practice(ISBP) for the Examination of Documents under Documentary Credits was selected in 2007 by the ICCs Banking Commission.

First introduced in 2002, the ISBP contains a list of guidelines that an examiner needs to check the documents presented under the Letter of Credit. Its main objective is to reduce the number of documentary credits rejected by banks.

FEDAI Guidelines

Foreign Exchange Dealer's Association of India (FEDAI) was established in 1958 under the Section 25 of the Companies Act (1956). It is an association of banks which deals in Indian foreign exchange and work in coordination with the Reserve Bank of India, other organizations like FIMMDA, the Forex Association of India and various market participants.
FEDAI has issued rules for import LCs which is one of the important area of foreign currency exchanges. It has an advantage over that of the authorized dealers who are now allowed by the RBI to issue stand by letter of credits towards import of goods.

As the issuance of stand by of letter of Credit including imports of goods is susceptible to some risk in the absence of evidence of shipment, therefore the importer should be advised that documentary credit under UCP 500/600 should be the preferred route for

http://www.infodriveindia.com/Exim/Guides/Export-Finance/Ch_3_Letter_Of_Credit_Lc.aspx

8/2/2010

Letter of Credit L/c Documentry Collection Export Import International Trade.

importers of goods.

Below mention are some of the necessary precaution that should be taken by authorised dealers While issuing a stands by letter of credits:

1. The facility of issuing Commercial Standby shall be extended on a selective basis and to the following category of importers
   i. Where such standby are required by applicant who are independent power producers/importers of crude oil and petroleum products
   ii. Special category of importers namely export houses, trading houses, star trading houses, super star trading houses or 100% Export Oriented Units.

2. Satisfactory credit report on the overseas supplier should be obtained by the issuing banks before issuing Stands by Letter of Credit.

3. Invocation of the Commercial standby by the beneficiary is to be supported by proper evidence. The beneficiary of the Credit should furnish a declaration to the effect that the claim is made on account of failure of the importers to abide by his contractual obligation along with the following documents.
   i. A copy of invoice.
   ii. Nonnegotiable set of documents including a copy of non negotiable bill of lading/transport document.
   iii. A copy of Lloyds /SGS inspection certificate wherever provided for as per the underlying contract.

4. Incorporation of a suitable clauses to the effect that in the event of such invoice / shipping documents has been paid by the authorised dealers earlier, Provisions to dishonor the claim quoting the date / manner of earlier payments of such documents may be considered.

5. The applicant of a commercial stand by letter of credit shall undertake to provide evidence of imports in respect of all payments made under standby. (Bill of Entry)

## Fixing limits for Commercial Stand by Letter of Credit. L/c

1. Banks must assess the credit risk in relation to stand by letter of credit and explain to the importer about the inherent risk in stand by covering import of goods.

2. Discretionary powers for sanctioning standby letter of credit for import of goods should be delegated to controlling office or zonal office only.

3. A separate limit for establishing stand by letter of credit is desirable rather than permitting it under the regular documentary limit.

4. Due diligence of the importer as well as on the beneficiary is essential.

5. Unlike documentary credit, banks do not hold original negotiable documents of titles to gods. Hence while assessing and fixing credit limits for standby letter of credits banks shall treat such limits as clean for the purpose of discretionary lending powers and compliance with various Reserve Bank of India's regulations.

6. Application cum guarantee for stand by letter of credit should be obtained from the applicant.

7. Banks can consider obtaining a suitable indemnity/undertaking from the importer that all remittances towards their import of goods as per the underlying contracts for which stand by letter of credit is issued will be made only through the same branch which has issued the credit.

8. The importer should give an undertaking that he shall not raise any dispute regarding the payments made by the bank in standby letter of credit at any point of time howsoever, and will be liable to the bank for all the amount paid therein. He importer should also indemnify the bank from any loss, claim, counter claims, damages, etc. which the bank may incur on account of making payment under the stand by letter of credit.

9. Presently, when the documentary letter of credit is established through swift, it is assumed that the documentary letter of

Letter of Credit L/c Documentry Collection Export Import International Trade.

credit is subject to the provisions of UCPDC 500/600 Accordingly whenever standby letter of credit under ISP 98 is established through SWIFT, a specific clause must appear that standby letter of credit is subject to the provision of ISP 98.

10. It should be ensured that the issuing bank, advising bank, nominated bank. etc, have all subscribed to SP 98 in case stand by letter of credit is issued under ISP 98.

11. When payment under a stand by letter of credit is effected, the issuing bank to report such invocation / payment to Reserve Bank of India.

Table of Contents

- Chapter 1 - Payment Methods In Export Import
- Chapter 2 - Payment Collection Against Bills
- Chapter 3 - Letter Of Credit (L/c)
- Chapter 4 - Trade Documents
- Chapter 5 - Pre Shipment Trade Finance
- Chapter 6 - Post Shipment Finance
- Chapter 7 - Forfeiting Factoring
- Chapter 8 - Bank Guarantees
- Chapter 9 - Transport Risk
- Chapter 10 - Contract Credit Risk
- Chapter 11 - Country Political Risk
- Chapter 12 - Currency Risk
- Chapter 13 - Export Import (Exim) Policy
- Chapter 14 - Foreign Exchange Management Act (FEMA)
- Chapter 15 - Fedai Guidlines

| Home | Import-Export Rules | Products | Exports Data | Importers Data |
|---|---|---|---|---|
| About Us | JNPT | Furniture Importers | India Export Data | India Import Data |
| Clients | CBEC | Leather Importers | China Export Data | China Importers |
| Contact Us | DGFT | Garments Importers | Indian Export Data | Import Data |
| Global Trade Data | Customs Data | Textile Importers | Exporters China | Custom Import Data |
| Indian Trade Data | Customs | Furniture Importers | Exporters Directory | USA Importers |
| Testiminials | HS Tariff | | Export Data | Importers India |
| Trade Resources | Harmonized Code List | | Export Data India | |
| Useful Links | | | | |
| SiteMap | | | | |

**JA0735**

Letter of Credit L/c Documentry Collection Export Import International Trade.

FAQS

**Copyright © 1999-2010 InfodriveIndia. All Rights Reserved.**

The information presented on the site is believed to be accurate. However, InfodriveIndia takes no legal responsibilities for the validity of the inf
Please read our Terms of Use and Privacy Policy before you use this Export Import Data Directory. RSS

8/2/2010

http://www.infodriveindia.com/Exim/Guides/Export-Finance/Ch_3_Letter_Of_Credit_Lc.aspx

# International Letter of Credit

Home

International

LOC Glossary

Export Glossary

LOC Overview

Advise - Confirm

SWIFT

Export Terms

Transport Docs

Export Docs

Drafts

LOC Payments

LOC Fees

Bankers Acceptance

LOC Transfers

Ex-Im Bank

Alternatives

## FEES CHARGED ON EXPORT LETTERS OF CREDIT

### How Are L/C Fees Split Between Importer and Exporter?

Generally, the fee splitting arrangement under letters of credit is for the buyer/importer to absorb most of the the costs incurred in setting-up the L/C. The costs in the beneficiary's (seller's) country are usually the responsibility of the beneficiary. Although this is the typical arrangement, the buyer and seller can arrange to split letter of credit fees in a variety of ways. For example, the buyer could absorb all fees both on its end as well as on the beneficiary's side. Or, the beneficiary could pay for all the bank fees except for the reimbursing bank charge (see below).

### What fees does the beneficiary normally pay?

Export letter of credit charges include the following:

### Advising

Compensates the advising bank for authenticating the L/C, sending the L/C to the beneficiary, and logging the L/C into the bank's liability system.







### Payment

Expressed as a percentage of the drawing amount but subject to a minimum charge. Compensates the bank for examining the documents compared to the terms and conditions of the letter of credit.



### Discrepancy

Compensates the bank for additional work involved in clearing a discrepancy or arranging for payment with discrepant documents. The advising bank charges for discrepancies and increasingly so does the issuing bank.

### Telex or communication charges to buyer's bank

These are often incurred when there are discrepancies or to follow-up on a payment. The exporter should try to fax its buyer directly to work-out any issues on payment since it is cheaper than using the bank than an intermediary.

### Courier & Postage

For sending documents and drafts to the issuing bank/reimbursing bank.

### Reimbursement bank charge

The issuing bank often selects a reimbursing bank in the seller's country and the reimbursement charge for L/C drawings is usually paid by the beneficiary. The total of these charges typically ranges from $150 to $250 dollars.

## Bank-to-Bank reimbursement arrangements

The issuing bank selects which foreign bank will provide the money for drawings under export letters of credit. This is a specialized service, which some banks offer foreign banks in order to expedite payments and ease the foreign bank's reconcilement work on export L/C reimbursements. Since the issuing bank is selecting the reimbursing bank, the issuing bank is aware of the charge being assessed - usually for the account of the beneficiary/seller.

The exporter should be aware that Article 19 (e) of the UCP 500 states that "the Reimbursing Bank's charges should be for the account of the Issuing Bank. However, in cases where the charges are for the account of another party, it is the responsibility of the Issuing Bank to so indicate in the original Credit and Reimbursement Authorization."

Since the reimbursing bank charge should be for the account of the Issuing Bank, the exporter should try to have the buyer absorb that cost. Passing this cost to the account party (buyer) eliminates one of the more costly L/C charges: typically ranging from $25 to $150. If the buyer is absorbing the reimbursement cost, the buyer should have leverage with its bank to reduce that charge.

## Controllable Fees

There are two types of fees where the exporter can control its cost: the advising fees and discrepancy fees. The exporter should instruct the buyer to have the export letter of credit advised directly to the bank that they are already using. This will save the exporter the cost of having the L/C advised through a first advising bank and then through to the exporter's bank. The bank issuing the L/C usually has an arrangement with a correspondent bank to have export letters of credit directed through that correspondent bank, which in turn gives the issuing bank a rebate. Thus, the exporter should push for direct advising to their own bank and thus save money and reduce the number of banks involved in the seller's country.

There are instances where the issuing bank is small and has a special arrangement with its preferred correspondent bank for advising letters of credit. For these cases it may be difficult for the small foreign bank to advise the L/C directly to any other bank.

Finally, the exporter should read carefully the section on "Payment and Discrepancies" in order that clean documents are presented, thereby expediting payment and eliminating discrepancy charges.

## Buyer's Letter of Credit Fees

Exporters often are not fully aware of the credit implications and cost involved for the buyer in opening a letter of credit. In order for the buyer to open a letter of credit with its bank, the buyer must have an appropriate credit facility with the issuing bank. Although

the cost of opening a letter of credit varies from country to country, as a rule of thumb, the exporter can estimate that in most developed nations, the percentage cost for opening and paying a letter of credit will be 3/4% for letters of credit in excess of $100,000 (minimums will vary from bank to bank); for in underdeveloped countries, the issuing and negotiation cost can be upwards of 1.5%.

The cost for the buyer in opening its L/C and for subsequent negotiation is important information.  The exporter should ask the buyer what the typical charges are in its country and how much its bank charges for opening and negotiating letters of credit.  For the buyer with scarce credit availability, there is also the cost of using its credit line for opening a letter of credit. Remember, the buyer that is having the letter of credit issued must also have the adequate credit facility with it's issuing bank.

### L/C charges should be factored into selling price

It is always important for the exporter to quote its export selling price knowing all the costs involved: freight, insurance, duty, bank export L/C charges, and issuing bank opening and payment fees. Obviously, the export L/C charges may make the deal unprofitable if the transaction amount is relatively small.

JA0739

Bank of India - Charges

http://www.boiusa.com/letters_credit.htm



# Bank of India
( A Government of India Undertaking )



**The following are indicative charges and are subject to discretion for negotiation on case to case basis.**

| Import Letter of Credit |
|---|

### LC COMMISSION

1/4% for first quarter 1/8% for subsequent quarters Minimum USD 50.00

### Amendment

Commission for LCs without addition in amount or extension of date USD 50.00

Commission for LCs with addition in amount or extension of date, will be charged as per charges given above with a minimum of USD 50.00

### OTHER CHARGES

Swift - Full Cable        USD 150.00
    Short Cable        USD  50.00
Discrepancy Charges        USD  50.00
Payment Cable        USD  50.00
Amendment Cable        USD  50.00
Acceptance Commission of 1/6% per month for DA LCs and ITR commission of 1/6% pm for the sight LCs

### Standby Letter of Credits

Commission of 0.25% per quarter on the LC amount

### Export Letter of Credit

LC Advising Charges        USD 150
Negotiation Charges        1/4% of the Document Amount Min USD 75
Discrepancy Charges        USD 50
Confirmation Charges        1/4% per quarter
Courier        USD 50
Swift Charges        USD 35.00
Transfer/Asignment Charges        ¼% p.a Min USD 100
Cancellation of LC        USD 50.00

### FBP

Commission of 0.25% on the value of the bill and Courier charge of USD 25

### Reimbursement

| Reimbursement Commission | USD 105 upto USD 100,000 |
| | USD 120 from USD 100,001 to USD 500,000 |
| | USD 150 from USD 500,001 to USD 1,000,000 |
| | USD 300 more than USD 1,000,000 |

[ Home/ BOI Overview/ STAR CD/ Business Opportunities ]

Bank of India, New York Branch is a member of FDIC
Please e-mail your comments and suggestions to **boiny@usa.net**

**Lloyds TSB** | for the journey...

Business banking > Rates and charges > International Services rates and charges

## International Services rates and charges

Sending and receiving money | Currency accounts | Bills and cheques/drafts in foreign currency or drawn abroad | Clean and Documentary bills received from abroad | Letters of Credit | Lloyds TSB Aval | Guarantees and Standby Letters of Credit | Status enquiries | Foreign exchange | Post payment charges

### Sending and receiving money
### Sending money abroad

| Transaction type | Charges |
|---|---|
| Standard International Moneymover | £21 |
| Express International Moneymover[1] | £28 |
| Non-urgent Euro (SEPA)[2] | £19 |
| International Draft payable abroad | £15 |

All charges are per item unless otherwise stated.

[1]Express International Moneymovers in Euro that do not contain a valid Bank Identifier Code (BIC) and International Bank Account Number (IBAN) will have an additional charge of £7 applied.

[2]For non-urgent Euro (SEPA) you must provide a Bank Identifier Code (BIC) and International Bank Account Number (IBAN).

Charges as at 28th January 2008.

### Receiving money from abroad

| Transaction type | Charges |
|---|---|
| Electronic payments received from abroad | Up to £100 – £2<br>Over £100 – £7 |
| Foreign cheque/draft | See tariff for Outward Collection or Negotiation |

## Currency accounts

### Euro current accounts

View foreign currency accounts interest terms

| Transaction type | Charges |
|---|---|
| Maintenance fee | £24 per annum (half yearly fee of £12 charged in March and September or April and October)[9] |
| Foreign banknotes paid in or out (i.e. foreign banking)[3] | £2 per £100; minimum £3; plus £10 administration fee |

JA0742

| Euro BACS credit paid into your Euro account | 15p |
| Euro cheques drawn in UK and paid into your account | See tariff for domestic Euro transaction |
| Currency cheques for sterling cheques drawn abroad and paid into your Euro account | See tariff for Outward Collection or Negotiation |

[3]Where the cash is in a different currency from the account, we'll let you know the appropriate rate of exchange at the time of the transaction.

[9]When maintenance charges are applied will depend on the currency of the account being debited. If charges are being debited from a sterling account the maintenance fee will be charged in March and September or from a foreign currency account in April and October.

**Domestic Euro transaction (both paying and collecting banks are UK based)**

| Transaction type | Charges |
|---|---|
| Euro cheques issued from your Euro account | 59p |
| Euro cheques paid into your Euro account In addition, charge levied for credit | 27p 70p |

**Foreign currency accounts**

View foreign currency accounts interest terms

| Transaction type | Charges |
|---|---|
| Account maintenance fee | £30 per half year (charged in March and September or April and October)[10] |
| Foreign banknotes paid in or out (i.e. foreign banking)[4] | £2 per £100; minimum £3; plus £10 administration fee |
| Currency cheques or sterling cheques drawn abroad and paid into your currency account | See tariff for Outward Collection or Negotiation |

[4]Where the cash is in a different currency from the account, we'll let you know the appropriate rate of exchange at the time of the transaction.

[10]When maintenance charges are applied will depend on the currency of the account being debited. If charges are being debited from a sterling account the maintenance fee will be charged in March and September or from a foreign currency account in April and October.

**Bills and cheques/drafts in foreign currency or drawn abroad Negotiations**

| Transaction type | Charges |
|---|---|
| Bill and cheques/drafts (including dividend warrants) payable: <br><br> • in foreign currency or sterling drawn abroad; or <br> • in foreign currency drawn in the UK <br><br> (See below for exceptions)[5] | Up to £100 – £5 Over £100 – 25p per £100 Minimum £8, maximum £80 Charges as per cheque |
| Cheques/drafts payable in a different currency from the country upon which the | Up to £100 – £5 |

| | |
|---|---|
| cheque/draft is drawn (excluding items expressed in sterling or drawn in the UK) | Over £100 – 25p per £100<br>Minimum £15, maximum £80<br>Charges as per cheque |
| Unpaid charge (if the cheque/draft is not honoured by the paying bank) | £5 |

[5]For Euro cheques drawn in the UK; please refer to tariff for domestic Euro transactions.

**Outward Collection (applicable when you are an exporter)**

| Transaction type | Charges |
|---|---|
| Clean bills and cheques/drafts (including dividend warrants) | Up to £100 – £5<br>Over £100 – 25p per £100<br>Minimum £15, maximum £80<br>N.B. Fee to be taken whether item is paid or unpaid |
| Documentary bills | 25p per £100<br>Minimum £30, maximum £80 |

**Clean and Documentary bills received from abroad**
**Inward Collection (applicable when you are an importer)**

| Transaction type | Up to £10,000 | £10,000-£50,000 | Over £50,000 |
|---|---|---|---|
| Documentary (documents with or without a Bill of Exchange) | £40 | £60 | £80 |
| Clean (Bill of Exchange and Promissory notes without documents) | £20 | £40 | £60 |
| Received from remitters abroad other than banks (both documentary and clean) | As above plus £30 | | |

**Letters of Credit**
**Import Letters of Credit (excluding standby Letters of Credit)**

| Transaction type | Charges |
|---|---|
| Letters of Credit up to £25,000 | £150 up to 6 months<br>£75 for each additional 3 months period or part thereof |
| Letter of Credit over £25,000<br>Validity up to 6 months<br>Validity over 6 months | 60p per £100; minimum £150<br>30p per £100; minimum £75 per 3 month period or part thereof |

These fees cover:

- the issue of a Letter of Credit,
- one amendment, including an extension of term (provided not outside original validity period) and increase of amount (provided that where the original amount was for £25,000 or less, the new total is no greater than £25,000),
- one payment/examination of documents presented,
- one month's acceptance/deferred payment undertaking,
- normal transmission costs.

| Transaction type | Charges |
|---|---|
| Additional amendments, additional payments, examination of documents, additional month acceptance/deferred payment undertaking, cancellation, 'on the spot' document checking | Charges vary for these specialised services and will be advised at the time the service is provided. |

**Export Letters of Credit**

| Transaction type | Charges |
|---|---|
| Pre-advising | £25 |
| Advising | £40 |
| Payment | 0.125% per presentation; minimum £75 |
| Presentations with discrepancies | £40 |
| Amendments[6] | £40 plus any additional confirmation charges |
| Cancellations | £50 |
| Confirmation and Acceptances/ Deferred payment undertakings | Subject to arrangement |
| Transferring a credit | 0.4% (on the amount transferred); minimum £60 |

[6]For Export Letters of Credit advised by us bearing our confirmation, increases and extensions may attract additional confirming commission plus amendment commission.

**Lloyds TSB Aval**

| Transaction type | Charges |
|---|---|
| Avalisation of trade bills of exchange | £2 per £100 per annum; minimum £60 |

**Guarantees and Standby Letters of Credit**

| Transaction type | Charges |
|---|---|
| Issue of guarantees/Standby Letters of Credit to foreign beneficiaries | £2 per £100 per annum; (charged quarterly in advance) plus £75 administration fee |

**Status enquiries**

| Transaction type | Charges |
|---|---|
| Status enquiries abroad | £20 |
| If sent electronically | Additional £10 |

**Foreign exchange**

| Transaction type | Charges |
|---|---|
| Spot transactions | No charge |
| Forward exchange contracts | No charge |
| Currency options | You will be advised of the charges when the service is provided |

**Post payment charges**

These charges apply when requests are made after an international payment has been sent abroad.

| Transaction type | Charges |
| --- | --- |
| Amendments[7] | £5 per message |
| Beneficiary claiming non-receipt of funds (BCNR) query | £5 per chaser after the first one which is free of charge |
| Recalling a payment[8] | £20 per payment |

[7] Amendments are only allowed on International Moneymover (Standard and Express). They are amendments you want to make on the beneficiary details and/or the amount of payment after the payment is sent.

[8] If the payment has already been credited into the beneficiary's account using International Moneymover, we can only recall the payment subject to the beneficiary's agreement. The charge will be taken whether the payment can or cannot be recalled. If a payment is recalled, the amount returned to you will be calculated according to the exchange rate on the day it is credited into your account. In the case of cancelling a draft, we may ask you to sign a counter indemnity which allows us to debit your account if money is paid out.

Back to top

Lloyds TSB Commercial is a trading name of Lloyds TSB Bank plc and Lloyds TSB Scotland plc and serves customers with an annual turnover of up to £15m.

Lloyds TSB Bank plc and Lloyds TSB Scotland plc are authorised and regulated by the Financial Services Authority under numbers 119278 and 191240 respectively.

Licensed under the Consumer Act 1974 under registration numbers 0004685 and 0198797 respectively.

We subscribe to the Lending Code: copies of the Code can be obtained from www.lendingstandardsboard.org.uk

Both companies are members of the Financial Services Compensation Scheme and the Financial Ombudsman Service. (Please note that due to the schemes' eligibility criteria not all Lloyds TSB Commercial customers will be covered by these schemes.)

Lloyds TSB Commercial Finance is a trading name of Lloyds TSB Commercial Finance Limited.

When using these products and services your agreement will be with a Lloyds Banking Group company whose terms and conditions will apply.

# Exhibit 5

# India 2007 Wage Rate for
# Spinning Industry

> ILO Home > What we do

# Statistics and databases

## Statistics

Labour statistics play an essential role in the efforts of member States to achieve decent work for all and for the ILO's support of these efforts. These statistics are needed for the development and evaluation of policies towards this goal and for assessing progress towards decent work. They are also an important tool for information and analysis, helping to increase understanding of common problems, explain actions and mobilize interest.




### LABORSTA - database of labour statistics
Covers official core labour statistics and estimates for over 200 countries since 1969. Also provides methodological descriptions of main national statistical sources.

### Key Indicators of the Labour Market (KILM)
KILM is a comprehensive database of country-level data on 20 key indicators of the labour market, a training tool on development and use of labour market statistics, highlights of current labour market trends and analyses of key issues in the labour market.

### Labour Force Surveys
Compiles web sites which contain data from national statistical agencies, the ILO and other sources. Includes links to source web sites and references to print publications available in the ILO Library.



### Statistical Information and Monitoring Programme on Child Labour (IPEC-SIMPOC)
SIMPOC provides access to a comprehensive compendium of child labour

statistics and methodological guidance material. Processed child labour data can be accessed in the form of national child labour survey reports, statistical country-briefs and other resources derived from household-based SIMPOC surveys. A large number of micro-datasets are also available.

## Databases



### CISDOC - Occupational Safety and Health database
Nearly 50,000 citations of documents on occupational health and safety: law and regulations, chemical safety data sheets, training material, journal articles, books and ILO conventions.

QUI

Inte
Lab

Inte
Cla

Sta
sta

List

SEE

Dep

Poli

Hov



**ILOLEX - database of International Labour Standards and recommendations (including ratification information)**
Full-text database of ILO conventions and recommendations, ratification information, comments of the Committee of Experts and the Committee on Freedom of Association, discussions of the Conference Committee, representations, complaints, General Surveys, and numerous related documents.



**LABORDOC**
Labordoc, the ILO Library's database, contains references and full text access to the world's literature on the world of work. It covers all aspects of work and sustainable livelihoods and the work-related aspects of economic and social development, human rights and technological change. It includes books, articles, reports, and journals available at the ILO Library in Geneva and several ILO libraries around the world.



**NATLEX - database of national labour, social security and related human rights legislation**
Records in NATLEX provide abstracts of legislation and relevant citation information, and they are indexed by keywords and by subject classifications. Each record in NATLEX appears in only one of the three ILO official languages (English/French/Spanish). Where possible, the full text of the law or a relevant electronic source is linked to the record.

**Database of Conditions of work and Employment Laws: Working Time - Minimum Wages - Maternity Protection**

Copyright and permissions 1996-2010 International Labour Organization (ILO) - Disclair

>> **Topic:** Occupational wages and hours of work

>> **List of countries/areas selected:** INDIA |

>> Abbreviations and symbols

>> Download

**INDIA** (Rupee)                                    [ List of countries/areas selected ]

>> Type of data available:
- Wage or salary rates
- Normal hours of work

---

- **Wage or salary rates**                              [ Type of data ]

>> List of industries available:
Spinning, weaving and finishing textiles
Manufacture of wearing apparel (except footwear)
Manufacture of electronic equipment, machinery and supplies
Shipbuilding and repairing

**Industry: SPINNING, WEAVING AND FINISHING TEXTILES** [1]        [ Notes ] [ Industries ]

|                                              | 2007   | 2008 |
|----------------------------------------------|--------|------|
| 25 Thread and yarn spinner                   |        |      |
| **Total men and women** - Per day. Average.  | 110.66 |      |
| **Men** - Per day. Average.                  | 141.03 |      |
| **Women** - Per day. Average.                | 58.43  |      |
| 27 Cloth weaver (machine)                    |        |      |
| **Total men and women** - Per day. Average.  | 139.49 |      |
| **Men** - Per day. Average.                  | 143.44 |      |
| **Women** - Per day. Average.                | 97.97  |      |
| 28 Labourer                                  |        |      |
| **Total men and women** - Per day. Average.  | 107.33 |      |
| **Total men and women** - Per day. Average.  | 107.33 |      |
| **Men** - Per day. Average.                  | 115.78 |      |
| **Men** - Per day. Average.                  | 115.78 |      |
| **Women** - Per day. Average.                | 59.66  |      |
| **Women** - Per day. Average.                | 59.66  |      |

**Industry: MANUFACTURE OF WEARING APPAREL (EXCEPT FOOTWEAR)**    [ Notes ] [ Industries ]

|                                              | 2007   | 2008 |
|----------------------------------------------|--------|------|
| 29 Garment cutter                            |        |      |
| **Total men and women** - Per day. Average.  | 114.06 |      |
| **Men** - Per day. Average.                  | 156.04 |      |
| **Men** - Per day. Average.                  | 156.04 |      |

| | 2007 | 2008 |
|---|---|---|
| **Women** - Per day. Average. | | 89.91 |
| **Women** - Per day. Average. | | 89.91 |

**Industry: MANUFACTURE OF ELECTRONIC EQUIPMENT, MACHINERY AND SUPPLIES [2]**

[ Notes ]
[ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 72 Electronics engineering technician | | |
| **Total men and women** - Per day. Average. | | 121.48 |
| **Men** - Per day. Average. | | 130.21 |
| **Men** - Per day. Average. | | 130.21 |
| **Women** - Per day. Average. | | 116.64 |
| 73 Electronics fitter | | |
| **Total men and women** - Per day. Average. | | 237.89 |
| **Men** - Per day. Average. | | 237.89 |
| **Men** - Per day. Average. | | 237.89 |
| 74 Electronic equipment assembler | | |
| **Total men and women** - Per day. Average. | | 142.90 |
| **Total men and women** - Per day. Average. | | 142.90 |
| **Men** - Per day. Average. | | 141.45 |
| **Men** - Per day. Average. | | 141.45 |
| **Women** - Per day. Average. | | 143.84 |

**Industry: SHIPBUILDING AND REPAIRING**

[ Notes ] [ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 75 Ship plater | | |
| **Total men and women** - Per day. Average. | | 235.19 |
| **Men** - Per day. Average. | | 235.19 |

**NOTES:** [1]Cotton. [2]Computer and related activities.

• **Normal hours of work**

[ Type of data ]

>> List of industries available:
Spinning, weaving and finishing textiles
Manufacture of wearing apparel (except footwear)
Manufacture of electronic equipment, machinery and supplies
Shipbuilding and repairing

**Industry: SPINNING, WEAVING AND FINISHING TEXTILES**

[ Notes ] [ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 25 Thread and yarn spinner | | |
| **Total men and women** - Per day. | 8 | |
| **Men** - Per day. | 8 | |
| **Women** - Per day. | 8 | |
| 27 Cloth weaver (machine) | | |
| **Total men and women** - Per day. | 8 | |
| **Men** - Per day. | 8 | |

| | 2007 | 2008 |
|---|---|---|
| **Women** - Per day. | 8 | |
| 28 Labourer | | |
| **Total men and women** - Per day. | 8 | |
| **Men** - Per day. | 8 | |
| **Men** - Per day. | 8 | |
| **Women** - Per day. | 8 | |
| **Women** - Per day. | 8 | |

## Industry: MANUFACTURE OF WEARING APPAREL (EXCEPT FOOTWEAR)

[ Notes ] [ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 29 Garment cutter | | |
| **Total men and women** - Per day. | 8 | |
| **Men** - Per day. | 8 | |
| **Men** - Per day. | 8 | |
| **Women** - Per day. | 8 | |
| **Women** - Per day. | 8 | |

## Industry: MANUFACTURE OF ELECTRONIC EQUIPMENT, MACHINERY AND SUPPLIES

[ Notes ]
[ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 72 Electronics engineering technician | | |
| **Total men and women** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| **Women** - Per day. | | 8 |
| 73 Electronics fitter | | |
| **Total men and women** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| 74 Electronic equipment assembler | | |
| **Total men and women** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| **Men** - Per day. | | 8 |
| **Women** - Per day. | | 8 |

## Industry: SHIPBUILDING AND REPAIRING

[ Notes ] [ Industries ]

| | 2007 | 2008 |
|---|---|---|
| 75 Ship plater | | |
| **Total men and women** - Per day. | | 8 |
| **Men** - Per day. | | 8 |

# Exhibit 6

## India 2006 Country-Wide
## Labor Wage Rate

## EXPECTED WAGES OF SELECTED NON-MARKET ECONOMY COUNTRIES
### Expected Wage Calculation: 2007 GNI Data
### Regression Analysis: 2007 GNI Data

#### Index of Tables

Expected 2007 Wages of Selected NME Countries

Calculation of 2007 Wages and GNI Per Capita in US Dollars

Plot of NME Wage Regression Line and Market-Economy Wage Data

Summary Output

Residual Output

In accordance with the Federal Register notice Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 FR 61716, Oct 19, 2006 (hereafter, the "Antidumping Methodologies notice"), the Department published the annual expected NME wage rates based on 2007 GNI in the Federal Register notice Expected Non-Market Economy Wages: Request for Comments on 2009 Calculation, 74 FR 51555, October 7, 2009, ("2009 preliminary calculation") requesting comment with regard to potential clerical errors. The Department's methodology is described in full in the Antidumping Methodologies notice.

The Department received comments in response to the 2009 preliminary calculation notice. These comments are addressed in the accompanying Federal Register notice to this calculation.

The 2009 expected NME wage rates posted below are final as of December 9, 2009.

These expected NME wage rates have been finalized in the Final 2009 Notice and will be applied to all antidumping proceeding final determinations subsequent to December 9, 2009, for which the Department has not yet reached the preliminary results.

### Expected 2007 Wages of Selected NME Countries

| Country Name | 2007 GNI | Expected Wages |
|---|---|---|
| Armenia | 2,580.00 | 1.46 |
| Azerbaijan, Rep. of | 2,710.00 | 1.52 |
| Belarus | 4,240.00 | 2.19 |
| China,P.R.: Mainland | 2,410.00 | 1.39 |
| Georgia | 2,090.00 | 1.25 |
| Kyrgyz Republic | 610.00 | 0.60 |
| Moldova | 1,130.00 | 0.83 |
| Tajikistan | 460.00 | 0.53 |
| Uzbekistan | 730.00 | 0.65 |
| Vietnam | 770.00 | 0.67 |

### Calculation of Hourly Wages in 2007 U.S. Dollars

| Country | Code | Currency | Reported Year | Earnings | NC/Hour | CPI Inflator | Inflated | Exchange Rate, NC/USD | USD/Hour | GNI |
|---|---|---|---|---|---|---|---|---|---|---|
| Albania | AL | Lek | 2006 | 19,750.00 | 102.86 | 1.03 | 105.88 | 90.43 | 1.17 | 3,360.00 |
| Argentina | AR | Peso | 2006 | 9.72 | 9.72 | 1.09 | 10.58 | 3.10 | 3.42 | 6,040.00 |
| Australia | AU | Dollar | 2006 | 25.36 | 25.36 | 1.02 | 25.95 | 1.20 | 21.72 | 35,760.00 |
| Austria | AT | Euro | 2007 | 15.25 | 15.25 | 1.00 | 15.25 | 0.73 | 20.87 | 41,970.00 |
| Belgium | BE | Euro | 2007 | 16.61 | 16.61 | 1.00 | 16.61 | 0.73 | 22.73 | 41,120.00 |
| Botswana | BW | Pula | 2006 | 1,590.00 | 8.28 | 1.07 | 8.87 | 6.14 | 1.44 | 6,100.00 |
| Bulgaria | BG | Leva | 2007 | 381.00 | 1.98 | 1.00 | 1.98 | 1.43 | 1.39 | 4,460.00 |
| Canada | CA | Dollar | 2007 | 21.58 | 21.58 | 1.00 | 21.58 | 1.07 | 20.09 | 39,650.00 |
| Chile | CL | Peso | 2007 | 315,408.00 | 1,642.75 | 1.00 | 1,642.75 | 522.46 | 3.14 | 8,160.00 |
| Colombia | CO | Peso | 2007 | 694,244.00 | 3,615.85 | 1.00 | 3,615.85 | 2,078.29 | 1.74 | 4,100.00 |
| Costa Rica | CR | Colón | 2007 | 1,210.20 | 1,210.20 | 1.00 | 1,210.20 | 516.62 | 2.34 | 5,520.00 |
| Croatia | HR | Kuna | 2006 | 5,833.00 | 30.38 | 1.03 | 31.25 | 5.36 | 5.83 | 12,000.00 |
| Cyprus | CY | Pound | 2006 | 4.85 | 4.85 | 1.02 | 4.97 | 0.43 | 11.65 | 22,950.00 |
| Czech Republic | CZ | Koruna | 2006 | 18,482.00 | 96.26 | 1.03 | 99.07 | 20.29 | 4.88 | 14,240.00 |
| Denmark | DK | Krone | 2006 | 235.63 | 235.63 | 1.02 | 239.67 | 5.44 | 44.03 | 55,450.00 |
| El Salvador | SV | US dollar | 2007 | 1.28 | 1.28 | 1.00 | 1.28 | 1.00 | 1.28 | 3,200.00 |
| Estonia | EE | Kroon | 2007 | 11,047.72 | 57.54 | 1.00 | 57.54 | 11.43 | 5.03 | 12,840.00 |
| Finland | FI | Euro | 2007 | 15.14 | 15.14 | 1.00 | 15.14 | 0.73 | 20.72 | 44,310.00 |
| France | FR | Euro | 2007 | 13.30 | 13.30 | 1.00 | 13.30 | 0.73 | 18.20 | 38,790.00 |
| Germany | DE | Euro | 2007 | 19.09 | 19.09 | 1.00 | 19.09 | 0.73 | 26.13 | 38,990.00 |
| Guatemala | GT | Quetzal | 2006 | 1,581.00 | 8.23 | 1.06 | 8.77 | 7.67 | 1.14 | 2,470.00 |

| Country | Code | Currency | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Guyana | GY | Dollar | 2007 | 47,150.00 | 245.57 | 1.00 | 245.57 | 202.35 | 1.21 | 1,170.00 |
| China,P.R.:Hong Kong | HK | Dollar | 2007 | 10,300.00 | 53.65 | 1.00 | 53.65 | 7.80 | 6.88 | 31,570.00 |
| Hungary | HU | Forint | 2007 | 171,564.49 | 893.57 | 1.00 | 893.57 | 183.63 | 4.87 | 11,670.00 |
| Iceland | IS | Krona | 2007 | 1,946.00 | 1,946.00 | 1.00 | 1,946.00 | 64.06 | 30.38 | 57,750.00 |
| India | IN | Rupee | 2006 | 3,525.87 | 18.36 | 1.05 | 19.25 | 41.35 | 0.47 | 950.00 |
| Ireland | IE | Euro | 2006 | 14.45 | 14.45 | 1.05 | 15.18 | 0.73 | 20.74 | 47,610.00 |
| Israel | IL | New shekel | 2007 | 10,694.00 | 55.70 | 1.00 | 55.70 | 4.11 | 13.56 | 22,170.00 |
| Japan | JP | Yen | 2007 | 296,800.00 | 1,545.83 | 1.00 | 1,545.83 | 117.75 | 13.13 | 37,800.00 |
| Kazakhstan | KZ | Tenge | 2007 | 54,400.00 | 283.33 | 1.00 | 283.33 | 122.55 | 2.31 | 4,970.00 |
| Korea | KR | Won | 2007 | 2,688,000.00 | 14,000.00 | 1.00 | 14,000.00 | 929.26 | 15.07 | 21,510.00 |
| Latvia | LV | Lat | 2007 | 315.03 | 1.64 | 1.00 | 1.64 | 0.51 | 3.19 | 10,090.00 |
| Lithuania | LT | Litas | 2007 | 11.01 | 11.01 | 1.00 | 11.01 | 2.52 | 4.36 | 9,910.00 |
| Luxembourg | LU | Euro | 2007 | 14.82 | 14.82 | 1.00 | 14.82 | 0.73 | 20.28 | 79,060.00 |
| China,P.R.:Macao | MO | Pataca | 2007 | 4,990.00 | 25.99 | 1.00 | 25.99 | 8.04 | 3.23 | 35,360.00 |
| Macedonia, FYR | MK | Denar | 2007 | 11,653.00 | 60.69 | 1.00 | 60.69 | 44.73 | 1.36 | 3,410.00 |
| Malta | MT | Lira | 2007 | 2.60 | 2.60 | 1.00 | 2.60 | 0.31 | 8.34 | 16,680.00 |
| Mauritius | MU | Rupee | 2007 | 8,622.00 | 44.91 | 1.00 | 44.91 | 31.31 | 1.43 | 5,610.00 |
| Mexico | MX | Nuevo peso | 2007 | 4,689.21 | 24.42 | 1.00 | 24.42 | 10.93 | 2.23 | 9,400.00 |
| Mongolia | MN | Tughriks | 2007 | 160,200.00 | 834.38 | 1.00 | 834.38 | 1,170.96 | 0.71 | 1,290.00 |
| Montenegro, Rep. of | C9 | New Dinar | 2007 | 530.00 | 2.76 | 1.00 | 2.76 | 0.73 | 3.78 | 5,230.00 |
| New Zealand | NZ | Dollar | 2006 | 20.51 | 20.51 | 1.02 | 21.00 | 1.36 | 15.43 | 27,090.00 |
| Nicaragua | NI | Córdoba | 2006 | 13.90 | 13.90 | 1.11 | 15.45 | 18.45 | 0.84 | 990.00 |
| Norway | NO | Krone | 2007 | 31,983.00 | 166.58 | 1.00 | 166.58 | 5.86 | 28.42 | 77,370.00 |
| Panama | PA | Balboa | 2007 | 2.20 | 2.20 | 1.00 | 2.20 | 1.00 | 2.20 | 5,500.00 |
| Poland | PL | Zloty | 2007 | 2,450.66 | 12.76 | 1.00 | 12.76 | 2.77 | 4.61 | 9,870.00 |
| Portugal | PT | Euro | 2007 | 4.08 | 4.08 | 1.00 | 4.08 | 0.73 | 5.58 | 18,960.00 |
| Romania | RO | Leu | 2007 | 1,146.00 | 5.97 | 1.00 | 5.97 | 2.44 | 2.45 | 6,390.00 |
| Russia | RU | Rouble | 2007 | 12,879.00 | 67.08 | 1.00 | 67.08 | 25.58 | 2.62 | 7,530.00 |
| Serbia, Republic of | RS | New Dinar | 2007 | 30,620.00 | 159.48 | 1.00 | 159.48 | 58.45 | 2.73 | 4,540.00 |
| Seychelles | SC | Rupee | 2007 | 3,306.00 | 17.22 | 1.00 | 17.22 | 6.70 | 2.57 | 11,060.00 |
| Singapore | SG | Dollar | 2007 | 3,764.00 | 19.60 | 1.00 | 19.60 | 1.51 | 13.01 | 31,890.00 |
| Slovak Republic | SK | Koruna | 2007 | 20,024.00 | 104.29 | 1.00 | 104.29 | 24.69 | 4.22 | 11,720.00 |
| Slovenia | SI | Euro | 2007 | 1,123.58 | 5.85 | 1.00 | 5.85 | 0.73 | 8.01 | 21,510.00 |
| South Africa | ZA | Rand | 2007 | 7,430.00 | 38.70 | 1.00 | 38.70 | 7.05 | 5.49 | 5,300.00 |
| Spain | ES | Euro | 2007 | 13.35 | 13.35 | 1.00 | 13.35 | 0.73 | 18.27 | 29,290.00 |
| Sri Lanka | LK | Rupee | 2007 | 45.36 | 45.36 | 1.00 | 45.36 | 110.62 | 0.41 | 1,540.00 |
| Sweden | SE | Krona | 2007 | 139.50 | 139.50 | 1.00 | 139.50 | 6.76 | 20.64 | 47,870.00 |
| Ukraine | UA | Hryvnia | 2007 | 1,456.40 | 7.59 | 1.00 | 7.59 | 5.05 | 1.50 | 2,570.00 |
| United Kingdom | GB | Pound | 2007 | 11.74 | 11.74 | 1.00 | 11.74 | 0.50 | 23.49 | 43,430.00 |
| United States | US | Dollar | 2007 | 17.26 | 17.26 | 1.00 | 17.26 | 1.00 | 17.26 | 46,090.00 |



### Plot of NME Wage Regression Line and Market-Economy Wage Data



◆  Actual, Inflation Adjusted Market Economy Wage Rate, 2007 USD/hr          ——— Linear (Actual, Inflation Adjusted Market Economy Wage Rate, 2007 USD/hr)

SUMMARY OUTPUT

| Regression Statistics | |
|---|---|
| Multiple R | 0.889052605 |
| R Square | 0.790414535 |
| Adjusted R Square | 0.786862239 |
| Standard Error | 4.46242315 |
| Observations | 61 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 4430.852246 | 4430.852246 | 222.5080707 | 1.10671E-21 |
| Residual | 59 | 1174.880002 | 19.91322037 | | |
| Total | 60 | 5605.732248 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 0.328697918 | 0.836714618 | 0.392843522 | 0.69585086 | -1.345564152 | 2.002959988 |
| GNI | 0.000439571 | 2.94683E-05 | 14.91670442 | 1.10671E-21 | 0.000380605 | 0.000498537 |

RESIDUAL OUTPUT

| Observation | Predicted USD/Hour | Residuals |
|---|---|---|
| 1 | 1.805654902 | -0.634765636 |
| 2 | 2.983703926 | 0.433479011 |
| 3 | 16.04774011 | 5.667737775 |
| 4 | 18.77747311 | 2.094696145 |

| | |
|---|---|
| 5 | 18.40383816  4.329717994 |
| 6 | 3.010078158  -1.565561173 |
| 7 | 2.289182487  -0.900585167 |
| 8 | 17.75766948  -2.333569699 |
| 9 | 3.915593452  -0.771357677 |
| 10 | 2.130937095  -0.391115335 |
| 11 | 2.75512725  -0.412579482 |
| 12 | 5.603544292  0.222411265 |
| 13 | 10.41684161  1.234855929 |
| 14 | 6.588182281  -1.706592791 |
| 15 | 24.70288387  19.32417461 |
| 16 | 1.735323617  -0.455323617 |
| 17 | 5.972783538  -0.940363585 |
| 18 | 19.80606815  0.91554775 |
| 19 | 17.37963882  0.823630103 |
| 20 | 17.46755293  8.660296979 |
| 21 | 1.41443713  -0.272103934 |
| 22 | 0.842995439  0.370627281 |
| 23 | 14.20593959  -7.329520507 |
| 24 | 5.458486016  -0.592263122 |
| 25 | 25.71389609  4.666245974 |
| 26 | 0.746289922  -0.280840757 |
| 27 | 21.25665091  -0.514328484 |
| 28 | 10.07397659  3.484161677 |
| 29 | 16.944464  -3.816813696 |
| 30 | 2.513363458  -0.201457413 |
| 31 | 9.651988883  5.413810998 |
| 32 | 4.763964577  -1.570490856 |
| 33 | 4.684841881  -0.322251589 |
| 34 | 35.08114411  -14.7975016 |
| 35 | 15.8719119  -12.63770726 |
| 36 | 1.827633429  -0.470759302 |
| 37 | 7.660734377  0.681288563 |
| 38 | 2.794688598  -1.36061182 |
| 39 | 4.460660911  -2.225804973 |
| 40 | 0.895743903  -0.183187539 |
| 41 | 2.627651796  1.150438951 |
| 42 | 12.23666361  3.194977535 |
| 43 | 0.763872744  0.073412239 |
| 44 | 34.33826991  -5.920067421 |
| 45 | 2.746335839  -0.546335839 |
| 46 | 4.66725906  -0.055956773 |
| 47 | 8.662955188  -3.078794496 |
| 48 | 3.137553612  -0.689588883 |
| 49 | 3.638664017  -1.016458105 |
| 50 | 2.324348129  0.403960127 |
| 51 | 5.190347992  -2.620791833 |
| 52 | 14.34660216  -1.338728314 |
| 53 | 5.480464543  -1.25715525 |

| | | |
|---|---|---|
| 54 | 9.783860043 | -1.77445023 |
| 55 | 2.847437061 | 2.645244174 |
| 56 | 13.20371878 | 5.067983491 |
| 57 | -1.005636536 | -0.595595224 |
| 58 | 21.37093924 | -0.731089094 |
| 59 | 1.458394183 | 0.043668523 |
| 60 | 19.41924609 | 4.071465679 |
| 61 | 20.5885037 | -3.328503698 |

Download XL Spreadsheet containing the above data
2009-2007 Expected NME Wages

site index     e-mail webmaster     commerce.gov     trade.gov     export.gov     usa.gov     acrobat reader     privacy policy     disclaimer

United States Department of Commerce   International Trade Administration   Import Administration   14th Constitution Ave. N.W. Washington DC 20230

## PUBLIC CERTIFICATE OF SERVICE

**Floor-Standing, Metal-Top Ironing Tables And Parts Thereof
from the People's Republic Of China
A-570-888**

I, Kerry Horgan, hereby certify that a copy of the foregoing document was served upon the following parties by hand delivery or first class mail on August 24, 2010:

**Hand Delivery:**

Frederick L. Ikenson, Esq.
**Blank Rome LLP**
600 New Hampshire Avenue, NW
Washington, DC 20037

**First Class Mail:**

Lucinda Fernald, Esq.
**Garvey Schubert Barer**
5th Floor
Flour Mill Building
1000 Potomac Street, NW
Washington, DC 20007-3501

William E. Perry, Esq.
**Dorsey & Whitney LLP**
701 Fifth Avenue
Suite 6100
Seattle, Washington 98104-7043

Kerry Horgan

**BLANK** ROME LLP
COUNSELORS AT LAW

*FOR OFFICIAL FILE*
*RECEIVED*
AUG 24 2010
DEPT. OF COMMERCE
IMPORT ADMINISTRATION
ITA

| | |
|---|---|
| *Phone:* | *(202) 772-5865* |
| *Fax:* | *(202) 572-1419* |
| *Email:* | *ikenson@blankrome.com* |

Case No.: A-570-888
Total Pages: 45
Administrative Review (8/1/08-7/31/09)
AD/CVD Operations, Office 7

**PUBLIC DOCUMENT**

August 24, 2010

**BY HAND DELIVERY**

1137

The Honorable Gary Locke
Secretary of Commerce
Attn: ·Import Administration
Dockets Center, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:    Administrative Review of Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Information Concerning Valuation of Factors of Production for Since Hardware (Guangzhou) Co., Ltd. (Fifth Administrative Review)

Dear Mr. Secretary:

By letters distributed by email on July 13, 2010 and on August 16, 2010, the Department invited interested parties "to submit publicly available information to value factors of production for consideration of the Department's preliminary results" in the above-referenced review by August 24, 2010. Accordingly, on behalf of the petitioner, Home Products International, Inc. ("HPI"), we herewith provide specific information for the valuation of various material inputs used by Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") in its production of subject

000078

Hon. Gary Locke
August 24, 2010
Page 8

| Input Field Name | S H's PRC HTS | Indian HTS | Remarks |
|---|---|---|---|
| INSBOOK | 4821.10.00 | 4901.10.20 | Input is instruction book, not tag |
| PSFOAM | 3921.13.90 | 3921.11.00 | Input is polystyrene, not polyurethane |
| DESIC | 3211.00.00 | 2811.22.00 | Desiccant likely is silica (silicon dioxide), not an accelerant for drying of paint |

Except as otherwise noted (*see* n.4 *supra*), for each of Since Hardware's claimed inputs, HPI urges the Department to base the surrogate value upon Indian import statistics for the respective Indian HTS classification shown above.

**FINANCIAL RATIOS**

For the surrogate financial ratios of manufacturing overhead, selling, general and administrative expenses ("SG&A") and profit, we recommend use of the financial statements of Infiniti Modules Pvt. Ltd. ("Infiniti Modules") for the year ending March 31, 2007.

It is well-established that Infiniti Modules is a producer of merchandise comparable to the subject ironing tables;[7] indeed, this company has been relied upon by the Department in every administrative review of this order in which financial ratios were derived and applied.[8]

---

[7]     *See* product brochures and specifications available on Infiniti Modules' website at http://www.impl.biz/downloads.html (viewed Aug. 12, 2010).

[8]     The Department relied on the financial report of Infiniti Modules for year ended March 31, 2005 for determining the surrogate financial ratios in the first and second administrative reviews. *See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic Of China*, 72 Fed. Reg. 13,239 (Dep't of Commerce Mar. 21, 2007) (final results of antidumping duty administrative review (AR1)) and corresponding Issues and Decision Memorandum; *see also* Memorandum to the File from B. Wong and K. Horgan, "Factors of Production Valuation Memorandum for the Final Results of Antidumping Administrative Review ..." (Mar. 12, 2007) at 2 and Attachment 1 thereto; and *Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic Of China*, 73 Fed. Reg.

Hon. Gary Locke
August 24, 2010
Page 9

In the most recently completed administrative review (AR4), respondent Foshan Shunde

Yongjian Housewares & Hardware Co., Ltd. ("Shunde") recommended Infiniti Modules as the

appropriate Indian surrogate producer for purposes of the surrogate financial ratios (*see* Shunde

AR4 factors of production and surrogate value submission (Feb. 26, 2009) at Exhibit 1), but in

that submission – which pre-dated release of the AR3 final results – Shunde used Infiniti

Modules' financial statements for 2004-05. HPI agreed that Infiniti Modules was the appropriate

choice of comparable producer, but recommended use of the more contemporaneous financial

statements (for year ended March 31, 2007) used in the AR3 final results. *See* HPI submission

with AR4 surrogate value information (Aug. 13, 2009) at 44-45 and Attachment 6.

In the fourth administrative review the Department based Shunde's margin on adverse

facts available and did not employ surrogate financial ratios; nevertheless, the same Infiniti

Modules data remain the most appropriate source for such surrogate value information in this

review. Thus, we urge the Department to again use the 2006-07 financial statements of Infiniti

---

14,437 (Dep't of Commerce Mar. 18, 2008) (final results of antidumping duty administrative
review (AR2)) and corresponding Issues and Decision Memorandum; *see also* Memorandum to
the File from B. Wiltse and B. Wong, "Factors of Production Valuation Memorandum for the
Final Results" (Mar. 10, 2008) at 1-2 and Attachment 1 thereto.

For the third administrative review, the Department used Infiniti Module's financial
statements for year ended March 31, 2007. *See Floor-Standing, Metal-Top Ironing Tables and
Certain Parts Thereof from the People's Republic of China*, 74 Fed. Reg. 11,085, 11,086 (Dep't
of Commerce Mar. 16, 2009) (final results of antidumping duty administrative review (AR3));
Issues and Decision Memorandum for the Final Results in the Administrative Review of Floor-
Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of
China at Comment 2 (March 2009) ("we have in our final results determined to use the ratios set
forth in Petitioner's September 29, 2008 letter to calculate factory overhead, SG&A expenses
and profit" for the respondent company whose margin was not predicated on AFA (*id.*, final
page)).

Hon. Gary Locke
August 24, 2010
Page 10

Modules to value factory overhead, SG&A expenses and profit and to utilize the same financial

ratios presented in HPI's letter of September 29, 2008 and used by the Department in the final

results of the third administrative review. A copy of HPI's letter of September 29, 2008

(including exhibits) is annexed as Attachment 1. A copy of Infiniti Modules' 2006-07 financial

statements appears as Exhibit 1 to the letter; a copy of the spreadsheet, calculating the financial

ratios previously adopted and applied by the Department (9.71% for factory overhead, 28.14%

for SG&A, and 22.05% for profit) appears as Exhibit 2.

<div align="center">*    *    *    *    *</div>

If there are any questions concerning this submission, please do not hesitate to contact us.

Very truly yours,

Frederick L. Ikenson
Peggy A. Clarke
Larry Hampel
BLANK ROME LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 772-5865
*Attorneys for Home Products*
*International, Inc.*

Attachment

cc:   Richard Weible
      Robert James
      Michael Heaney

Exhibit 1

INFINITI MODULES PRIVATE LIMITED

DIRECTORS REPORT FOR THE YEAR 2006 - 2007

To,
The Members,

The Directors present their report on the working of Infiniti Modules Private Limited together with the Audited Accounts and Auditors' Report thereon for the financial year ended 31 st March, 2007.

OPERATIONS AND ACCOUNTS:

During the year the company achieved a turnover of Rs. 3,43,95,558/- (previous year Rs. 2,33,56,034/-. The Profit after taxation of Rs. 46,33,371/- (previous year Rs. 20,49,331/-) is being caried forward.

INFORMATION PURSUANT TO SECTION 217(1) (e) OF THE COMPANIES ACT, 1956.:

The company has earned Rs. 34,04,200/- (previous year Rs. 25,602/-) and incurred expenditure of Rs. 36,62,702/- (previous year Rs. Nil) in foreign exchange during the year. Other information as required under Section 217 (1) (e) of the Companies Act, 1956 read with the Companies (Disclosure of Particulars in the Report of the Board of Directors) Rules, 1988 is not applicable to the company and hence not furnished.

INFORMATION PURSUANT TO SECTION 217 (2A) OF THE COMPANIES ACT, 1956.:

During the financial year there were no employees employed throughout the year or for a part thereof in receipt of remuneration in the aggregate more than the prescribed amount.

DIRECTORS' RESPONSIBILITY STATEMENT

In compliance of Section 217(2AA) of the Companies Act, 1956 as amended by the Companies (Amendment) Act, 2000, the Directors of the Company confirm:

a) that the applicable accounting standards have been followed in the preparation of the annual accounts and that there are no material departures.

b) that such accounting policies have been selected and applied consistently and such judgements and estimates made are reasonable and prudent so as to give a true and fair view of the state of affairs of the Company as at March 31, 2007 and of the Profit of the company for the year ended on that date.

c) that proper and sufficient care has been taken for the maintenance of adequate accounting records in accordance with the provisions of the Companies Act, 1956

for safeguarding the assets of the Company and for preventing and detecting fraud and other irregularities.

d) that the annual accounts have been prepared on a going concern basis.

AUDITORS' COMMENTS

The Auditors' have commented, at paragraph (vii) of the Annexure to the Auditor's Report on the accounts of the company for the year ended March 31, 2007, that the Company has no internal audit system.

The Company has no internal system system but is still in the process of implementing an ERP program with inbuilt audit controls. The implementation is ongoing and on completition the company will have an internal audit system commensurate with the size of its business.

AUDITORS

M/s S.P. Bhandare & Associates, Chartered Accountants, Panaji, Auditors, hold office upto the conclusion of the ensuing annual general meeting. However, they being eligible offer themselves for reappointment.

for and on behalf of the Board


        sd/-                      sd/-
Mr. S. Trivedi           Mrs. S. Trivedi
Director                   Director

Date: 5 th September, 2007.

Regd. Office:        51 A, Pilerne Estate, Pilerne, Goa 403511.

## AUDITOR'S REPORT

The Members of M/S. Infiniti Modules Pvt. Limited.

1.  We have audited the attached balance sheet of M/s. Infiniti Modules Pvt. Limited, as at 31st March 2007 and the profit and loss account for the year ended 31st March 2007. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

2.  We conducted our audit in accordance with the auditing standards generally accepted in India. Those Standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

3.  As required by the Companies (Auditor's Report) Order, 2003 issued by the Central Government of India in terms of sub-section (4A) of section 227 of the Companies Act, 1956, we enclose in the Annexure a statement on the matters specified in paragraphs 4 and 5 of the said Order.

4.  Further to our comments in the Annexure referred to above, we report that:

(i)  We have obtained all the information and explanations, which to the best of our knowledge and belief were necessary for the purpose of our audit;

(ii)  In our opinion, proper books of account as required by law have been kept by the company so far as appears from our examination of those books.

(iii)  The balance sheet and profit and loss account dealt with by this report are in agreement with the books of account.

(iv)  In our opinion, the balance sheet and profit and loss account dealt with by this report comply with the accounting standards referred to in sub-section (3C) of section 211 of the Companies act, 1956.

(v)   On the basis of written representations received from the directors, as on 31st March 2007 and taken on record by the Board of Directors, we report that none of the directors is disqualified as on 31st March 2007 from being appointed as a director in terms of clause (g) of sub-section (1) of section 274 of the Companies Act, 1956.

(vi) In our opinion and to the best of our information and according to the explanations given to us, the said accounts give the information required by the Companies Act, 1956, in the manner so required and give a true and fair view in conformity with the accounting principles generally accepted in India:

    (a)   in the case of the balance sheet, of the state of affairs of the company as at 31st March 2007;

    (b)   in the case of the profit and loss account, of the profit for the year ended on that date.

For S. P. Bhandare & Associates.
Chartered Accountants

Sd/-
S. P. Bhandare
Proprietor
M. No. 35615

Place: Panaji-Goa
Date: 5th September 2007

**Annexure to the Auditor's Report for the year ended 31ˢᵗ March 2007**

Re: Infiniti Modules Private Limited

Annexure referred to in paragraph 3 of our report of even date,

In terms of the information and explanations given to us and the books and records examined by us in the course of audit and to the best of our knowledge and belief we state that:

(i)    (a)    The company has maintained proper records showing full particulars including quantitative details and situation of fixed assets.

        (b)    All the assets have not been physically verified by the management during the year but there is a regular programme of verification which, in our opinion, is reasonable having regard to the size of the company and the nature of its assets. No material discrepancies were noticed on such verification.

        (c)    During the year, the company has not disposed off substantial part of fixed assets.

(ii)    (a)    The inventory has been physically verified during the year by the management. In our opinion, the frequency of verification is reasonable.

        (b)    The procedures of physical verification of inventories followed by the management are reasonable and adequate in relation to the size of the company and the nature of its business.

        (c)    The company is maintaining proper records of inventory. The discrepancies noticed on verification between the physical stocks and the book records were not material.

(iii)    (a)    The company has taken unsecured loans from three parties covered in the register maintained under section 301 of the Companies Act, 1956. The maximum amount involved during the year was Rs.6281271.83 and the year end balance of loans taken from such parties was Rs.5114441.00

(b)  As the loans taken by the company are interest free and are not subject to any terms and conditions the questions of i) the rate of interest and other terms being prejudicial, ii) regular payment of principal and interest and iii) reasonable steps for recovery of overdue amounts, do not arise.

(c)  The company has not granted any loans secured or unsecured to companies, firms or other parties covered in the register maintained under section 301 of the Companies Act, 1956.

(iv)  In our opinion and according to the information and explanations given to us, there exists an adequate internal control system commensurate with the size of the company and the nature of its business for the purchases of inventory, fixed assets and for the sale of goods and services. During the course of our audit, we have not observed any continuing failure to correct major weaknesses in internal control system.

(v)  (a)  According to the information and explanations given to us, we are of the opinion that the particulars of contracts or arrangements that need to be entered into the register maintained under section 301 of the Companies Act, 1956 have been so entered.

(b)  In our opinion and according to the information and explanations given to us, the transactions made in pursuance of contracts or arrangements entered in the register maintained under Section 301 of the Companies Act, 1956 and exceeding the value of rupees five lakhs in respect of any party during the year have been made at prices which are reasonable having regard to prevailing market prices at the relevant time.

(vi)  In our opinion and according to the information and explanations given to us the company has not accepted any deposits from the public.

(vii)  *The Company has no internal audit system.*

(viii) We are informed that the Central Government has not prescribed maintenance of cost records under Section 209(1)(d) of the Companies Act, 1956.

(ix)   (a)   The company is regular in depositing with appropriate authorities undisputed statutory dues including provident fund, investor education protection fund, employees state insurance, income tax, sales tax, wealth tax, service tax, custom duty, excise duty and other material statutory dues applicable to it. Further since the Central Government has till date not prescribed the amount of cess payable under section 441 A of the companies Act, 1956, we are not in a position to comment upon the regularity or otherwise of the Company in depositing the same.

    (b)   According to the information and explanations given to us, no undisputed amounts payable in respect of provident fund, investor education protection fund, employees state insurance, income tax, sales tax, wealth tax, service tax, customs duty and excise duty were in arrears, as at 31st March 2007 for a period of more than six months from the date they became payable.

    (c)   According to the information and explanation given to us, there are no dues of income tax, sales tax, wealth tax, service tax, customs duty and excise duty which have not been deposited on account of any dispute.

(x)   In our opinion, the accumulated losses of the company are not more than fifty percent of its net worth. The company has not incurred cash losses during the financial year covered by our audit and the immediately preceding financial year.

(xi) In our opinion and according to the information and explanations given to us, the company has not defaulted in repayment of dues to a financial institution, bank or debenture holders.

(xii) The company has not granted any loans and advances on the basis of security by way of pledge of shares, debentures and other securities. Accordingly clause 4(xii) of the Order is not applicable.

(xiii) In our opinion, the company is not a chit fund or a nidhi/mutual benefit fund/society. Therefore the provisions of clause 4(xiii) of the Companies Auditor's Report) Order, 2003 are not applicable to the company.

(xiv)   In our opinion, the company is not dealing in or trading in shares, securities, debentures and other investments.   Accordingly, the provisions of clause 4(xiv) of the companies (Auditor's Report) Order, 2003 are not applicable to the company.

(xv)    The company has not given any guarantee for loans taken by others from banks or financial institutions.   Accordingly clause 4(xv) of the Order is not applicable.

(xvi)   In our opinion, the term loans have been applied for the purpose for which they were raised.

(xvii)  According to the information and explanations given to us and on an overall examination of the balance sheet of the company, we report that the no funds raised on short term basis have been used for long-term investment.

(xviii) The company has not made any preferential allotment of shares to parties and companies covered in the Register maintained under section 301 of the Companies Act, 1956.

(xix)   The company has, during the year, not issued any debentures.

(xx)    The company has, during the year, not raised any money by public issues.

(xxi)   According to the information and explanations given to us, no fraud on or by the  company has been noticed or reported during the course of our audit.

For S. P. Bhandare & Associates
Chartered Accountants


    Sd/-
S. P. Bhandare
Proprietor
M. No. 35615
Place: Panaji-Goa
Date: 5th September 2007

# Infiniti Modules Pvt. Ltd.

51A, Pilerne Estate, Pilerne , Bardez, Goa 403 511 India

## BALANCE SHEET AS AT 31ST March 2007

| | Schedule No. | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|---|
| **SOURCES OF FUNDS :** | | | |
| | | | |
| **Own Fund** | | | |
| Share Capital | 1 | 200,200 | 200,200 |
| Reserves & Surplus | 2 | 14,562,232 | 9,281,990 |
| | | | |
| **Loans Fund** | | | |
| Secured Loans | 3 | 2,446,958 | 4,872,584 |
| Unsecured Loans | 4 | 5,114,441 | 6,275,798 |
| | | | |
| Deferred Tax Liability | | 1,671,631 | 810,517 |
| Total | | 23,995,462 | 21,441,089 |
| **APPLICATION OF FUNDS:** | | | |
| | | | |
| Fixed Assets : | 5 | | |
| **Gross Block** | | 17,122,050 | 16,695,029 |
| Less: Accumulated Depreciation | | 3,884,193 | 3,028,146 |
| Net Block | | 13,237,857 | 13,666,883 |
| | | | |
| **Current Assets, Loans & Advances** | | | |
| Inventory | 6 | 5,843,253 | 4,460,429 |
| Sundry Debtors | 7 | 4,545,469 | 3,095,535 |
| Cash and Bank Balances | 8 | 4,991,913 | 2,514,473 |
| Loans and Advances | 9 | 6,867,392 | 2,969,629 |
| | | 22,248,027 | 13,040,066 |
| | | | |
| **Current Liablities & Provisions** | | | |
| Current Liablities | 10 | 10,447,891 | 5,064,052 |
| Provision for Tax | | 1,096,655 | 277,581 |
| | | 11,544,546 | 5,341,633 |
| | | | |
| Net Current Assets | | 10,703,481 | 7,698,432 |
| Miscellaneous Expenditure to the extent not written off or adjusted | | | |
| Preliminery Expenses | 11 | 54,124 | 75,774 |
| | | | |
| Total | | 23,995,462 | 21,441,089 |
| Significant accounting policies & notes on accounts | 19 | | |

As per our report of even date.
**For S.P. Bhandare & Associates**       **For  INFINITI MODULES PVT. LTD.**
**Chartered Accountants**

sd/-                                                    sd/-                          sd/-
S.P.Bhandare                                  Sanjeev Trivedi          Sonali Trivedi
Proprietor                                        Director                     Director
M.No. 35615

Place:  Pilerne - Goa
Date: 5th September 2007

# Infiniti Modules Pvt. Ltd.
51A, Pilerne Estate, Pilerne, Bardez, Goa - 403 511 India

## PROFIT & LOSS ACCOUNT FOR THE YEAR ENDED 31ST MARCH 2007

| | Schedule No. | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|---|
| **INCOME** | | | |
| Gross Turnover 37,843,086 | | | |
| Less: Excise duty 3,447,528 | | 34,395,558 | 23,356,034 |
| Net Turnover | | | |
| Other Income | 12 | 2,752,566 | 2,500,646 |
| Total | | 37,148,124 | 25,856,680 |
| **EXPENDITURE** | | | |
| Raw Materials Consumed | 13 | 19,620,236 | 13,693,114 |
| Variation in Stock | 14 | - | 212,567 |
| Payment to and provisions for employees | 15 | 2,385,610 | 2,318,333 |
| Manufacturing Expenses | 16 | 1,684,957 | 1,379,610 |
| Administration Selling & Other Expenses | 17 | 5,442,164 | 3,702,647 |
| Depreciation | 5 | 856,048 | 751,374 |
| Interest & Finance Charges | 18 | 567,969 | 567,548 |
| Total | | 30,556,984 | 22,625,193 |
| Profit for the year before taxation | | 6,591,140 | 3,231,487 |
| Less: Provision for taxation | | | |
| Current Tax | | 1,020,000 | 277,581 |
| Deferred Tax | | 861,114 | 810,517 |
| Fringe benefit Tax | | 76,655 | 94,058 |
| Net Profit for the year | | 4,633,371 | 2,049,331 |
| Excess Tax Provision for earlier years is not reversed | | 646,871 | |
| Balance in profit & Loss a/c. b/fd | | 6,781,990 | 4,732,659 |
| Total | | 12,062,232 | 6,781,990 |
| Significant accounting policies & notes on accounts | 19 | | |

As per our report of even date.
**For S.P.Bhandare & Associates**          **For INFINITI MODULES PVT. LTD.**
**Chartered Accountants**

sd/-                                   sd/-                          sd/-
S.P.Bhandare                            Sanjeev Trivedi               Sonali Trivedi
Proprietor                             Director                      Director
M.No. 35615

Place: Pilerne - Goa
Date: 5th September 2007

**Infiniti Modules Pvt. Ltd.**

51A, Pilerne Estate, Pilerne , Bardez, Goa - 403 511 India

| SCHEDULES TO BALANCE SHEET AND PROFIT & LOSS A/C AS ON 31.03. 2007 | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|
| **SCHEDULE  - 12 OTHER INCOME** | | |
| Interest on Bank Deposits | 151,217 | 141,187 |
| Interest Recived on Income Tax Refund | 195,100 | - |
| VAT Deferrement (75% of CST & VAT) | 2,406,249 | 2,082,539 |
| Job Work | - | 276,920 |
| | 2,752,566 | 2,500,646 |

## Infiniti Modules Pvt. Ltd.
51A, Pilerne Estate, Pilerne , Bardez, Goa - 403 511 India

### SCHEDULES TO BALANCE SHEET AND PROFIT & LOSS A/C AS ON 31.03. 2007

| | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|
| **SCHEDULE - 1 SHARE CAPITAL** | | |
| AUTHORISED CAPITAL | | |
| 1,50,000 Equity Shares of Rs.10/- each | 1,500,000 | 1,500,000 |
| ISSUED SUBSCRIBED & PAID UP CAPITAL | | |
| 20,020 Equity Shares of Rs.10/- each fully paid up | 200,200 | 200,200 |
| | 200,200 | 200,200 |
| **SCHEDULE - 2 RESERVES & SURPLUS** | | |
| General Reserve | 2,500,000 | 2,500,000 |
| Balance in Profit & Loss account | 12,062,232 | 6,781,990 |
| | 14,562,232 | 9,281,990 |
| **SCHEDULE - 3  SECURED LOANS** | | |
| State Bank of India Term Loan (Repayable within one year - Rs.5,05,966/-) (Previous Year Rs.5,19,142/-) ( Secured against the mortgage of Building / Shed and Hypothecation of Plant & Machenery.) | 505,966 | 1,326,187 |
| HDFC Bank Car Loan - Scorpio (Repayable within one year - Rs.53,364) (Previous Year Rs.2,06,758) | 53,364 | 260,122 |
| HDFC Bank Car Loan - Swift (Repayable within one year - Rs.1,43,291) (Previous Year Rs.1,33,001) | 271,130 | 404,131 |
| State Bank of India Cash Credit ( Secured against the hypothecation of Raw material, Stock in Process, Finished Goods and Book Debts/Bills receivable.) Besides the Term Loan and Cash Credits are guaranteed by the Directors. | 1,616,498 | 2,882,144 |
| | 2,446,958 | 4,872,584 |
| **SCHEDULE - 4 UNSECURED LOANS** | | |
| Loans from Directors | 5,114,441 | 6,275,798 |
| | 5,114,441 | 6,275,798 |

**Infiniti Modules Pvt Ltd**
51/A Pilerne Indl Estate, Pilerne, Bardez, Goa.

## Schedule - 5 Fixed Assets

| Assets | Gross Block | | | | Depreciation | | | Net Block | |
|---|---|---|---|---|---|---|---|---|---|
| | As at 01.04.2006 | Addition during the year | Deletion during the year | As at upto 31.03.2007 | As at 01.04.2006 | For the year | Upto 31.03.2007 | As at 31.03.2007 | As at 31.03.2006 |
| Land | 1,089,710 | - | - | 1,089,710 | - | - | - | 1,089,710 | 1,089,710 |
| Factory Building | 4,575,903 | 113,000 | - | 4,688,903 | 696,438 | 152,846 | 849,284 | 3,839,619 | 3,879,465 |
| Electrical Installation | 188,517 | 58,360 | - | 246,877 | 53,625 | 10,134 | 63,759 | 183,118 | 134,892 |
| Plant & Machinery | 7,220,162 | 84,102 | - | 7,304,264 | 1,534,845 | 345,575 | 1,880,420 | 5,423,844 | 5,685,317 |
| Moulds & Dies | 252,198 | 20,440 | - | 272,638 | 71,970 | 12,206 | 84,176 | 188,462 | 180,228 |
| Tools & Equipments | 524,122 | - | - | 524,122 | 73,553 | 24,896 | 98,449 | 425,673 | 450,569 |
| Computers | 881,621 | 84,625 | - | 966,246 | 329,000 | 151,705 | 480,705 | 485,541 | 552,621 |
| Office Equipment | 376,054 | 32,450 | - | 408,504 | 72,152 | 17,898 | 90,050 | 318,454 | 303,902 |
| Furniture & Fixtures | 287,899 | - | - | 287,899 | 62,489 | 18,224 | 80,713 | 207,186 | 225,410 |
| Air Condition | - | 34,043 | - | 34,043 | - | 846 | 846 | 33,197 | - |
| Vehicles | 1,263,627 | - | - | 1,263,627 | 133,066 | 120,045 | 253,111 | 1,010,516 | 1,130,561 |
| Crates & Bins | 35,217 | - | - | 35,217 | 1,009 | 1,673 | 2,682 | 32,535 | 34,208 |
| Total | 16,695,030 | 427,020 | - | 17,122,050 | 3,028,146 | 856,048 | 3,884,193 | 13,237,857 | 13,666,884 |
| Previous year | 14,665,378 | 2,178,107 | 148,455 | 16,695,030 | 2,276,772 | 751,374 | 3,028,146 | 13,666,884 | 12,388,606 |

# Infiniti Modules Pvt. Ltd.
51A, Pilerne Estate, Pilerne , Bardez, Goa - 403 511 India

## SCHEDULES TO BALANCE SHEET AND PROFIT & LOSS A/C AS ON 31.03. 2007

| | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|
| **SCHEDULE – 6 INVENTORIES** | | |
| (Unsecured, considered good) | | |
| Stock of Raw Materials | 5,807,541 | 4,446,544 |
| Stock of Packing material | 35,712 | 13,885 |
| Finished Goods | - | - |
| Work In Progress | - | - |
| | **5,843,253** | **4,460,429** |
| **SCHEDULE – 7 SUNDRY DEBTORS** | | |
| (Unsecured, considered good) | | |
| Debtors outstanding for more then six months | 551,471 | 845,850 |
| Other Debtors | 3,993,998 | 2,249,685 |
| | **4,545,469** | **3,095,535** |
| **SCHEDULE – 8  CASH & BANK BALANCES** | | |
| Cash in hand | 107,484 | 32,231 |
| Balance With Schedule Banks | | |
| Current Accounts | 1,847,552 | 828,156 |
| Margin Money with Bank against Bank guarantee | 2,015,096 | 1,642,824 |
| In Fixed Deposit Accounts with Scheduled Bank | 1,021,781 | 11,262 |
| | **4,991,913** | **2,514,473** |
| **SCHEDULE – 9 LOANS & ADVANCES** | | |
| (Unsecured, considered good ) | | |
| Advances recoverable in cash or kind | 166,367 | 154,372 |
| Central Excise Deposits | 100,595 | 82,517 |
| Deposits | 151,194 | 123,670 |
| Advance to Suppliers | 1,632,932 | 310,352 |
| GMF Components (India) Pvt. Ltd. | 3,870,120 | 1,667,757 |
| Advance Tax | 500,000 | 150,000 |
| TDS on FD Interest ( 06-07 ) | 33,792 | 31,336 |
| Income Tax | | 449,332 |
| Fringe Benefit Tax Paid | 106,976 | - |
| Interest Accrued | 82,955 | 293 |
| Prepaid Expenses | 22,461 | |
| | **6,867,392** | **2,969,629** |
| **SCHEDULE – 10  CURRENT LIABILITIES** | | |
| Sundry Creditors | 5,439,505 | 3,503,627 |
| Advances from Customers | 4,570,475 | 1,225,575 |
| Other Outstanding Liabilities | 437,911 | 334,852 |
| | **10,447,891** | **5,064,054** |
| **SCHEDULE – 11 PRELIMINERY EXPENSES** | | |
| Balance Brought forward | 75,774 | 97,424 |
| Less: Written Off | 21,650 | 21,650 |
| | **54,124** | **75,774** |
| **SCHEDULE – 12 OTHER INCOME** | | |
| Interest on Bank Deposits | 151,217 | 141,187 |
| Interest Recived on Income Tax Refund | 195,100 | - |
| VAT Deferrement (75% of CST & VAT) | 2,406,249 | 2,082,539 |
| Job Work | - | 276,920 |
| | **2,752,566** | **2,500,646** |

for Infiniti Modules P Ltd

Director

# Infiniti Modules Pvt. Ltd.
## 51A, Pilerne Estate, Pilerne , Bardez, Goa - 403 511 India

### SCHEDULES TO BALANCE SHEET AND PROFIT & LOSS A/C AS ON 31.03. 2007

| | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|
| **SCHEDULE - 13 MATERIAL CONSUMED** | | |
| **A   RAW MATERIAL** | | |
| Opening stock | 4,446,544 | 4,622,193 |
| Add: Purchase | 20,640,936 | 13,205,640 |
| | 25,087,480 | 17,827,833 |
| Less: closing stock | 5,807,541 | 4,446,544 |
| | 19,279,939 | 13,381,289 |
| | | |
| **B  PACKING MATERIAL** | | |
| Opening stock | 13,885 | 4,001 |
| Add: Purchase | 362,124 | 321,709 |
| | 376,009 | 325,710 |
| Less: Closing stock | 35,712 | 13,885 |
| | 340,297 | 311,825 |
| Total (A+B) | 19,620,236 | 13,693,114 |
| | | |
| **SCHEDULE - 14 VARIATION IN STOCK** | | |
| | | |
| **Opening Stock** | | |
| Semi Finished Goods | - | |
| Finished Goods | - | 212,567 |
| | | |
| | - | 212,567 |
| | | |
| **Closing Stock** | | |
| Semi Finished Goods | - | - |
| Finished Goods | - | - |
| | | |
| | - | - |
| | | |
| | - | 212,567 |
| | | |
| **SCHEDULE - 15 PAYMENT TO & PROVISIONS FOR EMPLOYEES** | | |
| Salaries, Wages, Over Time & Bonus | 1,791,944 | 1,503,753 |
| Petrol Allowance | 46,320 | 38,123 |
| Medical Allowance | 37,550 | 32,500 |
| Staff welfare expenses | 317,592 | 483,759 |
| Employers Contribution to PF, ESIC & LWF | 114,450 | 260,198 |
| Grauity, Leave Encashment & Ex Gratia | 77,754 | |
| | 2,385,610 | 2,318,333 |
| | | |
| **SCHEDULE - 16 MANUFACTURING & OTHER EXPENSES** | | |
| Consumable  & Stores | 306,474 | 268,972 |
| Electricity & Power | 99,897 | 207,584 |
| Factory Maintenance | 76,646 | 12,984 |
| Job Work Expenses | 1,188,423 | 876,699 |
| Water Charges | 13,517 | 13,371 |
| | 1,684,957 | 1,379,610 |

Infiniti Modules P Ltd.

Director

# Infiniti Modules Pvt. Ltd.
51-A, Pilerne Estate, Pilerne , Bardez, Goa - 403 511 India

## SCHEDULES TO BALANCE SHEET AND PROFIT & LOSS A/C AS ON 31.03. 2007

| | Figures for the Current Financial Year | Figures for the Previous Financial Year |
|---|---|---|
| **SCHEDULE - 17 ADMINISTRATIVE, SELLING & GENERAL EXPENSES** | | |
| Remuneration to Directors | 240,000 | 255,000 |
| Rent , Rates & Taxes | 156,341 | 57,229 |
| Printing & Stationary | 108,791 | 55,053 |
| Telephone Expenses | 203,271 | 188,647 |
| Insurance Charges | 21,698 | 110,271 |
| Legal & Professional Fees | 103,773 | 26,157 |
| Membership Fees | 16,820 | 18,500 |
| Advertisment & Publicity | 332,616 | 109,731 |
| Business Promotion | 32,126 | |
| Postage & Telegraph | 55,239 | 19,680 |
| Books & Periodicals | - | 16,654 |
| Carrage Outward | 171,168 | 45,457 |
| Commission on Sales | 2,095,600 | 1,243,938 |
| Security Charges | 75,350 | |
| Interest on Delayed payments | 107,455 | |
| Travelling & Conveyance | 866,566 | 226,696 |
| Repair & Maintenance | 665,075 | 474,198 |
| Donation U/S 80 G | 16,000 | |
| Motor Car Expens | 42,771 | |
| Website Expenses | 23,450 | |
| Damages on Delay payments | 18,171 | |
| Installation Expenses | - | 13,261 |
| Bad Debts | - | 102,745 |
| Audit Fees | 22,472 | 19,071 |
| Miscellaneous expenses | 45,761 | 44,557 |
| Preliminary expenses written off | 21,650 | 21,650 |
| **TOTAL** | **5,442,164** | **3,702,647** |
| | | |
| **SCHEDULE - 18 INEREST & FINANCE CHARGES** | | |
| Interest on Term Loan . | 131,498 | 235,760 |
| Bank Charges & Commission | 55,541 | 331,788 |
| Difference in Exchange Rate | 242,550 | |
| Interest on CC a/c | 104,147 | |
| Interest on Car Loan | 34,233 | |
| **TOTAL** | **567,969** | **567,548** |



Infiniti Modules P Ltd.

Director

**Infiniti Modules Pvt Ltd**
51/A, Pilerne Estate, Pilerne,
Bardez, Goa – 403 511, India

Schedules forming part of the accounts

## SCHEDULE 18

SIGNIFICANT ACCOUNTING POLICIES AND NOTES ON ACCOUNTS

1. SIGNIFICANT ACCOUNTING POLICIES

i   **Basis of preparation of financial statements**
    The financial statements are prepared under historical cost convention on the accrual basis of accounting and in accordance with the generally accepted accounting principles.

ii  **Revenue recognition**
    Revenue (income) is recognized when no significant uncertainty as to determination/realization exists.

iii **Fixed assets**
    Fixed assets are carried at cost of acquisition or construction less accumulated depreciation.

iv  **Depreciation**
    Depreciation on other assets is provided on the straight line basis at the rates and in the manner specified in Schedule XIV to the Companies Act, 1956.

v   **Inventories**
    Raw material, finished goods and work in progress are valued at cost or net realizable value, whichever is lower and provision for obsolescence if any, is made on the identified items.

vi  **Foreign currency transactions**
    Transactions in foreign currency are recorded at the original rates of exchange in force at the time the transactions are effected. Exchange differences arising on settlement of other transactions are recognized in the Profit & Loss account. Monetary items denominated in foreign currency are reinstated using the exchange rate prevailing at the date of Balance Sheet and the resulting net exchange difference between is recognized in the Profit & Loss Account.

vii **Taxes on Income**
    Tax expenses comprise both current tax and deferred tax at the applicable enacted rates. Current tax represents the amount of income tax payable/recoverable in respect of the taxable income/loss for the reporting period. Deferred tax represents the effect of timing difference between taxable income and accounting income for the reporting period that originate in one period and are capable of reversal in one or more subsequent periods.

viii **Contingent liabilities**
    These, if any, are disclosed in the Notes on accounts. Provision is made in the accounts in respect of those contingencies which materialize into liabilities after the year end till the approval of the accounts by the Board of Directors and which have material effect on the position stated in the balance sheet.

ix  **Preoperative/Preliminary Expenses**
    Preliminary/pre-operative Expenses have been written off over a period of 5 years.

**2. Earning per share**

Earning per share is calculated by dividing the profit attributable to the equity shareholders by the weighted average number of equity shares outstanding during the year as under;

|  | As at 31st March, 2007 | As at 31st March, 2006 |
|---|---|---|
| Profit /(Loss) after tax attributable to Equity Share-holders (Rupees) | 46,33,671 | 20,49,331 |
| Weighted average number of equity outstanding during the Year | 20,020 | 20,020 |
| Basic/Diluted Earnings per share (Rupees) | 231.43 | 102.36 |
| Nominal value per share (Rupees) | 10.00 | 10.00 |

**3. Contingent Liabilities**

|  |  | 2006-07 | 2005-06 |
|---|---|---|---|
| i | Towards estimated amount of contracts remaining to be executed on capital account | Nil | Nil |
| ii | For counter guarantee provided to bank against guarantees provided by them on behalf of Company | 20,15,096 | 16,42,824 |

**4. Remuneration paid to the Auditors**

|  | | |
|---|---|---|
| As audit fees | 22,272 | 13,462 |
| In Other Capacity |  | 5,609 |

**5. Expenditure in Foreign Currency**

|  | | |
|---|---|---|
| C.I.F. value of Imports | 36,39,602 | - |
| Travelling | 23,100 | - |

**6. Licenced and installed capacity and production**

|  | | |
|---|---|---|
| Licenced capacity | Not applicable | Not applicable |
| Installed capacity (as certified by the management on single shift basis) | | |
| Optima Patrition (Sq Mtrs) | 50000 | 50000 |
| Others (Nos) | 5000 | 5000 |

**7. Production and Sales**

| Item | UOM | Prodn/Sales Qty | Sales Value | Prodn/Sales Qty | Sales Value |
|---|---|---|---|---|---|
| Partitions | Sq Mtrs | 846 | 3,648,526 | 400 | 1,885,567 |
| Chairs | Nos | 9926 | 14,391,348 | 4905 | 8,171,584 |
| Tables | Nos | 3495 | 6,077,331 | 1376 | 5,311,440 |
| Storages | Nos | 207 | 1,176,116 | 513 | 2,096,637 |
| Mobile/Fixed Pedestal | Nos | 257 | 862,096 | 613 | 1,928,631 |
| Work surface | Nos | 237 | 512,455 | 76 | 215,113 |
| Doors & Door Closures | Nos | 22 | 222,424 | 9 | 69,953 |
| Credenza | Nos | 117 | 585,232 | 46 | 232,662 |
| Bed | Nos | 133 | 592,059 | 582 | 1,389,172 |
| Board Side | Nos | 57 | 137,020 | 49 | 30,237 |
| Wordrobe | Nos | 171 | 1,095,090 | 51 | 344,085 |
| Wire Basket | Nos | 3000 | 401,650 | | |
| Desk & Sofa | Nos | 1377 | 3,116,836 | 140 | 723,170 |
| Bag Hooks | Nos | 3000 | 83,100 | | |
| Others | Nos | 831 | 1,494,275 | 658 | 9,57,783 |
| **Total** | | **23676** | **34,395,558** | **9418** | **23,356,034** |

8.  Opening Stock & Closing Stock of Finished Goods

| Opening Stock | Nos | Nil | | Nil | Nil | Nil |
|---|---|---|---|---|---|---|
| Closing Stock | Nos | Nil | | Nil | Nil | Nil |

9.   Raw material consumed

| Consumption | UOM | Qty | Value | Qty | Value |
|---|---|---|---|---|---|
| ERW Steel Tubes | Mtrs | 63275 | 3,555,628 | 14047 | 930,927 |
| Aluminium Extrusion | Nos | 18 | 9,092 | 3812 | 690,892 |
| Boards & Laminates | Nos | 7980 | 2,789,499 | 3625 | 1,268,941 |
| Hardware | Nos | 85964 | 297,314 | 295957 | 113,517 |
| Rubber/PVC Extrusion | Mtrs | 104451 | 927,717 | 31102 | 983,097 |
| Plastic Components | Nos | 16216 | 1,618,345 | 13043 | 1,246,223 |
| Fabric | Mtrs | 1638 | 190,715 | | |
| Sheet Metal Components | Nos | 27745 | 1,652,456 | 4627 | 131,739 |
| Tiles | Nos | 10130 | 36,031 | 113 | 14,400 |
| Lupoglide | Nos | 2,366 | 537,960 | NIL | NIL |
| Metal Flange | Nos | 18,858 | 764,536 | NIL | NIL |
| Movie Seats | Nos | 2,889 | 299,335 | NIL | NIL |
| Ply back & seats | Nos | 5,452 | 710,748 | NIL | NIL |
| Laminate | Nos | 855 | 275,991 | NIL | NIL |
| Chair Mechanism | Nos | 1,076 | 207,639 | NIL | NIL |
| Edge | Nos | 14,091 | 284,615 | NIL | NIL |
| Others | | | 5,462,615 | | 8,313,378 |
| Total | | | 19,620,236 | | 13,693,114 |

10. Value of imported and indigenous Raw Material and Stores & Spares consumed

   a   Raw materials

| i. Imported | | 3,502,212 | 18.17% | 1,134,925 | 8.48% |
|---|---|---|---|---|---|
| ii Indigenous | | 15,777,727 | 81.83% | 12,246,364 | 91.52% |
| | | 19,279,939 | 100.00% | 13,381,289 | 100.00% |

   b.  Packing Materials

| i. Imported | | - | 0% | - | 0% |
|---|---|---|---|---|---|
| ii Indigenous | | 340,297 | 100% | 311,825 | 100% |

   c.  Stores & Spares

| i. Imported | | - | 0% | - | 0% |
|---|---|---|---|---|---|
| ii Indigenous | | 306,474 | 100% | 268,972 | 100% |

12  FOB value of Exports          34,04,200                25,602

13  Information in respect of amounts owned to Small Scale Units as on 31st March 2007 has not
    been available with the company though request for by the company from various vendors. The
    company is therefore unable to provide information about overdue amounts owned to such units.

14  Cash Credit account with the bank is secured by hypothecation of movable assets, stock, stores, work-in-process, book debts both present and future.

15  Previous year's figures have been regrouped and rearranged wherever necessary to make them comparable with current year's figures.

SIGNATURES TO SCHEDULE '1' TO '18'

As per the report attached                    For and on behalf of the board
**For S P Bhandare & Associates**            **For Infiniti Modules Pvt Ltd**
**Chartered Accountants**


    Sd/-                          sd/-              sd/-
S P Bhandare                  Sanjeev Trivedi    Sonali Trivedi
Proprietor                    Director           Director
M. No.35615

Place: Pilerne - Goa
Date: 5th September 2007

Balance Sheet Abstract and Company's General Business Profile.    Rs. '000's

I Registration No. `U36100GA1998PTCoo4982`    State Code: `2 4`

Balance Sheet Date `3 1` `0 3` `0 7`

II Capital raised during the year (Amount in Rs. Thousands)

Public Issue `N I L`    Rights Issue `N I L`

Bonus Issues `N I L`    Private Placement `N I L`

III Position of mobilisation and deployment of Funds (Amount in Rs. Thousands)

Total Liabilities `2 3 9 9 5`    Total Assets `2 3 9 9 5`

Sources of Funds
Paid up capital `2 0 0`    Reserves & Surplus `1 4 5 6 2`

Secured Loans `2 4 4 7`    Unsecured Loans `5 1 1 4`

Deferred Tax
Liability `1 6 7 2`

Application of funds
Net Fixed Assets `1 3 2 3 8`    Investments `N I L`

Net Current Assets `1 0 7 0 3`    Misc. Expenditure `5 4`

IV Performance of Company (Amount in Rs. Thousands)
Turnover `3 4 3 9 6`    Total Expenditure `3 0 5 5 7`

Profit before Tax `6 5 9 1`    Profit after Tax `4 6 3 3`

Earning per Share in Rs. `2 3 1`    Dividend Rate % `N I L`

V Generic names of principal products/Services of the Company

Item Code No.(ITC Code) `9 4 0 3 9`

Production description `F U R N I T U R E   A N D`
`P A R T S   T H E R E   O F`

For INFINITI MODULES PVT LTD

sd/-    sd/-
Sanjeev Trivedi    Sonali Trivedi
DIRECTOR    DIRECTOR

**JA0800**

# Exhibit 2

## INFINITI MODULES PVT. LTD.

Surrogate Values - Overhead, SG&A, Profit
Infiniti Modules Pvt. Ltd. (Mar. 31, 2007)
(values in Rs.)

| Items | Source Schedule | Income Statement Amounts | Raw Materials | Direct Labor | Energy | Manufacturing Overhead | SG&A and Interest | Profit | Excluded |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| Sales | 18 [sic] n. 7 | (34,395,558) | | | | | | | (34,395,558) |
| Interest on Bank Deposit | 12 | (151,217) | | | | | (151,217) | | |
| Interest Remitted by IDC | 12 | (195,100) | | | | | | | (195,100) |
| Misc. Income (deferred VAT) | 12 | (2,406,249) | | | | | | | (2,406,249) |
| Job Work | 12 | 0 | | | | | | | 0 |
| **COSTS & EXPENSES** | | | | | | | | | |
| Raw Materials | 13 | 19,620,236 | 19,279,939 | | | | | | 340,297 |
| Decrease in Work in Process | 14 | - | | | | | | | |
| Salaries and Wages | 15 | 1,791,944 | | 1,791,944 | | | | | |
| Driver and Petrol Allowance | 15 | 46,320 | | | | | 46,320 | | |
| Gratuties, etc. | 15 | 77,754 | | 77,754 | | | | | |
| Medical Allowance | 15 | 37,550 | | | | 37,550 | | | |
| Staff Welfare Expenses | 15 | 317,592 | | | | 317,592 | | | |
| Contribution to PF, ESIC, LWF | 15 | 114,450 | | | | 114,450 | | | |
| Carriage Inward | 16 | - | | | | | | | |
| Consumables and Stores | 16 | 306,474 | | | | 306,474 | | | |
| Electricity and Power | 16 | 99,897 | | | 99,897 | | | | |
| Factory Maintenance | 16 | 76,646 | | | | 76,646 | | | |
| Job Work Expenses | 16 | 1,188,423 | | | | | 1,188,423 | | |
| Water Charges | 16 | 13,517 | | | 13,517 | | | | |
| Remuneration to Directors | 17 | 240,000 | | | | | 240,000 | | |
| Rent, Rates, & Taxes | 17 | 156,341 | | | | | 156,341 | | |
| Printing & Stationery | 17 | 108,791 | | | | | 108,791 | | |
| Communication Expenses | 17 | 203,271 | | | | | 203,271 | | |
| Insurance | 17 | 21,698 | | | | | 21,698 | | |
| Legal & Professional Fees | 17 | 103,773 | | | | | 103,773 | | |
| Membership Fees | 17 | 16,820 | | | | | 16,820 | | |
| Advertisement & Publicity | 17 | 332,616 | | | | | 332,616 | | |
| Business Promotion | 17 | 32,126 | | | | | 32,126 | | |
| Postage & Telegraph | 17 | 55,239 | | | | | 55,239 | | |
| Books & Periodicals | 17 | - | | | | | | | |
| Carriage Outward | 17 | 171,168 | | | | | | | 171,168 |
| Commission on Sales | 17 | 2,095,600 | | | | | 2,095,600 | | |
| Security Service Charges | 17 | 75,350 | | | | | 75,350 | | |
| Interest on Delayed Payments | 17 | 107,455 | | | | | 107,455 | | |
| Travelling & Conveyance | 17 | 866,566 | | | | | 866,566 | | |
| Repair and Maintenance | 17 | 665,075 | | | | 665,075 | | | |
| Donation U/S 80 G | 17 | 16,000 | | | | | 16,000 | | |
| Motor Car Expenses | 17 | 42,771 | | | | | 42,771 | | |
| Website Expenses | 17 | 23,450 | | | | | 23,450 | | |
| Damages on Delay Payments | 17 | 18,171 | | | | | 18,171 | | |
| Installation Expenses | 17 | - | | | | | | | |
| Bad Debt | 17 | - | | | | | | | |
| Audit Fees | 17 | 22,472 | | | | | 22,472 | | |
| Miscellaneous Expense | 17 | 45,761 | | | | | 45,761 | | |
| Preliminary Expenses Written O | 17 | 21,650 | | | | | 21,650 | | |
| Depreciation | 5 | 656,048 | | | | detail below | detail below | | |
| Computer | | | | | | | 151,705 | | |
| Crates & Bins | | | | | | 1,673 | | | |
| Electrical Installation | | | | | | 10,134 | | | |
| Factory Building | | | | | | 152,846 | | | |
| Furniture & Fixture | | | | | | | 18,224 | | |
| Land | | | | | | | | | |
| Mould & Dies | | | | | | 12,206 | | | |
| Office Equipment | | | | | | | 17,898 | | |
| Plant & Machinery | | | | | | 345,575 | | | |
| Tools & Equipments | | | | | | 24,896 | | | |
| Vehicle | | | | | | | 120,045 | | |
| Interest on Term Loan | 18 | 131,498 | | | | | 131,498 | | |
| Bank Charges & Commission | 18 | 55,541 | | | | | 55,541 | | |
| Difference in Exchange Rate | 18 | 242,550 | | | | | 242,550 | | |
| Incteres on CC acct. | 18 | 104,147 | | | | | 104,147 | | |
| Interest on Car Loan | 18 | 34,233 | | | | | 34,233 | | |
| | | | | | | | | | |
| Profit Before Tax | P&L | 6,591,140 | | | | | | 6,591,000 | |
| | | | | | | | | | |
| **Total** | | | 19,279,939 | 1,869,698 | 113,414 | 2,065,117 | 6,565,288 | 6,591,000 | (36,485,442) |
| | | | | | | | | | |
| A Total Material, Direct Labor, and Energy Inputs | | | | 21,263,051 | | | | | |
| B Overhead as % of Material, Direct Labor, & Energy | | | | | | 9.71% | | | |
| C Total Material, Direct Labor, Energy, & Overhead | | | | | | 23,328,168 | | | |
| D SG&A as % of Material, Direct Labor, Energy & Overhead | | | | | | | 28.14% | | |
| E Total Material, Direct Labor, Energy, Overhead, & SG&A (i.e., COP) | | | | | | | 29,893,456 | | |
| F Profit as % of Material, Direct Labor, Energy, Overhead & SG&A | | | | | | | | 22.05% | |

SOURCE: Audited Financial Statements of Infiniti Modules Pvt. Ltd. for the Year Ended March 31, 2007.

FOR OFFICIAL FILE



**DORSEY**

DORSEY & WHITNEY LLP

**WILLIAM PERRY**
**Partner**
**(206) 903-8894**
**FAX (206) 903-8820**
perry.william@dorsey.com

August 24, 2010



RECEIVED
AUG 24 2010
DEPT. OF COMMERCE
IMPORT ADMINISTRATION

1140

ITA Case No. A-570-888
Total Pages: 25
5th Administrative Review
(08/01/2008 – 7/31/2009)
NME Office 7

**PUBLIC DOCUMENT**

**BY HAND DELIVERY**

The Honorable Gary F. Locke
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
Central Records Unit, Room 1870
14th Street & Pennsylvania Avenue, N.W.
Washington, DC  20230

Re:    Floor-Standing Metal-Top Ironing Tables from China:
         Submission of Surrogate Values for Since Hardware

Dear Mr. Secretary:

    We represent Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware"), a Chinese

producer and exporter to the United States of ironing tables, in the above referenced

investigation.  On behalf of Since Hardware, we hereby submit to the Department the surrogate

values in response to the Department's request for surrogate values and promulgating the list of

countries suitable for use in calculating appropriate surrogate values.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T  206.903.8800 • F  206.903.8820
COLUMBIA CENTER • 701 FIFTH AVENUE • SUITE 6100 • SEATTLE, WASHINGTON 98104-7043
USA  CANADA  EUROPE  ASIA-PACIFIC

000080

》 DORSEY™

August 24, 2010
Page 2

As determined in the Department's memorandum concerning the surrogate country list, the deadline for submitting surrogate values in this investigation is currently August 17, 2010. We requested an extension of this deadline to August 24, 2010, which was granted by Robert James in a letter to the parties. Therefore, this submission is timely.

The surrogate values which we have calculated are based on the publicly-available annual report of Omax Autos Limited, an Indian limited company listed on the Bombay Stock Exchange and with a registered office at 69 K.M. Stone, Delhi Jaiput Highway, Dharuhera, Rewari (Haryana) 122106 India. See Omax Annual Report in Appendix 1.

For the 2008-2009 annual review period, the Omax financial data yields the following ratios:

| Over head: | 7.08% |
| SG&A: | 7.57% |
| Profit: | 1.18% |

See Appendix 3.

Data pertaining to Indian imports and financial data obtained from Indian manufacturers is acceptable by the terms of the Department's memorandum promulgating a list of countries for surrogate values. In such memorandum, the Department listed India, the Philippines, Indonesia, Thailand, the Ukraine, and Peru as acceptable market economies for purposes of calculating surrogate values in this case.

Since Hardware used the publicly-available annual report of Omax Autos Limited ("Omax") to calculate surrogate values for overhead, selling, general, and administrative expenses, and profit. Omax is an acceptable source of data for these purposes because, like

DORSEY & WHITNEY LLP



August 24, 2010
Page 3

Since Hardware, Omax produces floor-standing, metal-top ironing tables. Omax has produced

such ironing tables since at least early 2010. It has also produced metal shoe racks, coat racks,

and other products with similar material requirements since 2008. It has exported floor-standing,

metal-top ironing tables to U.S. customers, including Polder Inc., since March 2010. See

Appendix 2.

Since Hardware submits the Omax annual reports despite Omax's receipt of DEPB

subsidies because Omax's operations and product line most closely matches Since Hardware's

during the review period. The Department has previously used financial statements that

evidence the use of countervailable subsidies when circumstances warranted. For example, in

the Carbazole Violet Pigment 23 from India case, the Department used data from a company

which had received a subsidy because the only other alternative was to use broad data that was

not industry specific. Decision Memorandum for the Countervailing Duty Investigation of

Carbazole Violet Pigment 23 From India, at Comment IV.A.1.b (November 17,2004). More

recently, in the Decision Memorandum for the Antidumping Duty Investigation of Certain Oil

Country Tubular Goods from the People's Republic of China (the "OCTG Decision"), the

Department used the financial statements of three Indian producers of similar goods (Tata,

ISMT, and OCTL), two of which had financial statements evidencing the use of subsidies (Tata

and ISMT). Comment V (April 8, 2010).

In the OCTG Decision, the Department compared the contemporaneity, specificity, level

of integration, and subsidies of each of the potential surrogate firms. Although it had initially

only accepted one of the firms (OCTL) as a surrogate, it used the financial data of all three in the

DORSEY & WHITNEY LLP



August 24, 2010
Page 4

final determination because it determined that using only OCTL's data "would result in significantly understating [the surrogate financial] ratios with respect to [the respondent Chinese firm]." The Department had three essential reasons for doing so.

1. Contemporaneity: All three firms had financial data that was contemporaneous with the review periods.

2. Comparability: Although all three firms produced comparable merchandise, the only firm without subsidies, OCTL, had a very narrow product line.

3. Level of Integration: None of the potential surrogate firms had a level of integration that was similar to the respondent Chinese firm's level of integration. Rather, Tata was fully integrated, OCTL was not very integrated, and ISMT was between the two in regard to integration. Therefore, the Department applied an overhead ratio based on the average of the three Indian producers. In other words, the Department determined it was essential to include the financial statements of companies benefitting from countervailable programs in the average financial ratio so as to ensure that the overall values used in the normal value calculation approximated the respondent's production experience.

In addition, one of the firms, Tata, benefited from the DEPB subsidy, the same very small subsidy from which Omax also benefits.

Based on an analysis similar to that used in the OCTG Decision, Since Hardware believes that Omax is the best surrogate firm. Omax produces floor-standing, metal-top ironing tables and other similar products which use the same type of raw materials. Like Since Hardware, it also produces many other lines of products. And, it has a similar level of integration. Moreover,

DORSEY & WHITNEY LLP

**Appendix 1: Omax Annual Report, 2008-2009**

# 26th ANNUAL REPORT 2008-09





**OMAX AUTOS LIMITED**

# Milestones

| | |
|---|---|
| **1983** | The year marked the beginning of the name "Omax Autos Limited". |
| **1985** | The first unit started in Dharuhera as an ancillary supplier to Hero Honda for Sheet Metal and Tubular Welded components. |
| **1986** | Omax Autos Limited went public with more than 7500 shareholders. |
| **1988** | Established its second unit Automax in Gurgaon. |
| **1989** | Diversified its customer base by roping in Carrier Aircon Ltd. in Air Conditioning Components. |
| **1997** | Bagged ISO 9002 certificate from TUV of Germany. |
| **1999** | Established its third unit- Speedomax in Sidhrawali. |
| | Tied up with Honda- Siel Cars India Ltd. and New Holland Tractors Ltd. for supply of Body and Axle parts. |
| **2000** | Set up the ultra modern Paint Shop with latest technology from ABB India Ltd. |
| **2001** | A new phase of Kaizen activity- Various Training & HR activities started in all plants. |
| **2002** | Established its Fourth Plant at IMT Manesar with a capital outlay of Rs. 200 million equipped with modern Tool Room, R&D Centre with state of the art machinery began production. |





| 2003 | Established its Fifth Plant- Sprocket division in Dharuhera. Bagged ISO/TS- 16949, ISO 14001 & OHSAS- 18001 Certification from UL India for all plants. |
| 2004 | Established its Sixth Plant at Bangalore having machining & sheet metal manufacturing facilities. |
| | Established its Seventh Plant- Indital at Dharuhera. Started Exports to North America and Europe with clients such as Delphi, Tenneco, Cummins, Piaggio etc. |
| 2005 | Established its Eighth Plant at Binola, Gurgaon for catering export clients. |
| 2006 | SAP rolled out in all Eight plants across India. |
| 2007 | Automax, Gurgaon-Sohna Road Plant merged with Binola Plant. |
| 2008 | Established its latest Plant at Lucknow to manufacture chassis for commercial vehicles for Tata Motors. |
| | Established new Corporate Office in Gurgaon. |
| 2009 | Tied up with IKEA for supply of Metal Houseware Products. |
| | Reached the remarkable heights of 26 years of manufacturing and rendering quality products & services to customers. |

........................ *and the journey continues.*



**O M A X   A U T O S   L I M I T E D**  ①



## Contents

| | |
|---|---|
| Corporate Information | 3 |
| Financial Highlights & Graphs | 4 |
| Corporate Profile | 6 |
| Vision, Mission & IMS Policy | 7 |
| Achievements & Awards | 8 |
| Omax Infrastructure | 9 |
| Our Strength- Our Employees | 10 |
| Clients | 11 |
| Parts of Excellence | 12 |
| Metal Houseware Products | 13 |
| Message from Managing Director | 14 |
| Notice | 17 |
| Management Discussion & Analysis | 20 |
| Directors' Report with Annexures | 26 |
| Corporate Governance Report | 34 |
| Auditors' Report | 49 |
| Financial Statements | 52 |

② OMAX AUTOS LIMITED

# Corporate Information

**Chairman Emeritus:**
Dr. Brijmohan Lal Munjal

**Board of Directors**

| | |
|---|---|
| Mr. Suresh Mathur | Chairman |
| Dr. Ramesh C. Vaish | Director |
| Dr. T.N.Kapoor | Director |
| Mr. Salil Bhandari | Director |
| Mr. Verinder Kumar Chhabra | Director |
| Mr. Atul Raheja | Director |
| Mr. Lalit Bhasin | Director |
| Mr. K.C.Chawla | Whole Time Director |
| Mr. Jatender Kumar Mehta | Managing Director |
| Mr. Ravinder Kumar Mehta | Managing Director |

**Audit Committee**

| | |
|---|---|
| Mr. Salil Bhandari | Chairman |
| Dr. T.N.Kapoor | Member |
| Mr. Atul Raheja | Member |
| Mr. Jatender Kumar Mehta | Member |
| Dr. R.C. Vaish | Member |

**Auditors**
M/s A. Kumar Gupta& Co.,
Chartered Accountants, Ludhiana

**Internal Auditors**
M/s Garg & Garg, M/s R.H.& Co.,
Singhi Chugh & Kumar, Doogar & Associates
Chartered Accountants

**Secretarial Auditors**
Chandrasekaran Associates,
Company Secretaries

**Senior Management Executives**

| | |
|---|---|
| Mr. N.P. Singh | ED (Human Resource) |
| Mr. V.K.Gupta | ED (Commercial) cum Company Secretary |
| Mr. Naresh Tandon | ED (Finance) |
| Mr. Kishor Karnataki | CEO (Commercial Vehicle & Passenger Car) |

**Register & Transfer Agent**
M/s Link Intime India Private Limited
(Formerly M/s Intime Spectrum Registry Limited)
A-40, 2nd Floor, Naraina Industrial Area,
Phase II, Near Batra Banquet Hall, New Delhi- 110028
Tel. No. +91-1-41410592-94
Fax: +91-11-41410591
E-mail: delhi@linkintime.co.in

**Corporate Office:**
Plot No. B-26, Institutional Area,
Sector 32, Gurgaon - 122001

**Omax Autos Limited**
Registered Office & Dharuhera Plant Address:
69 K.M.Stone, Delhi Jaipur Highway,
Dharuhera, Rewari (Haryana)- 122106

**Bangalore Plant**
Omax Autos Limited- Banglore Plant
Plot No. 6, Bomassandra- Jigani Link Road
Bomassandra, Banglore (Karnataka)- 560099

**Binola Plant**
Automax (A unit of Omax Autos Limited)
Delhi- Jaipur Highway, Village & P.O Binola
Gurgaon (Haryana)- 122001

**Dharuhera Plant II**
Indital (A unit of Omax Autos Limited)
69 K.M.Stone, Delhi Jaipur Highway,
Dharuhera, Rewari (Haryana)- 122106

**Manesar Plant**
Omax Autos Limited- Manesar Plant
Plot No. 6, IMT, Sector- 3, Manesar
Gurgaon (Haryana)- 122050

**Sidhrawali Plant**
Speedomax (A unit of Omax Autos Limited)
64 K.M.Stone, Delhi- Jaipur Highway,
Village Sidhrawali, Gurgaon (Haryana)-123413

**Sprocket Division**
Omax Autos Limited- Sprocket Division
69 K.M. stone, Delhi -Jaipur Highway,
Dharuhera, Rewari (Haryana)- 122106

**Lucknow Plant - Under construction**
Omax Autos Limited - Lucknow Plant
Tata Motors Vendor Park, Chinhat Industrial Area,
Deva Road, Lucknow-226019

**Bankers**

| | |
|---|---|
| Canara Bank | State Bank of India |
| Standard Chartered Bank | United Bank of India |
| Citi Bank | HSBC Bank |
| ABN Amro Bank | ICICI Bank |
| Deutsche Bank | Tata Capital Limited |

OMAX AUTOS LIMITED (3)

# Financial Highlights & Graphs

## Financial Performance

Rupees in Lacs

| Year ended | March 2005 | March 2006 | March 2007 | March 2008 | March 2009 |
|---|---|---|---|---|---|
| Gross Sales | 61,429 | 71,069 | 84,840 | 88,103 | 97,733 |
| Net Sales | 51,120 | 58,610 | 69,944 | 73,044 | 83,073 |
| Export Sales | 1,490 | 2,656 | 3,076 | 3,408 | 5,193 |
| Gross Profit (PBITD) | 5,544 | 5,730 | 7,710 | 7,367 | 7,991 |
| Net Profit (PAT) | 2,029 | 2,003 | 2,366 | 1,584 | 543 |
| Net Worth | 9,982 | 11,371 | 13,333 | 14,567 | 14,561 |
| Capital Employed | 15,487 | 19,590 | 20,262 | 24,578 | 30,962 |
| Fixed Assets (Net block) | 17,200 | 22,639 | 26,804 | 31,769 | 33,390 |









④ OMAX AUTOS LIMITED

## Key Indicators:

| Year ended | | March 2005 | March 2006 | March 2007 | March 2008 | March 2009 |
|---|---|---|---|---|---|---|
| Gross Profit Margin | (%) | 10.85 | 9.78 | 11.02 | 10.09 | 9.62 |
| Net Profit Margin | (%) | 3.97 | 3.42 | 3.38 | 2.17 | 0.65 |
| Export Sales/Net Sales (%) | | 2.91 | 4.53 | 4.40 | 4.67 | 6.25 |
| Debt/Equity | | 0.55 | 0.74 | 0.52 | 0.69 | 1.13 |
| Earning Per Share | (Rs) | 9.94 | 8.84 | 12.17 | 7.53 | 3.17 |
| Dividend Per Share | (Rs) | 2.00 | 2.00 | 2.25 | 1.50 | 1.00 |
| Book Value/Share | (Rs) | 46.67 | 52.70 | 62.34 | 68.11 | 68.08 |



GROSS PROFIT (PBITD)



BOOK VALUE/SHARE



EARNING PER SHARE



GROSS PROFIT MARGIN(%)

OMAX AUTOS LIMITED (5)

# Corporate Profile



Omax Autos Limited was incorporated in 1983 with a vision to emerge as a niche player in Auto Industry and has grown exponentially into truly diversified and globalised corporate entity since then. In the last Twenty-Six years of its existence, the Omax Autos Group has created and executed projects that were a part to touch every walk of life and human endeavor, while setting new benchmarks in quality. Today the Group enjoys a Gross Turnover Rs. 977.32 crores, spanning its horizon and providing fulfilled management. The group enjoys huge reserves of goodwill that has led to some of the biggest names in the corporate world putting their trust in us and constantly strives to provide products and services that enhance the quality of life and work, and to address a gamut of human needs.

OMAX Autos Ltd is in the business of manufacturing auto components. Omax is one of the largest manufacturers of Sheet Metal parts, Machined Tubular, Electroplated & painted components, Welding Facilities with integrated world-class features in India.

With growing opportunities & enhanced experience base Omax Autos has strengthen horizontally. In the last 26 years the company has widened its customer base and products by entering into 4 wheeler industry, producing for central railways and defence and producing home accessories apart from 2 wheeler industry. Not only within the domestic market our footsteps have also left their mark globally through IKEA, TENNECO, PIAGGIO & TOYOTA.

Though the Company has moved towards new frontiers in the last 26 successful years, yet it nourishes old relationships with undying passion and perseverance. With 8 plants as facilities, a strong infrastructure base and enlightened human resource we have reached the zenith of success.

Through continuous and aggressive strategy building and disciplined execution of the same it has been possible to attain high level of growth and experience. The key features of the strategy are –

a) To make major improvements towards customer's satisfaction.

b) To develop a competitive edge - to optimize its cost and move up in value chain.

c) To progress through a strong base laid on in depth research and development.

The Company has also made significantly major changes namely –

a) Applied for in house R&D activity recognition to the Govt. of India, Ministry of Science & Technology, New Delhi. The on site inspection visit has been successful and we expect formal approval letter soon.

b) Actively working on Solar, Hydro, Wind and Gas Energy options and our solar projects have been recommended to centre for approval.

c) With the present scenario of power and fuel, Omax is working on priority for energy efficiency, conservation as well as new & renewable resources of energy.

d) The plant heads in all Omax Plants have taken the challenges to improve efficiency of operations, especially focused to meet the planned product output; Quality gates at critical points in the manufacturing chain; effective PD.I leading to defect free products to the customers.

e) OPS (Omax Production Systems) has been developed by a team consisting of engineers from the plants and Corporate Engineering, to ensure efficiency and effectiveness of total operational aspects and also to ensure uniformity across all the plants of the group.

⑥ O M A X   A U T O S   L I M I T E D

*Vision*

"Highly customer oriented, humane and system run global organisation with a concern for society"

*Mission*

" We are a dedicated, proactive, loyal & accountable group of people with a quest for excellence through latest technology, people empowerment and brand equity to produce world class products by adopting best business practices and ethics."

*IMS Policy*

"In line with our Vision & Mission, we remain committed for total satisfaction of our customers, associates and society at large, through excellence in quality, value for money, on time deliveries and continual improvement. While achieving this, we remain committed to comply with legal and other requirements relating to Environment, Health & Safety, for prevention of pollution, ill-health & injury.

*Core Values*     • Human Dignity • Honesty • Commitment • Sincerity



*Aspiration*

To build a world class Company through reliability and be a great place to work.

Our vision is to make our Company the best in class in whatever we do, globally. The products and services we offer should be comparable to the best in the world, our business process and systems should set benchmark for others. We should earn the respect of our competitors and be loved by our stakeholders.

Our Company should be the most preferred company to work for, for any employee. He should feel like a owner, be able to live his dream, fulfill all his professional goals and enjoy while doing so.

OMAX AUTOS LIMITED ⑦

**Page 9 of 80**

# Achievements & Awards



















.....for such high rated success we have strong infrastructural base

⑧ OMAX AUTOS LIMITED

## Omax Infrastructure



**8** Manufacturing Plants situated across India, which forms the backbone of the structure called "OMAX AUTOS LIMITED".

**10** Facilities including Stamping Facility; CNC Pipe Bending Facility; Welding Facility; Sprocket Facility; Machining Facility; Piston Rod Manufacturing Facility; Tri Nickel Chrome Plating Facility; Tool Room Facility; Induction Hardening Facility and Tube Manufacturing facility.

**30** Main Products that form the vital & significant component and accessories for two wheeler, four wheeler and commercial vehicles. Sheet Metal Component that range in thickness from 0.6mm to 10mm.

**50** Customers / Clients that include OEMs & Tier I Manufacturers, which are Big Brand Names, provided with timely and quality product delivery.

# R&D Centre

To research & develop new products, designs and equipment as well as to focus on better performance by the existing product by cost minimization to the highest level possible

OMAX AUTOS LIMITED ⑨

# Our Strength-Our Employees

"*The* quality of an organization can never exceed the quality of the minds that make it up".

The way a team plays as a whole determines its success. There may be a bunch of individual stars in the sky, but only when put together that it forms a constellation worth a dime.

Omax, as an organization, meets the talent and organizational needs of the widening global corporates by pooling in new talent group, nurturing employees and managing employee relationships. The steps involved in achieving these targets are as follows:

## RECRUITMENT AND TRAINING

We recruit individuals with adequate knowledge and a passion to excel in business based not only on academic excellence but also on a proactive approach.

We have always believed that a sustained focus on technology, systems and human resources, especially at the worker level, holds the key to success. Therefore, at Omax, training needs are identified periodically for various levels and all the new technical recruits are trained in technical training center on welding, pressing machining and other technical fields and then placed in the concerned departments.

## EMPLOYEE ENHANCEMENT THROUGH INVOLVEMENT

The Company encourages employees' feedback for enhancing improvement in process and alignining employee goals with business objectives. It helps in building mutual trust and foster teamwork. At workman level, for example, expansion of canteen facilities with better services, improved telephone services, safe working environment were some of the initiatives taken during the year.

A series of initiatives were taken up at each location to improve employee engagement. These included communications, team building and creation of cross-functional teams to enhance job content, work environment and employee empowerment.

## EMPLOYEE MOTIVATION

We motivate our employees by awarding them with various awards like long-term awards, attendance awards, customer representative winner award... Various recreational activities are conducted for employees and their families, birthday greetings are sent across to the employees, a quarterly magazine is published for and by employees to encourage their creativity and to share their personal and academic excellence which acts as value addition for the company named as Omax Autos Limited "Infomax". This helps in promoting the feeling of oneness.

## HR MISSION

"To promote and sustain the culture of developing world class leaders for value addition in every sphere of original activities while fulfilling employees professional and personal satisfaction."





(10) O M A X   A U T O S   L I M I T E D

PUBLIC DOCUMENT

## Committed to deliver the best













### INDIAN CUSTOMERS (OEMS)

Hero Honda Motors Ltd.
Maruti Udyog Ltd. (Suzuki J.V.)
Honda Motorcycle & Scooters India Pvt. Ltd.
TVS Motors Ltd.
Suzuki Motorcycle Ltd.
New Holland Tractors (India) Pvt. Ltd.
Yamaha Motors India Pvt. Ltd.
Hero Motors Ltd.
International Tractor Ltd.

### INDIAN CUSTOMERS (TIER 1)

Bharat Seats Ltd.
Carraro india Ltd.
Caparo Maruti
Deiphi Automotives
Denso India Ltd.
Gabrial India Ltd.
India-Nippon Electricals Ltd.
Mitsuba Sical India Ltd.
Sundram Clayton Ltd.
IKEA
Honeywell
Toyota (India)

### EUROPEAN CUSTOMERS

Delphi-Spain
Delphi-Poland
Honeywell
Piaggio
Tenneco Automotive-Belgium
Supersprox-Czech

### NORTH AMERICAN CUSTOMERS

Deiphi Automotive Inc. USA
Tenneco Automotive (Maxico)



HERO MOTORS



DENSO

DELPHI
Driving Tomorrow's Technology





Sundaram-Clayton Limited

TENNECO
Automotives

Honeywell

OMAX AUTOS LIMITED (11)

## Parts of Excellence



⑫ OMAX AUTOSS LIMITED

## Metal Houseware Products



OMAX AUTOS LIMITED ⑬

# Message from Managing Director



**Dear Members**

I write to you after the end of one of the most challenging years in my entire career. The story of the financial crisis of last year is well documented and needs no further elaboration. As a consequence of this crisis the impact has been global. People have been affected all over the world.

The auto industry too has been deeply impacted. World giants like GM, Chrysler and Ford have been hit to the point where they are fighting a battle for survival.

Even Toyota has reported losses for the year 2008-09 of USD 4.9 billion against a profit of USD 24.6 billion in the preceding year. Further it has issued a forecast a loss of USD 9.2 billion in 2009-10. Let us remember that Toyota is one of the most respected names in the auto world - especially for its manufacturing and distribution system. That such a stellar organization has been cut so badly is the point that I would like to make.

These are not mere numbers. This harsh reality has translated into a crisis for governments, companies and individuals. People have lost jobs and have seen their life savings being reduced to nothing. Many companies have been wiped out and those that survived are struggling to avert the same disaster.

In India too, we have felt the shock waves of this crisis running through the globe.

We too have felt the pressure in the form of a severe demand contraction, a flight of the US Dollar and a resulting depreciating Rupee, rising interest costs and an evaporation of the export market.

All of these have happened together, without warning and just after one of the best growth years that we had seen. It is hence not surprising to find that companies had expanded their vision to encompass greater ambitions only to find that the tide has turned and that too so suddenly. Acquisitions and mergers which had appeared strategic and which had promised a global launch pad to many Indian companies now appear like dead weight.

**"Yet, there is a silver lining to this story".**

**Shift of Power**

The crisis that has wrecked havoc around the world, has also hit India - but there is a difference.

Nations are now confabulating with a sense of urgency and purpose that has not been witnessed earlier. The reactions are quick. National bankers are responding with policy decisions that are decisive. Even as such, the western hemisphere is reeling and trying to come to terms with reality. This crisis has brought forth issues on regulatory mechanisms and the Government's role in private business. Reports in western newspapers and electronic media abound with disbelief at the level to which the State is participating in private business.

In stark contrast, in India, we have only seen one company which has had to change its management. That too, has happened without government intervention.

Our banks have been impacted but have survived. In the aftermath of this mess, it is clearly visible that companies which have had a domestic focus, have largely been unscathed. This single statistic is of immense importance. There is evidence all around that we in India, have been tested and have survived.

As we look on the domestic front, we find that there are enough opportunities within our country. We are in the process of building a nation and there are tasks to be done. Key infrastructure projects are being prioritized. This will accelerate the process of national growth and at the same time India shall emerge a step ahead in the world equation.

The world balance is shifting and as India grows in self reliance we shall witness, more than before, that India shall lead from the front.

In your company, we too, have been at the receiving end of this changed reality. We have had to deal with a depreciating Rupee, demand contractions on the exports front, reduction in credit facilities by banks, rising interest rates. These events have shaken us but I am happy to say that we have emerged stronger.

Our operational returns have not only been retained but we have also grown against our numbers in the past year. However, increased interest cost, loss on account of foreign exchange etc. has dragged our numbers.

As a strategy, we have been diversifying our product and customer base. As such we have embarked in the area of expanding our product profile to Home Furnishings, Commercial Vehicles and the Indian Railways. Investments for creating manufacturing facilities have been earmarked. These projects were conceived at the high tide of business growth and we have ensured that these investments have been muted down in tune with the changed reality of the market place.

**Prudence over Ambition**

The other major change that this crisis has brought about world wide is the total shift in perception of risk - from being adventure driven to being totally risk averse.

Almost all the businesses that have survived grudgingly acknowledge that this slow down is actually healthy - it has brought back rationality in the thinking process.

We, at Omax Autos, have always valued prudence over ambition and growth has always been achieved with caution.

We, therefore, are facing consequences of the business impact and marginal costs of misplaced ambitions. Interest cost increase and a reduction in the demands of Commercial Vehicles and Export products represents the business fluctuations. There is a marginal increase in debt, reflecting investments in new ventures which are commensurate to the size and scale of our operations. All our investments continue to remain relevant. We continue to work a significant portion of our assets to capacity.

We have been looking internally to see where we too can cut waste and ensure that the design for efficient working gets embedded deep within our corporate DNA.

**Performance of the Company**

At the operations level the company has posted a top line and EBIDTA levels in excess of last year. I am sure that the significance of this has not been lost to our Members. Turnover grew by 13% and EBIDTA by 8% over the corresponding period last year. During the year customers drove aggressive price reduction programs and Omax Autos was able to maintain its margin on account of quick cost cuts, re-negotiations with vendors, alternative procurement strategies and engaging our people at all levels of operations.

A significantly larger interest cost has impacted the bottom line. An additional cost of Rs 12.8 crores over the last year has eaten into the bottom line - which includes a Foreign Exchange loss of Rs 3.76 Cr. Going forward - the interest rates have eased up and also as the loans would get repaid, we would shake off this yoke.

As per the policy directions received from the Board of Directors - the Company has pursued the policy of building self reliance and steadily increasing the product and customer base.

The investments in the R&D Facility are now mature and yielding results. We are now not only capable of managing diversified design requirements generated because of our growing product profile, but also are offering these services in the open market.

Our R&D facility dedicated to address the needs of our tool and die design is a significant step in this direction. Along with this, we have invested in separate lines for Ikea Home Furnishings and for the supply to the Railways. Besides this, the Company has also gone ahead with the investments in setting up facility for manufacturing parts for Commercial Vehicles at Lucknow, Plant for Railways at Kapurthala and Home Furnishing Division at Bawal.

These projects are in various stages of completion and have been pruned to meet the size of current operations.

**Two Wheelers**

The consistently growing performance of Hero Honda is a matter of great collective pride. I am sure that in times to come this story would be researched by Management Gurus and Corporate Pundits to decipher the "formula" which makes Hero Honda work.

To meet the growing demands of Hero Honda and other two wheeler customers, the Company has been augmenting capacity in existing lines as also adding additional equipments.

Specific emphasis is being given to setting up warehousing facilities for Hero Honda to ensure JIT supplies. Apart from this various projects of automation are being taken up to meet the increasing demand of Hero Honda.

**Home Furnishing**

The collective wisdom of almost all economic pundits is that the Indian middle class is a giant waking up from its slumber. Various scenarios have been projected for future growth. Even in the year gone by, the growth rates have been upward of 6 - 7% GDP. This is very potent, especially if we project this into the future even for 4 to 5 years.

The demand and growth, would unleash a very favorable impact on all aspects of business and economy especially to

OMAX AUTOS LIMITED ⑮

our investments in the Home Furnishing business. The muscle gained by understanding the Home Furnishing business world wide would make us stand tall in great stead as the Indian market opens up.

Keeping this in mind and also to cater to the export market, the Company has made a foray into the Home Furnishings segment. The strategy has been to tie up with the biggest international brand - Ikea. This would inculcate the desired level of quality, delivery and cost awareness within the Company. The Company has started exports of various items under this division. We are putting up a new 10 Acre plant facility at Bawal, Haryana. This plant will be operational in the 3rd quarter of FY 09-10.

### Commercial Vehicles & Other Projects

The Government's renewed commitment to spending on infrastructure would ensure that as the Indian economy gets into the upper gear, the goods transportation across the country would pick up too. With this, the demand for commercial vehicles/ buses and trucks too would pick up.

Our investment in the new facilities at Lucknow is aimed at this segment of the market. Currently, this investment has been pruned to the business requirement - with the flexibility of expansion.

The investment in projects for the Indian Railways too is another step in this direction. With renewed focus on the railways in the present Budget tabled by the Government, it is a matter of time that these opportunities open up to your Company. We are also in the process of commissioning of a new plant for Rail Coach Factory at Kapurthala (Punjab).

Our investment in infrastructure and backed by R&D facilities ensures that we are in the right position to exploit the opportunity as it comes up.

### Future Outlook

The principal customers of the Company - Hero Honda has shown volume expansion even as world over volumes have shrunk for all auto companies. This factor has helped the Company weather the current storm.

Going forward, we look towards greater operational efficiency and managing costs better.

With current investments in place, and as the economy shows signs of lifting up, we are prepared to reap the benefits of the take off.

I am quite confident that Omax will emerge as a much stronger player in the years to come.

I thank you all.

Jatender Mehta
Managing Director
Omax Autos Ltd.

(16)  O M A X   A U T O S   L I M I T E D

Notice is hereby given that the **TWENTY SIXTH** Annual General Meeting of the Members of **OMAX AUTOS LIMITED** will be held at the Registered Office of the Company at 69 Km. Stone, Delhi Jaipur Highway, Dharuhera, Distt. Rewari, Haryana on Wednesday the 30th day of September 2009 at 11:00 A.M. to transact the following business:

**ORDINARY BUSINESS:**

1. To receive, consider and adopt the Audited Balance Sheet of the Company as at 31st March, 2009 and Profit & Loss Account for the year ended on that date together with the reports of Auditors and Directors thereon.

2. To declare dividend for the year.

3. To appoint a Director in place of, Mr. Salil Bhandari, who retires by rotation, and being eligible offers himself for reappointment.

4. To appoint a Director in place of Dr. R. C. Vaish, who retires by rotation, and   being eligible offers himself for reappointment.

5. To appoint a Director in place of Dr. T. N. Kapoor, who retires by rotation, and being eligible offers himself for reappointment.

6. To appoint Auditors from the conclusion of this Annual General Meeting till the conclusion of the next Annual General Meeting and to fix their remuneration.

By order of the Board of Directors
For **Omax Autos Limited**

**(V. K. Gupta)**
Place: New Delhi            Executive Director-Commercial
Date: 25.07.2009           Cum Company Secretary

**NOTES:**

1. **A MEMBER ENTITLED TO ATTEND AND VOTE AT THE MEETING IS ALSO ENTITLED TO APPOINT A PROXY TO ATTEND AND VOTE AT THE MEETING INSTEAD OF HIMSELF/HERSELF AND THE PROXY NEED NOT BE A MEMBER OF THE COMPANY. PROXIES IN ORDER TO BE EFFECTIVE, THE INSTRUMENT OF APPOINTING PROXIES SHALL BE DEPOSITED AT THE REGISTERED OFFICE OF THE COMPANY NOT LESS THAN 48 (FORTY EIGHT) HOURS BEFORE THE COMMENCEMENT OF THE MEETING.**

2. The Register of Members and Share Transfer Books of the Company will remain closed from 25th day of September 2009 to 30th day of September 2009 (both days inclusive).

3. The payment of dividend, upon declaration by the shareholders at the ensuing annual general meeting, will be made on or before 29th day of October 2009

   A) To all those beneficial owners holding shares in electronic form as per the beneficial ownership data as may be made available to the company by National Securities Depository Limited (NSDL) and the Central Depository Services Limited

   (CDSL) as on 24th day of September 2009 after closing of business hours.

   B) To all those shareholders holding shares in physical form after giving effect to all the valid share transfers lodged with the company on or before 24th day of September 2009 before closing hours.

4. Members who have not encashed their dividend warrants may approach the Registrar and Transfer Agent of the company for claiming unclaimed dividend, as the amount of dividend remaining unpaid for a period of seven years from the date of declaration shall be transferred to Investor Education & Protection Fund (IEPF) as per the provisions of section 205A and 205C of the Companies Act, 1956. It may be noted that once the unclaimed dividend is transferred to the IEPF as above, no claim shall lie in respect thereof.

| F.Y. Ended | Date of Declaration of Dividend | Last Date for Claim |
|---|---|---|
| 2002-03 | 26.12.2003 | 25.12.2010 |
| 2003-04 | 30.11.2004 | 29.11.2011 |
| 2004-05 | 19.09.2005 | 18.09.2012 |
| 2005-06 | 26.09.2006 | 25.09.2013 |
| 2006-07 | 28.09.2007 | 27.09.2014 |
| 2007-08 | 30.09.2008 | 29.09.2015 |

The unclaimed dividend for the year ended 31.03.2001 has been transferred to IEPF and for the year ended 31.03.2002 is in process to transfer.

5. Members are advised to avail the facility for receipt of future dividends through Electronic Clearing Service (ECS). The ECS facility is available at the specified locations. Members holding shares in dematerialized form are requested to contact their respective Depository participants (DPs) for availing ECS facility. Members holding shares in physical form and desirous of availing ECS facility are requested to write to Registrar & Transfer Agent of the company for details. A copy of ECS mandate form is enclosed.

6. Pursuant to the provisions of Section 109A of the Companies Act, 1956, every shareholder or joint holders may nominate, in the prescribed manner, a person to whom all the rights in the shares vest in the event of the death of the sole holder or all joint holders. A nomination form is enclosed for shareholders holding shares in physical form. Members holding shares in electronic form may contact their respective depository participant for availing this facility.

7. Members holding shares in dematerialized mode are requested to intimate all changes with respect to their bank details, ECS mandate, nomination, change of address, change in name etc. to their depository participant (DP). Members holding shares in physical form are requested to intimate the above said changes to the company's Registrar & Transfer Agent.

8. Members are requested to send their queries, if any, at least 10 days in advance of the meeting, so that the information can be made available at the meeting.

9.  All documents referred to in the accompanying Notice are open for inspection at the Registered Office of the Company during office hours on all working days, between 11:00 a.m. to 1:00 p.m., upto the date of the Annual General Meeting.

10. Bank Account Details: In order to avoid fraudulent encashment of Dividend Warrant(s), members are advised to inform details of their A/c no., name and address of the bank, for incorporating the same in Dividend Warrant.

11. Members/Proxies are required to bring their duly filled attendance slip in the meeting. Members holding the shares in electronic form are requested to bring their DP-ID Number and Client-ID Number for identification.

12. Members are requested to bring their copy of the Annual Report to the Meeting.

13. Members who have not got their shareholding dematerialised are advised in their own interest to get their holdings dematerialised.

**ANNEXURE TO NOTICE**

**1. DETAILS OF DIRECTORS SEEKING APPOINTMENT/ REAPPOINTMENT AT THE FORTHCOMING ANNUAL GENERAL MEETING**

**(In pursuance to clause 49 of the Listing Agreement)**

Brief resume of the Directors seeking appointment/re-appointment in the 26th Annual General Meeting to be held on 30th day of September 2009:

**MR. SALIL BHANDARI**

Mr. Salil Bhandari, aged 50 years, is a professional and is on the Board of the company since August 1999. Being a Fellow Member of "The Institute of Chartered Accountants of India", Mr. Salil Bhandari has acquired a vast professional experience in the field of Financial Management.

Details of Directorships and Committee Membership/ Chairmanship held by Mr. Salil Bhandari are as follows:

| Directorship | Committee | Member/Chairman |
|---|---|---|
| Omax Autos Limited | Audit Committee | Chairman |
| | Shareholders'/ Investors' Grievance Committee | Member |
| Ginni International Ltd. | Shareholders'/ Investors' Grievance Committee | Member |
| BSL Ltd. | – | |
| Syenergy Environics Ltd. | – | |
| Bhilwara Energy Ltd. | – | |
| Ginni Global Ltd. | Audit Committee | Member |
| Integrated Outsourcing Solutions Pvt. Ltd. | – | |
| Adishree Chemicals & Fertilizers Pvt. Ltd. | – | |

| | | |
|---|---|---|
| Spectrum Credit & Investment Co. (P) Ltd. | – | – |
| Cerebrus Education & Studies Pvt. Ltd. | – | – |

Mr. Salil Bhandari holds 5670 equity shares of Rs. 10 each of the Company. He is not related to any other director on the Board of the Company.

**DR. R. C. VAISH**

Dr. R. C. Vaish, 68 years old and dynamic professional. Being a fellow Member of "The Institute of Chartered Accountants of India", Dr. Vaish has a wide experience in the field of Taxation.

Dr. R. C. Vaish joined the Company's Board during June 1995.

Details of Directorships and Committee Membership/ Chairmanship held by Dr. R. C. Vaish are as follows:

| Directorship | Committee | Member/Chairman |
|---|---|---|
| Omax Autos Limited | Audit Committee | Member |
| Ansal Properties & Infrastructure Ltd. | Audit Committee | Member |
| Express News Papers Ltd. | – | – |
| Jaiprakash Hydropower Ltd. | – | – |
| OCL India Ltd. | – | – |
| Bharat Consultants Private Ltd. | – | – |

Dr. R. C. Vaish does not hold any equity shares of the Company. He is not related to any other director on the Board of the Company.

**DR. T.N. KAPOOR**

Dr. T. N. Kapoor aged 77 years holds a Degree in Law and doctorate in commerce. An eminent management advisor and educationalist of over 40 years standing, he possesses a diverse and wide ranging experience and knowledge of corporate affairs having been associated as independent/ non-executive/nominee director with several well known public limited companies for past over 30 years. Dr. Kapoor also held various responsible positions with the Punjab University, Chandigarh including the prestigious position of Vice Chancellor during 1991-1997. He has also been involved with several Educational, professional associations and management institutes at Governing Board/Council level that include International Association of Universities Paris, IIM-Bangalore, IIM-Calcutta, All India Management Association New Delhi, MDI Gurgaon, LBSIM Delhi, IIPA-New Delhi & IAMR-New Delhi.

Dr. T. N. Kapoor has been associated with the Company as a Director since 1986. His presence in the Board has helped the Company immensely because of his vast and varied experience in corporate management, Finance and Human Resource Management.

Details of Directorships and Committee Membership/Chairmanship held by Dr. T. N. Kapoor are as follows:

| Directorship | Committee | Member/Chairman |
|---|---|---|
| Omax Autos Limited | Audit Committee | Member |
| | Shareholders and Investors Grievance Committee | Chairman |
| Vardhman Textiles Ltd. | Shareholders'/ Investors Grievance Committee | Chairman |
| Swaraj Engines Ltd. | Shareholders'/ Investors Grievance Committee | Chairman |
| | Audit Committee | Member |
| Modern Steels Ltd. | Shareholders'/ Investors Grievance Committee | Member |
| | Audit Committee | Member |
| Sterling Tools Ltd. | Shareholders'/ Investors Grievance Committee | Chairman |
| | Audit Committee | Member |
| KDDL Ltd. | Audit Committee | Chairman |
| Haryana Telecom Ltd. | – | – |

Dr. T. N. Kapoor does not hold any equity shares in the company. He is not related to any other director on the Board of the Company.

By Order of the Board of Directors
For **OMAX AUTOS LIMITED**

**(V. K. GUPTA)**
Executive Director-Commercial
cum Company Secretary

Place: New Delhi
Date: 25.07.2009

**20** Management Discussion and Analysis

## ECONOMIC SLOWDOWN

The calendar year 2008 began with bad news. By the time the fiscal year 2008-09 began American financial institutions began to fall apart and the situation had spun out of control dragging the major economies of America and Europe into recession. The panic had shot to a level where international banks were tottering. Liquidity evaporated and the risk perceptions changed dramatically.

So huge was the impact that the entire developed world converged in thought process. All the Central Bankers of the EU and America took on the mantle of managing fiscal policy on a daily basis. This saw governments backing in pumping of liquidity into the systems.

Where as the long term impact of all these measures is debatable - in the short term there appears to have been a containment of the crisis.

Reports of "Standard & Poor's" released in May 09 have indicated that - "The most recent statistical releases confirm that the world economy remained mired in a deep recession for the first quarter of the year. There is mounting evidence, however, that the first quarter may prove to be the low point of the downturn. Forward looking indicators suggest that economic activity is now stabilizing thanks to the effect of the considerable stimulus arising from the easing in monetary and fiscal policy in Europe and worldwide, and past falls in commodity prices".

This report goes on to state that the forecast for the Euro zone for the current year has been trimmed down to a negative growth of 4.2%.

In India too we have felt the tremor of the financial shock being felt worldwide. The Indian economy's growth forecast of 7.1% for FY09 represents the lowest growth rate for the last 6 years. The value of the Indian rupee weakened and declined by 28% from Rs 40/USD in April'08 to Rs 51/USD in March'09. The exports also stood at USD 169bn, which is short of the commerce ministry's revised target of USD 175bn and significantly lower than the initial target of USD 200bn.

The decline of inflation from 12.91% in Aug 08 to 0.26% in Mar'09 has raised fears of deflation. CRISIL in its report of May' 09 states that while the Indian economy may be negative inflation, the chances of deflation do not exist. In a broad spectrum analysis based on the IMF guidelines for measuring deflation, it has been concluded that the possibility of a deflation is remote.

### Effects on the Automotive Industry

An economic slowdown hits the non-core industries easily. The automotive industry has been badly hit by this economic slowdown, globally.

The severity of the crisis got magnified on account of the fact that it happened on the back of a economic upswing which lasted for almost 6 years in a row. This growth had given rise to a risk appetite which grew enormously - throwing caution to the wind. The mood had become bullish on every investment. Acquisitions and mergers were undertaken far in excess of ability and based on vanity.

The expansions and futuristic planning world over saw huge capacity build ups in anticipation of increased demands.

With the severity of the downturn it did not take long for panic to set in. Cash evaporated and the ensuing liquidity crunch saw the cost of capital sky rocket. All expansions funded by borrowing started hurting on two accounts - firstly on account of the cost of capital and secondly on account of no demand.

However, the picture is slightly different in the Indian automotive market. Our industry is not export-dependent. In terms of value, only 15-20% of the Indian market is accounted by exports. Therefore, fortunately the economic slowdown in the West has had a limited impact on our industry.

The two-wheelers account for 75% of the domestic market. This demand comes from the rural and semi-urban market. Fortunately, due to good monsoon and good agricultural yield, the purchase capacity in this market was sustained.

The auto industry will take at least two years to see the kind of growth it was witnessing till recently. While the domestic growth will provide the base, the accelerated growth will come through investments. The global auto industry will again relocate itself, as it needs cost-effective infrastructure and manpower.

### The Automotive Industry

The auto industry of India has notched up an impressive growth rate in the recent years. The automobile industry has continued to follow the path of growth especially the two-wheeler segment that accounts more than 75% of the total market share of vehicles by volume. Though the two-wheeler industry has faced revival, it would be interesting to see the developments in this industry as the years roll on.

The automobile industry has posted robust sales figures for the last three months. The yearly segment wise growth is as under:

- The two-wheeler segment as a whole grew by 4.62% during 2008-09.

- The passenger vehicles saw a growth of 6.75%, during 2008-09 over 2007-08.

- However, the Commercial vehicle segment declined by 22.33 % during 2008-09. The M&HCVs segment declined by 32.45% and LCVs recorded a negative growth of 11.23%.

The two-wheeler segment of the auto industry to which your Company is a major supplier had just a marginal growth during 2008-09.

### GOVERNMENT INITIATIVES

The auto industry's concern saw quick action by the Union Government. Various sops have been announced for the auto industry. Some of these are

– Reduction of excise duty by 4% on all vehicles and reduced excise duty to 8% from 10% on commercial vehicles and auto parts.

– Reduction in Central Sales Tax from 3% to 2%

– Introduction of GST from April 2010.

– Setting up of special institutions to promote skill development.

OMAX AUTOS LIMITED

– Automatic approval for foreign equity investment up to 100% for the manufacture of auto components.

– Manufacturing and imports in this sector are free from licensing and approvals.

– No local content regulation in the auto industry.

– Reduction in the duty of raw materials

– Setting up of the National Automotive Testing and R&D Infrastructure Project (NATRIP).

– Finalization of the Automotive Mission Plan (AMP) 2006-2016.

The government has also been working with the RBI & the auto industry to bring out guidelines which will help end the ambiguity regarding recovery and repossession of vehicles.

With all this, the two-wheeler industry was able to achieve a record production of nearly 8.4 million two-wheelers during the year 2008-09 and thus grew by 4.62%

## MARKETS AND CUSTOMERS

The severity of the squeeze of 2008-09 is for everyone to see. Markets have shrunk and there is pressure on all economies to manage this crisis.

In the auto segment the situation in India has been as follows:

| Particulars | Apr-March 2008-09 | Apr-March 2007-08 | % Gr. |
|---|---|---|---|
| | (Quantity in Nos - Lacs) | | |
| I Two wheelers | | | |
| Scooter | 11.71 | 10.75 | 8.93 |
| Motorcycles | 68.06 | 65.44 | 4.00 |
| Mopeds | 4.38 | 4.31 | 1.62 |
| Electric Two Wheelers | 0.25 | 0.17 | 47.06 |
| Total Two Wheelers | 84.40 | 80.67 | 4.62 |
| II Passenger Vehicles | | | |
| Passenger Cars | 15.51 | 14.14 | 9.69 |
| SUVs | 2.28 | 2.51 | -9.16 |
| MPVs | 1.07 | 1.01 | 5.94 |
| Total Passenger Vehicles | 18.86 | 17.66 | 6.79 |
| III Commercial Vehicles | | | |
| M&HCVs | | | |
| Passenger Carriers | 0.42 | 0.48 | -12.50 |
| Goods Carriers | 1.57 | 2.48 | -36.69 |
| Total M&HCVs | 1.99 | 2.96 | -32.77 |
| LCVs | | | |
| Passenger Carriers | 0.32 | 0.34 | -5.88 |
| Goods Carriers | 1.94 | 2.18 | -11.00 |
| Total LCVs | 2.26 | 2.52 | -10.31 |
| Total CVs | 4.25 | 5.48 | -22.44 |
| IV Three Wheelers | | | |
| Passenger Carrier | 4.15 | 3.75 | 10.66 |
| Goods Carrier | 0.82 | 1.30 | -36.92 |
| Total | 4.97 | 5.05 | -1.58 |

Source: ACMA Website

As is clearly visible the Indian passenger car and two wheeler industry has actually grown even in the worst financial year globally.

| International Auto Companies | 08-09 | 07-08 | Increase/ Decrease |
|---|---|---|---|
| | (Quantity in Nos - Lacs) | | |
| Ford - (Data for Calendar Year) | 11.38 | 16.43 | -30.74% |
| GM - (Data for Calendar Year) | 83.55 | 93.70 | -10.83% |
| Chrysler | 19.01 | 21.32 | -10.84% |
| Toyota | 75.67 | 89.13 | -15.10% |

Source: Annual Reports

In stark comparison world over, leading car makers have suffered volume losses in double digits across almost all the geographies.

This is a telling statistic and bears hope that we in India are seeing the emergence of a different economic reality that is built on self sufficiency. There are enough opportunities within our country to see that we are able to look at the future with hope.

As the challenge of infrastructure is addressed the economic activity would flow and reach into the far corners of this nation. This would spur growth and sustainability.

### Exports of Auto Components

Steered by the country's high engineering skills, established production lines, a thriving domestic automobile industry and competitive costs, global auto majors are rapidly ramping up the value of components they source from India. According to the Automotive Component Manufactures Association of India, more than one third (36%) of Indian auto component exports head for Europe with North America a close second at 26%.

India enjoys a cost advantage with regard to castings and forgings. The manufacturing costs in India are 25 to 30 per cent lower than its western counterparts. India's competitive advantage does not come from costs alone, but from its full service supply capability.

### OUTLOOK - Automotive Component Industry

The world's top car makers turn to India for the nuts and bolts of their vehicles. Riding this success and capitalizing on the spiraling demand of domestic auto companies, the Indian automobile components industry has emerged as one of India's fastest growing manufacturing sectors, and a globally competitive one.

The Indian auto component industry is likely to almost double to 18.48 billion USD by 2009 and reach about 39.52 billion USD by 2012. Its globally competitive component-manufacturing sector has been much in demand with global auto majors. A number of them source critical components from India, like- engine parts, drive transmission and steering parts, body and chassis, suspensions and breaking parts, equipment, electrical parts and lots more.

Around 500 key players dominate the auto components industry in India, which contribute to more than 85% of India's production. Some of the largest Auto industries are scaling up from producing individual components to making assemblies and systems, as automobile makers seek to manage fewer vendors and trim costs.

OMAX AUTOS LIMITED

## The Coming Decade

The Auto Components Manufacturers Association (ACMA) - has also felt the need for instituting a study on the potential of demand growth within the country in the next decade. The principal thoughts under consideration are that the Indian Economy is slated to have a growth rate of about 6 - 7% . If the current auto numbers are projected for another decade with these growth rates, the resulting volumes would provide a very healthy opportunity for companies which are already established players.

As the market consolidates and the global recovery happens the international players would find a renewed appetite for sourcing from India. The launch of many small cars in the price sensitive bracket has already spawned a component manufacturing base. This base would be a viable source for supply world wide.

Besides this, the Indian Component manufacturers are not new comers in the field of exports. Over the past decade, component manufacturers have established supplies into the western markets. So much so that almost all international OEMs already have their sourcing offices located in India. The current market intelligence on the potential in India is already available with the international community. Since international OEMs are also facing acute financial challenges they would be constrained to look at the opportunity with Indian Component suppliers present.

Most Indian component manufacturers have already established capacities. These companies have been able to bear the brunt of rising interest costs and an evaporation of exports to a varying degree. There is a lot of challenge in managing costs for most companies - but in comparison to our counterparts in other parts of the world we look to the future with hope.

## BUSINESS SCENARIO AT OMAX AUTOS

The past year has been characterized by the following challenges:

- Acute financial squeeze. The costs of interests have shot up  and liquidity evaporated
- Non Renewal of export orders in the four wheeler segment
- The depreciation of Rupee.
- Commodity prices have eased up after escalating for the first two quarters

At Omax Autos, we too had to deal with the challenges of the rapid change and the new realities as they have emerged.

The new reality which this changed environment presented was sudden. Your Company has been tested during these times and has emerged successful.

Though the cost of borrowing did shoot up Omax continues to be able to manage its liquidity position. We enjoy a healthy relationship with our bankers.

The exports in four wheeler segment have been impacted primarily due to lower demand of Big four Auto Players in the world which in turn have reduced the demand of their vendors in principal. In the past year the orders from these customers had dried up. However, the new line of business

that the Company has initiated with Ikea is stable. This product line is in its infancy and as the Indian economy picks up this would be a key line of business.

## The Significant Aspects of the Manufacturing at Omax Autos

- Amongst the top three companies in sheet metal and tubular segment - (Process 85k Tons Steel p.a.)
- Largest Sprocket manufacturing capacity (11 Million p.a.) in South East Asia.
- Largest Tri Nickel Chrome Plating facility (120 Million DM Sq.)
- Largest welding facility in India with 800 machines (100 Km welding capacity per day)
- 7 Manufacturing Plants - located across the country.
- Land Area - 204,000 Mts Sq and Covered Area - 100,600 Mts Sq
- Composite solution provider to customer requirement

The Process Capability at Omax Autos is:

- Designing
- Stamping
- Tubular Forming
- Machined Parts - Sprockets/ Piston Rods/ Oil
- Welding - MIG/ TIG/ SPOT/ ROBO
- Painting & Tri Nickel Chrome Plating/ED Painting
- Supporting infrastructure - Met Labs
- World Class Tool room and R&D Centre

With this band width, the Company is positioned as a total solution provider.

## Operations and Margin

## Materials



CRC Sheet

The commodity pricing of most of the products started shooting up as the year began. This created an immense challenge. All the major inputs like - Steel Sheets, Nickel, Steel Bars, Mig wire followed this trend. Procurement of materials became the key to sustenance as OEMs did not want to participate in totality with the increasing prices.

After the second quarter prices started easing up. By this time, the global meltdown had started and all OEMs started feeling the heat of the pressure in the market. As a



Steel Bars

consequence, the Company had to pass on the entire price reduction to the customers.

At Omax Autos, we were able to manage the challenge of such a volatile market - through a marginal erosion in profitability.

**Power**

The cost of power has come down on account of reduction in the fuel prices and the resulting diesel price reduction by the government in the second half of this year.

Given the scale of operations of the company and the growing needs of power, the company has taken concerted efforts to bring down the per unit cost of power. In this line the company is investing in Gas based generation and is working towards getting piped gas lines brought to the plants. As soon as this gets operational the per unit cost of power would be reduced.

Diesel

**Interest and Borrowing Costs**

As the year began, the interest rates started hardening. Gradually, as the economic crisis unfolded the cost of capital started increasing and liquidity came under a severe crisis. During this period your company had to borrow at peak rates of 16%.

The policy of prudence and cash management developed over the years helped the company to overcome this period. The company was able to re align its working capital and used its cash reserves to bring down borrowing. This strength of the company also helped in getting better rates. Over all, the interest and financial cost of the year was higher by Rs 12.84 Cr.

**Growing Up the Value Chain**

The Indian component suppliers have displayed a growing capability to cater to the engineering and production needs

of some of the world's biggest auto companies.

This is largely due to:

– Proficiency in understanding technical drawings and being well versed in all global automotive standards: American, Japanese, Korean and European.

– Appropriate automation leading to economically attractive production costs

– Flexibility in small batch production

– Growing IT capability for design, development and simulation.

Exciting times lie ahead for the Indian automotive component industry. India is a large market for automobiles. Not only do we have infrastructure and manpower but are also a promising future market. The middle class is growing fast and according to estimates, it is expected to add up 450 million people by 2020. This is the class that will buy cars and two-wheelers. India thus has a demographic dividend

**Hero Honda**

During the past year Hero Honda supplies have been kept under a special focus. Omax Autos is undertaking various initiatives to ensure supply efficiency to Hero Honda. These actions include:

• Setting up of dedicated warehousing facilities: The large requirements at various manufacturing locations, needs us to look at logistics from a complete customer satisfaction perspective. In order to achieve this and execute production scheduling with greater efficiency, we are contemplating an intermediate stock location.

• Investing in advanced automation and robotics for various operations: Many projects have been initiated to robotize the manufacturing lines which supply components to Hero Honda. This would enable the company to meet the demands in the most cost effective manner.

• Customer contact program to ensure that the customer voice is spread across the organization: We have taken steps to carry customer impressions and expectations to the entire organization. Customer opinions and views are captured and through special screening sessions, all the employees at Omax Autos have been mandated to view these programs.

**Commercial Vehicles Component Manufacturing facility:**

The company has set up a dedicated facility for component manufacturing for Commercial Vehicles at Lucknow. This facility is primarily for the supply to Tata Motors. Due to the slow down in the past year, work on this facility was also delayed. Presently, this facility is getting ready for commercial operation within current financial year. This investment is a step toward diversification of the company. As the markets start looking up, Omax Autos would be ready to reap the benefits of this investment.

**Railways**

As you are aware, your Company is now a registered

OMAX AUTOS LIMITED

supplier of the Indian Railways. The Company has obtained the technology to manufacture the Green Toilet from Defence Research Development Organization (DRDO), Ministry Of Defence. Based upon this technology, the company has successfully developed the Green Toilet and got it approved from the Indian Railways. Omax Autos is making a serious inroad into this business segment. This would increase the product profile of the company and also spread the business risk. The company is in the process of setting up dedicated facilities for this segment of the business.

## OPPORTUNITIES

The first Quarter of the current fiscal year has begun with hope. We are seeing better numbers in the auto market and the interest costs have come down too. At Omax Autos, we are servicing a large basket of Indian Auto companies. As the market picks up, we are positioned to take advantage of this growth.

With the focus on infrastructure spending by the government, there is a potential for growth within the auto industry in the medium terms. Your company has investments, manufacturing strength and the relationships to take advantage of this market turn.

Also, Omax Autos has made significant diversification into the Indian Railways and Home Furnishings. Each of these lines would create opportunities in the near future. The company has the resources to exploit these avenues as the opportunities arrive.

The year 2008-09 has witnessed threats as hike in interest rates, inflation depreciation of rupee, price rise of raw material and non-renewal of export orders in the four wheeler segment. The FTAs (Free Trade Agreements) and RTAs (Regional Trade Agreements) signed with China and ASEAN countries are arguably in their favour. Trade agreements signed with countries like Thailand and China which already offer a number of incentives to their domestic players, are perceived to be a huge threat to India. The industry is facing about 18-20% cost disadvantage in the form of increasing raw material costs, power costs, higher taxation, infrastructure costs, etc. when compared to China and Thailand. With the increasing input costs and automobile designs getting changed frequently, components manufacturers are required to constantly invest to upgrade themselves and to add value.

## RISKS AND CONCERNS:

The two wheeler segment performed a little better, whereas, performance of commercial vehicles during the year 2008-09 is negative.  Due to worldwide recession and the position of General Motors, Ford Toyota, the overall export potential for the auto industry is bad.

Component manufacturing remains one of the most price sensitive businesses. The auto majors are still facing pressures in the market place and would continue to exert such pressures on their suppliers. This has the direct impact of eroding bottom lines of the company.

The commodity prices too are not in control of the company. Any increase in input costs which are not passed on to customers has the risk of affecting the company.

The company is also exposed to interest rate variations on account of the borrowings. Any diverse interest rate movement has a significant impact on the company.

For the export markets, the company would be impacted by any further deterioration of the global economic environment. Apart from the exports the company is also exposed to currency fluctuations.

Though the company is optimistic on the Indian economic environment, any negative impact on the economy would have a direct impact on the company. The projections of the company are based on estimations and past experience. This might not hold true for the future.

Finally your company is significantly dependant on Hero Honda Motors Ltd and would be directly impacted by any developments at Hero Honda Motors Ltd.

## INTERNAL CONTROL SYSTEM AND THEIR ADEQUACY

The Company has intact the required internal control system and procedures, to ensure optimal use of Company's resources. The Company's internal audit department conducts regular audit of various operational and financial matters to derive findings as a comparison for targets achieved and observations for further action to be taken. The audit committee of the board of directors periodically requires the audit observations.

The internal control system is designed to ensure that all the financial and other records are reliable and authentic to prepare the financial statements and other data.

The internal control system is also designed to ensure that resources available with the Company are used adequately and the roles and responsibility assigned to each department has been accomplished in an optimum manner.

## HUMAN RESOURCE

Human Resource remain the most valuable asset of Omax Autos Ltd. The turbulence of the economic crisis of the past year has tested our people and their contribution is visible. People at all levels have displayed a sense of ownership and accountability which has ensured that we have been able to go past this crisis with minimum damage.

Each manufacturing location has competent leadership and has been steering improvement and cost cutting projects. Apart from this, a great emphasis has been laid on customer expectation management.

The company's human resource management systems are focused towards creating an environment of cost responsiveness and customer centricity. The paradigm is to develop an overall culture of Responsibility with Accountability.

Periodic skill based and managerial training is imparted at all levels in the organization. Ongoing trainings on TPM are a routine.

This holistic approach towards human resource development has ensured that there is a pro active involvement at all levels in finding solutions to improve processes, create a greater value for the customer, cut costs and ensure transparent operations.

## FINANCIAL PERFORMANCE AND ANALYSIS

Rs. In Lacs

| Abridged Profit and loss statement | Current Year 2008-09 | Previous Year 2007-08 |
|---|---|---|
| Gross sales & Other Income | 97733.33 | 88104.41 |
| Excise Duty & Sales Tax | 14659.77 | 15058.94 |
| **Net Sales** | **83073.56** | **73045.47** |
| Raw Materials and Components | 59590.26 | 51175.26 |
| Manufacturing Expenses | 4857.75 | 4676.36 |
| Employee Cost | 7819.77 | 7432.12 |
| Other Expenses | 2814.61 | 2393.81 |
| **Total Expenses** | **75082.39** | **65677.55** |
| **PBIDT** | **7991.17** | **7367.92** |
| Depreciation and Amortization | 2849.83 | 2676.68 |
| **PBIT** | **5141.34** | **4691.24** |
| Interest | 4238.84 | 2954.67 |
| **PBT** | **902.50** | **1736.57** |
| Exceptional Income | – | 621.19 |
| PBT (after exceptional Income) | 902.50 | 2357.76 |
| Current Tax | 352.86 | 670.44 |
| Deffered Tax | 6.99 | 103.35 |
| **PAT** | **542.65** | **1583.97** |
| Net Worth | 14561.15 | 14567.36 |
| Earning per share EPS in Rs. | 3.17 | 7.53 |

The net sales and other income of the Company for the year under review increased to Rs. 83073.56 lacs as compared to Rs. 73045.47 lacs in the previous financial period, registering a growth of 13.73% on an annualized basis. The profit before interest, depreciation and tax of the Company increased by 8.46% on an annualized basis from Rs. 7367.92 lacs in the previous period to Rs. 7991.17 lacs in the year under review. The net profit before exceptional income has decreased by 48.03% to Rs. 902.50 lacs. The reason for decrease in net profit of the Company is increase in financial cost that has gone up by 43.46% to Rs. 4238.84 lacs as compared to Rs. 2954.67 lacs in the previous year, this was primarily on account of increase in interest rates ,overall liquidity crunch over the world and depreciation in rupee.

During the year under review, export revenues (including deemed exports revenue) have shot up to Rs. 5193.26 lacs against Rs. 3408.05 lacs in the previous year i.e. increased by 52.38% on an annualized basis.

During the current financial year Company expect substantial increase in profit due to reduction in financial cost as interest rates are falling gradually, cost saving on account of power and value engineering, starting of production of Railway Coaches and Home Furnishing items at Kapurthala ( Punjab) and Bawal ( Haryana) respectively which will also help the Company to diversify its business and gradually

reduce dependency on auto segment. Further trial production of chassis of commercial vehicle has already been made at Lucknow project and Company expects staring of commercial production of chassis in the year 2009-10.

## HEALTH, SAFETY AND ENVIRONMENT

Your company is OHSAS compliant and ISO 18000 compliant.

The company has been following a policy of 'safety first' in all operations. Apart from training people, adequate systems and processes have been developed to ensure minimal risk to people who are working in all manufacturing locations and administrative offices of the company.

The company is also conscious of its responsibility towards the health of its people and towards the environment. The company has carried out various medical and health check ups for employees and their dependants.

The effluent disposal of the company ensures that the company is taking all possible precaution in preserving our environment. In doing so, the company goes beyond the prescribed minimum requirements of the standards to which the company complies. Rain water harvesting, using energy efficient equipment and green procurement initiatives form a regular part of the working of the company.

## CORPORATE SOCIAL RESPONSIBILTY

Corporate world has been dwelling for years from the society the best resources. This makes a Corporate entity responsible for a ploughing back as much to society as derived. We at Omax Autos have always been aware and enthusiastic for maintaining this balance. We have been conducting various activities and programmes for the society to add value to the living. In the terror of hazards like global warming we have been contributing on a positive note by running aforestation regime in the vicinity of all plants every year. The company has also entered into an agreement with an NGO for Paper recycling. For every 64 Kgs. of Paper, one tree is being cut. So, by this effort, the company is also contributing in Environment Protection. The company is also arranging regular welfare programs for its employees like sports activities in Binola, giving awards or incentives on shop floor level, etc. which motivates the employees of the company. Special training is being provided to the drivers, so that accidents can be minimized. We have a long way to go hand in hand with the society as a whole.

## CAUTIONARY STATEMENT

The company has made forward looking statements in this document that are subject to risks and uncertainties. Forward looking statements may be identified by the use of words like "expects", "anticipates", "believes", "estimates" or similar expressions. All statements that address expectations or projections about the future, including but not limited to, statements about the strategy of the company's growth, product development, market position, market expectation and financial expectations are forward looking statements.

For that statement, the company cautions that numerous important factors could affect the Company's actual results and could cause its results to differ materially from those expressed in any forward looking statement.

THE MEMBERS

OMAX AUTOS LIMITED

Your Directors take immense pleasure in presenting the **TWENTY SIXTH ANNUAL REPORT** together with Audited Statement of Accounts for the year ended 31st March, 2009.

**FINANCIAL RESULTS:**

The summary of the financial performance of the company for the year ended March 31st, 2009 as compared to the previous year is as below

Rs. In Lacs

| Particulars | Current Year 2008-09 | Previous Year 2007-08 |
|---|---|---|
| Net Sales and other income | **83073.56** | 73045.47 |
| PBIDT | **7991.17** | 7367.92 |
| Less: Interest | **4238.84** | 2954.67 |
| PBDT | **3752.33** | 4413.25 |
| Less: Depreciation | **2849.83** | 2676.68 |
| Profit before Exceptional Income | **902.50** | 1736.57 |
| Add: Exceptional Income | – | 621.19 |
| Profit Before Tax | **902.50** | 2357.76 |
| Less: Provision for tax | **359.85** | 773.79 |
| Net Profit After Tax (PAT) | **542.65** | 1583.97 |
| Prior period Income | **134.85** | 25.95 |
| Amount available for appropriation | **677.50** | 1609.92 |
| Appropriations: | | |
| Proposed dividend on equity shares | **213.88** | 320.83 |
| Dividend Distribution Tax | **36.35** | 54.52 |
| Transferred to General Reserve | **400.00** | 1000.00 |
| Surplus carried to balance sheet | **27.27** | 234.57 |

**DIVIDEND**

Taking into consideration the profitability of the year under review, the Board is pleased to recommend a dividend of Re. 1/- per equity share i.e. 10% on face value of equity share of Rs. 10/- each for the year ended 31st March 2009. The total cash outgo for this purpose would be Rs. 250.23 lacs (previous year Rs. 375.35 lacs), which includes Tax on Dividend amounting to Rs. 36.35 lacs (last year Rs 54.52 lacs).

**OPERATIONS AND FUTURE PROSPECTS OF THE COMPANY**

The Net sales and other Income of the Company for the year under review has increased to Rs. 83073.56 lacs as compared to Rs. 73045.47 lacs in the previous financial year, registering a growth of 13.73% on an annualized basis. The Profit before Interest, Depreciation and Tax of the Company has increased by 8.46% on an annualized basis, from Rs. 7367.92 lacs in the previous period to Rs.

7991.17 lacs in the year under review.

Despite the fact that total outstanding loans have decreased, interest cost has gone up from Rs.2954.67 lacs to Rs.4238.84 lacs, an increase of Rs 1284.17 lacs which includes Rs.376 lacs loss on account of foreign exchange fluctuations. This was primarily on account of the overall liquidity crunch, in the domestic as well as in the international markets, which in turn has increased the interest cost. To overcome this, the company had to borrow loans at much higher rates in comparison to the last financial year.

Primarily due to this enhanced interest cost, Profit Before Exceptional Income in the year under review is Rs. 902.50 lacs in comparison to Rs.1736.57 lacs last year. Further, due to non exceptional income of Rs. 621.19 lacs in 2007-08 (Current Year Nil), Profit After Tax for the year 2008-09 has got reduced to Rs.542.65 lacs as compared to Rs.1583.97 lacs in corresponding year.

However, in next financial year, the interest rates have fallen substantially and the pressure on raw material prices have also eased down. As such, we expect a considerable decline in interest as well other costs in 2009-10. All these factors in turn will improve the profitability of your company.

**Two Wheelers**

This sector grew from 80.67 lacs vehicles to 84.40 lacs vehicles, a growth of 4.62%. The company's major customer M/s. Hero Honda Motors Limited was the front runner in terms of sale in the two wheeler segment. Hero Honda sold 35.66 lacs vehicles as against 32.32 lacs two wheelers in 2007-08, a growth of 10.33 %.

Your company is confident that the two wheeler segment especially Hero Honda will keep on growing at this speed and Omax being a major supplier would participate in this growth.

**Commercial Vehicles**

In the Auto Sector, Commercial Vehicle Segment was the worst affected as sale was down to 4.25 lacs vehicles, as against 5.48 lacs vehicles in corresponding period, a decrease of 22.22%.

As you are aware, your company is setting up a plant at Lucknow for the manufacturing of chassis of light Commercial Vehicle & Heavy Commercial Vehicles for Tata Motors. In view of the slow down the implementation of this project has got delayed. Omax has reduced the capacity of the project in the 1st phase. However, the company will increase its capacity as soon as there is a demand in the market. Production in this plant will now commence in the 3rd quarter of 2009-10.

**Passenger Vehicles & Exports**

Despite the world over decline in sales of Passenger Cars and other SUVs, in India this sector has grown from 17.66 lacs vehicles to 18.86 lacs vehicles in 2008-09 i.e. a growth of 6.79%.

Although our export sales to Delphi and Tenneco remained stagnant, the over all direct export sales have increased from Rs.2470.89 lacs to Rs.3383.71 lacs. Further, some of the existing export contracts could not be renewed. However, your company was successful in getting fresh

orders from Ikea, a world leader in modular furniture and home furnishings.

Besides direct export, deemed export sales have also increased from Rs.937.16 lacs to Rs.1809.54 lacs in 2008-09. Thus the overall exports registered a growth of 93.09% as your company's export turnover touched to an all time high record of Rs.5193.26 lacs as against Rs.3408.05 lacs in year 2007-08.

Your Company is setting up a new plant for meeting the enhanced demand of new customers namely Ikea, Walmart Home Depot and is quite positive to meet the export target of Rs.7500 lacs in 2009-10.

## Diversification

As you are aware that Omax Autos is diversifying its portfolio in Railway, Defence and Home Furnishings, Our strategy is to utilize our existing infrastructure including plant & machines and to increase the overall operational efficiencies of the plants. Nevertheless, wherever required, new equipments are also being put to complement the existing set up and also to meet the enhanced requirements of its prestigious customers.

Your company is setting up two new plants, one at Kapurthala, Punjab, for the Rail Coach Factory and the other for Home Furnishing Division at Bawal, Haryana, primarily for Ikea & other players in this domain. Both the plants will start its production in the current financial year. On full operational basis, your company expects to do a turnover of Rs.10000 lacs in these segments.

## Conservation of Energy, Technology Absorption, Foreign Exchange Outgo

A statement giving details of conservation of energy, technology absorption, foreign exchange earnings and outgo, in accordance with Section 217(1)(e) of the Companies Act, 1956 read with the Companies (Disclosure of Particulars in the Report of Board of Directors) Rules, 1988, is annexed as "Annexure I" hereto and forms a part of this report.

## Management Discussion and Analysis Report

In terms of clause 49 of the listing agreement with the Stock Exchanges, Management Discussion and Analysis Report forms a part of this Report elsewhere.

## Corporate Governance

Your Company believes that the great organizations are built on the foundation of good governance practices. Corporate governance is all about effective management of relationships among constituents of the system, i.e. shareholders, management, employees, customers, vendors, regulatory and the community at large. Your company strongly believes that these relationships can be built & strengthened through fair corporate practices, transparency and accountability. Your company places prime importance on reliable financial information, integrity, transparency, empowerment and compliance with the law in letter and spirit. Your company also takes proactive approach and revisits its governance and practices from time to time so as to meet business and regulatory need. Compliance with Clause 49 of the Listing Agreement for

the year 2008-09 has been given in the corporate governance report, which is attached and forms a part of this report. The Auditor's certificate on compliance with corporate governance norms is also attached thereto.

## Board of Directors

Majority of the Board of your company is constituted of independent directors represented by eminent persons with diversified professional experience. The Board handles responsibilities such as policy formation, performance review and analysis and control. Further, they have delegated various powers to the Committees of Directors and senior executives of the company. The Board reviews delegated powers at periodic intervals.

In accordance with section 255 and 256 of the Companies Act, 1956 and Articles of Association of the company, Mr. Salil Bhandari, Dr. R. C. Vaish and Dr. T. N. Kapoor, Directors of the Company shall retire by rotation at the ensuing Annual General Meeting. All being eligible have offered themselves for re-appointment at the ensuing Annual General Meeting. The Board recommends their reappointment for your approval.

In accordance with the stipulation under Clause 49 of the Listing Agreement, brief resume of Mr. Salil Bhandari, Dr. R. C. Vaish and Dr. T. N. Kapoor together with the nature of their expertise in specific areas and names of the Companies in which they hold office of a Director and/or the Chairman/Membership of Committees of the Board, is given in the Notice of the Annual General Meeting.

## Directors' Responsibility Statement

A Directors' responsibility statement setting out the requirement pursuant to the provisions of section 217(2AA) of the Companies Act, 1956 is annexed as "Annexure-II" hereto and forms a part of this report.

## Auditors and Auditors' Report

M/s. A. Kumar Gupta & Co., Chartered Accountants were appointed as the Statutory Auditors of the Company at the last Annual General Meeting held on 30th September, 2008. They shall hold office till the conclusion of the ensuing Annual General Meeting of the Company. M/s A. Kumar Gupta & Co., have also given a Certificate under section 224(1B) of the Companies Act, 1956, confirming their eligibility and willingness to accept the office of the Statutory auditors, if re-appointed. The Board of Directors of your Company, recommend their re-appointment for your approval as statutory auditors to hold office from the conclusion of the ensuing Annual General Meeting till the conclusion of the next Annual General Meeting of the Company.

The Statutory auditors of the company submitted their report on the accounts of the Company for the accounting year ended 31st March, 2009 which was self-explanatory and needed no comments. There is no qualification or adverse remarks in the Auditors' Report for the year ended 31.03.2009.

## Fixed Deposits

The Company has not invited or accepted fixed deposits from the public during the year under review, within the

**28** D i r e c t o r s ' R e p o r t

meaning of Section 58A of the Companies Act, 1956 and the Rules made there under.

**Particulars of Employees**

The statement containing details pursuant to Section 217(2A) of the Companies Act, 1956, read with the Companies (Particulars of Employees) Rules, 1975 is annexed as Annexure-III hereto and forms a part of this Report.

**Quality Certifications**

The best product, quality service and customer satisfaction are an integral part of your company's vision. The Company's all round improvements and achievements in various areas are recognized from time to time by its customers and industrial associations. The units of the company are ISO 9001 and ISO/TS-16949/2002 certified for quality and show the company's commitment towards quality management.

**Health, Safety and Environment**

The Company considers health, safety and environment protection as a fundamental management responsibility. The Company's continuous efforts are directed to prevent accidents and have continual improvement in safety and Environment performance.

All the units of the Company have duly appointed Health, Safety and Environment (HSE) Committees comprising

officers at senior levels along with executives to take care of the health, safety and environment matters.

The company undertook various initiatives such as conducting of Training Programmes on Safety and Environment, Mock Emergency Evacuation Drill at certain units and works of the Company, besides upgrading the effluent treatment plants installed at various works to meet the latest standards of environmental regulations.

The company holds the ISO: 14001:1996 certification for its environmental management system and OHSAS 18001:1999 certification for Occupational Hazards and Safety Systems.

**Acknowledgement / Appreciation**

Your Directors place on record their gratitude to the Central Government, State Governments and Company's Bankers for the assistance, co-operation and encouragement extended to the Company. Your Directors also thank and sincerely appreciate the Business Associates and Employees at all levels for their unstinting efforts in ensuring an excellent all round operational performance. Last but not the least the directors would also like to thank valuable shareholders for their support and contribution.

We look forward to your continued support in the future.

For and on behalf of the Board of Directors
**Omax Autos Ltd.**

Place: New Delhi                                    Suresh Mathur
Date: 25.07.2009                                    Chairman

Information as per Section 217(1)(e) of the Companies Act, 1956 read with the Companies (Disclosure of particulars in the report of Board of Directors) Rules, 1988, and forming a part of the Directors' Report for the year ended March 31, 2009.

## A. CONSERVATION OF ENERGY

**a) The company has taken the following measures to conserve energy which have lead to reduction in power, fuel consumption and cost substantially:**

i) Installation of temperature controllers on cooling towers.

ii) Installation of Centrifuge Lubrication Oil cleaner on DG sets.

iii) Installation of air mist cooling system.

iv) Replacement of Exhaust fans with Power less wind ventilators.

v) Installation of Energy savers on lighting in all shops.

vi) Tripping provision installed through software for machine shops and press shops for energy saving during idle hours in some units.

vii) Conversion of electrical to thermal heating.

viii) Energy audit by CII.

ix) Continuing Energy efficient CFL & Electronics ballasts.

x) Optimization of Power Consumption of pumps in paint shops by reducing Horse Power of Motors.

xi) Replacement of 36W florescent lamps by 25W Lamps.

xii) Installation of neutral compensator for lighting feeders.

xiii) Improvement of Power Factor on User end.

xiv) Shifting of loading/unloading pattern of screw compressor.

xv) Installation of VFD on screw compressor.

xvi) Installation of air curtain at backing & drying oven in paint shop.

**b) Additional Investment and Proposals for reduction in consumption of energy:**

i) Installation of Gas based D. G. Sets for Power generation

ii) Use of LNG based Burners for Paint Shop & Boilers.

iii) Solar heating system in paint and plating shops.

iv) The consumption of all oils and lubricants to be reduced by extra filtration and design modification

v) Servo voltage stabilizer to optimize lighting voltage at 210 Volts.

vi) Power Generation control on 4th Degree harmonics.

vii) LED street lights

viii) Auto system controlling in AEP Plant

**c) Impact of above measures:**

With the implementation of various steps taken to conserve energy, the costs incurred on energy are expected to reduce considerably and consequently will lead to reduction in costs of production.

**d) Total energy consumption and Energy Consumption per unit of production**

The required Form A is not applicable to the auto component segment and hence not being provided.

## B. RESEARCH & DEVELOPMENT, TECHNOLOGY ABSORPTION, ADAPTATION AND INNOVATION

With a view to deploy technology as a strategic tool for global competitiveness through the process of innovation, eco-efficiency and cost reduction, the company has formally undertaken an initiative to establish an in-house R&D centre under approval of the Department of Scientific & Industrial Research, Government of India. For this purpose, an MOU has been signed with the Cleantech International Foundation and research plans have been prepared with a sharp focus on Zero Impact Manufacturing Technologies. These would include energy conservation, waste minimization, waterless processing and reduction in carbon footprint. A vision for R&D has been prepared and shall be updated dynamically to include emerging needs of OMAX shop floor in line with the emerging global trends in manufacturing technologies in-keeping with the corporate social agenda of the company.

OMAX AUTOS LIMITED

Formal application for recognition of in-house R&D facility by the DSIR has been filed during March 2009 and your company is expected to complete the process of evaluation and formal approval by 2nd quarter of fiscal year 2009-10. The recognition would entitle the company to avail of the package of incentives offered by the Government including Income Tax deduction under section 35(2AB) of Income Tax Act. Such weighted deduction is available @ 150% of the expenditure incurred on in-house R&D consequent to approval by the Government of India. The items of expenditure include R&D manpower, equipment, materials, outsourcing of technology and manpower training.

As a part of the above strategy it is proposed to jack up the net expenditure on R&D to 5% by 2015 by increasing it gradually in the next six years. Some of the important research initiatives short listed for immediate indulgence are listed as follows:

| | |
|---|---|
| Electron beam welding | Weld efficiency & fixture design |
| Physical Vapour Deposition (PVD) | Alternative coating processes/ Nano coatings |
| Robotics & laser guided fixtureless assembly | Waste minimization & scrap utilisation |
| Powder metallurgy techniques | Zero impact manufacturing |
| Energy conservation & low energy processing | Process simulation & redesign |

The above are in addition to the ongoing initiatives on productivity enhancement, material utilization, manpower saving and energy conservation as reported in earlier annual reports and in the paragraph related to conservation of energy.

It is proposed to maintain a core group to steer the in-house research & development exclusively charged with this responsibility at Manesar. This will be supported by the research teams at unit level that would act as inter-phasing agents between the central facility and the shop-floor. This would also facilitate continuous feedback on research needs of the shop-floor and adaptation of solutions at the users' end.

It is expected that the expenditure on research & development is bound to grow consistently depending on the emergence of research needs in the areas of new products/processes development, energy efficient technologies, new materials development, quality improvement, safety, health & environment including Zero Impact Manufacturing Initiative (ZIMI) and efforts to reduce the carbon footprint. However, on account of increase in productivity, reduction of costs and savings in terms of energy and materials, the expenditure in percentile terms will stabilize around 5% of the turnover, continuously pushing the revenues upwards and reducing the cost as well as the environmental impact consistently.

(I)  Research & Development (R&D)

|   |   |   |   |
|---|---|---|---|
| 1) | Specific areas in which R&D is carried: | a. | To achieve the ELV Norms the Company has replaced its hexavalent chromium passivation to trivalent process in zinc plating. |
| | | b. | Commissioning of the Industry RO Plant at Dharuhera Unit for processing Water Conservation |
| | | c. | Manufacturing of Progressive Toolings. |
| | | d. | Use of coil instead of steel sheet *in* some materials. |
| 2) | Benefits derived as a result of R&D: | a. | The benefits derived as a result of the above research and development Programmes was in the form of winning new businesses, building the confidence of existing customers, reducing the time to market and the conservation of environment. |
| | | b. | Commissioning of the Industry RO Plant at Dharuhera Unit for process Water Conservation & Recycling has resulted in saving precious water resources. |
| | | c. | The Company has achieved the following benefits by the use of Progressive tooling: |
| | | i. | Saving manpower |
| | | ii. | Improvement in productivity |
| | | iii. | Better utilization of Material |
| | | iv. | Pre cleaning in Paint Shop by adopting Nano Technology |
| | | d. | The Company has achieved raw material saving through strip layout changes to have economical blanking size |

OMAX AUTOS LIMITED

3) **Future Plan & Action:**

a) The Company is progressively working for setting up an advanced New Tool Room and an R&D Centre to carry out research for developing advanced tools to meet the present requirements of Indian Auto component industry and also to innovate new methods of production, reduction in manufacturing cost and manufacturing of Special Purpose machines. Following are the proposed projects to be undertaken in the area of R&D:

b) Weld efficiency & fixture design

c) Alternative coating processes/ Nano coatings

d) Waste minimization & scrap utilization

e) Zero impact manufacturing

f) Process simulation & redesign

g) Energy conservation & low energy processing

h) Powder metallurgy techniques

i) Physical Vapour Deposition (PVD)

j) Robotics & laser guided fixtureless assembly

k) Solar heating system in paint shop and electroplating plants

l) Electron beam welding

4) **Expenditure on R &D:**

| | | |
|---|---|---|
| a) | Capital Expenditure (Net of Sale/Disposal) Including capital work in progress as on 31.03.2009 | : Rs. 7.39 Cr. |
| b) | Capital expenditure incurred during the year 08-09 | : Rs. 1.66 Cr. |
| c) | Recurring Expenditure | : Rs. 1.37 Cr. |
| d) | Depreciation | : Rs. 0.23 Cr. |
| e) | Total (b to d) | : Rs. 3.26 Cr. |
| f) | Total R & D expenditure as % of turnover | :    0.40 % |

(II) **Technology Absorption, Adaptation and Innovation**

1) Efforts in brief made towards technology absorption, adaptation and innovation

a) The Company had entered into a technical collaboration agreement with COC Tooling & Stamping Co. Ltd. Taiwan in Feb 08 to enhance its Tool Design and Manufacturing Capabilities.

b) During the year under review the Company has entered into a technical technology agreement with the Defence Research Development Organisation (DRDO) for the manufacturing of Green Toilets for the Indian Railways.

2) Benefits derived as a result of the above efforts e.g. product improvement, cost reduction, product development etc.

a) Tie up with COC has resulted in the saving on account of manpower and increased productivity as technical training has been imparted by COC to our Tool Room (R&D) employees in Taiwan as well as in India.

b) Technology Transfer from DRDO has allowed the company to diversify in a new line of business which has a huge potential in near future

3) Information regarding import of technology:

| | | |
|---|---|---|
| - | Technology imported | Nil |
| - | Year of import | N.A. |
| - | Has technology been fully absorbed | N.A. |
| - | If not fully absorbed, areas where this has not taken place, reasons and future plans of action | N.A. |

O M A X   A U T O S   L I M I T E D

**32** Annexure I to the Directors' Report

## C. FOREIGN EXCHANGE EARNINGS AND OUTGO

a) Activities relating to exports, initiatives taken by the company to expand exports, exploring new exports markets and export plans:

Due to an over all recession across the globe the auto sector has also got affected. Major International auto companies have suffered badly. Exports to Delphi and Tenneco in particular have got impacted severely as the company could not get fresh orders from these customers.

However the Company managed to rope in new customers namely Ikea & others in the Home Furnishing Divisions.

Due to this, the company could achieve direct export sales to the tune of Rs 3383.71 lacs in 2008-09 as compared to Rs 2470.89 lacs in 2007-08.

b) Total foreign exchange used and earned   (Rs. In Lacs)

| Particulars | Current Year 2008-09 | Previous Year 2007-08 |
|---|---|---|
| Earnings (FOB Value of exports) | 3383.71 | 2470.89 |
| Outgo (CIF Value of imports) | 1199.07 | 1809.32 |
| Other expenses | 152.33 | 95.18 |

## Annexure II to the Directors' Report

Directors' responsibility Statement pursuant to the provisions of section 217(2AA) of the Companies Act, 1956 and forming a part of the Directors' Report for the year ended 31st March 2009;

The statement of the Directors' responsibility on the annual accounts of the Company for the financial year ended 31st March 2009 is provided below:

1) That in the preparation of the annual accounts for the financial year ended 31st March 2009 the applicable Accounting Standards have been followed along with proper explanation relating to material departures;

2) That the Directors have selected such accounting policies and applied them consistently and made judgments and estimates that were reasonable and prudent so as to give a true and fair view of the state of affairs of the Company at the end of the financial year and of the profit of the Company for the year under the review;

3) That the Directors have taken proper and sufficient care for the maintenance of adequate accounting records in accordance with the provisions of the Companies Act, 1956 for safeguarding the assets of the Company and for preventing and detecting fraud and other irregularities;

4) That the Directors have prepared the accounts for the financial year ended 31st March 2009 on a 'going concern' basis.

Particulars of employees pursuant to the provisions of Section 217 (2A) of the Companies Act, 1956, read with the Companies (Particulars of employees) Rules, 1975 and forming part of the directors' report for the year ended March 31, 2009.

Person employed for full/part of the year ended March 31, 2009 who were in receipt of remuneration which is in the aggregate was not less than Rs. 24, 00,000 p.a./ Rs. 2,00,000 p.m.

| Name of employee | Designation | Qualification | Remuneration (Rs in Lacs) | Age (Yrs.) | Exp (Yrs.) | Date of Commencement of employment in the Company | Previous employment held before joining the Company | % of equity share capital held |
|---|---|---|---|---|---|---|---|---|
| Mr. Jatender Kumar Mehta | Managing Director | B.E | 96.78 | 60 | 35 | 01.01.1986 | Partner- Omax Engineers | 6.08 |
| Mr. V. K. Gupta | Executive Director- Commercial Cum Company Secretary | M. Com, ACS, CWA | 43.21 | 55 | 34 | 07.07.1986 | Cost Accounts Officer-Kesar Enterprises Ltd. | – |
| Mr. N. P. Singh | Executive Director- Corp. HR | B. Sc. Diploma in PM & IR | 40.96 | 53 | 29 | 19.05.1987 | Manager- Personnel & Admn. Unitech Engineers (P) Ltd | – |
| Mr. Naresh Tandon | Executive Director- Finance | CA | 39.37 | 45 | 23 | 07.10.1992 | Partner-M/s. A. Kumar Gupta & Co., Chartered Accountants | – |
| Mr. K. C. Chawla | Whole Time Director | B. Sc. -Engg. | 33.72 | 65 | 40 | 01.01.1985 | Works Manager- Nav bharat Engg. Works | Negligible |
| Mr. Kishor Karnataki | CEO- Commercial Vehicles | B.E. | 31.44 | 49 | 26 | 24.07.2007 | Director - Business Development- Spicer India Limited | – |
| Mr. Sanjay Khazanchi** | CEO- Passenger Car | B.E.-Mech., MBA | 10.44 | 47 | 25 | 07.11.2007 | CEO-Deeya Energy Inc. Fremont, USA | – |

Notes:-

– Remuneration includes salary, commission, other allowances, payments and expenditures incurred on perquisites and company's contribution to provident fund and Superannuation fund.

– The appointment is on a contractual basis either as per shareholders' approval or as per appointment letter.

– Other terms and conditions are as per shareholders' resolution or as per appointment letter.

– All the above employees and Managing Directors work and look after the work of the company under the control and supervision of the Board of Directors of the Company.

** Details of the remuneration of these employees are for the part of the year.

**The Company's philosophy on Code of Corporate Governance**

The Company views Corporate Governance as a systemic process by which Companies are directed and controlled to maximize their capacity to generate wealth. As large corporate use vast quantum of societal resources, Omax believes that the governance process should ensure that the Company is managed in a manner that meets both stakeholders' aspirations and societal expectations.

Omax Autos is committed to the adoption of best governance practices and its adherence in the true spirit, at all times. Our Governance practices stems from an inherent desire to improve, innovate and reflects the culture of trusteeship that is deeply ingrained in our value system and forms part of the strategic thought process.

Omax's Corporate Governance initiative since time has always been following four core principles:

i.    Management must have the executive freedom to drive the organization forward without undue restraints;

ii.   This freedom of management, however, should be exercised within a framework of effective accountability and transparency.

iii.  Rights, Interests and Equitable Treatment of Shareholders should always be the key focus.

iv.   Integrity, Disclosures, Transparency and Ethical Behaviour.

Omax believes that any meaningful policy on Corporate Governance must provide empowerment to the executive management of the Company, and simultaneously create a mechanism of checks and balances which ensures that the decision making powers vested in the executive management are used with care and responsibility and not misused.

Omax's governance philosophy embraces the tenets of trusteeship, transparency, empowerment and accountability, control and ethical corporate citizenship. Omax believes that the practice of each of these tenets would lead to the creation of the right corporate culture in which the Company is managed in a manner that fulfils the purpose of Corporate Governance.

Trusteeship recognizes that large corporations have both an economic and a social purpose, thereby casting the responsibility on the Board of Directors to protect and enhance shareholders' value, as well as fulfilling obligations of other stakeholders.

Transparency requires that the Company makes appropriate disclosures where necessary and explains the basis of its policies and actions to all those who are affected by them.

Empowerment is a process used to unleash creativity and innovation throughout the organization by decentralizing and delegating the decision-making powers at the most appropriate levels.

Control ensures that freedom of management is exercised within a framework of checks and balances and is designed to prevent misuse of power, facilitate timely response to change and ensure effective management of risks.

Omax's Corporate Governance process continuously reinforce and helps actualizing the Company's belief in ethical corporate citizenship and is manifest through exemplary standards of ethical behavior, both within the organization as well as in external relationships.

**The Governance Structure**

The practice of Corporate Governance in Omax is at three interlinked levels:

i.    Strategic Supervision - by the Board of Directors

ii.   Strategic management - by one level below the Board

iii.  Executive management - by the Divisional Head of the business

This three-tier structure ensures that strategic supervision on behalf of the shareholders being free from the task of strategic management can be conducted by the Board with objectivity thereby sharpening accountability of the management. Further, strategic management being free from the task of day-to-day executive management, remains focused and energized. The structure also ensures that executive management of the divisions, being free from the collective strategic responsibilities for Omax as a whole, is focused on enhancing the quality, efficiency and effectiveness of each business.

The core roles of the key entities flow from the structure. The core roles, in turn, determine the core responsibilities of each entity. In order to discharge such responsibilities, each entity is empowered formally with requisite powers.

The structure, process and practice of governance enables focus on the corporate purpose while simultaneously facilitating effective management of the diverse businesses within the portfolio.

**BOARD OF DIRECTORS**

The Company understands that good and quality governance is a powerful competitive differentiator and critical to economic and social progress. The "Board" being the trustee of the Company, is responsible for the establishment of

cultural, ethical and accountable growth of the Company, is constituted with a high level of integrated, knowledgeable and committed professionals.

## Composition of the Board

The Board comprises of an optimal complement of independent professionals as well as company executives having in-depth knowledge of business. As on the date of this report, there are ten directors of which two are Managing Directors, one is Whole Time Director and seven are non-executive Independent directors thus making the 70% of the board members as Independent.

According to Clause 49, if the Chairman is Non-executive, at least one third of the board should consist of non-executive, independent directors. This provision is more than adequately met at Omax Autos Limited.

During the financial year under review, nine Board meetings were held on the following dates:

May 16, 2008, June 27, 2008, July 29, 2008, September 22, 2008, October 30, 2008, November 22, 2008, January 09, 2009, January 24, 2009 and February 14, 2009.

None of the Directors on the Board holds the office of director in more than 15 companies or membership of committees of the Board in more than 10 committees or chairmanship of more than 5 committees.

The details are explained in the table below:

| Name of Director | Designation | Board Meetings attended | Attendance at last AGM held | No. of other Directorships** | No. of Committees in which director is a Member or Chairman*** | |
|---|---|---|---|---|---|---|
| | | | | | Members | Chairman |
| Mr. Suresh Mathur | C & D (I) | 7 | NO | 4 | 1 | – |
| Mr. J. K. Mehta | PED | 9 | YES | 5 | 2 | - |
| Mr. R. K. Mehta | PED | 7 | YES | 4 | - | - |
| Mr. K. C. Chawla | WTD | 9 | YES | 0 | 1 | - |
| Dr. T. N. Kapoor | NED (I) | 7 | NO | 6 | 5 | 5 |
| Dr. R. C. Vaish | NED (I) | 4 | NO | 4 | 2 | - |
| Mr. Salil Bhandari | NED (I) | 8 | NO | 5 | 3 | 1 |
| Mr. Lalit Bhasin | NED (I) | 5 | NO | 9 | 6 | - |
| Mr. V. K. Chhabra | NED (I) | 1 | NO | 4 | - | - |
| Mr. Atul Raheja | NED (I) | 3 | NO | 5 | 1 | - |

Mr. J. K. Mehta and Mr. R. K. Mehta are brothers. None of the other directors is related to any other director.

@    C & D - Chairman and Director, PED - Promoter and Executive Director, WTD - Whole Time Director, NED - Non Executive Director, I - Independent Director

**    Private Limited Companies, Section 25 Companies and Foreign Companies have not been included for the calculation of Directorships of the Directors in other companies.

***    Audit Committee and Shareholders' and Investors' Grievances Committee have been considered for the purpose of Membership and Chairmanship held by the Director in Public Limited Companies.

An Independent director is a non-executive director who, apart from receiving director's remuneration, does not have any material pecuniary relationship or transactions with the Company, its promoters or its management or its subsidiaries and associates which in the judgement of the Board, may affect his independence of judgement and complying with other conditions as prescribed under Clause 49 of the listing agreement.

The Agenda papers, containing all the necessary information, are made available to the Board well in advance to enable the Board to discharge its responsibilities effectively and to take appropriate decisions. Where it is not practicable to attach or send the relevant information as a part of Agenda papers, the same are tabled at the Meeting.

All the relevant information suggested under the clause 49 is furnished to the Board from time to time. The information regularly supplied to the Board inter-alia includes the following:

• The annual Operating Plans and budgets and any updates thereon.

• Capital Budgets and updates, if any

• Minutes of meetings of Audit Committee and other committees of  the Board

• Legal Compliance report and certificate

OMAX AUTOS LIMITED

- General notices of interest
- Review of operations
- Strategic decisions relating to various ventures
- Statutory matters
- Review and adoption of Annual accounts and quarterly financial results

The Company has also laid down procedures to inform the Board Members about the risk assessment and mitigation procedure.

**Code of Conduct**

Omax's Board has laid down a code of Conduct for all Board Members and Senior Management Personnel of the Company. The Code of Conduct is available on the Company's website www.omaxauto.com

All Board Members and Senior Management personnel have affirmed compliance with the Code of Conduct. A declaration signed by Managing Director & Chief Executive Officer (CEO) to this effect is enclosed at the end of this report.

**Audit Committee**

As a measure of good Corporate Governance and to provide assistance to the Board of Directors in fulfilling the Board's oversight responsibilities, An Audit Committee has been constituted and headed by an Independent Director, presently the Audit Committee comprises of 4 Non-executive independent Directors and one Promoter Director. All the members of the Committee have requisite financial and management expertise/knowledge and have rich experience of the industry.

**Composition**

The Composition of the Audit Committee meeting is given herein below:

| Member's Name | Category | Designation |
|---|---|---|
| Mr. Salil Bhandari | Non-Executive / Independent Director | Chairman |
| Dr. T.N.Kapoor | Non-Executive / Independent Director | Member |
| Mr. Atul Raheja | Non-Executive / Independent Director | Member |
| Mr. J. K. Mehta | Promoter and Executive Director | Member |
| Mr. R C Vaish* | Non-Executive / Independent Director | Member |

\* Mr. R C Vaish has been appointed as a Member of the Audit Committee  w.e.f. 16.05.2008.

Mr. V. K. Gupta, Executive Director (Commercial) cum Company Secretary of the Company acts as Secretary of the Audit Committee.  Internal auditors, management and other senior personnel of the Company, also attend the Meeting of Audit Committee.

**Terms of reference:**

The terms of reference of Audit Committee include the matters specified in clause 49(II) of the Listing Agreement with the Stock Exchanges and section 192A of the Companies Act, 1956. The terms of reference of the Audit Committee includes the following:

- Overseeing the Company's financial reporting process and the disclosure of its financial information to ensure that the financial statement is correct, sufficient and credible.

- Recommending the appointment and removal of external auditor, fixation of audit fee and also approval for payment of any other services.

- Reviewing with the management the quarterly and annual financial statements before submission to the Board, focusing primarily on:

  – Any change in the accounting policies and practices.

  – Major accounting entries based on exercise of judgment  by management.

  – Qualification on draft audit report if any.

  – Significant adjustments arising out of audit.

  – The going concern assumption.

  – Compliance with accounting standards.

- Compliance with stock exchange and legal requirements concerning financial statements.
- Any related party transactions i.e. transaction of the Company of material nature, with promoters or the management, their subsidiaries or relatives etc. that may have potential conflict with the interest of the Company at large.

- Reviewing with management, external and internal auditor, adequacy of internal control systems.

- Reviewing the adequacy of internal audit function, including the Structure & strength of internal audit department, coverage and frequency of internal audit, financial & risk management policies particularly relating to foreign exchange exposure.

- Discussion with internal auditors on any significant findings and follow up thereon.

- Reviewing the findings of any internal investigations by the internal auditors into matters where there is suspected fraud or irregularity or a failure of internal control systems of a material nature and reporting the matter to the Board.

- Discussion with statutory auditors before the audit commences, about the nature and scope of audit as well as post audit discussion to ascertain any area of concern.

- To look into the reasons for substantial defaults in the payment to the depositors, debenture holders, shareholders (in case of non-payments of declared dividends) and creditors.

- To approve unaudited quarterly financial results and publish the same as required in the Listing Agreement.

- Carrying out any other function as per directions from the Board from time to time.

Apart from above, the committee also reviews other matters as required under Clause 49 of the Listing Agreement, Section 292A of the Companies Act, 1956 and other laws, rules and regulations.

During the year, five Audit committee meetings were held on June 25, 2008, July 08, 2008, July 29, 2008, October 30, 2008 and January 24, 2009.

As per the requirement of the Listing Agreement, the gap between any two meetings of the Committee is less than four months. The adequate quorum was present at every Audit Committee meeting.

**Attendance of members at Audit Committee Meetings**

| Member's Name | No. of Meetings attended |
|---|---|
| Mr. Salil Bhandari | 4 |
| Dr. T. N. Kapoor | 5 |
| Mr. Atul Raheja | – |
| Mr. J. K. Mehta | 4 |
| Mr. R C Vaish | 5 |

**REMUNERATION OF DIRECTORS**

**Remuneration Committee**

The Company is transparent in compensation policy of Directors. The Committee sets the overall policy on remuneration and the other terms of employment of executive Directors of the Company within the overall ceiling fixed by the members of the Company and recommend the same for the approval of the Board. The Committee recommends remuneration package of Executive Directors to the Board by reference to individual performance, experience and market conditions with a view to provide a package which is appropriate for the responsibilities involved.

The Members of the committee are as under:

| Member's Name | Category | Designation |
|---|---|---|
| Dr. R C Vaish | Non-Executive/ Independent Director | Chairman |
| Mr. Vineet Virmani* | Non-Executive/ Independent Director | Member |
| Mr. V. K. Chhabra | Non-Executive/ Independent Director | Member |
| Dr. T N Kapoor* | Non-Executive/ Independent Director | Member |

*Since Mr. Vineet Virmani has ceased from the Board w.e.f. 27.06.2008 due to his sad demise, Dr. T N Kapoor has been appointed as a member of the Remuneration Committee in place of Mr. Vineet Virmani.

During the financial year ended March 31, 2009, one Remuneration Committee meeting was held on 24.01.2009

**Attendance of members at Remuneration Committee Meetings**

| Member's Name | No. of Meetings attended |
|---|---|
| Dr. R. C. Vaish | 1 |
| Mr. V. K. Chhabra | - |
| Dr. T. N. Kapoor | 1 |

**Remuneration Policy of Directors**

**Executive**

The remuneration paid to the Executive director is recommended by the Remuneration Committee and approved by the Board of directors subject to shareholders' approval in the general meeting. Subsequently in the forthcoming General Meeting, the shareholders approve the Remuneration being paid to the Executive Director of the Company.

**Non-executive**

The Non-executive directors are paid by way of sitting fee of Rs. 10,000/- for every meeting of the Board and that of Rs. 2,500/- for the Committee meetings, if any, attended by them. The remuneration paid to the Non executive directors is approved by the Board of directors, subject to the approval by the shareholders in the general meeting.

Details of remuneration paid/payable to Directors for the year 2008-09 are as follows:

| Name of Director | Sitting Fees (Rs.) | Comm. on Profits (Rs.) | Salary (Rs.) | Contribution to Statutory Funds (Rs.) | Perquisites (Rs.) | Others (Rs.) | Total (Rs.) |
|---|---|---|---|---|---|---|---|
| **Executive Directors** | | | | | | | |
| Mr. J. K. Mehta | - | | 9000000 | 216000 | 462000 | - | 9678000 |
| Mr. R. K. Mehta | - | | 720000 | 86000 | 41000 | - | 847000 |
| Mr. K. C. Chawla | - | | 2929000 | 264000 | 179000 | | 3372000 |
| **Non-Executive Directors** | | | | | | | |
| Mr. Suresh Mathur | 70000 | 208000 | - | - | - | - | 278000 |
| Dr. T. N. Kapoor | 132500 | - | - | - | - | - | 132500 |
| Dr. R. C. Vaish | 55000 | - | - | - | - | - | 55000 |
| Mr. Salil Bhandari | 125000 | - | - | - | - | - | 125000 |
| Mr. Lalit Bhasin | 50000 | - | - | - | - | - | 50000 |
| Mr. V. K. Chhabra | 10000 | - | - | - | - | - | 10000 |
| Mr. Atul Raheja | 30000 | - | - | - | - | | 30000 |

The company is not making any payment to its directors by way of performance linked incentives. The appointment of the executive directors is on contractual basis and notice period is of 3 months of either side. There is no stock option in the company granted to the directors

**Shareholders'/Investors' Grievance Committee**

The Shareholders' & Investor Grievance Committee has been constituted to attend to and redress the shareholders'/ investors' grievances. The Committee is headed by an independent Director.

The Present composition of Shareholders'/Investors' Grievance Committee is as under:

| Name | Category | Designation |
|---|---|---|
| Dr. T. N. Kapoor | Non Executive / Independent Director | Chairman |
| Mr. Salil Bhandari | Non Executive / Independent Director | Member |
| Mr. J. K .Mehta | Executive Director | Member |
| Mr. K. C. Chawla | Executive Director | Member |

**DETAILS OF MEETING HELD DURING THE YEAR**

During the year, fifteen (15) Shareholders's/Investors' Grievance committee meetings were held on April 15, 2008, May 5, 2008, June 16, 2008, July 08, 2008, July 31, 2008, August 14, 2008, September 22, 2008, October 27, 2008, November 28, 2008, January 12, 2009, January 31, 2009, February 14, 2009, February 28, 2009, March 16, 2009 & March 31, 2009.

OMAX AUTOS LIMITED

Attendance of members at Shareholders'/Investor Grievance Committee Meetings:

| Member's Name | No. of Meetings attended |
|---|---|
| Dr. T. N. Kapoor | 15 |
| Mr. J. K. Mehta | 14 |
| Mr. K. C. Chawla | 15 |
| Mr. Salil Bhandari | 14 |

**Name, Designation and Address of Compliance Officer**

Mr. V. K. Gupta: Executive Director (Commercial) Cum Company Secretary
Omax Autos Limited
Plot No. 26-B, Sector 32, Institutional Area,
Gurgaon (Haryana)
Phone: 0124-4343000
Email: vkg@dhr.omaxauto.com

**Terms of reference**

The functioning and broad terms of reference of the Shareholders'/Investors' Grievance Committee as adopted by the Board is as under:

a)  To monitor work related to

• Transfer/transmission of shares of the Company;

• Dematerialisation/ rematerialisation of the shares of the Company;

• Subdivision, consolidation, replacement of any share certificate(s) of the Company;

b)  Approval of issue of duplicate share certificates against the original share certificates

c)  To look into the Redressal of shareholders and investors complaints like transfer of shares, non-receipt of Balance sheet, non-receipt of declared dividend, review of dematerialisation, rematerialisation, shareholding pattern, distribution schedules etc.

d)  To do all other acts or deeds as may be necessary or incidental thereto.

The main object of the Investors' Grievance and Share Transfer Committee is to strengthen investor relations.

The Company Secretary, being the Compliance Officer, is entrusted with the responsibility, to specifically, look into the Redressal of the shareholders and investors complaints and report the same to the Shareholders'/Investors' Grievance Committee.

**Details of Investor Complaints**

The Corporate Secretarial Department of the Company and Link Intime India Private Limited (formerly known as Intime Spectrum Registry Limited), the Registrar and Share Transfer Agent (RTA) of the Company attends to all the grievances of the shareholders and investors received. The details of Complaints received; resolved/pending during the financial year 2008-09 are given below:

Brought Forward: 0        Received: 21        Resolved: 21        Pending: 0

| S. No. | Nature of complaint | Received | Resolved | Pending |
|---|---|---|---|---|
| 1 | Non receipt of Dividend | 10 | 10 | Nil |
| 2 | Non Receipt of Annual Report/Others | 8 | 8 | Nil |
| 3 | Non-receipt of Share Certificates | 1 | 1 | Nil |
| 4 | Others | 2 | 2 | Nil |
| | Total | 21 | 21 | Nil |

No request for share transfer or payment of dividend is pending except those which are disputed.

## GENERAL BODY MEETINGS

Details of the last three Annual General Meetings held:

| Financial Year | Date of AGM | Time | Venue | Whether Special Resolution passed |
|---|---|---|---|---|
| 2007-2008 | 30.09.2008 | 11:00 AM | 69, KM Stone, Delhi Jaipur Highway, Dharuhera, Distt. Haryana | NO |
| 2006-2007 | 28.09.2007 | 11:30 AM | 69, KM Stone, Delhi Jaipur Highway, Dharuhera, Distt. Haryana | YES |
| 2005-2006 | 26.09.2006 | 11:00 AM | 69, KM Stone, Delhi Jaipur Highway, Dharuhera, Distt. Haryana | YES |

All the resolutions, including the special resolution set out in the respective notices were passed by the requisite majority of shareholders.

### Postal Ballot

During the year 2008-09, in terms of the provisions of section 192A of the Companies Act, 1956 read with the Companies (Passing of the resolution by postal ballot) Rules, 2001, following resolutions were passed by voting through postal ballot.

- altering its Part C of Clause III, titled as 'Other Objects' of the Memorandum of Association of the Company by incorporating four new clauses (48 to 51) after the existing sub clause 47 of Part C of Clause III, in terms of Section 17 of the Companies Act, 1956

- Approval of shareholders to commence new business stated in the clause 48 to 51 of other Object Clause of the Memorandum of Association of the Company, in existence with current and main business of the Company.

Related procedure for voting by postal ballot has been followed by the company. Dr. S. Chandrasekaran, Practicing Company Secretary had been appointed as scrutinizer. Mr. J.K. Mehta, Managing Director, Mr. V.K. Gupta, Executive Director (Commercial) cum Company Secretary and Mr. K.C. Chawla, Whole Time Director of the Company conducted this postal Ballot exercise. The said Special resolutions have been passed with requisite majority on voting by Postal Ballot. The result of the voting by Postal Ballot was announced by Mr. K. C. Chawla, Whole Time Director on Tuesday, December 30, 2008 at 11:30 A. M. at the Corporate office of the Company at Plot No.B-26, Institutional Area, Sector-32, Gurgaon, Haryana - 122001.

The details of voting pattern are as follows:

1.  **Result of the voting conducted through the Postal Ballot on the Special Resolution u/s 17 of the Companies Act 1956, for amendment in the Memorandum of Association by inserting new clause 48 to 51 in part C of Clause III of objects clause of the Company-**

| Particulars | No. | % of voting |
|---|---|---|
| Total number of votes received through postal ballot forms | 9827158 | |
| Less: No. of Votes for which right is not exercised through postal ballot | 5653 | |
| Less: No. of Votes which have been rejected | 4810 | |
| Net valid number of votes cast through postal ballot forms | 9816695 | 100.00 |
| Total number of votes which have been cast in favour of the resolution | 9676716 | 98.57 |
| Total number of votes which have been cast against the resolution | 139979 | 1.43 |

2.  **Result of the voting conducted through the postal ballot on the Special Resolution under section 149(2A) of the Companies Act, 1956 for commencement of new business as mentioned in Resolution No. 1 of postal Ballot notice dated 30.10.2008**

| Particulars | No. | % of voting |
|---|---|---|
| Total number of votes received through postal ballot forms | 9827158 | |
| Less: No. of Votes for which right is not exercised through postal ballot | 7246 | |
| Less: No. of Votes which have been rejected | 5410 | |
| Net valid number of votes cast through postal ballot forms | 9814502 | 100.00 |
| Total number of votes which have been cast in favour of the resolution | 9672523 | 98.55 |
| Total number of votes which have been cast against the resolution | 141979 | 1.45 |

OMAX AUTOS LIMITED

During the financial year 2009-10 resolutions with respect to (i) amendment in Memorandum of Association of the Company by inserting new object clause in the Memorandum of Association of the Company (ii) Commencement of new businesses as mentioned in the other objects of the Company (iii) Introduction of Employee Stock Option Scheme (iv) Change in terms of Remuneration of the Managing Director of the Company (v) payment of commission to the non-executive Chairman of the Company are proposed to be passed through postal ballot in terms of section 192A of the Companies Act, 1956 read with Companies (Passing of the Resolution by Postal Ballot) Rules, 2001.

Dr. S. Chandrasekaran, practicing Company Secretary, has been appointed as scrutinizer for conducting the postal ballot process. Mr. J.K. Mehta, Managing Director, Mr. V.K. Gupta, Executive Director (Commercial) cum Company Secretary and Mr. K.C. Chawla, Whole Time Director of the Company have been appointed to conduct postal ballot exercise. The Company is following postal ballot procedure in terms of Section 192A of the Companies Act, 1956 read with rules made thereunder.

## DISCLOSURES

i)   There is no materially significant related party transaction that may have potential conflict with the interest of the Company at large. Transactions with the related party are disclosed in the notes to the accounts in this Annual Report as per Accounting Standard 18 of the Institute of Chartered Accountants of India. There is no pecuniary relationship or transaction with the non-executive directors of the Company.

ii)  There is no non compliance by the Company and no penalties and strictures imposed on the Company by Stock Exchange or SEBI or any statutory authority on any matter related to capital markets, during the last three years.

iii) There is no requirement in the Company to maintain Whistle Blower Policy.

iv)  All mandatory requirements of Clause 49 of the Listing Agreement have been complied with by the company.

## MEANS OF COMMUNICATION

Besides communicating to the stock exchanges on which the company's shares are listed, the notices of the board meetings at which quarterly/half yearly results get approved are published in the following news papers:

| Particulars | Name of the News paper |
| --- | --- |
| English Newspapers in which quarterly/half yearly results were published | Financial Express<br>Business Standard |
| Vernacular Newspapers in which quarterly/half yearly results were published | Jansatta<br>Veer Arjun |

Website Address of the Company on which financial results and other information's are displayed: www.omaxauto.com. The Company is not displaying any official releases. The Company is not making any presentations to Institutional investors or to the Analysts.

**Management Discussion and Analysis Report form part of this Annual Report**

The complete Management Discussion and Analysis report is placed in the separate section of the Annual Report.

## GENERAL SHAREHOLDERS' INFORMATION

| 26th Annual General Meeting | : | Date | 30th day of September, 2009 |
| --- | --- | --- | --- |
| | | Time | 11:00 a.m. |
| | | Venue | 69 KM Stone, Delhi Jaipur Highway, Dharuhera, Rewari (Haryana) |
| Financial Year | : | | 1st April to 31st March |

**Dates of Book Closure**

The register of members and share transfer books of the company will remain closed from 25th day of September 2009 to 30th day of September 2009, both days inclusive, for the purpose of annual general meeting and payment of dividend declared, if any.

**Dividend Payment Date**

The dividend @ Re. 1.00/- each equity Share (i.e. 10% of the paid up value of each equity share) will be paid on or before 29th day of October 2009, if approved and declared by the shareholders in the ensuing Annual General Meeting.

OMAX AUTOS LIMITED

**42** Corporate Governance

For Demat Shareholders and Physical shareholders who have opted for ECS, dividend amount will be credited directly to their respective bank accounts through ECS. For others, dividend warrants will be posted on or before 29th day of October 2009.

**Listing on Stock Exchanges**

At present the equity shares of the Company are listed on the following Stock Exchanges.

| Name of Stock Exchanges | Stock Code | ISIN With NSDL & CDSL |
|---|---|---|
| The Bombay Stock Exchange Limited Phiroze Jeejeebhoy Towers, Dalal Street Mumbai- 400 001 | 520021 | INE 090B01011 |
| National Stock Exchange of India Limited "Exchange Plaza", Bandra- Kurla Complex, Bandra (E) Mumbai- 400 051 | OMAXAUTO | |

**Listing Fees**

The Annual Listing Fees for the financial year 2009-2010 has been paid to all the aforesaid Stock Exchange wherein the equity shares of the Company are listed, within the stipulated time.

**Outstanding GDRs/ADRs/Warrants or any Convertible instruments**

- No GDRs / ADRs have been issued by the Company.

- During the year under review the Company has no outstanding convertible instruments.

**Market Price Data**

Monthly High and Low prices of equity shares of Omax Autos Limited at the Stock Exchange, Mumbai (BSE) and at the National Stock Exchange of India Limited (NSE) during the period under review in comparison to BSE (Sensex) and NSE (Nifty)

| Month | NSE | | | | BSE | | | |
|---|---|---|---|---|---|---|---|---|
| | Share Prices | | Nifty | | Share Prices | | Sensex | |
| | High | Low | High | Low | High | Low | High | Low |
| April, 2008 | 57.00 | 47.00 | 5230.75 | 4628.75 | 57.40 | 45.00 | 17480.74 | 15297.96 |
| May | 53.00 | 45.70 | 5298.85 | 4801.90 | 54.00 | 45.25 | 17735.70 | 16196.02 |
| June | 48.00 | 37.65 | 4908.80 | 4021.70 | 46.95 | 37.50 | 16632.72 | 13405.54 |
| July | 39.15 | 31.50 | 4539.45 | 3790.20 | 39.00 | 31.00 | 15130.09 | 12514.02 |
| August | 42.45 | 35.40 | 4649.85 | 4201.85 | 44.00 | 36.00 | 15579.78 | 14002.43 |
| Sept | 43.95 | 31.40 | 4558.00 | 3715.05 | 43.85 | 32.00 | 15107.01 | 12153.55 |
| Oct | 35.60 | 18.80 | 4000.50 | 2252.75 | 36.00 | 20.45 | 13203.86 | 7697.39 |
| Nov | 28.50 | 19.15 | 3240.55 | 2502.90 | 28.50 | 19.15 | 10945.41 | 8316.39 |
| Dec | 25.35 | 19.00 | 3110.45 | 2570.70 | 25.95 | 19.50 | 10188.54 | 8467.43 |
| Jan, 2009 | 24.00 | 16.75 | 3147.20 | 2661.65 | 24.25 | 16.70 | 10469.72 | 8631.60 |
| Feb | 21.00 | 15.05 | 2969.75 | 2677.55 | 20.50 | 15.70 | 9724.87 | 8922.31 |
| March | 21.40 | 15.00 | 3123.35 | 2539.45 | 20.50 | 15.00 | 10127.09 | 8047.17 |

OMAX AUTOS LIMITED

Performance in comparison to broad based indices - BSE SENSEX:



Performance in comparison to broad based indices - NSE S&P CNX Nifty:



**Registrar and Share Transfer Agents (RTA)**

M/s Link Intime India Private Limited (Formerly known as Intime Spectrum Registry Limited), New Delhi has been appointed as the Registrar and Share Transfer Agent of the Company for handling the share transfer work both in physical and electronic form. All correspondence relating to share transfer, transmission, dematerialisation, rematerialisation etc. can be made at the following address.

M/s Link Intime India Private Limited
(Formerly Intime Spectrum Registry Limited)
Unit: Omax Autos Limited
A-40, 2nd Floor,
Naraina Industrial Area,
Phase-II, Near Batra Banquet Hall,
New Delhi-110 228
Tel: +91-11-41410592-94
Fax: +91-11-41410591
E-Mail: delhi@linkintime.co.in

**Share Transfer System**

The Company processes the share transfer and other related shareholders services through Registrar & Share transfer Agent (RTA) on a fortnight basis. The share transfer in physical form is generally registered within 15 days from the date of receipt, provided the documents are complete in all respects. The Company has a Shareholders' / Investors' Grievance Committee, which meets twice in a month if required, to consider and approve the share transfers and to resolve any query or problem in relation thereto.

**44** Corporate Governance

Distribution of Share Holding as on March 31, 2009

| Nominal Value of shares (In Rupees) | Number of holders | % to total holders | Total face value | % to total face value |
|---|---|---|---|---|
| 1 - 5000 | 10,775 | 79.59 | 15,72,421 | 7.35 |
| 5001 - 10000 | 1,669 | 12.33 | 11,90,774 | 5.57 |
| 10001 - 20000 | 631 | 4.66 | 8,94,409 | 4.18 |
| 20001 - 30000 | 167 | 1.23 | 4,30,649 | 2.01 |
| 30001 - 40000 | 69 | 0.51 | 2,50,206 | 1.17 |
| 40001 - 50000 | 48 | 0.36 | 2,17,568 | 1.02 |
| 50001 - 100000 | 90 | 0.66 | 6,32,429 | 2.96 |
| 100001 & above | 89 | 0.66 | 1,61,99,757 | 75.74 |
| Total | 13538 | 100.00 | 21388213 | 100.00 |

Shareholding pattern as on March 31, 2009

| S. No. | Category | No. of Shares | % of shareholding |
|---|---|---|---|
| 1 | **Promoters' Holding** | | |
| | Indian Promoters | 72,68,350 | 33.98 |
| | Bodies Corporate | 38,83,482 | 18.16 |
| 2 | **Non Promoters' Holding** | | |
| | Mutual Funds and UTI | - | - |
| | Banks, FIs, Insurance Companies | - | - |
| | Foreign Institutional Investors | 2,92,233 | 1.37 |
| | Private Corporate Bodies | 36,05,337 | 16.86 |
| | Indian Public | 61,93,191 | 28.95 |
| | NRIs / OCBs | 1,45,620 | 0.68 |
| | **Total** | **21388213** | **100.00** |



OMAX AUTOS LIMITED

**Dematerialization of shares and liquidity**

The equity shares of the Company are compulsory traded and settled only in the dematerialised form under ISIN No. INE 090B01011. M/s Link Intime India Private Limited formerly known as Intime Spectrum Registry Limited, the Company's Registrar & Share Transfer Agent looks after the dematerialization of shares and other related works.

The details of the equity shares of the Company dematerialised as on March 31, 2009 are given hereunder:

| Particulars | Number of Shares | Percentage |
|---|---|---|
| No. of shares in dematerialised form | 13169755 | 61.57 |
| No. of shares in Physical form | 8218458 | 38.43 |
| Total | 21388213 | 100.00 |

| | | |
|---|---|---|
| Plant Locations | : | **Registered Office & Dharuhera Plant**<br>Omax Autos Limited<br>69 KM Stone, Delhi Jaipur Highway<br>Dharuhera, Distt. Rewari, Haryana-122 106<br><br>**Sidhrawali Plant**<br>Speedomax (A unit of Omax Autos Limited)<br>64 KM Stone, Delhi-Jaipur Highway<br>Village Sidhrawali, Gurgaon, Haryana-123 413<br><br>**Manesar Plant**<br>Omax Autos Limited - Manesar Plant<br>Plot No. 6, Sector-3,<br>IMT Manesar, Gurgaon, Haryana-122 050<br><br>**Sprocket Division**<br>Omax Autos Limited - Sprocket Division<br>69 KM Stone, Delhi-Jaipur Highway<br>Dharuhera, Distt. Rewari, Haryana-122 106<br><br>**Bangalore Plant**<br>Omax Autos Limited - Bangalore Plant<br>Plot No 6, Bommasandra - Jigani Link Road<br>Bommasandra, Bangalore, Karnataka-560 099<br><br>**Binola Plant**<br>Automax - A unit of Omax Autos Limited<br>Delhi Jaipur Highway,<br>Village & P.O. Binola, Gurgaon, Haryana-122 001<br><br>**Dharuhera Plant - II**<br>Indital (A unit of Omax Autos limited)<br>69 KM Stone, Delhi-Jaipur Highway<br>Dharuhera, Distt. Rewari, Haryana-122 106<br><br>**Lucknow Plant - under construction**<br>Omax Autos Limited - Lucknow Plant<br>Tata Motors Vender park<br>Chinhat Industrial area<br>Deva Road, Lucknow- 226019 |
| Compliance status of clause 49 of Listing Agreement | : | The Company has complied with all the mandatory requirements prescribed in the clause 49 of the listing agreement. |
| **Corporate & Head Office**<br>Investors Relations Cell &<br>Address for correspondence | : | Plot No. B-26, Institutional Area,<br>Sector-32, Gurgaon-122001 (Haryana)<br>Phone No: (0124) 4343000 (30 Lines)<br>Fax No.: (0124)2580016<br>E-mail: omax@omaxauto.com<br><br>The Secretarial Department is headed by Mr. V. K. Gupta, Executive Director (Commercial) cum Company Secretary who acts as Compliance Officer of the Company. |

## Certificate on Corporate Governance

To

The Members of Omax Autos Limited

We have examined the compliance of conditions of Corporate Governance by Omax Autos Ltd. for the year ended on 31st March 2009, as stipulated in the Clause 49 of Listing Agreement of the Company with the Stock Exchanges in India.

The compliance of conditions of Corporate Governance is the responsibility of the management. Our examination has been in the manner described in the Guidance Note on Certification issued by the Institute of Chartered Accountants of India and has been limited to a review of the procedures and implementation thereof adopted by the Company for ensuring compliance with the conditions of Corporate Governance as stipulated in the said Clause. It is neither an audit nor an expression of opinion on the financial statements of the Company.

In our opinion and to the best of our information and according to the explanations given to us and based on our reliance upon the representations made by the management that there were no transactions of material nature with the management or relatives that may have potential conflict with the interest of the company at large.

We have been explained that no investor grievances were pending for a period exceeding one month against the Company as per the records maintained by the Company.

We certify that the Company has complied in all material respects with the conditions of Corporate Governance as stipulated in the above mentioned Listing Agreement.

We further state that the compliance is neither an assurance as to the future viability of the Company nor the efficiency or effectiveness with which the management has conducted the affairs of the Company.

For **A. KUMAR GUPTA & CO.**
Chartered Accountants

Place: New Delhi
Date: 25th July 2009

**(A. K. Gupta)**
Partner
Membership No. 12765

## Declaration for Compliance with the Code of Conduct

This is to certify that the company has laid down its Code of Conduct for all the Board Members and Senior Management of the Company and the copies of the same are uploaded on the website of the Company - www.omaxauto.com

It is hereby affirmed that during the year 2008-09, all the Directors and Senior Managerial personnel have complied with the Code of Conduct and have given a confirmation in this regard.

Place: New Delhi
Date: 25.06.2009

**Jatender Kumar Mehta**
Managing Director

THE BOARD OF DIRECTORS

OMAX AUTOS LIMITED

We Jatender Kumar Mehta, Managing Director and Naresh Tandon, Chief Financial Officer of the company certified to the Board of Directors that:

(a) We have reviewed financial statements and the cash flow statement for the financial year 2008-09 and that to the best of our knowledge and belief:

  (i) These statements do not contain any materially untrue statement or omit any material fact or contain statements that might be misleading;

  (ii) These statements together present a true and fair view of the company's affairs and are in compliance with existing accounting standards, applicable laws and regulations.

(b) To the best of our knowledge and belief, no transaction entered into by the Company during the year which is fraudulent, illegal or violative of the Company's code of conduct.

   Further, we accept that it is our responsibility to establish and maintain internal controls for financial reporting. Accordingly, we have evaluated the effectiveness of internal control systems of the Company pertaining to financial reporting and have disclosed to the Auditors and the Audit Committee, wherever applicable

  (i) deficiencies in the design or operation of such internal controls, if any, which came to our notice and steps have been taken or proposed to be taken to rectify these deficiencies.

  (ii) Significant changes in internal control financial reporting during the year.

  (iii) Significant changes in accounting policies during the year and that the same have been disclosed in the notes to the financial statement; and

  (iv) Instances of significant fraud of which we became aware and the involvement therein, if any of the management or an employee having a significant role in the company's internal control system over financial reporting.

Place: New Delhi                    **Naresh Tandon**              **Jatender Kumar Mehta**
Date: 25.07.2009                   Chief Financial Officer          Managing Director

## Compliance Certificate

Company No.            :   05-26142

Nominal Capital Rs.    :   30,00,00,000/-

To

**The Board of Directors**
**M/s. Omax Autos Limited**
**69 K M Stone,**
**Delhi-Jaipur Highway**
**Dharuhera, Rewari**
**Haryana-122106**

We have examined the relevant books and records of Omax Autos Limited having its Registered Office at 69 K M Stone, Delhi-Jaipur Highway, Dharuhera, Rewari, Haryana-122106, produced before us by the Company and by their registrar and share transfer agents M/s. Link Intime India Private Limited (formerly known as Intime Spectrum Registry Limited) New Delhi for the purpose of our Secretarial Audit Report for the financial year ended on 31.03.2009 (financial year). In our opinion and to the best of our information and according to the examinations carried out by us and explanations furnished to us by the Company, its officers and agents, we certify that in respect of the aforesaid financial year:

1. The Company has kept and maintained all registers and records as per the provisions of the Companies Act, 1956 (the Act) and the rules made there under and all entries therein have been duly recorded during the year.

2. The Company has duly filed the forms and returns with the Registrar of Companies within the time prescribed including filing of documents with additional fees under the Act and the rules made there under during the year.

3. The Company has given proper notice along with the agenda for convening of Board Meeting, Committee Meetings, Annual General Meeting and Resolution passed through Postal Ballot during the year.

**48** C o m p l i a n c e   C e r t i f i c a t e

4. The proceedings of the Board, Committee, General Meeting and Resolution passed through Postal Ballot have been properly recorded in the respective Minutes Books during the year.

5. The Board of Directors of the Company is duly constituted during the year.

6. The Company has obtained all the necessary approvals from the Board and Shareholders required as per the Act during the year. The approval of Shareholders for the revised remuneration of Mr. Jatender Kumar Mehta, Managing Director of the Company is being sought through Postal Ballot process.

7. The Company has not accepted any deposit in terms of Section 58A of the Act read with Companies (Acceptance of Deposit) Rules, 1975 during the year.

8. The Company has complied with the provisions of Section 154 of the Act during the year.

9. The Company has delivered all the certificates on lodgment thereof for transfer or for other purpose in accordance with the provisions of the Act and Rules made thereunder during the year.

10. The Company has declared and paid dividend to the eligible shareholders in compliance with the provisions of Section 205 of the Act during the year.

11. The Company has transferred the funds to Investor Education and Protection Funds in compliance with the provisions of Section 205C of the Act during the year.

12. The Company has paid remuneration to the Managing Director and Executive Director of the Company in terms of Section 198, 309 read with Schedule XIII of the Act. The approval of Shareholders for the revised remuneration of Mr. Jatender Kumar Mehta, Managing Director of the Company is being sought through Postal Ballot process and subject to the approval of Central Government.

13. The amount borrowed by the Company during the year is within the borrowing limits of the Company in terms of Section 293(1)(d) of the Act.

14. The Company has not appointed any sole selling agent in terms of Section 294 of the Act during the year.

15. The Company has not given any loan in terms of Section 295 of the Act during the year.

16. The Company has duly complied with the provisions of Section 297 of the Act during the year.

17. The Directors have disclosed their interest in terms of Section 299 of the Act.

18. The Company has not appointed any person at office or place of profit in terms of Section 314 of the Act during the year.

19. The Company has complied with the provisions of Section 372A of the Act during the year.

20. The Company has complied with the applicable provisions of SEBI (Substantial Acquisition of Shares and Takeover) Regulations, 1997 during the year.

21. The Company has complied with the applicable provisions of SEBI (Prohibition of Insider Trading) Regulation, 1992 during the year.

22. The Company has complied with the applicable provisions of SEBI (Depositories and Participants) Regulation, 1996 during the year.

23. The Company has received 21 investor's complaints/queries during the year and no complaint/query was pending as on 31.03.2009.

<div align="right">

Chandrasekaran Associates
Company Secretaries

Rupesh Agarwal
Partner
ACS No. 16302
CP No. 5673

</div>

Place: Delhi
Date: 25th July 2009

To The Members of **OMAX AUTOS LIMITED**

1.   We have audited the attached Balance Sheet of Omax Autos Limited, as at 31st March, 2009, the Profit and Loss Account and the Cash flow Statement of the Company for the year ended as on that date annexed thereto. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our Audit.

2.   We conducted our audit in accordance with auditing standards generally accepted in India. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of any material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statements presentation. We believe that our audit provides a reasonable basis for our opinion.

3.   As required by the Companies (Auditors' Report) Order, 2003 [as amended by Companies (Auditor's Report) (Amendment) Order, 2004] issued by the Central Government of India in terms of Section 227(4A) of the Companies Act, 1956, we enclose in the annexure a Statement on the matters specified in paragraphs 4 and 5 of the said order.

Further to our comments in Annexure referred to above, we report that:

a)   We have obtained all the information and explanations, which to the best of our knowledge and belief were necessary for the purposes of our audit;

b)   In our opinion, proper books of account, as required by law have been kept by the Company so far as appears from our examination of those books;

c)   The Balance Sheet, Profit and Loss Account and the Cash Flow Statement dealt with by this report are in agreement with the Books of Account of the Company;

d)   In our opinion, the Balance Sheet, the Profit and Loss Account and Cash Flow Statement dealt with by this report comply with the Accounting Standards referred to in section 211 (3C) of the Companies Act, 1956,

e)   On the basis of the written representations received from the Directors as on 31st March, 2009, and taken on record by the Board of Directors, we report that none of the Directors is disqualified as on 31st March, 2009 from being appointed as a Director in terms of clause (g) of sub-section (1) of section 274 of the Companies Act, 1956.

f)   In our opinion and to the best of our information and according to the explanations given to us, the accounts give the information required by the Companies Act, 1956, in the manner so required and give a true and fair view in conformity with the accounting principles generally accepted in India;

–   In the case of the Balance Sheet, of the state of the affairs of the Company as at 31st March 2009;

–   In the case of the Profit and Loss Account, of the profit for the year ended on that date, and

–   In the case of the Cash Flow statement, of the cash flows of the Company for the year ended on that date.

For and on behalf of
**A. KUMAR GUPTA & CO.**
(Chartered Accountants)

Place: New Delhi                                                    (A.K. GUPTA)
Date : 25.06.2009                                                    PARTNER
                                                                                    M. No. 12765

**Annexure to Auditors' Report**

The Annexure referred to in the auditor's report to the members of Omax Autos Limited for the year ended March 31, 2009. We report that:

1.   a)   The Company is maintaining proper records showing full particulars including quantitative details & situation of fixed assets.

b)   As explained to us, the Company has a system of physical verification, which is designed to cover all assets over a period of three years and in accordance herewith, physical verification of certain fixed assets of the Company was carried out during the year. In our opinion, the frequency of physical verification is reasonable having regard to the size of the Company and the nature of its fixed assets. No major discrepancy has been noticed during verification.

c)   Fixed assets disposed off during the year were not substantial. According to the information and explanations given to us, we are of the opinion that the disposal of fixed assets has not affected the going concern status of the company.

2.   a)   According to the information and explanations given to us, the inventory of finished goods, stores, spare parts and raw materials including components have been physically verified by the management during the year including for stock lying with third parties. The frequency of such verification is reasonable.

b)   In our opinion and according to the information


and explanations given to us, the procedure of physical verification of stocks followed by the management is reasonable and adequate in relation to the size of the Company and the nature of its business.

c) On the basis of our examination of the records of inventory, we are of the opinion that the Company is maintaining proper records of inventory. The discrepancies noticed on verification between the physical stock and the book records were not material in relation to the operations of the Company and the same have been properly dealt within the books of accounts.

3. a) According to information and explanations given to us, the Company has granted unsecured loans to Companies, firms or other parties covered in the register maintained under section 301 of the Companies Act, 1956, however, Maximum Amount involved is Rs. 110 Lacs & Closing Balance is Rs. 80.50 Lacs.

b) According to the information & explanations given to us, rate of interest and other terms and conditions of the aforesaid unsecured short term loans given by the Company are not prima facie prejudicial to the interest of the Company.

c) In our opinion and according to the information given to us, receipts of principal & interest of the aforesaid unsecured loan are regular.

d) During the year, the company has not taken any loans, secured or unsecured from Companies, firms or other parties covered in the register maintained under section 301 of the Companies Act, 1956.

4. In our opinion and according to the explanations given to us, there are adequate internal control procedures, commensurate with the size of the Company and the nature of its business, for the purchase of inventory, fixed assets and for the sale of goods and services. During the course of our audit, no weakness has been noticed in the internal controls.

5. a) As per information and explanations given to us, all the particulars of contracts or arrangements referred to in section 301 of the

Companies Act, 1956 and need to be entered into the register maintained under that section are found to be entered.

b) In our opinion and according to the information and explanations given to us the transactions made in pursuance of contracts and arrangements entered in the register maintained under section 301 of the Companies Act, 1956 and exceeding the value of rupees five Lacs in respect of any party during the year, have been made at the prices which are reasonable having regard to the prevailing market prices at that time.

6. The Company has not accepted any deposits during the year under report from the public under Section 58A and 58AA or any other relevant provisions of the Companies Act, 1956 and therefore, the provisions of clause 4(vi) of Companies (Auditor's Report) Order, 2003 (as Amendment) are not applicable to the Company.

7. In our opinion, the Company has an adequate internal audit system commensurate with the size and nature of its business.

8. We have broadly reviewed the books of Account maintained by the Company pursuant to the rules made by the Central Government for the maintenance of cost records under clause (d) of sub-section (1) of Section 209 of the Companies Act, 1956 and are of the opinion that prima facie the prescribed accounts & records have been kept by the Company so far as appears from our examination of the books of account of the Company.

9. a) According to the information and explanation given to us and on the basis of our examination of the books of accounts, the Company has been regular in depositing the statutory dues with appropriate authorities. There was no undisputed amount outstanding at the end for a period more than six months from the date they become payable.

b) According to the information and explanations given to us, The Disputed Statutory dues aggregating to Rs. 244.91 Lacs. That have not been deposited on account of matters pending before the appropriate authority are Amount are under :

| Sr. No. | Nature of the Statute | Nature of Dues | Fourm Where Dispute is pending | Period to which the amount relates | Amount (Rs. In Lacs) |
|---|---|---|---|---|---|
| 1 | Income Tax Act, 1961 | Disallowance of deduction, expenses | Commissioner of Income Tax (Appeal) | 1994-95 | 5.00 |
| 2 | Central Excise Act, 1944 | Disallowance of Cenvat Credit | CESTATE | 2004-05 | 238.43 |
| 3 | Income Tax Act, 1961 | Disallowance of deduction, expenses | Commissioner of Income Tax (Appeal) | 2005-06 | 1.48 |

10. The company does not have any accumulated losses at the end of the financial year and has not incurred any cash losses during the financial year covered by our audit and in the immediately preceding financial year.

11. Based on our audit procedures and on the information and explanations given to us by the management, we are of the opinion that the company has not defaulted in repayment of dues to any financial institutions or banks.

12. The company has not granted any loans and advances on the basis of security by way of pledge of shares, debentures and other securities, during the year under audit.

13. In our opinion, the Company is not a Chit Fund or Nidhi/Mutual Benefits Fund/Society. Therefore the provision of clause 4 (xii) of the Companies (Auditors' Report) Order, 2003 (as amended) are not applicable to the Company.

14. Based on our audit procedures and according to the information and explanations given to us by the management, the Company has maintained proper records of transactions & contracts and timely entries have been made therein. The shares, securities, debentures and other investments have been held by the Company in it's own name.

15. According to the information and explanations given to us by the management, the Company has not given any guarantee for loans taken by others from banks and financial institutions.

16. Based on our audit procedures and according to the information & explanation given to us, the terms loans were applied for which the loans were obtained.

17. In our opinion and according to the information & explanations given to us, the funds raised on short term basis have not been used for long-term investment.

18. The company has not made any preferential allotment of shares covered in the register maintained under Section 301 of the Companies Act, 1956.

19. During the period covered by our audit report, the Company has not issued any debentures.

20. The Company has not raised any money by way of public issue during the year.

21. According to the information and explanations given to us, no fraud on or by the company has been noticed or reported during the course of our audit.

For and on behalf of
**A. KUMAR GUPTA & CO.**
(Chartered Accountants)

Place: New Delhi
Date : 25.06.2009

(A.K. GUPTA)
PARTNER
M. No. 12765

**52** **Balance Sheet as at 31st March 2009**

(Rupees in lacs)

| PARTICULARS | SCHEDULE | Current Year as at 31.03.2009 | | Previous Year as at 31.03.2008 | |
|---|---|---|---|---|---|
| **SOURCES OF FUNDS** | | | | | |
| **SHARE HOLDER'S FUND** | | | | | |
| Share Capital | 1 | 2,138.82 | | 2138.82 | |
| Reserves & Surplus | 2 | 12,422.33 | 14,561.15 | 12,428.54 | 14,567.36 |
| **LOAN FUNDS** | | | | | |
| Secured Loan | 3 | 27,978.83 | | 29,460.79 | |
| Unsecured Loans | 4 | 301.00 | 28,279.83 | 3,081.23 | 32,542.02 |
| Deferred Tax Liability (Net) | 5 | | 1,443.95 | | 1,436.96 |
| **TOTAL** | | | 44,284.93 | | 48,546.34 |
| **APPLICATION OF FUNDS** | | | | | |
| **FIXED ASSETS** | | | | | |
| Gross Block | 6 | 41,162.77 | | 39,066.79 | |
| Less: Depreciation Reserve | | 15,241.41 | | 12,764.98 | |
| Net Block | | 25,921.36 | | 26,301.81 | |
| Capital Work in Progress & Advances | | 7,468.89 | 33,390.25 | 5,467.62 | 31,769.43 |
| **INVESTMENTS** | 7 | | 60.00 | | 60.00 |
| **CURRENT ASSETS, LOANS AND ADVANCES** | 8 | | | | |
| Inventories | | 3,629.65 | | 3,009.80 | |
| Sundry Debtors | | 8,927.41 | | 9,652.36 | |
| Cash & Bank Balances | | 4,102.13 | | 7,711.81 | |
| Loans & Advances | | 6,064.03 | | 4,866.98 | |
| | | 22,723.22 | | 25,240.95 | |
| **LESS : CURRENT LIABILITIES & PROVISIONS** | 9 | | | | |
| Current Liabilities | | 11,285.45 | | 7,548.34 | |
| Provisions | | 603.09 | | 1,045.79 | |
| | | 11,888.54 | | 8,594.13 | |
| **NET CURRENT ASSETS** | | | 10,834.68 | | 16,646.82 |
| **MISC. EXPENDITURE** | 10 | | – | | 70.09 |
| (To the extent not written off or adjusted) | | | | | |
| **TOTAL** | | | 44,284.93 | | 48,546.34 |
| **SIGNIFICANT ACCOUNTING POLICIES AND NOTES TO THE ACCOUNTS** | 16 | | | | |

For and on behalf of the Board of Directors

As per our report of even date
for A. KUMAR GUPTA & CO.
Chartered Accountants

NARESH TANDON
(Executive Director-Finance)

JATENDER KUMAR MEHTA
(Managing Director)

A.K. GUPTA
(Partner)
M.No. 12765

V.K. GUPTA
(Executive Director-Commercial
-cum-Company Secretary)

Dr. T.N. KAPOOR
(Director)

Place: New Delhi
Date: 25.06.2009

**Profit and Loss Account for the Year Ended 31st March 2009** **53**

(Rupees in lacs)

| PARTICULARS | SCHEDULE | Current Year ended 31.03.2009 | | Previous Year ended 31.03.2008 | |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| SALES & OTHER INCOME | 11 | | | | |
| Gross Sales | | 95867.41 | | 86494.02 | |
| Less : Excise Duty & Sales Tax | | 14659.77 | | 15058.94 | |
| Net Sales | | | 81207.64 | | 71435.08 |
| Other Income | | | 1865.92 | | 1610.39 |
| | | | 83073.56 | | 73045.47 |
| **EXPENDITURE** | | | | | |
| Cost of Material | 12 | 59590.26 | | 51175.26 | |
| Personnel Expense | 13 | 7819.77 | | 7432.12 | |
| Power,Fuel and Lubricants | | 2588.76 | | 2643.32 | |
| Manufacturing, Adm. and Selling Expenses | 14 | 5083.60 | 75082.39 | 4426.85 | 65677.55 |
| PROFIT FROM ORDINARY ACTIVITIES BEFORE INTEREST, DEPRECIATION AND TAX | | | 7991.17 | | 7367.92 |
| Interest and Financial Charges | 15 | | 4238.84 | | 2954.67 |
| PROFIT FROM ORDINARY ACTIVITIES BEFORE DEPRECIATION AND TAX | | | 3752.33 | | 4413.25 |
| Depreciation | | | 2849.83 | | 2676.68 |
| PROFIT FROM ORDINARY ACTIVITIES BEFORE TAX AND EXCEPTIONAL INCOME | | | 902.50 | | 1736.57 |
| Exceptional income (net) (Refer note 2 (f)) | | | − | | 621.19 |
| PROFIT FROM ORDINARY ACTIVITIES BEFORE TAX | | | 902.50 | | 2357.76 |
| Provision for Income Tax | | | | | |
| Current Tax | | 352.86 | | 670.44 | |
| Deferred Tax (Refer Note 2 (g)) | | 6.99 | 359.85 | 103.35 | 773.79 |
| PROFIT FROM ORDINARY ACTIVITIES AFTER TAX | | | 542.65 | | 1583.97 |
| Prior Period Adjustments (Net) (Refer Note 2 (h)) | | | 134.85 | | 25.95 |
| NET PROFIT AVAILABLE FOR APPROPRIATION | | | 677.50 | | 1609.92 |
| APPROPRIATIONS | | | | | |
| Proposed dividend | | 213.88 | | 320.83 | |
| Dividend Distribution Tax | | 36.35 | 250.23 | 54.52 | 375.35 |
| General Reserve | | | 400.00 | | 1000.00 |
| Surplus carried to Balance Sheet | | | 27.27 | | 234.57 |
| **TOTAL** | | | 677.50 | | 1609.92 |
| EARNINGS PER SHARE (Equity Shares, par value Rs. 10/- each) | | | | | |
| Basic/ Diluted EPS (Rs.) (Refer Note 2(p)) | | | 3.17 | | 7.53 |
| SIGNIFICANT ACCOUNTING POLICIES AND NOTES TO THE ACCOUNTS | 16 | | | | |

For and on behalf of the Board of Directors

As per our report of even date
for A. KUMAR GUPTA & CO.
Chartered Accountants

NARESH TANDON
(Executive Director-Finance)

JATENDER KUMAR MEHTA
(Managing Director)

A.K. GUPTA
(Partner)
M.No. 12765

V.K. GUPTA
(Executive Director-Commercial
-cum-Company Secretary)

Dr. T.N. KAPOOR
(Director)

Place: New Delhi
Date: 25.06.2009

OMAX AUTOS LIMITED

54 Schedules Annexed to & Forming Part of the Accounts

(Rupees in lacs)

| PARTICULARS | | Current Year as at 31.03.2009 | | Previous Year as at 31.03.2008 |
|---|---|---|---|---|
| **SCHEDULE-1** | | | | |
| **SHARE CAPITAL** | | | | |
| **Authorised Capital :** | | | | |
| 2,65,00,000 (Previous Year 2,65,00,000) Equity Shares of Rs.10/-each | | **2650.00** | | 2650.00 |
| 20,00,000 (Previous Year 20,00,000) Equity Shares of Rs.10/-each with Differential Voting Rights | | **200.00** | | 200.00 |
| 1,50,000 (Previous Year 1,50,000) 12% Optionally Convertible Cummulative Preference Shares of Rs.100/- each | | **150.00** | | 150.00 |
| | | **3000.00** | | 3000.00 |
| **Issued Subscribed and paid up Capital :** | | | | |
| 2,13,88,213 (Previous Year 2,13,88,213) Equity Shares of Rs. 10/- each | | **2,138.82** | | 2,138.82 |
| (Out of the above 1,61,25,000 Equity Shares have been allotted as fully paid-up by way of Bonus Shares by Capitalisation of Share Premium & General Reserve and 78,213 Equity Shares have been allotted as fully paid up in terms of the scheme of amalgamation for consideration other than cash.) | | **2,138.82** | | 2,138.82 |
| **SCHEDULE-2** | | | | |
| **RESERVES AND SURPLUS** | | | | |
| Share Premium | | **1,568.00** | | 1,568.00 |
| Capital Reserve | | **0.12** | | 0.12 |
| Capital Redemption Reserve | | **136.53** | | 136.53 |
| General Reserve | | | | |
| Balance as per last Balance Sheet | **9,745.90** | | 8,745.90 | |
| Less : Hedge Reserve Account (Refer note no. 2m) | **433.48** | | – | |
| Add : Transfer from Profit & Loss A/c | **400.00** | **9,712.42** | 1,000.00 | 9,745.90 |
| Profit & Loss Account | | | | |
| Balance as per last Balance Sheet | **977.99** | | 743.42 | |
| Add : Transferred from Profit & Loss A/c | **27.27** | **1,005.26** | 234.57 | 977.99 |
| | | **12,422.33** | | 12,428.54 |

(Rupees in lacs)

| PARTICULARS | | Current Year as at 31.03.2009 | | Previous Year as at 31.03.2008 | |
|---|---|---|---|---|---|
| **SCHEDULE-3** | | | | | |
| **SECURED LOANS** | | | | | |
| Term Loans | (a) | | | | |
| - United Bank of India | | **7,416.69** | | 4,656.83 | |
| - ABN Amro Term Loan | | **2,280.00** | | | |
| - ICICI Bank | | **4,015.57** | | 4,380.63 | |
| - Tata Capital Ltd. | | **1,545.70** | **15,257.96** | – | 9,037.46 |
| Loans and advances from Banks | | | | | |
| Working Capital Limits | (b) | | | | |
| - State Bank of India | | **2,127.23** | | 4,740.16 | |
| - Canara Bank | | **1,160.37** | | 855.30 | |
| - Citi Bank | | **1,343.22** | | 2,066.98 | |
| - Standard Chartered Bank | | **504.90** | | 450.00 | |
| - ABN AMRO Bank | | **520.25** | | 1,511.35 | |
| - HSBC Bank | | **3,000.00** | **8,655.97** | 3,000.00 | 12,623.79 |
| Overdraft Against FDR | | | **2,921.90** | | 6,756.60 |
| Sales Tax Deferment | (c) | | **1,143.00** | | 1,042.94 |
| | | | **27,978.83** | | 29,460.79 |

(a)   Term Loans from United Bank of India are secured by way of first charge/mortgage by way of deposit of title deeds of Land & Building of Speedomax Plant, Banglore Plant & Binola Plant and exclusive first charge on the plants & machineries and other movable fixed assets of all other units (Dharuhera, sprocket & Indital) except Manesar, financed by Term Loan I & II and Exclusive charge on the plants & machineries and other movable fixed assets of all other units (Sprocket, Indital) except Dharuhera financed by term loan III and creation of exclusive hypothecation charge on plant and machinary and other moveable fixed assets of Rs. 6.82 crores installed at Manesar plant.

(b)   Term Loan from ICICI Bank   is secured by way of first charge/mortgage by way of deposit of title deeds of Land & Building of Dharuhera Plant and hypothecation of other movable assets both present and future.

(c)   Term Loans from ABN AMRO Bank is secured by way of first charge/mortgage by way of deposit of title deeds of Land & Building of Corporate Office at Sec.-32 , Gurgaon and warehouse at village Behrampur,Gurgaon.

(d)   Term Loans from TATA Capital Limited is secured by way of exclusive charge on all the present and future fixed assets ( excluding land & building ) of Lucknow project and negative lien on the building/ super structure created on the land covered under term loan and equitable mortgage by way of deposit of title deed of Sector-44, institutional plot, Gurgaon and hypothecation of receivables of Lucknow plant in respect of supply to TATA Motor Ltd.

(e)   Cash Credit Working Capital Limits from Banks are secured by hypothecation of stock and book debts. Cash Credit from State Bank of India are further secured by way of deposit of title deed of Land & Building of Manesar Plant and hypothecation of company's other movable assets both present & future except for the plant and machineries and other moveable fixed assets of Rs. 6.82 crores installed at Manesar plant and financed by UBI under term loan III having exclusive charge on these assets.

(f)   Sales Tax Deferment is partially secured by way of bank guarantees.

| **SCHEDULE-4** | | | | |
|---|---|---|---|---|
| **UNSECURED LOANS** | | | | |
| Advances received from customers | | **301.00** | | 54.14 |
| Short term loan from banks-Deutsche Bank | | **–** | | 3,027.09 |
| | | **301.00** | | 3,081.23 |

| **SCHEDULE 5** | | | | |
|---|---|---|---|---|
| **DEFERRED TAX LIABILITY (NET)** | | | | |
| Deferred Tax Liability | | | | |
| Opening Balance | | **1,436.96** | 1,333.61 | |
| Add : Deferred Tax for the Year (Ref. To Note 2(g)) | | **6.99** | **1,443.95** | 103.35 | 1,436.96 |
| | | | **1,443.95** | | 1,436.96 |

OMAX AUTOS LIMITED

**56  Schedules Annexed to & Forming Part of the Accounts**

**SCHEDULE-6**
**FIXED ASSETS**

(Rupees in Lacs)

| PARTICULARS | GROSS BLOCK | | | | DEPRECIATION | | | | NET BLOCK | |
|---|---|---|---|---|---|---|---|---|---|---|
| | AS ON 01.04.2008 | ADDITIONS | SALE / TRANSFER | TOTAL AS ON 31.3.2009 | AS ON 01.04.2008 | FOR THE YEAR | ADJUSTMENTS DURING THE YEAR 31.03.2009 | UP TO 31.3.2009 | AS ON 31.03.2009 | AS ON 31.03.2008 |
| Land | 2784.11 | 160.10 | (472.46) | 2471.75 | – | – | – | – | 2471.75 | 2784.11 |
| Building | 8640.66 | 334.51 | 25.38 | 9000.55 | 910.46 | 270.00 | 8.95 | 1189.41 | 7811.14 | 7730.19 |
| Plant & Machinery | 19466.73 | 1812.63 | (442.14) | 20837.22 | 6929.45 | 1425.64 | (180.17) | 8174.92 | 12662.30 | 12537.28 |
| Dies & Tools | 3626.20 | 450.13 | (498.79) | 3577.54 | 2428.89 | 655.08 | (337.94) | 2746.03 | 831.52 | 1197.31 |
| Furniture & Fixture & Office Equipment | 2765.31 | 128.50 | 437.95 | 3331.76 | 1558.62 | 258.13 | 188.88 | 2005.63 | 1326.13 | 1206.69 |
| Computer & Other Equipments | 497.44 | 41.87 | (9.05) | 530.26 | 311.68 | 78.04 | (3.41) | 386.31 | 143.95 | 185.76 |
| Vehicles | 755.79 | 252.68 | (136.85) | 871.62 | 286.47 | 82.86 | (49.71) | 319.61 | 552.01 | 469.32 |
| Intangible Asset | 530.55 | 11.52 | – | 542.06 | 339.41 | 80.09 | – | 419.50 | 122.56 | 191.14 |
| Total | 39066.79 | 3191.94 | (1,095.96) | 41162.77 | 12764.98 | 2849.83 | (373.40) | 15241.41 | 25921.36 | 26301.81 |
| Previous Year | 35608.74 | 4595.60 | 1137.55 | 39066.79 | 10427.22 | 2676.68 | 338.92 | 12764.98 | 26301.81 | 25181.52 |

**CAPITAL WORK IN PROGRESS & CAPITAL ADVANCES**

| | Current Year | Previous Year |
|---|---|---|
| Capital Advances | 4801.72 | 4063.60 |
| Machinery under Installation | 1403.30 | 902.40 |
| Building under Construction | 412.09 | 120.25 |
| Furniture & Fitting under Installation | 33.48 | 24.07 |
| Dies & Tools under Installation | 106.75 | 169.60 |
| Preoperative Expenses | 711.55 | 187.70 |
| | 7468.89 | 5467.62 |

OMAX AUTOS LIMITED

**Schedules Annexed to & Forming Part of the Accounts**  **57**

(Rupees in lacs)

| PARTICULARS | Current Year as at 31.03.2009 | Previous Year as at 31.03.2008 |
|---|---|---|
| **SCHEDULE-7** | | |
| **INVESTMENTS** | | |
| QUOTED, LONG TERM AND NON TRADE : | | |
| Mutual Funds | | |
| DWS Fixed Term Plan | **60.00** | 60.00 |
| 6,00,000 Units of the face value of Rs. 10/- each (Previous Year - 6,00,000 units) | | |
| Market value Rs. 70.86 Lacs ( Previous year Rs 66.50 Lacs) | | |
| | **60.00** | 60.00 |
| | | |
| **SCHEDULE- 8** | | |
| **CURRENT ASSETS , LOANS AND ADVANCES** | | |
| **CURRENT ASSETS** | | |
| Inventories (as valued & certified by management) | | |
| (Refer Note 1 (f)) | | |
| Raw Material and components | **1,590.62** | 1,317.66 |
| Work-in-Progress | **787.09** | 570.29 |
| Finished Goods | **988.09** | 968.57 |
| Store & Tools | **175.14** | 147.60 |
| Scrap | **88.71**    **3,629.65** | 5.68    3,009.80 |
| **Sundry Debtors** (Unsecured) | | |
| Outstanding over six months | | |
| Considered Good | **85.18** | 220.68 |
| Considered Doubtful | **44.02** | – |
| | **129.20** | 220.68 |
| Less : Provision | **44.02** | – |
| | **85.18** | 220.68 |
| Other debtors | | |
| Considered Good | **8,842.23**    **8,927.41** | 9,431.68    9,652.36 |
| **Cash and Bank Balances** | | |
| Cash and Cheques in hand | **23.39** | 23.29 |
| Balance with Schedule Banks | | |
| On Current Account | **335.35** | 8.98 |
| On Cash Credit Account | **–** | 6.32 |
| Fixed Deposits | **3,611.02** | 7,619.26 |
| | **3,946.37** | 7,634.56 |
| Balance with Other Banks | | |
| On Current Account | **102.29** | 23.69 |
| On Unpaid Dividend Account | **30.08** | 30.27 |
| | **132.37**    **4,102.13** | 53.96    7,711.81 |
| **LOANS AND ADVANCES** | | |
| Advance recoverable in cash or in kind or | | |
| for value to be received | | |
| Considered Good | **5,884.59** | 4,697.27 |
| Security Deposits | **179.44**    **6,064.03** | 169.71    4,866.98 |
| | **22,723.22** | 25,240.95 |

OMAX AUTOS LIMITED

**58** S c h e d u l e s   A n n e x e d   t o   &   F o r m i n g   P a r t   o f   t h e   A c c o u n t s

(Rupees in lacs)

| PARTICULARS | | Current Year as at 31.03.2009 | | Previous Year as at 31.03.2008 |
|---|---|---|---|---|
| **SCHEDULE-9** | | | | |
| **CURRENT LIABILITIES AND PROVISIONS** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Sundry Creditors | | | | |
| Payable to Micro & S.M.E (Refer Note 2 (b)) | – | | 529.18 | |
| (Previous year S.S.I units) | | | | |
| Others | 8,889.12 | 8,889.12 | 4,739.02 | 5,268.20 |
| Interest Payable | | 45.65 | | 29.92 |
| Other Liabilities | | 1,887.12 | | 2,219.95 |
| Unclaimed Dividend | | 30.08 | | 30.27 |
| Provision for fair valuation loss on derivative | | | | |
| (Refer note no. 2m) | | 433.48 | | – |
| | | 11,285.45 | | 7,548.34 |
| **PROVISIONS** | | | | |
| Provision for Taxation | | 352.86 | | 670.44 |
| Proposed Dividend | | 213.88 | | 320.83 |
| Provision for Dividend Distribution Tax | | 36.35 | | 54.52 |
| | | 603.09 | | 1,045.79 |
| | | | | |
| **SCHEDULE-10** | | | | |
| **MISCELLANEOUS EXPENDITURE** | | | | |
| (to the extent not written off or Adjusted) | | | | |
| Deferred Revenue Expenditure | | | | |
| Balance brought forward | 70.09 | | – | |
| During the year | – | | 87.61 | |
| Less :Written off during the year | 70.09 | – | 17.52 | 70.09 |
| | | – | | 70.09 |
| | | | | |
| **SCHEDULE-11** | | | | |
| **GROSS SALES & OTHER INCOME** | | | | |
| **GROSS SALE** | | | | |
| Sale of finished goods | 92771.72 | | 84298.40 | |
| Job & Process Charges | 343.63 | | 234.09 | |
| Material, Scrap & other Sale | 2611.15 | | 1887.86 | |
| Export Incentive | 140.91 | | 73.67 | |
| | | 95867.41 | | 86494.02 |
| **OTHER INCOME** | | | | |
| Cash Discounting | 245.89 | | 353.97 | |
| Rent Income | 73.75 | | 4.61 | |
| Interest (Including TDS of Rs. 212.53 Lacs, | | | | |
| Previous Year TDS Rs. 251.75 Lacs) | 963.37 | | 1168.61 | |
| Profit on Sale of Fixed Assets | 290.18 | | 80.52 | |
| Foreign Exchange Fluctuation Gain (Net) | 262.71 | | – | |
| Misc. Income** | 30.02 | | 2.68 | |
| | | 1865.92 | | 1610.39 |
| | | 97733.33 | | 88104.41 |

**Includes interest on income tax refund Rs.24.12 lacs (Previous year NIL)

**Schedules Annexed to & Forming Part of the Accounts** 59

(Rupees in lacs)

| PARTICULARS | | Current Year<br>as at 31.03.2009 | | Previous Year<br>as at 31.03.2008 |
|---|---|---|---|---|
| **SCHEDULE-12** | | | | |
| **COST OF MATERIAL** | | | | |
| Raw Material and Components consumed | | | | |
| Opening Stock | **1317.66** | | 1142.27 | |
| Add : Purchases | **57715.76** | | 48646.77 | |
| | **59033.42** | | 49789.04 | |
| Less: Closing Stock | **1684.93** | **57348.49** | 1317.66 | 48471.38 |
| Increase (-) / Decrease in stock of finished | | | | |
| Goods and Work in Progress | | | | |
| Opening Stock | **1544.53** | | 1789.45 | |
| Less: Closing Stock | **1863.89** | **-319.36** | 1544.53 | 244.92 |
| Consumption of Stores & Tools | | **2561.13** | | 2458.96 |
| | | **59590.26** | | 51175.26 |
| | | | | |
| **SCHEDULE-13** | | | | |
| **PERSONNEL EXPENSES** | | | | |
| Salary,Wages and Allowances | | **7362.08** | | 6957.26 |
| Contribution to Provident Fund and E.S.I | | **255.70** | | 239.08 |
| Workmen and Staff Welfare | | **61.93** | | 63.93 |
| Directors remuneration & perks | | **135.38** | | 168.22 |
| Directors Sitting Fee | | **4.68** | | 3.63 |
| | | **7819.77** | | 7432.12 |
| | | | | |
| **SCHEDULE-14** | | | | |
| **MANUFACTURING, ADMIN & SELLING EXPENSES** | | | | |
| Outside Job work Expenses | | **1422.40** | | 1265.58 |
| Freight Inward, Cartage and Octroi | | **144.45** | | 111.61 |
| Packing Material Consumed | | **513.25** | | 355.48 |
| Rent | | **35.89** | | 16.86 |
| Repair and Maintenance | | | | |
| Building | | **54.21** | | 41.89 |
| Plant and Machinery | | **389.49** | | 381.95 |
| Other | | **168.71** | | 159.43 |
| Insurance | | **143.38** | | 162.35 |
| Rate, Fees and Taxes | | **31.91** | | 46.36 |
| Charity and Donation | | **7.21** | | 13.73 |
| Loss on Sale of Fixed Assets | | **54.01** | | 13.74 |
| Provision for doubtful debts | | **44.02** | | – |
| Selling & Distribution Expenses | | **1245.87** | | 1100.95 |
| Other Administrative Expenses | | **828.80** | | 756.92 |
| | | **5083.60** | | 4426.85 |
| | | | | |
| **SCHEDULE-15** | | | | |
| **INTEREST AND FINANCIAL CHARGES** | | | | |
| Interest on Term Loan | | **753.14** | | 654.21 |
| Interest on working capital | | **2492.44** | | 1765.52 |
| Cash Discounting Charges | | **459.75** | | 382.57 |
| Bank Charges & Deferred revenue exp. w/off | | **157.08** | | 152.37 |
| Currency (gain) / loss | | **376.43** | | – |
| | | **4238.84** | | 2954.67 |

O M A X   A U T O S   L I M I T E D

**SCHEDULE-16**

**1. SIGNIFICANT ACCOUNTING POLICIES :**

**(a) BASIS OF PREPARATION OF FINANCIAL STATEMENTS :**

The Financial Statements are prepared on accrual basis of accounting under the historical cost convention, in accordance with the mandatory applicable accounting standards issued by The Institute of Chartered Accountants of India and the relevant presentational requirements of the Companies Act, 1956.

**(b) REVENUE RECOGNITION :**

The revenue from sale of products is recognized at the point of dispatches of finished goods to the customers.

Export benefits are accounted on an accrual basis.

Interest income is recognized on proportionate basis inclusive of tax deducted at source thereon.

**(c) FIXED ASSETS :**

Fixed assets are stated at cost of acquisition including installation cost. Cost of Acquisition  is inclusive of freight, taxes, duties , insurance, interest, and other incidental expenses, net of cenvat credits, wherever applicable.

**(d) INTANGIBLE ASSETS :**

Intangible Assets  are amortized using Straight Line Method @ 25% p.a as per AS-26 on "Intangible Assets" issued by The Institute of Chartered Accountants of India.

**(e) DEPRECIATION :**

Depreciation on all the fixed assets is provided on pro rata basis by using the straight-line method at rates on double shift basis wherever applicable, in the manner specified in Schedule XIV of the Companies Act, 1956 except in the case of following assets where depreciation rate is provided at rates indicated against each asset:

| Name of assets | Dep. Rates |
|---|---|
| Dies, Tools & Fixtures | 33.33% |
| Rack, Bins & Trollies | 20.00% |
| Computer | 25.00% |
| Computer Software | 25.00% |
| Furniture & Fixture | 10.00% |
| Office Equipment | 10.00% |
| Vehicle | 12.00% |

**(f) VALUATION OF INVENTORIES :**

The valuation of Stock is as per Accounting Standard on " Valuation of Inventories" (AS-2) issued by the Institute of Chartered Accountants of India.

Stores & spares parts and loose tools are stated at cost.

Raw material & components, finished goods and work in progress are valued at cost or net realizable value whichever is lower.

Scrap is valued at estimated realizable value.

**The basis for determining the cost of various inventories are as under**

| | | |
|---|---|---|
| Raw material & Stores Tools | – | At yearly weighted average cost. |
| Work in Progress | – | Material cost plus appropriate portion of labour and production overheads. |
| Finished Goods & Goods in transit | – | At cost or net realizable value whichever is less. |

Finished Goods are valued inclusive of Excise Duty thereon.

**(g) INVESTMENTS :**

Current Investment are carried at the lower of cost and quoted/fair value, computed category wise. Long term Investment are stated at cost . Provision for diminution in the value of long term Investment, if any, is made only if such a decline is other than temporary in the opinion of management.

**(h) INSURANCE CLAIMS :**

Insurance claims receivable are accounted for depending on the certainty of receipts and are being credited to the respective heads of expenses.

(j) **FOREIGN CURRENCY TRANSACTIONS :**

Transactions denominated in foreign currencies are normally recorded at the exchange rates prevailing on the date of transaction.

Exchange differences arising on foreign currency transaction settled during the year are recognized in the Profit & Loss Account for the year.

All the Monetary items denominated in foreign currency outstanding at the year end are translated at exchange rates prevailing on the date of balance sheet. The resulted exchange difference whether any income or expenses on account of exchange difference either on settlement or on translation are recognized in Profit & Loss Account for the year.

In case of Forward contracts, the differences between the forward rate and the exchange rate on the date of the transaction is recognized in the Profit & loss Account.

(j) **BORROWING COSTS :**

Borrowing costs that are attributable to the acquisition or construction of qualifying assets of new projects are capitalized as part of the cost of such assets.

A qualifying asset is one that necessarily takes substantial period of time to get ready for intended use. All other borrowing costs are charged to revenue.

(k) **TAXATION :**

Provision for Income Tax (current tax ) is made on the basis of result of the year at the current rate of tax in accordance with Income Tax Act,1961. Deferred tax reflect the impact of current year timing difference between taxable income and timing difference of earlier years. Deferred tax is measured based on the tax rates and tax laws enacted or substantively enacted at the balance sheet date as per AS-22 on "Accounting for Taxes on Income" issued by The Institute of Chartered Accountants of India. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the profit and loss account in the year of change. Deferred tax assets arising from temporary timing difference are recognized to the extent there is a reasonable certainty that the assets can be realized in the future.

(l) **IMPAIRMENT OF ASSETS**

At each  Balance Sheet date, the company reviews, whether there is any indication that an asset may be impaired. If any such indication exists, the Company estimates the recoverable amount. If the carrying amount of the asset exceed its recoverable amount an impairment loss is recognized in the Profit & Loss account to the extent the carrying amount exceeds the recoverable amount.

(m) **RETIREMENT BENEFITS :**

Liabilities in respect of retirement benefits to employees are provided for as follows:

(i)   Defined Benefit Plan

Gratuity Liability is computed on the basis of premium paid to LIC of India as per actuarial valuation under Projected Unit Credit Method.

(ii)   Defined Contribution Plans

Liability for superannuation fund on the basis of the premium paid to LIC of India in respect of employees covered under Superannuation Fund Policy. Provident fund & ESI on the basis of actual liability accrued and paid to authority.

(iii)   Provision for compensated absences towards earned leave are determined using Projected Unit Cost method, with actuarial valuation being carried out at Balance Sheet date.

2.   **NOTES TO THE ACCOUNTS**

(Rupees in Lacs)

| | | Current Year as at 31.03.2009 | Previous Year as at 31.03.2008 |
|---|---|---|---|
| (a) | CONTINGENT LIABILITIES | | |
| | (i)   Guarantees given | 1,030.90 | 321.44 |
| | (ii)   Excise Matters | 238.43 | 211.00 |
| | (iii)   Income Tax Matter | 6.48 | 90.00 |
| | (iv)   Letter of credit | 586.65 | – |
| | (v)   Estimated amount of contracts remaining to be executed on account of capital commitments and not provided for | 1,182.60 | 1,687.81 |

vi)   The Company has entered into a Swap transaction of amount in INR into amount in USD.The outstanding amount as on 31st March 2009 is INR 3590 Lakhs and in USD 91.24 Lakhs. The probable loss/gain is dependent on USD/INR parity at the respective dates of settlement during the span of  transaction period upto March 2012.In view of the fact that no precise estimate can be made in this regard ,no provision on this has been made.

OMAX AUTOS LIMITED

**62**   S c h e d u l e s   A n n e x e d   t o   &   F o r m i n g   P a r t   o f   t h e   A c c o u n t s

(Rupees in Lacs)

| | | Current Year as at 31.03.2009 | Previous Year as at 31.03.2008 |
|---|---|---|---|
| (b) | Particulars of small-scale industries as defined under Micro, Small & Medium Enterprises Development Board 2006 have been identified company on the basis of information available with the company | | |
| (c) | Computation of Net Profit in Accordance with Section 198 of the Companies Act,1956. | | |
| | Profit before Tax as per Profit & Loss Account | 902.50 | 2,357.76 |
| | Add: Directors Remuneration (Including perquisites)* | 133.30 | 164.47 |
| | Add :(Profit)/Loss on Sale of Fixed Assets (net) | (236.17) | (687.97) |
| | Net Profit as per Section 349 of the Companies Act,1956 | 799.63 | 1,834.26 |
| | Maximum Limit for managerial remuneration to the Directors @ 10% of net profit as above | 79.96 | 183.43 |
| | Maximum Limit for commission to non whole time Directors @ 1% of net profit as above | 8.00 | 18.34 |
| | Total Managerial Remunerationpaid/ payable | 133.30 | 164.47 |
| | *Note : Remuneration of Managing Director, Mr. Jitender Mehta has been increased to Rs. 90 lacs from Rs.18 lacs p.a which is subject to approval of shareholders and Company Low Board. Further,commision of Rs. 2.08 lacs to non executive director is also subject to approval of shareholders. | | |
| (d) | Remuneration and perks paid / payable to Directors : | | |
| | Salary | 126.49 | 46.22 |
| | Perks | 6.81 | 18.25 |
| | Commission | 2.08 | 103.75 |
| | Provident Fund | 5.90 | 5.23 |
| | | 141.28 | 173.45 |
| (e) | Auditor's Remuneration paid/payable during the year | | |
| | Audit fee | 3.00 | 2.75 |
| | Tax audit fee | 1.00 | 1.00 |
| | Certification fee | 1.00 | 0.95 |
| | Re-imbursement of expenses | 1.32 | 0.71 |
| | | 6.32 | 5.41 |
| (f) | Exceptional income | | |
| i) | Profit/(Loss) on Sale of Land, building and other assets of Automax -Gurgaon Plant | – | 876.94 |
| ii) | Profit/( Loss) on sale of Investment in Omax Steels Limited | – | (255.75) |
| | Exceptional income (net) | – | 621.19 |
| (g) | Deferred Tax (AS-22) The break up of the net deferred tax liability arises on account of  timing difference as on 31st March,2009 is as under : Deferred tax liability- | | |
| | Deprecation | 16.45 | 153.30 |
| | Others | 223.27 | 90.86 |
| | Total Deferred tax liability (i) | 239.72 | 244.16 |
| | Disallowance u/s 43B | | |
| | Others (ii) | 232.73 | 140.81 |
| | Net deferred tax asset/(liability) (ii)-(i) | (6.99) | (103.35) |
| (h) | Prior period adjustments | | |
| (i) | Income Tax Refund | (110.75) | (4.10) |
| (ii) | Excess Provision for Taxation & other items pertain to previous year. | (24.10) | 30.05 |
| | Total (net) | (134.85) | 25.95 |

(I)   Gross turnover is net of inter unit transfer of Rs 4905.92 (Previous year Rs. 4422.00 lacs )

(j)   Gross turnover includes direct & deemed exports of Rs 5265.63 lacs (Previous year Rs. 3445.53 lacs)

(k)   Interest paid on borrowed funds during construction period pertaining  to major expansion plan is capitalized for Rs. 376.69 lacs (Previous Year Rs. 198 Lacs).

O M A X   A U T O S   L I M I T E D

l)   As per the policy on Deferred Revenue Expenditures being followed by the Company earlier, the Company was writing off the miscellaneous expenditures in five equal yearly installments. However, in view of Accounting Standard-26 (Accounting of Intangible Assets), the Company has written off the entire outstanding amount of Rs. 70.09 lacs instead of Rs. 17.52 lacs. Due to this change, Interest and financial charges has increased by Rs. 52.57 lacs, consequently, profit for the year and Reserve & Surplus  has been decreased by Rs. 52.57 lacs.

m)  The Company has taken derivative options for hedging of foreign currency exposure against exports. Due to these derivative options, the outstanding Mark to Market (MTM) as on 31.03.09  in Dollar is  USD 8.51 Lacs  and equivalent amount of  MTM in INR is Rs. 433.48 Lacs The company has created a provision for fair valuation loss on derivatives of Rs.433.48 Lacs under current liabilities & provisions and has correspondingly debited  the amount in Hedge Reserve account under Reserve & Surplus.

n)   Related Party Disclosure as required under Accounting Standard-18 on "Related Party Disclosure" issued by the Institute of Chartered Accountants of India are given below :

1)   Relationship :

   a)   Key management Personnel & their Relatives :

| | |
|---|---|
| Mr. Jatender Kumar Mehta | Managing Director |
| Mrs. Kiran Mehta | Wife |
| Mr.Devashish Mehta | Son |
| Mr. Punit Kaura | Son in law |
| Mrs. Sakshi Kaura | Daughter |
| Mr. Ritesh Katyal | Son in law |
| Mrs. Sandhya Katyal | Daughter |
| Mr. Ravinder Kumar Mehta | Managing Director |
| Mrs. Usha Mehta | Wife |
| Mr. Sandeep Dewan | Son in law |
| Mrs. Ekta Dewan | Daughter |
| Mr. Vinay Dhanda | Son in law |
| Mrs. Sarika Dhanda | Daughter |
| Mr. Varun Mehta | Son |
| Smt. Raj Dulari | Mother |
| Mr. S.M. Mehta | Brother |
| Mrs. Swaraj Mehta | Brother's Wife |
| Mr. S.K. Mehta | Brother |
| Mrs. Sudesh Mehta | Brother's Wife |
| Mr. K.C. Chawla | Whole Time Director |
| Mrs. Savita Chawla | Wife |
| Mr. Sandeep Kumar | Son in law |
| Mrs. Deepti Kumar | Daughter |
| Ms. Ridhima Chawla | Daughter |

   b)   Entities over which key management personnel and their relatives are able to exercise significant influence

   i)    Forerunner Capital Investment Limited
   ii)   Green Systems Limited
   iii)  Mehta Engineers Limited
   iv)   Omax Bikes Limited
   v)    Omax Fusions Limited
   vi)   Vishal Engineers
   vii)  Autotech Components (P) Ltd.
   viii) J.K. Mehta (HUF)
   ix)   R.K. Mehta (HUF)
   x)    S.K. Mehta (HUF)
   xi)   S.M. Mehta (HUF)
   xii)  Gurgaon Energy & Infrastructure Ltd.
   xiii) Haridwar Estates Pvt Ltd.

**64** S c h e d u l e s   A n n e x e d   t o   &   F o r m i n g   P a r t   o f   t h e   A c c o u n t s

2)  **The following transactions were carried out with related parties in the ordinary course of business and on arms length.**

(Rupees in Lacs)

|  | Current Year as at 31.03.2009 | Previous Year as at 31.03.2008 |
|---|---|---|
| **Purchase of Goods from Associate Parties** | | |
| Omax Fusion Ltd. | 2,048.82 | 1,303.64 |
| Mehta Eng. Ltd. | 1,293.29 | 2,009.58 |
| Autotech Components P Ltd. | 999.14 | 513.71 |
| **Sale of Goods incl. Job work to Associate Parties** | | |
| Omax Fusion Ltd. | 31.38 | 1.33 |
| Mehta Eng. Ltd. | 10.76 | 0.60 |
| Autotech Components P Ltd. | 2.91 | 1.39 |
| **Sale of Fixed Assets to Associate Parties** | | |
| Omax Fusion Ltd. | – | 0.46 |
| Autotech Components P Ltd. | 0.33 | – |
| **Interest Recd. from Associate Parties** | | |
| Omax Fusion Ltd. | 18.70 | 33.00 |
| Autotech Components P Ltd. | – | 1.28 |
| Haridwar Estates Pvt Ltd | 89.55 | 117.27 |
| **Rent Paid** | | |
| **Relatives of Key Management Personnel** | | |
| Mrs. Kiran Mehta | 15.20 | – |
| **Advance Against Purchase of Land** | | |
| **To Associate Parties** | | |
| Haridwar Estates Pvt Ltd | 288.96 | 1,263.94 |
| **Loans/Advance paid to Associate Parties** | | |
| Omax Fusion Ltd. | 74.50 | 200.00 |
| Autotech Components P Ltd. | 6.00 | 10.00 |
| **Dividend** | | |
| Key Management Personnel | 26.64 | 39.97 |
| Relatives of Key Management Personnel | 30.04 | 45.06 |
| Associate Parties | 54.84 | 82.25 |
| **Directors Remuneration & Perks** | | |
| Key Management Personnel | | |
| Director's remuneration | 133.30 | 164.47 |

(o)  **SEGMENT REPORTING:**

The company is primarily engaged in the business of Auto Components for Two Wheeler and Four wheeler industry, which are governed by the same set of risk and returns. As the company's business activity falls within a single primary business segment, the disclosure requirements of Accounting Standard ( AS-17) " Segment Reporting" issued by The Institute of Chartered Accountants of India are not applicable. Exports being less than 10%, Geographical segment reporting is also not required.

(p)  **Basic/Diluted EPS**

| | | | |
|---|---|---|---|
| (i) | Net Profit (Rs in lacs) available for equity shareholders | 677.50 | 1,609.92 |
| (ii) | Weighted Average No. of equity shares | 21,388,213 | 21,388,213 |
| (iii) | Basic / Diluted Earning per share (Rs.) (Equity Share of face value of Rs.10 each) | 3.17 | 7.53 |
| (iv) | Nominal Value of Share (Rs.) | 10.00 | 10.00 |

(q)  Previous Year's figures have been regrouped, rearranged & recasted wherever necessary to make them comparable with the current year's figures.

(r)  Figures has been rounded off to the nearest Lacs Rupees as per the approval granted by Central Government to the company.

(s)  Schedule 1 to 16 form an integral part of Balance Sheet.

O M A X   A U T O S   L I M I T E D

**(t)  REPORT UNDER AS - 15 (REVISED 2005) AS ON 31/03/2008 IN RESPECT OF GGCA SCHEME**
**MP No. 312344**

| | As on 31/03/2009 | As on 31/03/2008 |
|---|---|---|
| **1  Assumptions** | | |
| Discount Rate | **8.0%** | 8.0% |
| Salary Escalation | **3%** | 3% |
| **2  Table showing changes in present value of obligations** | | |
| Present value of obligations as at beginning of year | **28892217** | 26638227 |
| Interest cost | **2311377** | 1997867 |
| Current Service Cost | **3141545** | 3486470 |
| Benefits Paid | **(2445453)** | (2467686) |
| Actuarial (Gain)/Loss on obligations | **4382549** | (762661) |
| Present value of obligations as at end of year | **36282235** | 28892217 |
| **3  Table showing changes in the fair value of plan assets** | | |
| Fair value of plan assets at beginning of year | **26818324** | 26894587 |
| Expected return on plan assets | **2655280** | 2390966 |
| Contributions | **5195747** | 457 |
| Benefits paid | **(2445453)** | (2467686) |
| Actuarial Gain / (Loss) on plan assets | **NIL** | NIL |
| Fair value of plan assets at the end of year | **32223898** | 26818324 |
| **4  Table showing fair value of plan assets** | | |
| Fair value of plan assets at beginning of year | **26818324** | 26894587 |
| Actual return on plan assets | **2655280** | 2390966 |
| Contributions | **5195747** | 457 |
| Benefits Paid | **(2445453)** | (2467686) |
| Fair value of plan assets at the end of year | **32223898** | 26818324 |
| Funded status | **(4058337)** | (2073893) |
| Excess of actual over estimated return on plan assets (Actual rate of return = Estimated rate of return as ARD falls on 31st March) | **NIL** | NIL |
| **5  Actuarial Gain/Loss recognized** | | |
| Actuarial Gain/(Loss) for the year - obligation | **4382549** | (762661) |
| Actuarial (Gain)/Loss for the year - plan assets | **NIL** | NIL |
| Total (Gain)/Loss for the year | **4382549** | (762661) |
| Actuarial (Gain)/Loss recognized in the year | **4382549** | (762661) |
| **6  The amounts to be recognized in the Balance Sheet and Statements of Profit and Loss** | | |
| Present value of obligations as at the end of year | **36282235** | 28892217 |
| Fair value of plan assets as at the end of the year | **32223898** | 26818324 |
| Funded status | **(4058337)** | (2073893) |
| Net Asset/(Liability) recognized in Balance Sheet | **4058337** | 2073893 |
| **7  Expenses Recognised in Statement of Profit & Loss** | | |
| Current Service cost | **3141545** | 3486470 |
| Interest Cost | **2311377** | 1997867 |
| Expected return on plan Assets | **2655280** | 2390966 |
| Net Actuarial (Gain)/Loss recognised in the year | **4382549** | (762661) |
| Expenses recognised in Statement of Profit & Loss | **7180191** | 2330710 |

**66** **Schedules Annexed to & Forming Part of the Accounts**

**SCHEDULE-VI OF THE COMPANIES ACT, 1956**

**(A) Particulars in respect of licensed goods manufactured.**

| Class of Goods | Unit of Quantity | Licensed capacity | | Installed capacity | | Actual Production | |
|---|---|---|---|---|---|---|---|
| | | Current Year | Previous Year | Current Year | Previous Year | Current Year | Previous Year |
| Sheet Metal, Tubular & Machined Components | Tonnes | N.A. | N.A. | N.A. | N.A. | 75680.90 | 70875.71 |
| Dies | Pcs. | N.A. | N.A. | N.A. | N.A. | 133.00 | – |

**(B) Particulars in respect of Opening Stock, Closing Stock and Sales of licensed finished goods produced**

(Rupees in Lacs)

| Class of Goods | Unit of Quantity | | Opening Stock | | Sales | | Closing stock as on 31.03.2009 | |
|---|---|---|---|---|---|---|---|---|
| | | | Quantity | Value | Quantity | Value | Quantity | Value |
| Sheet Metal, Tubular & Machined Components | Tonnes | Current Year | 777.36 | 968.57 | 76147.92 | 92585.31 | 310.34 | 501.18 |
| Dies | Pcs. | | – | – | 62.00 | 186.41 | 71.00 | 486.91 |
| | | | | 968.57 | | 92771.72 | | 988.09 |
| | | Previous Year | 970.87 | 1329.70 | 71069.22 | 84298.40 | 777.36 | 968.57 |

**(C) Analysis of raw material and components consumed (on derived method)**

(Rupees in Lacs)

| Class of Goods | Unit of Quantity | Current Year as at 31.03.2009 | | Previous Year as at 31.03.2008 | |
|---|---|---|---|---|---|
| | | Quantity | Value | Quantity | Value |
| Sheet | Tonnes | 25903.00 | 11060.27 | 25213.50 | 10075.12 |
| Tubes | Tonnes | 11341.00 | 5689.21 | 8983.75 | 4579.15 |
| MS Round, Bar & Wire | Tonnes | 4726.00 | 2768.03 | 5765.77 | 2643.95 |
| Bought Out Goods | Tonnes | 54795.00 | 34498.14 | 44424.51 | 26870.10 |
| Chemical & Paints | Assorted | - | 3120.83 | - | 4149.72 |
| Die Material & Consumables | Assorted | - | 212.01 | - | 153.34 |
| | | 96765.00 | 57348.49 | 84387.53 | 48471.38 |

**(D) Value of raw material and stores (including components, spares & packing material consumed)**

(Rupees in Lacs)

| Class of Goods | Classification | Current Year | | Previous Year | |
|---|---|---|---|---|---|
| | | % | Value | % | Value |
| Sheet | Imported | 3.09 | 964.23 | 1.57 | 158.73 |
| | Indigenous | 96.91 | 10096.04 | 96.43 | 9916.39 |
| Tube | Imported | 0.00 | Nil | 0.00 | Nil |
| | Indigenous | 100.00 | 5689.21 | 100.00 | 4579.15 |
| Bar, Round & Wire | Imported | 0.00 | Nil | 0.00 | Nil |
| | Indigenous | 100.00 | 2768.03 | 100.00 | 2643.95 |
| Bought out Goods | Imported | 0.00 | Nil | 0.00 | Nil |
| | Indigenous | 100.00 | 34498.14 | 100.00 | 26870.10 |
| Electroplating - | Imported | 0.00 | Nil | 0.00 | Nil |
| Chemical & Paints | Indigenous | 100.00 | 3120.83 | 100.00 | 4149.72 |
| Die Material & Consumables | Imported | 0.00 | Nil | 0.00 | Nil |
| | Indigenous | 100.00 | 212.01 | 100.00 | 153.34 |
| Consumables store, tools & packing material | Imported | 7.60 | 233.57 | 12.61 | 354.83 |
| | Indigenous | 92.40 | 2840.81 | 87.39 | 2459.62 |
| | | | 60422.87 | | 51285.83 |

(Rs. in lacs)

| | Current Year as at 31.03.2009 | Previous Year as at 31.03.2008 |
|---|---|---|
| **(E)  Value of Imports on CIF Basis** | | |
| Particulars | | |
| Raw Material | **964.23** | 158.73 |
| Capital Goods | **1.27** | 1,295.76 |
| Consumables | **233.57** | 354.83 |
| | | |
| **(F) Expenditure incurred in foreign Currency** | | |
| Professional & Technical fees | **5.47** | 32.48 |
| Travelling Expenses | **2.41** | 2.11 |
| Export Promotion Expenses | **45.26** | 13.31 |
| Freight & Packing | **81.01** | 35.05 |
| Testing Charges | **3.22** | - |
| Warranty claim rejections | **14.96** | 12.23 |
| Dividends* | - | - |
| | | |
| **(G) Foreign currency earnings** | | |
| FOB Value of Exports | **3,383.71** | 2,470.89 |

*All payments are made in Indian rupees.

**68**   Balance Sheet Abstract and Company's General Business Profile

**I. Registration Details**

Registration No.   | 2 | 6 | 1 | 4 | 2 |       State Code | 0 | 5 |

Balance Sheet Date | 3 | 1 |   | 0 | 3 |   | 2 | 0 | 0 | 9 |

**II. Capital Raised during the year (Amount in Rs. '000)**

| Public Issue | | Right Issue |
|---|---|---|
| N I L | | N I L |

| Bonus Issue | | Private Placement |
|---|---|---|
| N I L | | N I L |

**III. Position of Mobilisation and Deployment of Funds (Amount Rs. Lacs)**

Total Liabilities | 4 | 4 | 2 | 8 | 4 | . | 9 | 3 |     Total Assets | 4 | 4 | 2 | 8 | 4 | . | 9 | 3 |

Sources of Funds

Paid up Capital | 2 | 1 | 3 | 8 | . | 8 | 2 |     Reserves and Surplus | 1 | 2 | 4 | 2 | 2 | . | 3 | 3 |

Secured Loans | 2 | 7 | 9 | 7 | 8 | . | 8 | 3 |     Unsecured Loans | 3 | 0 | 1 | . | 0 | 0 |

Deferred Tax Liabilities | 1 | 4 | 4 | 3 | . | 9 | 5 |     Share Suspense (Pending Allotment) | N I L |

Application of Funds

Net Fixed Assets | 3 | 3 | 3 | 9 | 0 | . | 2 | 5 |     Investments | 6 | 0 | . | 0 | 0 |

Net Current Assets | 1 | 0 | 8 | 3 | 4 | . | 6 | 8 |     Miscellaneous Expenditure | N I L |

Accumulated Losses | N I L |     Leased Assets | N I L |

**IV. Performance of Company (Amount Rs. Lacs)**

Turnover (Including other income) | 8 | 3 | 0 | 7 | 3 | . | 5 | 6 |     Total Expenditure | 8 | 2 | 1 | 7 | 1 | . | 0 | 6 |

Profit before tax | 9 | 0 | 2 | . | 5 | 0 |     Profit after tax | 5 | 4 | 2 | . | 6 | 5 |

Earning per Share (Rs.) | 3 | . | 1 | 7 |     Dividend Rate % | 1 | 0 | . | 0 | 0 | % |

**V. Generic Names of Three Principal Products/Service of Company (as per monetary terms)**

Item Code No. (ITC Code) | 7 | 3 | 2 | 6 | 9 | 0 | 1 | 9 |

Product Description |
| M | A | N | U | F | A | C | T | U | R | I | N | G |   | O | F |   | S | H | E | E | T |
| M | E | T | A | L | , |   | T | U | B | U | L | A | R |   | & |
| M | A | C | H | I | N | E | D |   | C | O | M | P | O | N | E | N | T | S |
| F | O | R |   | A | U | T | O | M | O | B | I | L | E | S |   | & |
| O | T | H | E | R |   | I | N | D | U | S | T | R | I | E | S |

For and on behalf of the Board of Directors

| | | |
|---|---|---|
| As per our report of even date<br>for A. KUMAR GUPTA & CO.<br>Chartered Accountants | NARESH TANDON<br>(Executive Director-Finance) | JATENDER KUMAR MEHTA<br>(Managing Director) |
| A.K. GUPTA<br>(Partner)<br>M.No. 12765 | V.K. GUPTA<br>(Executive Director-Commercial<br>-cum-Company Secretary) | Dr. T.N. KAPOOR<br>(Director) |

Place: New Delhi
Date: 25.06.2009

O M A X  A U T O S  L I M I T E D

**C a s h   F l o w   f o r   t h e   P e r i o d   E n d e d   3 1 s t   M a r c h   2 0 0 9**  **69**

(Rupees in Lacs)

| | | Current Year ended 31.03.2009 | | Previous Year ended 31.03.2008 |
|---|---|---|---|---|
| **A.  Cash Flow From Operating Activities** | | | | |
| (i)  **Net Profit before Tax & Extraordinary Items** | | 902.50 | | 2357.76 |
| Adjustment for: | | | | |
| Depreciation | 2849.83 | | 2,676.68 | |
| Prior Period Adjustments | 134.85 | | 25.95 | |
| Misc. Expenditure written off | 70.09 | | 17.52 | |
| (Profit) /Loss on sale of investment | − | | 255.75 | |
| (Profit)/Loss on Sale of Fixed Assets | (236.17) | | (943.72) | |
| Interest & other financial charges | 4,168.75 | 6987.35 | 2,953.49 | 4985.67 |
| (ii)  **Operating Profit before Working Capital Changes** | | 7889.85 | | 7343.43 |
| Adjustment for: | | | | |
| Trade & Other Receivable | 724.95 | | (3068.85) | |
| Inventories | (619.85) | | 196.32 | |
| Trade Payables | 2508.07 | | (3008.05) | |
| Loans & Advances | (617.08) | 1996.09 | 864.23 | (5016.35) |
| (iii) **Cash Generated from Operations** | | 9885.94 | | 2327.08 |
| Direct Taxes Paid | | (579.97) | | (567.03) |
| (iv) **Net Cash Flow from Operating Activities** | | 9305.97 | | 1760.05 |
| **B.  Cash Flow from Investing Activities :** | | | | |
| Purchase of Fixed Assets | (5193.21) | | (8440.93) | |
| Sale of Fixed Assets | 958.73 | | 1742.35 | |
| Sale of Investment | − | | 119.25 | |
| Net Cash Used in Investing Activities | | (4234.48) | | (6579.33) |
| **C.  Cash Flow from Financing Activities** | | | | |
| Proceeds from Unsecured Loans | 246.86 | | 711.96 | |
| Repayment of Unsecured Loans | (3027.09) | | (20.03) | |
| Proceeds from Long term Borrowings | 6320.56 | | 3150.84 | |
| Bank Overdraft limits/ Demand loan | (7802.52) | | 3896.42 | |
| Interest & financial charges | (4168.75) | | (2953.49) | |
| Miscellaneous Expenditure (Assets) | − | | (87.61) | |
| Dividend & Tax | (250.23) | | (375.35) | |
| Net cash Used in Financing Activities | | (8681.17) | | 4322.74 |
| **Net Increase/ (Decrease) in Cash** | | (3609.68) | | (496.54) |
| **Cash & cash Equivalent as on 01.04.2008** | | 7711.81 | | 8208.35 |
| **Cash & cash Equivalent as on 31.03.2009** | | 4102.13 | | 7711.81 |

Notes:  1.  Above Statement has been prepared in Indirect Method
2.  Cash and Cash equivalents consists of Cash in hand and balances with banks

**Auditors' Certificate**

We have examined the attached Cash Flow Statement of OMAX AUTOS LTIMITED for the year ended 31st March, 2009. The statement has been prepared by the Company in accordance with the requirements of listing agreement Clause No. 32 and is based on and in agreement with the corresponding Profit & Loss A/c and Balance Sheet of the Company covered by our report of 25 June 2009 to the members of the Company.

For A. KUMAR GUPTA & COMPANY
Chartered Accountants

A.K.Gupta
(PARTNER)
M.No. 12765

Place : Gurgaon
Date  : 25th June, 2009

O M A X   A U T O S   L I M I T E D

PUBLIC DOCUMENT

# OMAX AUTOS LIMITED



**OMAX**
Accelerating on the Growth Trajectory

Registered Office: 69 K.M. STONE, DELHI JAIPUR HIGHWAY,
DHARUHERA, DISTT. REWARI, (HARYANA)

## PROXY FORM

| For Physical Holding | For Electronic Form (Demat) NSDL/CDSL | | No. of Shares Held |
|---|---|---|---|
| LF No. | DP ID | CLIENT ID | |
| | | | |

I/We _____

of _____

being a Member/Members of Omax Autos Limited hereby appoint _____ of_____

or falling him _____ of _____as my/our proxy

to attend and vote for me/us and on my/our behalf at the Annual General Meeting of the Company, to be held on Wednesday, September 30, 2009 at 11.00 A.M. at the Registered Office of the Company at 69 K.M. Stone, Delhi-Jaipur Highway, Dharuhera-122106, District Rewari, Haryana and at any adjournment thereof.

Signature _____ Day of _____ 2009.

| Affix Re. 1/- Revenue Stamp |
|---|

Notes:
1. Please affix revenue stamp for appropriate value and sign across the stamp.
2. The Proxy Form must be deposited at the Registered Office of the Company not later than 48 hours before the time fixed for convening the meeting.
3. All alterations made in Proxy Form should be initialed.

- - - - - - - - - ✂ - - - - - - - - - - - - - - - - - - - - - - - ✂ - - - - -

# OMAX AUTOS LIMITED

**OMAX**
Accelerating on the Growth Trajectory

Registered Office: 69 K.M. STONE, DELHI JAIPUR HIGHWAY,
DHARUHERA, DISTT. REWARI, (HARYANA)

## ATTENDANCE SLIP

**To be handed over at the entrance of the Meeting Hall**

| For Physical Holding | For Electronic Form (Demat) NSDL/CDSL | | No. of Shares Held |
|---|---|---|---|
| LF No. | DP ID | CLIENT ID | |
| | | | |

I hereby record my presence at the Annual General Meeting of the Company, being held on Wednesday, the 30th September, 2009 at 11.00 A.M. at the Registered Office of the Company at 69 K.M. Stone, Delhi Jaipur Highway, Distt. Rewari, Haryana.

| FULL NAME OF THE MEMBER/JOINT MEMBER(S)/PROXY (IN BLOCK CAPITAL LETTERS): |
|---|
| |

| IF PROXY FULL NAME OF MEMBER/JOINT MEMBER(S) (IN BLOCK CAPITAL LETTERS): |
|---|
| |

_____
**Signature of Member/Joint Member(s)/Proxy**

PUBLIC DOCUMENT


**OMAX**
Accelerating on the Growth Trajectory

## ECS MANDATE FORM

To

M/s Link Intime India Private Ltd.
(formerly Intime Spectrum Registry Ltd.)
A-40, IInd Floor
Naraina Industrial Area,
Phase-II, Near Batra Banquet Hall,
New Delhi - 110 028

FOR SHARES HELD IN PHYSICAL MODE
Please complete this form and send to the
Company's Registrar & Transfer Agents'
Office mentioned herein.
FOR SHARES HELD IN ELECTRONIC MODE
Please inform your DP's directly.

I hereby consent to have the amount of dividend on my equity shares credited through the Electronic Clearing Service (Credit Clearing) - (ECS). The particulars are :

1.  Folio No./ Client ID No./Cert. No.                    :

2.  Name of 1st Registered Holder                         :

3.  Bank Details:

    *   Name of Bank                                       :

    *   Full Address of the Branch                         :

    *   Account Number                                     :

    *   Bank Ledger No./ Bank Ledger Folio No.             :

    *   Account Type : (Please tick the relevant box for Savings Bank Account, Current Account or Cash Credit A/c)

| 10 -Savings | 11- Current | 12 - Cash Credit |
|---|---|---|

    *   9 Digit Code Number of the Bank and Branch appearing on the MICR Cheque issued by the Bank (Please attach a photocopy of a Cheque for verifying the accuracy of the code number) :

I hereby declare that the particulars given above are correct and complete. If the transaction is delayed because of incomplete or incorrect information, I will not hold the Company responsible.

_____
(Signature of the Registered Holder as per
the specimen signature with the Company)

Name: _____

Date :   /   / 2009

Address: _____

_____

_____

PUBLIC DOCUMENT

PUBLIC DOCUMENT

**FORM 2B**
**NOMINATION FORM**

(To be filled in by individual(s) applying singly or jointly)

I/ We _____ and _____ and

_____ the holder(s) of Shares/Debentures/Deposit Reciept bearing number(s)_____

of M/s. _____wish to make a nomination and do hereby nominate the following persons(s) in whom all rights of transfer and/or amount payable in respect of shares or debentures of deposits shall vest in the event of my/our death.

Name(s) and Address(es) of Nominee(s)

Name          : _____

Address       : _____

Date of Birth : _____

(* to be furnished in case the nominee is a minor)

** The Nominee is a minor whose guardian is

Name and address_____

_____

_____

(** To be deleted if not applicable)

| | | |
|---|---|---|
| Signature | : | _____ |
| Name | : | _____ |
| Address | : | _____ |
| Date | : | _____ |
| Signature | : | _____ |
| Name | : | _____ |
| Address | : | _____ |
| Date | : | _____ |
| Signature | : | _____ |
| Name | : | _____ |
| Address | : | _____ |
| Date | : | _____ |

Address, Name and Signature of two witnesses : _____

Name and Address

1. _____

2. _____

**Instructions :**

1. The Nomination can only be made by individuals applying/holding shares/debentures on their own behalf singly or jointly, Non-individuals including society, trust, body corporate, partnership firm, Karta of Hindu Undivided Family, Holder of power of attorney cannot nominate. If the shares are held jointly, all joint holders will sign the nomination form. Space is provided as a specimen. If there are more joint holders more sheets can be added for signatures of holders of shares/debentures and witness.

2. A minor can be nominated by a holder of shares/debentures/deposits and in that event the name and address of the guardian shall be given by the holders.

3. The nominee shall *not* be a trust, society, body corporate, parternship firm, Karta of Hindu Undivided Family or a power of attorney holder. A non-resident Indian can be a nominee on repatriable basis.

4. Nomination stands rescinded upon transfer of share/debenture or repayment/renewal of deposits made.

**Appendix 2: Purchase Order and Invoice for 100027-01 and 100028-01**

**PUBLIC DOCUMENT**

```
                      Purchase Order 100027-01.txt
                                          PURCHASE ORDER
                                          Order no..:   100027-01
                                          Order date:  3/04/10
                                          Cancel on.:  5/15/10
                                          POLDER INDUSTRI - 03
                                                          Page    1
     Vendor: SPEEDOMAX/OMAX AUTO LTD        Ship: DELIVER TO PORT OF LA
             64KM STONE DELHI-JAIPUR        to:
             HGHWY VILLAGE SIDHRAWALI
             GURGAON 123413
     Vendor: 7OMAX
                               F.O.B.: Origin
     Terms: FULL PMT EX PORT
     Refno   Qty & U/M Vendor item          Our item        Price & U/M    Amount
     -----   --------- -----------          --------        -----------    ------
                  INSTRUCTIONS FOR THE SUPPLIER:
                  1. Immediately fax or e-mail confirmation of ship date as stated.
                  2. If for any reason you cannot ship this order as stated, we
                     require you to contact us at once with a revised ship date.
                  3. The cancel date of this order must match the vessel on board
                     date.  Unauthorized delays are subject to a 20% charge back
                     of the entire order plus compensation for expedited freight
                     service.
                  4. A copy of the invoice, packing list and express cargo bill of
                     lading must be faxed or e-mailed the day of the shipment.  All
                     original documents must be immediately sent via overnight mail
                     to Vinny Picone at Polder.
                  5. If payment is required prior to shipping, it will be made only
                     upon receipt of a proforma invoice.  Please include all
                     banking information to ensure an accurate payment.
                  6. Upon shipping any order, the Supplier expressly agrees to
                     indemnify, defend and hold Polder harmless and to pay all of
                     Polder's legal expenses relating to any claim, defense,
                     settlement and / or judgement, to the extent permitted by law,
                     based on any allegation that the product purchased:
                     (A) Violates any intellectual property right of a third party,
                         such as copyright, trademark, service mark, trade secret
                         and / or patent rights.
                     (B) Has caused injury to any person or property.
                  7. Polder reserves the right to cancel or change this PO
                     (quantity OR ship date) 30 days prior to shipment or upon
                     receiving notification the ship date can not be met.
                  8. Polder requires 60 day advanced notification for any price
                     increases.
     0001    ...  UPC 047188541703          IB-5416R-465
                  54" I/B W/WIRE REST LT BAMB/4
           1660  EA. Deliver on 7/19/10                   469.00 INR EA.
     778,540.00 INR
     -------------------------------------------------- Total:
     778,540.00 INR
       Instructions for vendor:
                                    Authorized by:
                                               -----------------------------------
```

**JA0892**

INVOICE

| | | |
|---|---|---|
| | Invoice No. & Date POL-21000001 | DATED 07-05.2010 |
| EXPORTER **M/S SPEEDOMAX ( A UNIT OF OMAX AUTOS LTD.)** 64 th K.M stone Delhi-Jaipur Highway VILL/PO : Sidhrawali , Distt : Gurgaon-123413 Haryana (INDIA) Tel. 0124-2679010-012  Fax: 0124-2679016 | Buyer's Order No Date 100027-01 | DATED 03.04.2010 |
| | Other References CONSIGNEMENT NO. | POL 01 |

| Consignee **Polder Inc** 195 Christian Street Oxford , CT-06478 USA | Buyer (If other than consignee) **Polder Inc** 195 Christian Street Oxford , CT-06478 USA |
|---|---|

| Pre Carriage by TRUCK | Place of receipt by pre-carrier ICD DADRI(U.P) | Country of origin of goods INDIA | Country of destination USA |
|---|---|---|---|

| Vessel/Flight No. | Port of loading NHAVA SHEVA(Mumbai) | Terms of delivery and payment **FOB MUMBAI-NHAVA SHEVA** |
|---|---|---|

| Port of dicharge LOS ANGLES | Final destination USA | |
|---|---|---|

| Marks & Nos | No & kind of pkgs       Description of goods | Quantity PCS | Rate INR /PC | Amount(INR) INR(FOB) |
|---|---|---|---|---|
| BOX        PCS/BOX | FABRICATED STEEL ARTICLE MADE OF MS CR COILS/ SHEETS/STRIPS WITH CLOTH AND NON WOVEN-IRONING TABLE | | | |
| 415           4 BOXES 1 TO 415 | 047188541703   IB-5416R-465 54" I/B W/WIRE REST LT BAMB/4 | 1660 | 469.00 | 778540.00 |
| Amount of chargable (In words) | | 1660 | TOTAL | 778540.00 |

RUPEES SEVEN LACS SEVENTY EIGHT THOUSAND FIVE HUNDRED FOURTY  ONLY

| | |
|---|---|
| TOTAL BOXES              **415** Net Wt:              **7810.30 KGS** Gross Wt:              **8851.95 KGS** Volume:              **50.00 CBM** | |

| SIGNATURE & DATE |
|---|

Declaration
We declare that this invoice shows the actual price of the goods decribed and that all particulars are true and correct .

**PUBLIC DOCUMENT**

```
                       Purchase Order 100028-01.txt
                                         PURCHASE ORDER
                                         Order no..:   100028-01
                                         Order date:  3/04/10
                                         Cancel on.:  5/20/10
                                         POLDER INDUSTRI - 03
                                                            Page    1
     Vendor: SPEEDOMAX/OMAX AUTO LTD        Ship: DELIVER TO PORT OF LA
             64KM STONE DELHI-JAIPUR        to:
             HGHWY VILLAGE SIDHRAWALI
             GURGAON 123413
     Vendor: 7OMAX
                              F.O.B.: Origin
     Terms: FULL PMT EX PORT
   Refno   Qty & U/M Vendor item            Our item      Price & U/M    Amount
   -----   --------- -----------            --------      -----------    ------
                     INSTRUCTIONS FOR THE SUPPLIER:
                     1. Immediately fax or e-mail confirmation of ship date as stated.
                     2. If for any reason you cannot ship this order as stated, we
                        require you to contact us at once with a revised ship date.
                     3. The cancel date of this order must match the vessel on board
                        date.  Unauthorized delays are subject to a 20% charge back
                        of the entire order plus compensation for expedited freight
                        service.
                     4. A copy of the invoice, packing list and express cargo bill of
                        lading must be faxed or e-mailed the day of the shipment.  All
                        original documents must be immediately sent via overnight mail
                        to Vinny Picone at Polder.
                     5. If payment is required prior to shipping, it will be made only
                        upon receipt of a proforma invoice.  Please include all
                        banking information to ensure an accurate payment.
                     6. Upon shipping any order, the Supplier expressly agrees to
                        indemnify, defend and hold Polder harmless and to pay all of
                        Polder's legal expenses relating to any claim, defense,
                        settlement and / or judgement, to the extent permitted by law,
                        based on any allegation that the product purchased:
                        (A) Violates any intellectual property right of a third party,
                            such as copyright, trademark, service mark, trade secret
                            and / or patent rights.
                        (B) Has caused injury to any person or property.
                     7. Polder reserves the right to cancel or change this PO
                        (quantity OR ship date) 30 days prior to shipment or upon
                        receiving notification the ship date can not be met.
                     8. Polder requires 60 day advanced notification for any price
                        increases.
   0001    ...       UPC 047188541635        IB-5416R-136
                     54" I/B W/WIRE REST BLUE ST/4
           1660  EA. Deliver on  7/19/10                   469.00 INR EA.
   778,540.00 INR
   ------------------------------------------------------- Total:
   778,540.00 INR
     Instructions for vendor:
                              Authorized by:
                                             ---------------------------------
```

Page 1

**PUBLIC DOCUMENT**

**INVOICE**

| | | Invoice No. & Date | DATED |
|---|---|---|---|
| | | POL-21000002 | 07-05.2010 |

EXPORTER
**M/S SPEEDOMAX ( A UNIT OF OMAX AUTOS LTD.)**
64 th K.M stone Delhi-Jaipur Highway
VILL/PO : Sidhrawali , Distt : Gurgaon-123413
Haryana (INDIA)
Tel. 0124-2679010-012   Fax: 0124-2679016

| Buyer's Order No Date | DATED |
|---|---|
| 100028-01 | 03.04.2010 |

Other References

CONSIGNEMENT NO.        POL 02

Consignee
**Polder Inc**
195 Christian Street
Oxford , CT-06478
USA

Buyer (If other than consignee)
**Polder Inc**
195 Christian Street
Oxford , CT-06478
USA

| Country of origin of goods | Country of destination |
|---|---|
| INDIA | USA |

| Pre Carriage by | Place of receipt by pre-carrier |
|---|---|
| TRUCK | ICD DADRI(U.P) |

Terms of delivery and payment

**FOB MUMBAI-NHAVA SHEVA**

| Vessel/Flight No. | Port of loading |
|---|---|
| | NHAVA SHEVA(Mumbai) |

| Port of dicharge | Final destination |
|---|---|
| LOS ANGLES | USA |

| Marks & Nos | No & kind of pkgs        Description of goods | Quantity | Rate | Amount(INR) |
|---|---|---|---|---|
| BOX    PCS/BOX | | PCS | INR /PC | INR(FOB) |
| | FABRICATED STEEL ARTICLE MADE OF MS CR COILS/ SHEETS/STRIPS WITH CLOTH AND NON WOVEN-IRONING TABLE | | | |
| 415        4 | 047188541635  IB-5416R-136 54" I/B W/WIRE REST BLUE ST/4 | 1660 | 469.00 | 778540.00 |
| BOXES 1 TO 415 | | | | |
| Amount of chargable (In words) | | 1660 | TOTAL | 778540.00 |

RUPEES SEVEN LACS SEVENTY EIGHT THOUSAND FIVE HUNDRED FOURTY  ONLY

| TOTAL BOXES | **415** |
|---|---|
| Net Wt: | **7810.30 KGS** |
| Gross Wt: | **8851.95 KGS** |
| Volume: | **50.00 CBM** |

SIGNATURE & DATE

Declaration
We declare that this invoice shows the actual price of the goods
decribed and that all particulars are true and correct .



BILLING CODE 3510-DS-P

1144

# DEPARTMENT OF COMMERCE

International Trade Administration

A-570-888

Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review

AGENCY:    Import Administration, International Trade Administration, Department of Commerce

SUMMARY: In response to requests from interested parties, the Department of Commerce (the Department) is conducting an administrative review of the antidumping duty order on floor-standing, metal-top ironing tables and certain parts thereof from the People's Republic of China (PRC). The period of review (POR) is August 1, 2008 through July 31, 2009. We have preliminarily determined that respondents Foshan Shunde Yongjian Housewares & Hardware Co., Ltd. (Foshan Shunde) and Since Hardware (Guangzhou) Co., Ltd. (Since Hardware) have made sales to the United States of the subject merchandise at prices below normal value. We invite interested parties to comment on these preliminary results. Parties filing comments are requested to submit with each argument (1) a statement of the issue and (2) a brief summary of the argument(s).

EFFECTIVE DATE:  (Insert date of publication in the *Federal Register*.)

FOR FURTHER INFORMATION CONTACT: Michael J. Heaney or Robert James, AD/CVD Operations, Office 7, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW, Washington, DC 20230; telephone: (202) 482-4475 or (202) 482-0649, respectively.

000086

SUPPLEMENTARY INFORMATION:

Background

On August 6, 2004, the Department published in the *Federal Register* the antidumping

duty order regarding floor-standing, metal-top ironing tables and certain parts thereof (ironing

tables) from the PRC. *See Notice of Amended Final Determination of Sales at Less Than Fair*

*Value and Antidumping Duty Order: Floor-Standing, Metal-Top Ironing Tables and Certain*

*Parts Thereof From the People's Republic of China*, 69 FR 47868 (August 6, 2004) (*Amended*

*Final and Order*).

On August 3, 2009, the Department published a notice of opportunity to request an

administrative review of the antidumping duty order on, *inter alia,* ironing tables from the

People's Republic of China. *See Antidumping or Countervailing Duty Order, Finding, or*

*Suspended Investigation; Opportunity to Request Administrative Review*, 74 FR 38397 (August

3, 2009). On August 31, 2009, Home Products International (the Petitioner in this proceeding)

requested, in accordance with 19 CFR 351.213(b)(1), an administrative review of this order for

Foshan Shunde and Since Hardware.

On September 22, 2009, the Department initiated an administrative review of Foshan

Shunde and Since Hardware. *See Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews and Requests for Revocation in Part*, 74 FR 48224 (September 22,

2009). On February 16, 2010, the Department issued a memorandum that tolled the deadlines

for all Import Administration cases by seven calendar days due to the recent Federal Government

closure. *See* Memorandum for the Record from Ronald Lorentzen, DAS for Import

Administration, regarding Tolling of Administrative Deadlines as a Result of the Government

Closure During the Recent Snowstorm, dated February 12, 2010.

On April 28, 2010, in accordance with section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.213(h)(2), the Department extended the deadline for the preliminary results of review until September 7, 2010. *See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Extension of the Time Limit for the Preliminary Results of the Administrative Review*, 75 FR 22372 (April 28, 2010).

The Department issued its original antidumping questionnaire to both Foshan Shunde and Since Hardware on September 29, 2009. Foshan Shunde timely filed its response to Section A of the questionnaire on November 13, 2009; Foshan Shunde's Sections C and D responses followed on November 20, 2009. Since Hardware timely filed its response to Section A of the questionnaire on October 29, 2009; Since Hardware's Sections C and D responses followed on November 19, 2009 and December 1, 2009 respectively. Petitioner filed comments on Foshan Shunde's sections A, C and D responses on November 15, 2009. Petitioner filed comments on Since Hardware's sections A, C, and D responses on December 7, 2009.

The Department subsequently issued supplementary questionnaires to Foshan Shunde and Since Hardware on February 24, 2010 and May 5, 2010. Foshan Shunde timely responded to each of these supplemental requests for information on March 8, 2010, March 25, 2010, April 9, 2010, and May 18, 2010. Since Hardware timely responded to each of the Department's supplemental requests for information on March 25, 2010, April 9, 2010, and June 3, 2010. On, April 9, 2010, Petitioner filed additional comments on the original and supplemental sections A, C, and D responses submitted by Since Hardware. On April 15, 2010, Petitioner filed additional comments on the original and supplemental sections A, C, and D responses submitted by Foshan Shunde. On August 25, 2010, Petitioner filed comments concerning the Department's verification of Since Hardware. On August 26, 2010, Petitioner filed comments concerning the

Department's verification of Foshan Shunde.

Verification

As provided in section 782(i)(3) of the Act, we verified the information submitted by Foshan Shunde and Since Hardware upon which we have relied in these preliminary results of review. We conducted our verification of Foshan Shunde from June 14 through June 18, 2010 and our verification of Since Hardware from June 21 through June 25, 2010. The Department's verification reports are on the record of this review in the Central Records Unit, Room 1117 of the main Department building. We used standard verification procedures, including examination of relevant accounting and production records, as well as source documentation provided by the respondents. *See* "Verification of the Sales and Factors Response of Foshan Shunde (Guangzhou) Co., Ltd. in the Antidumping Review of Floor Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China (PRC)" (Foshan Shunde Verification Report) dated August 17, 2010 . *See also* "Verification of the Sales and Factors Response of Since Hardware (Guangzhou) Co. Ltd. in the Antidumping Review of Floor Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China (PRC)" dated August 16, 2010 (Since Hardware 2008-2009 Verification Report ).

Surrogate Country and Surrogate Value Data

On July 13, 2010, the Department sent interested parties a letter inviting comments on surrogate country selection and surrogate value data. *See* the Department's Letter to All Interested Parties; Administrative Review of Floor-Standing, Metal-Top, Ironing Tables and Parts Thereof from the People's Republic of China ("PRC"): Surrogate Country List, dated July 13, 2010 (Surrogate Country List). On August 17, 2010, the Department received information to value factors of production (FOP) from Foshan Shunde, Since Hardware and the Petitioner.

With the exception of the surrogate value data to value labor, all of the surrogate values placed

on the record were obtained from sources in India.

Scope of the Order

For purposes of this order, the product covered consists of floor-standing, metal-top

ironing tables, assembled or unassembled, complete or incomplete, and certain parts thereof.

The subject tables are designed and used principally for the hand ironing or pressing of garments

or other articles of fabric. The subject tables have full-height leg assemblies that support the

ironing surface at an appropriate (often adjustable) height above the floor. The subject tables are

produced in a variety of leg finishes, such as painted, plated, or matte, and they are available

with various features, including iron rests, linen racks, and others. The subject ironing tables

may be sold with or without a pad and/or cover. All types and configurations of floor-standing,

metal-top ironing tables are covered by this review.

Furthermore, this order specifically covers imports of ironing tables, assembled or

unassembled, complete or incomplete, and certain parts thereof. For purposes of this order, the

term "unassembled" ironing table means a product requiring the attachment of the leg assembly

to the top or the attachment of an included feature such as an iron rest or linen rack. The term

"complete" ironing table means product sold as a ready-to-use ensemble consisting of the metal-

top table and a pad and cover, with or without additional features, *e.g.,* iron rest or linen rack.

The term "incomplete" ironing table means product shipped or sold as a "bare board" – *i.e.,* a

metal-top table only, without the pad and cover– with or without additional features, *e.g.,* iron

rest or linen rack. The major parts or components of ironing tables that are intended to be

covered by this order under the term "certain parts thereof" consist of the metal top component

(with or without assembled supports and slides) and/or the leg components, whether or not

attached together as a leg assembly. The order covers separately shipped metal top components and leg components, without regard to whether the respective quantities would yield an exact quantity of assembled ironing tables.

Ironing tables without legs (such as models that mount on walls or over doors) are not floor-standing and are specifically excluded. Additionally, tabletop or countertop models with short legs that do not exceed 12 inches in length (and which may or may not collapse or retract) are specifically excluded.

The subject ironing tables are currently classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 9403.20.0011. The subject metal top and leg components are classified under HTSUS subheading 9403.90.8040. Although the HTSUS subheadings are provided for convenience and for Customs and Border Protection (CBP) purposes, the Department's written description of the scope remains dispositive.

Non-Market-Economy Status

In every case conducted by the Department involving the PRC, the PRC has been treated as a non-market economy (NME). In accordance with section 771(18)(C)(i) of the Act, any determination that a foreign country is an NME country shall remain in effect until revoked by the administering authority. *See, e.g., Brake Rotors from the People's Republic of China: Final Results and Partial Rescission of the 2004/2005 Administrative Review and Notice of Rescission of 2004/2005 New Shipper Review,* 71 FR 66304 (November 14, 2006). None of the parties to this administrative review has contested such treatment. Accordingly, we calculated normal value (NV) in accordance with section 773(c) of the Act, which applies to NME countries.

Surrogate Country

When the Department investigates imports from an NME country and available

6

information does not permit the Department to determine NV pursuant to section 773(a) of the Act, then, pursuant to section 773(c)(4) of the Act, the Department bases NV on an NME producer's FOPs to the extent possible, in one or more market-economy countries that (1) are at a level of economic development comparable to that of the NME country, and (2) are significant producers of comparable merchandise. The Department determined India, the Philippines, Indonesia, Thailand, Ukraine and Peru are countries comparable to the PRC in economic development. (*See* Memorandum to Richard Weible from Carole Showers Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Order on Floor Standing Metal-Top Ironing Tables and Certain Parts ("Ironing Tables") from the People's Republic of China dated July 8, 2010 (Surrogate Country List)).

Based on publicly available information placed on the record by interested parties (*e.g.*, production data), the Department determines India to be a reliable source for surrogate values because India is at a comparable level of economic development pursuant to section 773(c)(4) of the Act, is a significant producer of the subject merchandise, and has publicly available and reliable data. Accordingly, the Department has selected India as the surrogate country for purposes of valuing the FOPs because it meets the Department's criteria for surrogate country selection.

Separate Rates

In proceedings involving NME countries, the Department has a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assigned a single antidumping duty rate. It is the Department's policy to assign all exporters of subject merchandise in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate. *See* Policy Bulletin 05.1:

Separate Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries, available at http://ia.ita.gov/policy/bull05-1.pdf. Exporters can demonstrate this independence through the absence of both *de jure* and *de facto* governmental control over export activities. The Department analyzes each entity exporting the subject merchandise under a test arising from the *Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 FR 20588 at Comment 1 (May 6, 1991) (*Sparklers*). This concept was further developed in *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994). (*Silicon Carbide*). However, if the Department determines that a company is wholly foreign-owned or located in a market economy, then a separate rate analysis is unnecessary to determine whether it is independent from government control.

Accordingly, we have considered whether Foshan Shunde and Since Hardware are independent from government control, and therefore eligible for separate rates. The Department's separate-rate test to determine whether the exporters are independent from government control does not consider, in general, macroeconomic/border-type controls, *e.g.*, export licenses, quotas, and minimum export prices, particularly if these controls are imposed to prevent dumping. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from the People's Republic of China,* 63 FR 72255, 72256 (December 31, 1998). The test focuses, rather, on controls over the investment, pricing, and output decision-making process at the individual firm level. *See, e.g., Notice of Final Determination of Sales at Less than Fair Value: Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61758 (November 19, 1997); *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty*

*Administrative Review*, 62 FR 61276, 61279 (November 17, 1997).

Foshan Shunde and Since Hardware both provided complete separate-rate information in their responses to our original and supplemental questionnaires. Accordingly, we performed a separate-rates analysis to determine whether Foshan Shunde and Since Hardware are independent from government control.

Absence of *De Jure* Control

The Department considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies. *See Sparklers*, 56 FR 20588 at Comment 1. The evidence provided by Foshan Shunde and Since Hardware supports a preliminary finding of de jure absence of control based on the following: (1) an absence of restrictive stipulations associated with their business and export licenses; (2) applicable legislative enactments decentralizing control of companies; and (3) formal measures (e.g., the *Foreign Trade Law*) decentralizing control of companies. *See, e.g.*, Foshan Shunde November 13, 2009 Section A questionnaire response at pages at A-4-A-5; *see also* Since Hardware October 29, 2009 questionnaire response at pages A-3-A-5.

Absence of *De Facto* Control

Typically, the Department considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by, or subject to, the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has

autonomy from the government in making decisions regarding the selection of its management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See Silicon Carbide* 59 FR 22857; *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic Of China,* 60 FR 22544 (May 8, 1995)  The Department has determined that an analysis of *de facto* control is critical in determining whether respondents are, in fact, subject to a degree of governmental control, which would preclude the Department from assigning separate rates.

The evidence provided by Foshan Shunde and Since Hardware support a preliminary finding of *de facto* absence of government control based on the following: (1) the absence of evidence that the export prices are set by or are subject to the approval of a government agency; (2) the respondents have authority to negotiate and sign contracts and other agreements; (3) the respondents have autonomy from government in making decisions regarding the selection of management; and (4) the respondents retain the proceeds of their export sales and make independent decisions regarding disposition of profits or financing of losses.   *See* Foshan Shunde November 13, 2010 Section A questionnaire response at A-7 through- A-9; *see also* Since Hardware October 29, 2010 Section A questionnaire response at A-5 through A-8.

In accordance with the criteria identified in *Sparklers* and *Silicon Carbide*, the evidence placed on the record of this review by Foshan Shunde and Since Hardware demonstrates an absence of *de jure* and de *facto* government control with respect to Foshan Shunde's and Since Hardware's exports of the subject merchandise.  Accordingly, we have determined that Foshan Shunde and Since Hardware have demonstrated eligibility for separate rates.

Fair Value Comparisons

To determine whether the respondents' sales of the subject merchandise to the United States were made at prices below normal value (NV), we compared its United States prices to normal values, as described in the "U.S. Price" and "Normal Value" sections of this notice. *See* section 773(a) of the Act.

*U.S. Price*

Export Price

We based U.S. price for Foshan Shunde and Since Hardware on export price (EP) in accordance with section 772(a) of the Act, because the first sale to an unaffiliated purchaser was made prior to importation, and constructed export price (CEP) was not otherwise warranted by the facts on the record. We calculated EP based on the packed price from the exporter to the first unaffiliated customer in the United States. We deducted foreign inland freight, and foreign brokerage and handling expenses from the starting price (gross unit price), in accordance with section 772(c) of the Act. Where appropriate, we made an addition to U.S. price for billing adjustments.

Both Since Hardware and Forever Holdings incurred foreign inland freight and foreign brokerage and handling expenses from PRC service providers. We therefore valued these services using Indian surrogate values (*see* "Factors of Production" section below for further discussion).

*Normal Value*

Factors of Production (FOPs)

Section 773(c)(1) of the Act provides that the Department shall determine NV using an FOP methodology if the merchandise is exported from an NME country and the Department finds that the available information does not permit the calculation of NV using home-market

prices, third-country prices, or constructed value under section 773(a) of the Act. When determining NV in an NME context, the Department will base NV on FOPs because the presence of government control on various aspects of these economies renders price comparisons and the calculation of production costs invalid under our normal methodologies. The Department's questionnaires required Foshan Shunde and Since Hardware to provide information regarding the weighted-average FOP.

In accordance with 19 CFR 351.408(c)(1), the Department will normally use publically available information to find an appropriate SV to value FOPs, but when a producer sources an input from a market economy and pays for it in market-economy currency, the Department may value the factor using the actual price paid for the input. *See* 19 CFR 351.408(c)(1); *see also Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F. 3rd 1376, 1382-1383 (Fed. Cir. 2001) (affirming the Department's use of market-based prices to value FOPs). During the POR, Foshan Shunde reported that it purchased a certain production material from a market economy supplier. *See* Foshan Shunde November 20, 2009 Section D response at exhibit D-2. Because Foshan Shunde purchased more than 33 percent of its total volume of this particular input from a market economy supplier, we used the market economy price paid for that material to value this input. *See* Foshan Shunde November 20, 2009 questionnaire response at exhibit D-2.) During the POR, Since Hardware made no purchases from market economy suppliers. *See* Since Hardware December 1, 2009 at Appendix D-6.

We calculated NV based on FOPs in accordance with section 773(c)(3) and (4) of the Act and 19 CFR 351.408(c). The FOPs include but are not limited to: (1) hours of labor required; (2) quantities of raw material employed; (3) amounts of energy and other utilities consumed; and (4) representative capital costs. The Department used FOPs reported by Foshan Shunde and

Since Hardware for materials, energy, labor, by-products, and packing. To calculate NV, we multiplied the reported unit factor quantities by publicly available values in the surrogate country, India.

Foshan Shunde and Since Hardware both reported by-product sales. Consistent with the Department's determination in the investigation of *Diamond Sawblades from the PRC*, we will deduct the surrogate value of by-products sold from normal value because the surrogate financial statements on the record of this administrative review contain no references to the treatment of by-products and because Since Hardware and Foshan Shunde provided evidence to demonstrate sales of their by-products. *See Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006) (*Diamond Sawblades from the PRC*), and accompanying Issues and Decision Memorandum at Comment 9, unchanged in *Notice of Amended Final Determination of Sales at Less Than Fair Value: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 35864 (June 22, 2006). This is consistent with accounting principles based on a reasonable assumption that if a company sells a by-product, the by-product necessarily incurs expenses for overhead, SG&A, and profit. *Id.*

In selecting the surrogate Indian values, we considered the quality, specificity, and contemporaneity of the data, in accordance with our practice. *See, e.g., Electrolytic Manganese Dioxide from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and accompanying Issues and Decision Memorandum at Comment 2*. The Department adjusted input prices by including freight costs to make them delivered prices, as appropriate. Specifically, the Department added to Indian import SVs a surrogate freight cost using the

shorter of the reported distance from the domestic supplier to the factory or the distance from the

nearest seaport to the factory of production. This adjustment is in accordance with the decision

of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Sigma Corp. v. United*

*States*, 117 F. 3rd 1401, 1407-08 (Fed. Cir. 1997). A detailed description of all SVs used to value

Foshan Shunde's and Since Hardware's FOPs may be found in the September 7, 2010

Memorandum to the File through Robert James, Program Manager Office 7 from Michael J.

Heaney International Trade Analyst: Antidumping Duty Administrative Review of Floor-

Standing, Metal Top Ironing Tables and Certain Parts Thereof from the People's Republic of

China, dated September 7, 2010 (Factors Valuation Memorandum.)

The Department calculated SVs for the majority of reported FOPs purchased from NME

sources using the contemporaneous, weighted average unit import value derived from the

Ministry of Commerce of India (Indian Import Statistics) for the POR. The Department used

Indian import data from the Global Trade Atlas (GTA) published by Global Trade Information

Services, Inc. (GTIS) which is sourced from the Directorate General of Commercial Intelligence

& Statistics, Indian Ministry of Commerce, to determine the surrogate values for most raw

materials, by-products and packing material inputs. The Department has disregarded statistics

from NMEs, countries with generally available export subsidies, and undetermined countries, in

calculating average value. In accordance with the Omnibus Trade and Competitiveness Act of

1988, Conf. Report to Accompany HR. 3, HR Rep. No., 100th Cong,. 2nd Session (1988), the

Department continues to apply its long-standing practice of disregarding surrogate values if it

has a reason to believe or suspect the source data may be subsidized. In this regard, the

Department has previously found that it is appropriate to disregard such prices from India,

Indonesia, South Korea and Thailand because we have determined that these countries maintain

broadly available, non-industry specific export subsidies. *See, e.g. Expedited Sunset Review of the Countervailing Duty Order on Carbazole Violet Pigment 23 from India*, 75 FR 13257 (March 19, 2010), and accompanying Issues and Decisions Memorandum at pages 4-5; *Expedited Sunset Review of the Countervailing Duty Order on Certain Cut-to Length Carbon Quality Steel Plate from Indonesia*, 70 FR 45692 (August 8, 2005), and accompanying Issues and Decisions Memorandum at page 4; *Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Final Results of Countervailing Duty Determination*, 66 FR 50410 (October 3, 2001), and accompanying Issues and Decision Memorandum at page 23. For a detailed description of all surrogate values used for Foshan Shunde and Since Hardware, see the Factors Valuation Memorandum.

In past cases, it has been the Department's practice to value various FOPs using import statistics of the primary selected surrogate country from the World Trade Atlas (WTA), as published by GTIS. *See, e.g., Certain Preserved Mushrooms from the People's Republic of China: Preliminary Results of Antidumping Duty New Shipper Review*, 74 FR 50946, 50950 (October 2, 2009). However, in October 2009, the Department learned that Indian import data obtained from the WTA, as published by GTIS, began identifying the original reporting currency for India as the U.S. dollar. The Department then contacted GTIS about the change in the original reporting currency for India from the Indian rupee to the U.S. dollar. Officials at GTIS explained that while GTIS obtains data on imports into India directly from the Ministry of Commerce, Government of India, as denominated and published in Indian rupees, the WTA software is limited with regard to the number of significant digits it can manage. Therefore, GTIS made a decision to change the official reporting currency for Indian data from the Indian rupee to the U.S. dollar in order to reduce the loss of significant digits when obtaining data

through the WTA software. GTIS explained that it converts the Indian rupee to the U.S. dollar using the monthly Federal Reserve exchange rate applicable to the relevant month of the data being downloaded and converted. *See Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value ; Affirmative Final determination of Critical Circumstances, and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010), and accompanying Issues and Decision Memorandum at Comment 4.

However, the data reported in the GTA software report import statistics, such as data from India, in the original reporting currency and thus these data correspond to the original currency value reported by each country. Additionally, the data reported in GTA software are reported to the nearest digit and thus there is not a loss of data by rounding, as there is with the data reported by the WTA software. Consequently, the Department will now obtain import statistics from GTA for valuing FOPs because the GTA import statistics are in the original reporting currency of the country from which the data are obtained and have the same level of accuracy as the original data released.

The Department valued electricity using the updated electricity price data for small, medium, and large industries, as published by the Central Electricity Authority, an administrative body of the Government of India, in its publication titled Electricity Tariff & Duty and Average Rates of Electricity Supply in India, dated March 2008. These electricity rates represent actual, country-wide, publically-available information on tax-exclusive electricity rates charged to small, medium, and large industries in India. We did not inflate this value because utility rates represent current rates, as indicated by the effective dates listed for each of the rates provided. *See* Factors Valuation Memorandum at page 7.

The Department valued water using data from the Maharashtra Industrial Development

Corporation (MDIC) as it includes a wide range of industrial water tariffs. To value water, we used the average rate for industrial use from MDIC water rates at http://www.midcindia.org. *See* Factors Valuation Memorandum at page 8.

We valued diesel fuel using the rates provided by the OECD's International Energy Agency's publication: *Key World Energy Statistics*. The prices are based on July 2007 prices in India for diesel. *See* Factor Valuation Memorandum at page 7.

For direct, indirect, and packing labor, pursuant to a recent decision by the Federal Circuit, we have calculated an hourly wage rate to use in valuing Foshan Shunde's and Since Hardware's reported labor input by averaging earnings and/or wages in countries that are economically comparable to the PRC and that are significant producers of comparable merchandise. *See Dorbest Ltd. v. United States*, 2009-1257 at 20 (Fed. Cir. 2010). Because this wage rate does not separate labor rates into different skill levels or types of labor, the Department has applied the same wage rate to all skill levels and types of labor reported by either Foshan Shunde or Since Hardware. *See* Factors Valuation Memorandum at page 7.

Since Hardware claimed that it utilized hot rolled steel as a production input of the subject merchandise. However, Since Hardware's supporting documentation provided to Department officials at verification did not demonstrate Since Hardware purchased hot-rolled steel in sizes of less than 1.1 millimeters. *See* Since Hardware 2008-2009 Verification Report at pages 21-23. We, therefore, assigned the surrogate value of cold-rolled steel to value this production input.

The Department valued truck freight expenses using a per-unit average rate calculated from data on the Infobanc Web site: http://www.infobanccom/logistics/logtruck.htm. The logistics section of this Web site contains inland freight truck rates between many large Indian

cities. Since this value is not contemporaneous with the POR, the Department deflated the rate using the Wholesale Price Index of India. *See* Factors Valuation Memorandum at page 9.

The Department valued brokerage and handling using a price list of export procedures necessary to export a standardized cargo of goods in India. The price list is compiled based on a survey case study of the procedural requirements for trading a standard shipment of goods by ocean transport in India that is published in *Doing Business 2010: India,* by the World Bank.

To value factory overhead, selling, general and administrative (SG&A) expenses, and profit the Department used the audited 2005-2006 financial statements of Infiniti Modules Pvt. Ltd. (Infiniti Modules).

We are preliminarily granting a by-product offset to both Foshan Shunde and Since Hardware for scrap steel sales. *See* Factors Valuation Memorandum at pages 3-4.

Currency Conversion

Where necessary, the Department made currency conversions into U.S. dollars, in accordance with section 773(A) of the Act, based on the exchange rates in effect on the date of the U.S. sale, as certified by the Federal Reserve Board.

Preliminary Results of Review

We preliminarily determine that the following antidumping duty margins exist:

| Exporter | Margin (percent) |
|---|---|
| Foshan Shunde Yongjian Housewares & Hardware Co., Ltd. | 8.49 |
| Since Hardware | 56.49 |

Assessment Rates

Pursuant to 19 CFR 351.212(b), the Department will determine, and CBP shall assess, antidumping duties on all appropriate entries. The Department will issue appropriate assessment instructions directly to CBP 15 days after the date of publication of the final results of this review. For assessment purposes, where possible, we calculated importer-specific *ad valorem* assessment rates for ironing tables from the PRC based on the ratio of the total amount of the dumping duties calculated for the examined sales to the total entered value of those same sales. We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review if any assessment rate calculated in the final results of this review is above *de minimis*. The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by the final results of these reviews and for future deposits of estimated duties, where applicable.

Cash Deposit Requirements

The following cash deposit requirements will be effective upon publication of the final results of this administrative review for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date, as provided for by section 751(a)(2)(C) of the Act: (1) for the exporters listed above, the cash deposit rate will be established in the final results of this review (except, if the rate is zero or *de minimis*, *i.e.*, less than 0.5 percent, no cash deposit will be required for that company); (2) for previously investigated or reviewed PRC and non-PRC exporters not listed above that have separate rates, the cash deposit rate will continue to be the exporter-specific rate published for the most recent period; (3) for all PRC exporters of subject merchandise which have not been found to be entitled to a separate rate, the cash deposit rate will be the PRC-wide rate of 157.68 percent (*see*



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-888
AR: 08/01/08–07/31/09
~~Proprietary Document~~
Public MEMH

September 7, 2010

MEMORANDUM FOR:      The File

THROUGH:      Robert James
              Program Manager

FROM:      Michael J. Heaney
           Senior International Trade Compliance Analyst
           AD/CVD Operations, Office 7

RE:      Antidumping Duty Administrative Review of Floor-Standing,
         Metal-Top Ironing Tables, and Certain Parts Thereof from the
         People's Republic of China

SUBJECT:      Factors of Production Valuation for the Preliminary Results

---

## INTRODUCTION AND METHODOLOGY

This memorandum outlines the methodology and selection of surrogate values used in the
calculation of normal value and U.S. price for the preliminary results for the fifth administrative
review of floor-standing, metal-top ironing tables and certain parts thereof from the People's
Republic of China ("PRC"). The Department of Commerce (the Department) has determined
that India is the appropriate surrogate country to use in this administrative review. *See*
"Memorandum from Carole Showers, Acting Director office of Policy, to Richard Weible,
Director, AD/CVD Operations, Office 7" dated July 13, 2010 ("Surrogate-Country
Memorandum"). Consistent with recent determinations involving non-market-economy (NME)
countries, with the exception of the surrogate value data to value labor, the Department chose
publicly available information from its surrogate country, India, when available and appropriate,
to value the factors of production.

Interested parties submitted comments regarding the appropriate sources for surrogate value data.
On August 24, 2010, Since Hardware (Guangzhou) Co., Ltd. (Since Hardware), Foshan Shunde
Yongjian Housewares and Hardware Co., Ltd. (Foshan Shunde), and Home Products
International, Inc. (the Petitioner in this proceeding) submitted comments regarding the selection
of appropriate surrogate values for valuing the factors of production for these preliminary results.

The Department evaluated the comments received in choosing the surrogate values. The
Department has detailed the surrogate value information for each factor of production, packing
material, the financial ratios, and U.S. sales adjustments. In selecting the best available



information for valuing factors of production in accordance with section 773(c)(1) of the Tariff Act of 1930, as amended (the Act), the Department chose, to the extent practicable, surrogate values which are non-export average values, most contemporaneous with the period of review (POR), product-specific, and tax-exclusive. Each of the surrogate values calculated by the Department is set forth below. OVERHEAD, SG&A and PROFIT represent ratios. Factors denominated in U.S. dollars are proceeded by a $. All other factors are denominated in Indian Rupees.

**Surrogate Values for August 2008 – July 2009**

**Since Hardware**

| Description | HTS NUMBER | Surrogate Value | Variable Name |
|---|---|---|---|
| COLD ROLLED STEEL COIL | 720917 | 42.7478 | COSTEELSV |
| COLD ROLLED STEEL COIL | 720917 | 42.7478 | HOSTEELSV |
| STEEL WIRE ROD | 72139190 | 29.2862 | WIRERODSV |
| STAINLESS STEEL | 721934 | 135.1533 | STSTEELSV |
| PA RESIN | 39081090 | 144.8310 | PARESINSV |
| PE RESIN | 390110 | 60.1344 | PERESINSV |
| PPRESIN | 39021000 | 50.8441 | PVCRESINSV |
| PVC RESIN | 39042110 | 38.2793 | PA_FRESINSV |
| PA&F RESIN | 39081090 | 144.8310 | PP_FRESINSV |
| PP&F RESIN | 39023000 | 70.9505 | PUFOAMSV |
| PU FOAM | 39211310 | 212.2128 | PEFOAMSV |
| PE FOAM | 39211900 | 269.2391 | COFABRICSV |
| COTTON FABRIC | 52085290 | 683.2530 | COTHREADSV |
| TERLENE FABRIC | 58079090 | 661.7672 | COROPESV |
| COTTON THREAD | 52041110 | 1153.0820 | COSTRIPSV |
| COTTON ROPE | 56079020 | 83.7832 | TESTRIPSV |
| COTTON FIXING STRIPS | 56079090 | 30.1968 | COSTRIPSV |
| TERLYENE FIXING STRIPS | 56075090 | 247.1783 | TESTRIPSV |
| PP FIXING STRIPS | 56074900 | 328.5669 | PPSTRIPSV |
| ELASTIC ROPE | 56041000 | 277.7817 | ELROPESV |
| PLYWOOD | 44129990 | 982.1442 | PLYWOODSV |
| GRAINED PAPER | 48114900 | 101.2199 | GRPAPERSV |
| PHOSPHATE | 28352990 | 128.5552 | PHOSPHATESV |
| HYDROCHLORIC ACID | 28061000 | 239.3243 | HYACIDSV |

2

| | | | |
|---|---|---|---|
| GLUE | 35069999 | 252.9073 | GLUESV |
| WELDING ROD | 83112000 | 325.4998 | WELDRODSV |
| PIGMENT | 32061110 | 105.5591 | PIGMENTSV |
| POWDER COATING | 32061110 | 105.5591 | COATINGSV |
| MURIATE OF POTASH | 28152000 | 62.2558 | MURIATESV |
| ZINC CHLORIDE | 28273990 | 77.6654 | ZINCCHLSV |
| ZINC INGOT | 79011200 | 73.5762 | ZINCINSV |
| BORIC ACID | 28100020 | 34.6327 | ROADIDSV |
| CHROMIUM ANHYDRIDE | 28191000 | 154.8286 | CHANHYDSV |
| NICKEL DICHLORIDE | 28273500 | 201.2482 | NIDICHLSV |
| NICKEL SALT | 28332400 | 200.1403 | NISALTSV |
| NICKEL SOFTENING AGENT | 38151100 | 622.9612 | NIAGENTSV |
| NUBBLY NICKEL | 75011000 | 711.5478 | NUNIKELSV |
| RUBBER PART | 40169990 | 331.2546 | RUBBERSV |
| SILICA GEL PART | 38249025 | 69.5196 | SILICASV |
| PLASTIC BEAD | 39264029 | 63.4651 | BEADSV |
| ELECTRICAL WIRE/PLUG | 853669 | 184.6479 | ELEPLUGSV |
| ZINC CLIP | 73182910 | 142.6975 | ZINCCLIPSV |
| LOCKER WASHER | 73182100 | 163.8529 | LOCKERSV |
| SPRING | 73202000 | 259.9641 | SPRINGSV |
| TAPPING SCREW | 73181400 | 204.6951 | TASCREWSV |
| STAPLE | 73170091 | 147.0485 | STAPLESV |
| BOLT | 73181500 | 136.8946 | BOLTSV |
| NUT WITH CAP | 73181600 | 148.9174 | NUCAPSV |
| NUT | 73181600 | 148.9174 | NUTSV |
| STEEL CAP | 73182990 | 175.0803 | STCAPSV |
| NAIL | 73170019 | 188.2901 | NAILSV |
| ALUMINIUM NAIL | 76161000 | 183.0726 | ALNAILSV |
| AXE | 73182990 | 175.0803 | AXESV |
| FIBERBOARD | 4411 | 21.9476 | FIBOARDSV |
| RIVET | 73182300 | 104.7262 | RIVETSV |
| DIRECT LABOR | NA | $1.0717 | DIRLABSV |
| INDIIRECT LABOR | NA | $1.0717 | INDIRLABSV |
| PACKING LABOR | NA | $1.0717 | PAKLABSV |
| ELECTRICITY | NA | 3.7999 | ELECSV |
| WATER | NA | 0.0159 | WATERSV |
| DIESEL OIL | NA | 36.0569 | DIEOILSV |

3

| | | | |
|---|---|---|---|
| ARGON | 28042100 | 26.9387 | ARGONSV |
| RECOVERED STEEL SCRAP | 72044100 | 17.4026 | STESCRAPSV |
| STAINLESS STEEL SCRAP | 72042190 | 75.4274 | STASCRAPSV |
| CARTON &CORR PAPER | 48191090 | 112.7872 | CARTONSV |
| PE SHEET | 39269099 | 235.1926 | PESHEETSV |
| PLASTIC STRIP | 56074100 | 192.9714 | PLSTRIPSV |
| ADHESIVE TAPE | 39191000 | 278.0005 | TAPESV |
| LABEL | 48211020 | 139.3353 | LABELSV |
| INSTRUCTION BOOK | 49011020 | 132.1017 | INSBOOKSV |
| PS FOAM | 39211100 | 186.0790 | PSFOAMSV |
| DESICCANT(SILICA GEL) | 28112200 | 67.6201 | DESICSV |
| BROKERAGE | NA | $[    ] | BROKERAGESV |
| INL FREIGHT | NA | 0.0018 | INLTRKFRSV |
| OVERHEAD | NA | 0.0971 | OVRHDSV |
| SG&A | NA | 0.2814 | SGASV |
| PROFIT | NA | 0.2205 | PROFTSV |

## Foshan Shunde

| Description | HTS Number | Surrogate Value | Variable Name |
|---|---|---|---|
| COLD ROLLED STEEL COIL | 720917 | 42.7478 | WHITEANNNEALSV |
| STEEL WIRES | 72171010 | 67.2345 | STEELWIRESV |
| COLD ROLLED STEEL COIL | 720917 | 42.7478 | BLACKANNEALSV |
| COTTON FABRIC | 521051 | 761.8985 | TCFABRICSV |
| OTHER COTTON FABRIC | 520832 | 455.8675 | DYECOTTONCLOTHSV |
| DYED COTTON FABRIC | 52085290 | 683.2530 | PRINTCOTTONCLOTHSV |
| OTHER COTTON FABRIC | 520832 | 455.8675 | TEFLONFABRICSV |
| POLYURETHENES EXPANDABLE | 39095000 | 210.6856 | PUFOAMSV |
| POLYSTERENE | 39031100 | 71.3291 | PEFOAMSV |
| NYLON LABEL BADGES | 58071020 | 322.6683 | NYLONLABELSV |
| CARBON DIOXIDE | 28112190 | 415.7679 | CARBONDIOXIDESV |
| NATURAL GAS | 27111100 | 14.266 | NATURALGASSV |
| ARGON GAS | 28042100 | 26.9387 | ARGONGASSV |
| ACETYLENE | 29012910 | 43.424 | ACETYLENESV |
| WELDING WIRE | 831130 | 416.0427 | WELDINGWIRESV |

4

| | | | |
|---|---|---|---|
| OTHER STOPPERS | 39235090 | 187.2884 | PEPARTSV |
| PLASTIC PARTS | 39269099 | 235.1926 | PVCPARTSV |
| POLYESTER RESINS | 39079120 | 108.6741 | POWDERCOATINGSV |
| DEGREASING AGENTS | 340290 | 123.2448 | DEGREASINGAGENTSV |
| OTHER PHOSPHATES | 28352990 | 128.5552 | PAGENTSV |
| PHOSPHORIC ACID | 28092010 | 47.8143 | PHOSPHORICACIDSV |
| SULPHURIC ACID | 28070010 | 3.2613 | VITRIOLICACIDSV |
| HYDROCHLORIC ACID | 28061000 | 239.3243 | HYDROCHLORICACIDSV |
| DIRECT LABOR | NA | $1.0717 | DIRLABSV |
| INDIIRECT LABOR | NA | $1.0717 | INDIRLABSV |
| PACKING LABOR | NA | $1.0717 | PACKLABSV |
| ELECTRICITY | NA | 3.799 | ELECTRICITYSV |
| WATER | NA | 0.0159 | WATERSV |
| RECOVERED STEEL SCRAP | 72044100 | 17.4026 | STESCRAPSV |
| CORRUGATED PAPER | 48081000 | 94.2659 | CORRUGATEDPAPERSV |
| SILICON DIOXIDE | 28112200 | 67.6201 | DESICCANTSV |
| ADHESIVE TAPE | 39191000 | 278.0005 | ADHESIVETAPESV |
| NYLON ROPE | 56075040 | 288.5767 | NYLONROPESV |
| POLYSTYRESENE SHEET | 390760 | 49.5324 | POLYSTYRENESHEETSV |
| ADHESIVE LABEL | 48211020 | 139.3353 | ADHESIVELABEL1SV |
| LABEL | 48211020 | 139.3353 | LABELSV |
| ADHESIVE LABEL2 | 48211020 | 139.3353 | ADHESIVELABEL2SV |
| PAPER IN SHEETS | 48059100 | 130.4788 | PAPERSV |
| CARTONS | NA | $[   ] | CARTONSV |
| RIVETS | 73182300 | 104.7262 | RIVET2SV |
| NUTS | 73181600 | 148.9174 | NUTSV |
| BOLT | 73181500 | 136.8946 | BOLTSV |
| RIVETS | 73182300 | 104.7262 | RIVETSV |
| SPRINGS | 73202000 | 259.9641 | SPRINGSV |
| WASHERS | 73182100 | 163.8529 | MESONSV |
| COTTER PIN | 73182400 | 333.7291 | CTERPNSV |
| HELICAL SPRINGS | 73202000 | 259.9641 | SPRING1SV |
| RIVETS | 73182300 | 104.7262 | RIVET3SV |
| NYLON THREAD | 54011000 | 222.6937 | NYLONTHREADSV |
| COTTON THREAD | 52041110 | 1153.082 | COTTONTHREADSV |
| BROKERAGE | NA | $[   ] | BROKERAGESV |
| INL FREIGHT | NA | 0.0018 | INTLRKFRSV |
| OVERHEAD | NA | 0.0971 | OVRHDSV |

5

| SG&A | NA | 0.2814 | SGASV |
| PROFIT | NA | 0.2205 | PROFTSV |

### I.    Wholesale Price Index Adjustors

Where publicly available information contemporaneous with the POR could not be obtained to value the factors, surrogate values were adjusted using the Wholesale Price Index (WPI) rate as published in the *International Financial Statistics* (*IFS*) of the International Monetary Fund (IMF). The average Indian WPI for the POR is 120.7833. *See* Attachment 1.

### II.    Indian Import Statistics Published By Global Trade Atlas

Unless indicated otherwise, we valued direct materials and packing materials using publicly available import prices from the Global Trade Atlas, published by Global Trade Information Services, Inc., which is a secondary electronic source that republishes the import prices reported in the Monthly Statistics of the Foreign Trade of India, Volume II: Imports ("MSFTI") for the POR, as published by the Directorate General of Commercial Intelligence and Statistics of the Ministry of Commerce and Industry, Government of India. *See* http://www.gtis.com/wta.htm.

For each input value, we used the weighted-average value per unit for that input imported into India from all countries, with three exceptions. First, imports from all countries that the Department has previously determined to be NME countries were excluded from the average. Second, import statistics from countries the Department has determined to subsidize exports (*i.e.,* Indonesia, South Korea and Thailand) were excluded from the calculation of average value. *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers from the People's Republic of China,* 69 FR 20594 (April 16, 2004). Finally, imports that were labeled as originating from an "unspecified" country were excluded from the weighted-average value, because the Department could not determine whether the imports were from either an NME country or a country with generally available export subsidies.

### III.    Exchange Rate Conversion

Indian surrogate values denominated in foreign currency were converted to U.S. dollars (USD) using the applicable exchange rate for India on the date of the U.S. sale. The exchange rates for each date in the POR were taken from the Department's website: http://www.trade.gov/ia/.

### IV.    Factors of Production

### A.    Material Inputs

The Department has detailed the surrogate value information for each factor of production, packing material, financial ratio, and U.S. sale adjustment in one worksheet. *See* Attachment 2.

6

For every factor of production, packing material, financial ratio, and U.S. sales adjustment, the summary worksheet in Attachment 1 details the Harmonized Tariff Schedule (HTS) classification, the source of the data, the time period of data, the source value, the currency of the source value, the source value unit of measure, the inflator, the POR-adjusted price, and the unit of measure of the POR-adjusted price.

For the following inputs the Department valued each material input or packing material by the following HTS classifications, using cumulative Indian imports from the MSFTI. All surrogate values listed below are reported on a rupees/kilogram basis:

## C.    Market-Economy Purchases

Foshan Shunde reported that it made market-economy purchases (MEP) of cartons during the POR. Because Foshan Shunde purchased more than 33 percent of its total volume of this particular input from a market economy supplier, we used the market economy price paid for that material to value this input. *See* Foshan Shunde's November 20, 2009 questionnaire response at Exhibit D-2.) During the POR, Since Hardware made no purchases from market economy suppliers. *See* Since Hardware's December 1, 2009 at Appendix D-6.

## V.    Direct, Indirect and Packing Labor

For direct, indirect, and packing labor, pursuant to a recent decision by the Federal Circuit, we have calculated an hourly wage rate to use in valuing Foshan Shunde's and Since Hardware's reported labor input by averaging earnings and/or wages in countries that are economically comparable to the PRC and that are significant producers of comparable merchandise. *See Dorbest Ltd. v. United States*, 2009-1257 at 20 (Fed. Cir. 2010). Because this wage rate does not separate labor rates into different skill levels or types of labor, the Department has applied the same wage rate to all skill levels and types of labor reported by either Foshan Shunde or Since Hardware.   We calculated a wage rate of $1.0717 for the POR. *See* Attachment 4.

## VI.    Electricity

The Department valued electricity using the updated electricity price data for small, medium, and large industries, as published by the Central Electricity Authority, an administrative body of the Government of India, in its publication titled Electricity Tariff & Duty and Average Rates of Electricity Supply in India, dated March 2008. These electricity rates represent actual, country-wide, publically-available information on tax-exclusive electricity rates charged to small, medium, and large industries in India. We did not inflate this value because utility rates represent current rates, as indicated by the effective dates listed for each of the rates provided. See Attachment 5.

## VII.   Diesel

We valued diesel fuel using the rates provided by the OECD's International Energy Agency's publication: *Key World Energy Statistics*. The prices are based on July 2007 prices in India for diesel. *See* Attachment 6.

## VIII.   Water

The Department valued water using data from the Maharashtra Industrial Development Corporation (MDIC) as it includes a wide range of industrial water tariffs. We used the average rate for industrial use from MDIC water rates at http://www.midcindia.org. *See* Attachment 7.

## VIX.   Factory Overhead, Selling General & Administrative (SG&A), and Profit

The Department relied upon publicly available information from the 2006-2007 financial statements for Infiniti Modules Limited (Infiniti Modules) financial statements to derived the surrogate overhead expenses; sell, general, and administrative expenses (SG&A); and profit ratios.

Petitioner placed on the record the Infiniti Modules 2006-2007 financial statements. *See* Petitioner's August 24, 2010 submission at attachment 1. Petitioner asserts that the Department should use Infiniti Modules 2006-2007 financial statements to derive financial ratios because Infiniti Modules produces merchandise comparable to ironing tables and because the Department has relied upon the financial statements of Infiniti Modules to derive financial ratios in all prior reviews of this proceeding.

Since Hardware placed upon the record the 2007-2008 financial statements of Omax Autos Limited (Omax). *See* Since Hardware August 24, 2010 submission at Appendix 1. Since Hardware asserts that the Department should use Omax's financial statements because Omax's product line closely resembles that of Since Hardware. *See* Since Hardware August 24, 2010 submission at page 2. Since Hardware further argued that the Department has used the financial statements of companies who receive countervailable subsidies where it has determined that alternative data is overly broad and not-industry specific. *Id.*

In this review, the Department finds the publicly available 2006-2007 Infiniti Modules audited financial statements represent the best source of financial ratio data. First, Infiniti Modules is a producer of comparable merchandise to the subject merchandise. Secondly, unlike Omax, Infiniti Modules received no countervailable subsidies. Therefore, for these preliminary results, the Department used the 2006–2007 Infiniti Modules financial statements to calculate the following overhead, SG&A, and profit ratios:

| | | |
|---|---|---|
| Factory Overhead Rate | = | 9.71% |
| SG&A Rate | = | 28.14% |

8

Profit Rate                  =      22.05%

## X.    Transportation and Handling

## A.    Foreign Inland Truck Freight

The Department valued truck freight expenses using a per-unit average rate calculated from data on the Infobanc web site: http://www.infobanccom/logistics/logtruck.htm. The logistics section of this web site contains inland freight truck rates between many large Indian cities. Since this value is not contemporaneous with the POR, the Department deflated the rate using the Wholesale Price Index of India. *See* Attachment 8.

## B.    Domestic Brokerage and Handling

The Department valued brokerage and handling using a price list of export procedures necessary to export a standardized cargo of goods in India. The price list is compiled based on a survey case study of the procedural requirements for trading a standard shipment of goods by ocean transport in India that is published in *Doing Business 2010: India*, by the World Bank. *See* Attachment 9.

## Attachments

1.    Inflators

2.    Factors of Production Spreadsheets

3.    Source Information for Surrogate Values

4.    Labor

5.    Electricity

6.    Diesel

7.    Water

8.    Foreign Inland Truck Freight

9.    Domestic Brokerage and Handling

Attachment 4
Labor

| Reporting Country | Reporting Countries Export Statistics (Partner Country: World) UDG: Tables and Chairs, HTS 9403.20 & 9403.90 Calendar Year: 2007 - 2009 | | | | |
|---|---|---|---|---|---|
| | United States Dollars | | | % Change 2009/2008 | Data Availability |
| | 2007 | 2008 | 2009 | | |
| Albania | $1,829,741 | $1,524,746 | $1,374,639 | -22.76 | 01/90 - 12/09 |
| Belize | $3,409 | $0 | $0 | -21.7 | 01/99 - 12/09 |
| Bolivia | $939,823 | $1,005,333 | $570,057 | -22.98 | 01/97 - 12/09 |
| Cape Verde | $5,880 | $0 | $0 | -4.96 | 01/99 - 12/09 |
| Ecuador | $997,986 | $1,133,705 | $603,828 | -42.83 | 01/97 - 12/09 |
| Egypt | $632,824 | $3,298,485 | $0 | -35.39 | 01/02 - 12/09 |
| El Salvador | $2,154,555 | $4,483,048 | $4,002,902 | -36.55 | 01/99 - 12/09 |
| Fiji | $6,925 | $0 | $0 | 15.32 | 01/97 - 12/09 |
| Guatemala | $2,428,365 | $2,680,187 | $1,969,438 | -3.01 | 01/96 - 12/09 |
| Guyana | $20,942 | $15,599 | $0 | -34.79 | 01/00 - 12/09 |
| India | $10,104,951 | $11,261,790 | $13,000,893 | -58.49 | 01/98 - 12/09 |
| Indonesia | $58,829,095 | $57,854,345 | $59,839,054 | -10.71 | 01/05 - 12/09 |
| Jordan | $5,008,596 | $6,126,691 | $3,921,718 | -10.33 | 01/98 - 12/09 |
| Maldives | $25 | $0 | $0 | -0.85 | 01/02 - 12/09 |
| Mongolia | $941 | $0 | $0 | -54.39 | 01/98 - 12/09 |
| Morocco | $26,318,759 | $21,111,530 | $18,287,270 | -81.6 | 01/99 - 12/09 |
| Nicaragua | $448,237 | $660,705 | $252,108 | 100.39 | 01/99 - 12/09 |
| Nigeria | $44,625 | $5,107 | $0 | 246.4 | 01/98 - 12/09 |
| Paraguay | $328,558 | $622,956 | $178,705 | -93.27 | 01/00 - 12/09 |
| Peru | $2,278,438 | $3,742,503 | $882,814 | 581.08 | 01/99 - 12/09 |
| Philippines | $27,478,632 | $25,282,457 | $29,156,344 | | 01/98 - 12/07 |
| Samoa (Western) | $3,788 | $1,224 | $0 | | 01/98 - 12/08 |
| Sri Lanka | $1,537,124 | $1,840,977 | $1,650,790 | | 01/98 - 12/08 |
| Sudan | $0 | $16,740 | $0 | | 01/98 - 12/08 |
| Swaziland | $19,425 | $0 | $0 | | 01/98 - 12/08 |
| Syria | $3,141,874 | $0 | $0 | | 01/98 - 12/08 |
| Thailand | $127,113,374 | $128,865,041 | $75,552,227 | | 01/98 - 12/08 |
| Tunisia | $14,115,843 | $12,681,469 | $8,040,505 | | 01/00 - 12/08 |
| Ukraine | $24,914,940 | $33,616,790 | $31,058,682 | | 01/00 - 12/07 |

¹Export Data reported in the Global Trade Atlas, as published by GTIS.

Reporting Countries Export Statistics (Partner Country: World)
Commodity: 630110, Electric Blankets, Of Textile Materials

| Reporting Country | Calendar Year: 2007 - 2009 United States Dollars | | | Wage Rate Data (Retrieved from Wage Rate Master List for PRC) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | Reported Year | Earnings | NC/Hour | CPI Inflator | Inflated | Exchange Rate NC/USD | USD/Hour | GNI |
| eporting Total | | | | | | | | | | | |
| lbania | 0 | 1 | 0 | 2006 | 19,750.00 | 102.86 | 1.03 | 105.88 | 90.43 | $ 1.17 | 3,360 |
| olombia | 20339 | 993 | 6156 | 2007 | 694,244.00 | 3,615.85 | 1.00 | 3,615.85 | 2,078.29 | $ 1.74 | 4,100 |
| cuador | 10 | 18252 | 0 | 2004 | 370.60 | 1.93 | 1.08 | 2.08 | 1.00 | $ 2.08 | 3,150 |
| uatemala | 236 | 50 | 25 | 2006 | 1,581.00 | 8.23 | 1.06 | 8.77 | 7.67 | $ 1.14 | 2,470 |
| dia | 895964 | 414263 | 171082 | 2006 | 3,525.87 | 18.36 | 1.05 | 19.25 | 41.35 | $ 0.47 | 950 |
| idonesia | 7037193 | 9472003 | 7300791 | 2007 | 836336.99 | 4355.92 | 1.00 | 4,355.92 | 9141.00 | $ 0.48 | 1,650 |
| forocco | 0 | 1963 | 1048 | *Wage or Earning Data Not Available | | | | | | | |
| amibia | 7735 | 1417 | NA | *Wage or Earning Data Not Available | | | | | | | |
| icaragua | 6 | 0 | 0 | 2006 | 13.90 | 13.90 | 1.11 | 15.45 | 18.45 | $ 0.84 | 990 |
| eru | 1806 | 3200 | 0 | 2007 | 3.41 | 3.41 | 1.00 | 3.41 | 3.13 | $ 1.09 | 3,340 |
| hilippines | 0 | 0 | 9180 | 2003 | 11166 | 58.16 | 1.25 | 72.41 | 46.15 | $ 1.57 | 1,600 |
| ri Lanka | 347 | 0 | 0 | 2007 | 45.36 | 45.36 | 1.00 | 45.36 | 110.62 | $ 0.41 | 1,540 |
| waziland | 127 | NA | NA | *Wage or Earning Data Not Available | | | | | | | |
| hailand | 102405 | 13569 | 2956 | 2003 | 6432.20 | 33.50 | 1.15 | 38.50 | 34.52 | $ 1.12 | 2,660 |
| unisia | 152407 | 40144 | NA | *Wage or Earning Data Not Available | | | | | | | |
| kraine | 0 | 820 | 0 | 2007 | 1,456.40 | 7.59 | 1.00 | 7.59 | 5.05 | $ 1.50 | 2,570 |
| s Code: 630110 | | | | Surrogate Country List: India - Colombia | | | | | Average USD/Hour= | $ 1.13 | |

A0944

2005

Please Note That the CPI 08 Is An Example for a Case With a Period that Primarily Covers 08. The Annual CPI To Calculate the Inflator Depends on Your Period.
Also, please note that the exchange rate used is for 2008. The exchange rate will vary by case.

| Country Name | GNI | CODE COUNTRY | CURRENCY | Reported | Earnings/Wage | NC/Hour* | CPI Reporting Year* | CPI 09** | CPI Inflator | Inflated | Exchange Rate NC/USD | USD/Hour |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Albania | 3840 | AL | Lek | 2006 | 19750.00 | 102.86 | 102.4 | 111.3 | 1.09 | 111.68 | 95.0 | $1.18 |
| Ecuador | 3690 | EC | US dollar | 2004 | 370.60 | 1.93 | 97.6486 | 120.1 | 1.23 | 2.37 | 1.00 | $2.37 |
| Egypt, Arab Rep. | 1800 | EG | Pound | 2007 | 220.00 | 5.00 | 117.676 | 155.6 | 1.32 | 6.61 | 5.54455 | $1.19 |
| El Salvador | 3480 | SV | US dollar | 2008 | 1.58 | 1.58 | 116.1 | 117.321 | 1.01 | 1.60 | 1.0 | $1.60 |
| Fiji | 3930 | FJ | Dollar | 2004 | 18.95 | 2.37 | 97.7 | 120 | 1.23 | 2.91 | 2.0 | $1.49 |
| Guatemala | 2680 | GT | Quetzal | 2008 | 2737.21 | 14.26 | 127.6 | 130.0 | 1.02 | 14.52 | 8.2 | $1.78 |
| Guyana | 1450 | GY | Dollar | 2007 | 47150.00 | 245.57 | 116.7 | 133.2 | 1.11 | 273.20 | 204.0 | $1.34 |
| India | 1040 | IN | Rupee | 2006 | 3525.87 | 18.36 | 105.769 | 135.2 | 1.28 | 23.47 | 48.4 | $0.48 |
| Indonesia | 1880 | ID | Rupiah | 2007 | 838336.99 | 4365.92 | 120.3 | 138.5 | 1.15 | 5,015.90 | 10389.9 | $0.48 |
| Iran, Islamic Rep.** | 3540 | IR | Rial | 2002 | 1189054.00 | 6196.11 | 66.0 | 187.0 | 2.83 | 17,584.44 | 9964.3 | $1.76 |
| Jordan | 3470 | JO | Dinar | 2007 | 237.00 | 1.23 | 112.0 | 127.8 | 1.14 | 1.41 | 0.7 | $1.96 |
| Mongolia | 1670 | MN | Tughriks | 2007 | 160200.00 | 834.38 | 114.6 | 152.3 | 1.33 | 1,106.97 | 1437.8 | $0.77 |
| Nicaragua | 1080 | NI | Córdoba | 2005 | 13.00 | 13.90 | 100.1 | 150.7 | 1.36 | 19.19 | 20.3 | $0.94 |
| Paraguay | 2110 | PY | Guaraní | 2003 | 816428.00 | 4252.23 | 89.7 | 133.9 | 1.49 | 6,346.00 | 4955.4 | $1.28 |
| Peru | 3990 | PE | Nuevo sol | 2008 | 3.61 | 3.61 | 109.825 | 113.1 | 1.03 | 3.72 | 3.0 | $1.23 |
| Philippines | 1890 | PH | Peso | 2003 | 11186.00 | 58.16 | 87.7 | 123.3 | 1.41 | 81.77 | 47.7 | $1.71 |
| Sri Lanka | 1780 | LK | Rupee | 2007 | 45.36 | 45.36 | 127.5 | 161.5 | 1.27 | 57.50 | 114.9 | $0.50 |
| Thailand | 3670 | TH | Baht | 2003 | 6432.20 | 33.50 | 93.1 | 111.9 | 1.20 | 40.26 | 34.3 | $1.17 |
| Ukraine | 3210 | UA | Hryvnia | 2008 | 1848.96 | 9.63 | n.a. | 15.9 | n.a. | 13.97 | 7.8 | $1.79 |

*National Currency per Hour.

**2008 GNI per capita, Atlas Method (current US dollars), as reported by the World Bank.
2008.

^Because the IMF's International Financial Statistics does not report a CPI for Ukraine, we have used the CPI % Over Previous Period for 2008 to inflate the wage rate. The formula is Wage Rate * (1 + 2008 CPI %) *(1+2009 CPI %)

| Country | Rate $ |
|---|---|
| India | 0.48 |
| Indonesia | 0.48 |
| Peru | 1.28 |
| Philippines | 1.23 |
| Thailand | 1.17 |
| Ukraine | 1.79 |

Average
1.07166667